# Exhibit 8

```
 1                 UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION


 3


 4    ROBERT LANG,


 5
              PLAINTIFF,
 6
          -VS-                    DOCKET NO. 1:21-CV-04196-ELR
 7
                                  VOLUME 2 OF 7
 8                                (PAGES 237 - 495)
      SIG SAUER, INC.,
 9


10            DEFENDANT.


11


12              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                BEFORE THE HONORABLE ELEANOR L. ROSS
13                 UNITED STATES DISTRICT JUDGE
                        JUNE 12, 2024
14


15    APPEARANCES:


16    ON BEHALF OF THE PLAINTIFF:


17          ROBERT ZIMMERMAN, ESQ.
            RYAN D. HURD, ESQ.
18          MATTHEW PRESTON BONHAM, ESQ.


19


20    ON BEHALF OF THE DEFENDANT:


21          KRISTEN ELIZABETH DENNISON, ATTORNEY AT LAW
            BRIAN KEITH GIBSON, ESQ.


22


23


24    ELIZABETH G. COHN, RMR, CRR
      OFFICIAL COURT REPORTER
25    UNITED STATES DISTRICT COURT
      ATLANTA, GEORGIA
```

```
 1                      I N D E X

 2                                            PAGE

 3   VOIR DIRE                                 30

 4

 5   OPENING STATEMENT

 6   BY MR. ZIMMERMAN                          273

 7   BY MS. DENNISON                           305

 8

 9   WITNESS

10   SEAN TONER

11   DIRECT EXAMINATION BY MR. ZIMMERMAN       340

12   CROSS-EXAMINATION BY MS. DENNISON         442

13   REDIRECT EXAMINATION BY MR. ZIMMERMAN     479

14   RECROSS-EXAMINATION BY MS. DENNISON       488

15

16   ROBERT BRYAN LANG

17   DIRECT EXAMINATION BY MR. HURD            505

18   CROSS-EXAMINATION BY MR. GIBSON           560

19   REDIRECT EXAMINATION BY MR. HURD          598

20   RECROSS-EXAMINATION BY MR. GIBSON         602

21

22   MICHAEL QUACKENBUSH

23   DIRECT EXAMINATION BY MR. BONHAM          605

24   CROSS-EXAMINATION BY MR. GIBSON           630

25
```

1              THANK YOU.

2              THE COURT:  THANK YOU.

3              ALL RIGHT.  LADIES AND GENTLEMEN, ALTHOUGH I TOLD YOU

4    THAT WE MAY GO TO LUNCH NOW, WE FINISHED OPENINGS A LITTLE

5    EARLIER THAN I THOUGHT.  SO LET ME TURN MY ATTENTION TO

6    PLAINTIFF.

7              ARE YOU READY TO CALL YOUR FIRST WITNESS?

8              MR. ZIMMERMAN:  I AM, YOUR HONOR, IF I COULD JUST

9    HAVE A BRIEF TWO-MINUTE BATHROOM BREAK.

10             THE COURT:  CERTAINLY.

11             ALL RIGHT.  IF YOU-ALL WOULD GO BACK TO THE JURY ROOM

12   FOR JUST A MINUTE.  WE'LL AT LEAST GO AHEAD AND GET STARTED.

13   WE PROBABLY WON'T FINISH THIS WITNESS BEFORE WE BREAK FOR

14   LUNCH.  LEAVE YOUR PADS OUT HERE.  DON'T DISCUSS THE CASE.

15             THANK YOU SO MUCH, LADIES AND GENTLEMEN.

16             (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

17   11:49 A.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

18             THE COURT:  ALL RIGHT.  WE'LL TAKE A QUICK BREAK.

19             BEFORE WE DO, LET ME JUST SAY, WHILE THE OPENING WAS

20   TAKING PLACE, AS I WAS LISTENING, I WAS ALSO LOOKING BACK AT

21   THE MOTIONS IN LIMINE DEALING WITH THE COMPLIANCE AND OTHER

22   ISSUES THAT I THINK YOU WERE GETTING AT FOR THE OPENING OF THE

23   DOOR.

24             I'M NOT SURE THAT I STILL FULLY UNDERSTAND YOUR

25   ARGUMENT, BUT I HAVE REVIEWED MY NOTES ON EVERYTHING.  SO IF

1   YOU NEED TO RAISE AN ISSUE AGAIN RELATED TO THAT, I'D ASK THAT

2   YOU DO SO AFTER -- WELL, WE'LL DO IT ONCE WE COME BACK FROM

3   LUNCH IF YOU NEED TO GO INTO THAT WITH A WITNESS.

4           MS. DENNISON:  THANK YOU.

5           THE COURT:  THANK YOU SO MUCH.  WE'LL TAKE A BREAK

6   AND COME BACK AND CALL OUR FIRST WITNESS.

7           (WHEREUPON, A BRIEF RECESS WAS HAD FROM 11:50 A.M. TO

8   11:56 A.M.)

9           THE COURT:  ARE YOU-ALL READY FOR THE JURY TO COME

10  IN?

11          YOU READY FOR THE JURY?

12          MR. ZIMMERMAN:  YES, YOUR HONOR.

13          THE COURT:  OKAY.  OKAY.

14          MR. ZIMMERMAN:  YOUR HONOR, HOW LONG BEFORE LUNCH?

15          THE COURT:  IT JUST DEPENDS.  NO SET STANDARD.  IF

16  YOU ARE -- IF YOU WANT TO SUGGEST AN APPROPRIATE BREAKING POINT

17  THAT YOU KNOW YOU'RE IN -- AT IN YOUR EXAMINATION, I'M AMENABLE

18  TO THAT.

19          MR. ZIMMERMAN:  THANK YOU.

20          THE COURTROOM SECURITY OFFICER:  ALL RISE.

21          (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

22  11:57 A.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

23          THE COURT:  ALL RIGHT.  THE JURY IS SEATED.  EVERYONE

24  ELSE MAY BE SEATED.

25          LADIES AND GENTLEMEN -- I THINK THAT'S ALL OF YOU.

1    YEAH.  WE ARE GOING TO GO AHEAD AND GET STARTED.  MY HOPE IS

2    THAT WE CAN GO AT LEAST ABOUT 30 MINUTES, BUT I HAVE TOLD

3    COUNSEL THAT IF HE GETS TO A CERTAIN POINT IN HIS EXAMINATION

4    THAT HE FEELS IS A GOOD STOPPING POINT, TO LET THE COURT KNOW.

5            SO LET ME GO AHEAD AND TURN MY ATTENTION TO PLAINTIFF

6    AND ASK YOU TO CALL YOUR FIRST WITNESS, PLEASE, SIR.

7            MR. ZIMMERMAN:  THANK YOU, YOUR HONOR.  WE'RE JUST

8    SETTING UP TO MAKE SURE THAT WE'RE HOOKED IN.  BUT IN THE

9    MEANTIME, WE'RE GOING TO CALL SEAN TONER.

10           THE COURT:  ALL RIGHT.

11           COME ON UP, SIR, AND I WILL SWEAR YOU IN.

12           GOOD MORNING TO YOU.

13           MR. TONER:  GOOD MORNING.

14           THE COURT:  IF YOU WILL RAISE YOUR RIGHT HAND FOR ME.

15                           **SEAN TONER,**

16   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

17   FOLLOWS:

18           THE COURT:  ALL RIGHT.  IF YOU WOULD TAKE THE WITNESS

19   SEAT, PLEASE.  AND ONCE YOU ARE SEATED COMFORTABLY, SIR, IF YOU

20   WOULD FIRST STATE YOUR FIRST AND LAST NAMES AND THEN SPELL YOUR

21   NAMES FOR THE RECORD.

22           THE WITNESS:  YES.  MY NAME IS SEAN TONER, S-E-A-N,

23   T-O-N-E-R.

24           MR. ZIMMERMAN:  MAY I PROCEED, YOUR HONOR?

25           THE COURT:  I'M SORRY?

1          MR. ZIMMERMAN:  MAY I PROCEED?

2          THE COURT:  YES.

3                    DIRECT EXAMINATION

4    BY MR. ZIMMERMAN:

5    Q.   MR. TONER, YOU ARE NOW THE LEAD DESIGNER FOR THE SIG SAUER

6    P320?

7    A.   YES.  THAT'S CORRECT.

8    Q.   OKAY.  YOU WERE NOT THE LEAD DESIGNER WHEN IT WAS

9    ORIGINALLY DESIGNED; IS THAT CORRECT?

10   A.   SO WHEN I STARTED AT SIG SAUER, THE P320 PROGRAM HADN'T

11   STARTED.  SO WHEN I FIRST STARTED, I WAS WORKING DIFFERENT

12   PROJECTS.

13          THE COURT:  EXCUSE ME.

14          COUNSEL, PLEASE APPROACH FOR A SECOND.  IT'S OKAY.

15          (WHEREUPON, A CONFERENCE WAS HAD AT THE BENCH BETWEEN

16   THE COURT AND COUNSEL, OUT OF THE HEARING OF THE JURY AND THE

17   COURT REPORTER.)

18          MR. ZIMMERMAN:  MAY I MOVE THIS, YOUR HONOR?

19          THE COURT:  SURE.

20   BY MR. ZIMMERMAN:

21   Q.   SO, SIR, I HAD ASKED YOU IF YOU WERE THE LEAD DESIGNER

22   WHEN YOU STARTED.  LET ME ASK IT A LITTLE BIT DIFFERENTLY.

23          WHEN THE P320 CAME OUT, YOU WERE WITH THE COMPANY.

24   CORRECT?

25   A.   THAT'S CORRECT.

1   Q.   AND THERE WAS SOMEONE ELSE WHO WAS THE LEAD DESIGNER.

2   CORRECT?

3   A.   I WORKED ON A TEAM.  AND WE HAD A TEAM LEAD, BUT I WAS NOT

4   THE TEAM LEAD AT THAT TIME.

5   Q.   OKAY.  RIGHT.  ARE YOU AGREEING WITH ME THAT YOU WERE NOT

6   THE LEAD DESIGNER AT THE TIME IT CAME OUT, THE --

7   A.   I WAS A SENIOR DESIGN ENGINEER ON THE TEAM WORKING ON THE

8   PROJECT.

9   Q.   OKAY.  LET ME ASK IT DIFFERENT WAY, SIR.

10      WHO WAS THE LEAD DESIGNER OF THE P320 WHEN THAT PROJECT

11  CAME OUT?

12  A.   I GUESS YOU COULD CALL IT MY TEAM LEAD, THE LEAD DESIGNER,

13  WHICH WOULD BE MATT TAYLOR.

14  Q.   OKAY.  WOULD YOU CALL HIM THE LEAD OF THAT PROJECT, JUST

15  LIKE YOU CALLED YOURSELF THE LEAD NOW?

16  A.   YES.  HE WAS THE LEAD OF THE 320 TEAM.

17  Q.   THANK YOU.

18      SIR, IN ADDITION TO DESIGNING THE P320 WITH THE TEAM, YOU

19  ACTUALLY ISSUED A REPORT IN THIS CASE, DID YOU NOT?

20  A.   YES, I DID.

21  Q.   OKAY.  AND IN THAT REPORT, YOU CAME TO CONCLUDE CERTAIN

22  THINGS ABOUT MR. LANG'S INCIDENT.  CORRECT?

23  A.   YES.

24  Q.   OKAY.  AND YOU CONCLUDED THAT A FINGER OR A FOREIGN OBJECT

25  ULTIMATELY PULLED THE TRIGGER.

1   A.   YES.  I BELIEVE THAT THE TRIGGER WAS PULLED.

2   Q.   OKAY.  AND IN PERFORMING YOUR EVALUATION -- WERE YOU HERE

3   FOR THE OPENING STATEMENTS?

4   A.   NO, I WAS NOT.

5   Q.   OKAY.  THERE WERE STATEMENTS ABOUT EVIDENCE.

6        DID YOU EVER LOOK AT MR. LANG'S P320?

7   A.   NO, I DID NOT.

8   Q.   OKAY.  DID YOU EVER LOOK AT MR. LANG'S HOLSTER?

9   A.   NO, I DID NOT.

10  Q.   DID YOU EVER LOOK AT THE SPENT SHELL CASING THAT HAD A

11  DENT IN IT?

12  A.   NO, I DID NOT.

13  Q.   OKAY.  DID YOU LOOK AT MR. LANG'S CLOTHING TO DETERMINE

14  WHAT CLOTHING HE WAS WEARING AND WHAT WAS ON AND AROUND HIM ON

15  HIS RIGHT SIDE WHERE THAT GUN WAS IN THE HOLSTER?

16  A.   I DON'T BELIEVE SO, NO.

17  Q.   SIR, WE CAN AGREE THAT MR. LANG PURCHASED A CARRY SIZED

18  P320.  CORRECT?

19  A.   THAT IS MY UNDERSTANDING, YES.

20  Q.   OKAY.  AND THAT'S WHAT YOU WROTE IN YOUR REPORT.

21       NOW, WOULD YOU AGREE WITH ME THAT CUSTOMERS SHOULD SELECT

22  A PISTOL WITH THE FRAME DESIGNS THAT ARE DIRECTLY SUITED TO

23  THEIR NEEDS?

24  A.   I'M SORRY.  CAN YOU REPEAT THE QUESTION?

25  Q.   SURE.  WHEN SOMEONE'S PICKING A GUN, WOULD YOU AGREE THAT

1    THE CUSTOMER SHOULD SELECT THE PISTOL WITH THE FRAME DESIGN

2    THAT MEETS THEIR NEEDS?

3    A.   YES.   THE CUSTOMERS HAVE OPTIONS OF DIFFERENT MODELS THAT

4    WE PROVIDE TO THE PUBLIC THAT THEY CAN CHOOSE FROM FOR WHATEVER

5    REASONS THEY WANT TO PICK.

6    Q.   OKAY.   SIR, I'M GOING TO SHOW YOU, FOR IDENTIFICATION

7    PURPOSES, A DOCUMENT THAT WE'VE MARKED AS PLAINTIFF'S

8    EXHIBIT 82.

9         SIR, I'LL HAND YOU A PAPER COPY.

10        MR. ZIMMERMAN:  MAY I APPROACH, YOUR HONOR?

11        THE COURT:  YES.  AND YOU NEED NOT REQUEST GOING

12   FORWARD, BUT THANK YOU.

13   BY MR. ZIMMERMAN:

14   Q.   SIR, DOES THIS APPEAR TO YOU TO BE A PRODUCT CATALOG FOR

15   SIG SAUER?

16   A.   YES.  I BELIEVE THAT'S WHAT IT IS.

17   Q.   OKAY.

18        MR. ZIMMERMAN:  AND FOR THE RECORD, THIS IS TRIAL

19   EXHIBIT 82, BATES 279 TO 398.

20   BY MR. ZIMMERMAN:

21   Q.   I WANT TO DIRECT YOUR ATTENTION TO THE PAGE THAT SAYS

22   PAGE 9 ON IT, ON THE BOTTOM CORNER.  LET ME KNOW WHEN YOU'RE

23   THERE, SIR.

24   A.   OKAY.

25   Q.   ALL RIGHT, SIR.  NOW, DOES THIS SHOW THE SIZES AND TRIGGER

1    TIMES OF P320S IN OTHER SIG SAUER WEAPONS?

2    A.    YES.  IT'S A SNAPSHOT OF A FEW OF OUR DIFFERENT PRODUCTS.

3              MR. ZIMMERMAN:  YOUR HONOR, AT THIS TIME I WOULD SEEK

4    TO MOVE THIS PRODUCT CATALOG INTO EVIDENCE AS PLAINTIFF'S TRIAL

5    EXHIBIT 1.

6              THE COURT:  OKAY.  I'M SORRY.  I GOT A LITTLE

7    CONFUSED.  YOU REFERENCED PLAINTIFF'S 82 BEFORE.  WAS THAT FOR

8    MARKING IT AS -- IN TERMS OF DISCOVERY?

9              MR. ZIMMERMAN:  IDENTIFICATION ONLY.  IF YOU'D LIKE

10   ME TO REFER TO IT AS P-82 --

11             THE COURT:  I'D JUST LIKE YOU TO BE CONSISTENT --

12             MR. ZIMMERMAN:  SURE.

13             THE COURT:  -- SO THAT THE RECORD IS CLEAR.

14             MR. ZIMMERMAN:  FAIR ENOUGH, YOUR HONOR.

15             THE COURT:  HOW ARE YOU REFERENCING IT?

16             MR. ZIMMERMAN:  WE CAN ADMIT IT AS PLAINTIFF'S

17   EXHIBIT 82 IF YOU PREFER.

18             THE COURT:  IT'S NOT MY PREFERENCE.  IT'S JUST

19   WHATEVER IS CONSISTENT.  SO --

20             MR. ZIMMERMAN:  YES.  82.

21             THE COURT:  -- IT'S BETTER FOR 1 BECAUSE THIS IS YOUR

22   FIRST EXHIBIT.  BUT IF YOU'RE COMFORTABLE WITH 82, I'M FINE

23   WITH THAT.  JUST TELL ME HOW YOU WANT TO REFERENCE IT.

24             MR. ZIMMERMAN:  GO WITH 82, YOUR HONOR.

25             THE COURT:  82?

1          MR. ZIMMERMAN:  YES.

2          THE COURT:  ALL RIGHT.

3          ANY OBJECTION TO 82?

4          MS. DENNISON:  THIS WOULD BE ENTERED OVER THE

5   OBJECTIONS STATED EARLIER TO YOUR HONOR THIS MORNING.

6          THE COURT:  WITH RESPECT TO THE OPENING STATEMENTS,

7   THE OBJECTION WE DISCUSSED THEN?  OR I'M NOT SURE.

8          MS. DENNISON:  MAY WE APPROACH BRIEFLY?

9          THE COURT:  YES.  LET'S -- TALKED ABOUT A LOT OF

10  THINGS TODAY THUS FAR, AS WE DO EVERY DAY.

11          (WHEREUPON, A CONFERENCE WAS HAD AT THE BENCH BETWEEN

12  THE COURT AND COUNSEL, OUT OF THE HEARING OF THE JURY AND THE

13  COURT REPORTER.)

14          THE COURT:  OKAY.  WHICH WE ALREADY DISCUSSED.

15          OKAY.  THANK YOU SO MUCH.

16          ALL RIGHT.  OBJECTION IS OVERRULED.  IT'S ADMITTED.

17          MR. ZIMMERMAN:  MR. HURD, CAN YOU SHOW PAGE 9?

18  BY MR. ZIMMERMAN:

19  Q.   SO THIS IS THE 2017 CATALOG.  THERE WE GO.

20       ON THE LEFT-HAND SIDE, DO YOU SEE THE DIFFERENT SIZES OF

21  THE PISTOLS?

22  A.   YES.  THERE'S DIFFERENT MODELS AS WELL AS DIFFERENT SIZES.

23  Q.   OKAY.  AND AT THE VERY TOP, IT SAYS:  YOU WANT A PISTOL

24  WITH FRAME DIMENSIONS DIRECTLY SUITED TO YOUR NEEDS.

25          DOES IT NOT SAY THAT?

1    A.    YES, IT DOES.

2    Q.    OKAY.  AND FOR THE P320, YOU-ALL OFFER FULL SIZE, CARRY

3    VERSIONS, AND COMPACT.

4          DO YOU SEE THAT?

5    A.    THOSE ARE NOT P320S PICTURED ON THE PAGE.

6    Q.    DO YOU SEE THOSE SIZES, SIR?

7    A.    I DO SEE THE SIZES.

8    Q.    DO YOU OFFER THEM FOR THE P320?

9    A.    WE DO.

10   Q.    OKAY.  AND "CARRY," THAT MEANS WHAT?  CARRYING A WEAPON?

11   A.    NO.  IT REFERS TO THE SLIDE LENGTH AND THE CAPACITY

12   COMBINATION.

13   Q.    WHO CAME UP WITH THE TERM "CARRY" FOR THAT SIZE?

14   A.    I BELIEVE IT WAS PRODUCT MANAGEMENT.

15   Q.    OKAY.  DID THE CARRY VERSION OF THE P320 EVER HAVE A

16   TRIGGER SAFETY THAT WAS PERMITTED TO BE SOLD TO THE PUBLIC?

17   A.    I'M SORRY.  A TRIGGER SAFETY?  WHAT DO YOU REFER TO AS

18   THAT?

19   Q.    WE'VE MET MANY TIMES, HAVE WE NOT, SIR?

20   A.    WE HAVE.

21   Q.    OKAY.  AND TRIGGER SAFETY, AS WE'VE TALKED ABOUT BEFORE --

22   WE'LL START WITH THE TABBED TRIGGER.

23         YOU KNOW THAT IT PROTOTYPED THIS GUN WITH A TABBED

24   TRIGGER, CORRECT?

25   A.    YES, WE DID.

1   Q.   DID THAT EVER GO TO MARKET?

2   A.   NO, IT DIDN'T.  WE OFFERED IT AS AN OPTION, BUT WE NEVER

3   WENT INTO PRODUCTION WITH IT.

4   Q.   SO WHO DID YOU OFFER IT TO?

5   A.   IT WAS OFFERED AS AN OPTION FOR PEOPLE THAT WOULD WANT IT.

6   MAINLY LE, LAW ENFORCEMENT OFFICERS.

7   Q.   RIGHT.  BUT WHEN YOU SAY YOU OFFERED IT, COULD -- DID

8   ANYONE BUY IT?

9   A.   NOT TO MY KNOWLEDGE, NO.

10   Q.   WAS THERE EVER -- DO YOU KNOW WHAT AN SKU IS, SKU CODE, A

11   SKU?

12   A.   I KNOW WHAT A SKU IS, YES.

13   Q.   WHERE YOU SAY, THIS IS GOING TO BE THE PRODUCT NUMBER, SO

14   THAT WHEN SOMEONE PURCHASES IT, YOU KNOW WHAT PRODUCT THEY

15   PURCHASED?

16   A.   YES.  THAT'S HOW IT WORKS.

17   Q.   DID YOU EVER HAVE A SKU FOR A TABBED TRIGGER VERSION OF

18   THE P320?

19   A.   I DON'T RECALL THAT.

20   Q.   OKAY.  AND IF SOMEONE WERE TO SAY THAT THIS GUN WAS

21   AVAILABLE TO PURCHASE FOR THE FIRST THREE YEARS THIS WEAPON WAS

22   OUT ON THE MARKET WITH A TABBED TRIGGER, THAT WOULD BE

23   INCORRECT?

24   A.   IT WAS AVAILABLE AS AN OPTION FOR PEOPLE TO GET IF THEY

25   DESIRED IT.

1  Q.   COULD I GO TO THE STORE AND FIND ONE?

2  A.   I DON'T KNOW.  I DON'T HAVE AN ANSWER FOR THAT.

3  Q.   LET ME ASK YOU, SIR:  DO YOU KNOW OF ANY STORE IN THE

4  COUNTRY WHERE YOU SENT A GUN WITH A TABBED TRIGGER FOR SALE TO

5  THE PUBLIC?

6       CAN YOU NAME A SINGLE STORE?

7  A.   CAN YOU REPHRASE THAT?

8       ARE YOU TALKING ABOUT PRESENT DAY?

9  Q.   EVER.  HAVE YOU EVER SENT A P320 WITH A TABBED TRIGGER OUT

10  TO A GUN STORE FOR SALE?

11  A.   I DON'T KNOW THE ANSWER TO THAT QUESTION.

12  Q.   OKAY.  CAN YOU TELL ME WHETHER THERE WAS A SINGLE DAY THAT

13  SOMEONE COULD GO ON THE WEBSITE AND GO THROUGH THE PRODUCTS AND

14  ACTUALLY FIND A GUN WITH A TABBED TRIGGER?

15  A.   I BELIEVE THE WEBSITE COULD LIST THE TABBED TRIGGER AS AN

16  OPTION IN THE EARLY DAYS.

17  Q.   IN THE MARKETING.  CORRECT?

18  A.   I'M SORRY, SIR?

19  Q.   ON THE MARKETING, IN THE BROCHURES.

20       BUT DID THEY EVER ACTUALLY ALLOW IT TO BE SOLD TO THE

21  PUBLIC?

22  A.   I DON'T KNOW IF IT WAS ON THE WEBSITE OR NOT, BUT I KNOW

23  IT WAS IN BROCHURES.

24  Q.   OKAY.  SO IF YOU CAN'T BUY IT ON THE WEBSITE AND YOU CAN'T

25  GO INTO A GUN STORE TO PURCHASE IT, WHERE COULD CUSTOMERS FIND

1    THIS TABBED TRIGGER?

2    A.    SO WE SELL OUR PRODUCTS THROUGH DISTRIBUTORS.  SO AT THAT

3    TIME I WOULD ASSUME THEY WOULD TALK TO THE DISTRIBUTORS.

4    Q.    OKAY.  DID YOU SELL -- DID YOU GIVE ANY OF YOUR

5    DISTRIBUTORS P320S WITH TABBED TRIGGERS ON THEM?

6    A.    I DON'T KNOW THE ANSWER TO THAT QUESTION.

7    Q.    SIR, THE JURY WAS TOLD ABOUT PLAINTIFF'S EXPERT JAMES

8    TERTIN NEVER HAVING DESIGNED A STRIKER-FIRED PISTOL.

9         PRIOR TO YOUR JOINING THIS DESIGN TEAM FOR THE P320, HAD

10   YOU EVER DESIGNED A STRIKER-FIRED PISTOL?

11   A.    NO, NOT AT THAT TIME.  THIS WAS THE FIRST ONE.

12   Q.    OKAY.  AND HAVE YOU DESIGNED ANY SINCE?

13   A.    NOT FROM THE GROUND UP.  BUT I'VE WORKED ON OTHER PROJECTS

14   AT SIG WITH THE P365 PRODUCT LINE, WHICH IS A STRIKER-FIRED

15   PISTOL.

16   Q.    AND, SIR, MATT TAYLOR, THE PROJECT LEAD, HAD HE EVER

17   DESIGNED A STRIKER-FIRED PISTOL PRIOR TO THE P320?

18   A.    NOT TO MY KNOWLEDGE, NO.

19   Q.    DID ANYBODY ON THAT TEAM THAT SIG PUT TOGETHER EVER DESIGN

20   A STRIKER-FIRED PISTOL BEFORE THE P320?

21   A.    POSSIBLY, BUT NOT -- I DON'T KNOW THAT FOR SURE.

22   Q.    OKAY.  SIR, DID YOU COME HERE WITH ANY NAME ON THAT TEAM

23   WHO HAD EXPERIENCE DESIGNING A STRIKER SAFETY -- A STRIKER

24   PISTOL, I SHOULD SAY?

25   A.    I'M SORRY.  CAN YOU REPEAT THE QUESTION?

1    Q.    YEAH.  DID YOU COME HERE TODAY WITH THE NAME OF ANYBODY ON

2    THAT ORIGINAL DESIGN TEAM WHO HAD ANY EXPERIENCE DESIGNING A

3    STRIKER-FIRED WEAPON?

4    A.    BEFORE I JOINED SIG, THERE WERE SOME STRIKER-FIRED DESIGNS

5    THAT THEY WERE WORKING ON AS A PROTOTYPE.  AND SO THE PEOPLE

6    THAT WOULD HAVE BEEN WORKING ON THAT WOULD HAVE BEEN -- WERE

7    AVAILABLE FOR CONSULTATION.

8    Q.    AVAILABLE -- WERE THEY ON A TEAM?

9    A.    THEY'RE IN R&D, RESEARCH AND DEVELOPMENT.  BUT I DON'T

10   RECALL WHETHER THEY'RE ON THE SPECIFIC TEAM.

11   Q.    OKAY.  SO THEY WERE ON A TEAM WHO TRIED TO COME UP WITH A

12   STRIKER-FIRED DESIGN FOR SIG SAUER BUT THAT DIDN'T GO TO

13   MARKET.

14   A.    CORRECT.  THOSE ARE ONLY PROTOTYPES.  WE DECIDED NOT TO GO

15   IN THAT DIRECTION.

16   Q.    NOW, SIR, THE CARRY SIZED VERSION OF THE P320, DID THE

17   CARRY SIZED VERSION -- WE TALKED ABOUT THE TRIGGER SAFETIES.

18        DID THE CARRY SIZED VERSION EVER COME WITH A MANUAL

19   SAFETY -- MANUAL SAFETY MEANING THE THUMB SAFETY?

20   A.    I DON'T RECALL WHETHER THAT PARTICULAR MODEL HAD A THUMB

21   SAFETY OR NOT.  I DON'T BELIEVE WE DID HAVE A THUMB SAFETY ON

22   THAT ONE.

23   Q.    OKAY.  SO WHEN BRYAN LANG WENT TO PURCHASE A CARRY SIZED

24   P320 IN MARCH OF 2018, WAS HE ABLE TO PURCHASE ONE WITH A

25   TABBED TRIGGER SAFETY?

1   A.   I DON'T RECALL THE TIMELINE AS FAR AS WHEN WE STOPPED

2   OFFERING THE TABBED TRIGGER SAFETY, WHETHER IT WAS 2018 OR NOT.

3   I DON'T RECALL OR HAVE THAT KNOWLEDGE.

4   Q.   SIR, I THOUGHT YOU TESTIFIED BEFORE THAT YOU NEVER

5   ACTUALLY WENT TO MARKET WITH A P320 WITH A TABBED TRIGGER.

6        DID YOU NOT SAY THAT BEFORE?

7   A.   WE NEVER WENT TO PRODUCTION, BUT WE HAD IT OFFERED AS AN

8   AVAILABLE OPTION IF SOMEBODY WANTED IT.

9   Q.   SO IF I CALLED UP SIG AND SAID, HEY, THAT GUN THAT YOU

10  NEVER PUT IN PRODUCTION, I WANT ONE, SIG MAKES IT THAT WAY?

11  A.   SO I THINK PRIMARILY IT WOULD BE MORE ON THE CONTRACT SIDE

12  WITH LAW ENFORCEMENT OFFICERS.

13  Q.   OKAY.  NOT FOR SOMEONE LIKE BRYAN LANG?

14  A.   IF HE'S NOT A LAW ENFORCEMENT OFFICER, THEN I GUESS NOT.

15  Q.   OKAY.  COULD BRYAN LANG, IN 2018, HAVE GONE INTO HIS LOCAL

16  GUN SHOP HERE IN GEORGIA AND PURCHASED A P320 CARRY SIZE WITH A

17  MANUAL THUMB SAFETY?

18  A.   I DON'T BELIEVE WE HAD THAT AS AN OFFERING, NO.

19  Q.   YOU SAID "HAD."  DID YOU EVER HAVE A MANUAL THUMB SAFETY

20  AS AN OPTION FOR THE P320?

21  A.   YES.

22  Q.   HOW ABOUT FOR THE CARRY SIZE?

23  A.   I DON'T BELIEVE WE'VE EVER HAD A CARRY SIZE, WITH THE

24  EXCEPTION OF THE M18 COMMERCIAL, THAT WOULD FIT THAT

25  DESCRIPTION.

1    Q.   DID YOU DECIDE THAT THE CARRY VERSION WOULD NOT HAVE ANY

2    EXTERNAL SAFETIES OFFERED?

3         DID YOU PERSONALLY DECIDE THAT?

4    A.   NO, I DID NOT.

5    Q.   DID YOUR DESIGN TEAM DECIDE THAT CARRY VERSIONS OF THE

6    P320 WOULD NOT HAVE ANY EXTERNAL SAFETY AS AN OPTION?

7    A.   NO.  IT WOULDN'T HAVE BEEN A DESIGN DECISION.

8    Q.   SIR, GOING BACK TO MR. LANG'S INCIDENT, YOU NEVER

9    INSPECTED THE GUN.  CORRECT?

10   A.   THAT'S CORRECT.

11   Q.   NEVER INSPECTED THE HOLSTER.

12   A.   THAT'S CORRECT.

13   Q.   NEVER INSPECTED THE CLOTHES.

14   A.   THAT'S CORRECT.

15   Q.   NEVER INSPECTED THE SHELL CASING.

16   A.   THAT'S CORRECT.

17   Q.   OKAY.  DID YOU EVER SPEAK TO MR. LANG?

18   A.   NO, I HAVE NOT.

19   Q.   SIR, ARE YOU AWARE THAT SIG SAUER SELLS BLACKPOINT

20   HOLSTERS ON SIG'S WEBSITE?

21   A.   YES, I AM.

22   Q.   AND THOSE ARE KYDEX HOLSTERS?

23   A.   FROM MY UNDERSTANDING, YES.

24   Q.   DO YOU KNOW WHAT TYPE OF HOLSTER MR. LANG HAD AT THE TIME

25   OF HIS INCIDENT?

1  A.   I BELIEVE IT WAS A KYDEX TYPE HOLSTER.

2  Q.   BLACKPOINT?

3  A.   YES.

4  Q.   SIMILAR TO THE ONES THAT SIG SELLS ON ITS OWN WEBSITE?

5  A.   I DON'T KNOW THAT FOR CERTAIN, BUT IT'S POSSIBLE.

6  Q.   OKAY.  YOU SELL BLACKPOINT HOLSTERS, YOU SELL KYDEX

7  HOLSTERS.  INSIDE THE WAISTBAND?

8  A.   YES.

9  Q.   SIR, YOU HAVE NO IDEA WHETHER THE TRIGGER WAS PULLED BY

10 THE HOLSTER OR A FOREIGN OBJECT OR BY MR. LANG'S FINGER

11 TOUCHING THE TRIGGER, DO YOU?

12 A.   THAT'S CORRECT.

13 Q.   SIR, CAN WE AGREE THAT WHEN A ROUND IS FIRED USING THE

14 P320, THE SLIDE -- AND WE CAN LOOK HERE AT THE CARRY -- SLIDE'S

15 AT THE TOP OF THE GUN?

16 A.   I'M SORRY.  ARE YOU POINTING AT SOMETHING?

17 Q.   YEAH.  IS IT NOT COMING UP ON MINE?

18 A.   OH.  I SEE YOUR MOUSE NOW.

19 Q.   THE TOP OF THE GUN IS THE SLIDE.  CORRECT?

20 A.   CORRECT.  THAT'S THE SLIDE ASSEMBLY.

21 Q.   OKAY.  AND WE CAN AGREE THAT WHEN THE P320 FIRES A ROUND,

22 THE SLIDE WILL MOTION BACKWARDS?

23 A.   THAT'S CORRECT.

24 Q.   OKAY.  CAN WE AGREE THAT IF THE GUN DOESN'T FIRE WITHIN A

25 HOLSTER, THEN THE RETRACTION OR THE MOVEMENT OF THE SLIDE

1   SHOULD CAUSE THE GUN TO DISCHARGE THE SPENT SHELL CASING?

2   A.   YES.  WHEN YOU FIRE THE GUN OUTSIDE OF A HOLSTER, THE

3   SLIDE RECIPROCATES, EXPENDING THE SPENT SHELL CASING.

4   Q.   HAVE YOU EVER HEARD OF THE TERM "STOVEPIPING"?

5   A.   YES.

6   Q.   OKAY.  CAN STOVEPIPING OCCUR IF A GUN FIRES WHEN IT IS

7   INSIDE THE HOLSTER?

8   A.   CAN IT OCCUR?

9   Q.   YEAH.

10  A.   CONCEIVABLY, YES.

11  Q.   OKAY.  SIR, DID YOU REVIEW ANY OF THE EXPERT REPORTS OR

12  INSPECTIONS OF ANYBODY ELSE WHO WAS INVOLVED IN THIS CASE?

13  A.   I DID LOOK AT THE REPORT FROM MR. WATKINS.

14  Q.   HOW ABOUT AL LAROCHELLE?

15  A.   I DON'T BELIEVE I'VE SEEN THAT REPORT, NO.

16  Q.   SIR, I'LL SHOW YOU A COPY OF YOUR REPORT ON PAGE 1, WHERE

17  IT SAYS:  THE DATA AND INFORMATION CONSIDERS ONLY SEVEN BULLET

18  POINTS.  ONE OF THEM IS THE PHOTOS AND INSPECTION OF

19  AL LAROCHELLE, MARCH 3RD, 2021.

20       IS THAT ONE OF THE SEVEN BULLET POINTS THAT YOU REVIEWED

21  BEFORE TAKING THE STAND?

22            MS. DENNISON:  YOUR HONOR --

23            THE COURT:  YES.

24            MS. DENNISON:  -- MAY WE APPROACH?

25            THE COURT:  YES.

1          (WHEREUPON, A CONFERENCE WAS HAD AT THE BENCH BETWEEN

2    THE COURT AND COUNSEL, OUT OF THE HEARING OF THE JURY AND THE

3    COURT REPORTER.)

4          THE COURT:  OKAY.  ALL RIGHT.  YOU CAN GO BACK TO

5    YOUR SEATS.

6          IF THERE IS AN OBJECTION, RAISE AN OBJECTION AND THE

7    COURT WILL RULE.  IF NOT, WE'LL KEEP MOVING.  IF THERE'S AN

8    OBJECTION, I'LL HEAR AN OBJECTION.  THANK YOU.

9    BY MR. ZIMMERMAN:

10   Q.   SIR, DID YOU REVIEW AN INSPECTION REPORT BY AL LAROCHELLE?

11   A.   I MEAN, IT'S POSSIBLE I DID.  I JUST -- WHEN YOU ASKED ME

12   THAT QUESTION, I HADN'T RECALLED THAT.

13   Q.   OKAY.  DID YOU DO ANYTHING TO PREPARE TO BE HERE TODAY FOR

14   THIS JURY?

15   A.   YES.

16   Q.   OKAY.  WHEN DID YOU COME IN?

17   A.   I'M SORRY?

18   Q.   WHEN DID YOU COME INTO TOWN?

19   A.   I GOT HERE MONDAY EVENING.

20   Q.   OKAY.  DID YOU READ YOUR REPORT?

21   A.   I DID NOT REFRESH MY MEMORY ON MY REPORT.  NO, I DID NOT.

22          MS. DENNISON:  OBJECTION, YOUR HONOR.

23          THE COURT:  WHAT'S YOUR OBJECTION?

24          MS. DENNISON:  MY OBJECTION IS THAT THIS WITNESS IS

25   NOT BEING OFFERED AS AN EXPERT WITNESS IN THIS MATTER.

1          THE COURT:  SO WHAT IS YOUR OBJECTION?

2          IS IT OUTSIDE THE SCOPE?

3          WHAT IS YOUR SPECIFIC OBJECTION?  NOT A SPEAKING

4     OBJECTION, BUT YOUR SPECIFIC OBJECTION.

5          MS. DENNISON:  MY OBJECTION IS OUTSIDE THE SCOPE.

6          THE COURT:  ALL RIGHT.

7          RESPONSE?

8          MR. ZIMMERMAN:  YOUR HONOR, I ESTABLISHED THAT HE

9     WROTE A REPORT, WHETHER HE'S AN EXPERT OR NOT, AND HE REVIEWED

10    CERTAIN INFORMATION PERTAINING TO MR. LANG'S INCIDENT.  SO

11    CERTAINLY HE'S ENTITLED TO TELL ME WHETHER HE REVIEWED HIS

12    REPORT IN THE LEAD UP TO THIS TRIAL.

13         THE COURT:  ALL RIGHT.  I WILL OVERRULE FOR NOW.

14         BUT I WILL SAY I THOUGHT THAT THERE WAS GOING TO BE

15    AN OBJECTION TO ASKED AND ANSWERED, BECAUSE YOU'VE ASKED THIS

16    WITNESS TWICE ABOUT CERTAIN THINGS AS FAR AS HIS REVIEW OF

17    THOSE ITEMS, AND I'VE HEARD HIM SAY, NO, HE DIDN'T.

18         AND SO TO CONTINUE TO ASK HIM THAT AND ASK HIM

19    ANYTHING BASED ON THAT I THINK WOULD BE OBJECTIONABLE.  BUT I

20    HAVEN'T HEARD THAT PARTICULAR OBJECTION RAISED YET.

21         SO OVERRULED RIGHT NOW.

22         PROCEED.

23    BY MR. ZIMMERMAN:

24    Q.  I'M GOING TO SHOW YOU SOME INSPECTION PHOTOS AND SEE IF

25    YOU HAVE REVIEWED THOSE.

1          MR. ZIMMERMAN:  IF YOU COULD SHOW JE-4, JOINT
2     EXHIBIT 4.
3          THE COURTROOM DEPUTY:  IT NEEDS TO BE ADMITTED FIRST.
4          MR. ZIMMERMAN:  YOUR HONOR, I THINK YOU HAVE TRIAL
5     BINDERS, UNLESS YOU'D LIKE A PAPER COPY.
6          THE COURT:  I HAVE SCREENS FOR ANYTHING THAT YOU'RE
7     GOING TO SHOW, SO I DON'T USUALLY USE THE TRIAL BINDERS BECAUSE
8     THEY GET SO VOLUMINOUS.  SO I CAN SEE WHATEVER YOU SEE.
9          MR. ZIMMERMAN:  WOULD YOUR HONOR LIKE A PAPER COPY AS
10    WELL?
11         THE COURT:  NO.  I'M FINE.  I CAN USE MY SCREENS.  I
12    HAVE SCREENS.
13         WHAT IS IT, FOR THE RECORD?
14         MR. ZIMMERMAN:  THIS IS AN INSPECTION REPORT BY
15    AL LAROCHELLE.
16         THE COURT:  I'M SORRY.  WHAT IS THE NUMBER?
17         MR. ZIMMERMAN:  JOINT EXHIBIT 4.
18         THE COURT:  OKAY.  AND I'M NOT SURE WHETHER YOU-ALL
19    HAVE MADE SOME TYPE OF STIPULATION TO THE ADMISSION OF CERTAIN
20    EVIDENCE.  BUT, CERTAINLY, IF IT'S NOT IN, IT CAN'T BE
21    PUBLISHED RIGHT YET.  SO --
22         THE COURTROOM DEPUTY:  I TOOK IT DOWN.
23         MR. ZIMMERMAN:  THANK YOU.
24    BY MR. ZIMMERMAN:
25    Q.   SIR, DID YOU REVIEW THOSE PHOTOS OF MR. LAROCHELLE?

1   A.   I'M SORRY.  THERE'S NO PHOTOS ON MY SCREEN.

2   Q.   THE PHYSICAL PAPER -- I DON'T WANT TO SHOW THE JURY UNTIL

3   YOU CONFIRM THAT YOU'VE SEEN THEM.

4   A.   IT IS POSSIBLE, BUT I DON'T -- IT DOESN'T LOOK FAMILIAR TO

5   ME AT THE TIME.

6   Q.   OKAY.  WERE YOU ATTEMPTING TO BE ACCURATE WHEN YOU

7   IDENTIFIED WHAT DATA AND INFORMATION YOU CONSIDERED IN THIS

8   CASE?

9   A.   YES.

10  Q.   OKAY.  AND WHAT'S THE DATE ON THAT INSPECTION REPORT YOU

11  HAVE?  IS IT MARCH 3RD, 2021?

12  A.   I BELIEVE IT'S MARCH 10TH, 2021.

13  Q.   OKAY.  IS THERE A SECOND REPORT OF MR. LAROCHELLE THAT YOU

14  REVIEWED INSTEAD OF THAT ONE?

15  A.   NO.  I WOULD ASSUME IT WOULD HAVE BEEN THIS ONE.

16  Q.   OKAY.  AND TO THE EXTENT YOU REVIEWED THOSE PHOTOS, AS YOU

17  SAY YOU DID IN YOUR REPORT, THAT WOULD HAVE BEEN, IN PART, WHAT

18  YOU DID TO FORM AN OPINION IN THIS CASE ABOUT MR. LANG'S

19  INCIDENT?

20  A.   YES, IT WOULD HAVE.

21  Q.   OKAY.

22          MR. ZIMMERMAN:  YOUR HONOR, AT THIS TIME I'D LIKE TO

23  ADMIT JOINT EXHIBIT 4.

24          THE COURT:  OKAY.  WHEN YOU SAY JOINT EXHIBIT, WHAT

25  DO YOU MEAN?

1          MR. ZIMMERMAN:  SO THERE ARE THREE SETS OF EXHIBITS.

2    THERE ARE THE JOINT EXHIBITS AT THE FRONT OF OUR COMMUNAL

3    EXHIBIT LIST, AND THEN PLAINTIFF'S EXHIBITS AND DEFENSE

4    EXHIBITS, YOUR HONOR.

5          THE COURT:  SIR, MAY I JUST SEE WHAT YOU HAVE?

6          THE WITNESS:  YES, MA'AM.

7          THE COURT:  THANK YOU.

8          WHAT IS 4?  WHAT ALL ARE YOU ADMITTING AT THIS POINT?

9          MR. ZIMMERMAN:  YOUR HONOR, THE PHOTOGRAPHS CONTAINED

10   WITHIN THE --

11         THE COURT:  SO THIS WHOLE PACKET AS 4?

12         MR. ZIMMERMAN:  YES, YOUR HONOR.

13         THE COURT:  BECAUSE THIS DOESN'T HAVE AN IDENTIFIER

14   ON IT.  THIS DOESN'T HAVE ONE OF OUR COURT EXHIBIT NUMBERS OR

15   STICKERS.

16         MS. DENNISON:  YOUR HONOR, THAT WAS PRESUMABLY A

17   MISTAKE FROM THE COPY SERVICE.  SO OUR APOLOGIES.  THIS IS A

18   JOINT EXHIBIT.  WE CAN GET ONE --

19         THE COURT:  OH, WE HAVE THEM HERE.  THEY JUST NEED TO

20   BE PUT ON.  SO THERE'S -- I'M NOT SAYING THERE WAS A MISTAKE

21   THAT'S BEEN MADE.  IT JUST NEEDS TO BE DONE FOR OUR RECORDS

22   BEFORE IT GOES INTO EVIDENCE.

23         MR. ZIMMERMAN:  BEFORE I OPEN THIS, I --

24         THE COURT:  SO THIS IS GOING TO -- I'M GOING TO PUT

25   JOINT EXHIBIT 4 ON IT.  AND YOU'RE MOVING IT INTO EVIDENCE.

1        I ASSUME THERE'S NO OBJECTION.

2        MS. DENNISON:  THERE IS NO OBJECTION TO THE JOINT

3   EXHIBITS, YOUR HONOR.

4        THE COURT:  ALL RIGHT.  THEN IT'S ADMITTED, 4 IS

5   ADMITTED.

6        I'LL GIVE IT BACK TO YOU, SIR.

7        THE WITNESS:  THANK YOU.

8   BY MR. ZIMMERMAN:

9   Q.   SIR, IF YOU CAN GO TO PAGE -- LET'S START WITH PAGE 3C93.

10       MR. ZIMMERMAN:  AND IF YOU COULD SHOW, MR. HURD, THE

11  PHOTOS ON THAT PAGE.

12  BY MR. ZIMMERMAN:

13  Q.   SIR, DO YOU KNOW WHAT THE MEASUREMENT IS BETWEEN THAT

14  PISTOL -- AND THE MUZZLE SIDE -- AND THE END OF THE HOLSTER?

15  A.   I DON'T KNOW THE EXACT NUMBER, NO.

16  Q.   OKAY.  DO YOU SEE THAT NICK THAT IS ON THE HOLSTER?

17  A.   YEAH.  IF YOU'RE TALKING ABOUT THAT HALF MOON SHAPE, YES.

18  Q.   DO YOU KNOW IF THAT HALF MOON SHAPE WAS ON THE SIDE OF

19  MR. LANG'S LEG, MEANING THE HOLSTER ON THAT SIDE WAS CLOSER TO

20  HIS LEG OR ON THE OUTSIDE?

21  A.   I DON'T HAVE THAT INFORMATION.

22  Q.   DID YOU YOURSELF, OR FROM ANYONE ELSE, OBTAIN INFORMATION

23  ABOUT WHETHER OR NOT THAT GUN WAS CANTED OR THE HOLSTER WAS

24  CANTED WITHIN THAT INCH OR SO GAP BETWEEN THE GUN AND THE

25  HOLSTER?

1  A.   I'M SORRY.  CAN YOU REPEAT THE QUESTION?

2  Q.   YEAH.  DID YOU DO ANYTHING YOURSELF OR DID YOU RELY ON

3  ANYBODY ELSE'S MEASUREMENTS TO DETERMINE WHETHER OR NOT THAT

4  HOLSTER HAD ANY CANTING OR ANGLING AS A RESULT OF LAYING UP

5  AGAINST MR. LANG'S LEG?

6  A.   NO, I DID NOT.

7  Q.   SIR, CAN WE AGREE IT'S YOUR OPINION THAT -- WELL, LET ME

8  TAKE A STEP BACK.

9       YOU HAVE NO IDEA WHETHER A TRIGGER SAFETY WOULD HAVE

10  PREVENTED THIS ACCIDENT, DO YOU?

11  A.   THAT'S CORRECT.  I WOULDN'T KNOW.

12  Q.   SIR, AT A MINIMUM, CAN WE AT LEAST AGREE THAT A TRIGGER

13  SAFETY WOULD HAVE REDUCED THE POTENTIAL FOR AN INCIDENT LIKE

14  THIS?

15  A.   I THINK THAT'S VERY SUBJECTIVE.  I DON'T THINK YOU CAN

16  MAKE THAT ASSUMPTION WITHOUT KNOWING WHAT CAUSED THE TRIGGER TO

17  BE PULLED.

18  Q.   SIR, YOU'VE TESTIFIED BEFORE, HAVE YOU NOT, THAT A TRIGGER

19  SAFETY CAN REDUCE THE SURFACE AREA ON THE TRIGGER THAT CAN BE

20  EXPOSED TO A PULL?

21  A.   SO A TRIGGER TAB SAFETY IS MAINLY USED FOR DROP SAFETY ON

22  GUNS THAT DON'T HAVE BALANCED TRIGGER SYSTEMS.  SO TO HAVE A --

23  PUT A NUMBER TO HOW WELL THAT WOULD PREVENT A TRIGGER FROM

24  BEING PULLED IS VERY SUBJECTIVE.

25            MR. ZIMMERMAN:  YOUR HONOR, I MOVE TO STRIKE.  THE

1    ANSWER WAS NONRESPONSIVE.

2              THE COURT:  RESPONSE?

3              FIRST, I'M GOING TO ASK YOUR RESPONSE.  THEN I'M

4    GOING TO ASK YOU-ALL TO APPROACH ONE MORE TIME.

5              BUT RESPONSE TO THAT FIRST.

6              MS. DENNISON:  YOUR HONOR, I THINK THAT HE WAS

7    ANSWERING THE QUESTION TO THE BEST OF HIS ABILITY.  YEAH.

8              THE COURT:  ALL RIGHT.  I'LL OVERRULE.

9              COME ON UP.

10             (WHEREUPON, A CONFERENCE WAS HAD AT THE BENCH BETWEEN

11   THE COURT AND COUNSEL, OUT OF THE HEARING OF THE JURY AND THE

12   COURT REPORTER.)

13             THE COURT:  LADIES AND GENTLEMEN --

14             YOU-ALL GO BACK FOR A SECOND.  I'M SORRY.  I DIDN'T

15   MEAN TO KEEP YOU UP HERE.

16             WE ARE AT 12:30.  I AM GOING TO TAKE UP A QUICK LEGAL

17   ISSUE WITH THE ATTORNEYS, BUT I'M GOING TO GO AHEAD AND EXCUSE

18   YOU TO LUNCH.

19             SO PLEASE BE BACK, 1:30.  MS. BECK WILL MEET YOU BACK

20   THERE AND TELL YOU -- GIVE YOU A LITTLE MORE INFORMATION.  BUT

21   AS I SAID YESTERDAY, YOU DON'T HAVE TIME TO GO OFF CAMPUS.  SO

22   PLEASE MAKE USE OF OUR LOVELY CAFETERIA DOWNSTAIRS.

23             WHY ARE YOU LAUGHING, MS. BECK?

24             ALL RIGHT.  OKAY.  SO SHE WILL MEET YOU BACK THERE.

25             ALL RIGHT.  THANK YOU SO MUCH.

1          THE COURTROOM SECURITY OFFICER:  ALL RISE.

2          THE COURT:  THANK YOU.  SORRY.  DON'T DISCUSS THE

3     CASE.  GO ON BACK.

4          AND YOU'RE ALWAYS FREE TO BRING YOUR OWN LUNCH.

5     REMEMBER THAT THROUGHOUT THE TRIAL.

6          JUROR:  DID IT.

7          THE COURT:  YOU DID?  YOU MAY HAVE TO SHARE, THEN.

8          (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

9     12:30 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

10         THE COURT:  ALL RIGHT.  ALL RIGHT.  EVERYBODY BE

11    SEATED.

12         SO MAJOR ISSUE WHEN THE FIRST WITNESS OUT OF THE BOX,

13    WE CAN'T AGREE ON WHETHER OR NOT THIS WITNESS IS MEANT TO BE AN

14    EXPERT WITNESS.  AND WHAT I SAID AT THE LAST BAR CONFERENCE WAS

15    TO MS. DENNISON.  IT APPEARS THAT SHE IS TRYING TO ESTABLISH A

16    FOUNDATION FOR AN OBJECTION TO MR. TONER TESTIFYING AS AN

17    EXPERT IN THE AREAS THAT HE IS TESTIFYING.  AND I HAVE NOT

18    HEARD HIM QUALIFIED AS AN EXPERT IN ANYTHING HERE TODAY.  SHE

19    SAYS HE IS NOT AN EXPERT AND NOT PROPER FOR THIS PARTICULAR

20    TESTIMONY.

21         PLAINTIFF'S COUNSEL SAYS, THIS IS THE FIRST TIME I'M

22    HEARING OF THIS.

23         SO EXACTLY WHERE ARE WE?  WE DO HAVE SEVERAL

24    DIFFERENT WITNESSES COMING.  YOU-ALL KNOW BETTER THAN THE COURT

25    DOES WHAT THE ANTICIPATED TESTIMONY IS FOR EACH WITNESS.

1          SO WHY ARE WE SEEMINGLY A BIT CONFUSED AS TO WHETHER

2     QUESTIONS THAT MR. TONER SEEMS NOT TO KNOW A LOT ABOUT -- AND

3     THAT'S NOT TO SUGGEST THAT HE'S NOT KNOWLEDGEABLE.  BUT IT DOES

4     SEEM LIKE FROM THIS EXAMINATION THAT SOME OF THIS IS OUTSIDE OF

5     THE SCOPE OF HIS KNOWLEDGE.  I DON'T KNOW WHY THAT IS, THOUGH,

6     SO I'M NOT ATTRIBUTING THAT TO ANYONE IN PARTICULAR.

7          I'LL HEAR FROM YOU FIRST, MR. ZIMMERMAN.

8          MR. ZIMMERMAN:  SURE, YOUR HONOR.  SO THIS IS THE

9     ONLY WHAT I WOULD CONSIDER DUAL WITNESS.  HE IS A CORPORATE

10    DESIGNEE AND A DESIGNER OF THE P320.  HE ALSO ISSUED AN EXPERT

11    REPORT IN THIS CASE DATED 11/2/2022.

12         THE COURT:  ON THE DESIGN.

13         MR. ZIMMERMAN:  SUMMARY OF OPINIONS ALSO TALKS ABOUT

14    THE PISTOL DISCHARGE WHEN MR. LANG WAS ATTEMPTING TO REMOVE THE

15    PISTOL AND HOLSTER FROM HIS WAISTBAND; THE DAMAGE TO MR. LANG'S

16    HOLSTER CONFIRMS IT WAS PARTIALLY WITHDRAWN FROM THE HOLSTER;

17    IT IS MOST LIKELY THAT THE TRIGGER WAS PULLED BY MR. LANG'S

18    FINGER, BUT IT IS ALSO POSSIBLE SOME FOREIGN OBJECT PULLED THE

19    TRIGGER.

20         SO HE'S NOT TALKING JUST ABOUT THE DESIGN OF THE GUN;

21    HE ACTUALLY, IN HIS SUMMARY OF OPINIONS, TALKS ABOUT THIS CASE.

22         THE COURT:  OKAY.

23         MS. DENNISON, WHAT IS YOUR OBJECTION?

24         AND, AGAIN -- AND I WAS TRYING TO GET YOU TO NARROW

25    IT FOR ME SO THAT I UNDERSTOOD EXACTLY WHAT YOU'RE OBJECTING

1    TO.  BECAUSE UP HERE AT THE BENCH, YOU JUST GAVE -- LAUNCHED

2    INTO A LONG EXPLANATION AS TO WHY THIS WITNESS SHOULD NOT BE

3    TESTIFYING TO THIS INFORMATION.

4            IT SOUNDED TO ME LIKE IT WAS -- THAT YOU WERE SAYING

5    IT WAS OUTSIDE OF THE SCOPE OF HIS KNOWLEDGE OR EXPERTISE OR

6    TASKS IN THIS CASE.  BUT I'M NOT SURE.

7            MS. DENNISON:  YES, YOUR HONOR.  IT WAS OUR

8    UNDERSTANDING -- FIRST OF ALL, MR. TONER DID ISSUE AN EXPERT

9    REPORT IN THIS MATTER.  BUT AT NO POINT DID WE CONVEY TO

10   PLAINTIFF'S COUNSEL THAT WE PLAN TO PRODUCE HIM AT TRIAL AS AN

11   EXPERT WITNESS.  IN FACT, IN THE OPENING STATEMENT I JUST

12   PROVIDED, I SAID TO THE JURY, SIG SAUER IS PROVIDING ONE EXPERT

13   WITNESS.  THAT IS DEREK WATKINS.  I DID NOT INDICATE -- AND I

14   SPECIFICALLY SAID THAT MR. TONER WOULD BE TESTIFYING SOLELY AS

15   THE DESIGNER OF THE P320 PRODUCT.

16           WHEN I MADE THE AGREEMENT WITH MR. ZIMMERMAN FOR --

17   TO BRING MR. TONER IN TO TESTIFY IN HIS PORTION OF THE CASE, IT

18   WAS WITH THE UNDERSTANDING THAT MR. TONER [SIC] WAS PRESENTING

19   HIM AS A SIG SAUER CORPORATE REPRESENTATIVE, NOT AS A SIG SAUER

20   EXPERT, WHICH HE'S NOT BEING OFFERED ON.

21           SO ALL OF THESE QUESTIONS ARE OUTSIDE THE SCOPE OF

22   WHAT WE EVER INTENDED TO CALL MR. TONER ON.  NOBODY WILL BE

23   QUALIFYING HIM AS AN EXPERT WITNESS TO TESTIFY IN THIS MATTER

24   AND AT THIS TRIAL.  AND THESE QUESTIONS ARE BETTER SUBJECT TO

25   MR. WATKINS, WHO WILL BE THE LIABILITY EXPERT THAT SIG WILL BE

1   PRESENTING.

2        THE COURT:  ALL RIGHT.  IS IT FAIR TO SAY, FROM YOUR

3   PERSPECTIVE, THE QUESTIONS HE'S BEING ASKED ARE OUTSIDE OF THE

4   SCOPE OF THE AGREEMENT BUT WITHIN THE SCOPE OF WHAT HE PUT IN

5   HIS REPORT?

6        MS. DENNISON:  NOT -- NOT -- NOT NECESSARILY, YOUR

7   HONOR.

8        THE COURT:  IS WHAT MR. ZIMMERMAN JUST CHARACTERIZED

9   AS FAR AS BEING IN HIS REPORT ACCURATE, THOSE FINDINGS ABOUT --

10   THAT WENT BEYOND JUST DESIGN?

11        MS. DENNISON:  SO WHEN WE OFFERED MR. TONER AS AN

12   EXPERT IN THIS MATTER, IT WAS AT THE TIME --

13        THE COURT:  LET ME ASK MY QUESTION AGAIN BEFORE YOU

14   GET TO YOUR POINT.

15        IS MR. ZIMMERMAN ACCURATE IN HIS CHARACTERIZATION OF

16   WHAT IS INCLUDED IN MR. TONER'S REPORT IN THIS CASE?

17        MS. DENNISON:  I DON'T BELIEVE SO, YOUR HONOR.

18        THE COURT:  OKAY.  IF WE CAN'T EVEN AGREE AS TO

19   WHAT'S WITHIN A REPORT, WE'VE GOT A SERIOUS PROBLEM.

20        I'M GOING TO GIVE YOU-ALL 5 MINUTES -- AND,

21   RECOGNIZE, THIS IS CUTTING INTO YOUR LUNCH TIME, BECAUSE I'M

22   NOT GOING TO PUSH LUNCH BACK -- TO COME TO SOME AGREEMENT WITH

23   RESPECT TO WHAT'S IN THAT REPORT, WHAT MR. TONER IS EXPECTED TO

24   TESTIFY TO.

25        BECAUSE THIS IS THE TYPE OF THING THAT I THINK -- AND

1    I APPRECIATE ANY TIME ATTORNEYS ARE WILLING TO CONFER AND MAKE

2    AGREEMENTS.  BUT THIS IS THE TYPE OF THING THAT SHOULD HAVE

3    BEEN CLARIFIED IN THIS AGREEMENT BEFORE THIS WITNESS HIT THE

4    STAND.

5            SO I'M GOING TO GIVE YOU-ALL ABOUT 5 MINUTES.  TAKE

6    THAT TIME AND LET ME KNOW ONCE WE'RE READY TO TALK AGAIN, OR

7    TELL ME IF WE JUST WANT TO GO TO LUNCH AND WE WANT TO COME BACK

8    A COUPLE MINUTES EARLY TO DISCUSS IT.  EITHER WAY.  EITHER WAY

9    YOU-ALL WANT TO DO IT, I'M OPEN TO.

10           MR. ZIMMERMAN:  THANK YOU, YOUR HONOR.

11           THE COURT:  DECIDE THAT NOW, RIGHT HERE RIGHT NOW IN

12   FRONT OF ME SO I CAN SEE WHO THE TROUBLEMAKER IS IN THESE

13   AGREEMENTS.  SO YOU-ALL DECIDE.

14           MS. DENNISON:  WE CAN DISCUSS IT NOW OR WE CAN

15   DISCUSS IT AFTER --

16           MR. ZIMMERMAN:  WE CAN DISCUSS IT NOW, YOUR HONOR.

17           THE COURT:  OKAY.  ALL RIGHT.  SO YOU WANT ME TO HOLD

18   OFF?  BECAUSE I --

19           MR. ZIMMERMAN:  YOU KNOW WHAT, FOR EVERYONE ELSE'S

20   SAKE, I'D RATHER EVERYONE GO TO LUNCH.  WE CAN ADDRESS IT.

21   HOPEFULLY, WE CAN COME TO AN AGREEMENT --

22           THE COURT:  OKAY.

23           MR. ZIMMERMAN:  -- AND WE WON'T HAVE TO BOTHER THE

24   COURT.

25           THE COURT:  ALL RIGHT.  AND IF YOU DO, THAT'S FINE.

1    THAT'S WHAT I'M HERE FOR.  BUT YOU-ALL NEED TO HAVE

2    ACCOMPLISHED A LITTLE BIT BEFORE I JUMP IN.

3              SO LET'S TRY TO COME BACK FROM LUNCH -- I TOLD THE

4    JURORS, WHAT, 1:30?  YOU-ALL BE BACK AT 1:25.  ALL RIGHT?

5              ALL RIGHT.  THANK YOU SO MUCH.  WE ARE IN RECESS FOR

6    LUNCH.

7              THE COURTROOM SECURITY OFFICER:  ALL RISE.

8              (WHEREUPON, THE LUNCH RECESS WAS HAD FROM 12:24 P.M.

9    TO 1:24 P.M.)

10             THE COURT:  THANK YOU, SIR.

11             THANK YOU.  PLEASE BE SEATED.

12             OKAY.  SO WHERE ARE WE?  WHO WANTS TO START?

13             MR. ZIMMERMAN, I WILL START WITH YOU SINCE YOU ARE IN

14   THE PROCESS OF QUESTIONING THE WITNESS.

15             MR. ZIMMERMAN:  HAPPY TO REPORT THAT WE'VE WORKED THE

16   ISSUE OUT.  I'M GOING TO ASK HIM ONE ADDITIONAL QUESTION.

17             MS. DENNISON:  HE'S HERE.

18             MR. ZIMMERMAN:  THAT'S OKAY.

19             I'M GOING TO ASK HIM ONE ADDITIONAL QUESTION IN THIS

20   AREA THAT WE'VE DISCUSSED AND THEN MOVE ON FROM THE AREA

21   ENTIRELY.

22             THE COURT:  OKAY.

23             MS. DENNISON:  YOUR HONOR --

24             THE COURT:  YES.

25             MS. DENNISON:  -- WE DON'T NEED TO DO IT NOW, BUT I

1    DO WANT TO -- YOU SUGGESTED EARLIER THIS MORNING THAT IF WE

2    WANTED TO RERAISE THE ISSUE OF THE INDUSTRY STANDARDS --

3            THE COURT:  YEAH.  LET'S GO AHEAD AND DO IT NOW.

4            SO I REVIEWED DOCUMENT 53 -- AND I'M NOT SURE IF THIS

5    IS THE CORRECT ONE OR NOT -- PLAINTIFF'S MOTION IN LIMINE TO

6    PRECLUDE EVIDENCE OF COMPLIANCE WITH DROP TESTING, WHICH I

7    GRANTED, SAYING THE DEFENDANT COULD SAY THE GUN WAS IN

8    COMPLIANCE BUT NOT GO SPECIFICALLY INTO TESTING BECAUSE THIS IS

9    NOT A DROP CASE.  AND MY UNDERSTANDING AT THAT TIME WAS THAT

10   THERE HAD NOT BEEN DISCOVERY PROVIDED REGARDING THE TESTING.

11           I THINK YOU DID ARGUE THAT THAT WOULD OPEN THE DOOR

12   TO THE RECALL/UPGRADE PROGRAM.  I'M NOT SURE IF THAT'S THE

13   OBJECTION YOU WERE MAKING TODAY.

14           BUT I GUESS WHAT CONFUSED ME IS IF YOU-ALL AGREE TO

15   THE USE OF A PARTICULAR DOCUMENT IN OPENING, WHY YOU WOULDN'T

16   GO FURTHER AND DISCUSS YOUR UNDERSTANDING THAT ONLY CERTAIN

17   PORTIONS COULD BE USED.  IT SEEMS LIKE YOU WOULD KNOW THAT IF

18   SOMEONE IS GOING TO USE A DOCUMENT IN OPENING, YOU WOULD ASSUME

19   THE ENTIRE DOCUMENT UNLESS YOU-ALL AGREE TO SOMETHING OTHER

20   THAN THAT.

21           MS. DENNISON:  AND I DID, YOUR HONOR.

22           THE COURT:  OKAY.

23           MS. DENNISON:  I DID ASSUME THE ENTIRE DOCUMENT WOULD

24   BE USED.  AND THAT'S MY POINT, YOUR HONOR.  THE ENTIRE DOCUMENT

25   ACTUALLY INDICATES THAT THE P320 MEETS U.S. STANDARDS FOR

1  SAFETY.  AND SO --

2          THE COURT:  WELL, LET ME STOP YOU THERE BEFORE YOU GO

3  ON.

4          SO WAS YOUR OBJECTION TO LACK OF COMPLETENESS THAT HE

5  DIDN'T GO INTO THE REST OF IT OR THAT HE SOMEHOW MADE SOME

6  IMPROPER ARGUMENT BASED ON WHAT HE DID GO INTO?

7          MS. DENNISON:  I DON'T HAVE AN OBJECTION, YOUR HONOR.

8  I AM ARGUING THAT HE OPENED THE DOOR TO EVIDENCE THAT WAS

9  PREVIOUSLY EXCLUDED BY WHAT HE ARGUED IN HIS OPENINGS.

10         THE COURT:  OKAY.  WHAT SPECIFIC ARGUMENT?

11         MS. DENNISON:  THE ARGUMENT -- SO IT'S TWO-FOLD.  IT

12  IS -- THE ARGUMENT THAT MR. ZIMMERMAN MADE IN OPENING WAS THAT

13  THE VOLUNTARY -- THAT SIG SAUER SHOULD HAVE ISSUED A RECALL AND

14  INSTEAD ISSUED A VOLUNTARY UPGRADE PROGRAM, AND THAT THE GUN

15  WAS NOT DROP SAFE.  THAT'S WHAT PLAINTIFF ARGUED IN OPENING.

16         THE FACT THAT THE GUN MET AND EXCEEDED U.S. INDUSTRY

17  STANDARDS IS DIRECT REBUTTAL TO THAT ARGUMENT AND WAS INCLUDED

18  IN DISCOVERY AND IN THE DOCUMENT THAT MR. ZIMMERMAN SHOWED A

19  PORTION OF TO THE JURY.

20         AND SO WHAT WE SAY IS IT OPENS THE DOOR.  AND WE

21  SHOULD BE ABLE TO SHOW THE WHOLE DOCUMENT, AND WE SHOULD BE

22  ABLE TO TELL THE JURY THAT, NO --

23         THE COURT:  LET ME STOP YOU.

24         IS THERE SOME REASON THAT YOU CAN'T SHOW THE WHOLE

25  DOCUMENT?  THAT'S WHY I ASKED WHEN YOU-ALL AGREED THAT THE

1    DOCUMENT WOULD BE USED.  IS IT THAT YOU AGREED TO ONLY A

2    PORTION OF IT?  IS THERE SOME LIMITATION ON YOUR AGREEMENT FOR

3    THE DOCUMENT?

4          MS. DENNISON:  NO, YOUR HONOR.  I DON'T WANT TO RUN

5    AFOUL OF YOUR HONOR'S ORDER THAT WE CAN'T SAY THAT THE PISTOL

6    PASSED U.S. INDUSTRY STANDARDS.

7          SO PER YOUR INSTRUCTION, PER YOUR HONOR'S INSTRUCTION

8    THAT IF WE THINK THE DOOR HAS BEEN OPENED TO THAT, THAT WE NEED

9    TO APPROACH YOU FIRST AND DISCUSS IT, THAT'S WHY I'M

10   APPROACHING YOU FIRST.  BECAUSE ONCE I SHOW THIS DOCUMENT, WHEN

11   I TELL THE JURY THE DOCUMENT SAYS THAT IT MEETS THE U.S.

12   INDUSTRY STANDARDS, I DON'T WANT TO RUN AFOUL OF YOUR HONOR'S

13   RULING.

14         THE COURT:  BUT ARE YOU UNDER THE IMPRESSION, WHETHER

15   IN OPENING OR OTHERWISE, THAT YOU CAN SHOW THAT ENTIRE

16   DOCUMENT?

17         MS. DENNISON:  I AM, YOUR HONOR.

18         THE COURT:  OKAY.  SO WOULDN'T THEY SEE THAT

19   REGARDLESS?

20         MS. DENNISON:  THEY WOULD.  BUT I NEED TO MAKE IT

21   CLEAR, YOUR HONOR, IN PARTICULAR, BECAUSE THE PLAINTIFF ARGUED

22   THAT THIS GUN WAS NOT DROP SAFE IN THEIR ARGUMENT AND WE SHOULD

23   HAVE ISSUED A RECALL, NOT JUST A VOLUNTARY UPGRADE PROGRAM, WE

24   NEED TO BE ABLE TO NOW TELL THE JURY THAT THE REASON THAT WE

25   ISSUED THE VOLUNTARY UPGRADE THAT THEY SHOWED INSTEAD OF A

1    RECALL IS BECAUSE IT MET AND EXCEEDED INDUSTRY STANDARDS --

2              THE COURT:  OKAY.  SO IT SOUNDS LIKE YOU'RE SAYING

3    THAT WHAT WAS DONE IN TERMS OF THE RECALL/UPGRADE IS INCLUDED

4    IN THAT DOCUMENT, BUT YOU'RE ASKING -- OR SUGGESTING THAT A

5    DOOR HAS BEEN OPENED WITH RESPECT TO AN ARGUMENT THAT YOU WANT

6    TO MAKE BASED ON THAT.

7              AND I'M SORRY.  I'M JUST NOT FOLLOWING YOU.  AND I

8    APOLOGIZE.  I'M SURE IT'S ME.  I'M SURE IT'S ME.

9              MS. DENNISON:  I'LL BE VERY CLEAR, YOUR HONOR.  I

10   WANT TO BE ABLE TO ASK MY WITNESS -- WHO IS IN THE COURTROOM,

11   YOUR HONOR.  BUT I WOULD LIKE, WHEN I --

12             THE COURT:  WHAT DO YOU WANT TO ASK HIM?  AND I ASKED

13   THIS -- I ASKED THIS BEFORE.  TELL ME EXACTLY WHAT YOU WANT TO

14   GO INTO SO WE KNOW EXACTLY WHAT WE'RE DEALING WITH.  TELL ME

15   WHAT YOU WANT TO ASK.

16             MS. DENNISON:  I WANT TO ASK HIM IF THE P320 MET AND

17   EXCEEDED INDUSTRY STANDARDS AND WHAT THOSE STANDARDS ARE.

18             THE COURT:  OKAY.

19             AND YOUR POSITION AS TO WHETHER SHE SHOULD BE ABLE TO

20   DO THAT?

21             MR. ZIMMERMAN:  IT'S ALREADY BEEN RULED THAT INDUSTRY

22   STANDARDS ARE NOT PART OF THIS CASE, YOUR HONOR.  THAT HAS

23   BEEN -- THE ISSUE OF OPENING THE DOOR -- THE ISSUE OF VOLUNTARY

24   UPGRADE HAS ALREADY BEEN RULED THAT THAT IS ADMISSIBLE.

25             THE ONLY THING I SHOWED WAS THAT SIG ISSUES VOLUNTARY

1   UPGRADE PROGRAM.  I DID NOT SHOW ANY --

2           THE COURT:  WHICH I ALLOWED IN.

3           MR. ZIMMERMAN:  OF COURSE.  I DID NOT SHOW THE

4   INDUSTRY STANDARDS THAT ARE PART OF THE DOCUMENT BUT ARE

5   INADMISSIBLE.

6           SO FOR ME TO SAY "VOLUNTARY UPGRADE," WHICH IS

7   ADMISSIBLE, OPENING THE DOOR TO INDUSTRY STANDARDS MAKES NO

8   SENSE WHATSOEVER.

9           MS. DENNISON:  BUT, YOUR HONOR, HE'S GOING TO ARGUE,

10  WHICH HE DID TO THE JURY, THAT SIG SAUER DID SOMETHING BAD BY

11  NOT ISSUING A RECALL, AND HE SAID THAT IT WAS NOT DROP SAFE.

12          WE NEED TO BE ABLE TO SHOW THE JURY THAT IT MET AND

13  EXCEEDED INDUSTRY STANDARDS --

14          THE COURT:  BUT I SAID THAT YOU COULD SAY IT'S DROP

15  SAFE AND THAT IT'S IN COMPLIANCE.  I JUST SAID YOU COULDN'T GO

16  INTO THE UNDERLYING DETAILS ABOUT ALL THE TESTING THAT WAS

17  DONE.

18          MS. DENNISON:  OKAY.

19          THE COURT:  SO IS THAT SOMETHING DIFFERENT?

20          MS. DENNISON:  OKAY.  I JUST WANTED TO MAKE SURE,

21  YOUR HONOR.  SO --

22          THE COURT:  IS THAT SOMETHING DIFFERENT FROM WHAT YOU

23  UNDERSTOOD?

24          MR. ZIMMERMAN:  YOUR HONOR, THAT IS NOT MY -- I DON'T

25  THINK THAT'S EITHER OF OUR UNDERSTANDINGS, WHICH IS WHY MS.

1    DENNISON IS RAISING THIS.

2            THE ISSUE OF DID THEY TEST IT --

3            THE COURT:  YES.

4            MR. ZIMMERMAN:  -- WE CAME TO AN AGREEMENT YESTERDAY

5    THAT THEY CAN SAY THAT THEY TESTED IT.  AND THEY WILL SAY THAT

6    THEY TESTED IT INTERNALLY AND, BECAUSE OF THE TESTING, THEY

7    FELT IT WAS DROP SAFE.

8            THE COURT:  OKAY.

9            MR. ZIMMERMAN:  AND WE CAME TO AN AGREEMENT ON THAT.

10   THAT'S FINE.

11           THAT IS DIFFERENT THAN SAYING THAT THEY COMPLIED WITH

12   SOME INDUSTRY STANDARDS THAT YOUR HONOR ALREADY RULED --

13   COMPLIANCE WITH THOSE INDUSTRY STANDARDS WAS THE MOTION

14   IN LIMINE THAT YOUR HONOR GRANTED IN PLAINTIFF'S FAVOR.  SO --

15           THE COURT:  OKAY.  LET ME STOP YOU THERE.

16           AND SO YOU'RE SAYING THAT THAT -- AND WE'RE IN

17   AGREEMENT THAT THAT WAS THE RULING.  THERE WERE SO MANY MOTIONS

18   IN LIMINE.

19           YOU'RE SAYING THAT THE DOOR WAS OPENED IN THAT

20   RESPECT HOW?

21           MS. DENNISON:  BECAUSE THE JURY CAN'T DETERMINE THE

22   ISSUE THAT PLAINTIFFS RAISED, WHICH IS:  WAS SIG SAUER

23   NEGLIGENT IN -- REALLY, THEY SAID SIG SAUER LIED.  I MEAN,

24   LITERALLY, THE SLIDE SAID:  SIG SAUER LIED.  AND NOBODY WILL

25   SAY RECALL, AND THIS SHOULD HAVE BEEN A RECALL INSTEAD OF A

1    VOLUNTARY UPGRADE.

2            AND HE PUT UP A SLIDE THAT SAID:  THIS GUN IS NOT

3    DROP SAFE.  THEY'RE TELLING YOU IT IS.  IT'S NOT.

4            SO IT IS IMPORTANT FOR US TO BE ABLE TO SAY --

5            THE COURT:  LINE THEM UP.  LINE THEM UP.  DON'T BRING

6    THEM IN.

7            MS. DENNISON:  -- THAT THIRD-PARTY STANDARDS,

8    INDUSTRY STANDARDS, THAT THE P320 HAS MET AND EXCEEDED THOSE

9    INDUSTRY STANDARDS.  OTHERWISE, THE JURY WILL JUST THINK, WELL,

10   THEY JUST TESTED TO THEIR OWN INTERNAL STUFF, AND THE PLAINTIFF

11   SAID THAT IT WAS -- THAT IT WAS -- THAT THAT WASN'T SUFFICIENT.

12           SO THE JURY WILL HAVE TO -- THE ISSUE HAS BEEN

13   RAISED.  AND THE JURY WILL HAVE INCOMPLETE EVIDENCE IF THEY ARE

14   NOT ABLE TO SEE -- FIRST OF ALL, IF I'M NOT ABLE TO EXPLAIN

15   THAT IT MET AND EXCEEDED U.S. INDUSTRY STANDARDS AND THAT'S WHY

16   IT WAS NOT A RECALL THAT WAS OFFERED.  IT WAS BROUGHT UP

17   DIRECTLY, AND IT WILL BE --

18           THE COURT:  LET ME SEE THE DOCUMENT.

19           MS. DENNISON:  IT WILL BE HIGHLY PREJUDICIAL TO

20   EXCLUDE THIS EVIDENCE AT THIS POINT BASED ON THE ARGUMENTS MADE

21   BY COUNSEL THIS MORNING IN OPENING STATEMENTS.

22           THE COURT:  WHAT IS IT -- AND I'M SORRY IF YOU SAID

23   THIS ALREADY.

24           WHAT IS IT THAT YOU WANT TO ASK AND OF WHOM?

25           MS. DENNISON:  I WANT TO ASK MR. TONER IF THE P320

1    MET AND EXCEEDED INDUSTRY STANDARDS, AND I WANT HIM TO JUST SAY

2    WHAT THOSE STANDARDS ARE -- THAT IS, SAAMI, NIJ, WHICH IS IN

3    THIS DOCUMENT, WHICH WAS IN FACT RAISED IN DISCOVERY.

4           AND DROP HAS BEEN NOW A PART OF THIS CASE.

5    MR. ZIMMERMAN MADE DROP A PART OF THIS CASE WHEN HE TOLD THE

6    JURY --

7           THE COURT:  I SAID THAT -- I SAID THAT THAT PART

8    COULD COME IN, THE DROP.  I GUESS I'M JUST NOT SEEING --

9           MS. DENNISON:  OKAY.

10          THE COURT:  RACHEL, HELP ME OUT HERE, BECAUSE I'M NOT

11   GETTING IT.  ARE YOU FOLLOWING THIS AT ALL NOW?

12          WE'RE OFF THE RECORD FOR A SECOND, LIZ.

13          (WHEREUPON, AN OFF-THE-RECORD DISCUSSION WAS HAD.)

14          THE COURT:  ALL RIGHT.  OKAY.  BACK ON THE RECORD.

15          MR. ZIMMERMAN, WHAT DID -- FOR YOUR OPENING STATEMENT

16   PURPOSES, DID YOU READ WHAT IS HIGHLIGHTED BEFORE THE COURT

17   RIGHT NOW?

18          MR. ZIMMERMAN:  NO, YOUR HONOR.

19          THE COURT:  WHAT DID YOU -- WHAT PORTION DID YOU SHOW

20   OR REFER TO?

21          MR. ZIMMERMAN:  THE ONLY PORTION I SHOWED WAS THE

22   TITLE:  SIG SAUER ISSUES VOLUNTARY UPGRADE PROGRAM.

23          THE COURT:  OKAY.  REGARDLESS OF WHAT YOU WENT INTO

24   IN OPENING, DO YOU AGREE THAT THIS DOCUMENT -- DO BOTH OF

25   YOU -- I'M ASKING MR. ZIMMERMAN RIGHT NOW -- WILL COME INTO

1    EVIDENCE IN ITS ENTIRETY?

2              MR. ZIMMERMAN:  NO, YOUR HONOR.  IN FACT, ON OUR

3    TRIAL EXHIBIT LIST, WE IDENTIFIED IT AS P320 VOLUNTARY UPGRADE

4    NOTICE, IN PARENTHESES, WITH REDACTIONS OF CONTENTS OTHER THAN

5    THE HEADING.

6              THE COURT:  OKAY.  I HAVE ASKED SEVERAL TIMES IF

7    THERE WAS ANY LIMITATION OR RESTRICTION TO THE AGREEMENT OF

8    THIS DOCUMENT COMING IN.  AND I HAVE BEEN TOLD NO.  THAT'S A

9    SPECIFIC QUESTION THAT I ASKED:  IS ONLY A REDACTED OR PORTION

10   OF THIS DOCUMENT COMING IN UNDER YOU-ALL'S AGREEMENT?

11             YOU ARE TELLING ME THAT, YES, YOU-ALL AGREED TO ONLY

12   A PORTION COMING IN?

13             MR. ZIMMERMAN:  YOUR HONOR, THAT IS PLAINTIFF'S

14   EXHIBIT, WHICH WE IDENTIFIED AS JUST THE TOP PORTION.  IN THE

15   OPENING, I GAVE HER A LIST OF THOSE DOCUMENTS WE INTEND TO USE,

16   WHICH IS -- IS IT P-95?

17             MR. HURD:  YES.

18             THE COURT:  YES.

19             MR. ZIMMERMAN:  PE-95.  AND PE-95 IS THE VOLUNTARY

20   UPGRADE NOTICE WITH REDACTIONS OTHER THAN THE HEADING.

21             SO THERE HAS NEVER BEEN AN AGREEMENT THAT THE WHOLE

22   DOCUMENT COMES IN.  IT IS NOT AN EXHIBIT OF DEFENSE.

23             THE COURT:  OKAY.

24             DID YOU NOT TELL ME SOMETHING DIFFERENT,

25   MS. DENNISON?

1          MS. DENNISON:  YES.  BECAUSE THAT -- THE MAY 30TH

2   EXHIBIT LIST THAT WE GOT SAID THAT IT WAS GOING TO BE THE

3   ENTIRE VOLUNTARY UPGRADE PROGRAM NOTICE, INCLUDING THE

4   STATEMENTS OF RON COHEN.  AND THIS IS ANOTHER VERSION OF IT,

5   WHICH I THINK WE RECEIVED ON THE EVE OF TRIAL.

6          THE COURT:  HAVE YOU TWO EVER SPOKEN TO EACH OTHER?

7          AND I'M SORRY.

8          MS. DENNISON:  WE SPEAK EVERY DAY, YOUR HONOR.

9          THE COURT:  THIS IS CRAZY THAT YOU-ALL ARE NOT IN

10  AGREEMENT ON SOMETHING LIKE THIS.  AND I'VE ASKED THIS SEVERAL

11  TIMES, BECAUSE THAT WAS CENTRAL TO MY -- TO MY QUESTIONING, IS

12  WHETHER THIS ENTIRE DOCUMENT WAS IN OR JUST A PORTION OR

13  REDACTED VERSION OF IT.

14          MS. DENNISON:  YOUR HONOR, FIRST OF ALL, WE SPEAK

15  EVERY DAY.  SO, YOU KNOW, THE ISSUE IS HERE, REGARDLESS, IS THE

16  ARGUMENT MADE IN OPENING BROUGHT DROP AND DROP SAFETY INTO

17  THIS.  AND SIG NEEDS TO BE ABLE TO SAY THAT THIS GUN WAS DROP

18  SAFE BECAUSE IT MET U.S. INDUSTRY STANDARDS.  IT WAS -- IT

19  WAS --

20          THE COURT:  OKAY.

21          MS. DENNISON:  -- OPENED THE DOOR ON IT, AND IT WILL

22  BE HIGHLY PREJUDICIAL TO EXCLUDE IT.

23          THE COURT:  ALL RIGHT.  I'M JUST GOING TO SAY THIS.

24  THIS IS VERY FRUSTRATING TO ME.  BECAUSE I THINK, REGARDLESS OF

25  MY ANSWER THAT I'M -- THE RULING I'M GOING TO PRONOUNCE,

1    YOU-ALL -- AND YOU BOTH HEARD EACH OTHER AND BOTH HEARD ME ASK

2    SEVERAL TIMES WHETHER THIS ENTIRE DOCUMENT WAS IN UNDER THE

3    AGREEMENT OR WHETHER THERE WAS ANY STIPULATION TO A REDACTION.

4    AND NO ONE SAID ANYTHING CONTRARY TO THE OTHER ONE'S RESPONSE.

5         SO YOU-ALL EITHER NEED TO LISTEN CAREFULLY, MORE

6    CAREFULLY, OR I NEED TO ASK MY QUESTIONS MORE CAREFULLY.  AND

7    I'LL TAKE THE BLAME FOR IT IF IT'S ME.

8         I DO RECALL THAT PORTION OF YOUR -- FROM YOUR

9    OPENING.  I JUST ASSUMED IT WAS NOT PROBLEMATIC BECAUSE IF

10   THERE -- IF I'M BEING TOLD THERE'S AN AGREEMENT FOR THIS WHOLE

11   THING TO COME IN, THEN I'M THINKING EVERYTHING'S OKAY.

12        I AM GOING TO -- BASED ON WHAT I RECALL FROM YOUR

13   OPENING STATEMENT AND MY ASSUMPTION -- WHICH I'M JUST GOING TO

14   GO WITH THE ASSUMPTION THAT THIS ENTIRE DOCUMENT IS IN.  I

15   DON'T KNOW WHICH OF YOU IS CORRECT.

16        I WILL SAY THAT THE DOOR HAS BEEN OPENED, AND YOU CAN

17   ASK ABOUT COMPLIANCE.  THAT'S MY RULING.

18        MR. ZIMMERMAN:  YOUR HONOR, MAY I JUST BE HEARD FOR

19   ONE MOMENT?

20        THE COURT:  YOU MAY BE HEARD.  AND THIS -- AND I'M

21   SORRY.  YOU-ALL MAY HAVE TO TIGHTEN UP YOUR AGREEMENTS GOING

22   FORWARD.  BUT YOU CERTAINLY MAY BE HEARD VERY BRIEFLY.

23        MR. ZIMMERMAN:  THIS WAS ONE OF THE MAJOR MOTIONS

24   IN LIMINE THAT PLAINTIFF FILED TO PRECLUDE EVIDENCE OF INDUSTRY

25   STANDARDS.

1          WE DISCUSSED WITH MS. DENNISON THAT THEY COULD SAY

2   YESTERDAY THEY CONTEST, THEY TESTED, AND IT DIDN'T PASS

3   THEIR -- IT DIDN'T PASS OTHERS' DROP TESTING.

4          THIS IS AN ATTEMPT TO GET IN INDUSTRY STANDARDS

5   BECAUSE I SAID VOLUNTARY UPGRADE PROGRAM, WHICH HAS BEEN DEEMED

6   ADMISSIBLE ALREADY.

7          THE COURT:  ALL RIGHT.  I APPRECIATE IT.  I'M SORRY.

8   AND THIS IS WHAT I WOULD SUGGEST -- AND YOU-ALL ARE MAKING IT

9   DIFFICULT.  YOU-ALL MAY NEED TO REDUCE YOUR AGREEMENTS, YOUR

10  SO-CALLED AGREEMENTS TO WRITING SO THAT EVERYONE IS ON THE SAME

11  PAGE.  THAT'S ALL I CAN TELL YOU.

12         I APOLOGIZE IF THIS IS CONTRARY TO A PRIOR RULING.

13  I'M GOING BY WHAT I RECALL HEARING TODAY.  I'M SORRY THAT THERE

14  IS SOME DISCREPANCY IN THE AGREEMENT, THAT THERE WAS SOME LACK

15  OF UNDERSTANDING WITH RESPECT TO THE QUESTIONS I ASKED EARLIER.

16         BUT BASED ON WHAT I HEARD IN OPENING TODAY, I AM

17  GOING TO FIND THAT THE DOOR HAS BEEN OPENED AND THAT SHE CAN GO

18  INTO SOME INDUSTRY STANDARDS.  THAT'S MY RULING.  SORRY.

19         LET'S BRING THEM IN.

20         AND HERE'S THE EXHIBIT.

21         MS. DENNISON:  THANK YOU, YOUR HONOR.  MAY I APPROACH

22  AND GRAB IT?

23         THE COURT:  GET IT.

24         THE COURTROOM SECURITY OFFICER:  ALL RISE.

25         (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

1   1:39 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

2            THE COURT:  ALL RIGHT.  THE JURY IS SEATED.  EVERYONE

3   ELSE MAY BE SEATED.

4            LADIES AND GENTLEMEN, I HOPE YOU ENJOYED YOUR LUNCH.

5   WE ARE BACK AND READY TO GO.

6            WHERE WERE WE AT THIS POINT?  REMIND ME OF WHERE WE

7   WERE.

8            WAS MR. TONER STILL ON THE STAND?

9            MR. ZIMMERMAN:  YES, YOUR HONOR.

10           THE COURT:  OKAY.  MR. TONER, ARE YOU IN THE

11  COURTROOM, SIR?

12           COME ON BACK UP.  AS YOU COME UP, SIR, I REMIND YOU

13  THAT YOU ARE UNDER OATH STILL.

14           YOU MAY RESUME YOUR EXAMINATION.

15           MR. ZIMMERMAN:  THANK YOU, YOUR HONOR.

16  BY MR. ZIMMERMAN:

17  Q.   SIR, DESPITE ISSUING A REPORT WHERE YOU GAVE OPINIONS

18  ABOUT MR. LANG'S INCIDENT, YOU'RE NOW NOT PLANNING TO OFFER ANY

19  OF THOSE TO THE JURY.  CORRECT?

20  A.   CORRECT.

21  Q.   OKAY.  LET'S TALK ABOUT TRIGGER WEIGHT.

22       CAN WE AGREE THAT TRIGGER WEIGHT IS ESSENTIALLY THE AMOUNT

23  OF FORCE THAT NEEDS TO BE EXERTED ON THE TRIGGER TO PULL AND

24  FIRE THE WEAPON?

25  A.   YES.  THAT IS CORRECT.

1    Q.   OKAY.  NOW, I IMAGINE SIG PROVIDES OWNER'S OR OPERATOR'S

2    MANUALS WITH ALL OF THEIR GUNS, NOT JUST THE P320.

3    A.   WE USED TO PROVIDE HARD COPY OF THE MANUAL, BUT I BELIEVE

4    WE DO IT ELECTRONICALLY NOW.

5    Q.   HOW ABOUT BACK IN 2018?

6    A.   AT THAT POINT IT SHOULD HAVE BEEN A HARD COPY, I WOULD

7    BELIEVE.

8    Q.   OKAY.

9         MR. ZIMMERMAN:  I WILL MARK FOR IDENTIFICATION JOINT

10   EXHIBIT 8, WHICH IS A COPY OF MR. LANG'S MANUAL.  AND I WILL

11   SHOW THE WITNESS BEFORE PUBLISHING.

12        THE COURT:  AND LET ME JUST UNDERSTAND.  WHEN YOU SAY

13   JOINT EXHIBIT, DOES THAT MEAN THAT YOU-ALL HAVE AGREED NOT TO

14   OBJECT TO THE ADMISSIBILITY OF THOSE PARTICULAR EXHIBITS?

15        MS. DENNISON:  YES, YOUR HONOR.

16        MR. ZIMMERMAN:  YES, YOUR HONOR.

17        THE COURT:  OKAY.  I MAY STILL ASK FOR THE RECORD,

18   BUT I JUST WANT TO BE SURE.

19        ALL RIGHT.  GO AHEAD.

20   BY MR. ZIMMERMAN:

21   Q.   I'M GOING TO SHOW YOU AND HAND YOU JOINT TRIAL EXHIBIT 8.

22        CAN YOU JUST TAKE A LOOK AT THAT AND CONFIRM THAT IS THE

23   OPERATOR'S MANUAL FOR THE P320 X SERIES?

24   A.   YES, IT IS.

25   Q.   SIR, IF YOU CAN GO TO PAGE 78.

1          THE COURT:  OKAY.  AND SO EVEN THOUGH THERE'S A JOINT

2     AGREEMENT NOT TO OBJECT, YOU'RE MOVING THAT INTO EVIDENCE?

3          MR. ZIMMERMAN:  YES, YOUR HONOR.  I JUST WANT TO

4     CONFIRM 78 SHOWS THE TRIGGER WEIGHTS, AND THEN I'LL MOVE IT

5     INTO EVIDENCE.

6          THE COURT:  OKAY.  ALL RIGHT.

7          MR. ZIMMERMAN:  WE'RE STILL PLANNING TO.

8          THE COURT:  OKAY.

9     BY MR. ZIMMERMAN:

10    Q.   78, SIR?

11    A.   YES, I'M THERE.

12    Q.   OKAY.  AND DOES THAT SHOW TRIGGER WEIGHTS FOR THE X

13    SERIES?

14    A.   THERE'S A LOT OF SPECIFICATIONS ON THE CHART, BUT TRIGGER

15    WEIGHT IS ONE OF THEM.

16    Q.   OKAY.

17         MR. ZIMMERMAN:  AT THIS TIME, YOUR HONOR, I SEEK TO

18    MOVE INTO EVIDENCE JOINT EXHIBIT 8.

19         THE COURT:  ADMITTED BY STIPULATION?

20         MS. DENNISON:  YES, YOUR HONOR.

21         THE COURT:  ALL RIGHT.

22    BY MR. ZIMMERMAN:

23    Q.   SO WE HAVE A FEW GUNS HERE.  IF WE LOOK AT THE COLUMNS, WE

24    SEE X5, X-VTAC, X-CARRY.

25         DO YOU SEE THOSE?

1    A.   YES, I DO.

2    Q.   OKAY.  AND WHILE THE TRIGGER WEIGHT'S THE SAME, I JUST

3    WANT TO MAKE SURE THAT WE'RE ALL ON THE SAME PAGE.

4         MR. LANG'S GUN WAS AN X-CARRY?

5    A.   ARE YOU CONFIRMING THAT WITH ME, SIR?

6    Q.   YES.  YOU DID WRITE A REPORT AND LOOK AT CERTAIN

7    INFORMATION.  CAN YOU CONFIRM THAT HE HAD AN X-CARRY?

8    A.   YES, IT WAS.

9    Q.   OKAY.  SIR, DID SIG SAUER MAKE A PROMISE IN THIS MANUAL

10   THAT YOU WOULD DELIVER A GUN TO MR. LANG THAT REQUIRED 6 POUNDS

11   OF FORCE TO PULL THE TRIGGER?

12   A.   SO THE TRIGGER PULL WEIGHT IS LISTED IN THIS CHART AS

13   6 POUNDS.

14   Q.   OKAY.  WELL, LET'S GET BACK TO MY QUESTION.

15        DID YOU MAKE A PROMISE TO THE CUSTOMERS IN THIS MANUAL

16   THAT SIG WOULD DELIVER A GUN THAT REQUIRED 6 POUNDS OF FORCE TO

17   PULL THE TRIGGER?

18   A.   IT'S LISTING THE NOMINAL RANGE OF THE TRIGGER PULL, BUT

19   THERE IS VARIATION TO THAT.

20   Q.   OKAY. SO YOU DID NOT PROMISE THAT, OR YOU DID?  I DON'T

21   KNOW --

22   A.   I MEAN, THIS IS A -- THIS IS A MANUAL.  IT'S NOT A

23   SPECIFICATION WITH THE VARIATION INCLUDED IN IT.  SO THIS IS

24   A -- WHAT I WOULD CALL A NOMINAL RANGE.  SO IT COULD BE PLUS OR

25   MINUS FROM THERE.

1  Q.   OKAY.  WHAT'S THE WORD AT THE TOP SAY?  SERIES WHAT?

2  A.   SPECIFICATIONS.

3  Q.   OKAY.  AND IS THERE A RANGE TO SAY 4 AND A HALF TO 7 AND A

4  HALF?

5  A.   NOT ON THIS DOCUMENT, NO.

6  Q.   DOES IT SAY 5 TO 7?

7  A.   NO, IT DOES NOT.

8  Q.   DOES IT SAY ANYTHING OTHER THAN 6 POUNDS OF TRIGGER WEIGHT

9  TO FIRE THE PISTOL THAT MR. LANG RECEIVED?

10 A.   IT SAYS 6 POUNDS.

11 Q.   SIR, CAN WE AGREE THAT A GUN THAT IS SUPPOSED TO FIRE AT

12 6 POUNDS BUT FIRES WITH LESS WEIGHT BEING PUT ON THAT TRIGGER

13 FAILS TO LIVE UP TO THE GUN COMPANY'S PROMISE?

14 A.   SO I THINK THAT THE -- WHAT WAS NOT INCLUDED ON THE

15 SPECIFICATION CHART WAS THE RANGE OF POSSIBLE WEIGHTS THAT YOU

16 WOULD SEE BOTH ON THE UNDERSIDE AND THE OVERSIDE.

17 Q.   DID MR. LANG GET THE CHOICE TO GET THE MANUAL THAT HAD A

18 RANGE OR DID YOU GIVE HIM THE ONE THAT SAID THE GUN WON'T FIRE

19 UNLESS YOU PUT 6 POUNDS ON THE TRIGGER?

20 A.   I DON'T SEE A RANGE ON THIS PARTICULAR DOCUMENT.

21 Q.   OKAY.  DID YOU SUGGEST TO SOMEBODY, HEY, MAYBE WE SHOULD

22 GIVE CUSTOMERS A RANGE SO THAT THEY CAN KNOW WHAT GUN THEY ARE

23 ACTUALLY PURCHASING?

24      THIS IS -- THIS IS THE MANUAL.  CORRECT?

25 A.   THIS IS THE MANUAL, YES.

1    Q.   DID YOU CONSIDER WHETHER TO GIVE MR. LANG ACCURATE

2    INFORMATION IN THE MANUAL ABOUT TRIGGER WEIGHT?

3    A.   AS ENGINEERING, DESIGN ENGINEERING, THAT'S NOT OUR ROLE,

4    IS TO PROVIDE THE NUMBERS FOR THESE SPECIFICATIONS.

5    Q.   OKAY.  SO THE DESIGN ENGINEERING TEAM DOES NOT STAND BY

6    THE SPECIFICATIONS IN THE MANUAL?

7    A.   I'M JUST SAYING THAT THERE IS A RANGE.  IT'S NOT EXACTLY

8    6 POUNDS ON EVERY GUN.

9    Q.   OKAY.  HAVE YOU SEEN OTHER MANUALS WHERE THEY ACTUALLY

10   GIVE A RANGE?

11   A.   NOT THAT I RECALL AT THE MOMENT.

12   Q.   OKAY.  SO THIS IS JUST WHAT YOU WOULD LIKE TO SEE HAPPEN,

13   GIVE A RANGE TO CUSTOMERS?

14   A.   I THINK IT WOULD BE MORE ACCURATE INFORMATION.

15   Q.   AND THIS IS LESS ACCURATE INFORMATION THAT MR. LANG

16   RECEIVED.  CORRECT?

17   A.   YES.  IT DOESN'T INCLUDE THE RANGE THAT WE WOULD SEE IN

18   MANUFACTURING VARIATION.

19   Q.   OKAY.  WOULD YOU EXPECT THE EXPERTS IN THIS CASE -- AND,

20   SIR, YOU'RE NOT SEEKING TO BE QUALIFIED AS A EXPERT IN THIS

21   CASE NOW, ARE YOU?

22   A.   THAT'S CORRECT.

23   Q.   OKAY.  THE EXPERTS IN THIS CASE TESTED THE TRIGGER, I'LL

24   REPRESENT TO YOU, BETWEEN 4 AND A HALF AND 5 POUNDS.

25        DOES THAT MEET THE 6 POUND TRIGGER WEIGHT IN THE

1    OPERATOR'S MANUAL?

2    A.   IT DOESN'T MEET THE WEIGHT THAT'S SPECIFIED IN THE

3    SPECIFICATION CHART, BUT IT'S NOT OUTSIDE WHAT I WOULD EXPECT

4    TO SEE.

5    Q.   OKAY.  WHAT ABOUT MR. LANG, WHAT HE EXPECTED TO SEE?

6        DID HE RECEIVE ANYTHING ELSE THAT SAID, THIS GUN MIGHT

7    FIRE WITH AS LITTLE AS 4 AND A HALF POUNDS OF FORCE?

8    A.   I DON'T -- I CAN'T ANSWER THAT QUESTION, WHAT HE RECEIVED

9    AND WHAT HE DIDN'T.

10   Q.   OKAY.  ARE YOU AWARE OF ANY OTHER DOCUMENTS THAT COME

11   ALONG WITH THE GUN THAT SAYS, HEY, LISTEN TO ME, DON'T LISTEN

12   TO THE MANUAL; WE'RE ONLY GOING TO GIVE YOU 4 AND A HALF POUNDS

13   OF TRIGGER WEIGHT?

14   A.   NOT THAT I'M AWARE OF.

15   Q.   SIR, DIDN'T YOU TESTIFY ON ANOTHER OCCASION THAT YOU'VE

16   NEVER SEEN A P320 X HAVE A TRIGGER WEIGHT AS LOW -- OR UNDER

17   5 AND A HALF POUNDS?

18   A.   I DON'T RECALL IF I SAID 5 AND A HALF POUNDS.  BUT I HAVE

19   SEEN THEM PLUS OR MINUS 1 POUND OR SO.

20   Q.   PLUS OR MINUS 1 POUND FROM WHAT?

21   A.   FROM 6.

22   Q.   SO YOU'VE SEEN AS LOW AS 5?

23   A.   I BELIEVE SO, YES.

24   Q.   SIR, DO YOU RECALL IN PRIOR TESTIMONY, WHEN YOU WERE ASKED

25   WITH RESPECT TO THE --

1          MR. ZIMMERMAN:  FOR THE RECORD, WE'RE READING AT

2     TRANSCRIPT UNNAMED, PAGE 195, LINES 13 TO 22.

3     BY MR. ZIMMERMAN:

4     Q.   DO YOU RECALL BEING ASKED:  TELL ME WHICH ONES -- WITH

5     RESPECT TO THE WEIGHTS, ARE THEY ALL NOT ACCURATE OR JUST SOME

6     OF THEM NOT ACCURATE?

7          WE'RE TALKING ABOUT THE WEIGHTS IN MANUALS.

8          ANSWER:  WELL, I MEAN, THEY'RE ALL A LITTLE BIT SKEWED.

9     THE STANDARD P320 CLIMB RANGE COULD GO OVER 7 POUNDS.  I DON'T

10    THINK I'VE EVER SEEN ONE THAT'S AS LOW AS 5 AND A HALF.  SO I

11    THINK THAT RANGE IS OFF.  SO, TYPICALLY, IN THE 6 AND A HALF TO

12    7 AND A HALF RANGE.

13         DO YOU RECALL SAYING THAT, SIR?

14    A.   I DON'T RECALL IT EXPLICITLY.  BUT IF YOU HAVE IT IN THE

15    TRANSCRIPTS, I'LL AGREE WITH YOU.

16    Q.   DO YOU RECALL TESTIFYING THAT THE EXACT -- THERE ARE THREE

17    TYPES OF TRIGGERS, AFTER THE ONE THAT HAD TO BE REDESIGNED,

18    THAT SIG SAUER GENERALLY SELLS WITH THE P320?

19    A.   YES, THERE ARE THREE DIFFERENT TRIGGER TYPES.

20    Q.   OKAY.  SO ONE IS A CURVED TRIGGER?

21    A.   THAT'S CORRECT.  THE STANDARD TRIGGER.

22    Q.   ONE IS A FLAT TRIGGER?

23    A.   YES.

24    Q.   AND THEN THERE'S ANOTHER ONE THAT'S A FLAT TRIGGER THAT'S

25    SKELETONIZED, WHICH HAS A HOLE.  YOU CAN SEE THROUGH THE

1  MIDDLE.

2  A.   THAT'S CORRECT.

3  Q.   AND MR. LANG'S WAS THE MIDDLE ONE, RIGHT?  THAT FLAT

4  TRIGGER WITHOUT THE SKELETONIZED PORTION.

5  A.   THAT'S CORRECT.

6  Q.   FOR THAT, DO YOU RECALL TESTIFYING THAT YOU WOULD EXPECT

7  TO SEE BETWEEN 6 AND 6 AND A HALF POUNDS OF PRESSURE TO PULL

8  THE TRIGGER?

9  A.   I DON'T RECALL THAT TESTIMONY.

10  Q.   SIR, IN ANOTHER TRANSCRIPT --

11         MR. ZIMMERMAN:  READING FROM UNNAMED TRANSCRIPT,

12  PAGE 73, LINES 4 TO 13.

13  BY MR. ZIMMERMAN:

14  Q.   THIS IS A RECENT ONE, SIR, FROM --

15         THE COURT:  I'M SORRY.  WHAT DOCUMENT -- THOSE LINES

16  ARE FROM WHAT DOCUMENT?

17         MR. ZIMMERMAN:  THIS IS FROM A PRIOR TRANSCRIPT --

18         THE COURT:  OKAY.

19         MR. ZIMMERMAN:  -- YOUR HONOR.  IN FACT --

20         THE COURT:  OF THIS WITNESS'S TESTIMONY?

21         MR. ZIMMERMAN:  OF THIS WITNESS'S TESTIMONY.

22         THE COURT:  OKAY.

23         MR. ZIMMERMAN:  PAGE 73.  THIS WAS TAKEN A FEW WEEKS

24  AGO.

25         THE WITNESS:  OKAY.

1    BY MR. ZIMMERMAN:

2    Q.   WITHOUT EXACTNESS TO IT, WOULD CURVED BE AROUND THAT 7 AND

3    A HALF, FLAT WOULD BE AROUND THE 6 AND A HALF, 5 WOULD BE

4    AROUND THE 5 AND A HALF -- I'M SORRY -- SKELETON WOULD BE

5    AROUND THE 5 AND A HALF POUNDS?

6        ANSWER:  TYPICALLY, CURVED IS 7, 7 AND A HALF; FLAT IS 6,

7    6 AND A HALF; AND THEN THE SKELETON ONE IS 5 AND A HALF TO 6,

8    SOMEWHERE IN THAT RANGE.

9            MS. DENNISON:  OBJECTION, YOUR HONOR.  SORRY.  COULD

10   WE HAVE THE WITNESS VIEW THE TESTIMONY THAT HE'S --

11           THE COURT:  I DON'T MIND -- I HAVE NO IDEA WHAT IT

12   IS.  I'M ASSUMING YOU-ALL DO SINCE YOU HAVEN'T OBJECTED TO IT.

13   I DON'T KNOW WHAT TRANSCRIPT THIS IS, BUT I DON'T HAVE A

14   PROBLEM WITH THAT IF IT WOULD BE MORE HELPFUL.

15           IT HASN'T BEEN IDENTIFIED SUFFICIENTLY FOR THE

16   RECORD, BUT PERHAPS YOU-ALL HAVE SOME AGREEMENT IN PLACE FOR

17   THAT.

18           MS. DENNISON:  WE DO, YOUR HONOR.  THANK YOU.

19           THE COURT:  AND I ASSUME BOTH PARTIES HAVE THE SAME

20   UNDERSTANDING REGARDING THAT AGREEMENT.  ALL RIGHT.  BY MR.

21   ZIMMERMAN:

22   Q.   SIR, DID YOU TESTIFY A FEW WEEKS AGO THE FLAT TRIGGER, YOU

23   WOULD EXPECT TO SEE 6 TO 6 AND A HALF POUNDS?

24   A.   IT'S POSSIBLE THAT I SAID THAT, YES.

25   Q.   THE OTHER POSSIBILITY IS, WHAT, THE COURT REPORTER GOT IT

1    WRONG?

2    A.   I'M READING MY TRANSCRIPT, AND I SEE THAT, YES.

3         THE COURT:  AND, AGAIN, JUST FOR THE RECORD, THAT

4    TRANSCRIPT TO WHICH HE REFERRED, EVEN THOUGH IT HASN'T BEEN

5    IDENTIFIED FULLY, YOU'RE REFERRING TO IT AS WHAT NUMBER,

6    EXHIBIT NUMBER?

7         MR. ZIMMERMAN:  YOUR HONOR, IT IS NOT AN EXHIBIT

8    NUMBER BASED UPON THE PRIOR RULINGS.  WE'RE IDENTIFYING IT TO

9    DEFENSE SO THAT THEY HAVE AN OPPORTUNITY TO SEE IT, BUT IT'S

10   NOT GOING TO BE ADMITTED INTO EVIDENCE.

11        THE COURT:  JUST IDENTIFIED AS -- I UNDERSTAND IT'S

12   NOT GOING INTO EVIDENCE.  I JUST WANT THE RECORD TO BE FULL AND

13   CLEAR.  A PRIOR TRANSCRIPT OF THIS WITNESS.

14        MR. ZIMMERMAN:  YES, YOUR HONOR.

15        THE COURT:  OKAY.

16   BY MR. ZIMMERMAN:

17   Q.   SIR, HAVE YOU EVER STUDIED OR TESTED WHETHER GUNS WITH

18   TRIGGER WEIGHTS THAT FALL BELOW THE STANDARDS THAT YOU PROMISED

19   WOULD HAVE MORE INSTANCES OF UNINTENDED DISCHARGES?

20   A.   NO.  THAT IS NOT SOMETHING THAT WE'VE ENDEAVORED.

21   Q.   I WANT TO TALK A LITTLE BIT ABOUT SINGLE-ACTION VERSUS

22   DOUBLE-ACTION.  OKAY?  AND WE'VE TALKED ABOUT THIS BEFORE.  IF

23   YOU AGREE WITH ME, GREAT.  YOU CAN TELL ME.  IF NOT, WE CAN

24   DEAL WITH IT.

25        A SINGLE-ACTION PISTOL IS ONE WHERE THERE'S ONE ACTION OR

1    MOVEMENT OF THE FIRING MECHANISM.  FAIR?

2    A.    YES.  THAT IS ONE WAY YOU CAN DESCRIBE IT.

3    Q.    AND IN A SINGLE-ACTION PISTOL, THE FIRING MECHANISM IS

4    PRELOADED OR PRECOCKED.  FAIR?

5    A.    YES.  MOSTLY, THAT'S CORRECT.

6    Q.    DOUBLE-ACTION, DOUBLE-ACTION PISTOLS ARE ONES WHERE THERE

7    ARE TWO ACTIONS OR MOVEMENT OF THE FIRING MECHANISM.  CORRECT?

8    A.    YES.

9    Q.    IT'S NOT JUST FORWARDS BUT BACKWARDS AS WELL.

10   A.    CORRECT.

11   Q.    AND IN A DOUBLE-ACTION, AFTER THE PISTOL'S FIRING

12   MECHANISM IS PULLED BACKWARDS, THEN A CONTINUED TRIGGER PULL

13   WILL FIRE THE WEAPON.  FAIR?

14   A.    YES.  THAT'S CORRECT.

15   Q.    SIR, CAN WE AGREE AT THE BEGINNING OF A PULL ON A

16   DOUBLE-ACTION PISTOL, THE DOUBLE-ACTION PISTOL WILL HAVE MORE

17   TRIGGER WEIGHT BECAUSE IT'S ACTUALLY PULLING BACK THAT STRIKER?

18   A.    WELL, IT'S MORE OF A HAMMER TURN; BUT, YES, IT WOULD BE

19   PULLING BACK THE HAMMER.

20   Q.    OKAY.  AND, SIMILAR WITH STRIKER, RIGHT?  IF YOU'RE

21   PULLING BACK THE STRIKER, THE WEIGHT IS GOING TO INCREASE

22   EARLIER FOR A DOUBLE-ACTION.

23   A.    THAT'S CORRECT.

24   Q.    SO HAVE YOU SEEN THE TERM "PRE-TRAVEL" WHEN IT COMES TO

25   THE P320?

1   A.   YES.

2   Q.   OKAY.  AND PRE-TRAVEL IS THE DISTANCE THAT THE TRIGGER IS

3   GOING TO MOVE FROM REST TO A CERTAIN POINT BEFORE IT IMPACTS

4   THE STRIKER.  FAIR?

5   A.   NOT COMPLETELY.

6   Q.   OKAY.  PLEASE.

7   A.   SO PRE-TRAVEL WOULD BE A TERM THAT YOU WOULD USE FOR WHEN

8   THE TRIGGER IS AT REST TO THE VERY START OF SEER MOVEMENT, OR

9   WHEN YOU'RE STARTING TO REALLY SEE SEER FROM THE STRIKER -- OR

10  THE STRIKER FROM THE SEER.  EXCUSE ME.

11  Q.   RIGHT.  THAT'S THE POINT AT WHICH THE STRIKER BEGINS TO

12  MOVE.

13  A.   THAT'S CORRECT.

14  Q.   SIR, HAVE YOU EVER TESTIFIED THAT THE P320 WAS A

15  DOUBLE-ACTION PISTOL?

16  A.   I BELIEVE I HAVE USED THAT TERM IN THE PAST, YES.

17  Q.   AND YOU WERE UNDER OATH WHEN YOU DID THAT.

18  A.   CORRECT.

19  Q.   HAVE YOU TESTIFIED THAT THE P320 IS A SINGLE-ACTION

20  PISTOL?

21  A.   I BELIEVE THAT I'VE TESTIFIED THAT IT WAS MORE AKIN TO A

22  SINGLE-ACTION PISTOL, MEANING MORE LIKE A SINGLE-ACTION PISTOL

23  THAN A DOUBLE-ACTION.

24  Q.   OKAY.  AND THEN A FEW WEEKS AGO, DID YOU TESTIFY THERE

25  THAT THE P320 WAS A DOUBLE-ACTION PISTOL?

1  A.   I'M GOING OFF MY MEMORY, BUT I BELIEVE I SAID IT WAS A

2  STRIKER-FIRED -- I MAY HAVE SAID DOUBLE-ACTION.  BUT, LIKE I

3  SAID, IT'S MORE AKIN TO A SINGLE-ACTION PISTOL.

4  Q.   DO WORDS MATTER TO YOU, SIR?

5  A.   YES.

6  Q.   ESPECIALLY WHEN YOU'RE TALKING ABOUT A GUN THAT YOU

7  DESIGN?

8  A.   YES.

9          MR. ZIMMERMAN:  IT'S FOR IDENTIFICATION, SAME

10  TRANSCRIPT, PAGE 120, LINES 9 TO 16.

11          MS. DENNISON:  OBJECTION.  IMPROPER IMPEACHMENT.

12          THE COURT:  I DON'T KNOW -- AGAIN, I DON'T EVEN KNOW

13  WHAT IT IS.

14          MR. ZIMMERMAN:  I'LL WITHDRAW IT.

15          THE COURT:  ALL RIGHT.

16  BY MR. ZIMMERMAN:

17  Q.   SIR, DID YOU CALL IT A DOUBLE-ACTION STRIKER GUN ABOUT

18  THREE WEEKS AGO?

19  A.   I BELIEVE I DID USE THAT TERM, BUT I QUALIFIED IT WITH

20  SAYING THAT IT WAS MORE LIKE A SINGLE-ACTION.

21  Q.   DIDN'T YOU SAY IT'S NOT THE SAME AS A SINGLE-ACTION?

22  A.   SO A SINGLE-ACTION IS MORE OF A HAMMER-FIRED WEAPON TERM,

23  SO IT'S HARD TO CLASSIFY A STRIKER AS SUCH.  BUT THE REALITY

24  IS, WITH THE AMOUNT OF MOVEMENT OF OUR STRIKER SYSTEM, IT'S

25  MORE OF A SINGLE-ACTION.  SO I WOULD CLASSIFY IT AS A

1    STRIKER-FIRED SINGLE-ACTION.

2    Q.   SIR, WHY DID YOU SAY IT'S A DOUBLE-ACTION THREE WEEKS AGO?

3    A.   SO WHAT I WAS REFERRING TO WAS THE -- THE MINOR MOVEMENT

4    OF THE STRIKER THAT GOES TO THE REAR AND FULLY COCKS THE

5    STRIKER SYSTEM.  BUT THE REALITY IS THAT IT'S ALMOST FULLY

6    COCKED WHEN IT'S IN A CLOSED STATE BEFORE YOU PULL THE TRIGGER.

7    Q.   MY APOLOGIES.  YOU SAID SINGLE BEFORE, YOU SAID DOUBLE

8    BEFORE.

9        WHAT IS YOUR TESTIMONY TODAY?  IS IT SINGLE OR DOUBLE?

10   A.   IT'S A STRIKER-FIRED SINGLE-ACTION SYSTEM.

11   Q.   WHY YOU DID SAY ON TWO OF THE THREE PRIOR OCCASIONS IT WAS

12   DOUBLE?

13            MS. DENNISON:  OBJECTION.  ASKED AND ANSWERED.

14            THE COURT:  OVERRULED.

15            THE WITNESS:  I'VE JUST -- I'VE HAD TIME TO THINK

16   ABOUT IT AND TO DELINEATE BETWEEN THAT MINOR MOVEMENT OF THE

17   STRIKER GOING REARWARD AS YOU'RE PULLING THE TRIGGER.  IT

18   DOESN'T MAKE SENSE TO CALL IT A DOUBLE-ACTION.

19   BY MR. ZIMMERMAN:

20   Q.   HOW MUCH TIME DID YOU NEED TO THINK ABOUT IT, SIR?

21   A.   I DON'T HAVE A TIME FRAME FOR YOU.

22   Q.   DAYS, WEEKS, MONTHS, YEARS?

23   A.   A COUPLE DAYS.

24   Q.   OKAY.  BUT WHY LAST MONTH?

25        LET ME TAKE THAT BACK.

1      WHEN YOU SAID YOU THOUGHT ABOUT IT, AND YOU'RE GOING TO GO

2   SINGLE-ACTION, WHEN DID YOU ACTUALLY COME TO THAT CONCLUSION?

3   A.   IT WAS SHORTLY AFTER WE HAD THAT TESTIMONY.

4   Q.   WHICH ONE?  FROM A FEW WEEKS AGO?

5   A.   THE ONE THAT YOU'RE REFERRING TO.

6   Q.   SIR, WAS IT YOUR 2022 TESTIMONY OR 2023 TESTIMONY OR YOUR

7   2024 TESTIMONY?

8      WHEN DID YOU COME TO THAT ENLIGHTENMENT?

9   A.   IT WAS AFTER THE MOST RECENT ONE, SO IT WOULD HAVE BEEN

10  2024.

11  Q.   OKAY.  SO UP UNTIL A MONTH AGO, YOU WEREN'T SURE IF THE

12  GUN YOU MADE IS A SINGLE OR A DOUBLE-ACTION GUN?

13  A.   IT'S NOT THAT I WASN'T SURE.  IT'S THAT I WAS HOLDING ONTO

14  THE THOUGHT OF THE STRIKER MOVEMENT GOING REARWARD.  AND I CAME

15  TO THE CONCLUSION THAT THAT MINOR MOVEMENT WAS NOT ENOUGH TO

16  CLASSIFY IT AS DOUBLE-ACTION.

17  Q.   WHY WERE YOU HOLDING ONTO THAT?

18  A.   JUST BECAUSE OF THE TECHNICAL NATURE OF IT.  BUT WHAT IT

19  REALLY COMES DOWN TO IS, YOU KNOW, THE PERCENTAGES THAT DIDN'T

20  MAKE SENSE TO ME IN MY HEAD WHEN I THOUGHT ABOUT IT FROM THAT

21  ANGLE.

22  Q.   WHY DID YOU TESTIFY TO IT UNDER OATH?

23  A.   BECAUSE AT THE TIME, I WAS THINKING ABOUT --

24          MS. DENNISON:  OBJECTION.  ASKED AND ANSWERED.

25          MR. ZIMMERMAN:  I'LL WITHDRAW IT.

1   BY MR. ZIMMERMAN:

2   Q.   SIR, YOU'RE NOT THE ONLY PERSON AT SIG WHO HAS CALLED THIS

3   A DOUBLE-ACTION PISTOL.  CORRECT?

4   A.   THAT'S POSSIBLE.

5   Q.   ARE YOU AWARE THAT SIG'S OWN PRODUCT MANUAL, THE CATALOG,

6   CALLED IT A DOUBLE-ACTION PISTOL?

7   A.   YES, I AM.

8   Q.   WERE YOU IN THE DOUBLE-ACTION CAMP THEN OR WERE YOU IN THE

9   SINGLE-ACTION CAMP THEN?

10  A.   LIKE I SAID, IT WAS KIND OF A RECENT THING THAT I'VE COME

11  TO THAT CONCLUSION.  BUT -- SO AT THAT TIME I MAY HAVE BEEN

12  THINKING THAT IT WAS DOUBLE-ACTION.

13  Q.   HOW ABOUT IN 2018, WHEN MR. LANG PURCHASED HIS WEAPON, IN

14  THAT YEAR, WHICH WAY WERE YOU GOING?

15  A.   I MEAN, NOBODY WAS ASKING ME ABOUT IT, BUT MY CONCLUSION

16  IS THE SAME.  WITH THAT MINOR REARWARD STRIKER MOVEMENT, I

17  WOULDN'T CALL THAT A DOUBLE-ACTION.

18  Q.   WELL, YOU TESTIFIED BOTH WAYS.

19       DO YOU KNOW WHAT YOU WERE THINKING BACK IN 2018 WHEN

20  MR. LANG PURCHASED YOUR WEAPON?

21           MS. DENNISON:  OBJECTION, YOUR HONOR.  ASKED,

22  ANSWERED, IRRELEVANT, ARGUMENTATIVE.

23           THE COURT:  ALL RIGHT.  OVERRULED.

24           THE WITNESS:  I DON'T RECALL WHAT I WAS THINKING IN

25  2018 ON THAT SUBJECT.

1    BY MR. ZIMMERMAN:

2    Q.   SIR, CAN WE AGREE THAT USERS CANNOT SEE FOR THEMSELVES

3    WHETHER A GUN IS DOUBLE- OR SINGLE-ACTION?

4    A.   I THINK FROM THE -- I THINK FROM THE USER'S STANDPOINT,

5    DEPENDING ON WHAT TYPE OF GUN IT IS, WHETHER IT'S A

6    HAMMER-FIRED OR A STRIKER-FIRED, YOU'RE GOING TO GET DIFFERENT

7    INPUTS, AND YOU CAN DRAW YOUR CONCLUSIONS BASED ON THAT.

8    Q.   OKAY.  SO IS THERE ANY WAY FOR A USER TO SEE WHETHER A

9    STRIKER-FIRED GUN IS COCKED OR UNCOCKED FOR A P320?

10   A.   NO, THERE ISN'T.  WHEN THE SLIDE IS CLOSED, YOU SHOULD BE

11   ASSUMING THAT IT'S COCKED.

12   Q.   BECAUSE, DESPITE WHEN WE CUT INTO THE SLIDE, SIG DOESN'T

13   OFFER THEIR GUNS WHERE YOU CAN SEE THROUGH THE SIDE OF THE

14   SLIDE.  CORRECT?

15   A.   I'M SORRY.  WHAT ARE YOU REFERRING TO?

16   Q.   YOU'VE SEEN, I BELIEVE, SOME PICTURES OR VIDEOS WHERE THE

17   SLIDE HAS A CUTOUT WHERE YOU CAN SEE INTO IT.  HAVE YOU SEEN

18   THOSE?

19   A.   YES.

20   Q.   OKAY.  AND YOU DON'T OFFER THOSE TO THE PUBLIC, OBVIOUSLY.

21   A.   NO, WE DON'T.

22   Q.   IS IT IN THE MANUAL THAT THIS IS A PRECOCKED PISTOL?

23   A.   I DON'T KNOW THAT FOR CERTAIN.

24   Q.   DO YOU AGREE WITH THE BASIC CONCEPT THAT USERS, CUSTOMERS

25   HAVE TO RELY ON THE GUN MANUFACTURER TO TELL THEM THE TRUTH

1    WHEN IT COMES TO WHAT TYPE OF GUN THEY ARE PURCHASING?

2    A.    SO THE OWNER'S MANUAL HAS A LOT OF INFORMATION IN IT.    SO

3    I WOULD ASSUME THAT THE CUSTOMERS WOULD THINK THAT THAT WAS

4    ACCURATE.

5    Q.    OKAY.  AS A GENERAL CONCEPT -- AND WE CAN TALK ABOUT ANY

6    TO START -- DO YOU AGREE THAT CUSTOMERS SHOULD BE ABLE TO RELY

7    UPON THE COMPANIES WHO MAKE PRODUCTS TO TELL THEM THE TRUTH

8    ABOUT WHAT THE PRODUCT IS?

9    A.    IN GENERAL, YES.

10   Q.    ARE THERE TIMES WHERE YOU DON'T THINK YOU SHOULD TELL THEM

11   THE TRUTH?

12   A.    NOT THAT I CAN THINK OF.

13   Q.    OKAY.  SIR, CAN WE AGREE THAT EVERY SINGLE SINGLE-ACTION

14   PISTOL THAT SIG SAUER MADE BEFORE THE P320 HAD AT LEAST ONE

15   EXTERNAL SAFETY ON IT?

16   A.    SO BEFORE THE 320 WAS HAMMER-FIRED WEAPONS, AND I BELIEVE

17   THEY DID HAVE MANUAL SAFETIES ON THEM.

18   Q.    EVERY SINGLE SINGLE-ACTION ONE.  CORRECT?

19   A.    I BELIEVE THAT'S ACCURATE.

20   Q.    OKAY.  AND HAMMER-FIRED GUNS -- SIG MAKES SOME

21   HAMMER-FIRED GUNS WHERE THE HAMMER IS EXPOSED.  CORRECT?

22   A.    THAT'S CORRECT.

23   Q.    AND SOME HAMMER-FIRED GUNS WHERE THE HAMMER IS INSIDE THE

24   GUN FRAME.  CORRECT?

25   A.    YES, SIR.  THERE'S ONE MODEL THAT DOES THAT.

1  Q.   OKAY.  AND WHETHER THE HAMMER IS EXPOSED OR INSIDE THE

2  FRAME OF THE GUN, EVERY SINGLE SINGLE-ACTION PISTOL THAT SIG

3  SAUER SELLS -- OTHER THAN THE P320 AND ITS SISTER GUN, THE

4  P365 -- INCLUDES SOME TYPE OF EXTERNAL SAFETY.  FAIR?

5  A.   I BELIEVE THAT'S CORRECT.

6  Q.   EVEN THE NEWEST -- IS THE P322 STILL THE NEWEST

7  HAMMER-FIRED GUN?

8  A.   I DON'T THINK THAT'S COMPLETELY ACCURATE.  I THINK WE'VE

9  LAUNCHED OTHER MODELS SINCE THEN.

10  Q.   OKAY.  WELL, LET'S TALK ABOUT THE P322.  I THINK THAT CAME

11  OUT AFTER THE P320.  CORRECT?

12  A.   THAT'S CORRECT.

13  Q.   OKAY.  THE P322 IS A HAMMER-FIRED GUN?

14  A.   YES.  IT HAS AN INTERNAL HAMMER ON IT.

15  Q.   IT HAS AN INTERNAL HAMMER THAT IS SINGLE-ACTION, MEANING

16  IT'S PRECOCKED?

17  A.   I BELIEVE THAT'S CORRECT, BUT I'M NOT AN EXPERT ON THAT

18  WEAPON.

19  Q.   OKAY.  AND THAT GUN CAN'T BE PURCHASED WITHOUT AN EXTERNAL

20  SAFETY, CAN IT?

21  A.   THAT'S CORRECT.  IT HAS AN EXTERNAL SAFETY ON ALL THE

22  MODELS.

23  Q.   DO YOU KNOW WHY THE P322 TEAM DECIDED THAT THEY WERE GOING

24  TO PUT AN EXTERNAL SAFETY ON EVERY SINGLE ONE OF THOSE GUNS?

25  A.   SO THE P322 IS A .22 CALIBER PISTOL, AND ITS TARGETED

1    AUDIENCE IS THE NOVICE USER TO FIREARMS.  SO I BELIEVE THAT'S

2    WHY THEY PUT THE MANUAL SAFETY ON EVERY ONE OF THEM.

3    Q.    OKAY.  IT HAS NOTHING TO DO WITH THE SINGLE-ACTION NATURE

4    OF THE GUN?

5    A.    I CAN'T -- I DON'T KNOW THAT ANSWER.

6    Q.    HAVE YOU SOLD .22S WITHOUT MANUAL SAFETIES OR EXTERNAL

7    SAFETIES?

8    A.    I'M SORRY.  CAN YOU REPEAT THE QUESTION?

9    Q.    YEAH.  HAS SIG SOLD OTHER .22S -- .22 CALIBER PISTOLS

10   WITHOUT SOME SORT OF EXTERNAL SAFETY?

11   A.    THERE WAS AN EARLIER MODEL OF A .22, BUT I'M NOT CERTAIN

12   WHETHER IT HAD A MANUAL SAFETY ON EVERY ONE OR NOT.

13   Q.    SIR, BEFORE THE P320 LAUNCHED, DIDN'T SIG PUT EXTERNAL

14   SAFETIES ON EVERY SINGLE SINGLE-ACTION PISTOL BECAUSE PRECOCKED

15   GUNS ARE MORE PRONE TO UNINTENDED DISCHARGES THAN THOSE WITH

16   HEAVIER AND/OR LONGER TRIGGER PULLS?

17   A.    MY UNDERSTANDING OF THE MANUAL SAFETY ON THE SINGLE-ACTION

18   GUNS IS BECAUSE THERE'S AN EXPOSED HAMMER AND THEY ARE PRONE TO

19   GETTING THINGS HOOKED UP OR BUMPED OR THINGS OF THAT NATURE,

20   AND ALSO FOR DROP SAFETY.

21   Q.    OKAY.  EXPOSED HAMMERS.  WHAT ABOUT NOT EXPOSED HAMMERS?

22   YOU JUST TOLD US THE P322 IS A GUN WITH A HAMMER THAT IS NOT

23   EXPOSED.  YOU CAN'T BUY ONE OF THOSE WITHOUT AN EXTERNAL

24   SAFETY, RIGHT?

25   A.    TO THE BEST OF MY KNOWLEDGE, THAT'S CORRECT.

1  Q.   YOU CAN'T GET SOMETHING CAUGHT UP ON THAT INTERNAL HAMMER

2  ON A P322, RIGHT?

3  A.   FROM WHAT I CAN UNDERSTAND, YES.

4  Q.   SIR, DIDN'T -- DID YOU PREVIOUSLY TESTIFY THAT, DESPITE

5  BEING A GUN DESIGNER AT SIG SAUER, YOU DIDN'T KNOW WHY EVERY

6  SINGLE-ACTION GUN HAD A SAFETY BEFORE THE P320?

7           MS. DENNISON:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE

8  AND ALSO BEYOND THE SCOPE.

9           THE COURT:  AND ALSO BEYOND --

10          MS. DENNISON:  BEYOND THE SCOPE.  THIS WITNESS ISN'T

11 OFFERED AND HAS NEVER BEEN OFFERED AS AN EXPERT IN PISTOLS

12 BEYOND THE ONE THAT HE HAS DESIGNED.

13          THE COURT:  OKAY.  I'M UNCLEAR ON THE SCOPE NOW,

14 BECAUSE WE'VE BEEN TOLD THERE ARE CERTAIN THINGS HE HAS

15 TESTIFIED OR ALLUDED TO OR INCLUDED IN HIS REPORT THAT Y'ALL

16 HAVE AGREED WON'T BE ESTABLISHED THROUGH THIS WITNESS.

17          SO WHAT'S YOUR RESPONSE TO SCOPE IN PARTICULAR?

18          MR. ZIMMERMAN:  THIS IS A GUN DESIGNER.  I AM TALKING

19 ABOUT GUN DESIGNS.

20          THE COURT:  IS IT IN HIS EXPERT REPORT?

21          LET ME ASK YOU THAT.

22          MR. ZIMMERMAN:  SO --

23          THE COURT:  IS IT IN HIS EXPERT REPORT?

24          MR. ZIMMERMAN:  IT IS NOT, YOUR HONOR.

25          THE COURT:  OKAY.

1          MR. ZIMMERMAN:  BUT THE EXPERT REPORT IS NOT -- WE --

2          THE COURT:  I'M GOING TO SUSTAIN.

3          MR. ZIMMERMAN:  OKAY.

4          THE COURT:  I'LL SUSTAIN.

5          AGAIN -- AND I DON'T KNOW THE PARAMETERS OF YOU-ALL'S

6    AGREEMENT.  PERHAPS I SHOULD HAVE HAD YOU-ALL REDUCE THEM TO

7    WRITING, AND I'M SORRY THAT I DID NOT DO THAT.

8    BY MR. ZIMMERMAN:

9    Q.   SIR, ASIDE FROM WRITING A REPORT IN THIS MATTER, YOU ARE A

10   CORPORATE REPRESENTATIVE OF SIG SAUER, TESTIFYING ON BEHALF OF

11   THE DESIGN OF THE P320?

12   A.   THAT'S CORRECT.

13   Q.   OKAY.  AND WHEN YOU, AS A DESIGNER, MADE THAT GUN, DID YOU

14   DO ANYTHING TO DETERMINE WHY THE OTHER TEAMS WERE PUTTING A

15   SINGLE-ACTION -- PUTTING A SAFETY ON EVERY SINGLE SINGLE-ACTION

16   GUN?

17   A.   I DON'T RECALL INVESTIGATING THAT, NO.

18   Q.   DO YOU KNOW OF ANY OTHER GUNMAKER WHO SELLS PRECOCKED

19   PISTOLS WITHOUT ANY EXTERNAL SAFETIES?

20   A.   I KNOW KAHR ARMS HAS A STRIKER-FIRED WEAPON THAT DOESN'T

21   HAVE A SAFETY ON IT.

22   Q.   WHAT'S IT CALLED?

23   A.   I DON'T KNOW THE MODEL NUMBER.

24   Q.   IT'S SINGLE-ACTION?

25   A.   I BELIEVE SO.

1    Q.    WHY DO YOU BELIEVE THAT?

2    A.    IT'S A STRIKER-FIRED ACTION.  I DON'T KNOW IF IT'S

3    CONSIDERED SINGLE-ACTION OR NOT.

4    Q.    OKAY.

5    A.    I DON'T KNOW IF IT HAS RESTRIKE CAPABILITY.

6    Q.    DID YOU EVER READ THE MANUAL FOR THE KAHR?

7    A.    NO.  I DON'T HAVE A KAHR ARMS FIREARM.

8    Q.    OKAY.  AND IF THE MANUAL SAID IT'S DOUBLE-ACTION ONLY,

9    WOULD YOU HAVE ANY REASON TO DISAGREE WITH THAT?

10   A.    I WOULD LIKE TO TAKE A LOOK AT THE MECHANISM AND SEE IF

11   THAT'S TRUE OR NOT.

12   Q.    OKAY.  WOULD YOU LIKE TO DO THAT BEFORE TESTIFYING THAT

13   THAT IS A SINGLE-ACTION PISTOL THAT COMES WITHOUT AN EXTERNAL

14   SAFETY?

15   A.    I DON'T KNOW HOW I WOULD.

16   Q.    YOU ALREADY TESTIFIED.  WHEN I ASKED, IS THERE ANY OTHER

17   SINGLE-ACTION OR PRECOCKED PISTOL THAT ANYONE ELSE MAKES OTHER

18   THAN SIG SAUER, YOU SAID, OH, KAHR MAKES ONE.

19        DO YOU KNOW IF KAHR MAKES A SINGLE-ACTION ONE?

20   A.    I DON'T KNOW IF IT'S SINGLE-ACTION OR DOUBLE-ACTION.

21   Q.    THAT'S MY QUESTION, SIR.

22        DO YOU KNOW OF ANY GUN THAT YOU CAN TESTIFY UNDER OATH --

23   YOU'VE TESTIFIED BEFORE.

24        DO YOU KNOW OF ANY GUN THAT IS PRECOCKED SINGLE-ACTION --

25   YOU'VE HAD TIME TO DO THE HOMEWORK, TIME TO DO THE RESEARCH --

1  THAT DOES NOT HAVE AN EXTERNAL SAFETY?

2  A.   NOT THAT I CAN THINK OF AT THE MOMENT.

3  Q.   OKAY.  SIR, WHO WAS THE PERSON AT SIG WHO WAS FIRST TASKED

4  AT DESIGNING A STRIKER-FIRED GUN BEFORE THE P320 VERSION?

5  A.   SORRY.  CAN YOU GIVE ME A TIME FRAME?  I GUESS THAT

6  DEPENDS ON WHAT THE TIME FRAME WOULD BE.

7  Q.   MY UNDERSTANDING IS THAT SIG SAUER, BEFORE THE P320, HAD

8  PUT A TEAM TOGETHER WHO ATTEMPTED TO PUT A STRIKER-FIRED PISTOL

9  ON THE MARKET.

10  A.   I DON'T KNOW IF THERE'S A TEAM, BUT THERE WAS A DESIGNER

11  WORKING ON A STRIKER-FIRED PROJECT.

12  Q.   DO YOU KNOW WHO THAT WAS?

13  A.   YES.

14  Q.   WHO?

15  A.   ETHAN LESSARD.

16  Q.   IS HE STILL WITH THE COMPANY?

17  A.   NO, HE'S NOT.

18  Q.   OKAY.  I ASKED YOU BEFORE LUNCH WHETHER YOU CAN IDENTIFY

19  ANYBODY ON THE P320 TEAM WHO HAD DESIGNED A STRIKER-FIRED

20  PISTOL BEFORE THE P320.  WAS HE ON THE TEAM?

21  A.   HE WASN'T ON THE TEAM DIRECTLY, BUT HE WAS WORKING IN

22  RESEARCH AND DEVELOPMENT.

23  Q.   OKAY.  I'M TALKING ABOUT THE TEAM THAT MADE THE P320.

24      ANYBODY THAT YOU CAN GIVE ME A NAME THAT RAISED -- THAT

25  COULD RAISE THEIR HAND BACK THEN AND SAY, HEY, I'VE DESIGNED A

1   STRIKER-FIRED PISTOL BEFORE?

2   A.   I DON'T BELIEVE AT THAT POINT ANYBODY HAD.

3   Q.   SIR, ISN'T IT TRUE THAT THE P320 WAS DESIGNED BASED OFF OF

4   ANOTHER GUN CALLED THE P250?

5   A.   THAT'S CORRECT.

6   Q.   AND CAN WE AGREE THE P250 WAS A DOUBLE-ACTION PISTOL?

7   A.   THE P250 WAS A DOUBLE-ACTION HAMMER-FIRED PISTOL.

8   Q.   ALL RIGHT.  BUT WHEN YOU DESIGNED -- WHEN YOU MADE CHANGES

9   TO THAT DESIGN FROM THE P250 TO THE P320, THE P320 BECAME A

10  SINGLE-ACTION.  CORRECT?

11  A.   IT'S A STRIKER-FIRED SINGLE-ACTION GUN, YES.

12  Q.   BUT WHEN IT WENT FROM A DOUBLE-ACTION TO A SINGLE-ACTION,

13  DID YOU PUT A SAFETY ON IT?

14  A.   WE DIDN'T HAVE A SAFETY RIGHT AWAY, BUT IT WAS IN THE PLAN

15  TO DEVELOP A MANUAL SAFETY FOR IT.

16  Q.   BUT NOT FOR THE CARRY VERSION?

17  A.   SO I DON'T KNOW IF THERE WAS SPECIAL OPTIONS TO A CARRY

18  VERSION.  BUT I DON'T REMEMBER OR RECALL A SKU THAT WAS

19  SPECIFIC FOR THAT MODEL.

20  Q.   OKAY.  WE TALKED ABOUT SKUS BEFORE.

21       WHAT WAS THE SKU FOR THE GUN THAT ANY OF US COULD GO IN

22  AND GET A P320 WITH A TRIGGER SAFETY?  WAS THERE ONE?

23  A.   THERE WASN'T ONE.

24  Q.   SO IT WASN'T AROUND FOR THREE YEARS WHERE SOMEONE COULD GO

25  IN WITH A SKU NUMBER AND PURCHASE ONE.  FAIR?

1  A.   I DON'T RECALL WHETHER THERE WAS A SKU OR EVEN KNOW IF

2  THERE WAS A SKU OR NOT.

3  Q.   SIR, ISN'T IT TRUE THAT YOUR DESIGN TEAM ORIGINALLY PUT A

4  TRIGGER SAFETY AS A STANDARD COMPONENT ON THE P320?

5  A.   SO IN THE EARLY DAYS OF THE DESIGN, WE DID HAVE THE TABBED

6  TRIGGER DESIGN AVAILABLE AS A -- AS AN OFFERING.

7  Q.   HOLD ON.  STAY WITH ME.

8       BEFORE IT WAS AVAILABLE AS AN OFFERING -- I GUESS NOT ON

9  THE WEBSITE OR IN THE STORES, BUT THEORETICALLY -- THE FIRST

10 PROTOTYPES OF THE P320 DIDN'T JUST HAVE A TRIGGER SAFETY AS AN

11 OPTION, IT HAD IT AS STANDARD, RIGHT?

12 A.   YEAH.  THAT'S CORRECT.  THE PROTOTYPES.

13 Q.   SIR, HAVE YOU SEEN THE MARKETING MATERIALS, SAFETY WITHOUT

14 COMPROMISE?

15 A.   I BELIEVE I HAVE.

16 Q.   DID THAT SAFETY WITHOUT COMPROMISE MARKETING MATERIAL COME

17 OUT BEFORE OR AFTER YOU REMOVED THE TRIGGER SAFETY FROM THE

18 P320?

19 A.   I DON'T HAVE INFORMATION ON THAT.

20 Q.   SIR, DO YOU KNOW A SINGLE PERSON, LAW ENFORCEMENT

21 DEPARTMENT IN THE COUNTRY OR THE WORLD WHO WAS EVER ABLE TO BUY

22 A P320 WITH AN EXTERNAL SAFETY?

23 A.   I DON'T KNOW IF THEY WERE ABLE TO BUY IT, BUT I KNOW THAT

24 WE DIDN'T END UP SELLING ANY.

25 Q.   OKAY.  AND ARE YOU TESTIFYING UNDER OATH THAT IT WAS IN

1  THE WEBSITE OR IN THE STORES?

2  A.   I BELIEVE IT WAS IN OUR PRODUCT CATALOG AT SOME TIME, BUT

3  I DON'T KNOW WHEN IT WAS REMOVED.

4  Q.   OKAY.  YOU CAN'T JUST PULL A GUN OUT OF A PRODUCT CATALOG.

5       IF I WANTED TO BUY ONE, COULD I GO TO THE STORE TO GET IT?

6  WERE THEY IN THE STORES?

7  A.   I DON'T RECALL.

8  Q.   WERE THEY ON THE WEBSITE?

9  A.   I DON'T REMEMBER.

10 Q.   SIR, WHEN YOU DESIGNED THE P320, DID YOU REALIZE YOU WERE

11 GOING TO BE THE FIRST TEAM EVER TO SELL STRIKER-FIRED PISTOLS

12 THAT ARE PRECOCKED WITHOUT ANY EXTERNAL SAFETY?

13 A.   I KNOW THAT WE -- WE KNEW WHAT WE WERE DESIGNING AS FAR AS

14 A STRIKER ACTION SYSTEM.  BUT I DON'T KNOW IF I KNEW WHETHER IT

15 WAS THE FIRST GUN WITHOUT ANY EXTERNAL SAFETIES.

16 Q.   I'M NOT SURE I UNDERSTAND YOUR ANSWER.

17      BACK WHEN YOU WERE DESIGNING THE GUN, DID YOU KNOW WHETHER

18 ANYONE ELSE WAS -- HAD ALREADY DONE WHAT YOU-ALL WERE GOING TO

19 DO, PUT A STRIKER-FIRED PISTOL THAT'S PRECOCKED IN THE HANDS OF

20 AMERICANS WITHOUT ANY EXTERNAL SAFETY?

21 A.   I DON'T RECALL AT THAT TIME WHETHER I KNEW THAT OR NOT.

22 Q.   SIR, DO SIG SAUER P320S HAVE INTERNAL SAFETIES?

23 A.   YES.

24 Q.   DO GLOCKS HAVE INTERNAL SAFETIES?

25 A.   YES.

1  Q.   SMITH & WESSONS HAVE INTERNAL SAFETIES?

2  A.   YES.

3  Q.   SPRINGFIELDS, DO THEY HAVE INTERNAL SAFETIES?

4  A.   YES.

5  Q.   TAURUSES, RUGERS, SHADOW SYSTEMS?

6  A.   I'M LESS FAMILIAR WITH THOSE BRANDS, BUT I'M -- IT'S

7  POSSIBLE.

8  Q.   ARE YOU AWARE OF ANY STRIKER-FIRED PISTOL IN THE MARKET

9  THAT DOESN'T HAVE AN INTERNAL SAFETY?

10  A.   AGAIN, I'M NOT AWARE OF EVERY FIREARM OUT THERE.  BUT SOME

11  OF THE ONES THAT YOU DESCRIBED, YES, THEY HAVE INTERNAL

12  SAFETIES.

13  Q.   NOT SOME.

14       ARE YOU AWARE OF ANY STRIKER-FIRED PISTOL THAT ANY OF US

15  COULD GO BUY THAT DOESN'T HAVE AN INTERNAL SAFETY?

16  A.   I CAN'T SPEAK TO EVERY BRAND OUT THERE.

17  Q.   OKAY.  MY QUESTION IS:  DO YOU KNOW OF A SINGLE GUN OUT

18  THERE THAT DOESN'T HAVE AN INTERNAL SAFETY?

19  A.   OF THE ONES I KNOW, I KNOW THEY HAVE INTERNAL SAFETIES.

20  Q.   AND THAT DIDN'T PREVENT EVERY OTHER GUN MANUFACTURER FROM

21  PUTTING AN EXTERNAL SAFETY ON THEIR PRECOCKED PISTOLS.  FAIR?

22  A.   SO SOME OF THE OTHER MANUFACTURERS OFFER MANUAL SAFETIES

23  AND THEY ALSO DON'T OFFER -- OR OFFER MODELS WITH AND WITHOUT A

24  MANUAL SAFETY.

25  Q.   WHAT ABOUT A TRIGGER SAFETY?

1  A.   MOST OF THEM HAVE A TRIGGER TAB SAFETY.

2  Q.   IS THERE ANY GUN COMPANY OUT THERE THAT YOU'RE AWARE OF

3  THAT SELLS A PRECOCKED PISTOL WITHOUT A MANUAL SAFETY OR A

4  TRIGGER SAFETY?

5  A.   THE ONLY ONE THAT I CAN THINK OF THAT I'M NOT SUPER

6  FAMILIAR WITH IS THE KAHR ARMS GUN.  AND I HAVEN'T LOOKED AT IT

7  ONE OF THOSE IN A LONG TIME.

8  Q.   AND YOU HAVE NO IDEA IF IT'S SINGLE- OR DOUBLE-ACTION.

9  A.   I DO NOT KNOW THAT.  I'M SORRY.

10  Q.   YOU HAVE NO IDEA, IF WE WERE TO PULL UP THE MANUAL,

11  WHETHER THE MANUAL ITSELF SAYS SINGLE- OR DOUBLE-ACTION?

12       MS. DENNISON:  OBJECTION, YOUR HONOR.  THIS HAS BEEN

13  ASKED AND ANSWERED.

14       THE COURT:  SUSTAINED.

15  BY MR. ZIMMERMAN:

16  Q.   SIR, CAN'T WE AGREE THAT THE TWO PURPOSES OF A TRIGGER

17  SAFETY ARE TO PREVENT DROP FIRES AND UNINTENDED DISCHARGES?

18  A.   SO I WOULD AGREE THAT THEY'RE DEFINITELY FOR DROP SAFETY.

19  A LOT OF THE OTHER MANUFACTURERS, THEIR TRIGGER SYSTEMS ARE NOT

20  BALANCED, SO THEY NEED THAT FEATURE TO BE DROP SAFE.

21       AS FAR AS PREVENTING UNINTENDED DISCHARGES, I'M NOT SURE

22  IF THERE'S ANY EVIDENCE OF THAT.

23  Q.   SIR, I'LL DIRECT YOU TO THE APRIL 20, 2022, DEPOSITION YOU

24  GAVE, AT PAGE 59.  AND AFTER YOUR COUNSEL READS IT, I'LL ASK

25  YOU TO READ IT SILENTLY TO YOURSELF.

1       SIR, I'M GOING TO ASK YOU TO READ PAGE 59 OF YOUR 2022

2   DEPOSITION, THE HIGHLIGHTED PORTION AND THEN THE ANSWER,

3   PLEASE, INTO THE NEXT PAGE.  JUST READ QUIETLY TO YOURSELF AND

4   LET ME KNOW WHEN YOU'RE DONE.

5   A.   (COMPLIES.)

6   Q.   SIR, DO YOU RECALL TESTIFYING THAT THE TWO FUNCTIONS OF A

7   TRIGGER SAFETY ARE TO PREVENT DROP FIRES AND UNINTENDED

8   DISCHARGES?

9            MS. DENNISON:  OBJECTION, YOUR HONOR.  IT

10  MISCHARACTERIZES THE --

11           THE COURT:  OVERRULED.

12           THE WITNESS:  SO THE -- THERE'S A SMALL THEORY THAT

13  IF YOU DON'T PULL ON EXACTLY IN THE FRONT OF THE TRIGGER, THAT

14  IT WOULD PREVENT IT FROM BEING PULLED.  BUT IT'S A VERY

15  SPECIFIC INSTANCE AND VERY ACUTE.  THE OTHER PRIMARY FUNCTION

16  IS DROP FIRE SAFETY.

17  BY MR. ZIMMERMAN:

18  Q.   HOW SMALL OR ACUTE IS THAT THEORY, SIR?

19  A.   I HAVE NO IDEA.

20  Q.   WHY DO YOU SAY IT WAS SMALL OR ACUTE?

21  A.   JUST BASED ON THE GEOMETRY OF WHAT I'VE SEEN OF SOME OF

22  THESE DESIGNS.  SOME OF THEM ARE -- ALTHOUGH THE TAB GOES ALL

23  THE WAY OUT TO THE EDGE OF THE TRIGGER, AND THEY DON'T HAVE

24  THAT EFFECT AT ALL.  IT ALL DEPENDS ON THE GUN.

25  Q.   HAVE YOU SEEN GLOCK'S TRIGGER SAFETY?

1    A.    YES.

2    Q.    HAVE YOU SHOT A GLOCK?

3    A.    YES, I HAVE.

4    Q.    HAVE YOU SEEN GLOCK'S WEBSITE ABOUT WHAT THEY REFER TO THE

5    TRIGGER SAFETY TO PREVENT?

6    A.    YES, I HAVE.

7    Q.    AND DON'T THEY SAY -- DOESN'T GLOCK SAY THAT THE TWO

8    PURPOSES OF A TRIGGER SAFETY ARE TO PREVENT DROP FIRES AND

9    UNINTENDED MOVEMENT OF THE TRIGGER?

10   A.    I HAVE SEEN THAT ON THEIR WEBSITE, YES.

11   Q.    DO YOU AGREE OR DISAGREE WITH GLOCK?

12   A.    I AGREE THAT, UNDER CERTAIN CIRCUMSTANCES, IF YOU ARE AT

13   EXACT ANGLES ON -- TRYING TO PULL A TRIGGER WITHOUT ACTIVATING

14   THE TAB, THAT THE GUN WOULDN'T FIRE.

15   Q.    NOT IF YOU'RE TRYING TO PULL, SIR.  RIGHT?

16   A.    I'M SORRY.  WHAT'S THE QUESTION?

17   Q.    DO YOU BELIEVE MR. -- DO YOU HAVE ANY INFORMATION THAT

18   MR. LANG WAS TRYING TO PULL HIS WEAPON, HIS PISTOL?

19   A.    NO, I DO NOT.

20   Q.    SIR, WHEN THE MILITARY AGREED TO PURCHASE P320S, IT ONLY

21   DID SO WHEN SIG SAUER INCLUDED AN EXTERNAL SAFETY ON IT.

22   CORRECT?

23   A.    NO.  THAT'S NOT CORRECT.  THE MANUAL SAFETY WAS PART OF

24   THE REQUIREMENT FROM THE GET-GO.

25   Q.    RIGHT.  THE MILITARY WOULDN'T HAVE TAKEN THE PISTOL THAT

1    YOU GAVE TO MR. LANG.  CORRECT?

2    A.   I'M SORRY.  CAN YOU REPEAT THE QUESTION?

3    Q.   YEAH.  THE MILITARY WOULD NOT HAVE TAKEN THE PISTOL THAT

4    YOU GAVE TO MR. LANG.  CORRECT?

5    A.   I DON'T KNOW WHAT YOU MEAN BY TAKE THE PISTOL.

6    Q.   THEY WOULDN'T BUY IT.

7    A.   NO.  IT WOULDN'T HAVE MET THE REQUIREMENTS THAT THEY SET

8    FORTH FOR ALL THE MANUFACTURERS.

9    Q.   THEY CALL IT THE M17, RIGHT?  THE MILITARY VERSION?

10   A.   THAT'S CORRECT.

11   Q.   AND THE MILITARY VERSION, THE M17, IS A P320 PLUS A THUMB

12   SAFETY?

13   A.   IT'S -- YES.  IT'S BASED ON THE 320 DESIGN, AND THERE IS A

14   MANUAL SAFETY.

15   Q.   DID SIG SAUER PROVIDE THE MILITARY WITH PROTOTYPES OF THE

16   P320 THAT THEY COULD TEST?

17   A.   YES.  THAT WAS PART OF THE ORIGINAL SUBMISSION.

18   Q.   DID YOU EXPECT THE MILITARY WOULD TEST THE P320S TO

19   DETERMINE IF THEY WERE DROP SAFE?

20   A.   YES.  THAT WAS PART OF THE REQUIREMENT.

21   Q.   DID YOU LEARN THAT THE MILITARY DID IN FACT PERFORM

22   TESTING TO DETERMINE IF THE P320S WERE DROP SAFE?

23   A.   YES, THEY DID.

24   Q.   AND IN FEBRUARY OF 2017, DID THE MILITARY TELL SIG SAUER

25   THAT THE P320S FAILED THE MILITARY DROP TEST?

1   A.   SO THEY TOLD US THAT THEY WERE TESTING THE PISTOL IN A

2   PROTOCOL THAT WAS ABOVE AND BEYOND WHAT WAS IN THEIR

3   PROTOCOL -- IN THEIR STANDARD, AND THEY ASKED US TO SEE IF WE

4   CAN IMPROVE IT.

5   Q.   SIR, IT WAS A DIFFERENT ORIENTATION THAN THE WAY YOU

6   TESTED IT BEFORE, RIGHT?

7   A.   IT WAS A DIFFERENT ORIENTATION, AND THEY HAD THE MANUAL

8   SAFETY IN THE OFF POSITION.

9   Q.   RIGHT.  SO YOU TESTED A DROP FIRE TO FALL IN ONE ANGLE,

10  THEY TESTED IN ANOTHER ONE.

11  A.   THAT'S CORRECT.

12  Q.   OKAY.

13  A.   THEY HAVE ADDITIONAL PARAMETERS.

14  Q.   NOW, WHEN THE P320 FAILED THE MILITARY'S DROP TESTS, WAS

15  THAT FAILURE ACCEPTABLE TO SIG SAUER?

16  A.   SO THE -- WHEN THEY MADE LIGHT OF THAT SITUATION, WE SET

17  OFF TO IMPROVE IT AND PROVIDED ADDITIONAL TEST SAMPLES FOR THEM

18  TO CONTINUE THEIR TESTING.

19  Q.   SO YOU GAVE THE MILITARY A REDESIGNED GUN WITH A

20  REDESIGNED TRIGGER?

21  A.   YES.  WE REENGINEERED SOME OF THE FIRING MECHANISM.

22  Q.   BUT FROM FEBRUARY OF 2017 UNTIL AUGUST OF 2017, DID YOU

23  CONTINUE TO SELL THE OLD TYPE OF PISTOL WITH THE OLD TYPE OF

24  TRIGGER TO THE PUBLIC?

25  A.   YES, WE DID.

1  Q.   WAS THAT YOUR DECISION?

2  A.   NO, IT WAS NOT.

3  Q.   WHO MADE THAT CALL?

4  A.   I DON'T HAVE INFORMATION ON THAT.

5  Q.   AT THAT TIME YOU WERE THE LEAD OF THE P320 TEAM, RIGHT?

6  A.   NO, I WAS NOT.

7  Q.   OKAY.  SO WAS IT MATT TAYLOR WHO MADE THAT CALL?

8  A.   EXCUSE ME.  I WAS THE LEAD AT THAT TIME.  SORRY.  I HAD

9  THE TIME FRAME MIXED UP.

10  Q.   OKAY.  SO YOU WERE THE LEAD.  YOU FIND OUT SOMEBODY ELSE

11  AT P320 WAS GOING TO MAKE THE DECISION TO CONTINUE SELLING

12  THESE TO THE PUBLIC?

13  A.   IT WASN'T AN ENGINEERING DECISION.

14  Q.   IT WASN'T AN ENGINEERING DECISION.

15       DID YOU VENTURE TO FIND OUT WHO WAS GOING TO MAKE THAT

16  DECISION FOR THE GUN THAT YOU WERE THE LEAD FOR?

17  A.   I DON'T RECALL IF I ASKED THAT QUESTION OR NOT.

18  Q.   THAT DOESN'T STAND OUT TO YOU, WHETHER THE PUBLIC WAS

19  GOING TO GET THE SAME TYPE OF REDESIGN THAT THE MILITARY GOT?

20         MS. DENNISON:  OBJECTION, YOUR HONOR.  I'M GOING TO

21  OBJECT TO RELEVANCE.  WE'RE GOING VERY FAR BEYOND THE SCOPE OF

22  THE ISSUES IN THIS CASE.

23         THE COURT:  I'LL SUSTAIN.

24  BY MR. ZIMMERMAN:

25  Q.   SIR, WHEN DID YOU STOP SELLING THE -- I'LL MOVE ON.

1      WAS THE MILITARY THE ONLY OUTSIDE ENTITY THAT SIG SAUER

2  LEARNED OF THAT PERFORMED TESTING OF THE P320?

3  A.   I'M SORRY.  CAN YOU REPEAT THE QUESTION?

4  Q.   YEAH.  I'LL REPHRASE IT.  I'LL MAKE IT A LITTLE EASIER.

5      OMAHA OUTDOORS CAME TO YOU IN AUGUST OF '17 AND SAID, HEY,

6  WE TESTED THIS FOR DROP FIRE SAFETY TOO.  RIGHT?

7  A.   YES.

8  Q.   AND DID THEY TELL YOU THAT THEY TESTED IT AT ORIENTATIONS

9  AND THE GUN WAS NOT DROP SAFE?

10          MS. DENNISON:  SAME OBJECTION, YOUR HONOR.

11          THE COURT:  I'LL GIVE HIM SOME LEEWAY.  I'LL

12  OVERRULE.  I DON'T -- I'M NOT -- I'LL OVERRULE.

13          THE WITNESS:  I'M SORRY.  CAN YOU REPEAT YOUR

14  QUESTION?

15  BY MR. ZIMMERMAN:

16  Q.   SURE.  DID YOU LEARN THAT OMAHA OUTDOORS DROP FIRED THE

17  GUN -- DROP TESTED THE GUN AND IT WAS FIRING?

18  A.   YES.  THAT'S THE WAY IT HAPPENED.

19  Q.   OKAY.  SIR, DID SIG SAUER SCRAMBLE AS A RESULT OF OMAHA

20  OUTDOORS MAKING THAT INFORMATION KNOWN TO THE PUBLIC?

21  A.   THE -- WHEN WE LEARNED ABOUT IT THROUGH THE MILITARY, WE

22  STARTED WORKING ON A SOLUTION, A PRODUCTION SOLUTION.  AND SO

23  THAT WAS AROUND THE -- FEBRUARY, MARCH, APRIL, THE TIME FRAME

24  OF 2017.

25          SO WE WERE WORKING ON A PRODUCTION SOLUTION FOR ALL OF OUR

1    GUNS.  AND WHEN THE OMAHA OUTDOORS INCIDENT HAPPENED, IT

2    ACCELERATED OUR TIMELINE.

3    Q.   BECAUSE THE PUBLIC LEARNED OF IT?

4    A.   NO.  BECAUSE WE RECOGNIZED THAT WE CAN ENHANCE THE DESIGN

5    BASED ON WHAT WE LEARNED FROM THE MILITARY.  AND WE -- A

6    VERSION OF THAT IS WHAT WE ENDED UP IMPLEMENTING AS PART OF THE

7    UPGRADE.

8    Q.   SIR, THE REASON THAT THE PUBLIC GOT THE, AS YOU CALL IT,

9    UPGRADE WASN'T BECAUSE OMAHA OUTDOORS MADE THAT INFORMATION

10   KNOWN TO THE PUBLIC?

11   A.   AS I SAID, THAT ACCELERATED OUR TIMELINE.  WE WERE WORKING

12   ON A PRODUCTION SOLUTION IN THE MEANTIME.

13   Q.   WHY DID THE PUBLIC'S KNOWLEDGE ACCELERATE YOUR TIMELINE?

14   A.   JUST BECAUSE WE WANTED TO OFFER THE PUBLIC AN ENHANCED

15   VERSION OF THE 320 THAT WE KNEW THAT WE CAN IMPROVE.

16   Q.   DID YOU HAVE MEETINGS BETWEEN THE TIME OF THE MILITARY

17   REDESIGN AND THE PUBLIC'S REDESIGN TO DETERMINE IF AND WHEN THE

18   PUBLIC WOULD GET THE UPGRADE?

19   A.   I DON'T RECALL ANY SPECIFIC MEETINGS.  IT WAS JUST WORK IN

20   PROGRESS.

21   Q.   SIR, WHEN I ASKED YOU TO BE REAL AT YOUR DEPOSITION ABOUT

22   WHY THE PUBLIC WAS GOING TO GET THAT NEW DESIGN -- BECAUSE THAT

23   INFORMATION WAS OUT ON THE INTERNET.  CORRECT?

24           MS. DENNISON:  OBJECTION, YOUR HONOR.  IT'S IMPROPER

25   IMPEACHMENT.

1          THE COURT:  I'LL SUSTAIN.  I'LL SUSTAIN AS TO THE

2     FORM OF THE QUESTION.

3          MR. ZIMMERMAN:  OKAY.

4     BY MR. ZIMMERMAN:

5     Q.   WAS THERE ANY PERSON AT SIG SAUER, BEFORE OMAHA OUTDOORS

6     CAME OUT AND MADE THIS PUBLIC, THAT SAID, WE ARE GOING TO TAKE

7     WHAT WE CHANGE FOR THE MILITARY, AND WE'RE GOING TO MODIFY IT

8     FOR OUR MEN AND WOMEN IN LAW ENFORCEMENT AND OUR MEN AND WOMEN

9     WHO PURCHASE THIS GUN?

10    A.   I DON'T REMEMBER A SPECIFIC PERSON SAYING THAT, BUT IT WAS

11    PART OF OUR ENGINEERING WORK THAT WE WERE DOING TO IMPROVE THE

12    GUN.

13    Q.   YOU DIDN'T HAVE A SINGLE CONVERSATION ABOUT THAT THAT YOU

14    WERE INVOLVED IN.  CORRECT?

15    A.   NOT THAT I RECALL.

16         MR. ZIMMERMAN:  YOUR HONOR, WE'VE BEEN GOING FOR

17    ABOUT AN HOUR.  WOULD YOU MIND IF WE TAKE A BRIEF COMFORT

18    BREAK?

19         THE COURT:  SURE.

20         MR. ZIMMERMAN:  THANK YOU.

21         THE COURTROOM SECURITY OFFICER:  ALL RISE.

22         (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

23    2:33 P.M., AND A BRIEF RECESS WAS HAD FROM 2:33 P.M. TO 2:44

24    P.M.)

25         THE COURTROOM SECURITY OFFICER:  ALL RISE.

1    (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

2  2:45 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

3        THE COURT:  ALL RIGHT.  THE JURY IS SEATED.  EVERYONE

4  ELSE MAY BE SEATED.

5        AND YOU MAY RESUME YOUR EXAMINATION.

6        MR. ZIMMERMAN:  THANK YOU, YOUR HONOR.

7  BY MR. ZIMMERMAN:

8  Q.   READY TO PROCEED, MR. TONER?

9  A.   YES, SIR.

10  Q.   ALL RIGHT.  IN TERMS OF THE DROP TESTING THAT SIG DID

11  VERSUS WHAT THE U.S. MILITARY DID VERSUS WHAT OMAHA OUTDOORS

12  DID, DO YOU KNOW HOW HIGH THEY DROPPED THE GUNS FROM?

13  A.   I'M SORRY.  FOR WHICH INSTANCE?

14  Q.   EITHER THE MILITARY OR OMAHA OUTDOORS WHEN THEY BOTH TOLD

15  YOU THAT THE GUN WAS NOT DROP SAFE.

16  A.   YES.  I KNOW A LITTLE BIT ABOUT THE TESTING PROTOCOL OF

17  THE MILITARY, BUT I HAVE NO IDEA ABOUT OMAHA OUTDOORS.

18  Q.   DIDN'T THEY E-MAIL YOU DIRECTLY?

19  A.   THERE WAS AN E-MAIL, BUT I DON'T REMEMBER WHAT IT -- THE

20  CONTENTS WERE, TO BE HONEST WITH YOU.

21  Q.   DID YOU EVER LOOK INTO IT, THAT THIS NATIONAL GUN SELLER

22  IS CONTACTING THE GUNMAKER SAYING THAT THEY'RE TESTING IT AND

23  IT'S NOT PASSING THEIR DROP FIRE TO SEE WHAT THEY'RE DOING?

24  A.   I DIDN'T HAVE ANY CONTACT WITH THEM AT THAT TIME.

25  Q.   WELL, THEY HAD CONTACT WITH YOU BECAUSE THEY E-MAILED YOU,

1    RIGHT?

2    A.   LIKE I SAID, THEY E-MAILED ME, BUT I DON'T REMEMBER THE

3    CONTENT OF THE E-MAIL.

4    Q.   AND YOU NEVER E-MAILED THEM BACK?

5    A.   I DON'T BELIEVE SO.

6    Q.   DID YOU ASK SOMEBODY ELSE FROM YOUR TEAM TO E-MAIL THEM

7    BACK?

8    A.   NOT THAT I RECALL.

9    Q.   DID YOU UNDERSTAND THAT THEY WERE E-MAILING YOU BECAUSE

10   THEY FELT THIS WAS A PUBLIC SAFETY CONCERN?

11   A.   I KNOW THEY E-MAILED US SAYING THAT THEY FOUND THIS --

12   FOUND A SCENARIO, BUT I DON'T REMEMBER WHAT THE CONTENT OF THE

13   E-MAIL WAS.

14   Q.   YOU DON'T EVEN KNOW HOW HIGH THEY DROPPED THE GUNS FROM?

15   A.   I DON'T RECALL.

16   Q.   OR WHAT ANGLE THEY DROPPED THE GUNS FROM?

17   A.   I KNOW WHAT THE ANGLE WAS, YES.

18   Q.   WHAT WAS THE ANGLE?

19   A.   I BELIEVE IT WAS KNOWN AS NEGATIVE 30.

20   Q.   OKAY.  AND CAN YOU JUST EXPLAIN WHAT THAT MEANS?

21   A.   SO, BASICALLY, IT'S THE ANGLE -- IF YOU'RE DROPPING A GUN,

22   SO THE GUN WOULD LOOK LIKE A V, AND THERE WOULD BE DROPPING ON

23   THE REAR OF THE SLIDE.

24   Q.   I DON'T KNOW IF YOU CAN DO IT, BUT ARE YOU ABLE TO USE

25   YOUR WATER BOTTLE TO SHOW A LITTLE BIT OF KIND OF HOW THE

1    ANGLES CHANGE WHEN YOU DROP IT?

2            MS. DENNISON:  OBJECTION, YOUR HONOR.  AGAIN, WE ARE

3    GOING WAY BEYOND THE SCOPE OF THE ISSUES IN THIS CASE.

4            THE COURT:  I'LL OVERRULE.  I DON'T KNOW -- I'LL

5    OVERRULE.

6    BY MR. ZIMMERMAN:

7    Q.   CAN YOU PICK UP YOUR WATER BOTTLE?

8    A.   SURE.

9    Q.   SO YOU'RE SAYING NEGATIVE 30 WOULD BE A CERTAIN ANGLE,

10   LIKE THIS -- IF YOU COULD HOLD IT UP -- VERSUS, LIKE,

11   30 DEGREES WOULD BE --

12   A.   SO IT'S THE OPPOSITE, SO IT WOULD BE SOMETHING LIKE THAT

13   (INDICATING).

14   Q.   OKAY.  NOW, YOU-ALL DROP TESTED THE GUNS AT CERTAIN ANGLES

15   OR DEGREES, RIGHT?

16           THE COURT:  AND LET ME -- LET ME ASK YOU, JUST SO

17   THAT I UNDERSTAND:  WHY ARE YOU GOING FAR INTO DROP AND TO

18   THE --

19           MR. ZIMMERMAN:  WELL, YOUR HONOR, BECAUSE OF THE

20   RULING THAT WAS MADE, I NEED TO BE ABLE TO ADDRESS -- MAY I

21   APPROACH?

22           THE COURT:  YEAH.  COME ON UP.

23           (WHEREUPON, A CONFERENCE WAS HAD AT THE BENCH BETWEEN

24   THE COURT AND COUNSEL, OUT OF THE HEARING OF THE JURY AND THE

25   COURT REPORTER.)

1    THE COURT:  OKAY.  OBJECTION HAS BEEN WITHDRAWN.

2  BY MR. ZIMMERMAN:

3  Q.  ALL RIGHT.  SO, MR. TONER, YOU DROPPED IT AT A CERTAIN

4  ANGLE, RIGHT?

5  A.  YES.

6  Q.  OMAHA OUTDOORS DROPPED IT AT SOME ANGLE.  YOU DON'T KNOW

7  WHAT THE ORIENTATION WAS.

8  A.  NO.  I BELIEVE I SAID IT WAS AT THE NEGATIVE 30 ANGLE.

9  Q.  BUT YOU DON'T KNOW HOW HIGH?

10  A.  THAT'S CORRECT.

11  Q.  AND THE MILITARY TESTED IT.  DO YOU KNOW HOW HIGH THEY

12  DROPPED IT FROM?

13  A.  I BELIEVE IT'S APPROXIMATELY 5 FEET.

14  Q.  OKAY.  NOW, SIG SAUER MAKES UP ITS OWN TESTING FOR HOW

15  THEY ARE GOING TO DROP FIRE A PISTOL, RIGHT?

16  A.  WE TEST TO STANDARDS AND PROTOCOLS, TYPICALLY.

17  Q.  OKAY.  SO ARE YOU FAMILIAR THAT SOME GUN COMPANIES HAVE

18  GOTTEN TOGETHER AND CREATED AN INDUSTRY STANDARD FOR HOW A GUN

19  IS SUPPOSED TO BE DROP TESTED?

20  A.  YES.

21  Q.  OKAY.  AND DID YOU-ALL TEST THE GUN TO THAT DROP FIRE

22  STANDARD?

23  A.  YES, WE DID.

24  Q.  OKAY.  BUT THE MILITARY AND OMAHA OUTDOORS, TWO COMPANIES

25  WHO DON'T MAKE GUNS, THEY TESTED IT AT DIFFERENT ANGLES.

1   A.   YES.

2   Q.   AND BECAUSE OF THAT, ESPECIALLY WITH THE MILITARY, YOU-ALL

3   QUICKLY AND IMMEDIATELY REDESIGNED THEIR PROTOTYPES, RIGHT?

4   A.   WE WENT INTO A REENGINEERING EFFORT SO WE CAN PROVIDE

5   FURTHER GUNS SO THEY CAN COMPLETE THEIR TESTING.

6   Q.   HOW MUCH WAS THE MILITARY CONTRACT?

7   A.   I DON'T --

8       MS. DENNISON:  OBJECTION, YOUR HONOR.  IRRELEVANT AND

9   PREJUDICIAL.

10      THE COURT:  I'LL SUSTAIN AS TO RELEVANT.

11  BY MR. ZIMMERMAN:

12  Q.   SIR, WAS THERE A REASON WHY YOU QUICKLY DEALT WITH THE

13  DROP FIRE ISSUE WHEN THE MILITARY CAME TO YOU BUT DIDN'T DO THE

14  SAME FOR THE PUBLIC AT THE SAME TIME?

15  A.   LIKE I SAID BEFORE, WHEN THE MILITARY BROUGHT TO LIGHT THE

16  SITUATION, WE STARTED -- WE IMPLEMENTED IT FOR THE MILITARY

17  FIRST, AND THEN WE WERE WORKING ON THE SOLUTION FOR THE

18  CONSUMER MARKET.

19  Q.   WHY DIDN'T YOU GIVE THE MILITARY AND THE PUBLIC THE FIX AT

20  THE SAME TIME?

21  A.   SO AT THE END OF THE -- BY THE TIME WE WENT INTO

22  PRODUCTION, IT WAS AROUND THE SAME TIME.

23  Q.   OKAY.  DIDN'T YOU TELL ME BEFORE THAT FROM FEBRUARY TO

24  AUGUST, YOU CONTINUED SELLING THE GUN TO THE PUBLIC?

25  A.   YES.

1  Q.   OKAY.  AND YOU HAVE NO IDEA WHY YOU ACTED FASTER FOR THE

2  MILITARY CONTRACT VERSUS ORDINARY JOE SMITH BUYING A GUN?

3  A.   LIKE I SAID, WE PROVIDED SOME ENGINEERING TEST SAMPLES.

4  THEY WEREN'T PRODUCTION GUNS.  SO WE GAVE THEM TEST SAMPLES SO

5  THEY COULD CONTINUE THEIR TESTING FOR THE EVALUATION.

6  Q.   OKAY.  SO JUST BECAUSE THE INDUSTRY DID -- THE GUNMAKERS

7  CAME OUT WITH A DROP TEST THAT SIG COMPLIED WITH, THAT DIDN'T

8  MEAN IT COMPLIED WITH THE MILITARY STANDARDS OR WITH OMAHA

9  OUTDOORS STANDARDS.  FAIR?

10  A.   YES.  IT SHOWED A VULNERABILITY IN CERTAIN SITUATIONS.

11  Q.   VULNERABILITY.  A SAFETY ISSUE?

12  A.   IT WAS A VULNERABILITY AT A CERTAIN ANGLE AT A CERTAIN

13  HEIGHT.

14  Q.   LET ME ASK YOU A DIFFERENT WAY.

15       WAS THE VULNERABILITY OF A GUN FIRING WHEN DROPPED A

16  SAFETY ISSUE?

17  A.   I MEAN, IT'S AN ISSUE THAT WE NEEDED TO ADDRESS, FOR SURE.

18  Q.   WHY CAN'T YOU SAY THE WORD "SAFETY"?

19  A.   I MEAN, I CAN SAY THE WORD "SAFETY."

20  Q.   OKAY.  WAS IT A SAFETY ISSUE OR WAS IT SOME OTHER ISSUE?

21  WAS IT --

22  A.   SO WE MEETED [SIC] AND EXCEEDED THE STANDARDS THAT WE WERE

23  TESTING TO.  SO WE LOOKED AT IT AS MORE OF AN ENHANCEMENT THAN

24  A SAFETY ISSUE.

25  Q.   OKAY.  WHEN A GUN DROPS AND FIRES, THAT BULLET CAN STRIKE

1  SOMEBODY, RIGHT?

2  A.   THAT'S CORRECT.

3  Q.   YOU DON'T WANT THAT TO HAPPEN, DO YOU?

4  A.   NO, OF COURSE NOT.

5  Q.   WOULD THE PERSON WHO GETS HIT FROM THAT BULLET CONSIDER IT

6  A SAFETY ISSUE?

7  A.   THEY COULD.

8  Q.   NOW, WHEN YOU TOLD THE PUBLIC YOU WERE GOING TO MAKE A

9  CHANGE, DID YOU CALL IT A RECALL?

10  A.   NO.  WE CALLED IT A VOLUNTARY UPGRADE.

11  Q.   WAS THAT YOUR DECISION, SIR?

12  A.   ABSOLUTELY NOT.

13  Q.   ABSOLUTELY NOT.

14       WAS IT THE DESIGN TEAM'S DECISION?

15  A.   NO, IT WAS NOT.

16  Q.   WHAT TEAM CAME UP WITH THE TERM "VOLUNTARY UPGRADE"?

17  A.   I DON'T HAVE INFORMATION ON WHO CAME UP WITH THAT TERM.

18  Q.   DO YOU KNOW WHAT TEAM IDENTIFIED THEMSELVES ON THE

19  VOLUNTARY UPGRADE PROGRAM NOTICE TO THE PUBLIC?

20  A.   I'M SORRY.  CAN YOU ASK THE QUESTION AGAIN, PLEASE?

21  Q.   YEAH.  WAS IT THE PUBLIC RELATIONS TEAM WHO WAS ACTUALLY

22  IDENTIFIED ON THE VOLUNTARY UPGRADE PROGRAM NOTICE?

23  A.   I'M SORRY.  WAS IT THE PUBLIC RELATIONS TEAM?  I BELIEVE

24  THAT'S CORRECT.

25  Q.   DID THEY COME UP WITH THE TERM "VOLUNTARY UPGRADE

1  PROGRAM"?

2  A.   I DON'T KNOW THAT FOR CERTAIN.

3  Q.   WHY DIDN'T YOU TELL PEOPLE THAT THIS GUN HAD A

4  SUSCEPTIBILITY TO FIRING WHEN DROPPED AND THAT IT NEEDED TO BE

5  FIXED?

6  A.   WHY DID WE TELL PEOPLE?

7  Q.   WHY DIDN'T YOU TELL PEOPLE THAT?

8  A.   I BELIEVE WE DID, AND IT'S PART OF THE VOLUNTARY UPGRADE

9  NOTICE.

10  Q.   WHAT PERCENTAGE OF THE PUBLIC GOT YOUR VOLUNTARY UPGRADE

11  NOTICE AND ACTUALLY SENT THEIR GUNS BACK?

12  A.   I DON'T KNOW ABOUT THE PERCENTAGE OF THE PUBLIC, BUT I

13  KNOW THAT WE HAD ABOUT 160,000 GUNS GO THROUGH THE PROGRAM.

14  Q.   OKAY.  OUT OF A COUPLE MILLION, RIGHT?

15  A.   NO.  THAT'S NOT CORRECT.

16  Q.   OVER A MILLION?

17  A.   NO.

18  Q.   HOW MANY GUNS?

19  A.   I BELIEVE AT THE TIME WE HAD SOLD ABOUT 300,000.

20  Q.   SO FROM 2014 UNTIL 2018 OR SO, 2017, YOU HAD SOLD ONLY

21  300,000 OF THESE GUNS?

22  A.   I BELIEVE THAT'S THE NUMBER.  CORRECT.

23  Q.   HOW ABOUT TO THE PUBLIC?  I THINK YOU SAID -- WELL, LET ME

24  TAKE A STEP BACK.

25       DID YOU HAVE LAW ENFORCEMENT SALES REPS AT SIG?

1  A.   DO WE HAVE SALES REPS?

2  Q.   YEAH.

3  A.   YES, WE DO.

4  Q.   SPECIFICALLY FOR LAW ENFORCEMENT?

5  A.   YES.

6  Q.   DID THOSE LAW ENFORCEMENT SALES REPS REACH OUT TO LAW

7  ENFORCEMENT TO TELL THEM THAT THERE'S A SAFETY VULNERABILITY

8  WITH THIS GUN?

9  A.   I DON'T KNOW IF THEY DID OR NOT.

10  Q.   OTHER THAN PERHAPS A MAILER THAT WASN'T EVEN IDENTIFIED AS

11  A RECALL, DID YOU DO ANYTHING TO INFORM THE PUBLIC THAT THEIR

12  GUNS HAD THIS SAFETY VULNERABILITY?

13         MS. DENNISON:  OBJECTION, YOUR HONOR.  AGAIN, WE ARE

14  SO FAR BEYOND THE SCOPE OF ANY ISSUE IN THIS CASE.

15         MR. ZIMMERMAN:  YOUR HONOR, I'D BE HAPPY IF THIS

16  DIDN'T HAVE TO BE ADDRESSED.  BUT BASED UPON THE STANDARDS THAT

17  ARE COMING IN, I NEED TO ADDRESS IT.

18         MS. DENNISON:  THIS DOESN'T HAVE TO DO WITH

19  STANDARDS.

20         THE COURT:  I DON'T KNOW WHERE YOU'RE GOING TO GO

21  WITH STANDARDS.

22         MR. ZIMMERMAN:  MAY I APPROACH, YOUR HONOR?

23         THE COURT:  NO.  NO.  DON'T APPROACH ANYMORE.  DON'T

24  APPROACH.

25         I'LL OVERRULE.

1          GO AHEAD.

2     BY MR. ZIMMERMAN:

3     Q.   THE VOLUNTARY UPGRADE PROGRAM WAS THE DOCUMENT THAT

4     IDENTIFIED THOSE INDUSTRY STANDARDS.   CORRECT?

5     A.   YES.

6     Q.   AND YOU TOLD THE PUBLIC, HEY, WE COMPLIED WITH THESE

7     INDUSTRY STANDARDS.

8          DID YOU TELL THEM THAT OMAHA OUTDOORS TESTED IT AND FOUND

9     THE SAFETY VULNERABILITY?

10    A.   I DON'T RECALL IF IT WAS CALLED OUT IN THE MEMO ABOUT

11    OMAHA OUTDOORS OR NOT.

12    Q.   OMAHA OUTDOORS COMES TO YOU IN EARLY AUGUST.   AND WITHIN,

13    WHAT, DAYS OR A WEEK OR SO, YOU ISSUED THE VOLUNTARY UPGRADE

14    PROGRAM?

15    A.   I DON'T KNOW THE TIME FRAME, BUT I KNOW IT WAS PRETTY

16    QUICK.

17    Q.   PRETTY QUICK.

18         WOULD IT HAVE BEEN AS QUICK IF OMAHA OUTDOORS HADN'T COME

19    TO YOU -- NOT COME TO YOU, GONE TO THE PUBLIC AND SAID, HEY,

20    THERE'S A SAFETY VULNERABILITY?   WOULD IT HAVE BEEN THAT QUICK?

21    A.   LIKE I SAID, WE WERE WORKING ON A PRODUCTION SOLUTION, SO

22    IT WAS ALREADY IN THE WORKS.   SO, LIKE I SAID, IT ACCELERATED

23    OUR TIMELINE.   I CAN'T TELL YOU HOW LONG IT WOULD HAVE TAKEN IF

24    IT WASN'T FOR THAT.

25    Q.   SO THESE LOWER INDUSTRY STANDARD TESTS -- OR THESE

1  DIFFERENT INDUSTRY STANDARD TESTS DEALT WITH DROP FIRE, RIGHT?

2  A.    THAT'S PART OF IT, YES.

3  Q.    THERE ARE NO INDUSTRY STANDARD TESTS WHATSOEVER ON THE

4  RISKS OF UNINTENDED DISCHARGES ON PISTOLS.  CORRECT?

5  A.    NOT THAT I HAVE SEEN, NO.

6  Q.    DID SIG PERFORM ANY TESTING ITSELF ON THE ISSUES INVOLVING

7  UNINTENDED DISCHARGES?

8  A.    I'M SORRY.  COULD YOU REPEAT THE QUESTION AGAIN, PLEASE?

9  Q.    SURE.  YOU UNDERSTAND THAT IT'S A HAZARD IF SOMEONE DROPS

10 THEIR GUN FROM UP HERE, IT HITS THE GROUND AND IT FIRES, RIGHT?

11 A.    YES.

12 Q.    THAT'S SOMETHING YOU CARE ABOUT AND WANT TO MAKE SURE IT

13 DOESN'T HAPPEN.

14 A.    CORRECT.

15 Q.    SO YOU TEST --

16 A.    WE TEST FOR THAT.

17 Q.    I'M SORRY?

18 A.    CORRECT.  WE TEST FOR THAT.

19 Q.    AND THAT'S WHY YOU TEST FOR IT.

20     DO YOU TEST WHEN A TRIGGER THAT IS 4 AND A HALF, 5, 5 AND

21 A HALF POUNDS, 6 POUNDS IS MOVED 55 ONE-THOUSANDTHS OF AN INCH,

22 WHETHER THERE ARE UNINTENDED DISCHARGE RISKS ASSOCIATED WITH

23 THAT?

24 A.    NOT THAT I'VE HEARD OF OR SEEN, NO.

25 Q.    NOT THAT YOU'VE HEARD OF OR SEEN.

1      IN THE 12 YEARS YOU'VE BEEN WITH THE COMPANY, HAS THE

2 COMPANY EVER PERFORMED ANY TRIGGER SAFETY TESTS?

3 A.   NOT THAT I RECALL.

4 Q.   HAVE YOU EVER PURCHASED OR BORROWED A GLOCK OR A SMITH &

5 WESSON OR ANY GUN WITH A TRIGGER SAFETY AND TESTED THE ABILITY

6 FOR THAT TRIGGER SAFETY TO PREVENT THE GUN FROM MOVING

7 BACKWARDS WITH UNINTENDED GRAZES, MOVEMENT, FOREIGN OBJECTS, OR

8 ANYTHING ELSE TOUCHING THAT TRIGGER?

9 A.   NO.  I HAVEN'T TESTED THAT FEATURE.

10 Q.   OKAY.  YOU CAME FROM NEW HAMPSHIRE DOWN TO GEORGIA AND

11 NEVER -- WERE YOU CURIOUS ABOUT WHETHER THERE'S A RISK OF

12 UNINTENDED DISCHARGES WITHOUT TRIGGER SAFETIES?

13 A.   LIKE I'VE SAID, I'VE SEEN THE DESIGNS.  I KNOW WHAT THE

14 MATERIALS ARE ON THEIR WEBSITES.  BUT I'VE NEVER TRIED TO

15 QUANTIFY WHAT THAT WOULD BE.

16 Q.   OKAY.  SO IN TERMS OF WHAT YOU KNOW FROM THE WEBSITES --

17 I'M GOING TO SHOW YOU WHAT WE'LL IDENTIFY FOR THE RECORD AS

18 PLAINTIFF'S EXHIBIT 96.

19      BEFORE I --

20           THE COURT:  PLAINTIFF'S 96?

21           MR. ZIMMERMAN:  PLAINTIFF'S 96, YOUR HONOR.

22           THE COURT:  OKAY.

23 BY MR. ZIMMERMAN:

24 Q.   HAVE YOU SEEN GLOCK'S WEBSITE?

25 A.   I'VE BEEN ON GLOCK'S WEBSITE, YES.

1   Q.   AND HAVE YOU SEEN WHAT THEY DISCUSS WHEN IT COMES TO

2   TRIGGER SAFETIES PREVENTING UNINTENDED DISCHARGES?

3   A.   I'VE SEEN SOME LANGUAGE ON THEIR WEBSITE REGARDING THAT,

4   BUT I DON'T KNOW THE SPECIFICS.

5   Q.   SIR, I'LL SHOW YOU THE SECOND PAGE OF THIS DOCUMENT, P-96.

6   IT'S ALSO BATES LABELED LANG TRIAL 16.

7             MS. DENNISON:  OBJECTION, YOUR HONOR.  HEARSAY.

8             THE COURT:  I DON'T KNOW -- DO I KNOW WHAT IT IS

9   EXACTLY?

10            MR. ZIMMERMAN:  YOUR HONOR, THIS IS A --

11            THE COURT:  HAVE YOU IDENTIFIED IT ALREADY?

12            MR. ZIMMERMAN:  YES.  THIS IS THE GLOCK WEBSITE.

13            THE COURT:  YOU HAVEN'T JUST IDENTIFIED IT IN COURT?

14            MR. ZIMMERMAN:  P-96, YOUR HONOR.

15            THE COURT:  YES.  BUT HAVE YOU IDENTIFIED WHAT IT IS,

16  OR NO?  I JUST WANT TO MAKE SURE IF -- WHETHER I MISSED IT.

17            DID YOU IDENTIFY IT IN COURT TODAY, JUST NOW?

18            MR. ZIMMERMAN:  I THOUGHT I JUST DID.  BUT IF I --

19            THE COURT:  IF YOU DID, I MAY HAVE MISSED IT.

20            MR. ZIMMERMAN:  YEAH.  THIS IS THE GLOCK WEBSITE,

21  YOUR HONOR, DISCUSSING THE REASONS FOR --

22            THE COURT:  GO AHEAD AND APPROACH HIM.

23            WHAT'S YOUR OBJECTION?

24            MS. DENNISON:  HEARSAY, YOUR HONOR.

25            THE COURT:  I'LL SEE WHAT QUESTIONS HE ASKS FIRST AND

1    SEE WHETHER HE'S ABLE TO LAY A PROPER FOUNDATION.  I'M NOT SURE

2    IF HE WILL.

3           BUT RIGHT NOW, I WON'T SUSTAIN THAT.  I'LL OVERRULE

4    IT.  IT'S PREMATURE.

5    BY MR. ZIMMERMAN:

6    Q.  SIR, YOU CAN READ THAT PAGE, AND LET ME KNOW WHEN YOU'RE

7    FINISHED.

8           THE COURT:  IS IT BEING USED FOR HIM TO HAVE HIS

9    RECOLLECTION REFRESHED, HIS -- WHAT'S THE BASIS WITH WHICH

10   YOU'RE GOING TO USE IT?

11          MR. ZIMMERMAN:  SURE.

12          I MEANT QUIETLY TO YOURSELF BEFORE WE READ IT TO THE

13   JURY.

14          THE BASIS, YOUR HONOR, IS WHETHER OR NOT HE IS AWARE

15   OF --

16          THE COURT:  OKAY.  DON'T TELL ME YOUR QUESTION,

17   BECAUSE I CAN ALREADY TELL YOU'RE GOING TO ANSWER TOO MUCH.  SO

18   NEVER MIND.  AND IT'S NOT YOUR FAULT, IT'S THE WAY I ASKED IT.

19          YOU CAN GO AHEAD AND JUST REVIEW WHAT HE'S ASKED YOU

20   TO, MR. TONER.

21          AGAIN, I'LL OVERRULE RIGHT NOW, AS IT STANDS.  YOU

22   MAY RENEW YOUR OBJECTION IF YOU NEED TO.

23          AS I UNDERSTAND IT, THOUGH, AT THIS POINT HE'S JUST

24   ASKED HIM TO REVIEW IT.  I DON'T KNOW WHY.

25          MR. ZIMMERMAN:  ALL RIGHT.

BY MR. ZIMMERMAN:

Q.   SIR, BEFORE I ASK YOU -- OR PUBLISH THIS TO THE JURY, IS IT YOUR UNDERSTANDING THAT GLOCK HAS A TRIGGER SAFETY ON THEIR GUN TO PREVENT TWO THINGS --

         MS. DENNISON:  OBJECTION, YOUR HONOR.  HE -- THIS IS HEARSAY NOW, BECAUSE MR. ZIMMERMAN WANTS TO READ IN WHAT THE HEARSAY STATEMENT SAYS IN HIS QUESTION.

         THE COURT:  ALL RIGHT.  I'LL SUSTAIN AS TO WHAT I THINK -- WHERE I THINK THE QUESTION IS GOING TO GO AS FAR AS THE -- WHAT I THINK IS GOING TO BE THE FORM OF THE QUESTION.

         YOU CAN ASK HIM A QUESTION, A FOUNDATIONAL QUESTION TO ESTABLISH WHETHER HE HAS KNOWLEDGE, SUFFICIENT KNOWLEDGE TO ANSWER WHAT YOU'RE ABOUT TO ASK HIM.

         IF YOU ARE JUST GOING TO ASK HIM, IS IT TRUE THAT THIS DOCUMENT SAYS THIS, IT DOES SOUND LIKE IT'S GOING TO BE HEARSAY UNLESS YOU ESTABLISH SOME OTHER FOUNDATION.

         SO GO AHEAD AND ASK A QUESTION MORE ALONG THE LINES OF FOUNDATIONAL.

         MR. ZIMMERMAN:  SURE.

BY MR. ZIMMERMAN:

Q.   SIR, HAVE YOU SEEN BEFORE TODAY HOW GLOCK IDENTIFIES THE BENEFITS OF A TRIGGER SAFETY?

A.   YES, I HAVE.

Q.   OKAY.  AND ARE YOU AWARE OF WHAT YOUR COMPETITOR IDENTIFIES AS THE BENEFITS OF A TRIGGER SAFETY?

1  A.   YES.  I HAVE READ IT.

2  Q.   OKAY.  HAVE YOU DISCUSSED WITH YOUR OWN TEAM WHETHER A

3  TRIGGER SAFETY CAN PREVENT DROP FIRES AND IF THE TRIGGER IS

4  SUBJECTED TO ANY PRESSURE THAT ISN'T A DIRECT FIRING MECHANISM

5  OR PULL?

6  A.   NO, I HAVE NOT.

7  Q.   SIR, IN DESIGNING THIS PISTOL, WERE YOU AWARE THAT --

8  GLOCK'S YOUR MAIN COMPETITOR IN THE STRIKER-FIRED INDUSTRY,

9  RIGHT?

10 A.   YEAH.  THAT'S CORRECT.

11 Q.   WERE YOU AWARE THAT YOUR MAIN COMPETITOR, WHEN THEY WERE

12 CONSIDERING THE BENEFITS OF A TRIGGER SAFETY DESIGN, THAT THEY

13 IDENTIFIED TWO PURPOSES?

14 A.   ARE YOU TALKING ABOUT NOW OR BACK WHEN WE WERE DESIGNING

15 THE ORIGINAL PISTOL?

16 Q.   HOW ABOUT BACK IN THE ORIGINAL DAYS.

17 A.   I DON'T RECALL READING THAT SPECIFIC LANGUAGE OR

18 UNDERSTANDING THAT AS THEIR MARKETING PLAN.

19 Q.   WHEN YOU UNDERSTOOD -- IT WAS A MARKETING PLAN?

20 A.   WELL, THEIR MARKETING MATERIALS THAT YOU READ ON THE

21 WEBSITE.

22 Q.   OKAY.  DO YOU HAVE ANY BELIEF THAT WHAT THEY PUT ON THEIR

23 WEBSITE IS DIFFERENT THAN WHAT THEY BELIEVE THE ACTUAL TRIGGER

24 SAFETY IS FOR?

25          MS. DENNISON:  OBJECTION, YOUR HONOR.  CALLS FOR

1    SPECULATION.

2         THE COURT:  I'LL OVERRULE.  IF HE HAS KNOWLEDGE OF A

3    BASIS, I'LL OVERRULE.

4         THE WITNESS:  I HAVE NO IDEA WHAT THEIR KNOWLEDGE IS

5    OF THAT.

6    BY MR. ZIMMERMAN:

7    Q.   OKAY.  DO YOU HAVE THE AUTHORITY AS THE TEAM LEAD TO

8    GATHER YOUR TEAM TOGETHER AND SAY, LET'S TEST A TRIGGER SAFETY

9    TO SEE IF IT CAN ACTUALLY DO TWO THINGS, PREVENT DROP FIRES AND

10   PREVENT THE TRIGGER FROM FIRING WHEN IT IS NOT SUBJECTED TO A

11   DIRECT FIRING PULL?

12   A.   DO I HAVE THAT AUTHORITY?

13   Q.   YEAH.

14   A.   YES.  I COULD -- MY TEAM COULD TEST THAT.

15   Q.   OKAY.  AT ANY TIME SINCE YOU KNEW THAT GLOCK WAS SAYING

16   THAT THE TWO BENEFITS WERE DROP FIRE AND UNINTENDED DISCHARGES

17   ON TRIGGER SAFETIES, DID YOU GATHER YOUR TEAM TOGETHER AND SAY,

18   HEY, LET'S TAKE A LOOK AT THIS FOR THE BENEFIT OF OUR

19   CUSTOMERS?

20   A.   NO, WE HAVE NOT.

21   Q.   HAVE YOU LOOKED INTO WHETHER A SHORTER TRIGGER ON A

22   SINGLE-ACTION PISTOL IS AT A GREATER RISK OF FIRING WITHOUT

23   FINGER-ON-TRIGGER CONTACT THAN ONE THAT HAS A LONGER TRIGGER

24   PULL?

25   A.   NO, I HAVEN'T LOOKED INTO THAT.

1    Q.   SIR, YOU WOULD AGREE WITH ME THAT GUNS THAT HAVE TRIGGER

2    SAFETIES DO NOT SLOW THE USER DOWN WHEN THEY WANT TO FIRE THE

3    WEAPON.  CORRECT?

4    A.   IT DOESN'T SLOW THE USER DOWN AS LONG AS THEIR FINGER IS

5    IN THE CORRECT POSITION ON THE FEATURE, THAT TAB TRIGGER

6    FEATURE.

7    Q.   RIGHT.  WHEN THEY PUT THEIR FINGER INSIDE THE TRIGGER

8    GUARD, IT FACES UP TO THE TRIGGER AND THEY PULL, RIGHT?

9    A.   YES.  THAT'S HOW IT WORKS.

10   Q.   MEANING WHEN THEY WANT TO FIRE THE WEAPON?

11   A.   YES.

12   Q.   OKAY.  SIR, YOU CAN AGREE THAT TRIGGER SAFETIES CAN

13   PREVENT SIDE PULLING AND OTHER UNINTENDED DISCHARGES, RIGHT?

14   A.   I THINK FOR THE VERY SPECIFIC INSTANCE WHERE YOU'RE NOT

15   PULLING DIRECTLY ON THE TAB TO DISENGAGE IT, THEN IT WOULD

16   PREVENT THE TRIGGER FROM GOING REARWARD.

17   Q.   DO YOU HAVE ANY INFORMATION ABOUT WHETHER MR. LANG PUT HIS

18   FINGER IN, DIRECTLY PULLED ON THAT TRIGGER?

19   A.   NO, I DO NOT.

20   Q.   OR WHETHER HIS FINGER EVER MADE CONTACT WITH THAT TRIGGER?

21   A.   NO, I DO NOT.

22   Q.   OR IF THERE WAS A FOREIGN OBJECT THAT GOT NEXT TO THAT

23   TRIGGER?

24   A.   I HAVEN'T SEEN ANY INFORMATION ON A CAUSE.

25   Q.   CAN WE AGREE THAT THERE ARE TYPES OF UNINTENDED DISCHARGES

1    THAT CAN OCCUR WITH A P320 THAT CANNOT OCCUR WITH A GLOCK?

2    A.   I'M NOT SURE I CAN THINK OF ANYTHING AT THE MOMENT.

3    Q.   HOW ABOUT SIDE PULLING THE PISTOL, LIKE WE SAW IN THE

4    OPENING, THE TRIGGER?

5    A.   I MEAN, IF IT'S A VERY SPECIFIC SIDE PULL, THEN I GUESS

6    THAT WOULD BE POSSIBLE.

7    Q.   OKAY.  SO THERE ARE TYPES OF UNINTENDED DISCHARGES.

8         HOW ABOUT ABOVE THE TRIGGER SAFETY?

9         ABOVE THE TRIGGER SAFETY ON A GLOCK WON'T PULL IT IF IT --

10   LET ME TAKE A STEP BACK.

11        YOU MENTIONED THAT THE TRIGGER, THE BLADE, THAT TAB IS ON

12   THE FRONT END OF THE GUN, ON THE TRIGGER, RIGHT?

13   A.   IT'S LOCATED ON THE FRONT OF THE TRIGGER.  I THINK THAT'S

14   WHAT YOU'RE ASKING ME.

15   Q.   YEAH.  SO IF YOU PULL BELOW THAT TAB ON THE FRONT OF THE

16   TRIGGER, P320 WON'T GO OFF, RIGHT?

17   A.   I'M SORRY.  I'M NOT FOLLOWING YOUR LINE OF QUESTIONING.

18   CAN YOU REASK THE QUESTION?

19   Q.   SURE.  IF YOU HAVE A TRIGGER SAFETY, LIKE A GLOCK DOES,

20   AND THERE'S PULLING ON THE BOTTOM OF THAT TRIGGER, THAT TRIGGER

21   WILL NOT GO OFF.

22   A.   YES.  ON A PISTOL WITH A TAB SAFETY, IF YOU'RE NOT

23   TOUCHING THE TAB, IT WON'T GO OFF.

24   Q.   BUT IT WILL ON A P320.

25   A.   IF YOU'RE ACTIVATING THE TRIGGER AND PUSHING IT REARWARD,

1  IT WILL GO OFF.

2  Q.   AND ON THE RIGHT SIDE OF A P320, IT WILL GO OFF, WHEN IT

3  WON'T ON A GLOCK.

4  A.   I GUESS IT DEPENDS ON WHAT YOU MEAN BY RIGHT SIDE.

5  Q.   RIGHT SIDE OF THE TRIGGER, SIR.

6  A.   SO --

7  Q.   THE SIDE OF IT, EVEN THE FACE OF IT, ON THE RIGHT-HAND

8  SIDE WHERE THE TAB IS.

9  A.   IT ALL DEPENDS ON YOUR ANGLE OF FORCE ON THE TRIGGER.  BUT

10  IT'S CONCEIVABLE THAT IF YOU'RE ON THE SIDE, IT COULD PULL.

11  Q.   RIGHT.  AND IF YOU'RE GETTING ADEQUATE TRIGGER WEIGHT ON

12  THAT TRIGGER, RIGHT?

13  A.   I'M SORRY.  TRIGGER WEIGHT?

14  Q.   YEAH.  IF YOU'RE GETTING ADEQUATE TRIGGER WEIGHT ON THAT

15  TRIGGER, IT WILL PULL ON A P320.

16  A.   IF YOU'RE PUTTING ADEQUATE FORCE ON THE TRIGGER, YES, IT

17  WILL PULL.

18  Q.   AND THAT FORCE YOU'RE TALKING ABOUT IS THE TRIGGER WEIGHT?

19  A.   YES.  THE TRIGGER PULL WEIGHT.

20  Q.   OKAY.  SIR, THE DESIGN OF TRIGGER SAFETIES HAS BEEN AROUND

21  SINCE THE 1980S.  CORRECT?

22  A.   I THINK THE ORIGINAL PATENT WAS ACTUALLY EARLIER THAN

23  THAT.

24  Q.   OKAY.  YOU -- AND YOU TALKED ABOUT PATENTS.  A PATENT THAT

25  GLOCK HAS OR SOMEONE ELSE HAS WOULD NOT PREVENT YOU FROM BEING

1    ABLE TO DESIGN A TRIGGER SAFETY FOR THE P320.  FAIR?

2    A.   I MEAN, IT COULD DRIVE WHAT THE DESIGN ENDS UP BEING.  BUT

3    IT'S SOMETHING THAT WE DEAL WITH AS A DESIGN ENGINEER.

4    Q.   YEAH.  I MEAN, YOU PUT A TRIGGER SAFETY ON THE FIRST

5    PROTOTYPE OF THE P320, RIGHT?

6    A.   YES.

7    Q.   AND YOU WEREN'T ATTEMPTING TO VIOLATE SOMEBODY'S PATENT,

8    RIGHT?

9    A.   NOT AT THAT TIME.  BUT I DON'T KNOW IF WE DID A PATENT

10   SEARCH AT THAT PERIOD OF TIME.

11   Q.   RIGHT.  THERE'S NO PATENT ISSUE WITH SIG SAUER BEING ABLE

12   TO DESIGN, PRODUCE, SELL A GUN WITH A TRIGGER SAFETY.  FAIR?

13   A.   I BELIEVER THAT'S CORRECT.

14   Q.   SIR, THE ONLY STRIKER-FIRED PISTOL THAT YOU HAVE OTHER

15   THAN A SIG HAS A TRIGGER SAFETY, RIGHT?

16   A.   I BELIEVE THAT'S CORRECT.

17   Q.   HOW MUCH DOES THAT SAFETY COMPONENT COST, SIR?

18   A.   I'M SORRY.  ON THE COMPETITOR GUN THAT I OWN?

19   Q.   NO.  YOU WERE ASKED TO IDENTIFY HOW MUCH A TRIGGER SAFETY

20   WOULD COST SIG IF THEY PUT IT ON ONE OF THEIR WEAPONS, RIGHT?

21   A.   YES.

22   Q.   HOW MUCH?

23   A.   IF I RECALL CORRECTLY, I SAID ON THE ORDER OF FIVE TO TEN

24   DOLLARS.

25   Q.   RIGHT.  I THINK YOU SAID THAT THE NON-TRIGGER SAFETY COSTS

1    ABOUT FIVE, THE ONE WITH THE TRIGGER SAFETY COSTS ABOUT TEN.

2    A.    SOUNDS FAMILIAR, YES.

3    Q.    IS THAT IMPORTANT TO YOU AT ALL, THE COST OF THIS?

4    A.    THE COST OF A -- TO BUILD A GUN?

5    Q.    THE COST OF WHAT EVERY SINGLE ONE OF YOUR COMPETITORS IS

6    DOING, PUTTING A TRIGGER SAFETY ON A GUN.

7          DOES IT MATTER TO YOU WHAT THAT SAFETY COMPONENT COSTS?

8    A.    I MEAN, IT MATTERS TO THE COMPANY.  IT DOESN'T MATTER TO

9    ME PERSONALLY.

10   Q.    DID IT MATTER TO YOU WHEN YOU TESTIFIED ABOUT IT UNDER

11   OATH?

12   A.    I BELIEVE I ANSWERED TO THE BEST OF MY KNOWLEDGE WHEN YOU

13   WERE ASKING ME THOSE QUESTIONS.

14   Q.    SIR, SIG SAUER ATTEMPTS TO PROTECT AGAINST DROP FIRES.

15   CORRECT?

16   A.    YES.

17   Q.    IT ATTEMPTS TO PROTECT AGAINST WHAT DEFENSE COUNSEL IN

18   OPENING TALKED ABOUT, FIRING -- THE GUN FIRING IF SOMEONE PULLS

19   THE TRIGGER WHEN THEY'RE DISMANTLING IT, RIGHT?

20   A.    YES.

21   Q.    BUT SIG DOES NOT ATTEMPT IN THE USE OF A TRIGGER SAFETY OR

22   A MANUAL SAFETY ON THE CARRY P320 TO PREVENT AGAINST UNINTENDED

23   DISCHARGES.  FAIR?

24   A.    LIKE I SAID, WE'VE OFFERED THE MANUAL SAFETY ON MULTIPLE

25   MODELS.  IT'S NOT WITH THE CARRY SPECIFICALLY, BUT WE DO HAVE

1    MULTIPLE MODELS THAT HAVE A MANUAL SAFETY.

2    Q.   YOU HAVE ONE MODEL THAT'S NOT THE M17 OR M18 REPLICA,

3    RIGHT?

4    A.   WE HAVE -- ALSO, WE HAVE SOME STATE COMPLIANT MODELS THAT

5    HAVE THAT AS WELL.

6    Q.   OKAY.  IS THAT FOR LAW ENFORCEMENT SALES?

7    A.   NO.  IT'S FOR COMMERCIAL MARKET, MAINLY.

8    Q.   CAN ANYBODY GET A CARRY P320 TODAY WITH A TRIGGER SAFETY

9    OR A MANUAL THUMB SAFETY?

10   A.   NOT WITH A TRIGGER SAFETY.  I'M NOT A HUNDRED PERCENT SURE

11   WHETHER WE WOULD OFFER THE CARRY AS A SPECIAL MODEL OR NOT.  I

12   DON'T HAVE THAT KNOWLEDGE.

13   Q.   OKAY.  WITHOUT IT BEING A SPECIAL ORDER FOR A SPECIAL

14   PERSON OR LAW ENFORCEMENT DEPARTMENT, CAN SOMEONE GO ON THE

15   WEBSITE AND GET ONE, SIR?

16   A.   I DON'T KNOW A HUNDRED PERCENT WHETHER THAT'S CORRECT OR

17   NOT.

18   Q.   CAN SOMEONE GO INTO ANY STORE IN THE STATE OF GEORGIA AND

19   FIND A P320 CARRY WEAPON WITH A MANUAL SAFETY OR A TRIGGER

20   SAFETY?

21   A.   NOT WITH A TRIGGER SAFETY, BUT I'M NOT SURE IF WE HAVE

22   CARRY MODELS WITH A MANUAL SAFETY.  I'M NOT A HUNDRED PERCENT

23   ON THAT.

24   Q.   HAVE YOU EVER SEEN ONE, SIR?

25   A.   NOT -- I THINK SOME INTERNATIONAL SALES, WE'VE SOLD THAT

1 MODEL WITH A MANUAL SAFETY. BUT I'M NOT A HUNDRED PERCENT, SO

2 I DON'T WANT TO SPECULATE.

3 Q. NOT FOR UNITED STATES CITIZENS?

4 A. LIKE I SAID, I THINK I'VE SEEN CARRY WITH IT, BUT I DON'T

5 REMEMBER WHAT THE SPECIFIC MODEL WAS.

6          MR. ZIMMERMAN: THAT'S ALL I HAVE, SIR.

7          THE COURT: ALL RIGHT. CROSS?

8          MS. DENNISON: THANK YOU, YOUR HONOR.

9                  CROSS-EXAMINATION

10 BY MS. DENNISON:

11 Q. GOOD AFTERNOON, MR. TONER.

12 A. GOOD AFTERNOON.

13 Q. CAN A GUN BE MADE DROP SAFE AT ANY HEIGHT?

14 A. NO, IT CANNOT.

15 Q. DID YOU DISAGREE WITH THE VOLUNTARY UPGRADE PROGRAM BEING

16 ISSUED AS A VOLUNTARY UPGRADE PROGRAM, AS OPPOSED TO A RECALL?

17 A. NO, I DIDN'T DISAGREE WITH THAT.

18 Q. NOW, WHAT SPECIFICALLY DID SIG SAUER DO IN RESPONSE TO THE

19 ARMY'S CONCERN ABOUT THE P320 VULNERABILITY YOU IDENTIFIED?

20 A. SO ONCE WE HEARD ABOUT THE CONCERN, WE -- WE WENT INTO

21 ACTION. SO WE REDESIGNED SOME OF THE FIRING CONTROL UNIT

22 COMPONENTS TO MAKE IT A MORE BALANCED SYSTEM, AND THEN WE

23 PROVIDED ADDITIONAL PISTOLS, THEN, FOR TESTING.

24 Q. AND I KNOW YOU INDICATED THAT ABOUT 160,000 PISTOLS HAD

25 BEEN UPGRADED BY SIG SAUER. DO YOU HAVE ANY ESTIMATE FOR HOW

1    MUCH IT HAS COST SIG SAUER TO IMPLEMENT THAT PROGRAM?

2    A.   YES.  BETWEEN 17 AND 18 MILLION.

3    Q.   HAS SIG SAUER RECALLED OTHER PRODUCTS WHEN IT DEEMED IT

4    NECESSARY?

5    A.   YES, I BELIEVE THEY HAVE.

6    Q.   DO THE VOLUNTARY UPGRADE DESIGN CHANGES AND DROP-FIRE

7    ISSUES HAVE ANY RELEVANCE TO MR. LANG'S ASSERTION IN THIS CASE

8    THAT THE P320 DISCHARGED TOO EASILY BECAUSE IT DID NOT HAVE A

9    TRIGGER SAFETY?

10            MR. ZIMMERMAN:  OBJECTION, YOUR HONOR.

11            THE COURT:  WHAT'S YOUR OBJECTION?

12            MR. ZIMMERMAN:  THE OBJECTION IS THAT I WAS PRECLUDED

13   FROM ASKING QUESTIONS ABOUT THIS PARTICULAR CASE BECAUSE HE'S

14   BEEN WITHDRAWN AS AN EXPERT ABOUT THE FACTS OF THIS PARTICULAR

15   CASE.

16            THE COURT:  WHAT'S YOUR OBJECTION?

17            MR. ZIMMERMAN:  OUTSIDE THE SCOPE.

18            THE COURT:  WHAT'S YOUR RESPONSE?

19            MS. DENNISON:  MY RESPONSE, YOUR HONOR, IS THAT MR.

20   ZIMMERMAN HAS JUST SPENT, I DON'T KNOW --

21            THE COURT:  AND, I'M SORRY.  YOU MEAN, OUTSIDE THE

22   SCOPE OF YOUR DIRECT OR OUTSIDE THE SCOPE OF THIS -- OUTSIDE

23   THE SCOPE OF WHAT?

24            MR. ZIMMERMAN:  OUTSIDE THE SCOPE OF THIS WITNESS

25   TESTIFYING NOT AS AN EXPERT ON THE CAUSATION OF MR. LANG'S

1    INCIDENT, WHICH HE'S TESTIFIED HE HAS NOT.

2              THE COURT:  OKAY.  OVERRULED.

3    Q.   (BY MS. DENNISON)  I'M GOING TO ASK IT AGAIN SINCE WE HAD

4    THAT COLLOQUY.

5         DO THE VOLUNTARY UPGRADE PROGRAM DESIGN CHANGES HAVE ANY

6    RELEVANCE TO MR. LANG'S ASSERTION THAT THE P320 DISCHARGED TOO

7    EASILY BECAUSE IT DID NOT HAVE A TRIGGER SAFETY?

8    A.   NO.  THE UPGRADE COMPONENTS WERE SOLELY DESIGNED FOR DROP

9    SAFETY.

10   Q.   OKAY.  AND DO YOU KNOW WHETHER MR. LANG DROPPED HIS P320

11   PISTOL?

12   A.   I DON'T BELIEVE HE DID.

13   Q.   DO YOU KNOW IF MR. LANG'S PISTOL WAS MANUFACTURED AFTER

14   THE UPGRADED COMPONENTS WERE ALREADY INCLUDED IN THE P320

15   PISTOLS FOR SALE?

16   A.   YES.  I BELIEVE HE HAS AN UPGRADED MODEL.

17   Q.   OKAY.  SO WE'LL PUT THAT ASIDE.  THANK YOU.

18        HOW DO YOU FEEL ABOUT THE DESIGN OF THE P320 PISTOL?

19   A.   I'M VERY PROUD OF THE DESIGN.  IT'S EASILY ONE OF THE MOST

20   EXCITING AND PINNACLE POINTS OF MY CAREER.

21   Q.   WHAT SPECIFICALLY MAKES YOU PROUD OF THE DESIGN OF THE

22   P320 PISTOL?

23   A.   THE FACT THAT THE U.S. ARMY CHOSE OUR PISTOL OVER THE

24   MULTIPLE COMPETITORS REALLY MAKES IT A VALIDATION OF THE DESIGN

25   AND WHAT WE DID.

1  Q.   MR. TONER, HOW LONG HAVE YOU BEEN EMPLOYED BY SIG SAUER?

2  A.   I STARTED IN NOVEMBER OF 2012, SO THAT WOULD BE ABOUT 11

3  AND A HALF YEARS.

4  Q.   CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY A LITTLE

5  BIT ABOUT WHAT SIG SAUER DOES?

6  A.   SO SIG SAUER IS A MANUFACTURER OF FIREARMS, OPTICS,

7  ACCESSORIES, SUPPRESSORS, AND WE ALSO PROVIDE VERY HIGH-END

8  TRAINING FOR LAW ENFORCEMENT AND CIVILIANS.

9  Q.   DOES SIG SAUER SELL FIREARMS DIRECTLY TO CONSUMERS?

10  A.   FOR THE MOST PART, IT'S DONE THROUGH A DISTRIBUTORSHIP, SO

11  GUN -- GUN STORES AND DISTRIBUTORS, WITH THE EXCEPTION OF AT

12  OUR NEW HAMPSHIRE STORE, YOU CAN GO INTO THE, WHAT WE CALL THE

13  PRO SHOP, AND PURCHASE A GUN.  IF YOU'RE A NEW HAMPSHIRE

14  RESIDENT, YOU CAN WALK OUT THAT DAY WITH IT.  IF YOU'RE NOT,

15  THEN YOU CAN HAVE IT SHIPPED TO AN FFL OF YOUR CHOOSING IN YOUR

16  STATE.

17  Q.   AND JUST IN CASE THE JURY DOESN'T KNOW, WHAT'S AN FFL?

18  A.   SO AN FFL IS A DESIGNATION THE ATF GIVES YOU IF YOU ARE A

19  FEDERAL FIREARMS LICENSE HOLDER.  AND THAT ALLOWS YOU TO

20  TRANSFER GUNS TO CONSUMERS AND THE LIKE.

21  Q.   NOW, CAN YOU TELL THE JURY BRIEFLY ABOUT YOUR EDUCATIONAL

22  BACKGROUND?

23  A.   YES.  SO WHEN I GRADUATED COLLEGE, I WENT TO A TWO-YEAR

24  SCHOOL FOR COMPUTER-AIDED DRAFTING AND DESIGN.  AND, FROM

25  THERE, I WENT INTO THE WORK FORCE, AND I ENDED GETTING MY

1  BACHELOR'S IN MECHANICAL ENGINEERING TECHNOLOGY THROUGH A NIGHT

2  PROGRAM.

3  Q.   WHERE DID YOU OBTAIN THAT DEGREE?

4  A.   AT UNIVERSITY OF MASSACHUSETTS LOWELL.

5  Q.   NOW, MR. TONER, DO YOU HAVE A RESUME?

6  A.   YES.

7  Q.   AND I'D LIKE TO SHOW THE -- OR I'D LIKE TO SHOW YOU WHAT

8  WE'VE MARKED AS DEFENSE EXHIBIT 47, WHICH IS A COPY OF YOUR

9  RESUME.  DEFENSE EXHIBIT 47.

10          MS. DENNISON:  MAY I APPROACH, YOUR HONOR?

11          THE COURT:  YES.  AND YOU NEED NOT ASK GOING FORWARD,

12  BUT THANK YOU.

13          MS. DENNISON:  OLD HABITS DIE HARD, YOUR HONOR.

14          THE COURT:  THAT'S OKAY.  YOU SHOULD ASK AT LEAST THE

15  FIRST TIME, BUT I'M TELLING YOU, FROM HERE ON OUT, YOU NEEDN'T.

16  BUT I AGREE TO ASK THE FIRST TIME JUST SO EVERYONE KNOWS YOU

17  KNOW WHAT YOU'RE DOING.

18          MS. DENNISON:  THANK YOU.

19  Q.   (BY MS. DENNISON)  OKAY.  MR. TONER, IS DEFENSE EXHIBIT 47

20  A TRUE AND CORRECT COPY OF YOUR RESUME?

21  A.   YES, IT IS.

22  Q.   OKAY.  NOW, CAN YOU BRIEFLY TELL THE JURY ABOUT THE WORK

23  EXPERIENCE THAT YOU HAD BETWEEN YOUR GRADUATION FROM WATERBURY

24  STATE TECHNICAL COLLEGE WHEN YOU GOT YOUR ASSOCIATE'S DEGREE TO

25  WHEN YOU STARTED AT SIG SAUER IN 2012?

1    A.    YES.  SO WHEN I GOT OUT OF MY ASSOCIATE'S DEGREE PROGRAM,

2    I STARTED WORKING AT AN ELECTRICAL FITTINGS MANUFACTURER THAT

3    WAS NEARBY, BASICALLY SPECIALIZING IN INDUSTRIAL ELECTRICAL

4    COMPONENTS.

5         FROM THERE, I WENT AND WORKED AT A COMPETITOR OF THAT SAME

6    COMPANY FOR A BRIEF PERIOD OF TIME.

7         MOVING ON FROM THERE, I WORKED AT A COMPANY THAT MADE

8    FILTERS FOR SEMICONDUCTOR PRODUCTION.

9         AND FROM THERE, I WENT TO WORK AT U.S. REPEATING ARMS,

10   WHICH IS BETTER KNOWN AS WINCHESTER FIREARMS IN NEW HAVEN,

11   CONNECTICUT.

12        FROM THERE, I WENT OUT TO COLORADO FOR A YEAR AND A HALF

13   OR SO, AND I WORKED FOR A FLOOR CLEANING EQUIPMENT COMPANY.

14   COMING BACK TO NEW ENGLAND, I STARTED AS A MECHANICAL ENGINEER

15   FOR A PRODUCT DEVELOPMENT COMPANY IN MANCHESTER, NEW HAMPSHIRE,

16   THAT SPECIALIZED IN OUTDOOR EQUIPMENT, RECREATIONAL EQUIPMENT,

17   FIREARMS, WALKING STICKS, THINGS OF THAT NATURE.

18        AND FROM THERE, I WENT TO WORK FOR A COMPANY THAT MAKES

19   SUSPENSION SYSTEMS FOR MILITARY VEHICLES.  SO SUSPENSION

20   SYSTEMS IN HUMVEES AND FMTV'S AND MEDIUM TACTICAL VEHICLES,

21   THINGS OF THAT NATURE.

22        AND THEN FROM THERE, I LANDED AT SIG.

23             MS. DENNISON:  YOUR HONOR, AT THIS TIME, I WOULD MOVE

24   TO ADMIT DEFENDANT'S TRIAL EXHIBIT 47.

25             THE COURT:  ANY OBJECTION?

1        MR. ZIMMERMAN:  NO, YOUR HONOR.

2        THE COURT:  ALL RIGHT.  IT'S ADMITTED.

3   Q.   (BY MS. DENNISON)  OKAY.  NOW, LET'S TALK A LITTLE BIT

4   ABOUT YOUR ROLE AT SIG SAUER.  WHAT IS YOUR CURRENT JOB TITLE

5   AT SIG?

6   A.   SO IT'S SENIOR DESIGN ENGINEER/320 TEAM LEAD.

7   Q.   OKAY.  AND HOW LONG HAVE YOU BEEN A SENIOR DESIGN ENGINEER

8   AT SIG SAUER?

9   A.   SO THE ENTIRE TIME THAT I'VE BEEN AT SIG SAUER, I'VE BEEN

10  A SENIOR DESIGN ENGINEER, AND THEN TEAM LEAD IS AN ADDER TO

11  THAT TITLE.

12  Q.   WHAT OTHER ROLES HAVE YOU HELD AT SIG?

13  A.   SO WHEN I STARTED, I WASN'T A TEAM LEAD, SO I WAS A SENIOR

14  DESIGN ENGINEER.  FROM THERE, I WENT AND BECAME A TEAM LEAD IN

15  OUR SUPPRESSOR DIVISION.  SO I SPENT ABOUT A YEAR OF TIME DOING

16  THAT.  AND THEN I BECAME A 320 TEAM LEAD.

17  Q.   WHEN DID YOU BECOME THE P320 TEAM LEAD?

18  A.   SO THAT WOULD HAVE BEEN IN THE WINTER OR SPRING OF 2017

19  WHEN WE ENDED UP WINNING THE MODULAR HANDGUN CONTRACT.

20  Q.   ARE YOU REFERENCING THE U.S. ARMY CONTRACT?

21  A.   YES, MA'AM.

22  Q.   WHAT ARE YOUR JOB RESPONSIBILITIES AS SENIOR DESIGN

23  ENGINEER/P320 TEAM LEAD?

24  A.   SO I MANAGE A TEAM OF DESIGN ENGINEERS.  WE ALSO HAVE A

25  TEST TECH, SO IT'S THE NEW PRODUCT DEVELOPMENT OF THE 320

1   PRODUCT LINE.  WE ALSO SUPPORT THE MODULAR HANDGUN PRODUCTION

2   SUPPORT WHEN NEEDED.  SO IT'S NEW PRODUCT DEVELOPMENT,

3   PRIMARILY WITH 320 PRODUCT LINE.  AND THE P365 PRODUCT LINE HAS

4   BEEN ADDED ON RECENTLY.

5   Q.   WHICH MODEL PISTOLS HAVE YOU BEEN INVOLVED IN DESIGNING AT

6   SIG SAUER?

7   A.   SO THE -- THE 320 IS THE PRIMARY THAT'S BEEN FROM MORE OR

8   LESS FROM THE BEGINNING, AND ALSO THE 365 IS PART OF MY

9   RESPONSIBILITIES NOW.  I DID SOME SUSTAINING WORK WITH THE P250

10  PRODUCT LINE THE VERY BEGINNING AT SIG SAUER.

11  Q.   HAVE YOU BEEN INVOLVED IN DESIGNING ANY FIREARMS OUTSIDE

12  OF YOUR WORK AT SIG SAUER?

13  A.   YES.

14  Q.   WHERE?

15  A.   SO WHEN I WAS WORKING AT WINCHESTER FIREARMS, I WAS

16  INTRODUCED TO THE FIREARM INDUSTRY.  I WAS WORKING ON SOME

17  RIFLE PRODUCT LINES.  THEY DIDN'T MAKE PISTOLS.  SO IT WAS -- I

18  BELIEVE IT WAS A SHOTGUN AND A SNIPER RIFLE THAT I WAS WORKING

19  ON.

20      WHEN I WENT TO WORK AT MAKERS PRODUCT DEVELOPMENT, I

21  WORKED ON A PISTOL PROJECT FOR SIG SAUER AS A CONSULTANT WITH

22  THAT COMPANY.  WE'VE DONE SOME WORK WITH -- WE DID SOME WORK

23  WITH REMINGTON FIREARMS AS WELL AS MOSSBERG FOR SOME SHOTGUN

24  ACCESSORIES AND PRODUCTS.

25  Q.   DO YOU HOLD ANY PATENTS?

1  A.   YES, I DO.

2  Q.   DO ANY OF THESE PATENTS RELATE TO FIREARM DESIGN?

3  A.   YES.

4  Q.   HOW MANY PATENTS DO YOU HOLD RELATED TO FIREARM DESIGN?

5  A.   I BELIEVE IT'S ON THE ORDER OF EIGHT.

6  Q.   DO ANY OF YOUR PATENTS RELATE TO THE DESIGN OF THE FIRE

7  CONTROL UNIT?

8  A.   FOR THE P320?

9  Q.   FOR ANY FIRE CONTROL UNIT.

10 A.   YES.  YES.

11 Q.   OKAY.  AND CAN YOU TELL THE JURY WHAT PATENT OR PATENTS

12 THAT YOU HAVE THAT RELATE TO A FIRE CONTROL UNIT?

13 A.   SO THE P320 HAS A COMPONENT IN IT CALLED THE TAKE-DOWN

14 SAFETY LEVER.  SO THE PATENT I HAVE FOR THAT IS RESOUNDING

15 AROUND FIRE CONTROL UNIT.  WE ALSO HAVE A -- A SEAR COMPONENT

16 THAT HAS A PATENT.  WE HAVE A -- I BELIEVE THAT WAS THE OTHER

17 TWO THAT ARE RELATED TO FCU.

18 Q.   OKAY.  SO THE JURY HEARD A LITTLE BIT FROM ME ABOUT THE

19 TAKE-DOWN SAFETY LEVER.  CAN YOU TELL THE JURY WHAT IS UNIQUE

20 ABOUT THE TAKE-DOWN SAFETY LEVER?

21 A.   SO THE TAKE-DOWN SAFETY LEVER IS A COMPONENT THAT I

22 DESIGNED THAT MAKES IT SUCH THAT WHEN YOU'RE DISASSEMBLING A

23 PISTOL THAT YOU DON'T HAVE TO PULL THE TRIGGER TO TAKE IT

24 APART.  MOST OF THE STRIKER-FIRED COMPETITORS, IN ORDER TO TAKE

25 THE SLIDE ASSEMBLY OFF THE TOP OF THE GUN TO CLEAN IT, TO

1    MAINTAIN IT, FOR WHATEVER REASON YOU WANT TO TAKE IT OFF, YOU

2    HAVE TO PULL THE TRIGGER IN ORDER TO DO SO.  SO THAT'S -- THAT

3    WAS THE MAIN DESIGN EFFORT THAT I DID ON THAT COMPONENT.

4    Q.   OKAY.  AND I BELIEVE YOU JUST USED AN ACRONYM, FCU.  CAN

5    YOU EXPLAIN TO THE JURY WHAT THAT IS?

6    A.   YES.  SO THE FCU IS THE FIRE CONTROL UNIT, WHICH IS THE --

7    BASICALLY THE ENGINE OF THE PISTOL.  SO THAT'S WHAT SITS INSIDE

8    THE GRIP MODULE, WHICH IS THE PLASTIC PART THAT YOU WOULD PUT

9    YOUR HANDS ON WHEN YOU'RE MANIPULATING THE WEAPON.  SO THE FCU

10   IS -- CONTAINS THE TRIGGER, THE SLIDE CATCH, THE SEAR

11   COMPONENTS, AND THE TRIGGER BAR AND TRIGGER.

12   Q.   NOW, CAN YOU TELL THE JURY WHY IT'S IMPORTANT TO BE ABLE

13   TO DISASSEMBLE THE PISTOL WITHOUT PULLING THE TRIGGER?

14   A.   YES.  SO IF YOU HAVE THE ABILITY TO -- OR IF YOU -- IF

15   IT'S REQUIRED TO PULL THE TRIGGER TO DISASSEMBLE THE WEAPON,

16   IT'S VERY EASY TO FORGET THAT YOU HAVE A ROUND IN THE CHAMBER,

17   ACCIDENTALLY PUT A ROUND IN THE CHAMBER AS YOU'RE DISASSEMBLING

18   THE WEAPON.  SO IT CAN LEAD TO ACCIDENTAL DISCHARGES JUST BY

19   CLEANING YOUR WEAPON.

20   Q.   IS THAT A DESIGN THAT SIG PUT INTO THE P320 TO HELP

21   PREVENT RISK OF UNINTENTIONAL DISCHARGES?

22   A.   ABSOLUTELY.

23   Q.   OKAY.  SO CAN YOU PROVIDE THE JURY WITH AN EXPLANATION OF

24   THE COMPONENTS AND PARTS OF THE P320'S FIRE CONTROL UNIT?

25        AND BEFORE YOU DO THAT, WOULD IT BE HELPFUL IF THERE WERE

1  A DIAGRAM TO SHOW THE JURY?

2  A.   YEAH, I THINK SO.  IT CAN BE COMPLICATED IF I'M WAVING MY

3  HANDS AROUND.

4  Q.   OKAY.

5           MS. DENNISON:  AND I'D LIKE TO PUT UP FOR THE JURY --

6  I'D LIKE TO INTRODUCE DEFENDANT'S TRIAL EXHIBIT 26, WHICH IS A

7  DIAGRAM THAT WAS SHOWN IN THE OPENING STATEMENT THAT SHOWS

8  THESE COMPONENTS.

9           THE COURT:  ALL RIGHT.  I KNOW IT WAS USED IN

10  OPENING.  ANY OBJECTION TO IT?  YOU'RE MOVING IT INTO EVIDENCE

11  AT THIS TIME, CORRECT?

12           MS. DENNISON:  YES, YOUR HONOR.

13           THE COURT:  ANY OBJECTION?

14           MR. ZIMMERMAN:  NO, YOUR HONOR.

15           THE COURT:  ALL RIGHT.  IT'S ADMITTED.

16           MS. DENNISON:  OKAY.  COULD WE PLEASE PUT UP EXHIBIT

17  26?  THANK YOU VERY MUCH.

18           AND COULD WE POSSIBLY BLOW IT UP A LITTLE BIT SO THAT

19  IT IS EASIER TO SEE THE COMPONENTS?

20  Q.   (BY MS. DENNISON)  OKAY.  NOW THAT WE HAVE THE EXHIBIT UP

21  ON THE SCREEN, MR. TONER, CAN YOU SHOW THE JURY WHERE THE

22  FOLLOWING COMPONENTS ARE AND JUST BRIEFLY EXPLAIN WHAT EACH

23  COMPONENT DOES, WHICH IS THE STRIKER, THE STRIKER HOUSING, THE

24  SEAR, THE -- WHERE THE SEAR COMES TOGETHER WITH THE -- WITH THE

25  STRIKER FOOT, THE SAFETY LEVER, AND THE SAFETY LOCK?

1    A.   SURE.  SO THE -- THIS DIAGRAM IS A CAD ASSEMBLY, A PARTIAL

2    CAD ASSEMBLY OF WHAT THE COMPONENTS IN THE GUN ARE IN SPACE

3    WHEN IT'S ASSEMBLED.  SO THESE COMPONENTS ARE WHAT I REFERRED

4    TO EARLIER A LITTLE BIT AS THE ENGINE OF THE GUN.

5         SO THE -- WHAT YOU SEE ON THE BOTTOM IS A TRANSLUCENT KIND

6    OF PINK-COLORED PART.  THAT'S THE TRIGGER BAR.  SO I'M GOING TO

7    WALK THROUGH KIND OF THE SEQUENCE OF EVENTS OF HOW YOU WOULD

8    FIRE THE WEAPON.  I THINK THAT WOULD BE HELPFUL.

9         SO THAT PINK TRANSLUCENT PART, WHEN YOU ROTATE THE TRIGGER

10   TO THE REAR, THAT COMPONENT ACTUALLY GOES FORWARD AND NOT IN

11   THE SAME DIRECTION AS THE TRIGGER.  WHEN THAT IS DONE, THAT

12   KIND OF LIGHT-BLUE COLORED COMPONENT IS THE SAFETY LEVER.  THAT

13   ROTATES COUNTERCLOCKWISE ON THIS ORIENTATION TO DEACTIVATE THE

14   STRIKER SAFETY LOCK, WHICH IS SHOWN IN THAT KIND OF PINK

15   MAGENTA COLOR.

16        AND WHEN THAT DOES THAT, IT IS GETTING THE STRIKER -- IT

17   GETS THE STRIKER SAFETY LOCK OUT OF POSITION SO THAT WHEN THE

18   STRIKER IS RELEASED, IT CAN GO FORWARD AND STRIKE THE PRIMER OF

19   THE CARTRIDGE AND FIRE THE GUN.

20        THE GREEN PIECE IS THAT STRIKER COMPONENT THAT I TOUCHED

21   BASE ON.  THAT RIDES IN THE STRIKER HOUSING, WHICH IS THE KIND

22   OF LIGHT-BROWN, TANNISH-GOLD COLOR PART.  AND THAT -- ALL THAT

23   COMPONENT IS DOING IS GUIDING THAT GREEN PIECE THROUGH ITS

24   TRAVEL.  THE STRIKER AND SEAR CONNECTION -- THE SEAR IS THAT

25   RED COMPONENT.  THE STRIKER AND SEAR CORRECTION IS WHERE THOSE

1   TWO COMPONENTS MEET AND INTERACT.  AND THAT IS WHAT THE TRIGGER

2   BAR ALSO INTERACTS WITH AS YOU'RE CONTINUING TO PULL THE

3   TRIGGER.  THAT IS -- THE SEAR IS ROTATED COUNTERCLOCKWISE IN

4   THIS ORIENTATION.  AND THAT'S WHAT RELEASES THE STRIKER TO GO

5   FORWARD TO IGNITE THE ROUND.

6           MS. DENNISON:  OKAY.  WE CAN TAKE THAT DOWN.  THANK

7   YOU.

8   Q.   (BY MS. DENNISON)  MR. TONER, DO YOU HAVE AN ANIMATION OR

9   A SIMULATION THAT WOULD SHOW THE JURY HOW THOSE PARTS WORK

10  TOGETHER?

11  A.   YES.

12          MS. DENNISON:  I'D LIKE TO PUBLISH TO THE JURY AND

13  MOVE INTO EVIDENCE WHAT HAS BEEN MARKED AS EXHIBIT -- DEFENSE

14  EXHIBIT 58 THAT I SHOWED IN THE OPENINGS.

15          MR. ZIMMERMAN:  NO OBJECTION.

16          THE COURT:  IDENTIFY IT AGAIN FOR THE RECORD.

17          MS. DENNISON:  DEFENSE EXHIBIT 58.

18          THE COURT:  WHICH IS?

19          MS. DENNISON:  IT IS A SIMULATION OF HOW THE P320

20  MODEL PISTOL WORKS THAT I SHOWED IN MY OPENING.

21          THE COURT:  OKAY.  AND NO OBJECTION?

22          MR. ZIMMERMAN:  NO, YOUR HONOR.

23          THE COURT:  ALL RIGHT.  ADMITTED.

24          MS. DENNISON:  OKAY.  SO CAN YOU PLEASE PULL UP 58

25  AND PLAY THAT?

1          (VIDEO PLAYED)

2    Q.   (BY MS. DENNISON)  AND IS THIS ANIMATION, MR. TONER,

3    SHOWING THE JURY HOW THESE PARTS FUNCTION TOGETHER AS THEY ARE

4    MOVING?

5    A.   YES, IT DOES.

6          (VIDEO PLAYED)

7    Q.   (BY MS. DENNISON)  DID THAT SIMULATION ACCURATELY DEPICT

8    HOW THE P320'S INTERNAL COMPONENTS ARE DESIGNED TO OPERATE?

9    A.   YES.  IT'S VERY ACCURATE.

10   Q.   NOW, ARE THERE INTERNAL SAFETY FEATURES BUILT INTO THE

11   P320 PISTOL THAT PREVENT IT FROM FIRING WITHOUT A TRIGGER PULL?

12   A.   YES.

13   Q.   AND WHAT ARE THOSE SAFETIES?

14   A.   THE STRIKER OF SAFETY LOCK IS ONE OF THE COMPONENTS.  THE

15   TAKE-DOWN SAFETY LEVER IS ANOTHER ONE THAT IS PART OF THAT

16   SYSTEM, AS WELL AS THE -- THE PRIMARY HOOKUP OF THE SEAR AND

17   THE STRIKER.

18   Q.   DOES THE SECONDARY SEAR NOTCH ON THE SEAR ALSO PLAY A ROLE

19   IN SAFETY OF THE INTERNAL COMPONENTS OF THE GUN?

20   A.   YES.

21   Q.   NOW, THERE WAS SOME QUESTION ON -- WHEN MR. ZIMMERMAN WAS

22   QUESTIONING YOU ABOUT YOUR TITLE OF TEAM LEAD, WHEN YOU GOT TO

23   BE TEAM LEAD.  WOULD YOU CONSIDER YOURSELF TO BE THE PRIMARY

24   DESIGN ENGINEER FOR THE P320 PISTOL THAT IS AT ISSUE IN THIS

25   CASE?

1    A.   YES, I WOULD.

2    Q.   NOW, PRIOR TO DESIGNING THE P320 PISTOL, DID YOU HAVE ANY

3    FAMILIARITY WITH STRIKER-FIRED PISTOLS?

4    A.   YES.

5    Q.   CAN YOU EXPLAIN TO THE JURY WHAT FAMILIARITY YOU HAD?

6    A.   I HAD SHOT A COUPLE OF DIFFERENT STRIKER-FIRED PISTOLS, SO

7    I KNEW GENERALLY HOW THEY WORKED.

8    Q.   WHEN YOU WERE INITIALLY HIRED AT SIG SAUER IN 2012, WAS

9    SIG SAUER SELLING THE P320 PISTOL?

10   A.   NO, IT WAS NOT.

11   Q.   WHEN DID SIG SAUER FIRST START SELLING THE P320 PISTOL?

12   A.   SO WE LAUNCHED THE PRODUCT AT A TRADE SHOW IN EARLY 2014,

13   AND WE STARTED SELLING IT TWO TO THREE MONTHS AFTER THAT, I

14   WOULD ESTIMATE.

15   Q.   WAS THE P320 PISTOL IN DEVELOPMENT WHEN YOU JOINED SIG

16   SAUER IN 2012?

17   A.   NOT IN ITS FORM TODAY.  THERE ARE SOME EARLY DESIGNS THAT

18   -- AND PROTOTYPES THAT SOME OF THE GUYS HAD WORKED ON, BUT

19   NOTHING THAT WAS LIKE TODAY.

20   Q.   AND I BELIEVE THERE WAS SOME DISCUSSION EARLIER ABOUT

21   EARLIER STRIKER-FIRED MODEL PISTOLS THAT DIDN'T MAKE IT TO

22   PRODUCTION.  DO YOU RECALL THAT?

23   A.   YES.

24   Q.   OKAY.  CAN YOU JUST TELL THE JURY BRIEFLY WHY SIG SAUER

25   WOULD STOP MAKING A PROTOTYPE AND MOVE ON TO A NEW DESIGN

1    CONCEPT?

2    A.   YEAH.  IT DIDN'T MEET THE PERFORMANCE REQUIREMENTS THAT WE

3    WANTED TO ACHIEVE.  SO WE ENDED UP SCRAPPING THAT DESIGN AND

4    GOING TO A -- TO A NEW DESIGN THAT WE COULD ACHIEVE THE

5    PERFORMANCE REQUIREMENTS.

6    Q.   IS IT IMPORTANT TO SIG SAUER TO ACHIEVE THE DESIGN

7    PERFORMANCE STANDARDS IT SETS IN ITS PRODUCTION FIREARMS?

8    A.   OH, ABSOLUTELY.

9    Q.   WHAT MARKET WAS THE P320 ORIGINALLY DESIGNED FOR?

10   A.   THE PRIMARY MARKET THAT WE WERE GOING AFTER WAS THE LAW

11   ENFORCEMENT MARKET.  THAT WAS DEFINITELY AN AREA THAT WE DIDN'T

12   HAVE AS MUCH OF A PRESENCE AS WE WANTED.

13   Q.   DOES THE MARKET SIG IS DESIGNING A FIREARM FOR PLAY A ROLE

14   IN WHAT FEATURES MAY END UP BEING PLACED ON THAT FIREARM?

15   A.   OH, ABSOLUTELY.

16   Q.   AND YOU WERE ASKED SOME QUESTIONS WHEN MR. ZIMMERMAN WAS

17   -- WAS TALKING TO YOU ABOUT THE P322 PISTOL.  WAS THAT DESIGNED

18   FOR A PARTICULAR MARKET?

19   A.   YEAH.  IN GENERAL, IT'S DESIGNED FOR THE NOVICE FIREARMS

20   USER.

21   Q.   WHAT WERE THE DESIGN CRITERIA OR FEATURES THAT YOU WERE

22   PROVIDED IN DEVELOPING WHAT ULTIMATELY BECAME THE P320 PISTOL?

23   A.   DEFINITELY WANTED A NICE, SMOOTH TRIGGER WITH A SHORT

24   RESET.  WE -- TAKING IT APART WITHOUT HAVING TO PULL THE

25   TRIGGER WAS A VERY LARGE REQUIREMENT.  WE NEEDED TO BE MODULAR

1    IN USING SOME OF THE COMPONENTS AND FEATURES FROM THE P250

2    PRODUCT THAT IT WAS ORIGINATED FROM.

3    Q.    NOW, YOU TALKED A LITTLE BIT ABOUT THE IMPORTANCE OF

4    DISASSEMBLING THE PISTOL WITHOUT PULLING THE TRIGGER.  CAN YOU

5    TELL THE JURY HOW YOU WERE ABLE TO ACCOMPLISH DESIGNING THIS

6    TAKE-DOWN SAFETY LEVER FEATURE INTO THE P320?

7    A.    SO I CAME UP WITH THE COMPONENT CALLED THE TAKE-DOWN

8    SAFETY LEVER, WHICH IS ESSENTIALLY A LINK FROM THE TAKE-DOWN

9    LEVER TO THE REAR OF THE GUN.  SO IT MAKES IT SO YOU HAVE TO GO

10   THROUGH A COUPLE OF DISTINCT ACTIONS IN ORDER TO DISASSEMBLE

11   THE WEAPON.

12        FIRST, YOU HAVE TO SLIDE THE -- THE RACK, WHAT WE CALL

13   IT -- RACK TO SLIDE TO THE REAR WHICH IS RETRACTED ALL THE WAY

14   TO THE REAR AS FAR AS YOU CAN AND ENGAGE THE LEVER.  AND THAT

15   KEEPS IT IN PLACE.  IN DOING SO, EVEN IF THERE WAS A ROUND IN

16   THE CHAMBER, IT WOULD HAVE BEEN EJECTED THROUGH THAT ACTION.

17        NEXT, YOU WOULD NEED TO DISASSEMBLE -- OR, SORRY, REMOVE

18   THE MAGAZINE FROM THE PISTOL BECAUSE YOU CAN'T GO FORWARD WITH

19   CONTINUING TO DISASSEMBLE THE WEAPON WITH A MAGAZINE IN PLACE.

20        AND, FINALLY, YOU WOULD TURN THE TAKE-DOWN LEVER AT THAT

21   POINT.  AND WHEN YOU TURN THE TAKE-DOWN LEVER, IT DROPS THE

22   SEAR OUT OF POSITION SO THAT WHEN THE SLIDE ASSEMBLY COMES

23   FORWARD TO BE REMOVED FROM THE GUN, IT -- YOU DON'T HAVE TO

24   PULL THE TRIGGER.

25   Q.    WAS THIS DESIGN UNIQUE IN THE STRIKER-FIRED PISTOL

1   INDUSTRY?

2   A.   YES, IT WAS VERY UNIQUE.  I DON'T BELIEVE THERE WAS

3   ANYBODY ELSE AT THAT TIME THAT HAD DONE IT.

4   Q.   AND YOU EVENTUALLY OBTAINED A PATENT ON IT?

5   A.   YES.

6   Q.   CAN YOU BRIEFLY WALK THROUGH THE STEPS YOU WENT THROUGH IN

7   DESIGNING THE P320 PISTOL, JUST A BRIEF OVERVIEW FROM CONCEPT

8   TO PRODUCTION?

9   A.   SO EARLY CONCEPTS WAS MOSTLY ON OUR CAD SOFTWARE, COMPUTER

10  DRAFTING SOFTWARE.  SO YOU LAY OUT DIFFERENT IDEAS OF ACHIEVING

11  THE PRODUCT.  AND FROM THERE YOU GO INTO A PROTOTYPE STAGE.  SO

12  YOU WOULD DESIGN OR OBTAIN PARTS THAT YOU CAN PUT A FULL GUN

13  TOGETHER SO THAT YOU CAN GO THROUGH AND START DOING TESTING TO

14  THE PERFORMANCE REQUIREMENTS.

15       ONCE YOU GET TO THAT STAGE, YOU END UP WHITTLING IT DOWN

16  TO ONE DESIGN TYPICALLY, AND THEN YOU START TO REALLY DEVELOP

17  THE COMPONENTS AND REFINE THEM TO GET TO THE POINT WHERE THEY

18  MEET THE PERFORMANCE REQUIREMENTS OF, YOU KNOW, DURABILITY,

19  ENVIRONMENTALS, ABUSE OF HANDLING, THINGS OF THAT NATURE.

20       ONCE YOU GET PAST THAT PHASE AND YOU FEEL LIKE YOU HAVE A

21  VALID DESIGN, YOU DO SOME FINAL DESIGN VALIDATION, AND THEN YOU

22  MOVE FORWARD INTO SERIAL PRODUCTION.

23  Q.   NOW, I BELIEVE YOU MENTIONED THIS BRIEFLY.  ONCE YOU HAVE

24  A DESIGN YOU BELIEVED YOU -- THAT WILL WORK AS INTENDED, DO YOU

25  TEST THE FIREARM?

1    A.    YES, EXTENSIVELY.

2    Q.    ARE FIREARMS REGULATED BY ANY FEDERAL AGENCY?

3    A.    SO THEY ARE REGULATED THROUGH THE ATF, WHICH IS THE BUREAU

4    OF ALCOHOL, TOBACCO, AND FIREARMS.

5    Q.    ARE THERE ANY INDUSTRY -- AND I BELIEVE THAT WE HEARD A

6    LITTLE BIT ABOUT THOSE, BUT ARE THERE INDUSTRY ORGANIZATIONS

7    THAT SET STANDARDS TO WHICH FIREARMS ARE DESIGNED AND TESTED?

8    A.    YES, THERE ARE.

9    Q.    WHAT ARE SOME OF THE INDUSTRY STANDARDS OR INDUSTRY

10   ORGANIZATIONS THAT SET FIREARMS DESIGN AND TESTING STANDARDS?

11   A.    SO THERE'S SAAMI, NATO, THE NIJ.

12   Q.    OKAY.  SO I BELIEVE THAT MR. ZIMMERMAN ASKED YOU A LITTLE

13   BIT ABOUT THE SAAMI ORGANIZATION.  WHAT TYPES OF -- OR WHO IS

14   RESPONSIBLE FOR DETERMINING AND SETTING DESIGN AND TESTING

15   STANDARDS FOR THE NATO STANDARDS?

16   A.    SO I BELIEVE THOSE ARE THE NATO COUNTRIES.  I THINK IT'S

17   -- THE ABBREVIATION IS THE STANAG -- I DON'T KNOW HOW TO

18   PRONOUNCE IT, BUT, YES, THERE'S A -- IT'S A MOSTLY EUROPEAN AND

19   OUTSIDE OF THE UNITED STATES.

20   Q.    YOU MAY NOT KNOW HOW TO PRONOUNCE IT, BUT YOU JUST

21   CHALLENGED THE COURT REPORTER TO SPELL IT.

22         DO THESE INDUSTRY -- AND THEN YOU ALSO MENTIONED NIJ.  SO

23   THAT'S ANOTHER STANDARD-MAKING, STANDARD-SETTING ORGANIZATION?

24   A.    YES.

25   Q.    NOW, DO THESE INDUSTRY ORGANIZATIONS PUBLISH WRITTEN TEST

1  PROTOCOLS?

2  A.    YES.

3  Q.    DOES SIG SAUER TEST ITS PRODUCTS TO SOME OF THE TEST

4  STANDARDS DEVELOPED BY THOSE ORGANIZATIONS?

5  A.    YES, WE DO.

6  Q.    WHICH ONES?

7  A.    SO WE DO DROP TESTING, WE DO PRESSURE TESTING OF THE

8  BARRELS, WE DO A BUNCH OF ENVIRONMENTAL TESTING THROUGH, YOU

9  KNOW, SUBJECTING THE GUN TO HIGH TEMPERATURE, VERY LOW

10  TEMPERATURE, SAND AND DUST, MUD, RAIN, HUMIDITY.  WE DO SOME

11  ABUSIVE TESTING, INCLUDING BORE OBSTRUCTION.  WE'VE DONE

12  VIBRATION TESTING.  SO -- AND, OF COURSE, DROP TESTING.

13  Q.    PRIOR TO ITS SALE TO THE PUBLIC INITIALLY IN 2014, DID THE

14  P320 SATISFY THE VARIOUS INDUSTRY STANDARDS TO WHICH SIG SAUER

15  TESTED IT?

16  A.    YES, ABSOLUTELY.

17  Q.    AND THAT INCLUDES THE INDUSTRY STANDARD DROP TESTING?

18  A.    YES.

19  Q.    AND CAN YOU TELL THE JURY WHICH INDUSTRY STANDARDS YOU

20  DROP TESTED THE P320 PISTOL TO?  JUST THE NAMES OF THE

21  ORGANIZATIONS.

22  A.    SO IT WOULD HAVE BEEN SAAMI, NATO, AND ALSO USING THE

23  T.O.P., WHICH IS THE U.S. MILITARY STANDARD.

24  Q.    OKAY.  DID THE P320 MEET THOSE STANDARDS FOR DROP TESTING

25  WITHOUT THE INCLUSION OF A TABBED TRIGGER?

1    A.    YES.

2    Q.    MR. ZIMMERMAN ASKED YOU SOME QUESTIONS ABOUT WHETHER SIG

3    SAUER TESTED THE P320 FOR ACCIDENTAL TRIGGER PULLS THAT OCCUR

4    BY FINGER OR A FOREIGN OBJECT.  ARE YOU AWARE OF ANY TESTING

5    STANDARDS TO TEST FOR AN ACCIDENTAL TRIGGER PULL BY A FINGER OR

6    A FOREIGN OBJECT?

7    A.    I HAVE NEVER SEEN ANY TEST STANDARD TO ADDRESS THAT.

8    Q.    ARE YOU AWARE OF ANY MANUFACTURER WHO TESTS FOR ACCIDENTAL

9    TRIGGER PULLS BY A FINGER OR A FOREIGN OBJECT?

10   A.    I HAVE NEVER GOTTEN THAT INFORMATION.

11   Q.    MR. ZIMMERMAN -- HOLD ON.  I'M NOT GOING TO GO FORWARD

12   WITH THAT.

13        LET'S TALK ABOUT THAT BRIEFLY, THE MILITARY SELECTION,

14   BECAUSE THE JURY HAS HEARD A LOT ABOUT THIS BEING THE FIRST

15   STRIKER-FIRED PISTOL YOU DESIGNED.  HOW DID IT FEEL WHEN THE

16   U.S. MILITARY SELECTED THE PISTOL THAT YOU DESIGNED AS THEIR

17   OFFICIAL SIDEARM FOR ALL BRANCHES OF THE MILITARY?

18              MR. ZIMMERMAN:  OBJECTION, YOUR HONOR.  ASKED AND

19   ANSWERED.

20              THE COURT:  OVERRULED.

21              THE WITNESS:  THERE WAS A TREMENDOUS SENSE OF PRIDE.

22   THERE WAS A LOT OF WORK GOING INTO THAT DESIGN AND A LOT OF

23   WORK GOING INTO THE SUBMISSION OF THE SAMPLES AND GETTING THAT

24   PROGRAM -- OR GETTING THE GUN DESIGNED TO MEET THEIR

25   SPECIFICATIONS, SO IT MADE ME FEEL VERY PROUD THAT OUR MILITARY

1  MEN AND WOMEN HAD A SIDEARM THAT I DESIGNED TO PROTECT THEM AND

2  KEEP THEM SAFE.

3  Q.   (BY MS. DENNISON)  NOW, DID THE MILITARY CALL THE PISTOL

4  THE P320?

5  A.   NO, THEY DID NOT.

6  Q.   WHAT DID THEY REFER TO THE PISTOL AS?

7  A.   SO THERE ARE TWO SIZES OF THE WEAPON THAT WE SUBMITTED,

8  PER THEIR REQUIREMENTS.  IT WAS THE M17, WHICH HAD BEEN THE

9  FULL SIZE, AND THEN THE M18, WHICH WOULD HAVE BEEN A CARRY

10  MODEL.

11  Q.   OKAY.  AND THAT BRINGS ME TO ANOTHER QUESTION.  SO THE --

12  YOU SAID THE M18 WAS A CARRY MODEL.  NOW, DID SIG SAUER OFFER

13  COMMERCIAL VERSIONS OF THE M17 AND THE M18 TO THE PUBLIC FOR

14  PURCHASE?

15  A.   YES, WE DO.

16  Q.   DID THE CARRY SIZE OF THE P320, COMMERCIAL VERSION OF THE

17  M18, INCLUDE A MANUAL SAFETY?

18  A.   YES, IT DOES.

19  Q.   SO THERE WAS, IN FACT, A CARRY MODEL, THEN, THAT WAS

20  AVAILABLE TO THE PUBLIC FOR PURCHASE WITH A MANUAL SAFETY?

21  A.   YES, THAT'S CORRECT.

22  Q.   NOW, WHAT KIND OF TESTING DID THE MILITARY PUT THE M17 AND

23  M18 THROUGH?  WAS THAT JUST THE SAME NIJ AND SAAMI TESTS?

24  A.   IT'S VERY SIMILAR TO NATO.  SO THE -- A LOT OF THE

25  ENVIRONMENTALS AND THINGS OF THAT NATURE ARE VERY SIMILAR TO

1   NATO.  THEY ALSO DID A LOT OF DURABILITY TESTING.  IT WAS VERY

2   IMPORTANT TO THEM THAT THE PISTOL LASTS TO A VERY HIGH ROUND

3   COUNT THROUGH TESTING.  THEY ALSO DID ACCURACY AND DISPERSION

4   TESTING, SO THAT WAS ANOTHER VERY TIGHT REQUIREMENT IS TO MAKE

5   SURE, YOU KNOW, WHERE THE SOLDIER IS POINTING THE GUN THAT THE

6   BULLET WAS GOING WHERE THEY ARE AIMING.

7   Q.   ARE YOU AWARE OF ANY OTHER MANUFACTURERS THAT BID ON THE

8   MILITARY SUBMISSION?

9   A.   YES.

10  Q.   WHAT ARE SOME OF THE OTHER MANUFACTURERS THAT YOU ARE

11  AWARE OF THAT BID ON THE MILITARY SUBMISSION, ALONG WITH SIG

12  SAUER?

13  A.   SO GLOCK BID -- SUBMITTED TO IT; SMITH & WESSON; BARETTA;

14  FN.  THERE WAS ANOTHER COMPANY CALLED STI THAT SUBMITTED A GUN.

15  THOSE ARE THE ONES THAT ARE COMING TO MIND AT THE MOMENT.

16  Q.   OKAY.  AND DID -- ARE YOU AWARE OF WHETHER ALL OF THE

17  MANUFACTURERS THAT BID ON THE MILITARY SUBMISSION HAD MANUAL

18  THUMB SAFETIES ON THEIR PISTOLS FOR THAT SUBMISSION?

19  A.   I ASSUME THEY DID.  OTHERWISE, THEY WOULD HAVE BEEN THROWN

20  OUT RIGHT AWAY.  THAT WAS ANOTHER REQUIREMENT OF THE PISTOL

21  FROM THE MILITARY.

22  Q.   OKAY.  SO ARE YOU AWARE IF EVEN THE GLOCK, WHICH DOESN'T

23  OFFER MANUAL SAFETY ON ANY OF ITS PISTOLS TO COMMERCIAL

24  CUSTOMERS, ARE YOU AWARE OF WHETHER THAT MILITARY SUBMISSION BY

25  GLOCK HAD A THUMB TRIGGER -- I'M SORRY, A THUMB SAFETY?

1  A.   I ASSUME IT DID.  I NEVER SAW THEIR SUBMISSION, BUT I

2  ASSUME THEY DID.

3  Q.   IS THE P320 UNIQUE IN ITS SELECTION BY THE U.S. MILITARY

4  AS ITS OFFICIAL SIDEARM?

5  A.   IT'S VERY UNIQUE.  WE BEAT OUT ALL OUR COMPETITORS, SO,

6  YES.

7  Q.   NOW, MR. TONER, I BELIEVE YOU WERE ASKED SOME QUESTIONS

8  ABOUT WHETHER MR. LANG'S P320 CAME WITH AN OWNER'S MANUAL.  AND

9  YOU INDICATED THAT YOU DID.  DO YOU HAVE ANY UNDERSTANDING AS

10  TO WHETHER MR. LANG REVIEWED HIS OWNER'S MANUAL?

11  A.   I DO NOT.

12  Q.   OKAY.  AND YOU'VE SEEN THE OWNER'S MANUAL.  AND I BELIEVE

13  IT'S BEEN ADMITTED AS AN EXHIBIT ALREADY.

14           THE COURT:  WE STILL GOT A LITTLE WAYS TO GO, WHOEVER

15  THAT IS.  I'M SORRY.  IT'S OKAY.  IT'S OKAY.

16           MS. DENNISON:  I WAS WONDERING IF THAT WAS FOR ME.

17           MR. ZIMMERMAN:  IT HAS BEEN ADMITTED.  IT IS --

18           MS. DENNISON:  JOINT EXHIBIT 8.

19           THE COURT:  THE PRIOR TRANSCRIPT, IS THAT WHAT WE'RE

20  TALKING ABOUT?

21           MR. ZIMMERMAN:  NO, THE OPERATOR'S MANUAL.

22           MS. DENNISON:  OWNER'S MANUAL FOR THAT PISTOL.

23           THE COURT:  YOU SAID JOINT EXHIBIT 8?

24           MS. DENNISON:  YES.

25           THE COURT:  OH, THEN I HAVE THIS MARKED WRONG.  OKAY.

1    ALL RIGHT.  I'M SORRY.  THAT IS JOINT EXHIBIT 8.  THE PRIOR

2    TRANSCRIPT, WAS THAT ASSIGNED A NUMBER?

3              MS. DENNISON:  NO, IT WAS NOT, YOUR HONOR.

4              THE COURT:  OKAY.  JUST PUT IT IN THE WRONG PLACE.

5    OKAY.  GO AHEAD.

6    Q.   (BY MS. DENNISON)  ALL RIGHT.  SO UP ON THE SCREEN IS THE

7    COVER PAGE FOR JOINT EXHIBIT 8.  MR. TONER, ARE YOU AWARE OF

8    WHETHER THERE ARE ANY SAFETY WARNINGS INCLUDED IN THE MANUAL

9    ABOUT SAFE HANDLING OF THE P320 PISTOL?

10   A.   YES, THERE ARE.

11   Q.   WHERE WOULD WE FIND SOME OF THOSE WARNINGS?

12   A.   THEY ARE USUALLY IN THE MANUAL WITH A SECTION HEADER THAT

13   SAYS WARNINGS, OR THINGS OF THAT NATURE.

14             THE COURT:  EXCUSE ME ONE SECOND.

15             LADIES AND GENTLEMEN, WE ARE AT 3:50.  I AM INCLINED

16   TO PUSH IT TO ABOUT 4:30, 4:40, LIKE I DISCUSSED YESTERDAY.

17   BUT IS THERE ANYONE -- AND THIS WOULD INCLUDE ATTORNEYS AS WELL

18   -- WHO NEEDS A QUICK BREAK?  IF SO, JUST RAISE YOUR HAND.

19             ALL RIGHT.  LET'S KEEP GOING.

20             EXCUSE ME.  THANK YOU.

21             MS. DENNISON:  YOU ARE WELCOME.  I AM ACTUALLY ALMOST

22   THROUGH, SO HOPEFULLY WE CAN HURRY THIS UP.

23             THE COURT:  NOT TO RUSH YOU.  JUST WANTED TO SEE IF

24   WE NEEDED TO TAKE A BREAK.  OKAY.

25             MS. DENNISON:  THANK YOU, YOUR HONOR.

1    Q.   (BY MS. DENNISON)  OKAY.  SO IF WE TURN TO THE NEXT PAGE,

2    THE FIRST PAGE OF THE OWNER'S MANUAL BEHIND THE COVER SHEET,

3    AND HERE THERE IS A SECTION 1.0, SAFETY WARNINGS.  ARE THESE

4    SOME OF THE SAFETY WARNINGS YOU ARE REFERENCING THAT ARE

5    INCLUDED IN THE MANUAL?

6    A.   YES, THEY ARE.

7    Q.   OKAY.  AND ARE THERE WARNINGS CONTAINED HERE ABOUT THE

8    SAFETY AND HANDLING OF THE FIREARM?

9    A.   YES, THERE IS.

10   Q.   OKAY.  CAN YOU POINT OUT -- ARE THERE ANY THAT YOU SEE --

11   I KNOW THIS HAS BEEN BLOWN UP A LITTLE BIT.  ARE THERE ANY THAT

12   YOU SEE HERE THAT YOU WOULD WANT TO POINT OUT TO THE JURY?

13             MR. ZIMMERMAN:  OBJECTION.

14             THE COURT:  WHAT'S YOUR OBJECTION?

15             MR. ZIMMERMAN:  RELEVANCE AS TO WHAT HE WANTS TO

16   POINT OUT TO THE JURY.

17             THE COURT:  I OVERRULE.

18   Q.   (BY MS. DENNISON)  GO AHEAD, MR. TONER.

19   A.   OTHER THAN IT SAYING THAT FAILURE TO HEED THE WARNINGS

20   COULD RESULT IN INJURY OR DEATH TO OTHERS AS WELL AS SEVERE

21   DAMAGE TO THE FIREARM.

22   Q.   OKAY.  IF WE COULD GO DOWN TO THE LAST PARAGRAPH ON THAT

23   PAGE.  DO YOU SEE ANY WARNINGS HERE THAT ARE RELEVANT TO SAFE

24   HANDLING OF THE P320 PISTOL?

25   A.   YES.

1    Q.   OKAY.  CAN YOU POINT OUT THE ONES THAT YOU SEE THAT WOULD

2    BE RELEVANT TO AN UNINTENTIONAL DISCHARGE?

3    A.   SO THE -- WHERE IT TALKS ABOUT SAFETY MECHANISMS ARE

4    DESIGNED TO AUGMENT, NOT REPLACE, SAFE HANDLING PRACTICES,

5    CARELESS OR IMPROPER HANDLING OF ANY FIREARM CAN RESULT IN

6    UNINTENTIONAL DISCHARGE.  MANY SAFETIES ARE INCORPORATED INTO

7    YOUR FIREARM.  ONLY SAFE HANDLING HABITS WILL ENSURE THE

8    SAFETINESS OF YOUR FIREARM.

9    Q.   OKAY.  AND IF WE GO TO THE NEXT PAGE ON THIS EXHIBIT --

10        MS. DENNISON:  MOVE IT TO THE NEXT PAGE, PLEASE.

11   THOSE SAFETY WARNINGS CONTINUE, I BELIEVE.

12   Q.   (BY MS. DENNISON)  OKAY.  AND DO YOU SEE ANYTHING HERE,

13   STILL UNDER THE WARNING, THAT IS RELEVANT TO UNINTENTIONAL

14   DISCHARGES?

15   A.   SO BEST SAFETY IS PROPER AND APPLIED IN SAFE FIREARMS

16   HANDLING.  ALWAYS HANDLE YOUR FIREARM AS THOUGH YOU EXPECT THE

17   SAFETIES NOT TO WORK.  DO NOT LOAD A CHAMBER -- A ROUND INTO

18   THE CHAMBER UNTIL YOU'RE READY TO USE YOUR PISTOL.  IF YOUR

19   FIREARM'S EQUIPPED WITH MANUAL SAFETY, KEEP THE SAFETY ON AND

20   YOUR FINGER OFF THE TRIGGER UNTIL YOU'RE READY TO FIRE.

21        MS. DENNISON:  NOW, CAN WE MOVE TO PAGE 13 OF THE

22   MANUAL, PLEASE?

23   Q.   (BY MS. DENNISON)  OKAY.  NOW, DO YOU SEE ANYTHING ON THIS

24   PAGE THAT PROVIDES ANY INFORMATION RELEVANT TO UNINTENTIONAL

25   DISCHARGES?

1    A.    SO WE TALK ABOUT, IF YOU HAVE ANY DOUBTS ABOUT YOUR

2    ABILITY TO HANDLE A FIREARM, YOU SHOULD SEEK SUPERVISED

3    INSTRUCTION.  ONLY WHEN YOU ARE CERTAIN THAT YOU UNDERSTAND THE

4    MANUAL SHOULD YOU HANDLE YOUR WEAPON WITH LIVE FIRE AMMUNITION.

5    Q.    SO THAT'S IN THE PARAGRAPH ABOVE THERE.

6    A.    YEAH.  SORRY.  AND HAVING A FIREARM IN YOUR POSSESSION IS

7    A FULL-TIME JOB.  YOU CANNOT GUESS AND NOT FORGET.

8            MS. DENNISON:  OKAY.  AND LAST ONE, IF WE COULD JUMP

9    TO PAGE 28, PLEASE.  THERE IS A SECTION THERE, 5.0, FIRING WITH

10   A WARNING.

11   Q.    (BY MS. DENNISON)  MR. TONER, DO YOU SEE THAT WARNING UP

12   TOP UNDERNEATH TRIGGER THAT IS IN BOLD IN CAPS?

13   A.    YES.

14   Q.    DOES THAT WARNING RELATE TO UNINTENTIONAL DISCHARGES?

15   A.    YES, IT CAN.

16   Q.    OKAY.  AND HOW SO?

17   A.    BECAUSE ONE OF THE PRIMARY RULES OF FIREARM SAFETY IS THAT

18   YOU NEVER TOUCH THE TRIGGER UNLESS YOU'RE READY TO USE IT.  SO

19   ON GUNS WHERE YOU HAVE TO DISASSEMBLE THE WEAPON BY PULLING THE

20   TRIGGER, THAT'S BASICALLY VIOLATING ONE OF THE PRIMARY FIREARMS

21   SAFETY RULES.

22   Q.    OKAY.  ARE THERE ANY SECTIONS IN THE OWNER'S MANUAL THAT

23   YOU ARE AWARE OF THAT PROVIDE A RECOMMENDED CLEANING OR

24   MAINTENANCE SCHEDULE FOR THE P320 PISTOL?

25   A.    YES, I BELIEVE THERE IS.

1          MS. DENNISON:  OKAY.  IF WE COULD GO TO PAGE 42,

2     PLEASE.  OKAY.  AND DOWN ON PAGE 42, IF YOU COULD KEEP GOING

3     DOWN, PLEASE.  AND NEXT PAGE JUST IN CASE I HAVE THE WRONG

4     PAGE.

5          OKAY.  RIGHT HERE.

6     Q.   (BY MS. DENNISON)  SO UNDER MATERIALS REQUIRED, THERE ARE

7     SOME BULLET POINTS.  DO YOU SEE WHAT IT SAYS ABOUT THE

8     RECOMMENDED CLEANING SCHEDULE FOR THE PISTOL UNDERNEATH THAT?

9     A.   YES.

10    Q.   AND WHAT IS THE RECOMMENDED CLEANING SCHEDULE FOR THE P320

11    PISTOL?

12    A.   ACTUALLY, I CAN'T SEE THE SCHEDULE.  ALL I'M SEEING IS THE

13    INSTRUCTION.

14         OH, SORRY.  CLEAN AND REMOVE THE BEFORE OR AFTER EVERY DAY

15    THE PISTOL'S FIRED OR A MINIMUM OF 500 ROUNDS.

16    Q.   OKAY.  AND THEN ALMOST DONE WITH THE MANUAL.

17         THERE'S BEEN SOME MENTION -- THERE'S BEEN A LOT OF

18    MENTION, ACTUALLY, SO FAR ABOUT THE SPENT CARTRIDGE CASING THAT

19    DID NOT EJECT FROM THE PISTOL AFTER MR. LANG'S DISCHARGE.  ARE

20    YOU AWARE OF POSSIBLE REASONS FOR A SPENT CARTRIDGE CASING TO

21    FAIL TO EJECT?

22    A.   YES.

23    Q.   DO YOU KNOW WHAT SOME OF THOSE REASONS ARE?

24    A.   YEAH.  THE AMMO COULD BE UNDER-POWERED SO IT DOESN'T GET

25    OUT OF THE GUN COMPLETELY.  THE GUN COULD BE DIRTY AND NOT

1  CLEAN ENOUGH TO ALLOW FULL FUNCTION OF THE FIREARM.  THOSE ARE

2  KIND OF THE THINGS THAT ARE COMING UP TO MY -- OR INTO MY HEAD

3  AT THE MOMENT.

4  Q.   DO YOU KNOW WHETHER THE OWNER'S MANUAL PROVIDES ANY

5  INFORMATION TO USERS TO TROUBLESHOOT ISSUES WITH FAILURE TO

6  EJECT A CARTRIDGE?

7  A.   I THINK THERE IS A CHART THAT DESCRIBES SOME OF THAT, YES.

8        MS. DENNISON:  COULD WE GO TO PAGE 36, PLEASE?  OKAY.

9  AND CAN YOU PULL UP THE FAILURE TO EXTRACT OR EJECT PART?

10  Q.   (BY MS. DENNISON)  OKAY.  AND, MR. TONER, DOES THE MANUAL

11  PROVIDE POTENTIAL REASONS FOR A FAILURE TO EXTRACT OR EJECT OF

12  THE CARTRIDGE IN ITS TROUBLESHOOTING GUIDE IN THE MANUAL?

13  A.   YES, IT DOES.

14  Q.   AND WHAT ARE THOSE REASONS?

15  A.   INSUFFICIENT RECOIL DUE TO DIRT, LIGHT HOLDER LIMP WRIST.

16  THAT'S REFERRING TO A SHOOTING TECHNIQUE THAT IS NOT HOLDING

17  THE GUN FIRM ENOUGH.  AN AMMUNITION POWER ISSUE, WHERE THE

18  AMMUNITION COULD BE LOW-POWERED AND NOT STRONG ENOUGH TO CYCLE

19  THE SLIDE.

20  Q.   THANK YOU, MR. TONER.  AND ONE MORE THING.

21        MS. DENNISON:  I'D LIKE TO GO TO PAGE EIGHT.  ON THE

22  MANUAL.

23        MR. ZIMMERMAN:  I'M SORRY?

24        MS. DENNISON:  YES, 16.  IT'S 16.  I'M SORRY.

25        FOR THE RECORD, WE ARE GOING TO PAGE 16 OF THIS

1    EXHIBIT.

2    Q.   (BY MS. DENNISON)  OKAY.  NOW, THIS IS STILL THE MANUAL

3    THAT WAS PROVIDED TO MR. LANG.

4         CAN YOU SEE DOWN IN THE SECOND-TO-LAST PARAGRAPH HERE, HOW

5    DID SIG SAUER CHARACTERIZE THE TRIGGER SYSTEM FOR THE P320

6    PISTOL IN THE DOCUMENT THAT MR. LANG WOULD HAVE SEEN?

7    A.   WE CLASSIFIED IT AS A STRIKER-FIRED DESIGN.

8    Q.   OKAY.  AND ARE YOU AWARE OF WHETHER MR. LANG'S MANUAL

9    REFERENCES THE P320 PISTOL AS A DOUBLE-ACTION-STYLE TRIGGER

10   ANYWHERE WITHIN THE MANUAL?

11   A.   NOT THAT I AM AWARE OF.

12        MS. DENNISON:  OKAY.  THANK YOU.  I'M FINISHED WITH

13   THAT EXHIBIT.

14   Q.   (BY MS. DENNISON)  ALL RIGHT.  SO THE JURY HAS HEARD A

15   LITTLE BIT ABOUT TABBED TRIGGERS.  CAN YOU JUST EXPLAIN TO THE

16   JURY WHAT A TABBED TRIGGER IS?

17   A.   SO A TABBED TRIGGER IS A TWO-TO-THREE-PIECE DESIGN OF A

18   TRIGGER THAT HAS A COMPONENT THAT ACTS AS A TRIGGER BLOCK FOR

19   THE TRIGGER, SO YOU BASICALLY HAVE TO MOVE IT OUT OF THE WAY IN

20   ORDER FOR THE TRIGGER TO BE ABLE TO BE PULLED OR ACTIVATED.

21   Q.   DO DIFFERENT MANUFACTURERS THAT REQUIRE A TABBED TRIGGER

22   HAVE DIFFERENT STYLES OF THE TABBED TRIGGER ON THEIR PISTOLS?

23   A.   YES.  THEY ARE ALL FAIRLY UNIQUE IN THEIR SIZE AND SHAPE.

24   Q.   OKAY.  DO YOU KNOW WHAT A TABBED TRIGGER IS DESIGNED TO

25   DO?

1  A.   YES.  AS I DESCRIBED, THE TABBED TRIGGER IS THERE TO

2  PREVENT REARWARD MOTION OF THE TRIGGER UNLESS YOU DEACTIVATE

3  THAT TRIGGER TAB FEATURE OR COMPONENT SO THAT THE TRIGGER DOES

4  NOT GO REARWARD.

5  Q.   AS PART OF THE DEVELOPMENT OF THE P320 PISTOL, I BELIEVE

6  YOU SPOKE ABOUT SOME DROP TESTING THAT WAS DONE.  IS THAT ON --

7  WHEN MR. ZIMMERMAN ASKED YOU SOME QUESTIONS.  IS THAT RIGHT?

8  A.   THAT'S CORRECT.

9  Q.   OKAY.  SO CAN YOU EXPLAIN THE TYPES OF DROP TESTING, JUST,

10 HEIGHTS, ANGLES, AND SURFACES TO WHICH SIG SAUER TESTED ITS

11 P320 PISTOL?

12 A.   YEAH.  SO WE DID IT TO THE SAAMI STANDARDS.  SO THAT'S

13 APPROXIMATELY 4 FEET ONTO A RUBBER MAT, IF YOU WANT TO CALL IT

14 THAT.  AND THEN THERE WERE SIX ORIENTATIONS THAT YOU WOULD PUT

15 THE PISTOL IN IN ORDER TO DROP IT AND MEET THE STANDARD.

16     WE ALSO DID NATO TESTING, WHICH IS A HIGHER HEIGHT, SO

17 IT'S APPROXIMATELY 5 FEET.  AND THAT'S ONTO A CONCRETE

18 SUBSTRATE RATHER THAN A RUBBER CONTACT MAT.  SO YOU ARE JUST

19 DROPPING IT ONTO CONCRETE.  AND, AGAIN, THE SAME SIX

20 ORIENTATIONS THAT WE HAD FOR THE SAAMI STANDARD.

21 Q.   AND DID THE P320 MEET THOSE INDUSTRY STANDARDS FOR DROP

22 TESTING?

23 A.   YES, WE DID.

24 Q.   DID SIG SAUER TEST BEYOND THE INDUSTRY STANDARD PROTOCOLS

25 FOR DROP TESTING?

1    A.    YEAH.  WE HAVE OVER THE YEARS, YES.

2    Q.    OKAY.  AND IN WHAT WAY DID SIG SAUER TEST BEYOND THE

3    INDUSTRY STANDARDS?

4    A.    WE WENT TO HIGHER HEIGHTS, AND WE ALSO DID ADD SOME

5    ALTERNATE ANGLES.

6    Q.    NOW, THERE'S BEEN SOME TESTIMONY THAT THE P320 WAS FIRST

7    OFFERED WITH A TABBED TRIGGER AVAILABLE.  AND THERE WAS A LOT

8    OF QUESTION ABOUT WHAT THAT MEANT, ABOUT HOW IT WAS -- HOW IT

9    WOULD BE REQUESTED BY A CUSTOMER.

10        DID SIG SAUER ADVERTISE THE AVAILABILITY OF A TABBED

11   TRIGGER WHEN IT WAS INITIALLY OFFERED?

12   A.    YES, WE DID ADVERTISE IT THAT WAY.

13   Q.    OKAY.

14        MS. DENNISON:  AND HAS PLAINTIFF'S EXHIBIT 76 ALREADY

15   BEEN MOVED INTO EVIDENCE?

16        THE COURT:  I DON'T THINK SO.

17        MR. ZIMMERMAN:  NO.

18        MS. DENNISON:  OKAY.  IT HAS BEEN SHOWN, HOWEVER?  IS

19   THERE ANY OBJECTION TO ME SHOWING THAT EXHIBIT?

20        MR. ZIMMERMAN:  NO ISSUE SHOWING OR MOVING IT IN.  I

21   PLANNED TO DO SO AFTER WE ARE DONE.

22        MS. DENNISON:  OKAY.  THANK YOU.

23        THE COURT:  COULD YOU REMIND ME WHAT 76 IS?

24        MS. DENNISON:  PLAINTIFF'S EXHIBIT 76, IT IS ONE OF

25   THE SAFETY-WITHOUT-COMPROMISE ADVERTISEMENTS FROM SIG SAUER.

1        COULD YOU PLEASE PUBLISH PLAINTIFF'S EXHIBIT 76?

2        THE COURT:  IT IS ADMITTED.

3        MS. DENNISON:  THANK YOU.

4        DID YOU CATCH THAT?  IT'S ADMITTED.

5    Q.   (BY MS. DENNISON)  ALL RIGHT.  AND SO DO YOU KNOW WHERE

6    THIS INFORMATION WAS LOCATED THAT'S CONTAINED IN PLAINTIFF'S

7    EXHIBIT 76?

8    A.   I ASSUME IT WAS SOMETHING WE PROBABLY HAD IN OUR WEBSITE.

9    Q.   OKAY.  YOU DON'T KNOW EXACTLY WHERE IT CAME FROM?

10   A.   I DON'T.

11   Q.   OKAY.  AND DOES THIS DOCUMENT ADVERTISE THE AVAILABILITY

12   OF A TABBED TRIGGER?

13   A.   YES, IT DOES.

14   Q.   AND WHERE IS THAT?

15   A.   IT'S ON THE LAST LINE.

16   Q.   OKAY.  AND CAN YOU PLEASE READ THE LAST LINE?

17   A.   AND WHILE AVAILABLE AS AN OPTION, YOU WON'T NEED A TABBED

18   TRIGGER SAFETY FOR YOUR GUN TO BE DROP SAFE.

19   Q.   OKAY.  NOW, THIS DOCUMENT ALSO SAYS, JUST ABOVE THAT LINE

20   THAT YOU JUST READ TO THE JURY, NEVER AGAIN WILL YOU NEED TO

21   PULL THE TRIGGER TO DISASSEMBLE YOUR PISTOL.

22       DO YOU KNOW WHAT THAT IS REFERENCING?

23   A.   YES.  THAT'S REFERENCING THE TAKE-DOWN SAFETY LEVER SYSTEM

24   IN THE FCU AND HOW YOU DON'T HAVE TO PULL THE TRIGGER TO TAKE

25   YOUR SLIDE OFF THE WEAPON.

1  Q.   OKAY.  I'D ALSO LIKE TO SHOW YOU PLAINTIFF'S EXHIBIT 78,

2  WHICH HAS BEEN SHOWN TO THE JURY ON A NUMBER OF OCCASIONS

3  ALREADY.  THIS IS A DIFFERENT SAFETY-WITHOUT-COMPROMISE AD.  I

4  DON'T BELIEVE IT'S ADMITTED YET.

5          THE COURT:  IT'S NOT ADMITTED.  ARE YOU MOVING IT

6  INTO EVIDENCE?

7          MS. DENNISON:  YES.

8          THE COURT:  ALL RIGHT.  ANY OBJECTION?

9          MR. ZIMMERMAN:  NO.

10          THE COURT:  ALL RIGHT.  IT'S ADMITTED NOW.

11  Q.   (BY MS. DENNISON)  OKAY.  CAN WE PLEASE DISPLAY -- OKAY.

12  THANK YOU.  ALL RIGHT.

13      SO THIS PLAINTIFF'S EXHIBIT 78, WHICH IS ANOTHER ONE OF

14  THE SAFETY-WITHOUT-COMPROMISE DOCUMENTS THAT WERE SHOWN TO YOU

15  EARLIER, NOW, YOU WERE ASKED ABOUT THIS DOCUMENT.  AND THERE

16  WAS SOME MENTION ABOUT THE LANGUAGE UNDERNEATH SAFETY WITHOUT

17  COMPROMISE WHERE IT SAYS, FROM THE TRIGGER TO THE STRIKER AND

18  EVEN THE MAGAZINE, THE PISTOL WON'T FIRE UNLESS YOU WANT IT TO.

19      DOES PLAINTIFF'S EXHIBIT 78 ALSO IDENTIFY WHAT SIG IS

20  REFERRING TO WHEN IT SAID THE P320 WON'T FIRE UNLESS YOU WANT

21  IT TO?

22  A.   YES, IT DOES.

23  Q.   WHERE DOES IT IDENTIFY THAT?

24  A.   DOWN BELOW ON THAT BLACK BOX THAT HAS SOME MORE

25  INFORMATION ABOUT WHAT THAT IS REFERRING TO.

1    Q.   OKAY.  AND CAN YOU JUST TELL THE JURY BRIEFLY WHAT THIS

2    DOCUMENT INDICATES THAT SIG SAUER IS REFERRING TO WHEN IT TELLS

3    THE CUSTOMER THAT THE P320 WON'T FIRE UNLESS YOU WANT IT TO?

4    A.   YES.  IT'S REFERRING TO THE STRIKER SAFETY, THE DISCONNECT

5    SAFETY, AS WELL AS THE THREE-POINT TAKE-DOWN SAFETY.

6    Q.   DO YOU KNOW WHAT SIG EXPECTED ITS CUSTOMERS WOULD

7    REASONABLY BELIEVE BY THE STATEMENTS CONTAINED IN THIS EXHIBIT?

8    A.   I THINK WHEN YOU WOULD LOOK AT THIS DOCUMENT, YOU WOULD

9    THINK THAT WHAT WE ARE REFERRING TO ON THE TOP IS WHAT WE'RE

10   DESCRIBING IN THE BOTTOM.

11   Q.   AND AT SOME POINT, DID SIG SAUER DISCONTINUE OFFERING THE

12   TABBED TRIGGER AS AN OPTION?

13   A.   YES, WE DID.

14   Q.   WHY?

15   A.   NOBODY HAD ORDERED IT.  NOBODY WANTED IT.

16   Q.   AND YOU WERE ASKED A LITTLE BIT ABOUT LAW ENFORCEMENT

17   SALES.  YOU'RE NOT INVOLVED IN LAW ENFORCEMENT SALES, ARE YOU?

18   A.   NO, I'M NOT.

19   Q.   OKAY.  ARE YOU INVOLVED IN ANY OF THE SALES OF THE P320

20   PISTOLS?

21   A.   NO, I'M NOT.

22   Q.   ARE YOU FAMILIAR WITH HOW SIG SAUER COMMUNICATED THE

23   AVAILABILITY OF THE TABBED TRIGGER TO ITS DISTRIBUTORS OR LAW

24   ENFORCEMENT OR OTHER CUSTOMERS?

25   A.   NO, I HAVE NO KNOWLEDGE OF THAT.

1    Q.   IF A COMMERCIAL CUSTOMER OFF OF THE STREET ASKED FOR A

2    TABBED TRIGGER, WOULD SIG SAUER HAVE BEEN ABLE TO PLACE A

3    TABBED TRIGGER ON A P320 FOR PURCHASE BY A CUSTOMER?

4    A.   YEAH, WE WOULD HAVE BEEN ABLE TO DO THAT, FOR SURE.

5    Q.   OKAY.  ARE YOU AWARE OF ANY DOWN SIDES TO HAVING A TABBED

6    TRIGGER?

7    A.   YEAH.  I THINK, DEPENDING ON WHAT THE TABBED TRIGGER

8    DESIGN IS AND THE SHAPE OF IT, YOU COULD GET TO A POINT WHERE,

9    IF YOU INTENTIONALLY WANT TO FIRE THE WEAPON, YOU WOULDN'T BE

10   ABLE TO BECAUSE THE TABBED TRIGGER WOULD BE BLOCKING IT.  YOU

11   KNOW, YOUR GLOVES COULD GET WRAPPED UP IN THE TABBED TRIGGER

12   PREVENTING IT FROM ROTATING, YOU KNOW, THINGS OF THAT NATURE.

13   Q.   IS SIG SAUER -- OR DOES SIG SAUER CHOOSE TO PLACE

14   UNNECESSARY PARTS ON ITS FIREARMS?

15   A.   NO.  THAT'S KIND OF A FUNDAMENTAL DESIGN PHILOSOPHY IS TO

16   NOT HAVE THINGS THAT ARE NOT NEEDED.

17   Q.   WHY IS THAT?

18   A.   BECAUSE IT'S JUST MORE COMPLEXITY IN THE DESIGN.  THERE'S

19   MORE THINGS THAT CAN GO WRONG.  PARTS CAN BREAK.  IT'S HARDER

20   TO ASSEMBLE, THINGS OF THAT NATURE.

21   Q.   HAS COST EVER BEEN THE REASON WHY SIG SAUER DID NOT

22   INCLUDE A TABBED TRIGGER ON ITS P320 PISTOL?

23   A.   NO, IT HAS NOT.

24   Q.   DO YOU BELIEVE THAT A TABBED TRIGGER PREVENTS ACCIDENTAL

25   TRIGGER PULLS BY A FINGER OR A FOREIGN OBJECT?

1  A.   NO.  I DON'T BELIEVE THEY COULD EVER PREVENT ACCIDENTAL

2  DISCHARGE.  IF SOMETHING GETS IN THE TRIGGER GUARD, IT'S GOING

3  TO PULL THE TRIGGER, IF YOUR FINGER IS THERE OR FOREIGN OBJECT.

4  THERE'S MULTIPLE WAYS FOR IT TO HAPPEN.

5        MS. DENNISON:  THANK YOU, MR. TONER.  I DON'T HAVE

6  ANY FURTHER QUESTIONS FOR YOU.

7        THE COURT:  OKAY.

8        ANY REDIRECT?

9        MR. ZIMMERMAN:  YES, YOUR HONOR.  I HAVE LESS THAN

10  20 MINUTES.  I DON'T NEED TO TAKE A BREAK UNLESS ANYBODY ELSE

11  DOES.  WE GOOD?

12        THE COURT:  ANY REDIRECT?

13        MR. ZIMMERMAN:  THANK YOU.

14                    REDIRECT EXAMINATION

15  BY MR. ZIMMERMAN:

16  Q.   SIR, I'M A LITTLE CONFUSED ABOUT THE TRIGGER SAFETY.

17        YOU TESTIFIED UNDER OATH THAT THE P320 WITH A TRIGGER

18  SAFETY WAS NEVER MOVED FORWARD IN PRODUCTION, RIGHT?

19  A.   THAT'S CORRECT.

20  Q.   OKAY.  JUST WANTED TO MAKE THAT CLEAR.

21        AND YOU TESTIFIED, SIR -- THE VERY LAST QUESTION WAS

22  WHETHER THE PURPOSE OF A TRIGGER SAFETY IS TO PREVENT

23  UNINTENDED DISCHARGES.  YOU WERE ASKED ABOUT THE REASON, AND

24  ONE OF THE THINGS WAS DROP FIRES.

25        AND YOU SAID:  IT COULD HAVE AN IMPACT IN THAT DROP

1    SCENARIO, BUT IT'S NOT THE PRIMARY FUNCTION, I WOULD SAY.

2         DIDN'T YOU SAY THAT THE FUNCTION OF A TRIGGER SAFETY, EVEN

3    IF DROP FIRES IS A REASON, IS TO PREVENT UNINTENDED DISCHARGES?

4    A.   NO.  I BELIEVE I SAID THE PRIMARY WAS FOR DROP SAFETY.

5    Q.   OKAY.  DOES IT SAY "IS" THE PRIMARY FUNCTION OR "IS NOT"

6    THE PRIMARY FUNCTION?

7    A.   WHAT DO YOU WANT ME TO READ?

8         THE COURT:  THIS IS IMPEACHMENT WITH A PRIOR

9    TRANSCRIPT?

10        MR. ZIMMERMAN:  YES, YOUR HONOR.

11        THE COURT:  OKAY.

12        THE WITNESS:  I -- ALL I COULD SAY IS THAT I MISSPOKE

13   AT THAT POINT.  I MEANT TO SAY THE OPPOSITE.

14   BY MR. ZIMMERMAN:

15   Q.   SIR, THIS IS A TRIGGER SAFETY, IS IT NOT?

16   A.   I CAN BARELY TELL WHAT YOU'RE HOLDING UP, BUT --

17   Q.   THE SAME THING I SHOWED YOU EARLIER.

18   A.   THAT IS A TRIGGER BAR AND A TRIGGER WITH A TABBED TRIGGER

19   ON IT.

20        THE COURT:  I'M SORRY.  A TRIGGER BAR?

21        THE WITNESS:  YES, MA'AM.

22        THE COURT:  TRIGGER BAR WITH A TABBED TRIGGER ON IT.

23   OKAY.

24   BY MR. ZIMMERMAN:

25   Q.   IS THAT A FAIR AND ACCURATE REPRESENTATION OF WHAT A

1    TABBED TRIGGER LOOKS LIKE?

2    A.    YES.

3    Q.    OKAY.

4           MR. ZIMMERMAN:  AT THIS TIME, YOUR HONOR, PLAINTIFF

5    SEEKS TO MOVE THE TRIGGER SAFETY INTO EVIDENCE AS PLAINTIFF'S

6    EXHIBIT 123.

7           THE COURT:  ANY OBJECTION?

8           MS. DENNISON:  NO OBJECTION, YOUR HONOR.

9           THE COURT:  OKAY.  IT'S ADMITTED.

10   BY MR. ZIMMERMAN:

11   Q.    SIR, YOU SAID A COUPLE TIMES YOU HAD A TREMENDOUS SENSE OF

12   PRIDE ABOUT THE M17.

13         THE M17 IS THE P320 WITH AN EXTERNAL SAFETY, RIGHT?

14   A.    YES.  IT'S BASED ON THE 320 DESIGN.  THERE ARE SOME OTHER

15   DESIGN DIFFERENCES, BUT, YES.

16   Q.    RIGHT.  SO WE'VE BEEN TALKING A LOT ABOUT IT.  THE P320

17   EQUALS -- IT'S -- THE M17 VERSION IS THE P320 WITH A SAFETY.

18   A.    THAT IS PART OF IT, YES.

19   Q.    WOULD YOU AGREE THAT A RECALL IS DEFINED AS A REQUEST TO

20   RETURN, EXCHANGE, OR REPLACE A PRODUCT AFTER A MANUFACTURER

21   DISCOVERS DEFECTS THAT MIGHT ENDANGER THE CONSUMER?

22   A.    I MEAN, THAT CAN BE ONE REASON FOR RECALL, YES.

23   Q.    OKAY.  AND DID YOU BELIEVE THAT THOSE DROP FIRE ISSUES

24   THAT THE MILITARY FOUND AND THAT ONE OF YOUR SELLERS, OMAHA

25   OUTDOORS, FOUND MIGHT ENDANGER THE CONSUMER?

1    A.    I MEAN, IT'S A VERY -- IT WAS A VERY SPECIFIC SCENARIO --

2    YOU KNOW, MISHANDLING THE WEAPON.  SO THAT'S WHAT THE OMAHA

3    OUTDOORS IS ABOUT.

4    Q.    LET'S TALK ABOUT MISHANDLING THE WEAPON.

5          YOU CONSIDER DROP FIRING TO BE MISHANDLING A WEAPON?

6    A.    YES.

7    Q.    YOU STILL PROTECT AGAINST IT?

8    A.    YES.

9    Q.    OKAY.  THE SAFETY TAKEDOWN LEVER THAT YOU WERE SHOWN -- I

10   DON'T KNOW IF YOU WERE SHOWN THE LEVER, BUT THERE WAS A

11   DOCUMENT THAT TALKED ABOUT IT.

12         DOES THAT HAVE ANYTHING TO DO WITH THE SAFETY OF A PISTOL

13   WHEN THE PISTOL IS BEING CONCEAL CARRIED?

14   A.    I'M SORRY.  ARE YOU TALKING ABOUT THE TAKEDOWN SAFETY

15   LEVER THAT I DESIGNED?

16   Q.    YEAH.  THAT HAS TO DO WITH DISASSEMBLY AND CLEANING,

17   RIGHT?

18   A.    CORRECT.

19   Q.    NOT WHEN IT'S ON YOUR PERSON?

20   A.    THAT'S CORRECT.

21   Q.    SO IT'S IMPORTANT FOR YOU TO MAKE A GUN THAT'S SAFE FOR

22   DISASSEMBLY AND CLEANING, BUT IT'S NOT IMPORTANT ENOUGH FOR

23   EVERYDAY CARRY THAT THE GUN BE MADE WITH A TRIGGER SAFETY?

24              MS. DENNISON:  OBJECTION.  ARGUMENTATIVE.

25              THE COURT:  I'LL OVERRULE.

1           THE WITNESS:  I'M SORRY.  CAN YOU REPEAT THE

2      QUESTION?

3      BY MR. ZIMMERMAN:

4      Q.   SURE.  IT'S IMPORTANT ENOUGH TO PROTECT AGAINST DROP

5      FIRES, RIGHT?

6      A.   YES.

7      Q.   IT'S IMPORTANT ENOUGH TO PROTECT AGAINST AN UNINTENDED

8      DISCHARGE WHEN SOMEONE IS DISASSEMBLING AND CLEANING THE

9      WEAPON, RIGHT?

10     A.   YES.

11     Q.   BUT WHEN IT COMES TO UNINTENDED DISCHARGES, WHERE

12     SOMEONE'S FINGER MAY NOT EVEN TOUCH THE TRIGGER, IT IS NOT

13     IMPORTANT ENOUGH FOR EVERYDAY CARRY PEOPLE THAT THE GUN BE MADE

14     SAFER WITH A TRIGGER SAFETY, RIGHT?

15     A.   I DON'T KNOW IF IT'S UNIMPORTANT, BUT IT'S NOT A FEATURE

16     THAT WE NEED FOR DROP SAFETY.

17     Q.   I'M NOT TALKING ABOUT DROP SAFETY, SIR.  I'M TALKING ABOUT

18     UNINTENDED DISCHARGES.

19          DO YOU NEED ME TO REPEAT THE QUESTION?

20     A.   SURE.

21     Q.   YOU PROTECT AGAINST DROP SAFETY, RIGHT?

22     A.   I'M SORRY?

23     Q.   YOU TRY TO PROTECT AGAINST DROP SAFETY --

24     A.   YES.

25     Q.   -- OR AGAINST DROP FIRES.

1       YOU TRY TO PROTECT AGAINST UNINTENDED DISCHARGES FOR

2  DISASSEMBLING AND CLEANING?

3  A.   YES.

4  Q.   BUT YOU'VE NEVER EVEN TESTED A TRIGGER SAFETY TO SEE IF

5  THAT WOULD HELP IN INSTANCES WHERE THE P320 FIRES WITHOUT

6  FINGER-ON-TRIGGER CONTACT?

7  A.   THAT'S CORRECT.  I HAVE NOT LOOKED AT THAT.

8  Q.   INTERNAL SAFETIES VERSUS EXTERNAL SAFETIES.  YOU SHOWED

9  DIAGRAMS OF WHAT THE INSIDE OF THE GUN DOES.  YOU TALKED ABOUT

10  THE FACT THAT EVERY SINGLE OTHER MANUFACTURER HAS INTERNAL

11  SAFETIES, RIGHT?

12  A.   CORRECT.

13  Q.   THAT DOESN'T PRECLUDE THEM FROM USING EXTERNAL SAFETIES,

14  RIGHT?

15  A.   ON THEIR UNBALANCED TRIGGER DESIGNS, NO.

16  Q.   INTERNAL SAFETIES ARE TO MAKE SURE THE GUN DOESN'T FIRE

17  WITHOUT A TRIGGER PULL, RIGHT?

18  A.   YES.

19  Q.   AND EXTERNAL SAFETIES MAKE SURE THE TRIGGER DOESN'T GET

20  PULLED WITHOUT FLUSH TRIGGER CONTACT, RIGHT?

21  A.   I DON'T KNOW WHAT YOU MEAN BY FLUSH TRIGGER CONTACT.

22  Q.   YOU PUT YOUR FINGER IN THE TRIGGER GUARD, YOU WRAP YOUR

23  FINGER AROUND THE TRIGGER, AND THE TRIGGER IS PULLED.

24  A.   OKAY.

25  Q.   THAT'S WHAT EXTERNAL SAFETIES ARE DESIGNED TO DO, TO MAKE

1    SURE THAT THE GUN DOESN'T FIRE UNLESS YOU HAVE A DIRECT FIRING

2    PULL ON THE TRIGGER, RIGHT?

3              MS. DENNISON:  OBJECTION TO FORM, YOUR HONOR -- OR

4    OBJECTION TO ASKED AND ANSWERED.  ALSO AN OBJECTION TO FORM

5    WITH THE USE OF EXTERNAL SAFETIES.

6              THE COURT:  I'LL OVERRULE.

7              THE WITNESS:  SORRY.  CAN YOU REPEAT THE QUESTION?

8    BY MR. ZIMMERMAN:

9    Q.   YEAH.  EXTERNAL SAFETIES ARE THERE TO MAKE SURE THAT THE

10   GUN DOESN'T FIRE UNLESS THERE IS A FLUSH CENTER TRIGGER PULL,

11   RIGHT?

12   A.   THAT WOULDN'T REFER TO ALL EXTERNAL SAFETIES, BUT IT COULD

13   REFER TO THE TABBED TRIGGER.

14   Q.   YOU TALKED ABOUT THE FACT THAT IT IS IMPORTANT TO MEET THE

15   DESIGN STANDARDS THAT YOU SET, RIGHT?

16        YOU WERE ASKED ABOUT DESIGN STANDARDS AND HOW IMPORTANT IT

17   IS TO MEET THOSE STANDARDS?

18   A.   I DON'T KNOW IF IT'S STANDARDS, EXACTLY; BUT REQUIREMENTS,

19   SURE.

20   Q.   REQUIREMENTS.

21        WHEN YOU TALKED ABOUT YOUR SPECIFICATIONS, YOUR

22   REQUIREMENTS FOR TRIGGER WEIGHT, IS IT AS IMPORTANT THAT YOUR

23   GUNS DO WHAT YOU TELL THE USERS IT WILL, WHICH IS FIRE AT THE

24   TRIGGER WEIGHT THAT YOU PUT IN THE MANUAL?

25   A.   SO, LIKE I SAID BEFORE, THERE'S VARIATION IN THAT TRIGGER

1    WEIGHT.  YOU KNOW, WHAT'S IN THE MANUAL IS A NOMINAL NUMBER.

2    Q.   A WHAT?

3    A.   A NOMINAL NUMBER.

4    Q.   NOMINAL?

5    A.   YES.

6    Q.   WHAT DO YOU MEAN BY NOMINAL?

7    A.   BASICALLY, THE MIDDLE OF THE RANGE.

8    Q.   WHAT IS THE -- 5 AND A HALF TO 6 AND A HALF?

9    A.   SO I DON'T KNOW --

10   Q.   1 TO 10?

11   A.   I MEAN, IT COULD BE PLUS OR MINUS A POUND, PLUS OR MINUS A

12   HALF A POUND.  I DON'T HAVE THAT NUMBER IN MY HEAD.

13   Q.   WHO DOES?  THAT'S WHAT I'M ASKING.

14        BRYAN LANG, DID HE HAVE THAT INFORMATION?

15           MS. DENNISON:  OBJECTION, YOUR HONOR.  THIS IS BEYOND

16   THE SCOPE.

17           THE COURT:  I'LL SUSTAIN.

18           MS. DENNISON:  THANK YOU.

19   BY MR. ZIMMERMAN:

20   Q.   YOU TEST FOR RAIN, BUT YOU DON'T TEST FOR TRIGGER

21   SAFETIES, RIGHT?

22   A.   I DON'T KNOW OF ANY TESTING PROTOCOL FOR TRIGGER SAFETIES.

23   Q.   YOU SAID, SIR, THAT YOU DO TESTS OUTSIDE OF THE INDUSTRY

24   STANDARDS.  YOU CAN MAKE YOUR OWN TESTS UP, RIGHT?  YOU'RE A

25   LARGE COMPANY?

1    A.    WE DO.

2    Q.    OKAY.  YOU TEST FOR RAIN, BUT YOU DON'T TEST FOR TRIGGER

3    SAFETIES, DO YOU?

4    A.    WELL, RAIN IS PART OF A NORMAL TESTING PROTOCOL.

5    Q.    AGAIN, SIR, YOU'RE A VERY BIG COMPANY.  CAN YOU FIGURE OUT

6    A WAY TO TEST FOR TRIGGER SAFETIES?

7    A.    I'M NOT SURE AT THE MOMENT, BUT POSSIBLY.

8    Q.    YOU TEST FOR HUMIDITY, BUT YOU DON'T TEST FOR TRIGGER

9    SAFETIES, RIGHT?

10   A.    YES.

11   Q.    YOU TEST FOR MUD, BUT YOU DON'T TEST FOR TRIGGER SAFETIES,

12   RIGHT?

13   A.    YES.

14   Q.    WHEN IT COMES TO USERS CARRYING WITH A ROUND IN THE

15   CHAMBER -- YOU WOULD AGREE THAT MOST LAW ENFORCEMENT

16   DEPARTMENTS AND MOST INDIVIDUALS WHO ARE SERVING AND PROTECTING

17   OUR COMMUNITY ARE REQUIRED TO KEEP A ROUND IN THE CHAMBER,

18   RIGHT?

19   A.    I'VE NEVER WORKED --

20          MS. DENNISON:  OBJECTION, YOUR HONOR.  IT'S BEYOND

21   THE SCOPE.

22          THE COURT:  SUSTAINED.

23          IF YOU HAVE ANYTHING ELSE TO ASK BASED ON WHAT WAS

24   ASKED DURING THE LAST SET OF QUESTIONS, THAT'S FINE.  BUT I'M

25   GOING TO SUSTAIN AT THIS POINT.

1        MR. ZIMMERMAN:  YOUR HONOR, MAY I RESPOND TO THE

2   OBJECTION?

3        THE COURT:  SURE.  SURE.

4        MR. ZIMMERMAN:  THE QUESTION WAS ASKED ABOUT CARRYING

5   WITH A ROUND IN THE CHAMBER AND SPECIFICALLY REFERENCED THE

6   OPERATOR'S MANUAL TO SUGGEST THAT IT WAS NOT AN APPROPRIATE USE

7   OF THE GUN.

8        THE COURT:  AND YOUR QUESTION WAS WHAT?  I'M TRYING

9   TO GO BACK TO IT.

10        MR. ZIMMERMAN:  YEAH.  MOST LAW ENFORCEMENT

11   DEPARTMENTS AND MOST LAW ENFORCEMENT PERSONNEL HAVE TO CARRY

12   WITH A ROUND IN THE CHAMBER.

13        THE COURT:  YEAH.  I'M GOING TO SUSTAIN.

14        MR. ZIMMERMAN:  OKAY.  THAT'S ALL I HAVE.  THANK YOU.

15        THE COURT:  ALL RIGHT.  THANK YOU.

16        ALL RIGHT.  ANYTHING ELSE?

17        MS. DENNISON:  I HAVE ONE QUESTION, YOUR HONOR.

18                    RECROSS-EXAMINATION

19   BY MS. DENNISON:

20   Q.   MR. TONER, ARE YOU AWARE OF ANY STANDARDIZED TEST PROTOCOL

21   THAT COULD BE PUT IN PLACE TO TEST WHETHER AN ACCIDENTAL

22   TRIGGER PULL IS GOING TO PREVENT A DISCHARGE WITH A TABBED

23   TRIGGER?

24   A.   I HAVE NEVER SEEN ANYTHING OF THAT SORT.

25        MS. DENNISON:  THANK YOU.  THAT'S ALL I HAVE.

1          THE COURT:  ANYTHING ELSE?

2          MR. ZIMMERMAN:  NO, YOUR HONOR.

3          THE COURT:  ALL RIGHT.

4          ALL RIGHT.  THANK YOU, SIR.  YOU MAY STEP DOWN.

5          ANY REASON THIS WITNESS CANNOT BE EXCUSED AT THIS

6    TIME?

7          MR. ZIMMERMAN:  NOT FROM PLAINTIFF'S PERSPECTIVE,

8    YOUR HONOR.

9          MS. DENNISON:  NO, YOUR HONOR.

10         THE COURT:  ALL RIGHT.  YOU ARE FREE TO GO.  ARE YOU

11   LOCAL OR FROM OUT OF TOWN?  I CAN'T REMEMBER.

12         THE WITNESS:  I'M FROM NEW HAMPSHIRE, MA'AM.

13         THE COURT:  ALL RIGHT.  SO SAFE TRAVELS.

14         THE WITNESS:  THANK YOU, MA'AM.

15         THE COURT:  OKAY.  THANK YOU, SIR.

16              (TESTIMONY CONCLUDED.)

17                   -  -  -

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF GEORGIA

3  CERTIFICATE OF REPORTER

4

5

6          I DO HEREBY CERTIFY THAT THE FOREGOING PAGES ARE A

7  TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY

8  ME IN THE CASE AFORESAID.

9          THIS, THE 31ST DAY OF JULY, 2024.

10

11

12

13                              /S/ *ELIZABETH G. COHN*

14                              _____
                                ELIZABETH G. COHN, RMR, CRR
                                OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25