# Exhibit 10

1                UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF MISSOURI
2

3
    * * * * * * * * * * * * * * * * * *
4                                      *
    JOSHUA GLASSCOCK                   * No.
5                                      * 22-cv-3095-SRB
          vs.                          *
6                                      *
    SIG SAUER, INC.                    *
7                                      *
    * * * * * * * * * * * * * * * * * *
8

9

10   VIDEOTAPED DEPOSITION OF THOMAS TAYLOR,

11   Deposition taken at 299 Vaughn Street, Portsmouth,

12   New Hampshire, on Thursday, September 12, 2024,

13   commencing at 9:02 a.m.

14

15

16

17   Court Reporter:
     Pamela J. Carle, LCR, RPR, CRR
18

19

20

21

22

23

24

25

1                         APPEARANCES

2

   For the Plaintiff:

3

           WILLIAMS DIRKS DAMERON
4          1100 Main Street, Suite 2600
           Kansas City, Missouri  64105
5          By:  Michael Williams, Esq.
                816.945.7110
6               mwilliams@williamsdirks.com

7

   For the Defendant:

8

           DLA PIPER
9          1251 Avenue of the Americas
           New York, New York 10020-1104
10         By:  Colleen Gulliver, Esq.
                212.335.4673
11              colleen.gulliver@dlapiper.com
                and
12         LITTLETON PARK JOYCE UGHETTA & KELLY LLP
           2460 N Courtenay Pkwy, Suite 204
13         Merritt Island , Florida  32953
           By:  Kristen E. Dennison, Esq. (Via Zoom)
14              321.574.0280
                kristen.dennison@littletonjoyce.com

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X
     WITNESS:              THOMAS TAYLOR
2
     EXAMINATION:                          PAGE
3    By Mr. Williams                       6
     By Ms. Gulliver                       112
4
```

```
     EXHIBITS FOR IDENTIFICATION:

     TAYLOR              DESCRIPTION              PAGE

     Exhibit 1    Deposition notice                7

     Exhibit 2    Sig Glasscock 0000248, 6/8/18    31
                  e-mail

     Exhibit 3    Document, Sig Glasscock          33
                  00000199 to 200

     Exhibit 4    Document from Samantha Piatt     34
                  dated July 27, 2021 at 4:51
                  p.m.

     Exhibit 5    Chart, Sig Glasscock 0001772     42

     Exhibit 6    Chart                            42

     Exhibit 7    Documents Bates numbered 157     51
                  and 158

     Exhibit 8    Document Sig 146                 55

     Exhibit 9    Sig Glasscock 141 and 142,       57
                  e-mail from Kyle Reyes

     Exhibit 10   Sig Glasscock 128, 129 and       61
                  attachment

     Exhibit 11   Sig Glasscock 000104             67

     Exhibit 12   Sig 000224-26                    71
```

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required by law
California Firm Registration #179
LEXITAS

Case 3:20-cv-03035-MDH   Document 121-1   Filed 06/05/25   Page 4 of 126

1    Exhibit 13    Document dated 3/24/23, Nos.      75
                   255 and 256
2
     Exhibit 14    Documents numbered 257 through    77
3                  259

4    Exhibit 15    Sig 250 through 254               82

5    Exhibit 16    4/13/23 document, Taylor to       83
                   Cohen
6
     Exhibit 17    Sig Glasscock 218 and 219         86
7
     Exhibit 18    Sig Glasscock 0000004             89
8
     Exhibit 19    Sig Glasscock 12, 13, 14 and      91
9                  attachment

10   Exhibit 20    E-mail from QA Outdoors           93

11   Exhibit 21    P320 design 40                    95

12   Exhibit 22    Sig Glasscock 201 through 207     97

13           (Exhibits sent to Huseby, Inc.)

14

15

16

17

18

19

20

21

22

23

24

25

888-893-3767    Lexitas operates in all 50 states and is licensed where required.    LEXITAS
www.lexitaslegal.com    California Firm Registration #179

Page 5

1            THE VIDEOGRAPHER:  Good morning.  We're

2    going on the record at 9:02 a.m. for the following

3    deposition of Thomas Taylor, 30(b)(6) corporate

4    representative for Sig Sauer, Inc.

5            This is being taken on September 12,

6    2024, at 299 Vaughn Street, Portsmouth,

7    New Hampshire, 03801, in the matter of Joshua

8    Glasscock, on behalf of himself and others

9    similarly situated, versus Sig Sauer, Inc., filed

10   in the United States District Court for the Western

11   District of Missouri, Case No. 22-cv-3095-SRB.

12           My name is Gill Whitney, I'm the

13   videographer.  The court reporter is Pam Carle.  We

14   are here on behalf of Lexitas Legal.  Would you

15   counsel please announce their presence for the

16   record.

17           MR. WILLIAMS:  Mike Williams for the

18   plaintiff.

19           MS. GULLIVER:  Colleen Gulliver for

20   Sig Sauer and the witness.

21           MS. DENNISON:  And Kristen Dennison

22   here on behalf of Sig Sauer as well.

23           THE VIDEOGRAPHER:  Thank you.  The

24   reporter can swear in the witness.

25   //

Page 6

1          THOMAS TAYLOR,

2          having been duly sworn,

3          was deposed and testified

4          as follows:

5          EXAMINATION

6    BY MR. WILLIAMS:

7          Q.    Good morning, sir.  Can you please

8    state your full name for the record.

9          **A.    Thomas Taylor.**

10         Q.    Good morning, Mr. Taylor.

11         **A.    Good morning.**

12         Q.    My name is Michael Williams, and I'm a

13   partner at the firm Williams Dirks Dameron in

14   Kansas City, Missouri, and I am here to take your

15   deposition as a corporate representative.  I am

16   going to hand you what has been marked as

17   Deposition Exhibit 1.

18         **A.    Glasses.  Sorry about that.  We won't**

19   **get very far without those.**

20         Q.    Well, I am new to glass wearing, so I

21   am very cognizant, like, Ah, where are my glasses?

22              MS. GULLIVER:  Do you have a copy for

23   me?

24              MR. WILLIAMS:  Oh.  That's just the

25   notice.  We've been using the same one.

888-893-3767                Offices in all 50 states and licensed where required by law        LEXITAS
www.lexitaslegal.com                         California Firm Registration #179

1          MS. GULLIVER:  Okay.  Will you have

2   copies of other exhibits for me or no?

3          MR. WILLIAMS:  Yeah.

4          MS. GULLIVER:  Okay.  Great.

5   (Taylor Exhibit 1 was marked for identification.)

6      **A.     Okay.**

7   BY MR. WILLIAMS:

8      Q.     Sorry.  You've been handed what has

9   been marked as Deposition Exhibit 1.  Have you seen

10  that document before?

11     **A.     Yes, I have.**

12     Q.     That document is just the notice that

13  was sent out in this case that defines certain

14  topics that we want Sig Sauer to produce a witness

15  to testify on the behalf of the corporation.

16  That's all that basically means.

17     **A.     Okay.**

18     Q.     In this matter you have been designated

19  to address topics 17, 18 and 19.  So before we get

20  started, are you prepared to answer questions with

21  regard to those specific topics?

22     **A.     I am.**

23     Q.     Okay.  I skipped over something, but

24  let's jump back for one second.  You told us your

25  name, are you currently employed?

888-893-3767        Lexitas operates in all 50 states and is licensed where required.                LEXITAS
www.lexitaslegal.com                        California Firm Registration #179

1        A.      I am.

2        Q.      And where are you employed?

3        A.      **Sig Sauer.**

4        Q.      And what is your title at Sig Sauer?

5        A.      **Executive vice president, global brand**

6    **development.**

7        Q.      And how long have you been the

8    executive vice president of global brand

9    development?

10       A.      **Since the second week of June of 2024.**

11       Q.      How long have you been employed by Sig?

12       A.      **Not quite ten years, so nine years.  It**

13   **will be ten years in March of '24.**

14       Q.      It will be ten years in March of '25?

15       A.      **'25.  Sorry, March of '25.**

16       Q.      So prior to becoming executive vice

17   president, global brand management, what was your

18   title?

19       A.      **Brand development.**

20       Q.      I'm sorry, brand development.

21       A.      **Yes, sir.**

22       Q.      What was your title?

23       A.      **I was chief marketing officer and**

24   **executive vice president commercial sales.**

25       Q.      I'm sorry, chief vice president and --

Case 1:22-cv-03095-MD  Document 105-24

1    A.    Chief marketing officer and executive

2  vice president commercial sales.

3    Q.    And how long were you in that position?

4    A.    Since March of -- from March of 2015

5  until June of 2024.  So a little over nine years.

6    Q.    And what did you do in that position?

7    A.    I oversaw the marketing initiatives of

8  the company, as well as the domestic or US

9  commercial sales at the company.

10    Q.    And I assume that becoming the

11  executive vice president of global brand

12  development was a promotion?

13         MS. GULLIVER:  Objection, form.

14    A.    Just a different role.

15  BY MR. WILLIAMS:

16    Q.    So was it a lateral move?

17         MS. GULLIVER:  Objection to form.

18    A.    It's -- it was just a different role.

19  I talked to the company about doing a different

20  role within the company and they were able to

21  accommodate that role.

22  BY MR. WILLIAMS:

23    Q.    Okay.  So what do you do -- what are

24  your main job duties as the vice president of

25  global brand development?

1      A.      So I still support our chief marketing

2  officer in any way he needs.  I also am involved in

3  international marketing, special projects, industry

4  governance, various things like that in support of

5  the company.

6      Q.      Have you ever had your deposition taken

7  before?

8      A.      I have.

9      Q.      And have you had your deposition taken

10  as a corporate representative before?

11      A.      I have.

12      Q.      Approximately how many times have you

13  had your deposition taken as a corporate

14  representative?

15      A.      Three prior to this one, I believe.

16      Q.      Okay.  So you're a veteran at this, but

17  I'm going to go over some basic rules just to make

18  sure that we're all on the same page, is that okay?

19      A.      Of course.

20      Q.      You already understand this, you're

21  doing a great job of answering the questions

22  verbally.

23      A.      Yes.

24      Q.      And what I mean is the court reporter's

25  obligation is to take down everything -- every

Case 3:23-cv-03095-MMC   Document 112-4   Filed 05/02/24   Page 11 of 126

888-893-3767
www.lexitaslegal.com

Exhibit D relates to all 50 states and is licensed where required by law
California Firm Registration #179

LEXITAS

1   question that I ask, every answer that you give,

2   and any objections that counsel may make.  Because

3   of that, everything must be verbal, i.e., you can't

4   say uh-hum or um-um or shake your head, and we also

5   must let each other finish what we're saying.  So

6   you've got to let me finish my question before you

7   start your answer, I have to let you finish your

8   answer before I start the next question, and we

9   have to both be mindful that if counsel makes an

10  objection, we have to stop to allow them to make

11  their record, okay?

12      A.    Understood.

13      Q.    The other thing that we have to be

14  mindful of is that the court reporter is making a

15  record, and because of that, we have to make sure

16  that we're speaking while not slowly, we have to

17  monitor whether we're going too fast, because they

18  can only type 250, 300 words a minute, and

19  sometimes we'll get ahead of ourselves.

20          If we do that, the court reporter is

21  not being rude, she might hold up her hand or wave

22  or something just say slow down, I'm having trouble

23  keeping up.  All right?

24      A.    Understood.

25      Q.    Also, sometimes questions are going

888-893-3767                Exhibit B relates to all 50 states and is licensed with at least one US-based Registration Firm.               LEXITAS
www.lexitaslegal.com                                California Firm Registration #179

1    through my head and when they come out of my mouth

2    they may not make sense, they may be jumbled, they

3    may just be stupid.

4              If you ever get a question that just

5    doesn't make sense, you don't understand or

6    anything, will you promise to tell me?

7         A.    I will.

8         Q.    All right.  Because I -- while we're

9    here for certain specific topics, I don't want you

10   answering questions you don't understand.

11        A.    Of course.

12        Q.    Because that just belabors the point,

13   and we have to stay here longer.

14        A.    Understood.

15        Q.    I don't think I have anything else with

16   regard to the background stuff.

17        A.    Okay.

18        Q.    If you will flip to question 17.  And

19   if you could read that into the record, please.

20        A.    The marketing of the P320 to Missouri,

21   including Sig Sauer's analysis of same.

22        Q.    Are you prepared to answer questions on

23   that topic?

24        A.    I am.

25        Q.    What did you do to prepare to answer

Case 4:22-cv-03095-MDB Document 1-1 filed 05/24/24 Page 13 of 126

1   questions on that topic?

2        A.    I met with counsel, I conferred with

3   internal people within the company, and just

4   generally my knowledge of the situation over the

5   past several years.

6        Q.    Can you please identify each person you

7   met with internally to prepare to answer

8   question 17?

9        A.    Specifically to 17, Jack Morris, who

10  was our manager of e-mail marketing, and counsel, I

11  think I met specific to marketing.  I believe

12  that's the only person that -- that I've asked a

13  couple of questions to understand some things with

14  regard to question 17.

15       Q.    And I believe you said Jack Morris is

16  in charge of e-mail marketing?

17       A.    Yes.

18       Q.    Is he a direct report to you?

19       A.    No longer.  He -- he previously was but

20  does not report to me any longer.

21       Q.    Okay.  So prior to the second week of

22  June of 2024, Mr. Morris reported to you?

23       A.    He reported through another gentleman.

24  He has at times reported directly to me over the

25  years but more recently had a manager between me

888-893-3767
www.lexitaslegal.com

Exhibit D Relates Dept 50 statewide 1 is licensed with a court of law a Registration #110 ft.
California Firm Registration #179

LEXITAS

1    and him.

2         Q.      And who is that manager?

3         A.      Chad Laurent.

4         Q.      For the record, can you spell

5    Mr. Laurent's last name, if you know?

6         A.      Yes, L-A-U-R-E-N-T.

7         Q.      And what is Mr. Laurent's title?

8         A.      Director of digital marketing.

9         Q.      Thank you.

10        A.      Yes, sir.

11        Q.      Any other individuals inside the

12   corporation that you spoke with in preparation to

13   answer question 17?

14        A.      No, I don't think so.

15        Q.      Would you read topic 18 into the

16   record.

17        A.      The sale and/or shipment of P320 to

18   Missouri, including Sig Sauer's analysis of the

19   same.

20        Q.      And did you speak with any individuals

21   to prepare for answering that question?

22        A.      I did.  Outside of counsel I spoke with

23   Jack Barnes, Adam Asadoorian, and Cory Franks.

24        Q.      You've probably heard this a lot, but

25   there is zero chance I could even say Adam's last

Lexitas suite Deposition Services is licensed where required by law
888-893-3767        Lexitas Deposition Services
www.lexitaslegal.com                                   California Firm Registration #179

1  name.  Is there any way you could give us a close

2  spelling to it?

3       A.    I'll get close, it is an unusual

4  spelling.  A-S-S-A-D-O-O-R-I-A-N (sic).  I might be

5  off a double letter there, but I think that's going

6  to be close.

7       Q.    You actually spelled it so I can at

8  least, if I have a question, I can phonetically say

9  it.

10      A.    Yes.

11      Q.    So thank you.

12            And is Cory C-O-R-E-Y?

13      A.    No E, just C-O-R-Y.

14      Q.    What is Jack Barnes' title?

15      A.    His current title is senior vice

16  president, commercial sales.

17      Q.    What is Mr. Asadoorian's title?

18      A.    Directure -- sorry, director of

19  commercial sales analytics, or something very close

20  to that.

21      Q.    And then you say Cory Franks, correct?

22      A.    Yes, yes.

23      Q.    What is Cory Franks' title?

24      A.    He's a sales representative.  And, I'm

25  sorry, I also spoke to a gentleman named Jacob

888-893-3767   Exitas Deletates is licensed within the court of Nevada Registration #16 of
www.lexitaslegal.com               California Firm Registration #179

Lexitas

1   Wideman.

2        Q.    And can you spell Wideman?

3        A.    W-I-D-E-M-A-N.

4        Q.    So in Missouri we say Wideman.

5        A.    **He lives in Missouri, so...**

6        Q.    He does live in Missouri?

7        A.    **Uh-hum.**

8        Q.    What part?

9        A.    **I'm not sure.**

10       Q.    Do you know Mr. Wideman's title?

11       A.    **He's a sales rep also.**

12       Q.    Any other individuals you spoke with in

13  preparation for topic 18?

14       A.    **I believe that's all.**

15       Q.    All right, thank you.  And I believe

16  you also have topic 19.  Can you read that into the

17  record?

18       A.    **The suggested retail price, actual**

19  **price and actual cash value of the P320 before and**

20  **after a P320 has been modified with a voluntary**

21  **upgrade.**

22       Q.    Did you speak to any individuals in

23  preparation to answer topic 19?

24       A.    **I think with regard to that one, that**

25  **would have just been counsel.  And I do believe**

1    there's another document where some of these have

2    had some suggested modifications from our counsel

3    as well.  I've reviewed that document.

4        Q.    I'm sorry, I didn't understand your

5    answer.  Can you say that again?

6        A.    Well, you're asking me if I prepared

7    for these topics, and while I have, there's -- I

8    think there's some modifications suggested by our

9    counsel that I've read as well.  So similar, but

10   there are objections I think within those -- the

11   other documents, so I prepared for that.

12            MR. WILLIAMS:  I don't understand

13   anything.

14            MS. GULLIVER:  He's -- I can represent

15   I think what he's referring to is we modified

16   some of -- each one of these to say what we would

17   agree to put him up for, and you're just showing

18   him your deposition notice instead of our

19   objections and responses to it.  So he's explaining

20   that these categories are modified by our

21   objections and responses.

22            MR. WILLIAMS:  Was there a protective

23   order or anything?  I don't -- I didn't --

24            MS. GULLIVER:  He doesn't --

25            MR. WILLIAMS:  I know I'm -- let's go

Case 8:23-cv-03090-MSS-UAM Delates Dnd 50 standard Dis lilensed white reduifo 05/2da Registration #310FT.126
888-893-3767                                                    File d 05/24 Registration #310FT
www.lexitaslegal.com                    California Firm Registration #179

LEXITAS

1    off the record for a second.

2              MS. GULLIVER:  Sure.

3              THE VIDEOGRAPHER:  Off the record.

4    9:19.

5              (Recess taken.)

6              THE VIDEOGRAPHER:  We're back on the

7    record, 9:28.  Media No. 2.  Please proceed.

8    BY MR. WILLIAMS:

9         Q.    You understand that you're still under

10   oath?

11        **A.    I do.**

12        Q.    All right.  We were talking about topic

13   19, and I believe you told me you spoke with

14   counsel.  Did you speak with any other individuals

15   in preparation for topic 19?

16        **A.    I did speak with Jack Lawrence a little**

17   **bit about topic 19.**

18        Q.    Anyone else?

19        **A.    No.**

20        Q.    Did you review any documents in

21   preparation to respond to topic 19?

22        **A.    No, I did not.**

23        Q.    Did you review any documents in

24   preparation for topic 18?

25        **A.    I did.**

888-893-3767
www.lexitaslegal.com                          LEXITAS
California Firm Registration #179

1          Q.       What documents did you review?

2          A.       **Sales report.**

3          Q.       And when you say sales report, what do

4   you mean?

5          A.       **Just the reporting of sales of 320 into**

6   **the state of Missouri.**

7          Q.       Do you recall for what years?

8          A.       **I believe it was during the period I'm**

9   **being questioned about.**

10         Q.       Any other documents to prepare or

11  respond to topic 18?

12         A.       **No.**

13         Q.       Did you review any documents in

14  preparation for topic 17?

15         A.       **I did.**

16         Q.       What documents did you review?

17         A.       **I saw some marketing collateral such as**

18  **ads, website pages, things of that nature.**

19         Q.       And what do you mean when you refer to

20  marketing collateral?

21         A.       **Collateral is a term that -- kind of**

22  **all inclusive of advertisements, websites, anything**

23  **that has to do with the different aspects of**

24  **marketing that we do.**

25         Q.       And you said you reviewed ads, and then

1  you had a -- I didn't understand the third

2  category?

3       A.      Website pages.  Ads, website pages.  I

4  believe that was the only two I was specific about.

5       Q.      Any other documents you reviewed other

6  than marketing collateral, ads and website pages?

7       A.      No.  I'm sorry, I did review catalog

8  pages as well, sorry.

9       Q.      No problem.  And what do you mean by

10 catalog pages?

11      A.      It's a product catalog.

12      Q.      Internal documents?

13      A.      Both internal and external, customer

14 facing.

15      Q.      And, I'm sorry, when I say -- let me

16 try that question again.  When you say catalog

17 pages, were those catalog pages created by

18 Sig Sauer, or were they, you know, someone else's

19 ads like, I don't know, Bass Pro?

20      A.      These would have been created by Sig.

21      Q.      Any other documents you reviewed that

22 we haven't discussed to prepare for category 17, 18

23 or 19 other than marketing collateral, ads, website

24 pages, catalog pages and sales reports?

25      A.      Not that I recall.

888-893-3767    Exhibit D plates Doc 50 states and is licensed with a court of Nevada Registration #110ff.
www.lexitaslegal.com                    California Firm Registration #179

LEXITAS

1      Q.      With regard to Sig Sauer's marketing

2   P320 in Missouri, did you do -- or did Sig perform

3   any type of analysis of the market?

4            MS. GULLIVER:  Objection to form.

5      **A.      Are you asking specifically about the**

6   **state of Missouri?**

7   BY MR. WILLIAMS:

8      Q.      Yes.

9      **A.      No.**

10     Q.      Does Sig perform marketing analysis?

11            MS. GULLIVER:  Objection, form.

12     **A.      What type of market analysis are you**

13  **referring to?**

14  BY MR. WILLIAMS:

15     Q.      I guess that's what -- yes.  That's

16  kind of like why I was like, wait, maybe I'm just

17  using the wrong phrase or term.

18            Does Sig perform any analysis of say

19  like, Here's where we would be best suited to sell

20  our products in the state of Missouri?

21     **A.      I would think the answer to that**

22  **question would be no.  Not specifically that kind**

23  **of analysis.**

24     Q.      What types of analysis does Sig do

25  before selling products in a state?

Case 4:22-cv-03095-MDH   Document 157-1   Filed 05/16/24   Page 22 of 126
888-893-3767
www.lexitaslegal.com      Exhibit D relates to all 50 states and is licensed with the courts of Nevada Registration #216F.
California Firm Registration #179                    LEXITAS

1    A.    We don't really do a lot of

2  state-specific analysis, to be honest.

3    Q.    When you said a lot, does that mean you

4  don't do any?

5    A.    I would say the only analysis we do

6  state by state is at times we look at market share,

7  of what Sig's market share is in a given state so

8  we can understand if it's higher or lower than our

9  average.

10    Q.    And when Sig looks at its market share,

11  is that something that's performed on a quarterly

12  basis, an annual basis, or just randomly?

13         MS. GULLIVER:  Objection, form.

14    A.    We get -- we get the data on a monthly

15  basis, but we don't always analyze it on a monthly

16  basis.  There's no set time period we analyze it

17  on.

18  BY MR. WILLIAMS:

19    Q.    And when you say you get data on a

20  monthly basis, what data does Sig receive on a

21  monthly basis?

22    A.    BATF data.

23    Q.    And just so the record is clear, what

24  is the BATF data?

25    A.    Bureau of Alcohol Firearms and Tobacco.

888-893-3767
www.lexitaslegal.com    Exhibits and Plates in full 50 states and D.C. licensed with a drought of 50 state Registration #310T.
California Firm Registration #179

LEXITAS

1      Q.      And is there a department or group that

2  is set up to analyze that data?

3      **A.      Yes.**

4      Q.      What is that group called?

5      **A.      Our commercial sales analytics team.**

6      Q.      And if you know, who is the head of the

7  commercial analytics team?

8      **A.      Adam Asadoorian.**

9      Q.      And I believe we already have that

10  spelling, as close as we're going to get it,

11  correct?

12      **A.      Yes.**

13      Q.      So when you were in the chief marketing

14  role, what type of information or data would

15  Mr. Asadoorian provide you with regard to the

16  Missouri market?

17      **A.      Only a list, there's nothing**

18  **specifically pulled out for Missouri, it would just**

19  **be a list of states that would show their market**

20  **share across all 50 states.**

21      Q.      And would that data also tell you the

22  number of units that were sold in Missouri?

23      **A.      No.**

24      Q.      And so when you say market share, is it

25  just --

888-893-3767
www.lexitaslegal.com

Lexitas is licensed in all 50 states and is licensed where required by each state. Registration #416.

California Firm Registration #179

LEXITAS

1          A.      I'm sorry, yes, it would.  Some of our

2     reports are revenue, some are -- are units.  That

3     one would be units.  So, yes.  Yes.

4          Q.      Okay.

5          A.      Sorry.

6          Q.      And so that report would show you the

7     number of units that were sold in Missouri on any

8     given month, correct?

9          A.      Correct.

10          Q.      And you also mentioned that sometimes

11     the market share is based on revenue, is that

12     correct?

13          A.      It is.

14          Q.      And would that show you the revenue

15     that Sig was receiving from Missouri on any given

16     month?

17          A.      Not that data, no.

18          Q.      What data would show you the revenue

19     that Sig was receiving from Missouri sales of --

20     and I just realized something.  Let me back up for

21     a second.

22          A.      Uh-hum.

23          Q.      When we talked about the BATF data and

24     that it would show you the number of units that

25     were sold?

1      A.      Yes.

2      Q.      Were you talking about -- would it tell

3   you the number of P320 units that were sold?

4      A.      No.

5      Q.      It only tells -- does it -- is that --

6   is -- so the data that you would receive in that

7   report is only specific to the number of guns sold,

8   not any specific product line, is that correct?

9      A.      Yes.

10      Q.      Is there a data report that you

11   would -- that tells you the number of units of

12   P320s that would have been sold in Missouri?

13          MS. GULLIVER:  Objection to form.

14      A.      **We do -- we could track that by unit**

15   **and revenue with internal sales reports for direct**

16   **customers in Missouri.**

17   BY MR. WILLIAMS:

18      Q.      Okay.  Say that again.

19      A.      **We can track revenue and units of -- by**

20   **product line, P320 for example, going into Missouri**

21   **for our customers who buy from us directly in**

22   **Missouri.  And when I say customers, I mean**

23   **distributors, dealers, not consumers.**

24      Q.      So if I'm understanding you, what

25   you're saying is those numbers would be based on

1   units sold to -- sold commercially, i.e., to

2   dealers or the Bass Pros, commercial retail sales

3   like that, but not to specific Missouri residents,

4   is that correct?

5       A.    Yes.

6       Q.    Is there any report that you're aware

7   of that would tell you the number of units that

8   were sold to individuals, separate from this report

9   we just talked about that -- units sold to Missouri

10  residents as individuals?

11          MS. GULLIVER:  Objection to form.

12      **A.    Not those -- none of those reports**

13  **would tell us that.  We have some very limited**

14  **direct sales to consumers on our website.  It's a**

15  **custom -- custom gun builder, so to speak, and**

16  **those we can track that, but it's a very, very low**

17  **volume.**

18  BY MR. WILLIAMS:

19      Q.    Okay.  So if I'm understanding your

20  testimony, the primary mechanism for sales of P320s

21  in Missouri would be to distributors and commercial

22  entities, is that correct?

23      **A.    Yes.**

24      Q.    And that there would be very few that

25  were sold directly to consumers in Missouri?

888-893-3767                 Exhibit D relates to all 50 states and is licensed with a credit of 54 per Registration 2710T.
www.lexislegal.com                         California Firm Registration #179

LEXITAS

1          A.      Yes, that's accurate.

2          Q.      And the reports that you could -- that

3  would be generated for the sales to the commercial

4  and the distributors could tell you the number of

5  units and it could tell you the amount of revenue

6  on a monthly basis, is that correct?

7          A.      Yes.

8          Q.      Now, we've talked about the sales.  I

9  want to talk to you about marketing, i.e., ad buys

10  and things of that nature, okay?

11          A.      Yes, sir.

12          Q.      Does Sig Sauer have -- does Sig Sauer

13  buy ads or -- I'm sorry, I should say

14  advertisements that are sent to consumers in

15  Missouri?

16              MS. GULLIVER:  Objection to form.

17          A.      Not specifically in Missouri, no.

18  BY MR. WILLIAMS:

19          Q.      And does Sig Sauer buy advertisements

20  that are just sent out to consumers?

21          A.      Yes.

22          Q.      And what forms of advertisement does

23  Sig send out to consumers?

24          A.      So we do print advertising, television

25  advertising, social media are the primary vehicles.

888-893-3767
www.lexitaslegal.com

Exhibit D relates to all 50 states and is licensed within each of those 50
states
California Firm Registration #179

File produced under a Registration #179

LEXITAS

1      Q.      And what type of print advertising does

2 Sig do?

3      **A.      Just page ads in magazines.**

4      Q.      Can you give us a -- the top five

5 magazines that you would advertise in?

6      **A.      Some of the top three would be Guns &**

7 **Ammo Magazine, Recoil.  A lot of the ads we buy are**

8 **by ownership names and so they -- how they get put**

9 **out there is -- it's hard to determine the top**

10 **five, but those are probably the top -- the top**

11 **couple, would be Guns & Ammo and Recoil.**

12      Q.      Okay.  And then when you say you buy

13 them by advertiser, you mean like you have a --

14 with Hearst or something?

15      **A.      Yes.  Not Hearst, but something like**

16 **that.**

17      Q.      Okay.  What groups would that be?

18      **A.      Athlon is one ownership group, Outdoor**

19 **Sports Group.  Those are the two primary, the**

20 **biggest.**

21      Q.      And then those groups own different

22 magazines, newspapers, whatever?

23      **A.      Yes.**

24      Q.      And so you're doing a general ad buy?

25      **A.      Yes.**

888-893-3767
www.lexitaslegal.com

Exhibit Duplicates Duly-licensed where required by state law. California Registration #016.
California Firm Registration #179

LEXITAS

1      Q.      And there's no limitation on that

2   general ad buy that says you can't run these ads in

3   Missouri, correct?

4      A.      I can't speak to whether they can do a

5   state-specific ad, I don't know whether they can or

6   whether they can't, but we do not, we only buy

7   national ads.

8      Q.      You said you also advertise on TV?

9      A.      Yes.

10     Q.      What type of TV -- what TV mediums do

11  you advertise on?

12     A.      We don't do as much TV as we used to do

13  because it's not a primary medium anymore, as you

14  know.  But the hunting shows on television.

15  Buckmasters is one we still buy.  We do some what's

16  called run of press, where we'll go into the

17  Outdoor Network, which is like the Athlons and the

18  Outdoor Sports Group, but the TV version of that

19  where we'll run a press, where we'll buy ads and

20  then it just runs on the channel, so it doesn't

21  necessarily run on a particular show.  So those are

22  the -- those are the primary vehicles that we do on

23  TV and print.

24     Q.      What about advertising buys on social

25  media?  What are your primary advertisings on

Case 4:23-cv-00830 Nate Belcourt Document 51-24 Filed 05/22/24 Page 30 of 126

www.lexitaslegal.com    Utah Dep. states that is licensed while required by and Registration #016
California Firm Registration #179

LEXITAS
888-893-3767

1   social media?

2        A.      So, being a gun company we can't really

3   buy ads on social media, so when I say we're using

4   social media for marketing, it's our Instagram

5   pages, our Facebook pages, our YouTube channels,

6   and then we work with a lot of ambassadors and

7   influencers on social media to talk about Sig

8   products.

9        Q.      Any other media that you advertise on

10  that we haven't discussed?

11       A.      No.

12       Q.      Do you do any type of cobranding or

13  advertising with, like, say, a Bass Pro?

14       A.      Yes.

15       Q.      What do you do with -- what type of

16  advertising or cobranding do you do with Bass Pro?

17       A.      They'll run ads and they'll collaborate

18  with us for logos and pictures of our products.

19  They have -- throughout the year they have a couple

20  special events in their advertising that they do

21  and we collaborate with them for a half-page ad or

22  something like that.

23       Q.      Same thing with Cabela's?

24       A.      Yes.  And those are national, not --

25  not state-specific.

888-893-3767
www.lexitaslegal.com
Exhibit D relates to all 50 states and is licensed with the required Nevada Registration #106F
California Firm Registration #179
LEXITAS

1     Q.     Bass Pro is out of Springfield,

2  Missouri, correct?

3     A.     Yes.

4     Q.     Now, does Sig do any counter-marketing?

5  I.e., there's a story going on that says the P320

6  goes off without you touching the trigger, and then

7  there are obviously stories that run that say

8  that's not true.  Does Sig participate or do any

9  marketing to counter stories that may be adverse to

10  their products?

11          MS. GULLIVER:  Objection to form.

12     **A.     I'm not sure I would exactly call it**

13  **marketing, but, yes, we do counter those things.**

14  BY MR. WILLIAMS:

15     Q.     Okay.  Well, I'm the guy that wants to

16  use a term that you're comfortable with, so what

17  would you call that?

18     **A.     I think we try to make statements and**

19  **so forth to make sure our point of view is on the**

20  **record.**

21     Q.     Do you have a name that you refer to

22  that as?

23     **A.     No.**

24          (Taylor Exhibit 2 was marked for

25          identification.)

1   BY MR. WILLIAMS:

2       Q.    I'm going to hand you what's been

3   marked as Exhibit 2.

4       **A.    Okay.**

5       Q.    If you look at the second page of 22,

6   which is Sig Glasscock 00000248.  That's an e-mail

7   from you, correct?

8       **A.    Yes.**

9       Q.    And that's dated 6/8/2018 at 12:32

10  p.m.?

11      **A.    Yes.**

12      Q.    Did you -- and if you look at the first

13  page, did you draft this document?

14      **A.    I wouldn't have individually drafted**

15  **it, I would have been involved in the drafting of**

16  **this.**

17      Q.    I'm sorry, say that again?

18      **A.    I would have been involved in the**

19  **drafting of this.**

20      Q.    And when you said that there's, you

21  know, statements to make sure Sig's point of view

22  is on the record, is this the type of article you

23  mean, or the type of statement you mean?

24          MS. GULLIVER:  Objection to form.

25      **A.    Not necessarily.  This is -- this is a**

**communication to our bank to let them know. So it would be part of that, but this is -- this wasn't public facing, necessarily, this was just sort of a record to our bank to let them know about this CNN article that was potentially coming.**

BY MR. WILLIAMS:

Q. And do you recall if this was just sent to your bank, or was it sent to multiple groups?

**A. I don't know if this format or version exactly was sent -- who this was sent to besides our bank.**

(Taylor Exhibit 3 was marked for identification.)

BY MR. WILLIAMS:

Q. I'm going to hand you what has been marked as Exhibit 3.

**A. Okay.**

Q. Now, did you play a part in drafting this document?

**A. I did.**

Q. And was this document forward-facing, or was it to your bank or someone like that?

**A. I believe this would have been an outward-facing document.**

Q. And so is this what you meant when you

1    said statements to make sure your point of view is

2    on the record?

**3**        A.    Yes.

4         Q.    And this addresses an issue that

5    occurred with the Canadian Special Forces Operation

6    Command -- Canadian Special Operations Forces

7    Command?

**8**        A.    Yes.

9         (Taylor Exhibit 4 was marked for

10        identification.)

11   BY MR. WILLIAMS:

12        Q.    I'm going to hand you what has been

13   marked as Exhibit 4.

14             MR. WILLIAMS:  I'm sorry, I stapled the

15   extra copy.  Do you want me to staple that one?

16             MS. GULLIVER:  What do you mean?

17   What's attached?

18             MR. WILLIAMS:  No, what I'm saying is

19   the copy I have for you is stapled.  That one's

20   not.  I try to keep them consistent.  If you don't

21   care -- okay.

22             MS. GULLIVER:  Well, I appreciate that,

23   but, no, I'm good.  Thank you.

24             MR. WILLIAMS:  I always bring a

25   stapler, but sometimes my brain doesn't work right.

888-893-3767
www.lexitaslegal.com        Exhibit D relates to all statements and is licensed with a result of 5/12/24
California Firm Registration #179        File result 05/24 Registration 3510ft

LEXITAS

1          MS. DENNISON:  And I hate to interrupt,

2    but since you're talking.  If these documents,

3    because I'm remote, if these documents are Bates

4    labeled, if you could identify them by the Bates

5    label, that would be really helpful for me.

6          MS. GULLIVER:  I'm happy to read

7    Exhibit 2 and 3 in, if that's okay?

8          MR. WILLIAMS:  Yes.

9          MS. GULLIVER:  But I think we also need

10   to -- for some reason this one's cut off on Exhibit

11   4.

12         MR. WILLIAMS:  Yes.

13         MS. GULLIVER:  So Exhibit 2 is Sig

14   Glasscock 00000248 and 247, and then Exhibit 3 is

15   Sig Glasscock 00000199 to 200.

16         And then do you know what Exhibit 4 is?

17         MR. WILLIAMS:  I do not have the

18   document number.  Whoever, when they printed it or

19   copied it at the Kinkos, I guess they cut it off.

20         MS. DENNISON:  Okay.  I've seen that

21   happen before.

22         MR. WILLIAMS:  Yes.  But what --

23         MS. DENNISON:  It happened to me last

24   week in a deposition I was doing, but thank you

25   very much, I appreciate it.

888-893-3767
www.lexitaslegal.com
Exhibit Duplicates (not full-size) are licensed when required by a Registration #16187.
California Firm Registration #179
LEXITAS

1            MR. WILLIAMS:  So -- but if you don't

2    mind, I'll be back in Kansas City tomorrow.

3            MS. GULLIVER:  Great.

4            MR. WILLIAMS:  And so I can shoot you

5    an e-mail that says, Hey, Exhibit 4 was this

6    document.

7            MS. GULLIVER:  That would be great,

8    thank you.

9            MS. DENNISON:  Thank you.

10           MR. WILLIAMS:  I have to make myself a

11   note, or I'll forget.

12   BY MR. WILLIAMS:

13       Q.    I'm sorry, we sidetracked you.  Did you

14   get a chance to look at Exhibit 4?

**15       A.    I did.**

16       Q.    And Exhibit 4 is a document from

17   Samantha Piatt dated July 27 of 2021 at 4:51 p.m.,

18   correct?

**19       A.    Yes.**

20       Q.    And it is being sent from her to you?

**21       A.    Yes.**

22       Q.    And it just says, With options, is the

23   subject, correct?

**24       A.    Yes.**

25       Q.    Did Ms. -- am I saying that right,

Case 4:23-cv-03096-MWB   Document 104-5   Filed 05/02/24
888-893-3767                                    Exhibit duplicates of all statements is licensed with the authority of a Registration 3710
www.lexitaslegal.com                            California Firm Registration #179
LEXITAS

1  Piatt?

2      A.      Yes.

3      Q.      Okay.  Did Ms. Piatt report to you?

4      A.      Yes.

5      Q.      And did you ask her to draft this

6  document?

7      A.      **I don't know if ask would be the exact**

8  **right way to put it.  When we're in one of these**

9  **situations we would meet, you know, collaboratively**

10 **decide what we were going to do, so it would have**

11 **been a collaborative discussion, most likely.**

12     Q.      And this is dealing with -- I guess the

13 attachment says 7/26/21 ABC statement 5.docs,

14 correct?

15     A.      **Uh-hum.  Yes, sir.**

16     Q.      And if we look at the second page,

17 which I apologize, we don't have a Bates number

18 for, it says statement of 07/27, Option 1, news.

19 And it goes through a statement, We are

20 disappointed but not surprised that a liberal

21 antigun media outlet like ABC has chosen to report

22 and sensationalize frivolous lawsuits being

23 propagated by trial lawyers as newsworthy.

24         Did I read that accurately?

25     A.      Yes.

888-893-3767
www.lexitaslegal.com
Exhibit D plates Dept 50 standard 1 is licensed with a result of 54 vda Registration 3310f.
California Firm Registration #179
LEXITAS

1     Q.     So Option 1 means -- and it says news.

2 Does that mean you were going to send it to news

3 outlets, or what does that mean?

4          MS. GULLIVER:  Objection, form.

5     A.     **No, it just meant Option 1 was if we**

6 **chose to talk about the fact that this was reported**

7 **by a news outlet that might have an agenda, that's**

8 **the opening we would use.**

9 BY MR. WILLIAMS:

10    Q.     And so is it Sig's position that ABC

11 News is antigun media?

12          MS. GULLIVER:  Objection to form.

13    A.     **That's our belief.**

14 BY MR. WILLIAMS:

15    Q.     And then Option 2 says, Trial lawyers.

16 Once again, this lawsuit is a result of unsupported

17 allegations and claims being propagated by trial

18 attorneys seeking personal financial gain for a

19 negligent discharge caused by the (insert officer,

20 if LE) mishandling and/or misuse of a firearm.

21          Did I read that accurately?

22    A.     **Yes.**

23    Q.     What does LE stand for?

24    A.     **Law enforcement.**

25    Q.     So Option 2 is -- Option 1 says ABC is

Case 3:23-cv-03095-MMC   Document 72-4   Filed 05/14/24

www.lexitaslegal.com    888-893-3767
Suite Plates Full 50 state and DC licensed where required by law
California Firm Registration #179

LEXITAS

1    an antigun media outlet, correct?

2         A.    Yes.

3         Q.    Option 2 says that it's unsupported

4    allegations or claims being propagated by trial

5    attorneys seeking personal financial gain, correct?

6              MS. GULLIVER:  Objection, form.

7         A.    Yes.

8    BY MR. WILLIAMS:

9         Q.    And then there's an option 3 that says

10   Glock.  Who is Glock?

11        A.    **Glock is a firearms company.**

12        Q.    And it's one of your competitors?

13        A.    Yes.

14        Q.    And Option 3 reads, We are not

15   surprised that our competitor has decided to

16   participate in sensationalizing false claims that

17   seek to undermine the success of the P320.

18              This is nothing more than an act of

19   desperation due to their inability to prove

20   themselves in a head-to-head match-up with us.

21   Correct?

22        A.    Yes.

23        Q.    So did you believe Glock had something

24   to do with the ABC story?

25        A.    **What these three options were we're**

1    simply early in the process understanding what was

2    going on with whichever situation this was.

3                You know, news is involved in reporting

4    something that was sensationalized.  You know,

5    trial lawyers approaching law enforcement officers,

6    and we had intel at times that our competitor was

7    out sharing, propagating news reports with police

8    departments and such that there were allegations

9    against the 320.

10               So -- but this document, it was just us

11   capturing our thoughts as to which way we might go

12   with it, depending on what we ultimately found out

13   about the situation.

14       Q.     So Option 1, blame the news, Option 2,

15   blame the trial lawyers, Option 3, blame Glock,

16   correct?

17               MS. GULLIVER:  Objection to form.

18       A.     No, we were not looking to place blame,

19   we are considering all of our options in terms of

20   where and how the allegations were being

21   propagated.

22   BY MR. WILLIAMS:

23       Q.     Are there any other news outlets -- are

24   there any major news outlets that Sig does not

25   believe is antigun media?

1             MS. GULLIVER:  Objection, beyond the

2    scope.  You can answer in your personal capacity.

3         **A.       I think there are outlets that are more**

4    **or less favorable to guns, but we're -- I would say**

5    **we're cautious with all media.  Even ones that are**

6    **more conservative, we're cautious with all.**

7             MS. GULLIVER:  Mike, we've been -- oh,

8    I'm sorry, are you done questioning on this?

9             MR. WILLIAMS:  Sorry.  I have weird

10   facial ticks that I don't notice.  My significant

11   other tells me I speak with my face.  I was just

12   thinking.

13            MS. GULLIVER:  Okay.  But I was going

14   to ask for a break, but if you're not done with

15   this document, I don't want to get --

16            MR. WILLIAMS:  Oh, no.  I am a fan of

17   breaks.  I don't want to keep you here all day,

18   so -- but if we need to take a break, we can take a

19   break.

20            MS. GULLIVER:  Just a short one, if

21   that's okay.

22            MR. WILLIAMS:  Oh, yes.

23            THE VIDEOGRAPHER:  Off the record,

24   10:05.

25                 (Recess taken.)

1          (Taylor Exhibit 5 was marked for

2          identification.)

3          (Taylor Exhibit 6 was marked for

4          identification.)

5                    THE VIDEOGRAPHER:  We are back on the

6     record 10:19, media No. 3.  Please proceed.

7     BY MR. WILLIAMS:

8          Q.    You understand that you're still under

9     oath, correct?

10         A.    I do.

11         Q.    Okay.  In front of you are Exhibits 5

12    and 6, and I believe 5 is -- at the top says Copy

13    of Sig Glasscock 0001772.

14         A.    Okay, yes.

15         Q.    Okay.  I will represent to you that

16    this was so big that I only printed off like the

17    first page, or else we'd have like 4,000 pages for

18    no apparent reason.

19                    And what I am particularly interested

20    in, in talking, so that you don't worry about it,

21    is I want to talk to you about the explanation

22    page.

23         A.    Okay.

24         Q.    All right.  And so you recall earlier

25    you gave testimony about units being sold and how

Page 43

1    you, you know, you sell to the distributor and

2    that's how you know what units are sold in Missouri

3    and what percentage of market share?

4        A.    Yes.

5        Q.    Okay.  I believe this helps us

6    understand that, and so that's why I pulled this

7    out.  If we look at the key, the first one says

8    Ship date range.  And at least for this document it

9    says, Between 01 September of '17 and 18 April of

10   '22, correct?

11       A.    Yes.

12       Q.    Tell me what that means, the ship

13   range.

14       A.    **It's just the date range the report was**

15   **pulled.**

16       Q.    And those are just variables that you

17   add in?

18       A.    Yes.

19       Q.    Okay.  And that would be shipments to

20   Missouri?

21       A.    Yes.

22       Q.    Okay.  Then the next -- it says, next

23   category, Ship to customer category code.  And then

24   it has a bunch of stuff.  What does that tell us?

25       A.    **Here where it says not in, it's just**

888-893-3767                    Exhibit D is part of a standard is licensed with the result of 954 data Registration #410f
www.lexitaslegal.com                    California Firm Registration #179

LEXITAS

1    telling you what's been excluded from this report,

2    all these different categories within Sig Sauer.

3         Q.    And so if you take all those categories

4    out, then that would leave the number of commercial

5    sales in Missouri, or what would it leave?

6         A.    It would leave all the commercial sales

7    in Missouri with the exception, when we were

8    reviewing this data yesterday, conservation, the

9    last one here is a consumer sale.  So we did -- I

10   think we are having that added back in.

11        Q.    Okay.  So other than conservation,

12   these are categories of things or categories of

13   sales that are not to the distributors and the

14   retailers that sell to consumers, correct?

15        A.    True.

16        Q.    And that's limited to Missouri,

17   correct?

18        A.    Yes.

19        Q.    The next one says Value type fin.  I

20   have no idea what that means?

21        A.    I'm not exactly sure what that means.

22        Q.    Okay.  The next one says Part equals

23   H-D-G-U-N, so I'm assuming that's handgun?

24        A.    Yes.

25        Q.    And then the next category is Model,

1   which tells us only P320.  So I am to understand

2   that this chart has singled out P320 handgun sales

3   to retailers that sell to consumers in Missouri?

4           MS. GULLIVER:  Objection to form.

5       **A.     Retailers and distributors.**

6   BY MR. WILLIAMS:

7       Q.     Oh, I'm sorry, I left off distributors.

8       **A.     Yes.**

9       Q.     Okay.  So retailers and distributors

10  that sell handguns to Missouri and that it's

11  limited to just P320, correct?

12          MS. GULLIVER:  Objection to form.

13      **A.     Yes.**

14  BY MR. WILLIAMS:

15      Q.     And we know that because the next one

16  says state is Missouri, correct?

17      **A.     Yes.**

18      Q.     And the line category code means all.

19  Tell us what that means.

20      **A.     I'm not sure.**

21      Q.     What about source system?

22      **A.     Source system, Sig Sauer Oracle EBS is**

23  **just our mainframe system that all of our sales**

24  **data gets pulled into.  So it's being pulled from**

25  **that system.**

1    Q.    Okay.  And how long -- if you know, how

2  far back to go with the Oracle system?

3    A.    **We've had Oracle since I've been at**

4  **Sig Sauer.**

5    Q.    Okay, perfect.  And then it says Order

6  type.  And can you explain that?  Because I know it

7  looks like another exclusion.

8    A.    **Yeah.  Not in -- we're not including,**

9  **for example, T&E is a test and evaluation order,**

10  **which might mean we've sent it to a writer, a media**

11  **member, which is test and evaluation.**

12          **Warranty and repairs, if you pull this**

13  **without excluding those, it would -- it would track**

14  **a gun that was sent in to Sig by a consumer and**

15  **sent back to a consumer.  So we've excluded**

16  **anything that wouldn't be a new gun sale into the**

17  **state.**

18    Q.    And then the last one, is that -- what

19  does -- C-U-S-T-S-V-E-C-E, what does that stand

20  for?

21    A.    **Sorry.  I see business group.**

22    Q.    No, no, no. I'm sorry.  At the end of

23  the --

24    A.    **Oh, I'm sorry.  That's customer service**

25  **order type.**

1          Q.      What does that mean?

2          A.      So customer service is -- same thing,

3     it's all -- those are all part of the warranty,

4     customer service.

5          Q.      Oh.

6          A.      If a customer calls customer service,

7     has to transact a gun being repaired and sent back,

8     it would exclude any of those kinds of order --

9     order types.

10         Q.      And then it says Business group, and it

11    excluded these.  What is that?

12         A.      So it's just telling you that it's

13    commercial sales, it's excluding law enforcement,

14    military, government, international export, and so

15    on.

16         Q.      Okay.  And then if we just go to the

17    next page.  When we look at those categories it

18    kind of lays them out as to even further, like

19    which city it went to, the ZIP code, you know, all

20    of those things, correct?

21         A.      Yes.

22                 MS. GULLIVER:  Objection, form.

23    BY MR. WILLIAMS:

24         Q.      And then if we look at the third page

25    in category H it actually has the date that the

888-893-3767
www.lexitaslegal.com        Exhibit 1 Depletes Dept 50 state and is licensed with a court of 50 Data Registration #3105
California Firm Registration #179        LEXITAS

1    product was shipped, the item number and a

2    description, correct?

3        A.    Yes.

4        Q.    And then the last page just has the

5    serial number, correct?

6        A.    Yes.

7        Q.    And so this is a way that you could see

8    how many handguns -- how many P320 handguns were

9    sold in Missouri to retailers and distributors?

10            MS. GULLIVER:  Objection to form.

11       A.    Commercial.  Commercial retailers and

12   distributors, yes.

13   BY MR. WILLIAMS:

14       Q.    Okay.

15            MS. GULLIVER:  Same objection.

16   BY MR. WILLIAMS:

17       Q.    And just out of curiosity, do you know

18   why the date of April 18 of 2022 is selected?

19       A.    I don't know specifically if that's the

20   date range I was asked to prepare for.

21       Q.    Okay.  If we look at No. 6 -- oh, I'm

22   sorry.  If we look at -- I'm getting too

23   comfortable with you.  You've got just such a nice

24   demeanor.

25            If you look at Exhibit 6, what is

1   this -- how is this chart different than the one we

2   just looked at?

3       A.    I believe this was a first version that

4   we pulled that just had to be -- we had to ask more

5   questions and make sure it was giving -- giving you

6   what you were looking for.

7             This one does not have the customer

8   name, for example, the dealer or distributor it was

9   sent to, so I think we just -- in Exhibit 5 I

10  believe we just expanded our fields to make sure it

11  was giving you the right information.

12      Q.    Okay.  So if I'm short-circuiting this,

13  can I say that Exhibit 5 is a more detailed

14  analysis of the information in Exhibit 6?

15      A.    I believe it is.

16      Q.    Okay.  And I think your prior answer

17  eliminates this category, and -- Matt's finally

18  calling back.  Sorry, I'll put this phone in my

19  pocket.

20            I believe you've already answered this,

21  so I just want to make sure.  The document that we

22  looked at and that information is what you would

23  consider your -- would be the analysis information

24  that you would look at when we're talking about

25  sales and Missouri, correct?

888-893-3767
www.lexitaslegal.com          Exhibit Duplicates Due to statewide use licensed while required by data
California Firm Registration #179          LEXITAS

```
1              MS. GULLIVER:  Objection to form.
2         A.    I don't think the -- I think the answer
3    is not exactly because I -- we don't -- I don't
4    look at information this way.  Just in my analysis
5    I wouldn't look at it by store or by the state, but
6    it's the database we use to analyze data, but I
7    wouldn't look at it this way, no.
8    BY MR. WILLIAMS:
9         Q.    Okay, maybe that's a better way to say
10   it.  If I'm understanding your prior testimony, you
11   don't do a state -- you don't look at a
12   state-by-state analysis of sales on a monthly
13   basis, is that correct?
14        A.    No.
15        Q.    But you have a database that we just
16   looked at that allows you, if you needed to, to
17   refine the sales in a certain state, correct?
18        A.    Yes.  Sales within a retail or a
19   distributor, but not total sales in the state?
20        Q.    Got you.  Or I should say shipments in
21   a state, how's that?
22        A.    Sig's shipments directly into the
23   state.
24        Q.    Okay.  See, you just limited a whole
25   category by giving me that, because that was 18.
```

888-893-3767
www.lexitaslegal.com          All plates are not licensed unless result of real a Registration #179
California Firm Registration #179

1          (Taylor Exhibit 7 was marked for

2          identification.)

3                    MR. WILLIAMS:  I'm going to give you

4     the Bates numbers for these because apparently when

5     they made the copies they didn't -- but this one

6     has it.

7     BY MR. WILLIAMS:

8          Q.     So you have been handed Exhibit 7,

9     which is Bates numbered 157 and 158, and that

10    goes -- that's what starts, and I guess they've cut

11    mine off, too, because there was an attachment when

12    they printed it.  So I know the first two pages are

13    157, 158, and then these are the attachments that

14    follow.

15                    And so if you'd look at Exhibit 7.  Is

16    that an e-mail from Samantha Piatt?

17         **A.     Yes.**

18         Q.     And it's dated 7/28 of '21 at

19    10:22 a.m.?

20         **A.     Yes.**

21         Q.     And this was sent to you?

22         **A.     Yes.**

23         Q.     And some other people?

24         **A.     Yes.**

25         Q.     And it says the attachments are

1  Sig Sauer P320 news articles?

2      **A.      Yes.**

3      Q.      And then below that e-mail is an e-mail

4  for a Gary Wagschal from ABC.com, do you see that?

5      **A.      I do.**

6      Q.      And he is asking certain questions and

7  information related to the news articles, correct?

8      **A.      Yes.**

9      Q.      And then the attachments are just

10  various news articles about P320 and different

11  incidences?

12     **A.      Yes.**

13     Q.      Now, in Mr. Wagschal's message his

14  first sentence talks about that he's a senior

15  producer for ABC, correct?

16     **A.      Yes.**

17     Q.      And that he's working on a story for

18  Good Morning America and Nightline about the Sig

19  P320, correct?

20     **A.      Yes.**

21     Q.      His next sentence says, According to

22  news reports, lawsuits and eyewitness accounts, it

23  is alleged to misfire, that is the pistol is

24  accused of firing on its own without any -- anyone

25  pulling the trigger.  Correct?

1        A.      Yes.

2        Q.      And then in the next paragraph he says

3    that, Attached are a compilation of news articles

4    and TV reports about the alleged problem with the

5    Sig Sauer P320.  Correct?

6        A.      Yes.

7        Q.      And he tells you that, That is the

8    scope of their investigation, and that we are not

9    investigating other guns that are associated with

10   Sig Sauer.  Correct?

11       A.      Yes.

12       Q.      And the next sentence says, These

13   articles and TV reports should give you a clear

14   idea about our news program -- or what our news

15   programs will be about and what material

16   allegations are involving -- what the material

17   allegations are involving the gun that we are

18   investigating.  Correct?

19       A.      Yes.

20       Q.      He says -- next he says, We are

21   currently researching and reporting, but as

22   discussed, in future as we get closer to deciding

23   which alleged victims and other individuals we plan

24   to include in our broadcast pieces, we will give

25   you a timely opportunity to respond to these -- to

888-893-3767
www.lexitaslegal.com        LEXITAS
Exhibit D plates from 50 states and is licensed where required by each Registration #410
California Firm Registration #179

1  their specific allegations.  Correct?

2      A.    Yes.

3      Q.    And the next paragraph asks for a

4  spokesman from Sig Sauer to talk on camera to our

5  respected, fair and experienced ABC's news

6  correspondent David Scott in a television

7  interview, correct?

8      A.    Yes.

9      Q.    Have you had any dealings with David

10 Scott?

11     A.    No.

12     Q.    Have you ever watched any of his news

13 reports to see kind of if he's fair and balanced?

14     A.    Not that I recall.

15     Q.    And then the next to the last sentence

16 says, Please let us know if this on -- if this on

17 camera with David is a possibility, and if so, when

18 that could occur.  We are willing to do the

19 interview at the location and time of your

20 choosing, assuming it works within the production

21 schedule.  Correct?

22     A.    Yes.

23           MS. GULLIVER:  Objection to form.

24 BY MR. WILLIAMS:

25     Q.    Did you ever speak to Mr. Wagschal?

1       A.      No.

2       Q.      Did you ever speak to David Scott?

3       A.      No.

4       (Taylor Exhibit 8 was marked for

5       identification.)

6  BY MR. WILLIAMS:

7       Q.      I'm handing you what has been marked as

8  Exhibit 8.

9               MR. WILLIAMS:  For the record, the

10 first page of the document is Sig 146, and the

11 remainder is just the attachment, but somehow they

12 cut off the number.  This is why you don't let Todd

13 make copies.

14      A.      Okay.

15 BY MR. WILLIAMS:

16      Q.      All right.  Have you had a chance to

17 review Exhibit 8?

18      A.      I have.

19      Q.      This is an e-mail from Ms. Piatt to

20 you, correct, and some others?

21      A.      Yes.

22      Q.      And it's dated 8/17 of '21 at 2:11

23 p.m.?

24      A.      Yes.

25      Q.      And the subject is Media doc/statement,

888-893-3767                        Exhibit reproduction services are licensed where required by law.
www.lexitaslegal.com                        California Firm Registration #179

1   correct?

2          A.     Yes.

3          Q.     And it just starts out, So the result

4   of my meeting with RC this a.m. was the following.

5                 I'm curious about No. 2, and here's my

6   question.  It says, Who are we talking to, and then

7   subsection A, Come up with a grid about how we

8   communicate with various constituencies that we

9   would want to address.  Do you see that?

10         A.     I do.

11         Q.     And then four pages later there's a

12  grid, and the grid is titled Communications

13  Description, correct?

14         A.     Yes.

15         Q.     And my question -- and it kind of lays

16  out some options, correct?

17         A.     Yes.

18         Q.     Is this the standard communication grid

19  that is done if there's some kind of media

20  communication to go out?

21                MS. GULLIVER:  Objection to form.

22         A.     I don't think there's anything

23  standard, I think this is a one-off example of how

24  to address different channels and constituencies.

25  BY MR. WILLIAMS:

888-893-3767    www.lexitaslegal.com    California Firm Registration #179    LEXITAS

Page 57

1      Q.      Okay.  So this isn't a form that's

2    filled out every time there's an incident or issue,

3    this is just something she did for this specific

4    issue, correct?

5      A.      I don't believe the intent was this

6    specific issue, I was thinking what was going on at

7    this time, whether there was one or several issues,

8    I think she was trying to come up with a process

9    that we would have to communicate to different

10    constituencies.

11      Q.      Okay.  Yes, I was just wondering if it

12    was like, Hey, this is the process we use every

13    time, or if this was just a one-off that she came

14    up with.  So thank you very much for that answer.

15      A.      Yes, sir.

16      Q.      And, see, we can move on.

17      A.      Okay.

18      (Taylor Exhibit 9 was marked for

19      identification.)

20    BY MR. WILLIAMS:

21      Q.      I'm going to hand you what has been

22    marked as Exhibit 9.

23      A.      Okay.

24      Q.      Okay, this is a message on -- I'm

25    sorry.  This is an e-mail from Kyle Reyes, correct?

1      A.      Yes.

2              MR. WILLIAMS:  And I'm sorry, it's

3  document No. 141 and 142, Sig Glasscock 141 and

4  142.

5  BY MR. WILLIAMS:

6      Q.      And this is to you and some other

7  individuals, correct?

8      A.      Yes.

9      Q.      Who is Kyle Reyes?

10      A.      **He's a media member and a marketing**

11  **agency owner.**

12      Q.      And in 2021 did Sig have a contract

13  with Mr. Reyes?

14      A.      No.

15      Q.      Has Sig hired Mr. Reyes in any capacity

16  to do marketing or...

17      A.      No.

18      Q.      And I know it says that he's the

19  national spokesman Law Enforcement Today; president

20  and CEO, The Silent Partner?

21      A.      Yes.

22      Q.      Has Sig had any contracts with The

23  Silent Partner?

24      A.      **No formal contracts, no.**

25      Q.      What do you mean formal contract?

888-893-3767
www.lexitaslegal.com                 Digital Depositions and all legal services are provided without regard to race, creed, or national origin.
                                     California Firm Registration #179                                      LEXITAS

1       **A.      No contracts with them.**

2       Q.      And does Sig advertise with them or

3   something?

4       **A.      No.  Well, The Silent Partner is not a**

5   **media outlet, that's a marketing agency.**

6       Q.      Thank you.  Is the Law Enforcement

7   Today, is that a media outlet or is that --

8       **A.      That's a media outlet.**

9       Q.      Okay.  Does Sig advertise with Law

10  Enforcement Today?

11      **A.      No.**

12      Q.      Okay.  The to is to Patrick Droney?

13      **A.      Yes.**

14      Q.      Does Sig have a relationship with

15  Mr. Droney?

16      **A.      No.**

17      Q.      And if I could summarize this e-mail,

18  it's Mr. Reyes introducing Mr. Droney to you and a

19  few others at Sig, correct?

20      **A.      Yes.**

21      Q.      Do you know if Mr. Droney ended up

22  writing an article or collaborating with Sig on an

23  article?

24          MS. GULLIVER:  Objection to form.

25      **A.      I believe he did write an article, but**

888-893-3767
www.lexitaslegal.com                Lexitas Del plates in all 50 states and is licensed where required by law.
                                          California Firm Registration #179                LEXITAS

1    he did not specifically collaborate with us.

2    BY MR. WILLIAMS:

3        Q.    What do you mean he didn't collaborate

4    with Sig?

5        A.    To my knowledge, we never had any

6    formal communications with him about the article,

7    about any articles that he wrote.

8        Q.    Did you ever -- did you or anyone on

9    behalf of Sig meet with Mr. Droney?

10       A.    No.

11       Q.    Did you -- did Sig ask Mr. Reyes to

12   make this introduction?

13       A.    This communication was generated from a

14   conversation I had with Kyle Reyes, and he was

15   concerned about the allegations being made and

16   asked if Law Enforcement Today can help.  That was

17   the -- that was the context of this document.

18       Q.    Okay.  Got you.  So you were

19   acquaintances with Mr. Reyes?

20       A.    Yes.

21       Q.    And during a communication Mr. Reyes

22   decided to make this introduction?

23       A.    Yes.

24       Q.    And you didn't solicit -- you -- Sig,

25   you, on behalf of Sig or Sig did not solicit

888-893-3767
www.lexitaslegal.com                     These transcripts are licensed to be used within the State of Nevada Registration #110
                                         California Firm Registration #179

LEXITAS

1    Mr. Reyes to get an introduction to Pat Droney so

2    he could help you?

3        **A.      No.**

4        Q.     Okay.

5        (Taylor Exhibit 10 was marked for

6        identification.)

7    BY MR. WILLIAMS:

8        Q.    I'm handing you what has been marked as

9    Exhibit 10.

10            MR. WILLIAMS:  For the record, this is

11    Sig Glasscock 128, 129, and the attachment that has

12    the -- the attachment to the e-mail that has the

13    numbers off the edge.

14       **A.      Okay.**

15            (Discussion off the record.)

16            MR. WILLIAMS:  Sorry, we're just

17    coordinating so that we try to not impinge upon

18    your day.  I understand you're a busy man and I

19    don't like to impinge upon people's day any more

20    than I have to.

21       **A.      All good.**

22    BY MR. WILLIAMS:

23       Q.    I've handed you what has been marked as

24    Exhibit 10.

25       **A.      Yes.**

1      Q.      Exhibit 10 appears to be an e-mail from

2   you to a Mr. Jason Vincent, correct?

3      **A.      Yes.**

4      Q.      And that was on 8/28 of '21?

5      **A.      Yes.**

6      Q.      And who is Jason Vincent?

7      **A.      He's a media member.**

8      Q.      Is he a writer, or is he --

9      **A.      I believe specifically he's an editor,**

10   **but, yes, similar vein.**

11     Q.      And who is he an editor for?

12     **A.      Field Ethos magazine.**

13     Q.      What is Field Ethos, if you know?

14     **A.      It's an outdoor magazine, hunting,**

15   **shooting.  I believe they -- I think they actually**

16   **get into fishing and some other things like that,**

17   **but it's an outdoor publication.**

18     Q.      And here you have -- you forwarded him

19   the ABC statement and a few postings by PEO Soldier

20   and Picatinny Arsenal, correct?

21     **A.      Yes.**

22     Q.      Is Field Ethos one of the magazines or

23   brands that you advertise with?

24     **A.      We were advertising with them at that**

25   **time, we don't any longer.**

888-893-3767
www.lexitaslegal.com
Exhibit Duplicates Dual 50 states and is licensed with the courts of Nevada Registration #310F
California Firm Registration #179

LEXITAS

1    Q.    And do you recall why you sent him this

2  information?

3    A.    I believe we had a conversation, and as

4  you see, it says -- it says, Great to catch up with

5  you on so many fronts yesterday.  So we would have

6  talked about what was going on with the ABC News

7  and so forth.

8    Q.    Okay.  But you weren't asking him to

9  write an article or do any advertising related to

10  the response to these stories, is that correct?

11    MS. GULLIVER:  Objection to form.

12    A.    I believe as just in my normal course

13  of doing my job and talking with media members, a

14  lot of them had reached out to us and said, Hey,

15  what's going on with this?  And I would have filled

16  them in and, you know, some said, Can we help, can

17  we write a story about this, whatever, we're going

18  to try to get your point of view out.  So there

19  were -- he would have been one of those kind of

20  conversations that I would have had.

21  BY MR. WILLIAMS:

22    Q.    Okay.  Do you know if Field Ethos did

23  an article getting out Sig's point of view?

24    A.    I don't recall exactly, but I do not

25  believe they did.

888-893-3767
www.lexitaslegal.com                Exhibit D plates in all 50 states and is licensed where required.  Nevada Registration #410F.
California Firm Registration #179

LEXITAS

1     Q.     And other than an article do you recall

2  if they did any kind of Facebook or social media

3  post trying to get out Sig's position?

4     A.     I don't.

5     Q.     In that same document --

6     A.     Sorry.

7     Q.     Oh, no, no.  I remembered a question.

8  It talks about, if you go down four written

9  paragraphs that starts with, Lastly?

10    A.     Yes.

11    Q.     Please see the info below regarding the

12 SERPA holster the female officer from the ABC

13 report used.  Then it says -- did I read that

14 accurately?  Sorry.

15    A.     Yes.

16    Q.     It says, The one she said nothing could

17 get in the trigger guard as she demonstrated how it

18 could.  This is completely -- this is a completely

19 different issue that could come into play.  What

20 did you mean by that?

21    A.     So in the video on ABC News when she

22 was showing the gun in the holster, she held it up

23 and she said, There's no way anything can get in

24 this holster, as she took her finger and slid in

25 the holster.  So she said it wouldn't do it, and

1    then she demonstrated on the -- if you watch the

2    interview, she actually slid her finger in the

3    holster, so she demonstrated that something could

4    go in the holster as she was saying it couldn't.

5    So I was just pointing out that that was -- she was

6    contradicting herself in the interview.

7         Q.    And was it Sig Sauer's position that

8    this SERPA holster is what caused the unintended

9    firing of the gun?

10        A.    No, I don't think it was -- that wasn't

11   our -- we never said the SERPA holster caused it.

12   Our position was the SERPA holster has an opening

13   that would allow for something to get into the --

14   inside the holster and have access to the trigger

15   guard just if you look at the design of the SERPA

16   holster.

17             So our suggestion was that it could

18   have been a reason for something getting inside the

19   trigger guard and pressing the trigger, as opposed

20   to the gun going off by itself, which was the

21   allegation.

22        Q.    Because the next one, it said, We

23   learned of many departments and agencies that have

24   banned the use of this holster.  That's why I was

25   asking.

888-893-3767
www.lexitaslegal.com    Lexitas Deposes Duty 50 states and is licensed where required by law.    File: Production 05/24/24 Registration #616 of
California Firm Registration #179    LEXITAS

1    **A.    Yes.  It is a holster, because of that**

2   **gap in the holster, it has been banned by a number**

3   **of agencies, they don't like that -- they don't**

4   **like the style of this particular holster.**

5        Q.    And then the next thing says,

6   Interestingly we had a manager in our HR department

7   out to dinner last night in a local restaurant and

8   she heard a gun discharge in the restaurant.  It

9   was a Glock 43 in a purse.

10       **A.    Yes, I see it.**

11       Q.    Do you remember who that HR manager

12  was?

13       **A.    I don't.**

14       Q.    And you say -- the next sentence says,

15  Here's another story similar to many of the claims

16  against Sig, a Glock 43 discharging in a Walmart

17  store.

18       **A.    Yes.**

19       Q.    Finally at the bottom it says, This is

20  not a gun problem, it's a people problem.  Correct?

21       **A.    Yes.**

22       Q.    Let me know if you need any other

23  information about cops stating, My gun magically

24  went off, close quote.  What did you mean by that?

25       **A.    So the first portion I think was just**

888-893-3767
www.lexitaslegal.com

Lexitas is licensed in all 50 states and is a Registered Court Reporting Firm in the states of California, New York, Texas, and Virginia.
California Firm Registration #179

LEXITAS

Case 3:22-cv-03095-MMC   Document 101   Filed 06/04/24   Page 67 of 126

1    referring to the fact that it's -- you know, this

2    is a Glock, it's another example of another

3    manufacturer's gun went off in a purse or whatever.

4    And then same thing, when the sheriff's gun goes

5    off in a Walmart store that was also a Glock.

6              So when you look at a lot of these

7    cases I think there seems to be issues where there

8    could have been other things at play as opposed to

9    a gun going off by itself.

10        (Taylor Exhibit 11 was marked for

11        identification.)

12   BY MR. WILLIAMS:

13        Q.    I am going to hand you what has been

14   marked as Exhibit 11.  This is Sig Glasscock

15   000104.

16              MS. GULLIVER:  After this document can

17   we take a short break and then we can do the --

18              MR. WILLIAMS:  Sure.

19              MS. GULLIVER:  Another big --

20              MR. WILLIAMS:  Yeah.  Yeah, I

21   literally -- I think there are probably eight more,

22   and then we're done.

23        A.    Okay.

24   BY MR. WILLIAMS:

25        Q.    This is an e-mail from Douglas Amato to

Exhibit Duplicates are not to be stated.  Ds licensed within the court of Nevada.  Registration #310.
www.lexitaslegal.com        California Firm Registration #179        LEXITAS

1    you, correct?

2         A.      Yes.

3         Q.      Who is Douglas Amato?

4         A.      **He's a quality engineer in the company.**

5         Q.      And he's a Sig Sauer employee?

6         A.      Yes.

7         Q.      I should have just asked it that way.

8    Sometimes we are too technical in our own brains.

9    And who is Ed Murphy?

10        A.      **Ed Murphy is our vice president,**

11   **quality control.**

12        Q.      He says that, Talked with Ed Murphy

13   this morning, he mentioned you are involved in

14   getting the word out about the P320 can't fire

15   without the trigger being pulled.

16              Did I read that accurately?

17        A.      Yes.

18        Q.      Next sentence.  I have noticed some

19   common threads with the P320 firing on their own

20   incidents.

21              Did I read that accurately?

22        A.      **Yeah, just a note though that firing on**

23   **its own is in quotes, so --**

24        Q.      Oh, yeah.

25        A.      **Just...**

888-893-3767
www.lexitaslegal.com                Lexitas LLC operates in all 50 states and is licensed where required by law.
California Firm Registration #179                  Lexitas

1       Q.      The next sentence is the one I'm

2   interested in.  The ones I read about that had

3   details or a good photo, these all were using the

4   Blackhawk SERPA holster.

5       A.      Yes.

6       Q.      What was -- do you know what issue

7   there could have been with the Blackhawk SERPA

8   holster that was causing the P320 to discharge?

9       **A.      That's what I was saying previously**

10  **with the Hilton, that these SERPA holsters, and in**

11  **particular it's typically referring to law**

12  **enforcement holsters that have a light.**

13      Q.      I'm sorry, that have a what?

14      **A.      A flashlight on the gun.**

15      Q.      Oh, flashlight.  Thank you.

16      **A.      So it's wide, so to put the gun in the**

17  **holster, it has to have a wider opening at the top**

18  **of the holster which creates a gap.  And the**

19  **Blackhawk SERPA holsters were known for having an**

20  **extraordinarily wide gap.**

21              **So when it's in its holster while the**

22  **trigger guard is covered, it's certainly open at**

23  **the top so that fingers or other objects are known**

24  **to be able to slide down into that opening and have**

25  **access to the trigger.**

888-893-3767
www.lexitaslegal.com                Exhibit D plates Duell 50 states and DC licensed with the court of Nevada Registration #010F.
                                    California Firm Registration #179        LEXITAS

1       Q.      So the Blackhawk SERPA holster in this

2  exhibit is the same as the SERPA holster here,

3  that's just not -- is the -- let me try it this

4  way.

5              You talked to me about the SERPA

6  holster and the female officer, correct?

7       **A.      Yes.**

8       Q.      And this one is called a Blackhawk

9  SERPA holster.  Are those two different designs of

10  the SERPA holster, or is it the same thing?

11      **A.      Blackhawk is the manufacturer.  It'd be**

12  **like saying Sig Sauer P320.  So it's a Blackhawk**

13  **SERPA.**

14      Q.      Okay, thank you.  I was like, well, are

15  they different?  That makes sense.

16              We're going to take a short break, and

17  then hopefully I'm going to get you out of here

18  within the next hour.

19      **A.      Okay.**

20              THE VIDEOGRAPHER:  Off the record,

21  11:01.

22                  (Recess taken.)

23              THE VIDEOGRAPHER:  We're back on the

24  record 11:11, Media No. 4.  Please proceed.

25  BY MR. WILLIAMS:

1      Q.     You understand that you're still under

2  oath, correct?

3      A.     I do.

4  (Taylor Exhibit 12 was marked for identification.)

5  BY MR. WILLIAMS:

6      Q.     I am going to hand you what has been

7  marked as Exhibit 12, and that is document Sig

8  000224 through -- 24 through 26.

9      A.     Okay.

10     Q.     If you go to the second page, which is

11 Sig Glasscock 00025, it's an e-mail from Harris

12 Elhan, E-L-H-A-N, from Blackstone West to Samantha

13 Piatt, correct?

14     A.     Yes.

15     Q.     And it's from January 11th of 2023,

16 correct?

17     A.     Yes.

18     Q.     And it's about the Sig 320, is the

19 subject?

20     A.     Yes.

21     Q.     In that e-mail that was forwarded to

22 Ms. Piatt is another e-mail that is just on the --

23 from Evan's Gun World company page to Harris Elhan,

24 correct?

25     A.     Yes.

www.lexitaslegal.com          Lexitas Deposes U.S. in all 50 states and is licensed where required by law.   California Registration #179
888-893-3767          California Firm Registration #179          LEXITAS

1      Q.      And is Blackstone Market -- Marketing,

2  is that one of the companies that Sig uses for

3  marketing?

4      **A.      No, it's actually a sales rep**

5  **organization.  Harris Elhan was a sales rep for**

6  **Sig, so a sales rep organization is what Blackstone**

7  **Marketing is.**

8      Q.      Okay.  Tell me what you mean when you

9  say sales rep organization.

10     **A.      They call on our customers.**

11     Q.      So do you have an individual contract

12 with Harris Elhan, or is there a contract with

13 Blackstone Marketing?

14     **A.      Blackstone.**

15     Q.      Okay.  And he's just one of the

16 employees?

17     **A.      Yes.**

18     Q.      Okay.  And in this e-mail Evan's Gun

19 World, the last sentence of the second paragraph

20 says, After consulting with our attorney, we have

21 decided to shelve all Sig 320 and not sell or

22 transfer until we get clarification from Sig.  Do

23 you see that?

24     **A.      I do.**

25     Q.      And then if we go to the first page,

888-893-3767
www.lexitaslegal.com                   Lexitas Deposes in all 50 states and is licensed where required by law.
                                       California Firm Registration #179

1    Samantha Piatt is sending to you and Jack Barnes

2    some draft language, correct?

3        A.    Yes.

4        Q.    And that was on Thursday, January 12th

5    of 2023 at 12:38 a.m. correct?

6        A.    Yes.

7        Q.    In her second sentence it says, Tom,

8    this is all language from the plug-and-play

9    document.  Do you see that?

10       A.    I do.

11       Q.    I also included the video that we just

12   posted.  Correct?

13       A.    Yes.

14       Q.    What is the plug-and-play document?

15       A.    I believe what she's referring to there

16   would be a document that we had already approved

17   internally for use, making a statement about the

18   P320.

19       Q.    Did you have plug and play documents

20   for other guns?

21       A.    It would totally depend on the

22   circumstances.

23       Q.    Can you think of any other firearm

24   other than the P320 that you had a plug-and-play

25   document for?

1          MS. GULLIVER:  Objection to form.

2     Objection beyond the scope.  You can answer in your

3     personal capacity.

4          A.     Yeah, if there was -- were any issues

5     with a gun, we would have collaborate --

6     collaboratively written a document and all approved

7     it to use it, you know, to say, Okay, it's -- if we

8     get an inquiry from a media outlet or a customer

9     such as this, it would be a document we can send it

10    out.

11              So, for example, if the Cross rifle had

12    a recall at one time, we had a document we could

13    send out to explain what that recall was about,

14    that sort of thing.  So there were other guns that

15    had documents that would have been approved in that

16    capacity.

17    BY MR. WILLIAMS:

18         Q.     So your example of a plug-and-play

19    document would be one for the Cross rifle?

20         A.     I'm not -- I'm just saying it's just a

21    generalization.  Plug and play, she could have said

22    form letter, she could have said a lot of things.

23    I think she's just -- there was no formal term plug

24    and play, I think she was just referring to an

25    approved document.

1     Q.     Right.  And I guess my question was can

2   you think of any other gun other than the P320 that

3   you've had a form letter or a plug-and-play

4   document for?

5            MS. GULLIVER:  Objection, beyond the

6   scope.  You can answer in your personal capacity.

7     **A.     As I made the example of, we would have**

8   **had a statement for an issue we had with our Cross**

9   **rifle, that we would have had a document which we'd**

10  **have sent out in the same fashion.  So the answer**

11  **to your question is yes.**

12  BY MR. WILLIAMS:

13    Q.     Okay.  So, yes, the Cross one had a

14  plug and play or standardized letter?

15    **A.     Yes.**

16    (Taylor Exhibit 13 was marked for

17    identification.)

18  BY MR. WILLIAMS:

19    Q.     I'm handing you what has been marked as

20  deposition Exhibit 13.

21    **A.     Okay.**

22    Q.     This is a document dated March 24th of

23  2023, correct?

24    **A.     Yes.**

25    Q.     And it is addressed to Champe Barton

1    and Tom Jackson, correct?

2         A.      **Jackman, yes.**

3         Q.      I'm sorry, Jackman.  And there it says,

4    The Washington Post/Trace -- The Trace?

5         A.      Yes.

6         Q.      Is The Trace a part of the Washington

7    Post?

8         A.      **Yes, it's a subsidiary company of the**

9    **Washington Post.**

10        Q.      Okay.  Well, I just wondered because

11   they were at the same address.

12        A.      Yes.

13        Q.      And this says this is the Sig response

14   to an inquiry re the P320, correct?

15        A.      Yes.

16        Q.      And earlier we talked about a story

17   that ABC was investigating, correct?

18        A.      Yes.

19        Q.      Was this separate and apart from the

20   ABC --

21        A.      Yes.

22        Q.      -- story?

23        A.      Yes.

24                MR. WILLIAMS:  And then the page

25   numbers for that document were 255 and 256.

888-893-3767
www.lexitaslegal.com

Exhibit B relates to all 50 states and is licensed with the court order 5/24/24
California Firm Registration #179

**LEXITAS**

1          (Taylor Exhibit 14 was marked for

2          identification.)

3     BY MR. WILLIAMS:

4          Q.     I'm handing you what has been marked as

5     Exhibit 14.  Exhibit 14 are documents numbered 257

6     through 259.

7          A.     Okay.

8          Q.     Okay.  On Exhibit 14 the very last

9     page, which is Bates labeled 259, Ms. Piatt is

10    forwarding the Sig Sauer reply that we -- that was

11    marked as Exhibit 13.  Do you see that?

12              MS. GULLIVER:  Objection, form.

13         A.     So the only thing I don't know is that

14    letter that was sent to them also had -- I think

15    there were other documents that were sent that I

16    didn't see in your attachment, but that's the only

17    thing I would just clarify.

18    BY MR. WILLIAMS:

19         Q.     I'm sorry?

20         A.     That's not -- that was not the only

21    thing sent to the Washington Post and The Trace, we

22    sent them a lot of documentation about 320 cases,

23    so they had a pretty significant set of documents

24    supporting our information about the P320.  So I'm

25    just saying in this context I don't know if it's

888-893-3767
www.lexitaslegal.com
Exhibits Duplicates Deal 50 states and is licensed where required by law.
California Firm Registration #179
Registration #310

LEXITAS

1    referring to that letter or another communication

2    that we had sent to them with information.  So

3    that's my only -- I just want to be clear that I

4    can't assume which one it's referring to.

5         Q.     Okay.  If you look at Exhibit 13, the

6    Re line of that is Sig Sauer response to inquiry re

7    P320, correct?

8         A.     Yes.

9         Q.     And if you look at that document,

10   there's nothing that shows that there was an

11   attachment to it, correct?

12        A.     This?

13        Q.     No.  On Exhibit 13, sorry.

14        A.     This would probably -- this would have

15   been an attachment to an e-mail, I assume.  I'm not

16   sure I understand your question.

17        Q.     Right.  There's nothing on 13 that

18   shows that there were any other documents attached?

19        A.     True.  Yes, true.  True statement.

20        Q.     And then when you look at the e-mail of

21   March 30th -- sorry, get back to that page -- of

22   March 24th of 2023, do you see that?

23        A.     Yes.

24        Q.     Mrs. Piatt's e-mail to -- it's an

25   e-mail from Ms. Piatt to Mr. Jackman and

888-893-3767
www.lexitaslegal.com                 Exhibit Duplicates Dupl. 50 states and DC licensed with the court of Nevada Registration #161
California Firm Registration #179                                          Lexitas

1    Mr. Barton, correct?

2         A.    Yes.

3         Q.    And it says, Mr. Jackman plus Barton,

4    See attached reply to your inquiry.  Please kindly

5    confirm receipt of our reply.  Correct?

6         A.    Yes.

7         Q.    And then you get, on March 27th of

8    2023, which is on page 258, a reply from Tom

9    Jackman to her e-mail, correct?

10        A.    Yes.

11        Q.    And then on the 28th Ms. Piatt responds

12   to Mr. Jackman and Mr. Barton asking for, hey,

13   what's the deadline, correct?

14        A.    Yes.

15        Q.    And then on the first page, which is

16   what I'm interested in, there's an e-mail from

17   Barton Champe, C-H-A-M-P-E, on Thursday, March 30th

18   of 2023 to Tom Jackman and Samantha Piatt, correct?

19        A.    Yes.

20        Q.    And in the body of it it says, Hi,

21   Ms. Piatt, following up with two additional notes.

22   And the last sentence has a quote, or the

23   next-to-the-last sentence, starts with, He said,

24   regarding -- or actually, I'll just read the whole

25   thing.

1          The next it says, In the past week we

2    spoke with Bill Lewinski, an expert in accidental

3    shootings and executive director of the Force

4    Science Institute.  He said regarding the reports

5    of injuries with P320, The number and frequency of

6    injuries are strongly suggestive of a design flaw

7    versus a human performance error.  What we're

8    seeing is highly unusual.

9          And it's, quote -- I guess it's in

10   quotation marks from before the word the, and after

11   the word unusual.  Do you see that?

12        A.    Yes.

13        Q.    Did you ever have any communications

14   with Mr. Lewinski?

15        A.    No.

16        Q.    Do you know who Mr. Lewinski is?

17        A.    No.  Other than what it says in the

18   document here, executive director of the Force

19   Science Institute.

20        Q.    Hum?

21        A.    I don't know who he is other than what

22   it says who he is here, that's all I'm saying.

23        Q.    Oh.  I was -- I'm like, what did I

24   miss?  Okay, you mean -- and just to be clear, you

25   mean that in the document or in this e-mail

888-893-3767
www.lexitaslegal.com                Lexitas is duly licensed where required by law                LEXITAS
                    California Firm Registration #179

1    Mr. Lewinski's title is listed as expert in

2    accidental shootings and executive director of

3    Force Science Institute, correct?

4            MS. GULLIVER:  Objection to form.

5        A.    Yes.

6    BY MR. WILLIAMS:

7        Q.    You haven't had any -- or maybe you

8    have.  Had any communications with the Force

9    Science Institute?

10       A.    No.

11       Q.    So you weren't saying that you've --

12       A.    No, I was just saying --

13       Q.    -- dealt with him?

14       A.    You said I didn't know what he did or

15   something, and I said, I can only know what he did

16   by what it says in this e-mail.

17       Q.    Got you.  I heard something else.

18       A.    Sorry.

19       Q.    Because I was thinking of my next

20   question or moving on, and you said something about

21   the Force Science Institute, I'm like, wait, you've

22   been there?  Okay, let's talk about it.  So I

23   apologize, you probably said that and I just didn't

24   hear.

25            Do you know what the Force Science

888-893-3767
www.lexitaslegal.com    All Deponents are licensed where required by law
California Firm Registration #179    Exhibit 1, Florida Registration #210, Page 82 of 126    LEXITAS

1    Institute is?

2         A.    I don't.

3         (Taylor Exhibit 15 was marked for

4         identification.)

5    BY MR. WILLIAMS:

6         Q.    Keep that out, because here is

7    Exhibit 15.

8              MR. WILLIAMS:  And for the record, this

9    is Sig 250 through 254.

10   BY MR. WILLIAMS:

11        Q.    And so if you look at Exhibit 14, when

12   Ms. Piatt responds on 3/30 at 4:46 she says,

13   Please -- please see attached for the response to

14   your follow-up.  Please confirm receipt.  Do you

15   see that?

16        A.    I do.

17        Q.    And the reason I'm doing it in this

18   record is because that's the way they were

19   produced.  As you'll see, the numbers are

20   sequentially -- they were produced in sequential

21   order, but this 250 is dated March -- or

22   Exhibit 15 --

23        A.    Yes.

24        Q.    -- is dated March 30 of 2023, correct?

25        A.    Yes.

1    Q.    And it says it's the Sig Sauer Further

2    Response to Inquiry?

3    A.    Yes.

4    Q.    And if you just flip through that, does

5    this contain the additional information you were

6    talking about earlier, or that you mentioned

7    earlier you thought was in your response?

8    **A.    Yes, I believe this is the additional**

9    **information I was referring to.**

10    Q.    Okay.  Now, this document addresses

11    certain questions that were raised in the e-mail by

12    either Mr. -- either Mr. Barton or Mr. Jackman,

13    correct?

14    A.    Yes.

15    Q.    Do you know if this document or

16    information was shared with anyone other than in

17    response to the request of Mr. Barton and

18    Mr. Jackman?

19    **A.    No.**

20    Q.    And were you involved in drafting of

21    this document?

22    **A.    Yes.**

23            (Discussion off the record.)

24    (Taylor Exhibit 16 was marked for

25    identification.)

Lexitas Draft Copy is not certified transcript

888-893-3767   Exhibit Database licensed in all 50 states and is licensed with product of Nevada Registration #1 of   LEXITAS

www.lexitaslegal.com                    California Firm Registration #179

1    BY MR. WILLIAMS:

2        Q.      I'm handing you what has been marked as

3    Exhibit 16.

4        **A.      Are we moving on from these?**

5        Q.      Yeah.

6        **A.      Okay.**

7        Q.      I will say if there's more you want to

8    talk about, let's do it.

9        **A.      No.  All good.**

10       Q.      Okay.  Let me know when you've had a

11   chance to review Exhibit 16.

12       **A.      Okay.**

13       Q.      Now, this is from you to Ron Cohen,

14   correct?

15       **A.      Yes.**

16       Q.      Dated April 13 of 2023, correct?

17       **A.      Yes.**

18       Q.      Who is Ron Cohen?

19       **A.      CEO at Sig Sauer.**

20       Q.      And the subject states, DRAFT

21   Statement/Docs.  Correct?

22       **A.      Yes.**

23       Q.      First sentence says, Forgot to mention

24   that Sig and the P320 was part of Stephen Colbert's

25   opening monologue last night on national TV.

888-893-3767
www.lexitaslegal.com        Lexitas Delivers Depositions in all 50 states and is licensed where required by law.
California Firm Registration #179

1    Correct?

**2**        **A.      Yes.**

3        Q.      I know that he is an antigun idiot, but

4    this is hitting about as hard as anything we've

5    seen.

6             Did I read that accurately?

**7**        **A.      Yes.**

8        Q.      This is all vetted by Shawver,

9    S-H-A-W-V-E-R --

**10**       **A.      Yes.**

11       Q.      -- Rob, and all three main Clark-Hill

12   guys, (Nick, Howard and Joe).

13            Did I read that accurately?

**14**       **A.      Yes.**

15       Q.      And then it has, Here's our statement

16   without documents.  And here's a statement to use

17   with documents attached.  Correct?

**18**       **A.      Yes.**

19       Q.      What makes Stephen Colbert an antigun

20   idiot?

**21**       **A.      Well, I think he's pretty widely**

**22   documented as antigun, I think that's just part of**

**23   his position, and the idiot piece is just my**

**24   personal, you know, slam to him, I guess.**

**25            I'm just not a fan at all of any of his**

1    humor, so it's -- introduced that term.  So I don't

2    think the antigun and idiot are necessarily meant

3    to go together.  That's more of my interpretation

4    of Stephen Colbert.

5         Q.    Because someone takes an antigun stance

6    doesn't make them an idiot, correct?

7         A.    Absolutely not.

8         Q.    There can be intelligent people that

9    aren't -- that are antigun, and are unintelligent

10   people that are antigun, correct?

11        A.    100 percent.

12        Q.    Just like there can be pro-gun people

13   that are intelligent and there can be pro-gun

14   people that are idiots?

15        A.    Very much so.

16        (Taylor Exhibit 17 was marked for

17        identification.)

18   BY MR. WILLIAMS:

19        Q.    You have been handed what is

20   Exhibit 17, which is documents 218 and 219 from the

21   Sig Glasscock production.

22        A.    Okay.

23        Q.    This is an e-mail from Samantha Piatt

24   on April 13th of 2023 to Steve Rose, correct?

25        A.    Yes.

1         Q.      And I believe you were also a

2    recipient.   Who is Steve Rose?

3         **A.      He is executive vice president of our**

4    **defense sales team.**

5         Q.      And in the e-mail it says that, Below

6    are the items that you requested to handle the

7    inquiries coming into your team from the field

8    relative to the Washington Post/Trace article.

9              Please do not release this to your team

10   until Tom has given the all clear, just a final set

11   of eyes to check my work.   If there's something I

12   missed in your request, let me know.

13             Did I read that accurately?

14        **A.      Yes.**

15        Q.      Was Sig getting a lot of requests for

16   information related to the Washington Post and The

17   Trace article?

18        **A.      I wouldn't -- I don't know if I'd**

19   **classify it as a lot, but we did get inquiries.**

20        Q.      And were those specifically coming from

21   the government side?

22             MS. GULLIVER:   Objection, beyond the

23   scope.   You can answer in your personal capacity.

24        **A.      No, they were coming from other --**

25   **all -- a number of sources.**

BY MR. WILLIAMS:

     Q.     Well, you said Mr. Rose is on the
government side, correct?

     A.     **Yeah, yes.**

     Q.     And was he asking for this letter as
part of -- we talked about how sometimes you put
out your position to combat what you believe is
misinformation, correct?

     A.     **Yes.**

     Q.     And that information comes from the
marketing department, correct?

     A.     **Yes.**

     Q.     And --

     A.     **Among others.**

     Q.     What others?

     A.     **Marketing department, legal department,
approved by our CEO and so forth.  So there's
others involved in -- besides just marketing.**

     Q.     Okay.  And Mr. Rose reached out to
Ms. Piatt in her official capacity, correct?

     A.     **Yes.**

     Q.     And what is her official capacity?

     A.     **Director of communications.**

     Q.     And you approved this communication,
correct?

Case 3:23-cv-03099-MMC   Document 46-1   Filed 05/24/24   Page 89 of 126

 1      A.      At this time I don't know if it was

 2   finally approved because it says it was waiting for

 3   my approval.  So I can't recall exactly if it

 4   was -- if it was approved like this or if there

 5   were any changes to it.  So, as she said, it was

 6   awaiting my approval, so...

 7        (Taylor Exhibit 18 was marked for

 8        identification.)

 9   BY MR. WILLIAMS:

10      Q.      You have been handed what is marked as

11   Document -- Exhibit 18, correct?

12      A.      Yes.

13      Q.      And it is Sig Glasscock Exhibit 4 --

14   I'm sorry, Sig Glasscock 0000004.  Correct?

15      A.      I can't see that, but --

16              MS. GULLIVER:  Yeah, it's not --

17              MR. WILLIAMS:  Oh.

18   BY MR. WILLIAMS:

19      Q.      Okay.  I will represent that the

20   document is 000 -- a lot of 0s and a 4.

21      A.      Yes.

22      Q.      And this is -- at least it appears to

23   be an e-mail from Samantha Piatt to Steve Young, is

24   that correct?

25      A.      Yes.

888-893-3767
www.lexitaslegal.com          Exhibit Plates D-of-50 states and is licensed where required by law.   Registration No. 0 ...
                              California Firm Registration #179          LEXITAS

1      Q.      Who is Steve Young?

2      **A.      He's a sales rep.**

3      Q.      And it also CCs Jack Barnes and

4  yourself, correct?

5      **A.      Yes.**

6      Q.      And in it she says, Steve, per our

7  conversation, the following text is approved for

8  you to send along with the attachments.  Correct?

9      **A.      Yes.**

10      Q.      And this appears to be the statement

11  that we talked about in the last exhibit?

12      **A.      Without comparing it side by side, I**

13  **can't say for certain.**

14      Q.      And I will --

15      **A.      It is -- it is a bit different.**

16      Q.      Yeah.  I will agree with you that if

17  you look at the documents where it says on

18  Exhibit -- there are certain -- while the main

19  paragraphs are different, the headings are

20  different and then there is something added above

21  the -- or below the, We invite, there's another

22  sentence added to that paragraph and then another

23  sentence, but in essence they're pretty similar?

24          MS. GULLIVER:  Objection to form.

25  BY MR. WILLIAMS:

888-893-3767
www.lexitaslegal.com          Exhibit D Plates D-1 50 states and DC licensed where required 05/24/24 Registration #116
California Firm Registration #179          LEXITAS

1     Q.     Can we go with similar?

2            MS. GULLIVER:  Objection to form.

3     **A.     They're similar, but that's why I**

4  **questioned it before because they are -- you know,**

5  **when I said I don't know whether this one was**

6  **approved, because they are -- there are differences**

7  **in them, but yeah.  So they're similar documents.**

8  BY MR. WILLIAMS:

9     Q.     Yeah.  And that's what's called a

10 lawyer being lazy because I looked at it and said,

11 Oh, yeah, he approved it.

12            So similar statements, but not exactly?

13 **A.     Yes.**

14            MR. WILLIAMS:  What was that last

15 number?

16            MS. GULLIVER:  18.  Now it should be

17 19.

18            MR. WILLIAMS:  We should be done in

19 about three exhibits or so.

20     (Taylor Exhibit 19 was marked for

21     identification.)

22 BY MR. WILLIAMS:

23     Q.     I'm handing you what has been marked as

24 Exhibit 19.  And on my version is documents Sig

25 Glasscock 12, 13, 14, and then an attachment that

1   doesn't have the Bates numbers on it.  But I

2   believe that attachment is one we've already

3   discussed.

4        A.    Okay.

5        Q.    Now, does this appear to be an e-mail

6   that's being sent to forward a customer concern

7   from Bass Pro?

8        A.    Yes.

9        Q.    And then on the first page Jack Barnes

10  on April 17 forwards it to you and some others and

11  says, I would think that Bass should direct

12  customers to Sig customer service so they can use

13  the talking points and possible -- and possibly

14  talk them out of the return.  Correct?

15            MS. GULLIVER:  Objection to form.

16       A.    Yes.

17  BY MR. WILLIAMS:

18       Q.    And then Chris Meyer responds on 4/17

19  at 11:27 a.m., correct?

20       A.    Yes.

21       Q.    And he says, This being said, our

22  current verbiage doesn't directly attack the WaPo

23  points.  Can I have the green light to use the full

24  statement that we sent WaPo in official capacity

25  attached?  Correct?

1       A.      Yes.

2       Q.      And then the last two pages are the

3   response to the Washington Post article, correct?

4       A.      Yes.

5       Q.      Did you -- did Sig give permission and

6   send this response out?

7       A.      I don't recall.

8       Q.      Who would have been the person at Sig

9   that would have had to authorize that?

10      A.      I think I would have been able to

11  authorize it, I just don't remember if I did.

12      (Taylor Exhibit 20 was marked for

13      identification.)

14          MS. GULLIVER:  Does this one have a

15  Bates range?

16          MR. WILLIAMS:  I don't see one.

17          MS. GULLIVER:  Okay.  It looks like

18  it's cut off, so maybe we could add this to your

19  list.

20          MR. WILLIAMS:  Yeah.  Yeah.  This is a

21  Todd.  Somehow if he copied it, it didn't get a

22  Bates number.

23      A.      Okay.

24  BY MR. WILLIAMS:

25      Q.      Have you had a chance to look at

888-893-3767
www.lexitaslegal.com

Exhibit Plates Inc. is standards licensed where required by law
California Firm Registration #179

File produced by a Registration #187

LEXITAS

1   Exhibit 20?

2       A.      Yes.

3       Q.      It's an e-mail, appears to be, from QA

4   Outdoors.  What is QA Outdoors?

5       A.      It's part of a daily news outlet in the

6   outdoor industry.  This is a weekly interview they

7   do and send an e-mail out with the interview.

8       Q.      And so did you sit for this interview

9   or did they just send you questions and you send

10  them back in?

11      A.      I believe it was a verbal interview

12  of -- phone.  Phone interview.

13      Q.      And who is Jim Shepherd?

14      A.      He's the publisher and editor of -- the

15  Outdoor Wire is the public -- the main publication,

16  and QA Outdoors is part of that.

17      Q.      And does Sig -- I'm sorry, what was his

18  name, this publication?  Or what --

19      A.      The Outdoor Wire.

20      Q.      Does Sig advertise or do any business

21  with the Outdoor Wire or their parent company?

22      A.      Yes.

23      Q.      And what type of business does Sig do

24  with the Outdoor Wire?

25      A.      Just run an ad.

1       Q.      Anything else?

2       A.      No.

3       (Taylor Exhibit 21 was marked for

4       identification.)

5   BY MR. WILLIAMS:

6       Q.      I'm going to hand you what has been

7   marked as Exhibit 21.

8               MS. GULLIVER:  And just so we have it

9   for Kristen, it looks like the Bates number is P320

10  design 40, is that right?

11              MR. WILLIAMS:  Yes.

12              MS. DENNISON:  P320 design, what, 40?

13              MS. GULLIVER:  40.

14              MS. DENNISON:  Okay, thank you.

15              MS. GULLIVER:  Uh-hum.

16              MS. DENNISON:  I know which one that

17  is.

18      A.      Okay.

19  BY MR. WILLIAMS:

20      Q.      Who is Sean Toner?

21      A.      He's an engineer for Sig.

22      Q.      And this is an e-mail that was sent to

23  Amanda Hasevlat --

24      A.      Hasevlat.

25      Q.      Hasevlat, H-A-S-E-V-L-A-T, and Craig

1  Soboleski, S-O-B-O-L-E-S-K-I and Matthew Taylor,

2  with a CC to Chris Slusarz, S-L-U-S-A-R-Z, and

3  David Johnson.  Correct?

4       A.    Yes.

5       Q.    And the re is P250 & 320 technical

6  specification confirmation.  Do you see that?

7       A.    Yes.

8       Q.    In the body it says, Measured the

9  weights today, so I am confident they are correct.

10 Slight radius was also measured on gun.  Correct?

11            MS. GULLIVER:  Objection to form.

12      A.    Sight.  Sight radius.

13 BY MR. WILLIAMS:

14      Q.    Sight radius was also measured on the

15 gun.

16      A.    Yeah.

17      Q.    Correct?

18      A.    Yes.

19      Q.    And the next sentence says, As far as

20 trigger pull, we have never made one with a 5.5

21 trigger pull weight, but that is a marketing call.

22 Correct?

23      A.    Yes.

24      Q.    Do you know why marketing was involved

25 in the weight of a trigger pull?

888-893-3767    www.lexitaslegal.com    Exhibit D relates to all 50 states and is licensed without regard to a Registration or other jurisdictional requirements.    California Firm Registration #179

LEXITAS

1          MS. GULLIVER:  Objection.  Beyond the

2     scope, you can answer in your personal capacity.

3          **A.     No, this was before I was even**

4     **employed, so I wouldn't know why that -- why that**

5     **is in there.**

6     BY MR. WILLIAMS:

7          Q.     In your tenure at Sig Sauer, have you

8     ever been involved in deciding the weight of a

9     trigger pull?

10         **A.     No.**

11         Q.     Are you aware of anyone else in

12    marketing who's been involved in deciding the

13    weight of a trigger pull?

14         **A.     No.**

15         (Taylor Exhibit 22 was marked for

16         identification.)

17    BY MR. WILLIAMS:

18         Q.     I'm going to hand you what has been

19    marked as Exhibit 22.  This is Bates numbered 200

20    through 217.  So Sig Glasscock 200 -- I'm sorry.

21    Sig Glasscock 201 through 207.

22         **A.     Okay.**

23         Q.     If you flip to page 210 at the bottom.

24         **A.     Okay.**

25         Q.     Actually, I think you have to go to 209

888-893-3767     Exhibit operates in all 50 states and is licensed where required by law     Page 98 of 126
www.lexitaslegal.com                         California Firm Registration #179
LEXITAS

1    to get the start of it.

2         A.      Okay.

3         Q.      Do you see that bottom e-mail starts

4    with, it's an e-mail from Jose Pagliery,

5    P-A-G-L-I-E-R-Y?

6         A.      Yes.

7         Q.      And it is to Joel Harris at Sig Sauer?

8         A.      Yes.

9         Q.      Who is Joel Harris?

10        A.      At that time he was the director of

11   communications.

12        Q.      And what did the director of

13   communications do?

14        A.      Media relations, writing press

15   releases, that sort of thing.

16        Q.      All right.  And that's dated Tuesday,

17   April 17th, 2018 at 2:39 p.m., correct?

18        A.      Yes.

19        Q.      And it starts off, Joel, Jose at CNN

20   here.  I have been working on a piece that takes a

21   look at the Sig P320 and the voluntary upgrade

22   program.  We have reached the point in our

23   reporting where it is crucial to hear from

24   Sig Sauer itself.

25              Did I read that accurately?

888-893-3767
www.lexitaslegal.com                Lexitas Dedicates 1% of all sales to nonprofit organizations and is licensed where required by law. California Registration #179   LEXITAS

1      A.      Yes.

2      Q.      Our story, which will run in the coming

3   days, will explain to the American public the drop

4   fire issues and -- that led to the voluntary

5   upgrade program and incidents related to accidental

6   discharges.

7               Did I read that accurately?

8      A.      Yes.

9      Q.      The next paragraph says, Certain

10  aspects of this story are pivotal.  How many

11  non-upgraded P320s are out there in customers'

12  hands?  Are they sitting on store shelves?  Are

13  only upgraded P320s on sale right now?  Only

14  Sig Sauer is in a position to answer these

15  questions and address the public's concerns.

16              Did I read that accurately?

17     A.      Yes.

18     Q.      Next paragraph.  Parts of this matter

19  are complex.  We prefer to speak to Sig Sauer

20  instead of relying on e-mail to ensure a

21  free-flowing conversation.  But we are including

22  our questions so you may prepare for them.

23              We would like to sit down with CEO Ron

24  Cohen for an on-camera interview.  As that would

25  best convey how serious -- how seriously the

888-805-2767    Lexitas Operates in all 50 states and is Licensed where required    Nevada Registration #106F
www.lexitaslegal.com                          California Firm Registration #179

LEXITAS

1    company is taking this matter.

2              And if you have any questions of us,

3    please let us know.  Correct?

4         A.     Yes.

5         Q.     And then the following pages are

6    questions that he has posed, correct?

7         A.     Yes.

8         Q.     And if you go to page 208.

9         A.     Okay.

10        Q.     There's an e-mail from Jose Pagliery to

11   Joel Harris, correct?

12        A.     Yes.

13        Q.     And that's on Wednesday the 18th, 2018

14   at 8:21 a.m. correct?

15        A.     Yes.

16        Q.     And it says, Joel, it's extremely

17   important to us that we hear from Sig Sauer on

18   this.  Can you please let us know if you're open to

19   answering our questions?  Your input is pivotal for

20   this story to address the concerns of your

21   customers and the American public at large.

22              Did I read that accurately?

23        A.     Yes.

24        Q.     Page 207.

25        A.     Okay.

888.893.2767 | Lexitas Operates In all 50 states and is Licensed Where required | Nevada Registration #116F
www.lexitaslegal.com                              California Firm Registration #179

LEXITAS

1      Q.      Okay, at the bottom on April 18th, 2018

2  at 10:01 Joel Harris wrote, Jose, we are reviewing

3  your questions.  What is your timeline?  Best

4  regards, Joel Harris, Director Media Relations &

5  Communication.

6              Did I read that accurately?

7      A.      Yes.

8      Q.      The next e-mail is a response from Jose

9  Pagliery to Joel Harris, correct?

10     A.      Yes.

11     Q.      And that is on April 18th at 10:35 a.m.

12     A.      Yes.

13     Q.      And it says, Thank you, this will be

14  e-mail/phone only.  Our deadline is end of day

15  Thursday.  If Mr. Cohen is willing to sit down for

16  an on-camera interview, we can push this to Friday.

17             Did I read that accurately?

18     A.      Yes.

19     Q.      Then if we go up -- actually, we have

20  to go to 206 to get the time.  So page 206 Joel

21  Harris responds to Jose on Wednesday April 18th at

22  1:00 p.m., correct?

23     A.      Yes.

24     Q.      And he says, Jose, Mr. Cohen is away on

25  personal vacation, I'm trying to reach him.  I'll

1    get back to you.  Thank you.

2             Did I read that accurately?

3        A.    Yes.

4        Q.    On 205 Jose reaches back out to Joel

5    Harris, correct, at 1:08 p.m.?

6        A.    Yes.

7        Q.    And says, If he is open to the sit-down

8    interview, I may have success in pushing this back

9    further than Friday.  Correct?

10       A.    Yes.  Yes, yes.

11       Q.    And then the next day on Thursday,

12   April 19th, 2018 at 10:18 a.m. Joel responds to

13   Jose, correct?

14       A.    Yes.

15       Q.    And he says, Jose, I'm still waiting

16   for confirmation from our CEO on his availability.

17   Best regards, Joel.  Correct?

18       A.    Yup.

19       Q.    On page 204 we see that Joel responds

20   on April 19, 2018 at 10:23 a.m. correct?

21       A.    Uh-hum, yes.

22       Q.    And just says, Thank You?

23       A.    Yes.

24       Q.    Page 203.

25       A.    Okay.

888-983-3767   Lexitas Operates in all 50 states and is licensed where required. Nevada Registration #036F
www.lexitaslegal.com                    California Firm Registration #179

LEXITAS

1          Q.      Joel responds to Jose on Friday the

2     20th, correct?

3          A.      Yes.

4          Q.      And it says, Jose, I was finally able

5     to get in contact with Mr. Cohen, but he is

6     unavailable to do an interview.  Correct?

7          A.      Yes.

8          Q.      And then on that same page Jose

9     responds at 10:09 on April 20th and says, Okay,

10    thanks for trying.  When can we expect a response

11    from Sig to our questions?  Correct?

12         A.      Yes.

13         Q.      And that e-mail is at 10:09 on

14    April 20th, correct?

15         A.      Yes.

16         Q.      And approximately 24 minutes later Joel

17    sends the e-mail to you, Tabitha Wade and Teddy

18    Novin, correct?

19         A.      Yes.

20         Q.      Who is Tabitha Wade?

21         A.      She is Ron Cohen's chief of staff.

22         Q.      Who is Teddy Novin, N-O-V-I-N?

23         A.      He was an outside communications

24    consultant.

25         Q.      And is he someone that Sig Sauer used

888-893-2767   Lexitas Operates In all 50 states and is Licensed Where required Nevada Registration #146F
www.lexitaslegal.com                        California Firm Registration #179

Lexitas

1    for communications?

2        A.      **We work with him, yes.**

3        Q.      It simply says, FYI.  See below.

4    Correct?

5        A.      **Yes.**

6        Q.      Now, if we go to the first page there's

7    an e-mail from you on the 20th at 4:41 p.m.,

8    correct?

9        A.      **Yes.**

10       Q.      In that e-mail it starts with, Hi,

11   Debi.  Who's Debi?

12       A.      **Debi Dawson is the communications**

13   **manager for US Army PEO Soldier.**

14       Q.      And what is PEO Soldier?

15       A.      **It's their acquisition department.**

16       Q.      That's not a magazine or something?

17       A.      **No.**

18       Q.      Okay.  It says, Hi, Debi.  Per our

19   communication, here is the entire e-mail traffic

20   with the CNN reporter including the questions he

21   had for Sig in the original e-mail at the bottom.

22           Did I read that correctly?

23       A.      **Yes.**

24       Q.      We traded e-mails with him about

25   whether our CEO, Ron Cohen, would do a live

Lexitas Operates in all 50 states and is Licensed Where required by Nevada Registration #186F
www.lexitaslegal.com                    California Firm Registration #179                    888-893-2767

LEXITAS

1  interview, but never intended to do that.

2          Did I read that accurately?

3      A.    Yes.

4      Q.    We had hoped to navigate the release of

5  this story to today, Friday.

6          Did I read that accurately?

7      A.    Yes.

8      Q.    We also never intended to answer his

9  questions.

10         Did I read that accurately?

11     A.    Yes.

12     Q.    We went dark to him as of -- it says,

13 his 10:09 a.m. e-mail this morning.

14         Did I read this accurately?

15     A.    Yes.

16     Q.    From our point of view this is a smear

17 tactic story and will have many non-connected

18 elements trying to paint a very negative picture

19 about the P320, and possibly the Army's selection

20 of the M17.

21         Did I read that accurately?

22     A.    Yes.

23     Q.    But I suppose we do not know that for

24 sure.  Please see below.

25         Did I read that accurately?

1      A.      Yes.

2      Q.      I will keep you updated if I hear

3  anything else.  Correct?

4      A.      Yes.

5      Q.      Which of his questions that are

6  attached to this e-mail did you think were part of

7  a smear campaign?

8      A.      I'd have to study them for a while to

9  tell you exactly which ones I thought and go back,

10  recollection, you know, from six years ago.  I

11  think wholistically, when you read a list of

12  questions like this, we're able to usually put

13  together sort of what we think the media outlet is

14  looking for.

15          And our opinion was that this was an

16  old story, it was a year old after a voluntary

17  upgrade at this point.  He was mixing a lot of

18  issues and questions, and we just felt like he was

19  sort of on a fishing expedition for we didn't know

20  exactly what, and so we just didn't trust that this

21  was going to be an honest story.

22      Q.      Did you read the questions before

23  making that determination?

24      A.      Of course we would have read them, yes.

25      Q.      And you said that, We traded e-mails

888.922.7767 | Lexitas Operates in all 50 states and is licensed where required. Nevada Registration #076F
www.lexitaslegal.com                                    California Firm Registration #179

LEXITAS

1  with him about whether our CEO, Ron Cohen, would do

2  a live interview, but never intended to do that.

3  Correct?

4       A.      Yes.

5       Q.      Why not just tell him, Our CEO is

6  unavailable, or, we're not going to do the

7  interview?

8               MS. GULLIVER:  Objection, form.

9       A.      I'm not sure why -- to be honest with

10  you why we delayed in telling him that.  We may

11  have been in discussions with our CEO at the time

12  about whether he was going to do it or not.  He

13  does not do a lot of live interviews, and so we

14  could have been discussing it internally.

15               To say we never intended to do it, you

16  know, I don't know if it's wholly true in the early

17  moments of these -- this e-mail coming in.  But,

18  you know, at some point we made a determination to

19  not have him do that.

20  BY MR. WILLIAMS:

21       Q.      It also says, We never intended to

22  answer his questions.  So why not just tell him no?

23               MS. GULLIVER:  Objection to form.

24       A.      Yeah, I think we eventually did tell

25  him no, that we weren't -- we weren't going to

888.983.3767                Lexitas Operates in all 50 states and is licensed where required by law.
www.lexitaslegal.com                California Firm Registration #179

Nevada Registration #106F

LEXITAS

1   answer the questions.

2   BY MR. WILLIAMS:

3       Q.      You believe you told him no after this

4   e-mail string?

5       **A.      I'll have to go, maybe go back and read**

6   **it again to see whether we actually said no or**

7   **whether we just stopped replying.**

8       Q.      Well, this says, We went dark.

9       **A.      Yeah.  So then we just stopped**

10  **replying.**

11      Q.      And before you said that there, you

12  know, you were upset with ABC News because the

13  story was slanted and didn't give your perspective,

14  do you recall that?

15      **A.      Yes.**

16      Q.      Here you were being asked to give your

17  side of the story and you never intended to answer

18  his questions and went dark on him, is that

19  correct?

20          MS. GULLIVER:  Objection to form.

21      **A.      That's what it says.**

22  BY MR. WILLIAMS:

23      Q.      And then by this time you also had

24  prepared draft answers to questions, do you recall

25  that?

888-893-2767  Lexitas Operates in all 50 states and is licensed where required. Nevada Registration #096F
www.lexitaslegal.com                California Firm Registration #179

LEXITAS

 1              MS. GULLIVER:  Objection, form.

 2      A.      Not necessarily related to this time

 3  period.  This time period was in an odd place

 4  because this was about a year after the upgrade,

 5  but it was either before or just at the very

 6  beginning of the alleged guns going off by

 7  themselves.

 8              So in reading his questions, our

 9  opinion was that he was mixing a bunch of facts or

10  non-facts, and he was looking for a way to spin a

11  story.

12              When you deal with the antigun media,

13  and we're, you know, not extremely trustful of

14  whether they are going to report the facts

15  accurately, which is why we're trepidatious about

16  that sort of thing.

17  BY MR. WILLIAMS:

18      Q.      Had you had dealings with this

19  individual before?

20      A.      No.

21      Q.      And you believed CNN was doing -- is

22  CNN considered antigun media?

23      A.      Very much.

24      Q.      And what makes somebody antigun media?

25              MS. GULLIVER:  Objection, form.

Case 3:23-cv-03095-MMC   Document 50   Filed 03/04/24   Page 110 of 126

888.922.7067   Lexitas Operates in all 50 states and is Licensed where required Nevada Registration #106F
www.lexitaslegal.com                      California Firm Registration #179

LEXITAS

1    A.      We look at it when they, you know,

2  issue stories that don't -- that aren't factual.

3  BY MR. WILLIAMS:

4    Q.      Is it that they aren't factual or that

5  you don't agree with them --

6            MS. GULLIVER:  Objection form.

7  BY MR. WILLIAMS:

8    Q.      -- that makes them antigun.  I mean I

9  honestly don't know the answer.

10   A.      It could be both.  More often than not,

11 it's not factual.

12   Q.      But you would agree that someone can --

13 the media can disagree with your position on

14 something and it doesn't make them antigun or

15 antiSig, right?

16   A.      It could.

17   Q.      Is there any media, ABC, NBC, CBS or

18 Fox that hasn't done a story that was critical of

19 guns?

20   A.      I would say they all probably have at

21 times.  Even Fox, which is the most conservative of

22 the four major networks.

23   Q.      And would you consider Fox to be

24 antigun?

25   A.      They're probably not.

Case 3:23-cv-03095-MMC  Document 34-15  Filed 05/02/24  Page 111 of 126

888-893-3767                 Lexitas Operates in all 50 states and is Licensed Where required  Nevada Registration #116F
www.lexitaslegal.com                       California Firm Registration #179

LEXITAS

1          MR. WILLIAMS:  I don't think I'm going

2     to ask any of these others.  If you want to give me

3     five minutes, I think we're pretty much done.

4          MS. GULLIVER:  Great.  Let's go off the

5     record.

6          THE VIDEOGRAPHER:  Off the record,

7     12:13.

8                   (Recess taken.)

9          THE VIDEOGRAPHER:  We're going back on

10    the record, 12:25, Media No. 5.  Please proceed.

11    BY MR. WILLIAMS:

12     Q.    Okay, during the break I found 36 new

13    documents.  I'm just kidding.

14     A.    Oh, good.

15     Q.    Have you been able to listen to my

16    question -- or, I'm sorry.  Have you been able to

17    hear my questions and understand them?

18     A.    Yes.

19     Q.    Have you answered my questions in a

20    truthful and honest way?

21     A.    Yes.

22          MR. WILLIAMS:  I have no further

23    questions.

24          THE WITNESS:  Thank you.

25          MS. GULLIVER:  Let's just go off the

888.922.7167   Lexitas Operates in all 50 states and is licensed where required by law.   Nevada Registration #126F
www.lexitaslegal.com                                   California Firm Registration #179

Lexitas

1    record for a minute.

2              THE VIDEOGRAPHER:  Off the record at

3    12:26.

4                   (Recess taken.)

5              THE VIDEOGRAPHER:  We're going back on

6    the record, 12:35, Media No. 6.  Please proceed.

7              EXAMINATION

8    BY MS. GULLIVER:

9         Q.    Mr. Taylor, do you remember earlier

10   today you testified regarding your preparation for

11   today's deposition?

12        A.    I do.

13        Q.    And do you recall being asked whether

14   you reviewed any documents to prepare for the

15   deposition today?

16        A.    I do.

17        Q.    And did you also review e-mails as part

18   of your deposition preparation?

19        A.    I did.

20        Q.    Okay.  And what type of e-mails?

21        A.    **Various types, many of which we've seen**

22   **today.**

23        Q.    I now want to refer you back to

24   Exhibits 5 and 6, which were I believe the two

25   sales reports you testified to earlier today.

1          A.      Okay.

2          Q.      Do you recall being asked what the

3    differences were between Exhibit 5, which was the

4    first sales report that was produced, and

5    Exhibit 6, which ends in Glasscock 1772, which was

6    the sales report that was recently produced?

7          A.      I do.

8          Q.      And if we take a look at the

9    explanation page for Exhibit 5, I want to direct

10   your attention to the section that says Model, and

11   it says, Only P320.  Do you recall testifying as to

12   what that term meant?

13         A.      Yes.

14         Q.      Do you know whether Only P320 meant

15   that this particular report also excluded versions

16   of the P320 that were either an M17 or an M18?

17         A.      I believe it does exclude that.

18         Q.      Okay.  And then I believe you were also

19   asked what -- in the section that's called Order

20   type you were also asked what customer service

21   order type means.  Do you recall that?

22         A.      I do.

23         Q.      And I believe you testified at the time

24   that you thought it related to some sort of

25   customer service inquiry, is that correct?

888-595-2767   Lexitas Operates in all 50 states and is Licensed Where required    Nevada Registration #116F
www.lexitaslegal.com                      California Firm Registration #179

LEXITAS

1          A.      Yes.

2          Q.      Would it be accurate to say that that

3   customer service order type could also involve

4   sales through Sig's custom works program?

5          A.      Yes.  I did not take into consideration

6   the term customer service versus custom works, but

7   it could include custom works sales direct to

8   consumers.

9          Q.      And, okay, I think you've answered my

10  question.  But just so the record is clear, what is

11  custom works?

12         A.      Custom works is our sort of our

13  high-end gun department, and we have your

14  build-your-own-gun portion of our website where

15  consumers can go directly on the Sig Sauer website,

16  they can use a configurator to configurate a gun,

17  and that gun can be shipped directly to the

18  consumer.

19         Q.      Thank you.  And now I wanted to just

20  refer you back to Exhibit 3 that you saw earlier

21  today, which was Glasscock 199.  It's a letter, To

22  whom it may concern relating Boston Channel 5 WCVB

23  news report that was on the CANSOFCOM incident, do

24  you recall that?

25         A.      Yes.

888-983-3767   Lexitas Operates in all 50 states and is Licensed Where required. Nevada Registration #116F
www.lexitaslegal.com                    California Firm Registration #179

LEXITAS

1      Q.      Do you recall if CANSOFCOM conducted an

2   investigation on the incident?

3      A.      Yes, they did.

4      Q.      And do you know what the result of that

5   investigation was?

6      A.      Yes, the outcome was that it was user

7   error.  And we knew that at the time, which is why

8   we got the CANSOFCOM and asked if we could make a

9   statement.  Because they could not make a statement

10  until they conducted their investigation, although

11  they knew at that time it was likely user error.

12          We collaborated with them to make this

13  statement, and a day later followed up with their

14  own statement confirming it was user error.

15     Q.      And when you say user error, what do

16  you mean?

17     A.      That the gentleman in CANSOFCOM, the

18  Canadian Special Forces, had discharged his gun

19  with his own -- he pulled the trigger.

20     Q.      Now I just want to refer you back to

21  Exhibit 4, which was a draft of potential response

22  to the ABC News, Good Morning America and Nightline

23  pieces, do you recall that?

24     A.      Yes.

25     Q.      And do you recall being asked about the

888-983-3767   Lexitas Operates in all 50 states and is licensed where required.  Nevada Registration #116F
www.lexitaslegal.com                                    California Firm Registration #179

LEXITAS

1    first option for the beginning of your draft

2    response, which referred to ABC News as an antigun

3    media outlet?

4         A.    Yes.

5         Q.    Did you ultimately watch the final Good

6    Morning America segment?

7         A.    I did.

8         Q.    Did you also watch the Nightline

9    segment?

10        A.    I did.

11        Q.    And based on the segments that were

12   aired, did you conclude whether it was biased?

13        A.    We felt it was very biased, because in

14   the Good Morning America piece ABC News -- ABC

15   News' own gun expert opined that he didn't feel

16   like the gun could go off by itself.  And he went

17   on to say that the only reason he could suggest

18   that the gun allegedly went off by itself was

19   something that he termed legal momentum, and, you

20   know, obviously he was just saying that lawyers

21   have perpetuated the story that the gun can go off

22   by itself is what he was referring to.

23             When we watched that we were surprised

24   that he said that, but when we watched the

25   Nightline piece a little later in the day or a lot

888-893-3767    Lexitas Operates in all 50 states and is Licensed Where required Nevada Registration #176
www.lexitaslegal.com                    California Firm Registration #179

LEXITAS

1    later in the day, ABC News had edited the expert's

2    comments out of the piece, omitting -- omitting

3    that he said the gun likely couldn't go off by

4    itself and that the reason for alleged discharge

5    was legal momentum.

6              So they edited that piece out, so that

7    led us to being -- believing that it was biased

8    because they changed their story based on the later

9    understanding that that was not working in their

10   favor.

11       Q.    And are there any other articles or

12   media that we've discussed today in the deposition

13   where you felt that the media organization didn't

14   incorporate facts that you presented as part of

15   your discussions with that organization?

16       A.    I think the most egregious situation

17   was the Washington Post/Trace story where we really

18   decided to go all in and provide as much

19   information as we possibly could, you know, pages

20   of information.

21             And essentially they chose to either

22   ignore it or even edit video footage that we had

23   sent them to try to tell their story the way they

24   wanted to tell it.

25             And, you know, it was quite frustrating

888-893-3767
www.lexitaslegal.com

Lexitas Operates in all states and is licensed where required. Nevada Registration #116F
California Firm Registration #179

LEXITAS

1  to be -- to say, okay, fine, we're going to go in

2  and we're going to provide them as much information

3  as possible only to have them either not use it or

4  worse, edit it in a way that told the story the way

5  they wanted to tell .

6      Q.      And you referring to editing in your

7  answer.  What do you mean by that?

8      A.      For example, there was an alleged case

9  in Pasco County, Florida where a school resource

10  officer had made a claim that he was leaning on the

11  wall in the middle school cafeteria, and as he was

12  leaning on the wall the gun just went off by

13  itself.

14          And ABC News in Florida at that time,

15  different ABC News story, but ABC News Florida at

16  the time, reported the story as he said it, that

17  the gun had just gone off by itself while he was

18  leaning on a wall without touching the gun.

19          Unbeknownst to him, there was a video

20  camera in the cafeteria, and that video camera had

21  caught him actually not only touching his gun, but

22  fidgeting with his gun while he was standing within

23  feet of several schoolchildren.

24          We were a bit frustrated because the

25  department had to conduct and finalize their own

Lexitas Operates in all 50 states and is licensed where required by law.
www.lexitaslegal.com
California Firm Registration #179
LEXITAS

1    investigation, so we had to wait for them to do

2    that, but they eventually released the footage.

3            And essentially the officer was

4    clicking and unclicking his gun in and out of his

5    holster while standing, and two school lines full

6    of children getting their food in the cafeteria.

7    As soon as they released their investigation, he

8    was dismissed by the department for cause.

9        Q.    And how did you --

10       A.    And by the way, within that.  That's

11   where -- sorry, I didn't finish the thought.  ABC

12   News had edited that piece of footage, rather than

13   showing him multiple times holstering and

14   unholstering his gun, it showed him holstering his

15   gun and the bullet going off and striking the

16   floor.

17           So even within their own edit, I don't

18   think they understood what they were showing,

19   because the next logical question would be, why did

20   he have his gun out of his holster in the first

21   place?

22           So they tried to depict it as if he put

23   his gun in his holster one time, but he did it

24   multiple times.  But anybody that knows anything

25   about gun safety would suggest, why in the world

888-811-3408  Lexitas Operates in all 50 states and is Licensed where required Nevada Registration #065f
www.lexitaslegal.com                    California Firm Registration #179

LEXITAS

1    would he have his gun out of his holster in a

2    school cafeteria full of children?

3        Q.    And just so the record is clear, are

4    you saying that ABC News did this editing, or the

5    Washington Post?

6        A.    This was when we sent that footage to

7    the Washington Post to help them understand how

8    something can be alleged when somebody says, I

9    didn't touch it, and then video footage proved that

10   he touched it, but yet they took that same footage

11   and they turned it around and tried to suggest that

12   he only touched his gun one time.

13            Their lack of understanding of guns

14   would be this -- to believe they didn't even

15   understand that they were almost helping our story

16   by saying, you know, you shouldn't be touching your

17   gun in the first place, but the point is that they

18   manipulated the video footage to try to tell their

19   story.

20       Q.    And just going back to the ABC News,

21   Good Morning America and Nightline pieces, did they

22   feature a particular individual who had experienced

23   an unintended discharge as part of that broadcast?

24       A.    Yes, they did an extensive interview

25   with Officer Hilton from a police department in

Lexitas Operates in all 50 states and is licensed where required by law
888-392-3767
www.lexitaslegal.com
Texas Firm Registration #713
California Firm Registration #179
Florida registered / Nevada Registration #116F

LEXITAS

Case 6:23-cv-00395-JDK-JDL   Document 51   Filed 05/02/24   Page 121 of 126

1    Texas.

2         Q.      And did Ms. Hilton sue the company?

3         A.      She did.

4         Q.      And do you know how that case

5    ultimately was resolved?

6         A.      The case was dismissed in Sig Sauer's

7    favor.

8         Q.      Now I just want to refer you back to

9    Exhibit 22, which we were talking about a little

10   bit ago, the CNN request to Sig Sauer.  Do you

11   recall that?

12        A.      Yes.

13        Q.      And I want to refer you to Sig

14   Glasscock 202 in particular, your e-mail to Debi

15   Dawson.  Do you recall that?

16        A.      I do.

17        Q.      Okay.  Do you recall being asked why

18   you didn't just say no, but instead you said -- you

19   basically continued to respond and not just say no

20   right away?

21        A.      I do.

22        Q.      Do you recall that?

23        A.      Yes.

24        Q.      I want to direct your attention to the

25   part of your e-mail where you said, We had hoped to

888-893-3767
www.lexitaslegal.com
Lexitas Operates in all 50 states and is Licensed Where required Nevada Registration #126F
California Firm Registration #179
LEXITAS

1    navigate the release of this story to today, in

2    quotes, Friday.  Do you see that?

3         A.    I do.

4         Q.    Is there any significance in marketing

5    to Friday publications?

6         A.    Yes.  We prefer not to -- for us at Sig

7    we prefer not to do media releases on Fridays

8    because you're leading into the weekend when people

9    are distracted and doing other things.

10              So for us, if there was a negative

11   story coming, we would have been trying to navigate

12   that to be able to have it released on Friday so it

13   would have less impact.  So that was the purpose of

14   saying, trying to navigate it to Friday.

15        Q.    And then if we go back to the first

16   page of the exhibit, there's an April 20th, 2018,

17   5:00 p.m. e-mail from Debi back to you and others.

18   Do you see that?

19        A.    I do.

20        Q.    And Debi's response appears to say, He

21   clearly has an agenda, dot, dot, dot, yup, two

22   exclamation points.  Do you see that?

23        A.    I do.

24        Q.    What did you understand Debi to be

25   saying when she wrote that?

1        A.        After she had reviewed the 28

2    questions, that she agreed that there was some

3    hidden agenda within -- within what's -- the story

4    he was trying to write.

5                    MS. GULLIVER:  Thank you very much.

6                    THE WITNESS:  Thank you.

7                    MR. WILLIAMS:  Can you read that last

8    question and answer back to me, please.

9                    (Question and answer read.)

10                    MR. WILLIAMS:  I don't have any

11    questions.

12                    MS. GULLIVER:  Thank you.

13                    THE VIDEOGRAPHER:  This concludes the

14    deposition of Thomas Taylor.  Off the record at

15    12:48.

16        (The deposition was concluded at 12:48 p.m.)

17

18

19

20

21

22

23

24

25

888.893.2767   Lexitas Operates in all 50 states and is licensed where required Nevada Registration #165F
www.lexitaslegal.com                        California Firm Registration #179

LEXITAS

1  DEPOSITION ERRATA SHEET

2  Page___Line___Change_____

3  Page___Line___Change_____

4  Page___Line___Change_____

5  Page___Line___Change_____

6  Page___Line___Change_____

7  Page___Line___Change_____

8  Page___Line___Change_____

9  Page___Line___Change_____

10  Page___Line___Change_____

11  Page___Line___Change_____

12  Page___Line___Change_____

13  Page___Line___Change_____

14  Page___Line___Change_____

15  Page___Line___Change_____

16  Page___Line___Change_____

17  Page___Line___Change_____

18  Page___Line___Change_____

19  Page___Line___Change_____

20  Page___Line___Change_____

21  Page___Line___Change_____

22  Page___Line___Change_____

23  Page___Line___Change_____

24  Page___Line___Change_____

25  SIGNATURE:_____DATE:_____

888-811-3376 | Lexitas Operates In all 50 states and is licensed where required | Nevada Registration #165F
www.lexitaslegal.com                                    California Firm Registration #179

LEXITAS

Page 125

1                    CERTIFICATE

2              I, Pamela J. Carle, Registered

3    Professional Reporter, do hereby certify that the

4    foregoing is a true and accurate transcript of my

5    stenographic notes of the deposition of THOMAS

6    TAYLOR, who was first duly sworn, taken at the

7    place and on the date hereinbefore set forth, and

8    that reading and signing of the transcript was not

9    discussed.

10             I further certify that I am neither

11   attorney nor counsel for, nor related to or

12   employed by any of the parties to the action in

13   which this deposition was taken, and further that I

14   am not a relative or employee of any attorney or

15   counsel employed in this case nor am I financially

16   interested in this action.

17

18             THE FOREGOING CERTIFICATION OF THIS
     TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
19   THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
     CONTROL AND/OR DIRECTION OF THE CERTIFYING
20   REPORTER.

21

22

23              _Pamela J. Carle_

24            _____
                Pamela J. Carle, LCR, RPR, CRR

25

888.893.2767 | Lexitas Operates in all 50 states and is licensed where required | Nevada Registration #106f
www.lexitaslegal.com                    California Firm Registration #179

LEXITAS