# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSHUA GLASSCOCK, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 22-CV-3095-MDH |
| SIG SAUER, INC., | ) ) ) | |
| Defendant. | ) | |

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND
## SUGGESTIONS IN SUPPORT

Michael A. Williams
Matthew L. Dameron
Clinton J. Mann
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:     (816) 945-7110
mwilliams@williamsdirks.com
matt@williamsdirks.com
cmann@williamsdirks.com

Todd C. Werts
**LEAR WERTS LLP**
103 Ripley Street
Columbia, Missouri 65201
Telephone:     (573) 875-1991
werts@learwerts.com

***Counsel for Plaintiff and the Proposed Class***

# TABLE OF CONTENTS

STATEMENT OF FACTS ....................................................................................................9

I.      Overview ................................................................................................................9

II.     Pistol safety is a matter of design. ....................................................................10

III.    The P320's troubled design history overseen by Sig Sauer's marketing team.................12

IV.     The Defect .............................................................................................................13

V.      All P320s have the Defect....................................................................................15

VI.     Sig Sauer knows of the Defect.............................................................................16

        A.      Sig Sauer determined that each P320 is at a "high risk" to
                "kill [a] person unintentionally." .............................................................16

        B.      Sig Sauer knows that the P320's Defect injures consumers and
                law enforcement. .......................................................................................18

VII.    Sig Sauer uniformly conceals the Defect from Missouri consumers................24

VIII.   The class is uniformly damaged by Sig Sauer's conduct. .................................28

LEGAL STANDARD ......................................................................................................30

ARGUMENT ...................................................................................................................31

I.      The class satisfies Rule 23(a)..............................................................................31

        A.      Numerosity.................................................................................................31

        B.      Commonality..............................................................................................32

        C.      Typicality...................................................................................................34

        D.      Adequacy ...................................................................................................34

II.     The class satisfies the requirements of Rule 23(b)(3).......................................35

        A.      Predominance.............................................................................................36

                i.      Claims under the MMPA predominate and are routinely certified...........37

                ii.     The same is true under the amended MMPA...........................................38

                iii.    Sig Sauer's liability is subject to class-wide determination.....................40

                iv.     Damages can be determined on a class-wide basis...................................41

        B.      Superiority..................................................................................................42

                i.      A class action is manageable. ...................................................................42

                ii.     The proposed class is ascertainable. .........................................................44

III.    In addition, or alternatively, Rule 23(c)(4) issue certification is warranted. ...................45

CONCLUSION.................................................................................................................46

# INDEX OF EXHIBITS

Ex. 1, P320 advertisement: "WE'LL TAKE IT FROM HERE"

Ex. 2, 30(b)(6) Deposition of Sig Sauer, Inc. via Matthew Taylor

Ex. 3, Sig Sauer Glossary

Ex. 4, Report of Beau A. Biller

Ex. 5, Declaration of Benjamin D. Gatrost

Ex. 6, Sig Sauer – Striker Fired Pistol design overview

Ex. 7, Denial of Sig Sauer's Appeal to U.S. Government Accountability Office

Ex. 8, Trial Transcript, *Lang v. Sig Sauer,* Sean Toner Testimony

Ex. 9, Sean Toner email dated June 5, 2014

Ex. 10, 30(b)(6) Deposition of Sig Sauer, Inc. via Thomas Taylor

Ex. 11, Report of Edward Stockton

Ex. 12, Sig Sauer P320 product catalog

Ex. 13, Spreadsheet titled MHS Pistol Failure Modes, Effects, and Criticality Analysis (FMECA)

Ex. 14, Memorandum titled Failure Modes, Effects and Criticality Analysis (FMECA Memo)

Ex. 15, Purchase Description for the Modular Handgun

Ex. 16, Samantha Piatt email dated July 27, 2021 and attachment

Ex. 17, Tom Taylor email dated April 13, 2023 and attachments

Ex. 18, *Popular Handgun fires without anyone pulling the trigger, victims say*, Wash. Post (April 11, 2023)

Ex. 19, 30(b)(6) Deposition of Sig Sauer, Inc. via Christopher Meyer

Ex. 20, 30(b)(6) Deposition of Sig Sauer, Inc. via Matt Farkas

Ex. 21, Memorandum by Washington State Criminal Justice Training Commission

Ex. 22, P320 advertisement: "SAFETY WITHOUT COMPROMISE"

Ex. 23, Declaration of Matthew Dameron

Ex. 24, Verdict Form, *Lang v. Sig Sauer, Inc.*, No. 21-CV-4196 (June 20, 2024) ECF No. 131

Ex. 25, P320 advertisement: "HAPPY P320 DAY"

Ex. 26, P320 advertisement: "ONE FOR ALL"

Ex. 27, P320 advertisement: "BASED ON THE P320 THE M17 IS THE U.S. ARMY'S CHOICE"

Ex. 28, Declaration of Carla A. Peak, Verita Global

Ex. 29, Proposed Class Notice

Ex. 30, Williams Dirks Dameron firm resume

Ex. 31, Lear Werts firm resume

# TABLE OF AUTHORITIES

*Alpern v. UtiliCorp United, Inc.*,
    84 F.3d 1525 (8th Cir. 1996) ........................................................................34

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997).......................................................................................36

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013).......................................................................................30

*Ark. Educ. Ass'n v. Bd. Of Educ.*,
    446 F.2d 763 (8th Cir. 1971) ........................................................................32

*Avritt v. Reliastar Life Ins. Co.*,
    615 F.3d 1023 (8th Cir. 2010) ......................................................................36

*Barfield v. Sho-Me Power Elec. Co-op.*,
    No. 11-CV-4321, 2013 WL 3872181 (W.D. Mo. July 25, 2013)..............42, 44

*Bennett v. Nucor Corp.*,
    656 F.3d 802 (8th Cir. 2011) ........................................................................30

*Blades v. Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ........................................................................36

*Bradford v. AGCO Corp.*,
    187 F.R.D. 600 (W.D. Mo. 1999) ................................................................31

*Burnett v. Natl. Assn. of Realtors*,
    No. 19-CV-332, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022) ............... *passim*

*Butler v. Sear, Roebuck & Co.*,
    727 F.3d 796, (7th Cir. 2013) ..................................................................45, 46

*Byrd v. Aaron's, Inc.*,
    784 F.3d 154 (3d Cir. 2015)..........................................................................44

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)......................................................................................45

*Claxton v. Kum & Go, L.C.*,
    No. 14-CV-03385, 2015 WL 3648776 (W.D. Mo. June 11, 2015) .....31, 32, 36

*Cope v. Let's Eat Out, Inc.*,
    319 F.R.D. 544 (W.D. Mo. 2017) ................................................30, 32, 34, 42

*Cromeans v. Morgan Keegan & Co., Inc.*,
    303 F.R.D. 543 (W.D. Mo. 2014)...............................................................31, 41

*Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*,
    984 F.3d 595 (8th Cir. 2020) ...............................................................36

*Day v. Celadon Trucking Servs., Inc.*,
    827 F. 3d 817 (8th Cir. 2016) ...............................................................37

*DeBoer v. Mellon Mortg. Co.*,
    64 F.3d 1171 (8th Cir. 1995) ...............................................................32, 34

*Diesel v. Mariani Packing Co., Inc.*,
    No. 22-CV-1368, 2024 WL 1674520 (E.D. Mo. Apr. 18, 2024) .........................36, 38, 39

*Doran v. Missouri Dep't of Soc. Servs.*,
    251 F.R.D. 401 (W.D. Mo. 2008)...............................................................34

*Dumas v. Albers Medical, Inc.*,
    No. 03-640, 2005 WL 2172030 (W.D. Mo. Sept. 7, 2005) ...............................44

*Elsea v. U.S. Engineering Co.*,
    463 S.W.3d 409 (Mo. Ct. App. 2015)...............................................................37

*Hawkins v. Nestle U.S.A. Inc.*,
    309 F. Supp. 3d 696 (E.D. Mo. Feb. 16, 2018)...............................................................37

*Hays v. Nissan N.A., Inc.*,
    No. 4:17-cv-0353-BCW, 2021 WL 912262 (W.D. Mo. Mar. 8, 2021)...............38, 42

*Huch v. Charter Communications, Inc.*,
    290 S.W.3d 721, 724 (Mo. 2009) ...............................................................37

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    312 F.R.D. 332 (S.D.N.Y. 2015) ...............................................................44

*In re Motor Fuel Temp. Sales Practices Litig.*,
    292 F.R.D. 652 (D. Kan. 2013)...............................................................46

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006)...............................................................45

*In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*,
    No. 20-MD-02936, 2023 WL 9064606 (W.D. Mo. Dec. 13, 2023)...............34, 38, 39, 40

*In re Whirlpool*,
    722 F.3d 838 (6th Cir. 2013) ...............................................................46

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011) ..........................................................30

*M.B. by Eggemeyer v. Corsi*,
    No. 17-CV-4102, 2018 WL 3484048 (W.D. Mo. July 19, 2018)....................33

*McKeage v. TMBC, LLC*,
    847 F.3d 992 (8th Cir. 2017) ..........................................................44

*Mund v. EMCC, Inc.*,
    259 F.R.D. 180 (D. Minn. 2009)......................................................33

*Nelson v. Wal-Mart Stores, Inc.*,
    245 F.R.D. 358 (E.D. Ark. 2007)................................................45, 46

*New Directions Treatment Services v. City of Reading*,
    490 F.3d 293 (3d Cir. 2007) ...........................................................35

*Orduno v. Pietrzak*,
    932 F.3d 710 (8th Cir. 2019) ..........................................................36

*Paxton v. Union Nat'l Bank*,
    688 F.2d 552 (8th Cir. 1982) .............................................31, 33, 34

*Perras v. H&R Block*,
    789 F.3d 914 (8th Cir. 2015) ..........................................................37

*Ports Petroleum Co. of Ohio v. Nixon*,
    37 S.W.3d 237 (Mo. 2001) ............................................................37

*Rikard v. U.S. Auto Prot., LLC*,
    287 F.R.D. 486 (E.D. Mo. Nov. 30, 2012) ......................................33

*Sandusky Wellness Center, LLC*,
    821 F.3d 992 (8th Cir. 2016) ..........................................................44

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)................................................................36, 40

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)......................................................................32

Fed. R. Civ. P. 23 ................................................................................37, 43

Mo. Rev. Stat. § 407.020 ......................................................................37

Mo. Rev. Stat. § 407.025 ......................................................................38

15 Mo. C.S.R. § 60-8.020(1)(A).............................................................37

## INTRODUCTION

This case concerns a defectively designed pistol, the Sig Sauer P320. Sig Sauer designed the P320 without any external safety features, even though the pistol is effectively cocked (i.e., ready to fire) the moment a round is chambered. This is particularly galling because the P320 also has among the lightest and shortest trigger pulls of any comparable pistol on the market. The practical effect is that when consumers carry a loaded P320, it is akin to them taking a loaded revolver, pulling the hammer back, and then walking around with that cocked pistol in their holster—all without any external safety features. As set forth herein, the combination of these features constitutes the Defect (as defined in paragraphs 24–33, *infra*) that exists in every P320.

But Sig Sauer does not tell consumers about the P320's Defect. Nor does Sig Sauer warn consumers that the P320 is extraordinarily dangerous compared to similar pistols. And what was the result? P320 users have experienced a slew of unintended discharges across the country. This has resulted in law enforcement agencies who purchased the pistols as duty weapons having to replace their entire inventory, and scores of victims filing personal injury lawsuits against Sig Sauer due to the serious injuries caused by the P320's Defect—a Defect that is uniform among every P320 sold in Missouri.

This case seeks to hold Sig Sauer responsible for selling a needlessly dangerous product to Missouri consumers through unfair and deceptive practices in violation of the Missouri Merchandising Practices Act. Sig Sauer has known about the P320's Defect for years but has done nothing about it. All Missouri consumers who purchased the P320 have received a product that is subject to the same Defect and was sold using the same unfair practices. This motion seeks class certification for Missouri consumers so their claims can advance to the merits.

# STATEMENT OF FACTS

## I. Overview

1. Sig Sauer is a firearms manufacturer that designs, manufactures, and markets a pistol known as the P320.[1] *See P320 Pistols*, Sig Sauer (accessed Oct. 16, 2024), available at https://www.sigsauer.com/firearms/pistols/p320.html. A picture of the P320 is shown here:



Ex. 1, P320 advertisement: "WE'LL TAKE IT FROM HERE".

2. The P320 comes in various models (i.e., sizes, colors, etc.), but with respect to the pistol's internal mechanisms, it is undisputed that all P320s are designed and work the same with the same safety characteristics. Ex. 2, 30(b)(6) Deposition of Sig Sauer, Inc., via Matthew Taylor ("M. Taylor Dep.") 79:18–81:12. (Q. "And so the sizes change[] what it looks like from the outside, but the inside and how it works is the same regardless of what size it is[?]" A. "Yes. . . ." Q. "But it had all the of the same design characteristics and safety characteristics regardless of the size. Is that true?" A. "Yes."), 87:6–88:21, 99:14–15 (Q. "They're all designed the same, right?"

---

[1] Sig Sauer sold a small subset of P320s with manual safeties. The proposed class does not include P320s sold with manual safeties. As referred to herein, "P320" refers to a P320 sold without a manual safety, unless specifically referenced otherwise.

A. "Correct."), 150:6–155:7, 156:5–7, 161:10–12; *see also* Ex. 3, Sig Sauer Glossary at p. 3; Ex. 4, Report of Beau A. Biller ("Biller Report") at p. 5 ("the mechanical functionality of all P320 variants is the same."), 13, 19, 21 ¶ 17; Ex. 5, Declaration of Benjamin D. Gatrost ("Gatrost Decl.") at ¶97.

3.       The P320 has a unique design in the United States pistol market, combining a very light, short trigger pull with a design that cocks[2] and 97% energizes[3] the weapon anytime it is loaded. Ex. 1, M. Taylor Dep. 100:13–20. The P320 combines these features making the pistol easier to discharge, while omitting any means of de-energizing the weapon when a round is chambered and omitting any external safety device to prevent the trigger from moving. *See* Ex. 5, Gatrost Decl. at ¶¶ 53, 58, 60-62, 65–66, 73, 85.

4.       All of the P320s at issue contain the same Defect (as defined in paragraphs 24–33, *infra*).

## II.     Pistol safety is a matter of design.

5.       Pistols work by loading mechanical energy into a spring that then pushes either a hammer or striker against the ammunition to fire a projectile. Ex. 5, Gatrost Decl. at ¶¶ 31–32, 37.

6.       The mechanics of how this energy is captured and released in a firearm is called its "action type." Ex. 5, Gatrost Decl. at ¶ 43.

---

[2] As explained by Plaintiff's firearms expert Benjamin Gatrost, "when a single action pistol is cocked (either by manually thumbing the hammer or by operation of the slide) three things occur. First, the pistol is energized so that it has sufficient stored mechanical energy to discharge the primer of a loaded cartridge of ammunition. Second, the trigger pull distance of the pistol is almost always shortened. And third, the trigger pull weight of the pistol is almost always lessened." *See* Ex. 5, Gatrost Decl. at ¶ 43(5), n.5.

[3] The term "energize" describes the act of charging a pistol with mechanical energy that can be released to discharge the firearm. *See* Ex. 5, Gatrost Decl. at ¶ 36(1), n.1.

7. The three most common action types in handguns are, (1) single action; (2) double action only; and (3) double action / single action. Ex. 5, Gatrost Decl. at ¶ 43 (reviewing action types for both revolvers and pistols).

8. In a single action pistol, like those seen in cowboy movies, the user must first manually cock the firearm's hammer back, and then the user can depress the trigger to release the hammer, causing the weapon to fire. Ex. 5, Gatrost Decl. at ¶ 43(2), (4).

9. Triggers in double action only pistols are typically relatively heavy because the trigger pull must do two things: (1) pull the hammer against a spring to energize the weapon and then (2) continue pulling until a part known as the sear is moved to release the hammer. Ex. 5, Gatrost Decl. at ¶ 43 (1), (3); Ex. 2, M. Taylor Dep. 223:18–20.

10. In a double action / single action, the pistol can either be operated as a double action only or as a single action pistol. Ex. 5, Gatrost Decl. at ¶ 43(5). Typically, the first shot is the same as in a double action only pistol. But after the first shot, the pistol resets itself as a cocked single action pistol. *Id*. Alternatively, the shooter can manually skip the double action phase by manually cocking the pistol. *Id.*

11. In a striker-fired pistol, there is no hammer than can be manually cocked as in hammer-fired pistols. Ex. 5, Gatrost Decl. at ¶ 37. Rather, the spring acts directly against the striker and that spring is energized by either the trigger pull (as in a double action only hammer-fired pistol) or by the function of the gun itself (which makes it like a single action pistol with its hammer cocked). Ex. 5, Gatrost Decl. at ¶ 38.

12. Pistol safety is a function of design decisions impacting how the pistol operates and external safety devices that help prevent the weapon from firing. Ex. 5, Gatrost Decl. at ¶¶ 45–51.

13.     Pistols that are comparable to the P320, like the Glock 17 or the Smith & Wesson M&P, use a combination of longer, heavier trigger pulls with a trigger safety to require more intentionality to fire. Ex. 5, Gatrost Decl. at ¶ 49.

14.     Other comparable pistols, like most model 1911s, use a combination of a grip safety and a manual thumb safety along with a longer, heavier trigger pull to require more intentionality to fire. Ex. 5, Gatrost Decl. at ¶ 47(1). Most model 1911s also include a de-cocking lever to safely de-energize the weapon before holstering. *Id.* at ¶ 47(4). The Walter P99 and the Sig Sauer P229 also incorporate de-cocking levers. *Id.*

15.     While no handgun can be made completely safe, all handguns sold to consumers should be reasonably safe. Ex. 5, Gatrost Decl. at ¶ 51.

16.     Sig Sauer agrees: "[I]t's the responsibility of the design team to design away from any known defects." Ex. 2, M. Taylor Dep. 187:17–188:04.

## III.    The P320's troubled design history overseen by Sig Sauer's marketing team

17.     The P320 was originally based off a Sig Sauer pistol design called the P250. Ex. 2, M. Taylor Dep. 143:12–14; Ex. 6, Sig Sauer – Striker Fired Pistol design overview at '0001. The P250 is a discontinued pistol. Ex. 2, M. Taylor Dep. 72:21–24.

18.     Prior to being discontinued, the P250 was removed from consideration in 2010 by the United States Bureau of Alcohol, Tobacco, and Firearms due to reliability and safety concerns. Ex. 7, Denial of Sig Sauer's Appeal to U.S. Government Accountability Office; Ex. 5, Gatrost Decl. at ¶ 56.

19.     In 2012, Sig Sauer pivoted from the P250 to the P320 with the goal of developing "a striker fired pistol capable of using the P250 grip modules," along with other common parts, including a pre-existing inventory of barrels the company had in storage. Ex. 2, M. Taylor Dep.

74:6–21, 128:19–22; Ex. 6, Sig Sauer – Striker Fired Pistol design overview at '0001–04. In other words, Sig Sauer was trying to use the leftover parts of the P250 in a new firearm—the firearm that would become the P320.

20.     Before working on the P320, no one on the P320's design team had ever designed a striker fired pistol. Ex. 2, M. Taylor Dep. 140:16–141:6.

21.     Indeed, Sig Sauer's engineering team was sidelined during the design phase of the P320. Instead, Sig Sauer's marketing department had substantial control over the final design of the pistol. Ex. 2, M. Taylor Dep. 71:3–25; 91:2–18. Ex. 8, Trial Transcript, *Lang v. Sig Sauer*, Sean Toner Testimony 352:5–7, 414:19–415:13, 425:8–15.

22.     Sig Sauer's engineers did not decide that the P320 should have such a light trigger—that decision was approved as "a marketing call." Ex. 9, Sean Toner email dated June 5, 2014; Ex. 10, 30(b)(6) Deposition of Sig Sauer, Inc., via Thomas Taylor ("T. Taylor Dep.") 96:19–23.

23.     The P320 was originally designed to have both a thumb safety and a trigger safety. But, again, Sig Sauer's marketing team decided to remove those as standard safety features, and—in the case of the trigger safety—decided not to offer it as an option. Ex. 2, M. Taylor Dep. 141:20–142:2.

## IV.    The Defect

24.     The Sig Sauer P320 is defective. The defect has three components that, when combined, create an unreasonably dangerous product for its reasonably anticipated use. Those components are: (1) the P320 is effectively fully energized and ready to fire the instant that a round is chambered; (2) the P320 has a minimal trigger pull because it is short and lightweight; and (3)

the P320 lacks any external safety features. Collectively, these characteristics constitute "the Defect." Ex. 4, Biller Report at p. 20 ¶¶ 5–6; Ex. 5, Gatrost Decl. at ¶¶ 84, 85.

25.     Because of the Defect, the Sig Sauer P320 when chambered is functionally equivalent to a cocked gun with no external safety features. Ex. 4, Biller Report at p. 20 ¶ 6; Ex. 5, Gatrost Decl. at ¶¶ 63, 70, 86.

26.     Sig Sauer does not inform customers that the P320 has sufficient energy to discharge a bullet any time a round is chambered. Ex. 5, Gatrost Decl. at ¶ 87; *see also* Ex. 2, M. Taylor Dep. 221:17–23.

27.     All P320s have a very short, light trigger pull. That means the P320's trigger requires less work to fire the pistol than the trigger on pistols made by other manufacturers. Ex. 5, Gatrost Decl. at ¶¶ 49, 62–63.

28.     But Sig Sauer did not design the P320 to include any of the available external safety features routinely used on other pistols. Ex. 4, Biller Report at pp. 20–21 ¶¶ 5–6, 11; Ex. 5, Gatrost Decl. at ¶ 62.

29.     Sig Sauer admits that a manual safety would make the P320 safer. Ex. 2, M. Taylor Dep. 43:3–5 (Q. "But as to the question of manual safety, do you think it can help ensure safer handling?" A. "It could augment safer handling.").

30.     Nonetheless, the vast majority of P320s sold in Missouri are not equipped with a manual safety. Ex. 2, M. Taylor Dep. 173:23–174:3; Ex. 11, Report of Edward Stockton ("Stockton Report") at Tab 4.

31.     Because the P320 is effectively cocked when loaded, the P320 is functionally equivalent to a single action pistol with the hammer cocked back. Ex. 2, M. Taylor Dep. 100:13–20, 136:16–137:13, 211:7–16; Ex. 4, Biller Report at p. 20 ¶ 6; Ex. 5, Gatrost Decl. at ¶¶ 63, 70,

86. Thus, the P320 has sufficient energy to discharge ammunition. Ex. 2, M. Taylor Dep. 100:21–101:4.

32.     Sig Sauer acknowledges that just by looking at the P320, holding the P320, racking the P320's slide, or even firing the P320, a reasonable consumer could not determine what the action type of the P320 is. Ex. 2, M. Taylor Dep. 199:24–201:8.

33.     Despite the P320's Defect and known design risks, Sig Sauer refuses to adopt any external safety features for all P320s, which makes the P320 unreasonably dangerous for its reasonably anticipated use. Ex. 4, Biller Report at p. 20 ¶ 6; Ex. 5, Gatrost Decl. at ¶¶ 63, 84.

## V.     All P320s have the Defect.

34.     While the P320 comes in a variety of sizes and with a variety of optional add-ons, all P320s share the same design and safety characteristics because they all contain the same "fire control unit." The fire control unit is "the component (frame) that houses a majority of the key functional parts of some handguns; including parts such as the trigger, sear, and slide catch lever; and is the serialized part of the firearm." Ex. 2, M. Taylor Dep. 80:24–81:12; 99:14–15 (Q. "They're all designed the same, right?" A. "Correct."); 150:6–155:7; 156:5–7; 161:10–12. Ex. 3, Sig Sauer Glossary at p. 3. Ex. 4, Biller Report at pp. 5, 19, 21 ¶ 17; Ex. 5, Gatrost Decl. at ¶ 97.

35.     The large, medium, and small sizes of the P320's grip module do not impact the functionality of the P320. Ex. 2, M. Taylor Dep. 79:18–81:12 (Q. "And those different sizes, those don't have any impact on the functionality of the fire control unit or the sear striker, do they?" A. "They do not. They would all be interchangeable with the same fire control units.").[4]

---

[4] Sig Sauer defines the grip module as "a polymer or alloy component of a handgun that houses the primary firing components, including the trigger, sear, hammer, or striker." Ex. 3, Sig Sauer Glossary at p. 4.

36.     Similarly, the full size, compact, and subcompact versions of the P320 do not impact the functionality of the P320. Ex. 2, M. Taylor Dep. 79:18–81:12. (Q. "And so the sizes change[] what it looks like from the outside, but the inside and how it works is the same regardless of what size it is[?]" A. "Yes. . . ." Q. "But it had all the of the same design characteristics and safety characteristics regardless of the size. Is that true?" A. "Yes.").

37.     The P320 also comes in different models or variants, such as the P320X variant, which has a different shaped handle, but the P320X has the same fire control unit as the standard issued P320 and none of the ergonomic differences in the P320X change the way the P320 mechanically works, including its safety features. Ex. 2, M. Taylor Dep. 87:6–88:21.

38.     The different magazine sizes that correspond to different grip sizes of the P320 also do not impact the P320's basic mechanical functions. Ex. 2, M. Taylor Dep. 89:10–90:23 (A. "But, yes, in terms of basic function they all do the same thing as they interface with the fire control unit.").

39.     Different versions of the P320 all mechanically function the same and use the same fire control unit. Ex. 2, M. Taylor Dep. 150:6–155:7; 231:4–24 (A. "A pistol either fires or it doesn't fire, right? All the factors that lead to one outcome or the other have been exactly the same for every Sig Sauer P320 manufactured since August of 2017 to the present."); Ex. 12, Sig Sauer product catalog at '1727–1746.

**VI.     Sig Sauer knows of the Defect.**

> **A.     Sig Sauer determined that each P320 is at a "high risk" to "kill [a] person unintentionally."**

40.     In February of 2017, Sig Sauer evaluated the safety hazards of the P320 and reported them to the U.S. Army as part of the contract process to supply the P320 as the military's next pistol. The name of the evaluation was the "MHS Pistol Failure Modes, Effects, and Criticality

Analysis (FMECA)." Ex. 2, M. Taylor Dep 163:2–21; Ex. 13, Spreadsheet titled MHS Pistol

Failure Modes, Effects, and Criticality Analysis (FMECA); Ex. 14, Memorandum titled Failure

Modes, Effects and Criticality Analysis (FMECA Memo). *See also* Ex. 15, Purchase Description

for the Modular Handgun (explaining requirement to conduct FMECA).

41.     The "purpose of [the FMECA] is to provide an evaluation of the safety hazards

associated with test or operation of the handgun products of the Modular Handgun System." Ex.

14, Memo at '0412.

42.     The risk assessment identified the P320 as having a "high" risk for having an

accidental discharge that could kill a person unintentionally:

| Potential Failure Mode (results in a loss of "Function" or realization of a hazard) | Potential Cause of Failure (Prob of Occurrence) | O | Potential Effect of Failure (Severity Function) | S | Risk Assessment Matrix Level |
|---|---|---|---|---|---|
| Pistol accidentally / unintentional discharges | Accidental trigger pull (Operator error) Finger on trigger | C | Kill person unintentionally | 1 | High |
| Pistol accidentally / unintentional discharges | Accidental trigger pull (Foreign Object) | C | Kill person unintentionally | 1 | High |

Ex. 13, FMECA; Ex. 4, Biller Report at p. 17.

43.     Further, Sig Sauer evaluated those unintentional discharge risks as "likely to occur

sometime[] in the life of an item." Ex. 13, FMECA. Put another way, Sig Sauer admits that every

P320 unit is likely to suffer an unintended discharge during the life of each pistol. Ex. 13, FMECA;

Ex. 4, Biller Report at p. 14, 21 ¶ 9.

44.     This risk assessment of "catastrophic" is shown on the risk assessment matrix

below:

| RISK ASSESSMENT MATRIX | | | | |
|---|---|---|---|---|
| SEVERITY / PROBABILITY | Catastrophic (1) | Critical (2) | Marginal (3) | Negligible (4) |
| Frequent (A) | High | High | Serious | Medium |
| Probable (B) | High | High | Serious | Medium |
| Occasional (C) | High | Serious | Medium | Low |
| Remote (D) | Serious | Medium | Medium | Low |
| Improbable (E) | Medium | Medium | Medium | Low |
| Eliminated (F) | Eliminated | | | |

Ex. 13, FMECA; Ex. 4, Biller Report at p. 14, 21 ¶ 9 (explaining that a likely catastrophic outcome is a high risk).

45.     The FMECA identified safety measures that would decrease the P320's likelihood of unintentional discharge, which included employing a manual thumb safety and training according to a particular Army field manual. Ex. 2, M. Taylor Dep. Ex. 13, FMECA; Ex. 4, Biller Report at pp. 17-18, 20-21 ¶¶ 6, 8, 14.

46.     But even after identifying safety measures to decrease the P320's likelihood of unintentional discharge, and even in the face of the known likelihood, Sig Sauer refuses to adopt any external safety features for the P320. Ex. 4, Biller Report at p. 21 ¶ 14.

**B.      Sig Sauer knows that the P320's Defect injures consumers and law enforcement.**

47.     Several national news outlets—like ABC News and the Washington Post— have reported on consumers across the country who have been injured due to inadvertent discharges of the P320. Ex. 16, Samantha Piatt email dated July 27, 2021 and attachment; Ex. 17, Tom Taylor

email dated April 13, 2023 and attachments; *Detective sues Sig Sauer after she says her holstered P320 handgun nearly killed her*, ABC News (Aug. 24, 2021).[5] Sig Sauer, though, considers CNN, ABC, NBC, CBS, and even Fox at times, to be "antigun media." Ex. 10, T. Taylor Dep. 109:21–110:22.

48.     Regardless, the Washington Post reported in April last year, "At least 80 people, including police officers, allege they were shot by their SIG Sauer P320 pistols." Ex. 18, *Popular handgun fires without anyone pulling the trigger, victims say*, Wash. Post (April 11, 2023).

49.     For its part, Sig Sauer has collected four binders' worth of incident reports concerning the P320 that its senior customer service manager keeps at his home. Ex. 19, 30(b)(6) Deposition of Sig Sauer, Inc., via Christopher Meyer ("Meyer Dep.") 20:24–21:15.[6] He, though, does not collect incident reports from any other firearm that Sig Sauer manufactures. *Id.* at 21:4–15. Thus, even at Sig Sauer, the P320 stands alone.

50.     In truth, Sig Sauer has received over 200 complaints of unintended discharges of the P320, far more than any other pistol it manufactures. Ex. 19, Meyer Dep 54:8–18. And several have been captured on video and reported in the media. *See, e.g.,* Ex. 18 Wash. Post (April 11, 2023); Police1, *Conn. police department to replace all officers' handguns due to safety concerns*:

---

[5]   Available at https://abcnews.go.com/US/detective-sues-sig-sauer-holstered-p320-handgun-killed/story?id=79605906.

[6] Sig Sauer has not produced the binders of incident reports.



https://www.police1.com/police-products/firearms/articles/conn-police-department-to-replace-all-officers-handguns-due-to-safety-concerns-shVuKA0s4AIcvJze/ (July 28, 2023).

51.     Sig Sauer's corporate representative dismiss these videos and news reports as "anti-gun" or perhaps fraudulent, even comparing them to videos of Bigfoot. Ex. 10, T. Taylor Dep. 109:21–110:22; Ex. 16, Samantha Piatt email dated July 27, 2021 and attachment; Ex. 20, 30(b)(6) Deposition of Sig Sauer, Inc., via Matthew Farkas ("Farkas Dep.") 58:8–18:

> Q.   And so what is the explanation that the
> law enforcement sales folks are giving for why
> there are these videos online or these reports
> of lawsuits on some of the media outlets?
> [ . . .]
> A.   For me, I liken it to Bigfoot. I mean,
> there's videos about sightings of him online
> as   well.   I   don't   necessarily   believe
> everything I read or see online.

52.     Indeed, Sig Sauer's response to customer complaints and media reports about the P320 has been a strategy of denial. It blames the "anti-gun media" (Option 1), trial lawyers (Option 2), or even its competitors (Option 3). Sig Sauer even goes so far as to blame its victims—often law enforcement officers (also Option 2):

**Statement 07/27**

Option 1 (News):
We are disappointed, but not surprised, that a liberal, anti-gun media outlet like ABC has chosen to report and sensationalize frivolous lawsuits being propagated by trial lawyers as newsworthy.

Option 2 (Trial Lawyers)
Once again, this lawsuit is a result of unsupported allegations and claims being propagated by trial attorneys seeking personal financial gain for a negligent discharge caused by the (insert officer if LE) mishandling and/or misuse of the firearm.

Option 3: (GLOCK)
We are not surprised that our competitor has decided to participate in sensationalizing false claims that seek to undermine the success of the P320. This is nothing more than an act of desperation due to their inability to prove themselves in a head-to-head match up with us.

Ex. 16,  Samantha Piatt email dated July 27, 2021 and attachment (highlighting in original); Ex. 10, T. Taylor Dep. 37:16–40:21.

53.     Given these concerns, several law enforcement agencies have decided the P320 is no longer safe to use:

- **Milwaukee, Wisconsin Police Department**. *Milwaukee police officers begin training on new Glocks*, 12 WISN ABC, (Dec. 14, 2022) available at https://www.wisn.com/article/milwaukee-police-officers-begin-training-on-new-glocks/42241678; *Cop's pistol fires, hits his partner at crime scene. He didn't touch trigger, suit says*, Miami Herald (Mar. 30, 2023) available at https://www.miamiherald.com/news/nation-world/national/article273775305.html.

- **Philadelphia Transit Police**. *Philadelphia Transit Police Scrap SIG Sauer Pistols After Incident*, New Hampshire Public Radio (September 11, 2019) available at https://www.nhpr.org/post/philadelphia-transit-police-scrap-sig-sauer-pistols-after-incident; *What happened when a SEPTA officer's handgun spontaneously fired in Philly's*

*Suburban Station*, The Philadelphia Inquirer (Feb. 27, 2021) available at https://www.inquirer.com/business/sig-sauer-guns-septa-ice-misfiring-suits-police-20210227.html.

- **North Dakota Highway Patrol**. *Factory recall: Safety warning with Sig Sauer P320 pistol*, Blue Line (Dec. 15, 2017) available at https://www.blueline.ca/factory-recall-safety-warning-with-sig-sauer-p320-pistol-5052/#:~:text=Other%20agencies%20such%20as%20North,sent%20back%20to%20the%20factory.

- **Montville, Connecticut Police Department**. *Conn. Police department to replace all officers' handguns due to safety concerns*, Police 1 (July 28, 2023) available at https://www.police1.com/police-products/firearms/articles/conn-police-department-to-replace-all-officers-handguns-due-to-safety-concerns-shVuKA0s4AIcvJze/.

- **Brookfield, Connecticut Police Department**. *Some Connecticut police are replacing a handgun that can reportedly fire without being triggered*, Newstimes (April 30, 2024) available at https://www.newstimes.com/local/article/ct-police-sig-sauer-guns-safety-19404483.php.

- **Orange, Connecticut Police Department**. *Some Connecticut police are replacing a handgun that can reportedly fire without being triggered*, Newstimes (April 30, 2024) available at https://www.newstimes.com/local/article/ct-police-sig-sauer-guns-safety-19404483.php.

- **Morrow, Alabama Police Department**. *Morrow police chief pulls Sig Sauer['s] guns from service*, (Aug. 10, 2017) available at https://www.11alive.com/article/news/local/morrow-police-chief-pulls-sig-sauers-guns-from-service/85-463471360.

- **Bridge City, Texas Police Department**. *Lawsuit: Semi-automatic police service gun goes off by itself, nearly killing detective*, ABC News (August 25, 2021) available at https://abc11.com/sig-sauer-lawsuit-p320-pistol-brittney-hilton-accidental-discharge/10974219/.

- **Burnet City, Texas Police Department**. *BPD transitions to new duty gun to replace problematic firearm,* Daily Trib (Oct. 24, 2024) https://www.dailytrib.com/2024/10/24/bpd-transitions-to-new-duty-gun-to-replace-problematic-firearm/.

- **Marble Falls, Texas Police Department**. *MFPD recalls sidearms after accidental gun discharge at school*, Daily Trib (Sep. 24, 2024) available at https://www.dailytrib.com/2024/09/24/mfisd-officer-injured-in-accidental-gun-discharge-on-campus/.

- **Indian River County, Florida Sheriff's Office**. *Indian River County Sheriff's Office switches to new firearm after deputy injured in unintended discharge*, 5 WPTV West Palm

Beach (Dec. 4, 2023) available at https://www.wptv.com/news/treasure-coast/region-indian-river-county/indian-river-county-sheriffs-office-new-weapons-12-4-23.

54.     These concerns continue to mount. Just last month, on October 17, the Washington State Criminal Justice Training Commission issued a memo stating that it "has become aware of a serious safety concern with the Sig Sauer P320," and that "during a Basic Law Enforcement Academy (BLEA) firearms training, a student experienced a premature discharge with their agency issued firearm," which led the Commission to discover a separate incident involving the P320 in Washington state earlier this year. Ex. 21, FSCJTC Memo. Accordingly, the Commission decided that it "will not authorize the use of the Sig Sauer P320 in our agency-owned or contracted training facilities until further notice." *Id.*

55.     And just a few days ago, on November 1, a CBS news outlet reported on—and published video footage of—an officer who was nearly killed when the P320 discharged in his holster while he was walking. *It happened again: Texas officer injured by holstered SIG SAUER P320*, CBS | Austin (Nov. 1, 2024) available at https://cbsaustin.com/news/local/it-happened-again-texas-officer-injured-by-holstered-sig-sauer-p320.



https://cbsaustin.com/news/local/it-happened-again-texas-officer-injured-by-holstered-sig-sauer-p320

56. Despite all this, Sig Sauer marketing touts the safety of the P320 saying:

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

Sig Sauer also touts the fact that the P320 has been adopted as the military's M17 and M18 pistols, while omitting that the military requires every M17 and M18 to come equipped with a manual safety. Ex. 22, P320 advertisement: "SAFETY WITHOUT COMPROMISE"; Ex. 2, M. Taylor Dep. 234:8–235:2.

57. In the U.S. District Court for the District of New Hampshire alone, 64 plaintiffs filed consolidated complaints in June of this year, alleging they were injured by inadvertent P320 discharges. *See In Re: Sig Sauer P320 Products Liability Litigation*, No. 22-CV-536, ECF Nos. 63–72.

58. To date, injured individuals have filed no fewer than 32 additional cases against Sig Sauer in federal courts across the country, alleging inadvertent discharge of the P320, with many of the victims being law enforcement agents. Ex. 23, Declaration of Matthew Dameron ("Dameron Decl.") ¶ 35 (summarizing filings).

59. And recently, a jury sitting in the U.S. District Court for the Northern District of Georgia awarded a man $2.35 million for pain, suffering, and medical damages, finding that the P320 was defectively designed after it shot through the man's leg while he pulled it out of his holster. Ex. 24, Verdict Form, *Lang v. Sig Sauer, Inc*., No. 21-CV-4196 (June 20, 2024) ECF No. 131.

## VII. Sig Sauer uniformly conceals the Defect from Missouri consumers.

60. Sig Sauer maintains internal records of the number of P320s sold to Missouri consumers. From September 1, 2017 through April 18, 2022, Sig Sauer shipped over 21,000 P320s

into Missouri to commercial dealers. Ex. 11, Stockton Report at Tab 4; Ex. 2, M. Taylor Dep. 158:2–161:9.[7]

61.     Over 19,000 of those pistols did not include a manual thumb safety. Ex. 11, Stockton Report at Tab 5.

62.     Any statement Sig Sauer made describing the function of the P320 would apply to all P320s, and the company is "not aware of any statement that would be in conflict with each other" concerning different versions. Ex. 2, M. Taylor Dep. 156:13–157:4.

63.     Sig Sauer conceded that it knows more about the P320 than a reasonable consumer does.  Ex. 2, M. Taylor Dep. 191:21–192:1. And it designed the P320 with knowledge that the product was going to be sold to the general public for a price, and it expected that consumers would purchase the P320 for their personal use, including everyday carry. Ex. 2. M. Taylor Dep. 186:3–16, 225:16–24. For instance, Sig Sauer knows that users routinely keep a round chambered in their pistol. Ex. 2, M. Taylor 232:15–19; Ex. 20, Farkas Dep. 148:1–5.

64.     Even though Sig Sauer knows the P320 is harming individuals across the country, it has not made any design changes to the P320 in the last several years. Ex. 2, M. Taylor Dep. 230:6–16. Instead, Sig Sauer engages in the dissemination of information to counter stories concerning inadvertent discharges of the P320. Ex. 2, M. Taylor Dep. 230:6–16; Ex. 10, T. Taylor Dep. 31:4–20. *See e.g.* Ex. 17, Tom Taylor email dated April 13, 2023 and attachments (PR draft press release regarding "seriously flawed" Washington Post article).

65.     Sig Sauer purchases advertisements that are delivered to consumers through print advertising in magazines, television, and social media. Ex. 10, T. Taylor Dep. 27:19–28:3; 94:20–

---

[7] Sig Sauer has cut off its pre-certification production of sales data at April 18, 2022. While Plaintiff does not agree with this temporal limitation, it is a discovery dispute that can be deferred until after the Court's ruling on class certification.

25. It purchases national ad buys for its advertisements in magazines and is unaware of any limitation to those advertisements being distributed within Missouri. *Id.* at 28:12–29:7.

66.     In addition to omitting information concerning the design of the P320, the advertisements further conceal the Defect by equating the standard P320 (with no external safety features) with the military-issued M17 and M18 (both of which include a manual safety). Simply put, Sig Sauer attempts to leverage its relationship with the Department of Defense to sell more pistols to civilian consumers, and often relies on military iconography to achieve that goal, even though the military and civilian versions of the pistols are markedly different.

67.     For example, the screen shot below is from Sig Sauer's P320 homepage—not the page specifically dedicated to the M17 or M18—where Sig Sauer depicts a man in military combat gear brandishing the P320, which is described by Sig Sauer as "CHOSEN THE WORLD OVER":



*See P320 Pistols*, Sig Sauer (accessed Oct. 16, 2024), available at https://www.sigsauer.com/ firearms/pistols/p320.html.

68.     The following examples demonstrate how Sig Sauer advertises the P320 specifically—without reference to the M17 or M18—by depicting individuals in military combat fatigues with phrases like "HAPPY P320 DAY: THE OFFICIAL SIDEARMS OF ALL BRANCHES OF THE U.S. MILITARY," and "ONE FOR ALL":



Ex. 25, P320 advertisement: "HAPPY P320 DAY"; Ex. 26, P320 advertisement: "ONE FOR ALL".

69.     Another example is the following advertisement for the M17 specifically that states it is "BASED ON THE P320" while letting consumers know that the "M17 IS THE U.S. ARMY'S

CHOICE," and even displays the U.S. Army's logo, but again it completely omits that the Army-issued M17 includes a manual safety whereas the standard P320 does not:



Ex. 27, P320 advertisement: "BASED ON THE P320 THE M17 IS THE U.S. ARMY'S CHOICE".

**VIII.   The class is uniformly damaged by Sig Sauer's conduct.**

70.     The P320 pistols that Missouri consumers purchased were defective at the time of acquisition. As a result, consumers overpaid for the products, because the Defect differentiated the P320 from the accepted quality and safety standards for new handguns. Ex. 11, Stockton Report, ¶ 16.

71.     "This is not a potential defect as this design defect is manifested in every P320." Ex. 4, Biller Report at p. 20 ¶ 5.

72. Said another way, Sig Sauer failed to fulfill its bargain with consumers who agreed to purchase the P320 because those pistols were less valuable than what consumers reasonably expected to receive. Ex. 11, Stockton Report at ¶ 15.

73. Plaintiff's economic expert proposes a method by which to measure overpayment harm suffered by class members as a result of the alleged Defect. *Id.* at ¶ 16

74. The expert's method applies a benefit-of-the-bargain framework that considers the cost of a competent repair. *Id.* at ¶ 9. Calculating damages via a repair cost model is grounded in well understood and established economic theory and the firearms industry and its corresponding markets are suitable areas in which to apply the method. *Id.* at ¶ 14.

75. And because all P320s are designed the same, any repair or modification to a P320 would be uniform across all P320s. Ex. 5, Gatrost Decl. ¶¶ 90–96.

76. Like Class members, Plaintiff purchased and currently owns a P320 without a manual safety. Complaint [Doc. 1] at ¶ 6. Plaintiff paid approximately $400 for the pistol. *Id.*

77. Plaintiff's counsel has also contacted Verita Global, a class action settlement administrator to prepare a notice plan for the Missouri Class. Ex. 28, Declaration of Carla Peak ("Peak Decl.").

78. Included herewith is Plaintiff's proposed class notice. Ex. 29, Proposed Class Notice.

## LEGAL STANDARD

Class certification is governed by Federal Rule of Civil Procedure 23. A district court "must undertake a 'rigorous analysis' to ensure that the requirements of Rule 23 are met." *Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011). However, "there are limits to a court's analysis of the merits of a matter at the class certification stage. A court's inquiry on a motion for class certification is 'tentative,' 'preliminary,' and 'limited.'" *Cope v. Let's Eat Out, Inc.*, 319 F.R.D. 544, 551 (W.D. Mo. 2017) (quoting *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011)). Indeed, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citing *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455 (2013)). In this case, the proposed Class satisfies Rule 23. The Court should grant Plaintiff's motion.

**ARGUMENT**

Plaintiff seeks certification of the following class:

> **All persons who purchased a Sig Sauer model P320 pistol
> without an external thumb safety primarily for personal, family
> or household purposes in the state of Missouri from September
> 1, 2017, through the present.[8]**

The proposed class conforms to the discovery that has occurred to date. Sig Sauer's internal

documents and its corporate deposition testimony confirm that the P320 has the same design, each

P320 contains the alleged Defect, and Sig Sauer failed to inform Missouri consumers about the

P320's Defect.

## I.    The class satisfies Rule 23(a).

### A.    Numerosity

Rule 23(a)(1) requires that the class be sufficiently numerous such that joinder of all

members would be impracticable. Considering numerosity, courts analyze the "number of class

members as well as the nature of the action, the size of the individual claims, the inconvenience of

trying individual suits, and any other factor relevant to the practicability of joining all the putative

class members." *Claxton v. Kum & Go, L.C.*, No. 14-CV-03385, 2015 WL 3648776, at *3 (W.D.

Mo. June 11, 2015) (Harpool, J.) (citing *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir.

1982)). "The Eighth Circuit has not set forth an arbitrary number or arbitrary rules regarding

numerosity." *Bradford v. AGCO Corp.*, 187 F.R.D. 600, 604 (W.D. Mo. 1999). And "[w]hen the

question of numerosity is a close one, courts tend to strike a balance in favor of finding

numerosity." *Cromeans v. Morgan Keegan & Co., Inc.*, 303 F.R.D. 543, 551 (W.D. Mo. 2014).

---

[8] Excluded from the class are (1) individuals who have filed an individual action against Sig Sauer
related to the P320, or (2) individuals who no longer own a P320 pistol without an external thumb
safety.

Here, the proposed Class is sufficiently numerous. Sig Sauer has refused to produce the relevant sales data for the entire class period. However, for the limited time period of November 2017 through March 2022, Sig Sauer sold over 19,000 P320s (without a manual safety) into Missouri. *See* SOF at ¶ 61. This represents just a portion of the relevant P320s and easily satisfies the minimum threshold for establishing numerosity. *See Ark. Educ. Ass'n v. Bd. Of Educ.*, 446 F.2d 763, 765 (8th Cir. 1971) (a proposed class of 20 members satisfied numerosity); *Paxton*, 688 F.2d at 561 (finding a class of 74 employees satisfied numerosity); *Cope*, 319 F.R.D. at 554-55 (certifying classes of 99 and 144 members).

### B.    Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." A plaintiff must demonstrate "that the class members 'have suffered the same injury,' which 'does not mean merely that they have all suffered a violation of the same provision of law.'" *Burnett v. Natl. Assn. of Realtors*, No. 19-CV-332, 2022 WL 1203100, at *5 (W.D. Mo. Apr. 22, 2022) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011)). Indeed, the "claims must depend upon a common contention of such a nature that it is capable of class wide resolution." *Id.* (quoting *Dukes*, 564 U.S. at 350).

"[A] single common question is sufficient to satisfy Rule 23(a)(2)." *Claxton*, 2015 WL 3648776, at *3. And "[c]ommonality is not required on every question raised in a class action," *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). That's because commonality "does not require that every question of law or fact be common to every member of the class," and commonality "may be satisfied, for example, where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." *Burnett*, 2022 WL 1203100, at *5. For this reason, "[c]ommonality is easily

satisfied in most cases." *M.B. by Eggemeyer v. Corsi*, No. 17-CV-4102, 2018 WL 3484048, at *5 (W.D. Mo. July 19, 2018).

Further, "[c]ourts within the Eighth Circuit have stated that 'the commonality requirement imposes a very light burden on a plaintiff seeking to certify a class and is easily satisfied.'" *Rikard v. U.S. Auto Prot., LLC*, 287 F.R.D. 486, 489–90 (E.D. Mo. Nov. 30, 2012) (quoting *Mund v. EMCC, Inc.*, 259 F.R.D. 180, 183 (D. Minn. 2009)). *See also Paxton*, 688 F.2d at 561 ("[t]he rule does not require that every question of law or fact be common to every member of the class").

The proposed class satisfies Rule 23(a)(2)'s commonality requirement. While only one common question of law or fact is required, this case has many, including:

- whether the P320 contains the alleged Defect;

- whether Sig Sauer knew or should have known that the P320 contains the alleged Defect;

- whether the P320's alleged Defect makes it unreasonably dangerous for its reasonably anticipated use;

- whether Sig Sauer failed to inform consumers of the P320's alleged Defect;

- whether Sig Sauer failed to inform consumers that the P320 was of a different design than the military version of the pistol;

- whether Sig Sauer's omissions constituted a deception under Missouri law;

- whether Sig Sauer's omissions constituted an unfair practice under Missouri law;

- whether Sig Sauer's omissions constituted a concealment, suppression, or omission of material fact under Missouri law;

- whether Sig Sauer's unlawful acts would cause a reasonable person to purchase a P320; and

- whether there is sufficiently definitive and objective evidence to allow each of the class members' loss to be calculated with a reasonable degree of certainty.

The foregoing questions are common to the class because they will be answered by scrutinizing Sig Sauer's conduct in relation to the P320 rather than the conduct of the individual class members. *See In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*, No. 20-MD-2936, 2023 WL 9064606, at *12 (W.D. Mo. Dec. 13, 2023) ("When the defendant's conduct is the same, it is difficult to conceive of any significant equitable differences between class members."); *Doran v. Missouri Dep't of Soc. Servs.*, 251 F.R.D. 401, 404 (W.D. Mo. 2008) (observing that the commonality inquiry focuses on the defendant's conduct) (citing cases).

### C.    Typicality

Rule 23(a)(3)'s typicality requirement "is fairly easily met, so long as other class members have claims similar to the named plaintiff." *Cope*, 319 F.R.D. at 555 (citing *DeBoer*, 64 F.3d at 1174). And class representatives do not need "identical interests" with "every class member." *Claxton*, 2015 WL 3648776, at *3. In assessing typicality, courts consider whether the named plaintiff's claim "arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

The typicality requirement is satisfied here because Plaintiff asserts the same claims individually that he asserts on behalf of the class, and he suffered the same injury as unnamed class members, *i.e.*, he purchased a P320 but was unaware of the pistol's alleged Defect that was concealed by Sig Sauer.

### D.    Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." The focus "is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton*, 688 F.2d at 562. "A class representative

need only possess a minimal degree of knowledge necessary to meet the adequacy standard." *New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007).

Here, Plaintiff has no interest that is antagonistic to, or conflicts with, the interests of the class. To the contrary, Plaintiff's interests are coextensive of those of the proposed class members in establishing Sig Sauer's liability and damages. Plaintiff has participated actively in discovery, including sitting for a deposition, answering interrogatories, and gathering and producing documents. *See* Ex. 23, Dameron Decl. at 30.

Further, Plaintiff has retained qualified attorneys who are experienced in consumer protection and class action litigation. Proposed class counsel have extensive experience in handling matters related to consumer protection, including prosecuting similar cases via the class action device. The lawyers of Williams Dirks Dameron and Lear Werts have also successfully prosecuted class actions involving consumer protection claims, including taking class cases through trial. *See Burnett v. National Association of Realtors* (W.D. Mo.) (securing $1.7 billion jury verdict in class action for antitrust claims brought on behalf of Missouri consumers). Proposed class counsel also have a track record of successfully litigating claims in this Court under Missouri law. *See e.g. Smith, et al., v. Atkins Nutritionals Inc.*, Case No. 2:18-cv-04004-MDH; *Hays v. Nissan*, Case No. 4:17-cv-00353-BCW; *Woods v. CVS-Caremark*, Case No. 4:14-cv-00583-SRB. *See also* Ex. 23 Dameron Decl. at ¶ 34; Exs. 30–31 Firm Resumes. Plaintiff satisfies adequacy.

## II. The class satisfies the requirements of Rule 23(b)(3).

Plaintiff brings this action pursuant to Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The proposed class satisfies both the "predominance" and "superiority" requirements of Rule 23(b)(3).

### A. Predominance

The predominance requirement "subsumes the commonality requirement, so both can be analyzed through the lens of predominance." *Diesel v. Mariani Packing Co., Inc.*, No. 22-CV-1368, 2024 WL 1674520, at *4 (E.D. Mo. Apr. 18, 2024) (citing *Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595, 601 (8th Cir. 2020)).

Rule 23(b)(3)'s predominance requirement asks whether "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453–54 (2016) ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.")). *See also Claxton*, 2015 WL 3648776, at *4 (predominance under Rule 23 found where "all class members would present the same factual evidence at trial").

In other words, the court asks—upon "a limited preliminary inquiry"—whether, "if the plaintiff's general allegations are true, common evidence could suffice to make out a prima facie case for the class." *See Blades v. Monsanto Co*., 400 F.3d 562, 566–67 (8th Cir. 2005). *See also Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010) ("If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question."). Importantly, when there are issues common to the class that predominate, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class

members." *Day v. Celadon Trucking Servs., Inc.*, 827 F. 3d 817, 833 (8th Cir. 2016) (citing *Bouaphakeo*, 136 S. Ct. at 1045).

### i. Claims under the MMPA predominate and are routinely certified.

The MMPA's definition of prohibited conduct is "'unrestricted, all-encompassing and exceedingly broad.'" *Perras v. H&R Block*, 789 F.3d 914, 917 (8th Cir. 2015) (quoting *Ports Petroleum Co. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. 2001)). Indeed, the MMPA covers "every practice imaginable and every unfairness to whatever degree." *Ports Petroleum*, 37 S.W.3d at 240. The MMPA prohibits the "act, use or employment by any person of any deception [or] unfair practice . . . in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.1. And its banned practices include anything that "offends any public policy," or that is "unethical, oppressive or unscrupulous." 15 Mo. C.S.R. § 60-8.020(1)(A). *See also Huch v. Charter Communications, Inc.*, 290 S.W.3d 721, 724, 727 (Mo. 2009) ("Sec. 407.020 does not define deceptive practices; it simply declares unfair or deceptive practices unlawful.").

The "fundamental purpose" of the MMPA is to protect consumers, and the MMPA was enacted to "to regulate the marketplace to the advantage of those traditionally thought to have unequal bargaining power as well as those who may fall victim to unfair business practices." *Huch*, 290 S.W.3d at 724, 727. "The MMPA is interpreted broadly to promote its purpose to protect consumers." *Burnett*, 2022 WL 1203100, at *18. As such, "[t]he focus of the statutory scheme is on the defendant's conduct." *Hawkins v. Nestle U.S.A. Inc.*, 309 F. Supp. 3d 696, 701 (E.D. Mo. Feb. 16, 2018).

Given the MMPA's broad reach, and that the focus is on defendant's conduct, MMPA cases are routinely certified as class actions. *See e.g., Elsea v. U.S. Engineering Co.*, 463 S.W.3d 409, 420 (Mo. Ct. App. 2015) (certifying an MMPA class action where the unlawful practice could

be demonstrated by looking at the defendant's conduct); *Hays v. Nissan N.A., Inc.,* No. 17-cv-353, 2021 WL 912262, at *3 (W.D. Mo. Mar. 8, 2021) (certifying class-wide MMPA claim for defectively designed product); *Burnett*, 2022 WL 1203100, at *18 (certifying MMPA claim and holding "whether [defendants'] conduct amounts to an unfair practice creates common questions and is the central issue to the MMPA claim"); *In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*, 2023 WL 9064606, at *22 (certifying MMPA claim).

### ii.    The same is true under the amended MMPA.

In 2020, the Missouri legislature amended the MMPA to include three clarifying standards:

1. that the person acted as a reasonable consumer would in light of all circumstances;

2. that the method, act, or practice declared unlawful by section 407.020 would cause a reasonable person to enter into the transaction that resulted in damages; and

3. individual damages with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty.

*Diesel*, 2024 WL 1674520, at *5 (citing Mo. Rev. Stat. § 407.025.1(2)). None of these new elements, however, affect this Court's analysis under Rule 23 or prevent class certification under the MMPA. *See id.* (analyzing new amendments under MMPA and certifying class).[9]

*First*, arguments as to whether plaintiff acted as a reasonable consumer "are not proper on this motion," and "[t]o the extent this issue requires some individualized inquiry among the class members . . . [that] issue does not predominate." *Id.* at *9. For example, in *Diesel*, the Court held that under Rule 23(b)(3), an MMPA "class action is superior to other available methods for fairly

---

[9] The amendments did not alter the plain language of section 407.025, which still states that "class actions [are] authorized," and an "action may be maintained as a class action in a manner consistent with Rule 23 of the Federal Rules of Civil Procedure . . . ." Mo. Rev. Stat. § 407.025.6.

and efficiently adjudicating [the] controversy" because the "issue only involve[d] Missouri plaintiffs, each with relatively small claims, who might not otherwise seek or obtain relief absent a class action." *Id.* at *10 (citing *Burnett*, 2022 WL 1203100, at *19). The same is true here, where Plaintiff seeks to represent a class of Missouri consumers with relatively small claims concerning the purchase of their P320s and who may not have incentive to bring their claims individually.

*Second*, whether Sig Sauer's omissions "would cause a reasonable person to enter into the transaction" that resulted in damages is determined "without any individualized proof of reliance." *Id.* at *5–6. For example, where a plaintiff sought to certify a class based on deceptive food packaging, the court in *Diesel* held that "the issue of whether a reasonable consumer would be deceived by the allegedly deceptive packaging is subject to common proof, thus can be determined on a class wide basis." *Id.* (citing *In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*, 2023 WL 9064606, at *17 (finding that common issues of fact and law dominate the MMPA claim because "Missouri courts have held that the MMPA does not require individualized evidence as it pertains to reliance.")). Here, whether a reasonable consumer would be deceived by Sig Sauer's omissions concerning the P320's alleged Defect is subject to class-wide resolution under the MMPA.

*Third*, the MMPA provides for class-wide resolution of damages with sufficient particularity. *See Diesel*, 2024 WL 1674520, at *6–7 ("Further, the alleged ascertainable loss can be determined on a class-wide basis."). When analyzing damages under the MMPA, courts apply the "benefit of the bargain rule," which "awards a prevailing party the difference between the value of the product as represented and the actual value of the product as received." *Id.* at *6. Again, the court in *Diesel* rejected defendants' arguments that "individual inquiries are required to prove . . . loss under the MMPA." *Id.* at *7. The key is whether a determination can be made on a class wide

basis as to whether the actual value of the product is "less than" the value of the product "as represented" based on "an objective characteristic." *Id.* at *8–9.

That determination here has largely been made already; in denying Sig Sauer's motion for judgment on the pleadings, this Court held that "the very core of Plaintiff's complaint is that he did not receive what he bargained for because Sig Sauer concealed material facts about the P320 he purchased." Order [Doc. 70] at p. 6.

Beyond that, as discussed further below, Plaintiff has come forward with a class wide methodology for calculating damages supported by expert testimony. SOF ¶¶ 70–77; *infra* § II.A.iv.

### iii. *Sig Sauer's liability is subject to class-wide determination.*

When assessing whether common questions predominate, the Court inquires whether "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Bouaphakeo*, 136 S. Ct. at 1045.

Here, the same evidence will govern the threshold questions in the litigation, such as whether Sig Sauer's P320 contains the alleged Defect, whether the P320 is unreasonably dangerous for its reasonably anticipated use, and whether Sig Sauer violated its duties to consumers by concealing the P320's alleged Defect.[10] The resolution of these questions will focus

---

[10] Sig Sauer previously argued this case should be dismissed in light of *In re Polaris Marketing, Sales Practice, and Products Liability Litigation* because Plaintiff has not actually experienced an inadvertent discharge. *See* 9 F.4th 793 (8th Cir. 2021). This Court rejected that argument. *See* Order [Doc. 70] at 2–4. The facts presented here further solidify that the alleged Defect is manifest in all P320s due to the P320's defective design. SOF ¶¶ 2, 34–39 *See also Tuter v. Freud Am., Inc.*, No. 22-CV-282, 2022 WL 4636225, at *5 (W.D. Mo. Sept. 30, 2022) (distinguishing *Polaris* where product at issue alleged defect in all products even where all purchasers did not have first-hand experience of the defect).

exclusively on Sig Sauer and its conduct—evidence that is equally applicable to the entire class. Much of that evidence is readily available through documents and testimony concerning the design of the P320 (*see* SOF ¶¶ 17–33), and through Sig Sauer's representations to consumers and response to information concerning the P320's inadvertent discharges (*see* SOF ¶¶ 51–52, 56, 62). Indeed, Sig Sauer's corporate representatives confirmed that all P320s are the same with respect to the pistol's functionality and safety characteristics. SOF ¶¶ 2, 34–39. Plaintiff's experts likewise confirm that all P320s are the same with respect to the design features (or lack thereof) challenged here. *Id*. Because liability in this case is subject to uniform evidence of Sig Sauer's conduct, Plaintiff's claims satisfy predominance.

### iv.          *Damages can be determined on a class-wide basis.*

The Supreme Court dictates that proof of class-wide damages is ***not*** a prerequisite to class certification. *See Bouaphakeo*, 136 S. Ct. at 1045 ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, ***such as damages*** or some affirmative defenses peculiar to some individual class members.'") (internal citations omitted) (emphasis added). Rather, a plaintiff need only "show a linkage between [their] theory of liability and theory of damages." *Cromeans*, 303 F.R.D. at 559. Expert testimony establishing common impact from the defendant's conduct is sufficient to establish class-wide injury. *See, e.g., In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1259 (10th Cir. 2010). In this case, the fact that Plaintiff can establish damages for each class member through common evidence further supports certification.

Plaintiff submits the expert declaration of economist Edward Stockton. *See* Ex. 11, Stockton Report; SOF at ¶¶ 70–75. Stockton opines that using the methodology set forth in his Declaration he can (1) calculate the benefit-of-the-bargain damages for current owners of the P320

based on the cost to repair the P320's alleged Defect, and (2) apply that calculation to the class. This approach to determining class-wide damages has been endorsed by this Court in cases concerning defectively designed products. *See, e.g., Hays*, 2021 WL 912262, at *6 ("Thus, based on Eighth Circuit precedent regarding MMPA claims, the Court agrees with Plaintiff and finds that the class members share a common 'benefit of the bargain.'"). Accordingly, because the class damages are susceptible to common proof, Plaintiff satisfies the predominance requirement.

## B. Superiority

In addition to predominance, Rule 23(b)(3) contemplates that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."

### i. *A class action is manageable.*

To determine whether a class action is the superior method for litigating plaintiff's claims, courts consider "the difficulties likely to be encountered in the management of the action." *Burnett*, 2022 WL 1203100, at *19 (citing *Barfield v. Sho-Me Power Elec. Co-op.*, No. 11-CV-4321, 2013 WL 3872181, at *15 (W.D. Mo. July 25, 2013)). And the analysis "tak[es] into consideration choice of law determinations, notice to class members, etc." *Cope*, 319 F.R.D. at 557. That said, "dismissal for management reasons is never favored . . . [and] lack of manageability justifies denial of certification only where the attention and resources which would have to be devoted strictly to administrative matters will overwhelm any relief ultimately accruing to the plaintiff class." *Barfield*, 2013 WL 3872181, at *15 (quotations omitted).

Again, this case focuses on the P320's alleged Defect and challenges Sig Sauer's conduct in concealing that information from all Missouri consumers. Accordingly, a class action is just as manageable as a single plaintiff case. This is particularly true considering the absence of any choice-of-law concerns; the case is limited in scope to Missourians, and it will not implicate the

laws of several states. *Id.* at *15 (noting that superiority was satisfied where the case did not span multiple states or involve multiple issues of state law).

Concerning notice, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Burnett*, 2022 WL 1203100, at *19 (citing Fed. R. Civ. P. 23(c)(2)(B)) (finding the plaintiffs' contact of class administration company and attachment of a "robust" notice plan was sufficient for class certification).

Here, Plaintiff has done the same as in *Burnett* and contacted a settlement administrator to establish a plan that facilitates notice to class members, easily satisfying the manageability standard. *See* SOF ¶ 76; Ex. 28 Peak Decl. ("When combined, the direct notice efforts and media campaign are expected to reach approximately 85% of likely class members."); *see also* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* at 1 (2010) (explaining that notice to 70% or more of likely class members typically satisfies due process).

Finally, consolidating the claims of all Missourians who purchased P320s into one litigation would be in the best interest of the class members and the court system. For example, in *Burnett*, a class action was the superior method where each member had little incentive to control the litigation, the claims were the same, the individual damages were small compared with the costs of bringing the litigation, and separate proceedings would produce duplicative effort and a risk of inconsistent verdicts. *See Burnett,* 2022 WL 1203100, at *19. Just as in *Burnett*, it would be judicially inefficient for the claims of Missouri P320 owners to be spread among multiple actions, particularly where all class members would rely on the same legal theories and evidence.

Proposed class counsel can present this case on a class-wide basis as efficiently as on an individual basis, and in less time than prosecuting thousands of individual claims.

##### ii. *The proposed class is ascertainable.*

A "court must be able to readily ascertain class members in order to permit members to opt-out and to determine who is or is not bound by the judgment." *Barfield*, 2013 WL 3872181, at *13. And that "process of identification must be sufficient to satisfy due process but also efficient enough to prevent the court from being bogged down in individual inquires." *Id.* In the Eighth Circuit, "[a] class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017) (citing *Sandusky Wellness Center, LLC*, 821 F.3d 992, 997 (8th Cir. 2016)).

"The standard for ascertainability is not demanding. It is designed only to prevent the certification of a class whose membership is truly indeterminable." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015) (internal citations omitted). "[A] plaintiff need only show that class members *can* be identified." *Byrd v. Aaron's, Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (emphasis in original). To do so, a class definition must allow members to be identified "without resort to intensive, individualized factual inquiries." *Dumas v. Albers Medical, Inc.*, No. 03-CV-640, 2005 WL 2172030, at *5 (W.D. Mo. Sept. 7, 2005). Plaintiff has consulted a class action notice expert who has confirmed that notice can identify and reach at least 85% of the class. Ex. 28, Peak Decl. at ¶¶ 30-32.

Here, membership in the class is based on objective, verifiable facts. The definition contemplates plainly objective criteria that can be verified for each class member without requiring intensive, individualized factual inquiries. Thus, the proposed class is sufficiently ascertainable.

44

**III.    In addition, or alternatively, Rule 23(c)(4) issue certification is warranted.**

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Should the Court determine that Plaintiff's class cannot be certified under Rule 23(b)(3) or prefers to determine liability in the first instance and damages at a later phase, it should certify each of the common issues enumerated above in Section I(B) under Rule 23(c)(4).[11]

"[C]ourts may use subsection (c)(4) to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3)." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006). For example, the issue of liability may be decided on a class-wide basis. *In re St. Jude Med., Inc.*, 522 F.3d 836, 841 (8th Cir. 2008). *See also Nelson v. Wal-Mart Stores, Inc.*, 245 F.R.D. 358, 380 (E.D. Ark. 2007) ("The advisory committee envisioned severance of liability issues from damages issues as an appropriate use of [the Rule]."). "The relevant inquiry under Rule 23(c)(4)(A) is whether resolution of the particular common issues would materially advance the disposition of the litigation as a whole." *Nelson v. Wal-Mart Stores, Inc.*, 245 F.R.D. 358, 380 (E.D. Ark. 2007) (quotations omitted).

There is ample support for the use of class actions to determine liability: "the class action device save[s] the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979). Class actions—including issue classes—are appropriate when it is possible to resolve efficiently and effectively whether a defendant is liable on the basis of "if as to one, then as to all."

---

[11] Because individualized damages proceedings would only take place following a finding of liability in the Plaintiff's favor, under that approach, it would be unnecessary to consider a class-wide damages theory. *See Butler v. Sear, Roebuck & Co.*, 727 F.3d 796, 799–802 (7th Cir. 2013).

This case is unremarkable from other consumer product cases that have been certified under Rule 23(c)(4). Here, the use of issue certification under Rule 23(c)(4) would benefit each class member by resolving central issues on a common basis—an approach that would greatly streamline and facilitate the litigation moving forward. *See, e.g., Butler*, 727 F.3d at 800 ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification."); *In re Whirlpool*, 722 F.3d 838, 860-61 (6th Cir. 2013); *In re Motor Fuel Temp. Sales Practices Litig.*, 292 F.R.D. 652, 665 (D. Kan. 2013) (citing cases). For all the foregoing reasons, certification under Rule 23(c)(4) in this case is particularly appropriate. *See Nelson*, 245 F.R.D. at 380.

## CONCLUSION

Class certification in this case is appropriate. The factors of Rule 23 are met. Thus, Plaintiff requests that the Court (1) grant his motion for class certification; (2) appoint Joshua Glasscock as the class representative; and (3) appoint as class counsel the attorneys of Williams Dirks Dameron LLC and Lear Werts LLP.

DATED: November 5, 2024                    Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

_____/s/ Clinton J. Mann_____

| Matthew L. Dameron | MO Bar No. 52093 |
| Michael A. Williams | MO Bar No. 47538 |
| Clinton J. Mann | MO Bar No. 70212 |

1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:        (816) 945-7110
Facsimile:         (816) 945-7118
matt@williamsdirks.com
mwilliams@williamsdirks.com
cmann@williamsdirks.com

Todd C. Werts                    MO Bar No. 53288
**LEAR WERTS LLP**
103 Ripley Street
Columbia, Missouri 65201
T:        (573) 875-1991
F:        (573) 279-0024
E:        werts@learwerts.com

*Counsel for Plaintiff and the Proposed Class*