# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI SOUTHERN DIVISION

JOSHUA GLASSCOCK, on behalf of    )
himself and all others similarly situated,    )
    )
       Plaintiff,    )
    )
       v.    )     Case No. 22-CV-3095-MDH
    )
SIG SAUER, INC.,    )
    )
       Defendant.    )

## PLAINTIFF'S REPLY IN SUPPORT OF CLASS CERTIFICATION

Michael A. Williams
Matthew L. Dameron
Clinton J. Mann
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:   (816) 945-7100
mwilliams@williamsdirks.com
matt@williamsdirks.com
cmann@williamsdirks.com

Todd C. Werts
**LEAR WERTS LLP**
103 Ripley Street
Columbia, Missouri 65201
Telephone:   (573) 875-1991
werts@learwerts.com

*Counsel for Plaintiff and the Proposed Class*

## TABLE OF CONTENTS

REBUTTAL STATEMENT OF FACTS (RSOF) ........................................................................ 1

I.    Sig Sauer didn't disclose the Defect to Plaintiff. ................................................. 1

II.   Plaintiff knows about the case and has been helping to prosecute it. ............................ 5

A.    Plaintiff researched the issue on his own. ..................................................... 6

B.    Plaintiff reviewed the Complaint and stays updated on the case. ................................ 6

C.    Plaintiff understands the claims and the class action's goals. ................................. 6

D.    Plaintiff understands his duties and is satisfying them. ...................................... 7

III.  Sig Sauer's 2017 Failure Modes, Effects, and Criticality Analysis (FMECA) .............. 8

ARGUMENT ........................................................................................................................ 9

I.    Plaintiff and the class satisfy Article III standing. ........................................... 9

II.   Plaintiff's MMPA claim is subject to certification. ........................................... 11

III.  Plaintiff's damage model supports certification. .............................................. 19

IV.   Plaintiff satisfies Rule 23's other requirements. ............................................. 22

CONCLUSION .................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Golden Grain Co.*, 677 F. Supp. 3d 940 (E.D. Mo. 2023)................................ 16

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)................................ 12

*Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455 (2013)..... 12

*Anderson v. Ford Motor Co.*, 2020 WL 1853321 (W.D. Mo. Feb. 14, 2020)................... 17

*Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950 (N.D. Cal. 2018) ................................ 17

*Barfield v. Sho-Me Power Electric Coop.*, 2013 WL 12145824 (W.D. Mo. July 8, 2013)

................................................................................................................ 19, 20

*Blades v. Monsanto Co.*,  400 F.3d 562 (8th Cir. 2005)................................ 21

*Bodner v. Oreck Direct, LLC*, 2007 WL 1223777 (N.D. Cal. Apr. 25, 2007)................... 23

*Boren v. Henkel Corp.*, 2024 WL 2768669 (E.D. Mo. May 30, 2024)........................... 16

*Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791 (8th Cir. 2014)................................ 20

*Bradley v. Hertz Corp.*, 2019 WL 3975177 (S.D. Ill. Aug. 22, 2019) ............................ 14

*Buchholz v. Gen. Motors LLC*, 2023 WL 11697073 (W.D. Mo. Aug. 18, 2023).............. 13

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)........................................................ 20

*Cope v. Let's Eat Out, Inc.*, 319 F.R.D. 544 (W.D. Mo. 2017) ........................................ 16

*Craft v. Philip Morris Companies, Inc.*, 190 S.W.3d 368 (Mo. Ct. App. 2005) ......... 14, 16

*Craft v. Phillip Morris Cos., Inc.*, 2003 WL 23355745 (Mo. Cir. Ct. 2003) ................... 23

*Cromeans v. Morgan Keegan & Co.*, 303 F.R.D. 543 (W.D. Mo. Sept. 23, 2014)..... 20, 22

*DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995) ........................................... 22

*Diesel v. Mariani Packing Co., Inc.*, 2024 WL 1674520 (E.D. Mo. April 18, 2024) 14, 17,
20

*Doran v. Missouri Dept. of Social Services*, 251 F.R.D. 401 (W.D. Mo. 2008).............. 18

*Falco v. Nissan North America, Inc.*, 2016 WL 132474 (C.D. Cal. April 5, 2016).......... 24

*Ebert v. General Mills, Inc.*, 2015 WL 867994 (D. Minn. Feb. 27, 2015) ...................... 23

*Faltermeier v. FCA US LLC*, 2016 WL 10879705 (W.D. Mo. May 26, 2016) .............. 21

*George v. Omega Flex, Inc.*, 2020 WL 4718386 (W.D. Mo. Aug. 13, 2020).................. 14

*Glasscock v. Sig Sauer, Inc.*, 2023 WL 11959545 (W.D. Mo. Nov. 21, 2023) ....... 9, 10, 13

*Guerrero v. Henkel Corp.*, 2024 WL 2769745 (E.D. Mo. May 30, 2024)........................ 16

*Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099 (W.D. Mo. 2020) ........................... 24

*Hawkins v. Nestle U.S.A., Inc.*, 309 F. Supp. 3d 696 (E.D. Mo. 2018)...................... 13, 19

*Henke v. Arco Midcon, LLC*, 2014 WL 982777 (E.D. Mo. March 12, 2014).................. 23

*Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758 (Mo. 2007) ................ 13, 15

*High Life Sales Co. v. Brown-Forman Corp.*, 823 S.W.3d 495, 498 (Mo. 1992)............. 18

*Hightower v. Goldberg*, 2018 WL 296955 (M.D. Ga. Jan. 4, 2018) ................................ 21

*Hope v. Nissan North Am., Inc.*, 353 S.W.3d 68 (Mo. Ct. App. 2011) ...................... 16, 24

*Huch v. Charter Comm'ns, Inc.*, 290 S.W.3d 721 (Mo. 2009) ......................................... 18

*Huffman v. Credit Union of Texas*, 758 F.3d 963 (8th Cir. 2014) ................................... 17

*In re Aquila ERISA Litigation*, 237 F.R.D. 202 (W.D. Mo. 2006) .................................... 11

*In re Bisphenol-A Polycarbonate Plastics Products Liability Litig.*, 2011 WL 6740338
  (W.D. Mo. Dec. 22, 2011) ........................................................................................ 12

*In re Dollar Gen. Corp. Motor Oil Mktg. and Sales Practices Litig.*, 2019 WL 1418292
  (W.D. Mo. Mar. 21, 2019) ........................................................................................ 24

*In re Fawcett*, 664 B.R. 748 (E.D. Mo. 2024) .................................................................. 14

*In re Folgers Coffee Mktg. Litig.*, 2024 WL 4093111 (W.D. Mo. July 31, 2024) ..... Passim

*In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415 (E.D. Pa. July 29,
  2015)........................................................................................................................ 21

*In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936 (N.D. Cal. 2014) ................... 17

*In re Pork Antitrust*, 665 F. Supp. 3d 967 (D. Minn. 2023)............................................. 19

*In re Smitty's / Cam2 303 Tractor Hydraulic Fluid Marketing Litig.*, 2022 WL 710192
  (W.D. Mo. Mar. 9, 2022) .................................................................................... 14, 24

*In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013) ......................... 18

*In re Zurn Pex Plumbing Products Liability Litig.*, 644 F.3d 604 (8th Cir. 2011)10, 18, 19,
  21

*Johannessohn v. Polaris Industries, Inc.*, 9 F.4th 981 (8th Cir. 2021)........................... 9, 10

*Johnson v. Glock, Inc.*, 2024 WL 4479863 (N.D. Cal. Sept. 30, 2024)............................ 17

*Johnson v. Mead Johnson and Co., LLC*, 754 F.3d 557 (8th Cir. 2014)........................... 20

*Johnson v. Nissan N. Am. Inc.,*2022 WL 2869528 (N.D. Cal. July 21, 2022) ................. 17

*Keegan v. American Honda Motor Co., Inc.*, 284 F.R.D. 504 (C.D. Cal. 2012) .............. 24

*Keister v. Allstate Ins. Co.*, 663 F. Supp. 3d 1030 (W.D. Mo. 2023) ............................... 23

*Klosterman v. Vacation Mgt. Sols., LLC*, 682 S.W.3d 781 (Mo. Ct. App. 2023)............. 16

*M.B. by Eggemeyer v. Corsi*, 327 F.R.D. 271 (W.D. Mo. 2018) .................................... 11

*McCall v. Monro Muffler Brake, Inc.*, 2013 WL 1282306 (E.D. Mo. Mar. 27, 2013) ..... 14

*McKeage v. TMBC, LLC*, 847 F.3d 992 (8th Cir. 2017) .................................................. 24

*Meek v. Kansas City Life Ins. Co.*, 2022 WL 499049,n. 6 (W.D. Mo. Feb. 7, 2022) ....... 22

*Murphy v. Rigdon, Inc.*, 2018 WL 1005409 (W.D. Mo. Feb. 21, 2018) ........................... 13

*Parkinson v. Hyundai Motor America*, 258 F.R.D. 580 (C.D. Cal. 2008) ....................... 24

*Philips v. Ford Motor Co.*, 2015 WL 4111448 (N.D. Cal. July 7, 2015).......................... 17

*Plubell v. Merck & Co., Inc.*, 289 S.W.3d 707 (Mo. Ct. App. 2009) ......................... 14, 16

*Price v. United* Services, 2012 WL 2847821 (W.D. Ark. Mar. 16, 2012) ....................... 23

*Rawa v. Monsanto Co.*, 2017 WL 3392090 (E.D. Mo. Aug. 7, 2017)........................ 15, 16

*Riddell v. Gen. Motors LLC*, 2024 WL 4381746 (E.D. Mo. Feb. 14, 2024) .............. 16, 18

*Riddell v. General Motors LLC*, 2024 WL 2077559 (E.D. Mo. May 9, 2024)................. 19

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc*., 821 F.3d 992 (8th Cir. 2016) ............ 24

*Sgouros v. TransUnion Corp.*, 2023 WL 6690474 (N.D. Ill. Oct. 12, 2023)................... 14

*Sloan v. Gen. Motors LLC*, 2020 WL 1955643 (N.D. Cal. Apr. 23, 2020)...................... 16

*Smith v. ConocoPhillips Pipe Line Co.*, 801 F.3d 921 (8th Cir. 2015) ........................... 20

*Stotz v. Mophie, Inc.*, 2017 WL 11571083 (C.D. Cal. Dec. 14, 2017)............................. 22

*Substation K, Inc. v. Kansas City Power & Light Co.*, 2020 WL 2600975 (W.D. Mo. May 21, 2020)......................................................................................................................... 20

*Thornburg v. Ford Motor Co.*, 2022 WL 4348475 (W.D. Mo. Sept. 19. 2022)............... 23

*True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923 (9th Cir. 2018).......... 18

*Tucker v. General Motors*, 58 F.4th 392 (8th Cir. 2023).................................................. 14

*Tussey v. ABB, Inc.*, 2007 WL 4289694 (W.D. Mo. Dec. 3, 2007)................................. 23

*Tuter v. Freud America, Inc.*, 2022 WL 4636225 (W.D. Mo. Sept. 30, 2022).............. 9, 10

*Vitello v. Natrol, LLC*, 50 F.4th 689 (8th Cir. 2022) ........................................................ 20

*White v. Just Born, Inc.*, 2018 WL 3748405 (W.D. Mo. Aug. 7, 2018) ............... 12, 15, 16

**Statutes**

Mo. Rev. Stat. § 407.025(2)(b) ........................................................................................ 14

Mo. Rev. Stat. § 407.025(2)(c) ........................................................................................ 18

**Regulations**

15 Mo. CSR 60-9.110(4) ........................................................................................ 14, 15

15 Mo. CSR 60-9.010(1)(C) ........................................................................................ 16

Sig Sauer's opposition [Doc. 154] is a mishmash of arguments—many related to the merits of the litigation and some related to Rule 23's class certification factors. But none of Sig Sauer's arguments defeat certification, particularly where Plaintiff has submitted:

- common evidence of the P320's uniform design (Pl. Motion [Doc. 121] at ¶¶ 2, 34-39);

- common evidence of an alleged Defect in every P320 (*Id.* at ¶¶ 24-33); and

- common damages for every member of the proposed class (*Id.* at ¶¶ 70-75).

Applying Missouri law governing the Missouri Merchandising Practices Act (MMPA) to those facts leads to one conclusion: class certification is appropriate under Rule 23.

## REBUTTAL STATEMENT OF FACTS (RSOF)

### I.      Sig Sauer didn't disclose the Defect to Plaintiff.

79.[1]     Plaintiff knew he was purchasing a pistol without a manual safety, but he thought it would have internal safety mechanisms that would make it safe. Deposition of Joshua Glasscock (Volume II), attached as Exhibit 32, at 22:18-23:3. Plaintiff saw depictions of the P320 "many times" over the course of years. Pl. Ex. 32 at 30:1–22.

80.     Plaintiff specifically remembers seeing advertisements similar to what Sig Sauer's counsel showed him in his deposition, like the one below:

---

[1] Plaintiff has maintained consistent exhibit numbering and Statement of Facts numbering from his original Motion.



In response to the picture, Plaintiff stated, "I do remember seeing something to the effect of the US military had adopted the weapon and seen pictures of military personnel with the Sig P320." Pl. Ex. 32 at 32:1–3.

81.     Before his purchase—when Plaintiff was researching the P320—he stated, "I have seen pictures of military-dressed people with the P320 as if they also liked the P320." Pl. Ex. 32 at 32:11–18 (Q. "So you mean before purchase, correct?" A. "Yes, and I've seen it since.").

82.     Sig Sauer's counsel showed him another advertisement (below). Just like before, Plaintiff remembered seeing advertisements just like it:



Plaintiff stated, "Again, that guy looks like he's in the military or some sort of SWAT fatigues holding a P320. So I do remember seeing that." Pl. Ex. 32 at 34:24–35:1.

83.   Sig Sauer's counsel pressed Plaintiff on the issue, and again he stated that he saw Sig Sauer advertisements with military personnel that misled him:

> Q. So do you have any basis to support the
> statement that in its marketing about the
> military's adoption of the P320, though,
> Sig Sauer never discloses that the military
> version of the pistol contains an
> ambidextrous manual safety?
>
> A. Like I told you earlier, people in
> military fatigues and advertisements that
> it's good enough for the military. But I –
> it did not in my understanding of looking
> at that advertisement, that it – I believed
> that the gun that I purchased was the same
> one that the military had. That is what I
> believed.

Pl. Ex. 32 at 118:8–21.

84.   Plaintiff testified that Sig Sauer should have disclosed the Defect:

> I wish they would have told me all of the
> features of the gun that I now know. I wish
> they would have told me that it has a light
> trigger pull, that when there's a round in

> the chamber it is fully energized, and that
> it does not have an external safety. That
> would have been nice to know.

Pl. Ex. 32 at 36:14–16, 36:25–37:6.

85. Plaintiff knew the P320 didn't have an external safety when he bought it, but he had no idea about the dangers when all three characteristics of the Defect were combined. Pl. Ex. 32 at 38:17–24. He stated:

> I did not know that those three things
> together were in this weapon. So all three
> of those things together would have been
> nice to know.

Pl. Ex. 32 at 38:17-24.

86. And he wanted Sig Sauer to disclose all three components of the alleged Defect "in one setting as an advertisement for the gun." Pl. Ex. 32 at 52:17-23.

87. Plaintiff expected Sig Sauer to tell consumers the gun was dangerous:

> Q. Did you want Sig Sauer to have told you
> what action type your P320 was?
>
> A. I would have liked them to have told me
> that it was fully energized, that it had a
> light trigger pull, and that it did not
> have an external safety. I wanted to know
> those three things.
>
> Q. So not the action type then?
>
> A. I would like them to advertise as much
> as [you] can about a weapon that could be
> dangerous.

Pl. Ex. 32 at 70:17–25.

88. Plaintiff would not have bought the gun if Sig Sauer had disclosed the Defect. Pl. Ex. 32 at 39:9–14; Complaint [Doc. 1] at ¶ 8. That's because he would never carry a fully cocked gun—it's too dangerous:

4

```
Q. Do you know what I'm referring to when
I say an external hammer?

A. Yes, yeah.

Q. [W]ould you ever carry a gun with an
external hammer with the hammer locked back
in a holster?

A. No.

Q. Why?

A. It's extremely dangerous.

Q. Do you think it would be reasonable to
carry a gun in that cocked state?

A. No.

Q. Why?

A. Because it could go off at any time with
the hammer back like that.
```

Pl. Ex. 32 at 132:20–133:15.

      89.    Plaintiff purchased his P320 from a friend, not directly from Sig Sauer. Pl. Ex. 32 at 17:18–24. Sig Sauer does not sell its products directly to consumers. Pl. Ex. 10 at 25:10–26:05. All P320s are purchased either through distributors or on the second-hand market. *Id.*

## II.    Plaintiff knows about the case and has been helping to prosecute it.

      90.    During his second deposition, Sig Sauer questioned Plaintiff at length about his knowledge of the case, the claims he's bringing, his duties as a class representative, and even if he knew what judge was overseeing the case. He replied, "I believe it's Judge Harpool." Pl. Ex. 32 at 76:4–8.[2]

---

[2] Plaintiff also knew that Judge Harpool was not the original judge to preside over this case. Pl. Ex. 32 at 76:9–13.

**A. Plaintiff researched the issue on his own.**

91.     Plaintiff testified that before Plaintiff's counsel ever contacted him, he had read articles about the P320 "going off in the holster" because there were "numerous cases of it." Pl. Ex. 32 at 106:21–25. Plaintiff continued: "And then I get an email from my attorneys validating that. It's dangerous." Pl. Ex. 32 at 107:1–2.

92.     Plaintiff met in person with Plaintiff's counsel to discuss the case, and before agreeing to serve as a class representative. Pl. Ex. 32 at 92:5-10, 95:6–9; Declaration of Matthew L. Dameron, attached as Plaintiff's Exhibit 33, at ¶ 4.

**B. Plaintiff reviewed the Complaint and stays updated on the case.**

93.     As soon as Sig Sauer's counsel handed Plaintiff the Complaint, he confirmed he recognized the document and that he reviewed it before it was filed. Pl. Ex. 32 at 112:11–22. Indeed, Plaintiff confirmed the Complaint was "a working document that we discussed in depth." Pl. Ex. 32 at 113:1–2. Plaintiff receives the pleadings on the case, and he reads them. Pl. Ex. 32 at 75:11–24.

94.     He also recognized Plaintiff's suggestions in support of class certification, and he provides input on the case. Pl. Ex. 32 at 77:9–22, 78:17–22.

95.     He also knows that he has multiple experts involved supporting his claims. Pl. Ex. 32 at 79:4–15.

**C. Plaintiff understands the claims and the class action's goals.**

96.     Sig Sauer's counsel asked Plaintiff "What is your understanding of the claim you're bringing?" Pl. Ex. 32 at 109:2-3. He responded:

```
That the way that this was marketed was
deceiving to purchasers. They omitted
information, dangerous information that
consumers should have known about. That is
the gist of it.
```

Pl. Ex. 32 at 109:4-7.

97.     Plaintiff knows that he "was a consumer of the marketing, and so was everyone else in some way, shape, or form of the P320," and he recognizes:

that the gun that was marketed to me was
different than the gun marketed to [the]
military. That it was – that I was deceived
whenever I purchased the gun, that I
thought that the P320 that I had was the
same one that the military had.

Pl. Ex. 32 at 113:22—114:1.

98.    When asked about what he wanted out of the case, Plaintiff responded,

I want people who own P320s, including
myself, I want them to be safe. That's what
I want. However that looks.

Pl. Ex. 32 at 110:25—111:2.

**D.    Plaintiff understands his duties and is satisfying them.**

99.    Plaintiff understands what it means to be a class representative. Pl. Ex. 32 at
79:16–21 ("In this case I represent people who own Sig P320s.").

100.    And he understands that he has responsibilities to "those who have been put
in danger by owning a P320" by taking depositions and talking to his attorneys. Pl. Ex. 32
at 80:1–6.

101.    He also recognizes that "everything I owe myself, I owe them [the class],"
which means to Plaintiff "[t]o represent honestly the rest of the class." Pl. Ex. 32 at 80:7–
21.

102.    Plaintiff has not received any promises in exchange for serving as a class
representative. Pl. Ex. 32 at 131:20 –132:14.

103.    Before filing the Complaint or hiring his attorneys, Plaintiff met in person
with Todd Werts and Matthew Dameron, counsel for the proposed Class. *See* Pl. Ex. 33 at
¶ 4.

104.    Plaintiff reviewed the Complaint before it was filed and discussed it with his
attorneys. Pl. Ex. 32 at 112:11—113:6.

105.    Plaintiff responded to two different sets of interrogatories. Pl. Ex. 33 at ¶ 5.

106.    Plaintiff responded to two sets of document requests. Pl. Ex. 33 at ¶ 6.

107.    Plaintiff responded to a set of requests for admissions. Pl. Ex. 33 at ¶ 7.

108.    Plaintiff has participated in two separate depositions: the first on May 16, 2023 (conducted via Zoom), and the second on March 6, 2025 (conducted in person in Springfield, Missouri). Pl. Ex. 33 at ¶¶ 8-9.

109.    At Sig Sauer's request, Plaintiff made his P320 available for an hours long in-person inspection on November 26, 2024. Pl. Ex. 33 at ¶ 10.

## III.    Sig Sauer's 2017 Failure Modes, Effects, and Criticality Analysis (FMECA)

110.    Sig Sauer performed the FMECA for the P320 in response to the requirements of its contract with the Department of Defense. Def. Ex. 13 (Rauschenberger Report) at ¶ 60.

111.    The FMECA outlines what features Sig Sauer added to the P320 to make it DOD-compliant; the DOD-compliant version of the P320 is known as the M17 or M18. Pl. Pl. Ex. 2 at 163:13-21, 171:1-175:18; Pl. Ex. 13 (Sig Sauer's FMECA); Pl. Motion [Doc. 121] SOF at ¶¶ 55, 66.

112.    According to the FMECA (Pl. Ex. 13), to reduce the risk that the P320 could suffer an unintentional trigger pull because of "operator error," Sig Sauer directed its engineering department to add features known as the "P320 Actions" to make the firearm DOD-compliant. Pl. Ex. 13. Those actions included:

> 1) P320 minimum trigger pull is set to maximize trigger control without adversely effecting [sic] accuracy. 2) Adherence to range safety rules will preclude injury in the event of an accidental discharge.
>
> There is also a manual safety to further reduce probability of occurrence.

Pl. Ex. 13.

113.    Similarly, the FMECA states that to reduce the risk that the P320 could suffer an unintentional trigger pull because of a foreign object, the addition of a manual safety "also further reduce[s] the probability of occurrence." Pl. Ex. 13.

**ARGUMENT**

## I.    Plaintiff and the class satisfy Article III standing.

**Plaintiff presents common evidence of a Defect that presently exists in every P320:** This Court previously held that Plaintiff has Article III standing because he alleges "that every P320 is defective because they lack any external safety features." *Glasscock v. Sig Sauer, Inc.*, No. 22-3095, 2023 WL 11959545, at *2 (W.D. Mo. Nov. 21, 2023).

Sig Sauer doesn't dispute that all P320s sold to consumers maintain the same design and, therefore, all have the same alleged Defect. Its own corporate representative confirmed that all P320s use the same "fire control unit," and all versions of the P320 "mechanically function the same." Pl. Motion [Doc. 121] SOF at ¶¶ 34–39.

Plaintiff's technical experts also confirmed that the design of every P320 is uniform.[3] And Plaintiff's technical experts also confirmed that the Defect exists and is presently manifest in every P320.[4] Indeed, as Plaintiff's engineering expert put it: "This is not a potential defect as **this design defect is manifested in every P320**." Pl. Ex. 4 (Biller Report) at p. 20, ¶ 5 (emphasis added). Similarly, Plaintiff's damages expert, Edward Stockton, opined that every member of the proposed class "suffered economic harm at the point of acquisition as a result of the Defect." Pl. Ex. 11 at p. 18, ¶ 43. Thus, Plaintiff's common evidence supports the Court's previous finding regarding Article III standing. *Glasscock*, 2023 WL 11959545, at *2.

In opposition, Sig Sauer cites *Johannessohn v. Polaris Industries, Inc.*, 9 F.4th 981 (8th Cir. 2021), but this Court distinguished *Johannessohn* in cases where the defect is alleged to exist in all class products. *See, e.g., Tuter v. Freud America, Inc.*, No. 22-282, 2022 WL 4636225 (W.D. Mo. Sept. 30, 2022). In *Tuter*, the Court explained the distinction

---

[3] *See* Pl. Ex. 4 (Biller Report) at p. 20, ¶ 3 ("The functionality and safety characteristics sold in Missouri after September 2017 without a manual thumb safety are substantively identical. This is true regardless of the configuration or variant of the P320 in question."); Pl. Ex. 5 (Gatrost Report) at p. 32, ¶ 89 ("Based on the materials I have reviewed, the Defect exists in every Sig Sauer P320 sold without a manual thumb safety."); p. 33, ¶ 97 ("[A]ll P320s are designed the same and have the same safety characteristics").

[4] Pl. Motion [Doc. 121] SOF at ¶¶ 24-33 (defining the alleged Defect); 34-39 (addressing the uniformity of the P320's design); Pl. Ex. 5 (Gatrost Report) at p. 32, ¶ 89 ("Based on the materials I have reviewed, the Defect exists in every Sig Sauer P320 sold without a manual thumb safety.").

between (1) a plaintiff alleging that a defect *may* manifest only after some future event (the situation in *Johannessohn*), and (2) a plaintiff alleging that a uniform design defect already exists and is present in each product (the situation in *Tuter*). The former does not confer Article III standing; the latter does. 2022 WL 4636225, at *5.

The Court's opinion in *Tuter* also explained how *Johannessohn* differs from an earlier Eighth Circuit case: *In re Zurn Pex Plumbing Products Liability Litig.*, 644 F.3d 604 (8th Cir. 2011). Again, *Zurn* was distinguishable from *Johannessohn* (as described by the Eighth Circuit) because the *Zurn* plaintiffs alleged that the plumbing fixture contained a defect upon installation, even though it had not "failed" yet and caused property damage.

Here, Plaintiff's allegations fall squarely within the scope of *Tuter* and *Zurn*. Plaintiff presents common evidence of a present and existing Defect in every P320. The Defect renders the P320 unsafe, and it will cost consumers money to repair. Plaintiff's allegation regarding the P320's Defect does not rely on some additional condition precedent to occur before the defect "manifests"; rather, Plaintiff's common evidence supports that every P320 is currently defective in its present state. *See* Pl. Ex. 4 (Biller Report) at p. 20, ¶ 5 ("this design defect is manifested in every P320"); Pl. Ex. 5 (Gatrost Report) at p. 32, ¶ 89 ("the Defect exists in every Sig Sauer P320 sold without a manual thumb safety").[5]

**Sig Sauer's FMECA confirms the existence of a present Defect:** Sig Sauer's documents also confirm that the P320 in its current state is at a "high risk" to "kill [a] person unintentionally." Pl. Motion [Doc. 121] SOF at ¶¶ 40-46. According to the FMECA, Sig Sauer "admits that every P320 unit is likely to suffer an unintended discharge during the life of each pistol." *Id.* at ¶ 43.

Trying to discount its own document, Sig Sauer now suggests that the FMECA applies to "any pistol," rather than the P320. Opp. at p. 26. But the FMECA engages in a series of assessments of some baseline firearm and assigns numeric scores to that firearm—

---

[5] Sig Sauer doesn't discuss *Tuter* or *Zurn*, even though this Court cited both opinions in its previous order denying the company's motion to dismiss. *See Glasscock*, 2023 WL 11959545, at *2.

if it's not the P320 (the base model of the DOD-compliant firearm), then what firearm is it? And if the FMECA doesn't outline features that Sig Sauer added to the P320 to make it DOD-compliant, then why are the action steps called "P320 Actions"? The company offers no objective proof that the FMECA isn't describing the P320.[6] A jury can decide the truth.

But even if the Court gives credence to Sig Sauer's position and assumes that the FMECA applies to "any gun," then it still applies because P320s are a subset of "any guns." Thus, Sig Sauer's FMECA still demonstrates a critical fact: to make "any pistol" safe from an unintentional discharge, the manufacturer should (1) increase the trigger pull so it's more resistant than the "P320 minimum trigger pull," and (2) adopt a manual safety—two mitigating features specifically endorsed by the FMECA and added to the P320 to make it DOD-compliant.[7] Only then does the P320's risk of unintentional discharge lessen from "High" to "Medium," and only then does the probability of an unintentional discharge lessen from "<u>Likely</u> to occur" (level C) to "<u>unlikely</u>" (level E). Pl. Ex. 13.

Under either possible interpretation—the FMECA's plain and obvious language or Sig Sauer's post hoc, contrived reading—the result is the same: the consumer version of the P320 lacks critical safety features that make it a "High Risk Assessment" that is "likely" to unintentionally discharge. Given the P320's present danger, Plaintiff's common evidence supporting his allegations fall squarely within *Tuter* and *Zurn*. The Court should conform to its earlier finding that Plaintiff and the class have Article III standing.

## II. Plaintiff's MMPA claim is subject to certification.

Many of Sig Sauer's arguments that Plaintiff's MMPA claim is not amenable to class certification implicate Rule 23's commonality and predominance requirements. Commonality "imposes a light burden on the plaintiff seeking class certification and does not require commonality on every single question raised in a class action." *In re Aquila ERISA Litigation*, 237 F.R.D. 202, 207 (W.D. Mo. 2006). Indeed, it is "easily satisfied in most cases." *M.B. by Eggemeyer v. Corsi*, 327 F.R.D. 271, 278 (W.D. Mo. 2018).

---

[6] Sig Sauer's corporate representative discussed the FMECA at length; he never disclaimed that the FMECA's findings apply to the P320. Pl. Ex. 2 (Taylor Dep.) at 168:17-173:21. Sig Sauer's new argument is damage control.

[7] The "P320 Actions" in the FMECA would address two-thirds of the alleged Defect. Pl. Motion [Doc. 121] at ¶ 24.

And predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). It does not require that each element of the plaintiffs' claims be susceptible to class-wide proof. *Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 469 (2013). Plaintiff satisfies both prongs.

**Sig Sauer never disclosed the alleged Defect:** According to Sig Sauer, because the absence of a manual safety is readily apparent, then class certification must be defeated. But Sig Sauer's argument ignores two important points:

*First,* the absence of a manual safety is only one of three components of the alleged Defect. Pl. Motion [Doc. 121] at ¶ 24. Thus, while the absence of a manual safety may be apparent, the other two components of the Defect—and how they combine with the lack of manual safety—are not; there is no evidence that Plaintiff or the class could have known those facts. Sig Sauer's corporate representative agrees. Pl. Motion [Doc. 121] at ¶ 32.[8] And to be sure, Plaintiff does not claim that every firearm must have a manual safety. Rather, Plaintiffs' claim is that, given the fact that the P320 does not have a manual safety, that it maintains a fully energized state, coupled with its short, light trigger pull, renders every P320 dangerous and defective—a fact that isn't obvious to consumers that Sig Sauer should have warned them about.

*Second,* Sig Sauer tacitly concedes that it didn't disclose the Defect, stating instead that it disclosed "much" or "most" of what Plaintiff alleged was omitted. Opp. at pp. 2, 40. But Sig Sauer can't point to a single instance where it discloses the effect of combining the three components of the alleged Defect, or where it discloses that the DOD gun used as the cornerstone of its marketing campaign isn't the same as the P320. If Sig Sauer claims its

---

[8] In the cases cited by Sig Sauer, the relevant facts were obvious or disclosed—a key distinction from this case. *See In re Bisphenol-A Polycarbonate Plastics Products Liability Litig.*, No. 08-1967, 2011 WL 6740338, at *1 (W.D. Mo. Dec. 22, 2011) (consumers knew that baby bottles contained BPAs and bought them anyway); *White v. Just Born, Inc.*, No. 17-4025, 2018 WL 3748405, at *3 (W.D. Mo. Aug. 7, 2018) (consumers could easily tell whether packaging contained "slack fill" prior to purchase).

piecemeal warnings are sufficient, then that's a merits question subject to common evidence.[9]

**Plaintiff and the class satisfy the MMPA's causation element:** The MMPA simply requires a "causal connection" between the alleged omission and Plaintiff's injury. *Glasscock*, 2023 WL 11959545, at *4.[10] At Plaintiff's second deposition, Sig Sauer's counsel showed Plaintiff pictures of advertisements. Plaintiff recognized the advertisements from his research prior to purchasing the gun, and Plaintiff also stated that he personally "[saw] pictures of military-dressed people with the P320 as if they also liked the P320." *See* RSOF at ¶¶ 79-83. Plaintiff believes Sig Sauer should have disclosed that the military didn't use the consumer version of the P320, and that the P320 is dangerous. *Id.* at ¶¶ 84-87. If Plaintiff had known about the alleged Defect, he would not have bought the P320. *Id.* at ¶ 88. Despite this clear testimony, Sig Sauer argues against certification, but the company is wrong for two reasons:

***First***, omission claims under the MMPA do not require reliance. *Buchholz v. Gen. Motors LLC*, No. 23-06004, 2023 WL 11697073, at *3 (W.D. Mo. Aug. 18, 2023); *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 774 (Mo. 2007). The enabling regulations for the MMPA codify this position: "*Reliance and intent* that others rely upon such concealment, suppression or omission *are not elements* of concealment, suppression

---

[9] Of course, "[n]arrowly focusing on an aspect of the labeling does not serve the purpose of the MMPA." *Hawkins v. Nestle U.S.A., Inc.*, 309 F. Supp. 3d 696, 705 (E.D. Mo. 2018). This is particularly true where even Sig Sauer's counsel struggled to read the company's purported disclosures because they were "very tiny":

> **Sig Sauer's Counsel:** Okay. And again, apologies for the very tiny writing. [] And if you look at the second set, I believe it says, "Exceptional trigger, a smooth crisp trigger pull." Do you see that? Apologies for the size of the writing.
> []
> **Glasscock:** I would just be assuming that that's what that says . . . .
> []
> **Sig Sauer's Counsel:** That's totally understandable. Okay. Well, let's put that aside then.

Pl. Ex. 32 at 49:20–50:22.

[10] Sig Sauer's traceability analysis is based on the argument that a "direct causal connection between Plaintiff and Sig Sauer does not exist." Opp. at pp. 28–29. This Court previously rejected that argument. *Glasscock*, 2023 WL 11959545, at *4. And that argument addresses a merits issue. *See Murphy v. Rigdon, Inc.*, No. 17-556, 2018 WL 1005409, at *3 (W.D. Mo. Feb. 21, 2018) (analyzing causal connection on defendant's motion for summary judgment).

or _omission_ . . ." 15 Mo. CSR 60-9.110(4) (emphasis added)[11]; _see also Tucker v. General Motors_, 58 F.4th 392, 397 (8th Cir. 2023) (applying the MMPA "omission" definition).

**_Second_**, in _Tucker_ (a case that Sig Sauer doesn't cite), the Eighth Circuit held that omission claims "plainly require less proof" and rejected the defendant's argument that an "MMPA material omission claim _must_ be tied to an actionable affirmative statement." 58 F.4th at 398. Reversing the district court, the Eighth Circuit held that the MMPA's "plain language" concerning omission claims "dispels the notion that _this_ unlawful practice requires an affirmative statement." _Id._[12]

Sig Sauer also argues certification is improper because "Plaintiff has not offered common evidence of causation," but this misapplies the law.[13] "The new causation element . . . does not require an _individual_ showing of reliance." _Diesel v. Mariani Packing Co., Inc._, No. 22-1368, 2024 WL 1674520, *5 (E.D. Mo. April 18, 2024). _See also In re Fawcett_, 664 B.R. 748, 779–80 (E.D. Mo. 2024) (determining MMPA causation was satisfied where it was "surmisable" that defendant's conduct would have caused injury to consumers).[14] Rather, the MMPA asks whether Sig Sauer's conduct "would cause a reasonable person to enter into the transaction that resulted in damages." Mo. Rev. Stat. § 407.025(2)(b). This is plainly a common question.

---

[11] Plaintiff cited to and relied on the regulations in his Complaint. [Doc. 1] at ¶¶ 78-79.

[12] To support its contention, Sig Sauer cites cases where plaintiffs alleged specific misrepresentations but never saw the misrepresentation at issue—facts totally different than the allegations here. _See In re Smitty's_, No. 20-02936, 2022 WL 710192, at *8 (W.D. Mo. Mar. 9, 2022); _Sgouros v. TransUnion Corp._, No. 14-1850, 2023 WL 6690474, at *5 (N.D. Ill. Oct. 12, 2023).

[13] The cases Sig Sauer relies on all consider motions for summary judgment dismissing claims because there was no causal nexus between defendants' conduct and the _named plaintiffs_. _George v. Omega Flex, Inc._, No. 17-3114, 2020 WL 4718386, at *6 (W.D. Mo. Aug. 13, 2020) (granting summary judgment prior to certification because no causal nexus existed between named plaintiffs and defendant's conduct); _Bradley v. Hertz Corp._, No. 15-652, 2019 WL 3975177, at *6 (S.D. Ill. Aug. 22, 2019) (same); _McCall v. Monro Muffler Brake, Inc._, No. 10-269, 2013 WL 1282306, at *5 (E.D. Mo. Mar. 27, 2013) (same). None of these cases hold that the MMPA requires an individualized showing of causation on a classwide basis.

[14] "[C]lass members are not individually required to show what they would or would not have done had the product not been misrepresented . . ." _Plubell v. Merck & Co., Inc._, 289 S.W.3d 707, 714 (Mo. Ct. App. 2009); _see also Craft v. Philip Morris Companies, Inc._, 190 S.W.3d 368, 383 (Mo. Ct. App. 2005) (rejecting arguments that consumers' smoking behaviors, reasons for purchase, and knowledge predominated over common issues).

**Sig Sauer's "shifting knowledge" doesn't defeat certification:** Sig Sauer speculates that, if the company had knowledge of the Defect, then the company's knowledge would have shifted over time, thereby making the company's knowledge a moving target that defeats certification. But Sig Sauer misunderstands Missouri law concerning omission claims under the MMPA.

Under Missouri law, a defendant can be liable under the MMPA where it omits material facts that it knows or "upon reasonable inquiry would be known to him/her." 15 Mo. CSR § 60-9.110(3); *Rawa v. Monsanto Co.*, No. 17-1252, 2017 WL 3392090, *5 (E.D. Mo. Aug. 7, 2017) (quoting *White*, 2017 WL 3130333, at *8). The MMPA's omission component "imposes a broader duty on sellers than the common law imposes for fraud liability, as a fraud claim requires the seller to have actual knowledge of the material facts" as opposed to the "upon reasonable inquiry" standard adopted by the MMPA. *Hess*, 220 S.W.3d at 774.

Here, Plaintiff submits common evidence supporting both actual knowledge and imputed knowledge:

*Actual Knowledge*: The FMECA is common evidence that the company had notice that modifying the trigger pull and/or adding a manual safety (two of the three components of the alleged Defect) were potential steps to make the P320 safe. *See* Pl. Ex. 13 (FMECA).

It's undisputed that the FMECA was created in February 2017 (Def. Ex. 16 at ¶ 5), and the proposed class period doesn't start until September 2017—over six months after the FMECA. Pl. Motion [Doc. 121] at p. 31 (class definition). Thus, Plaintiff has offered common evidence of Sig Sauer's actual knowledge for the duration of the entire class period.

*Imputed Knowledge*: Additionally, Plaintiff alleges that Sig Sauer should have discovered the Defect "upon reasonable inquiry." Complaint [Doc. 1] at ¶ 79. And Plaintiff has common evidence showing this. In addition to its internal FMECA, Sig Sauer has been inundated with individual personal injury lawsuits alleging the P320 unintentionally discharges and has faced a barrage of law enforcement agencies discontinuing their use of

the P320. Pl. Motion [Doc. 121] at ¶¶ 47-59. Plaintiff has common evidence from which a jury could find that Sig Sauer should have initiated a "reasonable inquiry."[15]

But again, even if the Court discounts the merits of Plaintiff's common evidence, the company's knowledge about the Defect is a common question.[16] Under Missouri law, to the extent that the "knowledge" or "intent" requirement of an omission claim exists (contrary to the regulatory language), it can be inferred, meaning it is susceptible to common evidence. *Rawa*, 2017 WL 3392090, *5 (quoting *White*, 2017 WL 3130333, *8). Additionally, any inquiry about Sig Sauer's knowledge will focus exclusively on the company's conduct—yet another basis for certification.[17]

**Plaintiff's allegations satisfy the materiality element:** Sig Sauer argues that certification would be inappropriate because materiality differs for each class member. As a corollary, Sig Sauer also argues that each consumer's subjective preference defeats certification.[18] Both are wrong.

Under the applicable regulations, a fact is material if "a reasonable consumer would likely consider [it] to be important in making a purchasing decision." 15 Mo. CSR § 60-

---

[15] Even in the face of all these concerns, Sig Sauer still hasn't made any design changes. Pl. Motion [Doc. 121] SOF ¶ 64; Pl. Ex. 2 (Taylor Dep.) at 230:6–16 (Q. "[J]ust to be clear, have any changes been made to the design of the Sig Sauer P320 in the last several years as a result of these reports of unintended discharges?" A. "We have not made any design changes that pertain to inadvertent displacement of the trigger in these cases . . . .").

[16] At class certification, courts don't "engage in free-ranging merits inquiries." *In re Folgers Coffee Mktg. Litig.*, No. 21-2984, 2024 WL 4093111, *3 (W.D. Mo. July 31, 2024); *Cope v. Let's Eat Out, Inc.*, 319 F.R.D. 544, 551 (W.D. Mo. 2017).

[17] *See Hope v. Nissan North Am., Inc.*, 353 S.W.3d 68, 81-85 (Mo. Ct. App. 2011) (certifying omission and other claims under the MMPA because it focuses on the defendant's conduct); *Plubell*, 289 S.W.3d at 710 (same); *Craft*, 190 S.W.3d at 382-83 (same); *Riddell v. Gen. Motors LLC*, No. 20-254, 2024 WL 4381746, at *5 (E.D. Mo. Feb. 14, 2024) (defendants' knowledge of defect subject to classwide proof under the MMPA); *Sloan v. Gen. Motors LLC*, No. 16-7244, 2020 WL 1955643, at *43 (N.D. Cal. Apr. 23, 2020) ("whether GM had knowledge is thus resolvable by a singular answer applicable to the class").

[18] Sig Sauer's cited cases are "slack fill" cases that are factually distinguishable. *Abbott v. Golden Grain Co.*, 677 F. Supp. 3d 940, 948 (E.D. Mo. 2023) (discussing merits of complaint concerning allegedly underfilled rice pilaf box); *Guerrero v. Henkel Corp.*, No. 24-57, 2024 WL 2769745, at *1 (E.D. Mo. May 30, 2024) (discussing merits of complaint concerning plaintiff "[d]isappointed that he bought laundry detergent insufficient to wash 58 full loads of laundry"); *Boren v. Henkel Corp.*, No. 23-01605, 2024 WL 2768669, at *1 (E.D. Mo. May 30, 2024) (discussing merits of complaint concerning plaintiff "[d]isappointed that he bought fabric softener insufficient to wash 120 full loads of laundry."); *Klosterman v. Vacation Mgt. Sols., LLC*, 682 S.W.3d 781, 787 (Mo. Ct. App. 2023) (affirming trial court's motion for summary judgment on merits of individual claim with no discussion of Rule 23).

9.010(1)(C). "[T]he definition of material fact in the applicable MMPA regulations is broader than the materiality requirement of common law fraud." *Huffman v. Credit Union of Texas*, 758 F.3d 963, 968 (8th Cir. 2014). Thus, at the certification stage, the MMPA "asks whether the deceptive packaging would cause a *reasonable person* to enter into a transaction" and, accordingly, is judged without individualized proof. *Diesel*, 2024 WL 1674520, at *5-6. *See also* note 14, *supra* (citing *Plubell* and *Craft* for the reasonable consumer standard).

Here, "[o]bvious safety issues"—i.e., the danger that the P320 will unintentionally discharge—are material to consumers. *Johnson v. Glock, Inc.*, No. 20-8807, 2024 WL 4479863, *6 (N.D. Cal. Sept. 30, 2024) (citing *Johnson v. Nissan N. Am., Inc.*, No. 17-517, 2022 WL 2869528, at *14 (N.D. Cal. July 21, 2022)). Plaintiff's firearms expert agrees. Pl. Ex. 5 (Gatrost Report) at p. 32, ¶ 87 ("The existence of the Defect in the P320 is a material fact."). Sig Sauer may disagree with that conclusion, but whether the alleged Defect is material to a reasonable consumer is another common question for a jury.[19]

Sig Sauer's argument that the complaint rate is low doesn't negate the assertion of materiality as a matter of law, particularly at the class certification stage. In *Folgers*, this Court rejected Sig Sauer's argument. 2024 WL 4093111, at *4 ("The fact that some class members did not care about or were not deceived by the misrepresentation is better addressed in the context of the merits of the claim.") *See also Glock*, 2024 WL 4479863, at *1 (alleged number of satisfied customers was "based on the merits.").[20]

Beyond that, there is countervailing evidence to Sig Sauer's argument that the public does not see a problem with the P320. As its defect has started to come to light, several independent groups have begun taking action to limit, if not ban, the P320 from law

---

[19] *See Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 962 (N.D. Cal. 2018); *Philips v. Ford Motor Co.*, No. 14-02989, 2015 WL 4111448, *11 (N.D. Cal. July 7, 2015); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 957 (N.D. Cal. 2014) (finding that materiality of a defect is "generally a question of fact").

[20] Sig Sauer cites *Anderson v. Ford Motor Co.*, but it's an order on summary judgment, and the experts for both sides agreed that the complaint rate to Ford was lower than to other major manufacturers. No. 17-03244, 2020 WL 1853321, at *3 (W.D. Mo. Feb. 14, 2020). Unlike *Anderson*, Plaintiff's firearms expert found that the P320's Defect differentiates it from every other comparable gun on the market. Pl. Ex. 5 (Gatrost Report) at pp. 24-29, ¶¶ 64-76.

enforcement training facilities due to its risk of unintentional discharge.[21] Regardless, the evidence of Sig Sauer's defense will apply to every class member equally, further demonstrating the common questions.

Implicit in its materiality argument is Sig Sauer's assertion that some class members wanted a gun without an external safety (without knowing of the other two components of the Defect) and thereby waived their MMPA rights. But consumers can't waive their MMPA rights.[22] Thus, Sig Sauer's implicit argument that certain consumers may be subject to individualized defenses based on their unique states of mind simply isn't the law. Those issues don't impact Sig Sauer's MMPA liability, which turns on the impact of omissions on "a reasonable person."[23] Mo. Rev. Stat. § 407.025(2)(c).

Furthermore, Sig Sauer hasn't met its evidentiary burden to show that individual consumers hold the preferences that the company espouses. Sig Sauer cites inconclusive, unsupported affidavits from its company executives stating that consumers "may" prefer a gun without a safety and "may" have other preferences. This "evidence" is insufficient to defeat certification.[24] To hold otherwise means it would be "impossible" to certify class actions under the MMPA. *Riddell*, 2024 WL 4381746, at *5.

---

[21] *Records Show Oklahoma Law Enforcement Officials Concerned Over Popular Service Weapon*, https://www.news9.com/story/67f89205e5fad4a64be9e787/records-show-oklahoma-law-enforcement-officials-concerned-over-popular-service-weapon (reporting that P320s without a manual thumb safety will not be allowed Oklahoma's Council on Law Enforcement Education and Training facilities); Washington State Criminal Justice Training Commission, Sig Sauer P320 Pistol Report, Feb. 2025, https://cjtc.wa.gov/sites/default/files/2025-02/Sig%20Sauer%20P320%20Report%20February%202025.pdf (reporting reasons for banning P320 from Washington state law enforcement training facilities); Tactical Defense Institute Announcement, https://www.tdiohio.com/ ("After much discussion and review among our instructor cadre, the decision has been made that all variations of the Sig P320 pistol will no longer be permitted in any TDI classes.").

[22] Because of the MMPA's "broad scope and the legislature's clear policy to protect consumers, certain legal principles are not available to defeat claims authorized by the act." *Huch v. Charter Comm'ns, Inc.*, 290 S.W.3d 721, 725 (Mo. 2009). One disallowed defense is waiver: "To allow these laws to be ignored by waiver or by contract, adhesive or otherwise, renders the statutes useless and meaningless." *Id.* (quoting *High Life Sales Co. v. Brown-Forman Corp.*, 823 S.W.3d 495, 498 (Mo. 1992)).

[23] Similarly, individualized affirmative defenses don't destroy certification. *Doran v. Missouri Dept. of Social Services*, 251 F.R.D. 401, 405 (W.D. Mo. 2008) (collecting cases). Additionally, the relevance of affirmative defenses "must be subjected to the same rigorous inquiry as plaintiff's claims." *Zurn*, 644 F.3d at 619.

[24] *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 121–22 (2d Cir. 2013) (affirming class certification where "bald speculation" and "conjectural 'individualized questions of reliance' . . . do not undermine class

**The class period can extend after April 2022:** Without offering any authority, Sig Sauer argues that Plaintiff can't represent a class of individuals who purchased the P320 after April 2022. Yet, Sig Sauer's corporate representative confirmed that the fire control unit design of the P320 remains the same today as it was in 2017. Pl. Ex. 2 at 231:04-11. No facts or legal authority support Sig Sauer's position.

Concerning injunctive relief, the Court should adhere to *Hawkins* where the court upheld the plaintiff's ability to seek prospective relief and reasoned that "the fact that Plaintiff discovered Defendant's allegedly unlawful practice does not make the packaging less misleading." *Hawkins*, 309 F. Supp. 3d at 707.[25]

## III. Plaintiff's damage model supports certification.

Plaintiff offered a class-wide damage model from Edward Stockton. *See* Pl. Ex. 11. Sig Sauer did not depose Stockton, and Sig Sauer has not formally challenged Stockton's designation. Nonetheless, Sig Sauer invites this Court to *sua sponte* "conduct a focused Rule 702 analysis."[26]

In the Eighth Circuit, "the court may conduct a less stringent application of Rule 702 and *Daubert* at the class certification stage." *Zurn*, 644 F.3d at 610. The court "need not decide conclusively if the evidence it considers at this stage will ultimately be admissible at trial." *Id.* at 611; *see also In re Pork Antitrust*, 665 F. Supp. 3d 967, 986 (D. Minn. 2023). This Court agrees. *Barfield v. Sho-Me Power Electric Coop.*, No. 11-4321, 2013 WL 12145824, *2 (W.D. Mo. July 8, 2013) (applying a less stringent expert review even though all discovery had been completed).

While Sig Sauer offers its own expert to critique Stockton, the Eighth Circuit has generally stated that "district courts are admonished not to weigh or assess the correctness

---

cohesion"); *see also True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 932 (9th Cir. 2018) ("[W]e do not consider . . . defenses [to class certification] that [a defendant] might advance or for which it has presented no evidence[.]").

[25] Sig Sauer claims that the MMPA's requirement that a purchase be for "personal, family, household purposes" defeats certification. Courts reject this argument. *Folgers*, 2024 WL 4093111, at *4; *Riddell v. General Motors LLC*, No. 20-254, 2024 WL 2077559, at *10 (E.D. Mo. May 9, 2024).

[26] Numerous other courts have rejected efforts to exclude Stockton's opinions. *See, e.g., Riddell*, 2024 WL 2077559, at *1; *Hays v. Nissan North Am., Inc.*, No. 17-353 at Doc. 101 (W.D. Mo. Sept. 26, 2019) (same).

of competing expert opinions" at the class certification stage. *Johnson v. Mead Johnson and Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014). Thus, the Court shouldn't choose sides in the battle of the experts.[27]

Sig Sauer also claims (as an aside) that Plaintiff has ignored *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). Not true. According to this Court:

> Since *Comcast*, class defendants have attempted to have classes decertified based on individualized differences in class members' damages.
>
> Courts have not read *Comcast* so broadly, instead holding that it simply requires a plaintiff to show a linkage between its theory of liability and theory of damages.

*Cromeans v. Morgan Keegan & Co.*, 303 F.R.D. 543, 559 (W.D. Mo. Sept. 23, 2014); *see also Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 799 (8th Cir. 2014). The "linkage" between the theory of damages and theory of liability "need not be exact" so long as the damages theory is consistent with the liability case. *Barfield*, 2013 WL 12145824, *3 (quoting *Comcast*, 133 S. Ct. at 1433).[28]

Here, Stockton has proposed a class-wide "benefit of the bargain framework" wherein he calculates "overpayment by consideration of the cost of the execution of a competent repair." Pl. Ex. 11 at p. 6, ¶ 9.[29] According to Stockton's model, "[d]amages are equal to the amount of money necessary to pay for that repair." *Id.* at p. 7, ¶ 11. This is known as the "repair cost model." *Id.* at pp. 13-14, ¶¶ 29-30. "Cost of repair damages are

---

[27] Expert testimony "should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded at the outset." *Substation K, Inc. v. Kansas City Power & Light Co.*, No. 19-0031, 2020 WL 2600975, *1 (W.D. Mo. May 21, 2020).

[28] *Comcast* did not abrogate the lenient standard articulated in *Zurn*. The Eighth Circuit reaffirmed *Zurn* after *Comcast* was decided. *Smith v. ConocoPhillips Pipe Line Co.*, 801 F.3d 921, 925 n.2 (8th Cir. 2015) ("*Zurn* is a binding and well decided precedent which we need not revisit here.").

[29] The benefit of the bargain framework applies to claims under the MMPA. *Vitello v. Natrol, LLC*, 50 F.4th 689, 693 (8th Cir. 2022) (citing Missouri law). And "an objective, economic, 'benefit-of-the-bargain' loss . . . is sufficient to convey Article III standing." *Diesel*, 2024 WL 1674520, at *9.

a valid alternative to diminution in value damages under the MMPA." *Faltermeier v. FCA US LLC*, No. 15-491, 2016 WL 10879705, *3 (W.D. Mo. May 26, 2016) (collecting cases).

Stockton will apply the repair cost model to the technical findings from Plaintiff's other experts. According to those experts, selling a P320 "without a manual thumb safety is defective," and "[r]etrofitting a P320 sold without a manual thumb safety with a manual thumb safety is possible." Pl. Ex. 4 (Biller Report) at p. 21, ¶¶ 12, 16. Plaintiff's firearms expert agrees: "To repair the Defect, the P320 can be retrofitted with a manual thumb safety." Pl. Ex. 5 (Gatrost Report) at p. 32, ¶ 90. He continues: "In sum, it will cost consumers between $209.98 and $229.98 . . . to retrofit their P320s to have a manual safety. This cost estimate applies to all P320s without any external safety regardless of their age or usage history." Pl. Ex. 5 (Gatrost Report) at p. 33, ¶ 96.

Thus, Stockton will apply his economic model using these findings from Plaintiff's technical experts to calculate damages for the class.[30] Stockton's model aligns with Plaintiff's theory of liability (i.e., that a manual thumb safety remedies the P320's Defect), and it aligns with Sig Sauer's own FMECA about how to remedy the P320. *See* Pl. Ex. 13 (adding a manual thumb safety as one of the "P320 Actions" to make the firearm safer).[31] If Sig Sauer disagrees that Plaintiff's damages model satisfies *Comcast*, then it can test Stockton's theories under proper cross examination.[32]

---

[30] The fact that Stockton has not yet performed his damages calculations isn't concerning. Stockton's approach is consistent with *Zurn* where "there is bound to be some evidentiary uncertainty." 644 F.3d at 613. This is because a court's inquiry at certification is, in the words of the Eighth Circuit, "tentative," "preliminary," and "limited." *Id.*

[31] Sig Sauer cites *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005). But *Blades* was a price-fixing case brought under the Clayton Act—not an MMPA claim. And the plaintiff in *Blades* was unable to establish economic injury using the proposed models—a fact that further distinguishes it from Stockton's analysis.

[32] *See also Hightower v. Goldberg*, No. 17-0007, 2018 WL 296955, at *2 (M.D. Ga. Jan. 4, 2018) (if expert "failed to consider certain facts in forming his opinions, Defendants will be able to vigorously cross examine him, present their own expert testimony, and tell the jury why they believe his opinion should not be believed"); *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *6 (E.D. Pa. July 29, 2015) ("Courts have found that most contentions that [expert] assumptions are unfounded go to the weight, not the admissibility, of the testimony, and a district court has discretion . . . to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony").

The fact that Plaintiff purchased his P320 secondhand is immaterial. Sig Sauer commits only a footnote to this argument,[33] perhaps because Stockton's report already accounted for secondhand purchasers. Pl. Ex. 11 at pp. 17-18, ¶¶ 40-41. Moreover, even if the amount of Plaintiff's damages differ from other class members, that fact doesn't defeat certification.[34] And Sig Sauer's argument ignores that the company doesn't sell the P320 directly to <u>any</u> consumers. RSOF at ¶ 89.

## IV. Plaintiff satisfies Rule 23's other requirements.

**Typicality:** "Typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *Folgers*, 2024 WL 4093111, at *5; *see also DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). Here, Plaintiff owns a P320 with the alleged Defect, and his claims under the MMPA arise from the same operative facts as other members of the proposed class (i.e., other P320 owners with the Defect). Many of Sig Sauer's arguments concerning typicality are addressed previously. Glasscock satisfies typicality.

**Adequacy:** A plaintiff will adequately protect the interests of the class when he has "common interests" with the class and will "vigorously prosecute the class through qualified counsel." *Folgers*, 2024 WL 4093111, at *5.

Contrary to Sig Sauer's argument, Plaintiff is actively engaged in the litigation and familiar with the claims in the case. RSOF at ¶¶ 90-109. Sig Sauer can't identify a single thing that Plaintiff "should have" done but hasn't. Plaintiff satisfies adequacy.

Sig Sauer further argues that Plaintiff is inadequate because the "understanding of how [he] was harmed came only from [his] attorney." Opp. at p. 32. But Plaintiff explained that he read articles about the P320's problems: "And then I get an email from my attorneys

---

[33] Opp. at p. 28, n. 17. Sig Sauer's footnote misleadingly cites *Stotz v. Mophie, Inc.*, but fails to mention that the court found the plaintiff *was* typical. No. 16-8898, 2017 WL 11571083, *14 (C.D. Cal. Dec. 14, 2017) ("[T]he Court would find that Stotz's claims are typical of the proposed class and that the prerequisite of Rule 23(a)(3) is satisfied.").

[34] "[A]s long as the damages can be calculated for each class member through the same formula, variation in the result of the formula does not defeat predominance." *Meek v. Kansas City Life Ins. Co.*, No. 19-472, 2022 WL 499049, *7 n. 6 (W.D. Mo. Feb. 7, 2022); *Cromeans*, 303 F.R.D. at 559 (because "[t]he application of the plaintiff's model to each class member is merely mechanical," the possibility of "variation does not defeat the common issue of liability.").

validating that. It's dangerous." RSOF at ¶ 91. *See also Tussey v. ABB, Inc.*, No. 06-4305, 2007 WL 4289694, at *8 (W.D. Mo. Dec. 3, 2007) (rejecting the same argument).[35]

Attacking Plaintiff's credibility, Sig Sauer represents to the Court that, "Plaintiff claimed that Sig Sauer 'concealed its knowledge' that the P320 does not have a manual safety . . ., yet Plaintiff knew that his P320 did not have a manual safety." Opp. at p. 33. In support, Sig Sauer misrepresents paragraph 84 of the Complaint, which fully states:

> Nonetheless, Sig Sauer concealed its knowledge **of the alleged inadvertent discharge defect** from consumers, including Plaintiff and members of the Proposed Class.

[Doc. 1] at ¶ 84. Concealment of the alleged Defect (of which the absence of a manual safety is only one of three components) is entirely consistent with Plaintiff's testimony. The Court should reject Sig Sauer's baseless "credibility" argument.

Sig Sauer also contends Plaintiff isn't adequate because "[u]nlike the class defined in the Complaint, which excluded 'any individuals who have suffered personal injury' [], the Motion class does not []." Opp. at p. 34. According to Sig Sauer, this could result in "claim splitting." But Plaintiff's class presented in his Motion specifically excludes all "individuals who have filed an individual action against Sig Sauer related to the P320." Pl. Motion [Doc. 121] at p. 31, n.8.[36]

---

[35] Sig Sauer's cited cases are distinguishable. Sig Sauer relies on *Bodner v. Oreck Direct, LLC* where the plaintiff evinced "undeniable and overwhelming ignorance regarding the nature" of the case and didn't meet attorneys until the day before his deposition. No. 06-4756, 2007 WL 1223777, at *2 (N.D. Cal. Apr. 25, 2007). Sig Sauer also relies on *Price v. United Services* and *Keister v. Allstate*; like *Bodner*, those cases involved plaintiffs with near complete ignorance of the record and underlying facts. *See Price*, No. 10-2152, 2012 WL 2847821, at *8 (W.D. Ark. Mar. 16, 2012) ("when asked whether he agreed to be a class representative, Plaintiff stated that he was 'not sure exactly what that means.'"); *Keister*, 663 F. Supp. 3d 1030, 1040 (W.D. Mo. 2023) (finding plaintiff failed "to be aware of the basic facts underlying the lawsuit").

[36] Sig Sauer's argument about "claim splitting" is unavailing. Plaintiff brings only an MMPA claim, and the measure of damages for the MMPA is benefit-of-the-bargain damages; the MMPA doesn't give rise to personal injury claims. *Craft v. Phillip Morris Cos., Inc.*, No. 02-406A, 2003 WL 23355745, *8 (Mo. Cir. Ct. 2003) (rejecting the same argument in a MMPA case). Thus, *res judicata* can't attach for any personal injury claims because they are excluded from the proposed class and have not had a "full and fair opportunity to litigate the matter" in this forum. *Ebert v. General Mills, Inc.*, No. 13-3341, 2015 WL 867994, *11 (D. Minn. Feb. 27, 2015) (rejecting "claim splitting" argument). Moreover, Sig Sauer's cited cases are distinguishable because they don't consider "claim splitting" in the MMPA context. *Thornburg v. Ford Motor Co.*, No. 19-1025, 2022 WL 4348475 (W.D. Mo. Sept. 19. 2022) (common law claims arising from noxious odors); *Henke v. Arco Midcon, LLC*, No. 10-86, 2014 WL 982777 (E.D. Mo. March 12, 2014) (common law claims arising from pipeline defects).

**Ascertainability:** The Eighth Circuit has rejected a heightened ascertainability standard. *See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995–996 (8th Cir. 2016). In the Eighth Circuit, "[a] class may be ascertainable when its members may be ***identified by reference to objective criteria***." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017); *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1138 (W.D. Mo. 2020).

Here, whether someone owns a P320 without a manual safety is a verifiable fact. This determination does not necessitate a merits inquiry or consideration of an individual class member's state of mind. Other courts agree in the product defect context.[37]

Nonetheless, Sig Sauer argues that some class members may not have suffered a price premium injury; again, Stockton's opinions negate that speculation. Sig Sauer's expert may disagree, but that doesn't defeat certification. *See Folgers*, 2024 WL 4093111, at *10. Similarly, the fact that Sig Sauer lacks precise sales records doesn't prevent certification—this Court routinely relies on self-identification methods, retailer sales data, and other methods to satisfy any ascertainability concerns.[38] The class is ascertainable.

## CONCLUSION

Sig Sauer offers no compelling basis to deny Plaintiff's Motion [Doc. 121]. Accordingly, the Court should certify the proposed class.

---

[37] *Falco v. Nissan North America, Inc.*, No. 13-686, 2016 WL 132474, *14 (C.D. Cal. April 5, 2016) (finding ascertainability for vehicle owners based on motor registration records, ownership records, and class members' repair records); *Keegan v. American Honda Motor Co., Inc.*, 284 F.R.D. 504, 521-22 (C.D. Cal. 2012) (same); *Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 594 (C.D. Cal. 2008) (same); *Hope*, 353 S.W.3d at 78-79 (same).

[38] *Folgers*, 2024 WL 4093111, at *5 (self-authenticating affidavits appropriate to satisfy ascertainability); *In re Smitty's / Cam2 303 Tractor Hydraulic Fluid Marketing Litig.*, No. 20-2936, 2023 WL 9064606, *21 (W.D. Mo. Dec. 13, 2023) (combination of retailer sales data, class notice, and self-identification with proof of purchase satisfied ascertainability); *In re Dollar Gen. Corp. Motor Oil Mktg. and Sales Practices Litig.*, No. 16-2709, 2019 WL 1418292, at *16 (W.D. Mo. Mar. 21, 2019) (same).

DATED: April 28, 2025              Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

_/s/ Matthew L. Dameron_

| | |
|---|---|
| Michael A. Williams | MO Bar No. 47538 |
| Matthew L. Dameron | MO Bar No. 52093 |
| Clinton J. Mann | MO Bar No. 70212 |

1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:      (816) 945-7110
Facsimile:      (816) 945-7118
mwilliams@williamsdirks.com
matt@williamsdirks.com
cmann@williamsdirks.com

Todd C. Werts          MO Bar No. 53288
**LEAR WERTS LLP**
103 Ripley Street
Columbia, Missouri 65201
Telephone:   (573) 875-1991
Facsimile:   (573) 279-0024
werts@learwerts.com

***Counsel for Plaintiff and the Proposed Class***