EXHIBIT 13
Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI SOUTHERN DIVISION**

| | |
|---|---|
| JOSHUA GLASSCOCK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SIG SAUER, INC.,<br><br>Defendant. | Case No.: 6:22-cv-3095-SRB |

**<u>REBUTTAL EXPERT REPORT OF ROBERT RAUSCHENBERGER, PH.D.</u>**

**MARCH 27, 2025**

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

## Introduction

1. I have been retained by SIG SAUER, Inc. in my capacity as an expert in human factors, and I am providing the following report, summarizing the work conducted by J.S. Held in the matter of *Glasscock v. SIG SAUER*. I have reviewed case-specific materials (listed at the end of this report), as well as scientific literature related to human performance, warnings, safety communication, and consumer decision-making. This report describes my findings to date. The opinions contained herein are based on my education, training, and experience, as well as on my review of the aforementioned materials. The opinions proffered in the report have been rendered with a reasonable degree of scientific certainty. I reserve the right to supplement the report and to expand or modify my opinions based on review of material as it becomes available through ongoing discovery. Should I be asked to testify in this case, I plan to use excerpts and charts from the materials I have cited in this report. A copy of my resume is attached as an appendix to the report.

### Qualifications

2. I received a master's degree and a Ph.D. in cognitive psychology from The Johns Hopkins University. I am currently VP Director of Human Factors at J.S. Held, where I oversee a network of state-of-the-art user research centers that employ predominantly Ph.D.-level scientists performing research related to product usability, labeling comprehension, and product safety in use. Over the past 28 years, I have conducted research on the way humans process information, perceptually organize information, attend to various aspects of the visual world, and interact with technology. I have also assisted consumer products and healthcare companies in researching consumer attitudes toward their products, creating and evaluating instructions and warnings, and preparing regulatory submissions for clearance or approval by the FDA.

3. My research has been funded by the National Science Foundation, for which I also serve as grant reviewer. I have authored peer-reviewed articles on visual perception, visual attention, human-machine interaction, driver behavior, and warnings effectiveness, published in scientific journals and conference proceedings, and have, in turn, provided my own peer review as grant selection committee member, editorial board member, and as reviewer for two dozen scientific journals.

4. I served as the program chair for the healthcare technical group of the Human Factors and Ergonomics Society. I am a Fellow of the Psychonomic Society, which requires a nomination by a senior member and the fulfillment of certain criteria that are indicative of productive post-graduate research activity. My current or past professional memberships include the Visions Sciences Society (VSS), the Association for Research in Vision and Ophthalmology (ARVO), and the Association for Computing Machinery's (ACM) Special Interest Group on Human-Computer Interaction (SIGCHI).

5. I also held an adjunct professorship at the School of Interactive Arts and Technology at Simon Fraser University in Vancouver. I currently teach, and have for over ten years taught, a class at Drexel University on medical device human factors as part of a graduate-level course on biomedical engineering organized by a Drexel University professor in collaboration with a senior biomedical engineer at the FDA. I also teach,

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

and have for the past several years taught, a class on human factors at Arizona State University as part of a course on failure analysis and prevention. During my years at The Johns Hopkins University, I taught undergraduate courses on methods and statistics, anthropology, and multidisciplinary approaches to science. I am also regularly invited to present my research to scientists at research laboratories in both industry and academia, in the U.S. and abroad.

6. Prior to joining J.S. Held, I was a principal at Exponent, where I created and directed the Centers for Scientific User Research (CSUR). Prior to Exponent, I managed the research in human factors and user experience for the North American continent at Siemens Corporate Research, for the entire breadth of the Siemens portfolio, which, at the time, included medical, industrial, and consumer products. I have developed product warnings, used scientific methods to evaluate the safety of products, and used large-scale databases maintained by the FDA and the Consumer Product Safety Commission (CPSC) to evaluate the safety of products.

7. J.S. Held bills my time at a rate of $650 an hour in 2024. I performed all work related to the matter discussed below at this rate, and my compensation is not dependent upon a particular finding or the outcome of this litigation.

**Cognitive and Perceptual Psychology and the Science of Consumer Decision-Making**

8. Just as usability engineering was born out of cognitive and perceptual psychology[1] – as it is closely related to how humans perceive the "affordances" of designs,[2] process information, and commit errors based either on flawed perceptions or a flawed execution of their movements[3] – the study of consumer decision-making is an outgrowth of the psychology of human perception, cognition, memory, and information processing. In his chapters on consumer decision-making and designing labels for presenting risk information, Dr. James Bettman bases his exposition on thirty years of foundational research in information processing, for which he, in turn, identifies three major subsystems that allow memories and internal processes to interact with the environment: the perceptual systems, the motor system, and the cognitive systems.[4] All three subsystems have been the purview of perceptual and cognitive psychology for over a century.[5]

9. Not surprisingly, the decision-making processes that relate to risk taking/avoidance and the processing of warnings and other disclosures are also derived from the same

[1] E.g., Gillan, D. J., & Bias, R. G. (2001). Usability science. I: Foundations. *International Journal of Human-Computer Interaction*, *13*, 351-372

[2] E.g., Norman, D. A. (2015). Affordances: Commentary on the special issue of AIEDAM. *Artificial Intelligence for Engineering Design, Analysis and Manufacturing, 3*, 235-238

[3] E.g., Norman, D. A. (1981). Categorization of action slips. *Psychological Review, 88*, 1-15; Norman, D. A. (1983). Design rules based on analyses of human error. *Communications of the ACM, 26*, 254-258; Leape, L. L. (1994). Error in medicine. *Journal of the American Medical Association, 272*, 1851-1857; Reason, J. (1990). *Human error*. Cambridge University Press

[4] Bettman, J. R., Johnson, E. J., & Payne, J. W. (1986). *Consumer decision making*. In T. S. Robertson & H. H. Kassarjian (Eds.), Handbook of Consumer Behavior (pp. 50-84). Englewood Cliffs, NJ: Prentice-Hall; Bettman, J. R., Payne, J. W., & Staelin, R. (1991). Cognitive considerations in designing effective labels for presenting risk information. *Journal of Public Policy & Marketing, 5*, 1-28

[5] James, W. (1890). *The principles of psychology*. New York: Holt

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

underlying perceptual, cognitive, and motor structures and processes studied by perceptual and cognitive psychologists.[6] Given these foundational scientific origins, a sizeable body of literature has accumulated over the past four decades-plus on those factors that influence the effectiveness of warnings and other disclosures. For example, the effects of familiarity and benign experience, as well as the cost of compliance, have been subjected to empirical investigation.[7] The effect of repeated exposure to the same or different hazards has likewise undergone scientific scrutiny.[8] The impact of numerosity, embeddedness, formatting, and other aspects of presentation have also been studied by scientific researchers.[9]

**Understanding of Allegations and Scope of Report**

10. It is my understanding that Plaintiff Joshua Glasscock filed a class action complaint (the "Complaint") on April 18, 2022 alleging a single claim for violation of the Missouri Merchandising Practices Act ("MMPA").[10] It is also my understanding that, in the Complaint, the Plaintiff alleges that all P320 pistols without "external safety features"[11] (such as a manual safety or a tabbed trigger[12]) suffer from an "inadvertent discharge defect"[13] that renders them unreasonably dangerous.[14] It is further my understanding that the Plaintiff alleges that SIG SAUER fails to disclose the following information about the P320: that it has "a heightened risk of inadvertent discharges due to the absence of external safety features;" that it "requires a heightened degree of care than comparable firearms due to its lack of external safety features;" and that it "lacks safety features available on other comparable firearms in the marketplace."[15] Lastly, it is my understanding that the Plaintiff alleges that he and all other members of the putative class would not have purchased their respective SIG SAUER P320, or only would have done so only at a lesser price, had they been apprised of the alleged defect.[16]

11. I understand that Plaintiff sought in his April 18, 2022 Complaint to certify a class of "[a]ll persons who purchased a Sig Sauer model P320 pistol without an external safety in the state of Missouri from September 1, 2017, through the present."[17]

---

[6] See, e.g., Bettman, J. R., Payne, J. W., & Staelin, R. (1991). Cognitive considerations in designing effective labels for presenting risk information. *Journal of Public Policy & Marketing, 5*, 1-28.

[7] E.g., Dingus et al. (1991); Goldhaber & DeTurck (1988); Karnes et al. (1986); Lehto & Foley (1991); Otsubo (1988); Zeitlin (1994)

[8] E.g., Halpern-Felsher et al. (2001); Lima (2004)

[9] E.g., Chen et al. (1997); Huntley-Fenner et al. (2007); Otsubo (1988); Shaver et al. (2006); Strawbridge (1986)

[10] I have been informed that the Missouri Merchandising Practices Act ("MMPA") claim at issue has a five-year statute of limitations. (See Mo. Rev. Stat. § 516.120.)

[11] See Complaint ¶¶ 26, 36.

[12] See, however, the report of Derek Watkins, wherein he discusses that, "[w]ithin the firearm industry, the term 'external safety' is traditionally associated with manual safeties and not passive safeties. A thumb safety would be considered an external safety and a bladed/tabbed trigger would not" (Expert Report of Derek Watkins ["Watkins report"], p. 33).

[13] See Complaint ¶¶ 59, 68, 71, 84, 90.

[14] See Complaint ¶ 35.

[15] See Complaint ¶ 61.

[16] See Complaint ¶¶ 8, 64.

[17] Complaint, p. 1, ¶ 66

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

12. It is my understanding that in Plaintiff's Motion for Class Certification and Suggestions in Support ("Plaintiff's Suggestions"), the Plaintiff modified the class definition as well as the allegations regarding the defect and what SIG SAUER is alleged to have failed to disclose to consumers:

Class Definition:

a. "All persons who purchased a Sig Sauer model P320 pistol without an external thumb safety primarily for personal, family or household purposes in the state of Missouri from September 1, 2017, through the present."[18]

Alleged Defect:

a. The Plaintiff alleges that the "defect has three components": "(1) the P320 is effectively fully energized and ready to fire the instant that a round is chambered; (2) the P320 has a minimal trigger pull because it is short and lightweight; and (3) the P320 lacks any external safety features."[19]

Alleged Omissions:

a. The Plaintiff alleges in his Suggestions that SIG SAUER "omitt[ed] information concerning the design of the P320" and that SIG SAUER "does not inform customers that the P320 has sufficient energy to discharge a bullet any time a round is chambered."[20]

b. The Plaintiff alleges, further, that "Sig Sauer does not tell consumers about the P320's Defect. Nor does Sig Sauer warn consumers that the P320 is extraordinarily dangerous compared to similar pistols."[21]

Allegations Related to Action Type:

a. The Plaintiff compares the P320's purported design to "a single action pistol" and asserts that "a reasonable consumer could not determine what the action type of the P320 is" simply "by looking at the P320" or "holding the P320."[22]

13. I have been asked to perform a human factors evaluation of the likelihood that members of the putative class would have uniformly changed their purchase behavior had SIG SAUER provided certain disclosures, namely that the P320 does not have certain external safety features (either a tabbed trigger or a manual safety [when purchased without]) and

---

[18] See Plaintiff's Suggestions, p. 31. I have been asked to assume that the putative class period at issue here stops at the date of the filing of the Complaint (the "Putative Class Period"), as Plaintiff's Complaint indicates he is now aware of the information he claims SIG SAUER omitted. (See *Rawa v. Monsanto Co.*, 2018 WL 2389040, at *2 n.1 [E.D. Mo. May 25, 2018] [defining end date of class period in "false advertising" action as "the date the complaint was filed"]; *George v. Omega Flex, Inc.*, 2020 WL 4718386, at *8 [W.D. Mo. Aug. 13, 2020] [Harpool, J.] [a plaintiff "who knew about" a purportedly deceptive practice is "not injured by the practice"]; see also *Jacks v. DirectSat USA, LLC*, 2012 WL 2374444, at *8 [N.D. Ill. June 19, 2012] ["adopting the date the complaint was filed as the end date for the class period" where plaintiffs did not "provide a definite end date" and stated "to the present"], *modified*, 2015 WL 1087897 [N.D. Ill. Mar. 10, 2015] [decertifying class].)

[19] Plaintiff's Suggestions, pp. 13-14

[20] Plaintiff's Suggestions, pp. 8, 26

[21] Plaintiff's Suggestions, p. 8

[22] Plaintiff's Suggestions, pp. 11, 15


CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

that it is therefore alleged more prone to unintended discharges than other firearms;[23] that it has a shorter trigger pull than other, comparable weapons; and that it is highly energized once a round is chambered.[24]

**Summary of Opinions**

14. Based upon the analysis below, the published scientific literature, my review of the materials produced to me to date, including the Plaintiff's testimony, I conclude to a reasonable degree of scientific certainty that:

    a. There is no scientific empirical evidence that the P320 is involved in unintended discharge incidents at a rate higher than that of other pistols, either in the documents produced in the present matter nor in the published peer-reviewed science. Rather, the latter has shown unintended discharges to be distributed broadly across different makes, models, and designs of other pistols.

    b. Because adverse events accumulate over time, SIG SAUER's knowledge of any alleged defect in any of its products, and specifically the P320, will naturally differ across time; in this case, it will specifically have varied across the Putative Class Period. Given the very small number of alleged incidents before the filing of the Plaintiff's Complaint, the unknown or complex multifactorial circumstances surrounding these events, and the expected baseline level of unavoidable incidents, as documented by the scientific literature for any gun, it would have been unreasonable to expect SIG SAUER to know about the existence of the alleged defect, if it hypothetically existed.

    c. An analysis of adverse incident prevalence, both based upon published data and based upon a review of the incidents attributed to the P320 during the Putative Class Period, does not permit a conclusion that a disclosure would have been warranted.

    d. Not all buyers of the P320 would have been exposed to hypothetical disclosures or, conversely, have been exposed to alleged representations about the P320 made by SIG SAUER, and would therefore have modified their purchase decision.

    e. A hypothetical disclosure about the alleged defect would not have uniformly altered the purchase decision-making of prospective buyers of the SIG SAUER P320.

    f. Not all buyers of the P320 purchased and/or used the P320 for the same purposes or in a similar fashion; for example, some users might have stored it at home for potential, low probability use, whereas others might have used it recreationally, and yet others might have carried it on their person most or all of the time, resulting in different rates of exposure to the alleged defect and different rates of potential likelihood to experience an unintended discharge.

    g. Consumers' purchase decision-making is extremely varied; and the factors that weigh into the decision about whether, and, if so, which make and model of gun to purchase; the reasons for the purchase; the intended use of the gun; and

[23] Complaint ¶¶ 3-4, 27

[24] Plaintiff's Suggestions ¶¶ 3, 24, 27; Complaint ¶ 17

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

whether an external safety is desirable or not are all individuated questions for which a generic decision-making process cannot be generalized to all buyers of even the same product.

h. The report of Plaintiff's expert, Mr. Biller, creates qualitative impressions about the alleged lack of safety of the design of the P320 that are not well founded even in the materials Mr. Biller cites to support his opinions.

i. In the case of the P320, based upon consumer purchasing behavior and based upon the existence of highly-visited videos on how to remove a P320 manual safety, the absence of a manual safety on some models of the pistol constitutes a feature desirable to certain purchasers of the P320 and is deliberately pursued as such, as opposed to constituting a defect.

**Scientific Bases for Providing a Warning**

*Warnings need to be based on a scientific process and an empirical risk analysis*

15. The Plaintiff alleges that SIG SAUER failed to disclose to consumers in its marketing and in the owner's manual for the P320 about an allegedly increased likelihood of an inadvertent discharge owing to the absence of external safety features, such as a manual safety or a tabbed trigger, on some models of the P320.[25] The Plaintiff cites as supposed evidence for such an increased propensity a number of lawsuits that have been filed against SIG SAUER.[26] Apart from the fact that a relative magnitude judgment requires a referent ("increased" compared to what?), it should be obvious that allegations made as part of a lawsuit do not constitute evidence in a scientific sense. The circumstances for the alleged inadvertent discharges in these lawsuits are unknown, or at least not ascertainable from the Complaint in the present matter. Just like the police evaluate the circumstances of each individual unintended discharge,[27] the discharges in these lawsuits need to be investigated for factors unrelated to the presence or absence of an external safety.

16. Moreover, apart from the scientific uselessness of a legal complaints in determining incidence rates, the likelihood, or even a prevalence, of adverse incidents cannot be determined from an absolute number of alleged incidents alone, especially not in isolation. In order to calculate a likelihood or prevalence, both a numerator (number of incidents) and a denominator (number of relevant guns in circulation, number of uses of relevant guns in a given time interval, etc.) are required. Lastly, the resulting quotient needs to be compared to some meaningful comparator; for example, the prevalence (calculated in the same manner) of inadvertent discharges for other makes and models of firearms, or the prevalence of inadvertent actuations of other non-firearm (but potentially lethal) products, or the prevalence of inadvertent discharges of SIG SAUER P320s with external safety features, or the likelihood of being struck by lightning. For such an analysis, the individual design features alleged by the Plaintiff to cause the P320 to have a disproportionately high rate of unintended discharges are immaterial because the Plaintiff's allegation is that it is the ensemble of these features that renders the P320 more

[25] Complaint ¶ 27
[26] Complaint ¶ 37
[27] See, e.g., NYPD Annual Firearms Discharge Report 2010-2014.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

prone to unintended discharges than (presumably) other pistols. In other words, the Plaintiff's argument is that because the P320 is highly energized once a round is chambered and because the trigger pull is short and lightweight and because the P320 does not have a tabbed trigger, in addition to, on some models, not having an external safety, it is associated with more unintended discharges than other weapons.

17. In the particular case of the P320, relying upon legal complaints for purposes of a risk assessment is especially misleading because it artificially inflates the numerator for the prevalence calculation. A review of the cases filed against SIG SAUER involving the P320 reveals that, prior to mid-April 2022, the theory of unintended discharges related to the P320 involved allegations that users' P320s were discharging without a trigger pull, not that the P320 was defective for lacking an external safety.[28] Furthermore, many of the P320 inadvertent discharge incidents were determined to have resulted from user error rather than from a defect with the P320.[29] In any case, for as long as allegations, no matter how abundant, and irrespective of the specific nature of these allegations, remain unsubstantiated, it would be inappropriate for SIG SAUER to provide a warning based upon mere assertions. As discussed in the following section, providing a warning nevertheless under these circumstances can have detrimental effects and should be avoided. As a corollary: until a "safety signal" unequivocally emerges that has a substantiated empirical basis, there is no cause for a manufacturer to provide a warning; and not providing one does not constitute a willful omission, but, rather, a prudent decision, in line with the published science on warnings.

18. An examination of the timeline of the complaints involving the P320 is illustrative in this regard. All adverse incidents for any product need to accumulate over time, given that products gradually enter the market over time (as more and more units get sold with time), and given that adverse incidents manifest with some statistical probability, not with statistical certainty. When the probability is extremely small, as is the case of unintended discharges (as discussed in detail below), a considerable amount of time can elapse before even a single event manifests. In a similar vein, one could live many, many lifetimes and not be struck by lightning once. Accordingly, a considerable amount of time needs to elapse before any meaningful number of adverse incidents accumulates for any given product. For the P320, a gradual and initial accumulation of claims (whether substantiated or not) did not start until around 2019.[30] The Plaintiff purchased his gun on March 30, 2020[31] – at which point few of the lawsuits had been brought and few claims about inadvertent discharges had been made to SIG SAUER.[32] Christopher Meyer, who has worked in the SIG SAUER customer service department for nine years at the time of his deposition,[33] testifies in his declaration that there were no more than 76 claims for the P320 during the Putative Class Period.[34] Only a single one of these was identified as

---

[28] Declaration of Christopher Meyer in Support of SIG SAUER, Inc.'s Opposition to Plaintiff's Motion for Class Certification ("Meyer declaration") ¶ 15

[29] Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification ("T. Taylor declaration") ¶ 67

[30] See Figure 1 of Meyer declaration.

[31] See Deposition of James Thomas Faulkner, 03/15/2024 ("Faulkner depo"), p. 49.

[32] See Meyer declaration.

[33] Deposition of Christopher Meyer, 9/11/2024 ("Meyer depo"), p. 6

[34] Meyer declaration

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

having occurred in Missouri.[35] Of note, the Plaintiff himself has never experienced an unintended discharge,[36] nor has Mr. Faulker,[37] who sold Plaintiff his P320. Among the 76 unintended discharges, the vast majority were related to non-consumer uses of firearms; for example, in a military or law enforcement application.[38] Given the very sparse record of unintended discharges across five years of use, and in the face of the millions of P320s in the market, any manufacturer would be challenged to recognize such sporadic events as indicating any sort of issue with the product – especially in light of the potential for many of these events to be caused by human error (as discussed in greater detail below). Any such recognition of a potential "safety signal" is further aggravated by the fact that there is a baseline level of unintended discharges across all guns of any make, model, design, etc. Any perceivable "safety signal" would need to rise about this statistical noise, in the same way that for an auditory signal to be audible, it needs to rise about the background noise.

*There is a risk of overwarning*

19. Case reports, complaints, or explorative research with nondefinitive outcomes do not suffice to recommend a warning on a product, especially not in light of the widespread conviction among regulators and warnings researchers alike that warnings about low-level or speculative risks may be potentially harmful. Scientific studies have demonstrated repeatedly that "overwarning" can have deleterious effects on warnings compliance. A dedicated meta-review of the extant literature on product warnings discusses several emerging themes that arise from this literature, among them: desensitization to warnings,[39] reduced recall of certain warning messages, reduced believability or credibility of warnings, reduced ability to differentiate the relative magnitude of risks, and misplaced reliance on the completeness of a warning label.[40] Empirical studies on overwarning have found that perceived risk dilution,[41] as well as reduced noticing, reading, and compliance with warnings,[42] can occur as a result. Consequently, authors have proposed basing consumer product warnings on objective criteria, such as the prevalence and severity of injury, and reserving warnings for high-prevalence and/or high-severity risks.[43]

20. Because such government agencies as the Food and Drug Administration (FDA) and the Consumer Product Safety Commission (CPSC) have a vested interest in warnings, as one form of risk mitigation, they both advocate against overwarning or warning about speculative hazards. Speculative hazards are "theoretical hazards not well-grounded in scientific evidence."[44] The FDA, in its regulations, cautions that labeling that includes warnings against such speculative hazards "can cause meaningful risk information to

---

[35] *Ibid.*
[36] Deposition of Joshua Glasscock ("Glasscock depo"), 03/06/2025, p. 88
[37] Faulkner depo, pp. 31, 73
[38] *Meyer declaration*
[39] See, also, Stewart & Martin (1994), who include reactance, "boomerang" effects, and increased product attractiveness as additional unintended potential negative consequences of warnings.
[40] Frantz et al. (1999)
[41] Chen et al. (1997)
[42] Strawbridge (1986)
[43] E.g., McCarthy et al. (1982); McCarthy et al. (1994); McCarthy et al. (1995); Ayres & Wood (1995)
[44] Federal Register, Vol. 71, No. 15, p. 3935

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

'lose its significance'" and that "[o]verwarning … can … have a negative effect on patient safety and public health."[45]  The agency's stated concern is that "labeling that does not accurately portray a product's risks … potentially discourag[es] safe and effective use of approved products or encourag[es] inappropriate use…"[46]  Similarly, the CPSC admonishes authors of product instructions and warnings to "[a]void 'overwarning'" because "safety messages for highly unlikely and trivial hazards … weaken the effectiveness of the more significant messages."[47]  Based on published accounts, U.S. Congress was also concerned with warnings about insubstantial hazards when enacting the Federal Hazardous Substances Labeling Act.[48]

*Product risk needs to be contextualized*

21. Case reports constitute anecdotal observations for which confounding factors have either not been controlled or cannot even be ascertained.  Their results may furthermore not extrapolate to others, beyond the individual whose case is described in the case report. Even in greater numbers, case reports, complaints, or even documented injuries may not justify a warning.  From the finding that there are an estimated nearly 12,000 injuries in the U.S. alone every year related to first aid equipment,[49] for example, one might conclude that first aid equipment does more harm than good and should carry warnings. By the same logic, beds might be ejected from households for being too dangerous or made to bear warnings, given that there are an estimated more than 170,000 bed-related injuries annually in the U.S. alone.[50]  Without the proper context, such raw injury statistics are relatively meaningless.  To judge how hazardous beds are, it is important to place the injury statistics within the context of some denominator, whether it be the number of beds in the U.S. (over 300,000,000 according to the U.S. Census Bureau,[51] if one assumes one bed per bedroom), or the number of hours slept in a bed every year (~7 hours[52] x 365 days x 300,000,000 or over 766 billion hours).

22. There are several published articles in the scientific literature on unintended discharges of firearms, to which a large variety of firearms of all makes, models, and designs are susceptible – irrespective of the trigger pull distance or weight, the presence or absence of a manual safety, or other design elements of the gun in question.  Assessing the state of science until a more recent systematic empirical investigation of the topic, O'Neill and colleagues conclude that "there has been a reliance on theoretical generalizations and anecdotal evidence" and that "[i]nformation gleaned from an empirical analysis, one that can be verified through direct observation, can lead to a more complete and clear understanding of the issue."[53]  Various such empirical analyses all demonstrate that unintended discharges are observed "across a wide variety of firearms, regardless of

---

[45] *Ibid.*
[46] *Ibid.*
[47] Singer et al. (2003), p. 47
[48] See, e.g., Frantz et al. (1999).
[49] See McCarthy et al. (1982).
[50] *Ibid.*
[51] https://data.census.gov/table/ACSDT1Y2022.B25041  (accessed: 7/18/2024); https://www.cnbc.com/2016/04/28/theres-6-billion-being-wasted-in-americas-spare-bedrooms.html (accessed: 7/18/2024)
[52] https://www.nhlbi.nih.gov/resources/your-guide-healthy-sleep  (accessed: 7/18/2024)
[53] O'Neill et al. (2018a)

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

design, trigger mechanism, or trigger poundage."[54] These conclusions were based on a sample of 171 official reports of unintended discharges from 1992-2016. Using a different sample of 137 official reports from 1974-2015, another analysis found that unintended discharges were distributed across 23 models from 11 manufacturers. This study, as well, concludes that unintended discharges "can and do occur across a wide variety of manufacturers, models, and firearm types," and cautions not to extrapolate from the specific distribution of events across trigger types owing to the lack of counterbalancing in the study design.[55] Yet another study used the aforementioned samples of unintended discharges to investigate the causes of the intended discharge in each case.[56] It found that over half of unintended discharges occurred within the context of routine tasks, such as clearing and function checks, which, in turn, constituted over half of routine tasks associated with an unintended discharge. Another one quarter of unintended discharges were attributable to muscle coactivation, which resulted from a loss of balance, use of the other hand, and a loss of grip, which, collectively, accounted for nearly 70% of the unintended discharges in that category. The remaining quarter divided into unfamiliar firearm tasks (with unfamiliar firearms and hand transfers accounting for 70% of those tasks, in turn), contact with objects, startle stimuli, and medical conditions. A final study (to date) utilizing the 171 aforementioned official reports included a fairly high percentage of double-action only handguns (~27%) among the weapons involved in unintended discharges, which, the authors concluded, "substantiate[s] the claim that UDs [unintended discharges] occur across firearm types, trigger actions, and trigger weights."[57] A related study had found unintended discharges across a trigger weight range of four to 13 pounds.[58] In other words, unintended discharges are not the consequence of either a specific action type (such as single-action striker-fired) or trigger pull weight, or any other specific design element, as alleged by Plaintiff.[59] Defendant's expert, Derek Watkins, arrives at the same conclusion based upon his extensive analysis of different pistol designs and the root causes of various unintended discharge events.[60]

*The causes of unintended discharges are varied and not tied to specific makes, models, or designs*

23. The causes of unintended discharges are also of interest to the present discussion, because an unintended discharge does not mean that a firearm is unreasonably dangerous or necessarily discharges itself without involvement of the user. Consequently, O'Neill and colleagues operationally define an unintended discharge as "*an activation of the trigger mechanism* that results in an unplanned discharge that is outside of the firearm's prescribed use."[61] Such an operationalization avoids an attribution of blame and encompasses "events that result from the complacent handling of a firearm (often referred to as accidental or negligent discharges), those associated with involuntary muscle

[54] O'Neill et al. (2018a)
[55] O'Neill et al. (2017), p. 289
[56] O'Neill (2018)
[57] O'Neill et al. (2018b)
[58] O'Neill et al. (2017)
[59] See, e.g., Plaintiff's Suggestions, pp. 13-14.
[60] See Watkins report.
[61] O'Neill et al. (2017) (emphasis added)

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

contractions, and discharges that result from compromised structural integrity of the firearm."[62] The New York Police Department publishes an annual report of firearms discharges, which includes a section on unintended discharges. Five such reports were retrieved from the public domain, for 2010-2014. After 2014, no further reports were found in the public domain. These reports, spanning five years, provide analyses of the root causes of the unintended discharges recorded by the New York Police Department, subsequent to a departmental investigation. In 2010, half of the unintended discharges that did not occur during an adversarial conflict or animal attack occurred while the officer was unloading the gun; the other half occurred while the officer was handling the gun (from inspecting or cleaning the firearm, to attempting to render the firearm safe, to testing the firearm's operability).[63] Five of the 15 firearms involved were not the officers' regular guns, leading the Report to conclude that the associated unintended discharges stemmed from a lack of familiarity with the firearm in question.[64] Six of the remaining nine firearms were manufactured by Glock (which is by no means an indictment of Glock, but merely a statement of fact).[65] In all but one of the cases for which a finding was determined as the result of an investigation, the officer involved received some form of discipline or retraining,[66] intimating user error, rather than a defect on part of the gun. Similar results obtain for the 2011, 2012, 2013, and 2014 Reports: The bulk of the officers involved were determined to have violated Department guidelines and were subject to discipline and/or retraining.[67] In 2012, of the service weapons involved, 31% were Glocks, 46% Smith & Wessons, and 23% SIG SAUERs;[68] in 2013, 62% were Glocks and 38% SIG SAUERs;[69] and in 2014, 50% were Glocks, 28% Smith & Wessons, 11% SIG SAUERs, and 5% each a Colt and a Davis.[70] These results reinforce the findings from the published scientific literature, that the range of makes and models of guns that experience unintended discharges is quite wide; and it also implicates user error as a frequent culprit, even with individuals one would expect to be proficient in the proper use of firearms.

24. As discussed earlier, there were no more than 76 claims for the P320 during the Putative Class Period.[71] However, by the end of the Putative Class Period, there were approximately 2.4 million P320s in the marketplace, the P320 being SIG SAUER's top-selling pistol to date.[72] Given the 76 claims for the P320, only 0.003% of those pistols are involved in some form of unintended discharge. If one assumes that even only one quarter of the 2.4 million P320s have been in the market for a year or more, that equates to nearly 220 million days on which an unintended discharge could be observed with a P320, resulting in an estimated incidence rate of 0.00004% in a single year – making it

[62] O'Neill et al. (2018a)
[63] See NYPD Annual Firearms Discharge Report 2010.
[64] *Ibid.*
[65] *Ibid.*
[66] *Ibid.*
[67] See NYPD Annual Firearms Discharge Reports 2011, 2012, 2013, and 2014.
[68] NYPD Annual Firearms Discharge Reports 2012
[69] NYPD Annual Firearms Discharge Reports 2013
[70] NYPD Annual Firearms Discharge Reports 2014
[71] Meyer declaration
[72] Figure 2 of T. Taylor declaration

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

nearly three times more likely that someone would get struck by lightning[73] than experience an unintended discharge. Company records from SIG SAUER indicate that 21,389 P320s were shipped to (but I understand not necessarily sold in[74]) Missouri between September 1, 2017 and April 18, 2022.[75] For these guns, only a single unintended discharge is known to have occurred in Missouri during the Putative Class Period.[76] The resulting incidence rate (0.005%) is comparable in magnitude to the one calculated for nationwide occurrences.

25. So far, apart from the unsubstantiated allegations in the Complaint or the listing of lawsuits against SIG SAUER (many of which were based on allegations that users' P320s were discharging without a trigger pull and were found to involve user error[77]), none of which constitutes scientific evidence, I have not seen any empirical evidence to merit a conclusion that the SIG SAUER P320 is unreasonably dangerous compared to other types of pistols.[78] Whatever emerging science exists in the peer-reviewed literature is sparse at present and does not implicate the SIG SAUER P320, nor does it even permit a conclusion, at present, that striker-fired pistols are disproportionately involved in inadvertent discharges.[79] In the absence of such unequivocal quantified risk data, the peer-reviewed published science and regulatory guidance on risk communication (including warnings) both advocate against the issuance of a warning about the alleged defect. Moreover, even if one were to assert, for argument's sake, that, at present, there has been a sufficient accumulation of incidents relative to the number of products in the marketplace to warrant a warning for the P320 (which there clearly has not been, as discussed above), it should be remembered that at the time the Plaintiff purchased his P320 in March 2020, there were very few claims of unintended discharges made to SIG SAUER, and most of the approximately 200 claims accrued to date have only occurred since that time.[80]

**Consumer Attention to Warnings and Other Disclosures is Diverse and Scant**

26. Leaving aside the question of whether a warning about the alleged defect was even justified, there is a subsequent question, relevant to the allegations in the present case, of whether consumers in the putative class would have uniformly been exposed to, and if so, noticed and read such warnings, and whether they would have uniformly altered their purchase decision-making about the SIG SAUER P320 or whether the hypothetically warned-about alleged defect would have been material to them in their purchase decision-making. Depending upon the circumstances of the purchase, consumers might have been exposed to hypothetical warnings in none, one, or several places. The Plaintiff references

[73] See https://www.cdc.gov/lightning/data-research/index.html (accessed: 11/27/2024)

[74] See T. Taylor declaration. It is my understanding, however, that the fact that a given sale is listed on the Sales Chart does not mean that a consumer purchased that P320 during the Putative Class Period or that the sale occurred in the state of Missouri. (See T. Taylor declaration.)

[75] SIG-GLASSCOCK00008914

[76] Meyer declaration

[77] Meyer declaration ¶ 15; T. Taylor declaration ¶ 67

[78] See, also, Watkins report, p. 6 ("No evidence exists that the P320 platform is more prone to inadvertent discharge than its competitor pistols.").

[79] See, e.g., O'Neill et al. (2017); O'Neill (2018); O'Neill et al. (2018a); O'Neill et al. (2018b).

[80] Meyer depo, pp. 54-55, 60; Meyer declaration

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

the owner's manual as one such location,[81] and also references a small set of advertisements that presumably might have been candidates for incorporating a warning.[82] Both of these types of documents, as potential locations for hypothetical warnings, will be discussed in detail below.

27. The channels through which purchasers procure guns are variegated, however. Some buyers purchase their gun new. Some buyers, such as the Plaintiff, purchase their gun used or from a friend.[83] Some gun owners receive their weapon as a gift, as was the case for Mr. Faulker,[84] who sold the Plaintiff his SIG SAUER P320.[85] Some may purchase their gun at a gun show. Some may purchase their gun online. In his Declaration, Thomas Taylor, executive vice president of global brand development at SIG SAUER,[86] enumerates half a dozen different channels through which consumers could acquire a P320 during the Putative Class Period.[87] All of these circumstances will affect whether a purchaser is exposed to any information from SIG SAUER prior to purchase and, if so, what particular type of information. If the purchase is spontaneous, such as, for example, at a gun show or from a friend, there is little or no opportunity to consult advertisements. If the gun is purchased used, there may be no opportunity to consult an owner's manual. Even if the owner's manual is supplied with the used gun, the gun will, in the case of the P320, very likely no longer have the tag with which all new P320s are sold that directs the buyer to the owner's manual for safety-related information.[88] In lieu of manufacturer-authored information, a consumer may also consult third-party content instead, such as articles or reviews written by individuals unaffiliated with the manufacturer. These third-party materials are outside of the sphere of influence of the manufacturer and therefore do not present an opportunity to the manufacturer to incorporate warnings. Ultimately, even if a consumer should encounter a hypothetical warning, it is not likely, based upon the published science, that he or she will necessarily notice or read it, as discussed in the subsequent sections.

*Warnings and other disclosures are not uniformly noticed, read, or complied with*

28. As a limited resource, (in)attention can lead to sometimes surprising failures to become aware of even salient stimuli.[89] In one classical study, for example, nearly half of participants did not notice a confederate in a gorilla suit that walked into a scene to which participants were actively attending, beat its chest, and then exited the scene again, spanning a time course of around five seconds of sustained presence.[90] Consistent with this finding, the warnings literature also often finds low levels of noticing of warnings.[91] In one extreme example of an empirical study documenting a failure to notice warnings,

81 See Complaint ¶ 29.
82 See, e.g., Plaintiff's Suggestions ¶¶ 67-69.
83 See Glasscock depo, 05/16/2023, p. 40.
84 See Faulkner depo, pp. 24-25.
85 See Faulkner depo, pp. 23, 31, 36.
86 Deposition of Thomas Taylor, 09/12/2024 ("Thomas Taylor depo"), p. 8
87 T. Taylor declaration
88 See Deposition of Matt Taylor, 09/10/2024 ("Matt Taylor depo"), pp. 175, 215-216.
89 E.g., Simons & Chabris (1999); Hyman et al. (2010); Rensink et al. (1997)
90 Simons & Chabris (1999)
91 See, e.g., Stewart & Martin (1994).

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

"[o]f the one hundred participants, no one noticed any label of any type."[92] In that study, college-aged participants were asked to perform a task utilizing a hammer containing one of various warning labels; two versions of the label warned participants not to proceed further. In another study, shoppers were asked to imagine they were deciding to purchase an infant car seat and then directed to inspect and handle potential products.[93] In one condition of the study, nearly one fifth of the participants did not notice a four-inch wide banner placed across the front of an infant carrier that stated in capitalized, $1^{1}/_{8}$-inch high, red letters: "NOT A CAR SEAT."

29. Even once consumers have noticed and read a disclosure, they need to comprehend the disclosure, process its content, be motivated to change their behavior, and be in a position to do so. There are a variety of contextual factors that influence whether a person can or will alter his or her behavior in response to a warning.[94] For instance, scientific research has shown that the effectiveness of a warning is reduced by a person's familiarity with a product or activity.[95] The more experienced a person is in using a particular product, the less likely he will be to heed warnings concerning that product because he feels the hazard is overstated.[96] A scientific study using two types of saws, for example, concluded that participants more familiar with, and/or having had prior experience with, a particular type of product failed to read, comply with, and recall the warning associated with that product.[97] In a related study, of participants experienced with chain saws, only about half as many complied with the associated warning, in comparison to participants who were inexperienced with them.[98] Relevant to these scientific findings, Mr. Glasscock testifies that he grew up with firearms and rifles, hunting with his family from a very young age,[99] and that he first learned about firearm safety from his grandfather and father.[100] He testifies, further, that he recalls using semi-automatic pistols when learning from his grandfather and father.[101] His first firearm purchase was over a decade ago, and he owns a number of guns, including at least one without a manual safety.[102] In other words, based on the scientific literature, given his high degree of familiarity with and exposure to guns, it is very unlikely that the Plaintiff would have noticed, read, or modified his behavior in response to any hypothetical disclosure concerning the P320.

30. The perceived irrelevance of a warning can be further exacerbated by benign encounters in which a user has previously engaged in the warned-about behavior without experiencing negative outcomes. Such prior experiences undermine the cautionary message conveyed by the warnings as misplaced or exaggerated because they do not reflect the risk-taker's personal experience.[103] In a study of 'NO DIVING' warning signs

---

[92] Dorris & Purswell (1977), p. 257
[93] Frantz & Miller (1993)
[94] E.g., Vredenburgh & Helmick-Rich (2006); Stewart & Martin (1994)
[95] Zeitlin (1994); Otsubo (1988)
[96] Zeitlin (1994)
[97] Otsubo (1988)
[98] Zeitlin (1994)
[99] Glasscock depo, 05/16/2023, p. 17
[100] *Ibid.*
[101] Glasscock depo, 05/16/2023, p. 18
[102] Glasscock depo, 05/16/2023, pp. 33, 35-36, 38, 99
[103] Karnes et al. (1986); Leonard & Hill (1989); Ayres et al. (1994)

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

at a public pool, for instance, it was observed that swimmers with a history of diving into the shallow end of the pool, or who participated in a swimming team, were more likely to defy the posted warnings signs.[104] In another study, participants who reported engaging more frequently in such potentially risky behaviors as sky-diving, asbestos removal, or failing to wear a seatbelt on long trips rated these activities as significantly less risky than participants who engaged in these behaviors less frequently.[105] As these results suggest, in addition to benign encounters, a constant exposure to a particular hazard can cause individuals to become habituated to the associated risk[106] such that they will engage in potentially risky behavior with diminished hesitation.

*Pre-purchase attention to owner's manuals and advertisements is varied and very sparse*

31. *Owner's Manual*. The Plaintiff alleges that the SIG SAUER P320 owner's manual does not disclose to consumers that the P320 does not have external safety features available on other firearms and that the P320 allegedly has a higher risk of inadvertent discharge owing to the absence of external safety features.[107] An owner's manual is not, nor is it intended to be, marketing material; nor do all individuals (let alone the majority of them) read the owner's manual for a product prior to purchasing that product.[108] In fact, published scientific research shows that the level of reading of an owner's manual is low even post-purchase, and especially low for safety-related information. There are also differences in levels of attention to owner's manuals based upon the age of the product user.[109] For example, one study examining how drivers use owner's manuals found that, whereas 17% of drivers read the manual for the specific purpose of finding maintenance-related information, less than 1% read for safety-related information.[110] Such inattention to owner's manuals and selective reading is not limited to automotive manuals, but has been described in other product domains as well, such as computing machines and software.[111] These findings are well-illustrated and corroborated by the testimony of both the Plaintiff and of Mr. Faulkner, the previous owner of his P320: The Plaintiff testifies that, not only does he not recall looking at the P320 owner's manual before purchasing his P320,[112] but that he has never read the owner's manual[113] (nor that of his Taurus pistol[114]). Similarly, Mr. Faulkner testifies that, prior to purchasing his P320, which he subsequently sold to the Plaintiff, he never reviewed the owner's manual.[115] If neither the Plaintiff nor the previous owner of his gun ever read the owner's manual for the P320, much less before they purchased the gun, no warnings – hypothetical or

[104] Goldhaber & deTurck (1988)
[105] Leonard & Hill (1989)
[106] Halpern-Felsher et al. (2001); Lima (2004)
[107] Complaint ¶ 29
[108] See T. Taylor declaration.
[109] See Leonard (2001); Mehlenbacher et al. (2002).
[110] Leonard (2001)
[111] See, e.g., Rettig (1991).
[112] Glasscock depo, 05/16/2023, p. 60
[113] Glasscock depo, 05/16/2023, p. 51; see, also, Glasscock depo, 03/06/2025, pp. 122-126.
[114] Glasscock depo, 03/06/2025, p. 15; see, also, Glasscock depo, 03/06/2025, pp. 126-127 (wherein Mr. Glasscock testifies that he never read any of the owner's manuals for any of his guns, with the exception of that for the Glock 19, when he looked at the pictures and the label at the academy when the Glock 19 was issued to him).
[115] Faulkner depo, p. 35

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

otherwise – presented in the owner's manual could have reached them or, consequently, influenced their purchase decision-making.

32. *Advertisements*. The Plaintiff produced some very limited examples of SIG SAUER advertisements purporting to show that the P320 is marketed to consumers as a weapon chosen and/or used by the U.S. armed forces.[116] Not all buyers are exposed to every advertisement (or any); and they do not pay equal attention to any advertisements to which they may be exposed, or even notice those advertisements. Some buyers already know what they want without requiring additional promotional materials, and some are unaware of advertisements. Consequently, members of the putative class would not all have been exposed to marketing material; or, if they were exposed to such marketing material, they would not have been exposed to the same advertisements, brochures, etc. Nor would members of the putative class have been exposed to the varying advertisements at the same time, or even necessarily during the Putative Class Period.[117]

33. Both Messrs. Glasscock and Faulkner testify that they sought out third-party information to assess their purchases of P320, rather than going to the SIG SAUER website prior to making his purchase.[118] Such inattention to advertisements is not unexpected, given that consumers will more likely rely on the advice of trusted individuals within their personal networks who have experience with a particular product.[119] Accordingly, the Plaintiff states that "[p]rior to completing the purchase," he reviewed "the website for Palmetto State Armory," "talked to acquaintances who were former military personnel who said Sig Sauers were good pistols and that the military switched to them," and "read[] an article on the military's use of Sig Sauer pistols" that was not published by SIG SAUER.[120] More generally, he testifies, when purchasing a gun, he relies upon opinions from reputable sources that have endorsed the weapon, law enforcement, military, reputable gun enthusiasts. By contrast, he does not recognize any of the eight SIG SAUER advertisements placed before him at his deposition.[121]

*The information presented on the SIG SAUER website varied considerably over time*

34. Moreover, even if other members of the putative class had visited the website and also paid enough attention to it to take away certain information, they would have been exposed to different information. A review of SIG SAUER's website during the Putative Class Period of 2017 through 2022[122] shows that the one example provided by the Plaintiff (from well outside of the Putative Class Period) was cherrypicked and is not

---

[116] E.g., Plaintiff's Suggestions ¶¶ 67-69
[117] See T. Taylor declaration.
[118] Faulkner depo, p. 27; Glasscock depo, 05/16/2023, pp. 56-57. (Mr. Glasscock's testimony is rather vague and noncommittal with respect to whether he visited the SIG SAUER website: He cannot specifically remember which websites he visited or recall any specific websites he used for research on the P320, but merely speculates that he cannot imagine he would not have visited the SIG SAUER website, which is no more than post hoc conjecture, rather than a concrete episodic memory.)
[119] See, e.g., Mourali et al. (2005).
[120] See Glasscock Interrogatory Responses, p. 3, Response No. 5.
[121] See Glasscock, 03/06/2025, pp. 29, 30, 31, 34,35, 35-36, 44.
[122] E.g., https://www.sigauer.com via wayback.archive.org from 09/02/2017; 09/02/2018; 09/03/2019; 09/03/2020; 09/22/2021; and 04/07/2022

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

representative of the experience of the proposed class at large.[123] As illustrated below (next page), the landing page for sigsauer.com in 2017 featured the Legion Series and the MCX Rattler. The landing page, in 2018, referenced the P320 M17, but also provided a link to the P320 Voluntary Upgrade Program. In 2019, the landing page featured The Elite Hunter Tipped Ammunition; the Fall Sale for gear and apparel; riflescopes and rangefinders; and an announcement that "SIG SAUER is proud to have been selected by the U.S. Army for the next generation squad weapon system program," without mentioning any particular model. The 2020 landing page featured the Cross Rifle; the Vickers Guide; next generation squad weapons delivered to the U.S. Army, showing a rifle; and the P365, touted as the "#1 Selling Gun in America." As a fifth vignette, the landing page features the P320. All of these five vignettes alternate after some time, and the P320 is last in queue. It is therefore not the case that all visitors to the SIG SAUER website would necessarily have encountered the P320 vignette. The same is true of the prior years that feature more than one article, if the year in question even featured the P320 on the SIG SAUER landing page. In 2021, the P320 shares the landing page, in the fifth position in the queue, with the SLX/SLH Suppressors; a blog post about carrying more than one gun; SIG SAUER Elite Ammunition; and the P365, which is again touted as the "#1 selling gun in America." The P320 is described as "the world's most innovative handgun" without any reference, in word or image, to the military. Finally, in 2022, the landing page references SIG freedom days, the P226 ZEV, and the P322, touted as the most advanced, highest capacity 22 pistol in its class. In other words, there is considerable diversity in the information a consumer would have encountered on the SIG SAUER website during the Putative Class Period, if that consumer had visited the website in the first place.

09/02/2017

[123] Cf. Plaintiff's Suggestions, p. 26 – "*P320 Pistols*, Sig Sauer (accessed Oct. 16, 2024)" (Italics in the original); for a thorough discussion, see also T. Taylor declaration.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER



09/02/2018



09/03/2019 Slide 1



09/03/2019 Slide 2



09/03/2019 Slide 3

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER



09/03/2019 Slide 4

CAREERS PROMOTIONS CART LOGIN
SIG STORE PRODUCTS BLOG COMPANY SUPPORT ACADEMY JOIN LEGION SEARCH
NOW SHIPPING
CROSS RIFLE

09/03/2020 Slide 1

09/03/2020 Slide 2

09/03/2020 Slide 3

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER



09/03/2020 Slide 4



09/03/2020 Slide 5



09/22/2021



04/07/2022

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

In lieu of entering the SIG SAUER website via the landing page, it is also possible that visitors entered directly on the P320 page;[124] for example, via a redirect on Google. If so, they would have received different (initial) information from what visitors to the main landing page would have seen. The P320 page in 2017, for example, had four slides above the fold that cycled through on a 15-second cadence. The first slide references the P320 X-Five; the second slide references the P320 RX, with a video playing of the weapon being fired at a shooting range. The third references the P320 X-VTAC, with a link to learn more. The final slide references the P320 Nitron, with a video playing of the weapon being fired at a shooting range. The P320 page in 2018, by comparison, references the P320-M17. A second slide references an M17 commemorative pistol, a replica of a U.S. Army pistol. The P320 page in 2019 introduces the P320 X5 Legion, with a link to learn more, and a second slide that references the P320 as the world's most innovative handgun. The 2020 page appears to have remained largely the same as the 2019 page. The P320 page in 2021 references the Custom Works Spectre Series, with a link to learn more. The P320 page in 2022 had three slides. The first slide introduces the P320 Spectre Comp, with a link to learn more. The second slide references the P320 Xcarry Legion, with a link to learn more. The third slide references the Sig Custom Works Spectre Series[125]. In other words, there is considerable diversity in the information a consumer would have encountered on the SIG SAUER website during the Putative Class Period, if that consumer had visited the website in the first place, and if that consumer had navigated, either indirectly or directly, to the page dedicated to the P320.

09/12/2017 Slide 1

[124] E.g. https://www.sigsauer.com/products/firearms/pistols/p320/ (although the exact URL varied across the class period) via wayback.archive.org from 09/12/2017; 09/08/2018; 08/09/2019; 08/19/2020; 10/04/2021; 04/24/2022 (there are no 2022 captures available before the filing date of 04/18/2022)

[125] For the year 2022, no capture of this page existed prior to the Complaint filing date.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER



p. 23

CAREERS
PROMOTIONS
STORE
CART
LOGIN
PRODUCTS
USAGE
SUPPORT
HOW TO BUY
COMPANY
SEARCH
FIREARMS
PISTOLS
P320
P938
1911
SP2022
LEGION
P220
P225
P226
P227
P229
P320 RX
The only pistol in its class to include a slide-mounted reflex optic, the RX will ensure faster sight acquisition on target.
LEARN MORE
P320 X-VTAC
Viking Tactical joins the X-Series line with a P320 fit to fight
P320 NITRON
The original. Innovative, safe, and modular by design.
WATCH THE VIDEO
ACADEMY
P320-M17
THE U.S. ARMY'S NEW MODULAR HANDGUN
SYSTEM, NOW AVAILABLE IN A CIVILIAN VERSION

09/12/2017 Slide 2

09/12/2017 Slide 3

09/12/2017 Slide 4

09/08/2018 Slide 1

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER



09/08/2018 Slide 2



08/09/2019 Slide 1



08/09/2019 Slide 2



10/04/2021

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

35. Even putative class members who were somehow exposed to the same advertisements likely did not all notice or read the same information. Such a finding is not uncommon, and it exists for advertisements containing safety-relevant information. In a survey of over 300 consumers, for instance, only slightly more than half reported having read pharmaceutical advertisements carefully and completely,[126] even though these advertisements are known to contain warnings about side effects[127] that can present potentially dire health consequences to consumers. For all of these reasons above, therefore, there is no basis to believe that all members of the putative class would have been exposed to the same advertisements or, if these had contained warnings about the P320, these would have been uniformly displayed to, noticed, and/or read by members of the putative class. This conclusion is reinforced by the fact that, although every sigsauer.com landing page since at least September 2017 had a prominently-sized link to the Voluntary Upgrade Program, as illustrated in the figures above, the Plaintiff testifies that he was unaware of the upgrade program,[128] and Mr. Faulkner testifies that he had vaguely heard of it.[129] Irrespective of what representations a manufacturer makes about a particular product, consumers will more likely rely on the advice of trusted individuals within their personal networks who have experience with a particular product.[130] Consumers, including children above the age of eight,[131] understand that the intended purpose of marketing is to influence them to some degree.[132] The Plaintiff testifies that he had acquaintances formerly in the military who said that the P320 was a good pistol.[133]

36. A study by the Pew Research Institute revealed that, on average, only 35% of gun owners visit websites about guns, hunting, or other shooting sports.[134] In other words, there is a very large proportion of the proposed class that likely never visited sigsauer.com (especially, given that a consumer could not purchase a pistol through the website until October 2021,[135] or four years into the Putative Class Period) or was exposed to SIG SAUER advertisements or materials in other media formats. Moreover, the percentage of gun owners who visit gun-related websites varies as a function of the number of guns someone owns, ranging from 22% for someone with a single gun to 51% for someone with five or more guns,[136] suggesting a high degree of nonuniformity in experiences, information seeking, and behavior among the members of the putative class. Even if there had been consistent, enduring, and uniform advertisements about the P320 making certain representations and omitting specific disclosures, as the Plaintiff alleges, only a fraction of the proposed class would have been exposed to such an advertisement. An even smaller fraction would have noticed, read, and incorporated some, but not all, of the

[126] Wilkes et al. (2000)
[127] 21 CFR 202.1(e)(5)(iii)
[128] Glasscock depo, 05/16/2023, p. 55
[129] Faulkner depo, p. 33
[130] See, e.g., Mourali et al. (2005).
[131] See, e.g., Ali & Blades (2014).
[132] See, e.g., Calfee & Ringold (1994).
[133] Glasscock depo, 05/16/2023, p. 48
[134] Parker et al. (2017)
[135] See T. Taylor declaration.
[136] *Ibid.*

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

information presented in their purchase decision-making, as discussed in detail elsewhere in this report. Moreover, there is nonuniformity among gun owners with regard to their consultation of websites dedicated to gun- or shooting sports-related websites: The Pew Research study showed, further, that such web usage by gun owners is modulated by age.[137]

37. Two of the other advertisements cited by Plaintiff (Exhibits 26 and 27[138]) are print advertisements, which were targeted at very specific demographics.[139] Such targeting would have limited their dissemination within the broader proposed class. Additionally, with the decline in physical media, and the decreased interest in print media, as well as given that such media are available largely to those who have subscribed to specific periodicals or loan these out from libraries (provided that they even carry them), it is questionable that very many members of the proposed class would have encountered such ads, much less paid attention to them or considered them in their purchase decision-making. A third advertisement cited by Plaintiff (Exhibit 25) was a digital advertisement that was displayed only for one month, in March of 2021,[140] making it unlikely that any meaningful number of members of the putative class would have seen it. It, moreover, did not appear until three-and-a-half years into the Putative Class Period.

38. In summary, there is no way to determine which putative class members, if any, would have been exposed to a statement in the P320 owner's manual before purchase or in any of SIG SAUER's advertising (whether on its website or in print or digital advertisements) without questioning each putative class member individually.

*Some members of the putative class may have been apprised about the alleged greater propensity for unintended discharges through media attention to the SIG SAUER P320, and some would still have purchased the gun without manual safety, in spite of post hoc assertions to the contrary*

39. Without SIG SAUER needing to provide specific warnings and disclosures, some consumers may have been alerted to the alleged propensity for unintended discharges by the media attention the SIG SAUER P320 has garnered. Many of the news reports cited by the Plaintiff in the Suggestions are outside the Putative Class Period, and are fairly recent; for example, Plaintiff's Suggestions reference articles from April 11, 2023.[141] Nevertheless, such articles may have raised awareness among prospective members of the putative class about the alleged issue in the later parts of the Putative Class Period.[142] From the dates of these news articles forward, some members of the putative class may have been aware of the alleged defect when purchasing their P320, whereas others, who did not pay attention to the news articles, would not have been. Ultimately, therefore,

[137] *Ibid.*
[138] E.g., Plaintiff's Suggestions ¶¶ 68-69
[139] As Thomas Taylor discusses in his declaration, Exhibit 26 was published only in the July/August 2016 print edition of Recoil magazine, and Exhibit 27 was created in 2018 and distributed internally to the salesforce and to commercial dealers, and would therefore not have been seen by someone purchasing a P320 used from a private seller.
[140] T. Taylor declaration
[141] Plaintiff's Suggestions ¶¶ 47-48
[142] For example, in Plaintiff's Suggestions, Plaintiff references news reports from July 27, 2021 (Plaintiff's Suggestions ¶ 47).

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

there are heterogeneities in the proposed class both across time (pre and post articles) and within a cross section of time (owing to differences in levels of attention to the news articles). I have not seen any evidence produced in this litigation that would enable someone to determine which class members, if any, became aware of the alleged defects through court filings or media attention without questioning each putative class member individually.

40. The scientific conclusions about the (lack of) likelihood of buyers of the SIG SAUER P320 uniformly noticing and reading hypothetical warnings in owner's manuals, on the one hand, and advertisements for the P320, on the other, is not contradicted by any assertions of the Plaintiff to the contrary. Scientific research has demonstrated repeatedly that people's statements about their propensity to adhere to certain warnings does not match their own actions.[143] For example, drivers asked about their seatbelt use overestimate their own compliance.[144] Estimates of the discrepancy between reported and observed behavior are in excess of 10%.[145] In one particular study, 6% of drivers who claimed that they always wear a seat belt were unbelted at the time of the interview.[146] They paradoxically gave their "always" response even though they knew that the observer could see that they were presently not wearing one.

41. In another study, participants were given the following warning accompanying a hammer: "Caution! Do not proceed further. Ask for instructions before you continue this operation. It is important that you do not use this hammer to strike."[147] They were asked to indicate whether they would comply and whether they thought others would comply. Slightly over 50% of participants responded that they would comply, and around 47% of participants thought others would comply. When actual compliance with the very same warning was measured in a second study, it was found that none of the participants heeded the warning.[148]

42. Moreover, even after filing the present lawsuit, the Plaintiff remains in possession of his P320.[149] He testifies that, prior to the lawsuit being filed, he never contacted SIG SAUER for any reason regarding his P320, and that he did not have any issues with his P320, either functionally, mechanically, or otherwise.[150] In spite of, ostensibly, harboring concerns about the safety of the P320, the Plaintiff has not sold, donated, returned, or otherwise divested himself of the gun. Apparently, he stopped using his P320 only "after his attorneys contacted him and informed him that that he 'may have a claim … regardless of whether [he] … experienced an unintended discharge."[151] Similarly, although Mr. Faulkner sold his P320, he continues to own his Glock 19, in

[143] Frantz et al. (2005); Ayres et al. (1990)
[144] Streff & Wagenaar (1989)
[145] *Ibid.*
[146] *Ibid.*
[147] Ayres et al. (1990)
[148] *Ibid.*
[149] Complaint ¶ 7; see, also, Glasscock depo, 03/06/2025, p. 91.
[150] Glasscock depo, 05/16/2023, pp. 64-65
[151] Plaintiff's Responses to Defendant's First Set of Requests for Admissions, p. 2; Glasscock depo, 05/16/2023, p. 65; Glasscock, Joshua000027

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

spite of it lacking an external safety.[152] He testifies that he is, personally, not concerned about the lack of safety of a gun that does not have a manual safety.[153] The Plaintiff, as well, testifies that before he was married with stepchildren, he was not concerned about the absence of a manual safety on his P320.[154] Both gentlemen testify that they understood at the time of purchase that their particular P320 did not have a manual safety.[155] Mr. Faulkner testifies that he knew this fact because he had done "research" prior to the purchase, and that he noticed the absence of a manual safety when he held the pistol in his hands at the store.[156] The Plaintiff, in turn, testifies that he knew Mr. Faulkner wanted to sell his P320 because it did not have a safety.[157] Mr. Faulkner had told the Plaintiff that his wife wanted him to sell his P320 because it did not have an external safety;[158] the same information was also relayed to the Plaintiff in a text thread between him and Mr. Faulkner.[159] In other words, some members of the putative class would still have purchased the P320 without manual safety even if apprised of the alleged defect, post hoc verbal assertions (in the absence of behavioral change) to the contrary.

43. Indeed, there is evidence to suggest that even members of the putative class who purchased the P320 with a manual safety may have considered the presence of the manual safety an undesirable aspect of the gun, the other alleged design defects – such as the allegedly short trigger pull, the highly energized nature of the gun, or the absence of a tabbed trigger – notwithstanding.[160] There are, for example, videos on the Internet demonstrating how to remove an undesired manual safety on the P320.[161] These videos have been viewed several tens of thousands of times, in some cases. A video entitled, "SIG P320 M17 Safety Removal," for example, has been viewed 52,000 times in the past four years.[162] Another video, entitled, "How to remove, install, delete or add the manual safety lever on your SIG Sauer P320" has received 25,000 views in only 10 months.[163] Evidently, the manual safety is not an element of the P320 every P320 owner desires or values. This latter conclusion is also supported by the fact that sales of P320s without manual safety outstrip sales of P320s with manual safety by a factor of almost three.[164] What is furthermore salient about the sales statistics for P320s with and without manual safety is that, in the years following heightened media attention to the alleged propensity of the P320 to experience unintended discharges,[165] there is effectively no change in the

---

152 Faulkner depo, pp. 38, 99
153 Faulkner depo, p. 77
154 Glasscock depo, 05/16/2023, p. 44
155 Glasscock depo, 05/16/2023, pp. 42-43; Faulkner depo, pp. 26, 35
156 Faulkner depo, p. 27
157 Glasscock depo, 05/16/2023, p. 42
158 Faulkner depo, p. 39
159 Faulkner depo, p. 72
160 See, e.g., Meyer declaration.
161 E.g., https://www.youtube.com/watch?v=NBukQh-mYwM (accessed: 1/11/2025); https://www.youtube.com/watch?v=Hzh-Bcyyg5I (accessed: 1/11/2025)
162 See https://www.youtube.com/watch?v=NBukQh-mYwM (accessed: 1/11/2025).
163 See https://www.youtube.com/watch?v=Hzh-Bcyyg5I (accessed: 1/11/2025).
164 See Figure 2 of T. Taylor declaration.
165 In Plaintiff's Suggestions, Plaintiff references news reports from July 27, 2021 (Plaintiff's Suggestions ¶ 47).

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

ratio of P320s with manual safety and those without.[166] If there were widespread concern across the putative class, in response to intensified media scrutiny of the alleged issue, one would expect an increasing skew in sales toward P320s with manual safety. Lastly, for law enforcement, specifically, a manual safety appears to be an undesirable feature on the P320, given that Matt Farkas, Senior Director of Law Enforcement Sales,[167] is unaware of any law enforcement agency having selected a P320 with a manual safety as its service weapon.[168]

44. In a similar vein, there is evidence to suggest that consumers did not consider a tabbed trigger to be a desirable design element of the P320. Matt Taylor, director of R&D at SIG SAUER,[169] testifies that, not only is he unaware of any tests that would suggest that tabbed triggers help prevent unintended discharges[170] and that their effectiveness in doing so would not be obvious "in a lot of cases,"[171] but that there was a lack of interest from the market to purchase a variant of the P320 with a tabbed trigger.[172] He testifies that when the P320 was unveiled, one prototype featured a tabbed trigger and the other did not.[173] The tabbed trigger was mentioned in SIG SAUER's marketing literature.[174] Nevertheless, the production of a P320 with a tabbed trigger "did not happen because SIG [SAUER] never had interest from anyone purchasing to do so."[175] In light of these market dynamics, it seems spurious to argue after the fact that all members of a putative class of P320 buyers would not have purchased a P320 without manual safety if they had been apprised of the alleged defect, which also entails the absence of a tabbed trigger.[176]

45. The Plaintiff himself – in spite of alleging in the Complaint that he would not have purchased his P320 if he had known about the alleged omissions, which he now claims are that it has a putatively light trigger pull (which could have easily been ascertained during the purchase of the pistol by handing it), is fully energized when a round is in the chamber, and has no external safety[177] – has not researched the details of the triggers of

---

166 That ratio ranges between 1:1.4 and 1:5.4 during the Putative Class Period, with a median of 1:2.7. During the years 2021 and 2022, the ratios were 1:5.0 and 1:2.9, respectively, which are well within the range across the entire Putative Class Period and both above the median value for that time period.

167 Deposition of Matt Farkas ("Farkas depo"), p. 8

168 Declaration of Matt Farkas in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification ("Farkas declaration")

169 Matt Taylor depo, p. 8

170 Matt Taylor depo, pp. 57-62

171 Matt Taylor depo, p. 59; see also the discussion in Derek Watkins' report of the inability of tabbed triggers to prevent unintended discharges.

172 Matt Taylor depo, pp. 139-140

173 Matt Taylor depo, pp. 138-139

174 Matt Taylor depo, p. 139

175 Matt Taylor depo, pp. 139-140

176 As shown by Derek Watkins in his expert report, tabbed triggers are incorporated into the design of pistols to guard against unintended discharges from abusive conditions, such as gun drops; see, in particular, Figure 5.3.4 from Derek Watkins' expert report, which reproduces a verbatim statement from Glock Armorer's manual, which reads: "This [the trigger safety; i.e., tabbed trigger] is designed to prevent the trigger from going to the rear *when dropped*." (emphasis added) (see Watkins report, p. 26). SIG SAUER addressed the risk of unintended discharges from gun drops by incorporating a design that dispenses with the need for a tabbed trigger (see Watkins report).

177 Glasscock depo, 03/06/2025, pp. 39, 52, 106-107

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

the guns he has bought, including trigger weight and trigger pull length,[178] nor has he researched the degree of energization of a gun prior to purchasing it or researched the topic in general.[179]  Consequently, he has not displayed much interest in these aspects of the guns he has purchased, until he was told by his attorneys that the P320 is allegedly dangerous for the reasons the Plaintiff now recites.[180]  In any event, the Plaintiff also testifies that, even if a manual safety were to be added to his P320, he does not believe that alone would remedy the defect.[181]  Furthermore, although the Plaintiff now additionally claims that SIG SAUER purportedly omitted that "the gun that [he] purchased was the same one that the military had,"[182] he agrees that SIG SAUER disclosed that the M17 and M18 were available with safeties and that other consumers could have been aware of that disclosure – and, consequently, he might have been aware as well, had he done any research about topics allegedly of interest, or even material, to him, prior to purchasing his P320.[183]

**Consumer Purchase Considerations Are Variegated**

46. Consumer product purchase decision-making is a complex process that is cognitively challenging and taxes the human attention and memory systems.[184]  For many products, such as guns, consumers have a large number of makes and models from which to make a final selection.  Each make and model, in turn, has different sets of features that trade off against one another.  Not all features are available across different models or different brands, so that direct comparisons are not always possible – an aspect of the car purchase or lease process that has garnered attention in the literature.[185]  As discussed by Bettman and colleagues, "… different attributes may apply to different alternatives.  Given an amount of money to spend, one might choose, for example, between a vacation, described by attributes such as the number of days of sunshine and the quality of food, and a new dishwasher, described by its effectiveness in cleaning pans."[186]  Even the guns owned by Messrs. Glasscock and Faulkner evince a large diversity and range of options. Mr. Faulkner testifies that he owned Sears and Roebuck .22 semi-automatic rifles, a Henry .22 lever action rifle, a Glock 26 in a 9-millimeter, a Glock 23 in a .40 caliber, a GSG ATI 1911 pistol in a .22 caliber, and a .45 Long Colt E30.[187]  The Plaintiff, in turn, testifies that he owned a Taurus TCP 380, a Glock 23, and a SIG SAUER P320.[188] During the Putative Class Period, SIG SAUER offered approximately 90 P320 models for sale,[189] not to mention that consumers in the last approximately year of the Putative Class Period could build their own P320, based on different grip mod, slide, barrel, guide

[178] Glasscock depo, 03/06/2025, pp. 39, 41, 47
[179] Glasscock depo, 03/06/2025, p. 57
[180] Glasscock depo, 03/06/2025, pp. 54-56, 60-61, 64; Glasscock depo, 05/16/2023, pp. 63-64
[181] Glasscock depo, 03/05/2025, p. 109
[182] Glasscock depo, 03/06/2025, p. 118
[183] Glasscock depo, 03/06/2025, pp. 120-121
[184] See, e.g., Bettman et al. (1991).
[185] *Ibid.*
[186] Bettman et al. (1991), p. 51
[187] Faulkner depo, p. 24
[188] Glasscock depo, 05/16/2023, pp. 15, 25, 30, 33
[189] Declaration of Phil Strader in Support of Sig Sauer, Inc's Opposition to Plaintiff's Motion for Class Certification ("Strader declaration") ¶ 4.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

& spring, magazine, and optics options.[190] Manual safety options are presently also available in some number of models.[191] The P320 comes in three different calibers,[192] which will be important to some consumers and less so to others. Five of the models are currently offered with manual safety;[193] and several (other) models offer an optional manual safety.[194] During the Putative Class Period, SIG SAUER offered for sale to commercial customers at least four pairs of P320 models that were identical except for the (customer-chosen) presence or absence of a manual safety.[195]

*There is a diversity of purchase decision criteria and decision-making processes*

47. It is spurious to assume that all members of the putative class will have valued all of these options equally and uniformly and that they would have placed equal weight on the presence or absence of a manual safety, even if SIG SAUER had provided explicit disclaimers of the ilk demanded by the Plaintiff, and interested consumers had been exposed to, noticed, read, and incorporated these disclaimers into their decision-making. The active disinterest of some P320 owners in the manual safety and the initial lack of general interest in a tabbed trigger have already been discussed above. It cannot be ruled out that the absence of a manual safety was attractive to some buyers, whereas others may have been indifferent, and yet others may have opted to buy either a P320 model with a manual safety or in conjunction with a manual safety kit, or they may have opted to purchase another gun entirely. Some of the alternatives – such as the Glock 19 owned by Mr. Faulkner,[196] and the Glock 23 and Taurus TCP 380 owned by the Plaintiff[197] do not have manual safeties either, including a tabbed trigger.[198] The Plaintiff testifies that he was single at the time he purchased his P320 and therefore, like Mr. Faulkner,[199] not concerned about a lack of manual safety, and that he later married and acquired two stepchildren,[200] which changed the circumstances for him. In fact, his testimony was: "No, I was a single guy at the time, just me in the house, and I was not worried about it."[201] This response is consistent with consumers knowingly purchasing a P320 without manual safety features and then later deciding, for whatever reason, that they want a manual safety; it does not mean that they were deceived into purchasing something they did not, at the time, want.

48. Even for a single consumer, therefore, the significance of a manual safety as a feature of a gun can change over time, depending upon the context of his or her personal needs or constraints. Such an observation is consistent with the published scientific literature,

---

190 See, e.g., https://www.sigsauer.com/customworks/p320 (accessed: 11/19/2024).
191 See Strader declaration.
192 https://www.sigsauer.com/firearms/pistols/p320.html (accessed: 11/19/2024)
193 https://www.sigsauer.com/firearms/pistols/p320.html?manual_safety=2851 (accessed: 11/19/2024); these include: the P320-M17; P320-M18; P320-XFULL; P320-FLUX LEGION; and P320-XFIVE LEGION.
194 Matt Taylor depo, p. 106
195 Strader declaration ¶¶ 7-8
196 Faulkner depo, pp. 38, 99
197 Glasscock depo, 05/16/2023, pp. 35-36; Glasscock depo, 03/06/2025, p. 23
198 See Glasscock depo, 05/16/2023, pp. 35-36.
199 Faulkner depo, p. 77
200 Glasscock depo, 05/16/2023, p. 44
201 *Ibid.*

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

which shows that pre- and post-purchase criteria in purchased decision-making have little overlap; that is, consumers indicate widely diverging criteria before they purchase a product and after they have purchased it.[202] It is illusory to assume that, for all members of the putative class, the presence of a warning about the absence of specific safety features (e.g., tabbed trigger, manual safety) or about certain aspects of the design (e.g., short trigger pull) on (some) P320 models would have made any difference in their purchase decision-making. Indeed, based upon the published science on the intended and unintended consequences of warnings,[203] the perception of a heightened sense of risk (whether factually true or not) may have increased the desirability of the P320 without a manual safety, or in appreciation of other hypothetically warned-about aspects of its design.

49. Some buyers will have purchased their P320 new, such as Mr. Faulker;[204] others, such as the Plaintiff, will have purchased them used.[205] Whether members of the putative class purchased their P320 new or used will determine the materials to which they are exposed (e.g., whether they had any exposure to information from SIG SAUER prior to purchase, whether the owner's manual accompanies the used gun), how much prior research they do, what options are available to them, and what price they pay – all of which will decisively color their purchase process in unique ways and call strongly into question the uniformity and cohesion of a group of individuals whose only communality is that they live in Missouri and own a SIG SAUER P320 without manual safety (whether intentionally or unwittingly so).

*There is a diversity in firearm experience pre-purchase*

50. Some members of the putative class will have extensive experience with guns, others none. The Plaintiff, for example, testifies that he grew up with firearms and rifles, hunting with his family at a very young age,[206] and that he learned handgun safety from his father and grandfather.[207] He testifies, further, that he recalls using semi-automatic pistols when he was learning how to use guns from his father and grandfather,[208] and that his first firearm purchase was over a decade ago.[209] Published research on gun ownership shows that, by contrast, many gun owners (as much as nearly one quarter in one study,[210] approximately one third in another study[211]) grew up in a household without a gun; and between one quarter and 40% of gun owners own only a single gun,[212] this broad range reflecting the pronounced differences between male and female gun owners. Similar gender-based dichotomies among gun owners exist in the proportion of gun owners who own handguns only, which is approximately 20% for men and

[202] See, e.g., Taylor & Burns (1999); Gardial et al. (1994).
[203] Stewart & Martin (1994)
[204] Faulkner depo, p. 26
[205] Glasscock depo, 05/16/2023, p. 40
[206] Glasscock depo, 05/16/2023, p. 17
[207] *Ibid.*
[208] Glasscock depo, 05/16/2023, p. 18
[209] Glasscock depo, 05/16/2023, p. 25
[210] Wolfson et al. (2020)
[211] Parker et al. (2017)
[212] Wolfson et al. (2020); see also Parker et al. (2017).

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

approximately 40% for women.[213] Scientific research shows the perception of risk to be individuated, with individuals who are consistently exposed to a specific risk habituating to it over time,[214] and those who have familiarity with a product or activity judging the associated risks to be lower than those without such familiarity.[215] The former are more likely to engage in risky behaviors related to the familiar product or activity, and they are less likely to notice, read, or heed warnings and other admonitions regarding such risky behavior.[216] As discussed earlier, product users familiar with, and/or having had prior experience with, a particular type of product or activity fail to read, comply with, and recall the warning associated with that product or activity,[217] compared to product users who are inexperienced with the same product or activity.[218] Based on the published scientific literature, therefore, it cannot be assumed that all members of the putative class would uniformly have read hypothetical disclosures about the alleged defects of the P320, or to have weighted them in a similar fashion. This conclusion certainly holds for the Plaintiff, who owned various other firearms prior to purchasing his P320;[219] he purchased a Taurus TCP 380 in the 2010 timeframe, which does not have an external safety;[220] in or around March 2014, in connection with his previous employment at the Henry County Sheriff's Office, he purchased a Glock 23 Generation 4, which does not have a manual thumb safety either.[221]

*There is diversity in the rationale for purchasing and/or owning a firearm*

51. The reasons gun owners give for why they own a gun are also diverse: Nearly 60% of gun owners cite self-defense as the reason, approximately 27% cite recreation, and approximately 8% cite exercising their constitutional right.[222] Of gun owners surveyed, only less than one quarter reported participating in gun-related activities more than "rarely."[223] Only approximately 14% reported going to a shooting range more than "rarely."[224] That is, a majority of gun owners passively own a gun; in other words, they do not actively engage with it on a regular basis, but rather own it for exceptional circumstances that may arise. A comparison of survey responses across time shows that the reasons for ownership have not remained stable over time: A published study from 2004 reports only 46% (versus 60% in 2020) of gun owners indicating self-defense as the reason they own a handgun.[225] The reason(s) why a consumer may purchase a particular type of firearm are individualized: Whether the firearm is semi-automatic or not; whether the firearm has a manual safety or not; whether the firearm is used often, recreationally, or used never, as a pure prophylactic safety measure; etc. will all

---

213 Wolfson et al. (2020)
214 E.g., Halpern-Felsher et al. (2001); Lima (2004)
215 E.g., Leonard & Hill (1989)
216 E.g., Dingus et al. (1991); Goldhaber & DeTurck (1988); Karnes et al. (1986); Lehto & Foley (1991); Otsubo (1988); Zeitlin (1994)
217 Otsubo (1988)
218 Zeitlin (1994)
219 E.g., Glasscock depo, 05/16/2023, p. 25
220 Glasscock depo, 05/16/2023, pp. 25, 36
221 Glasscock depo, 05/16/2023, pp. 15, 30-31, 35
222 Siegel & Boine (2020)
223 *Ibid.*
224 *Ibid.*
225 See Hepburn et al. (2006).

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

decisively influence their decision-making with regard to which features are important and which ones not.

52. The Plaintiff, for example, testifies that the appearance of the P320 was important, whereas its modularity and its ability to change caliber were not.[226] He testifies, further, that he wanted a bigger gun than the Glock 23, as well as the ability to change ammunition.[227] For the Glock 23, in turn, he testifies that he purchased it in part because he understood, at the time, that that law enforcement uses Glocks.[228] Other considerations for Mr. Glasscock's selection of the P320 were its use of 9 mm ammunition, which is less expensive,[229] and that he was looking to move from a compact gun to a full-sized pistol "purely out of preference."[230] He testifies, also, that he cares about the reliability and performance of gun when making a purchase,[231] as well as opinions from reputable sources, such as law enforcement, the military, or reputable gun enthusiasts.[232] Specifically with regard to semi-automatic guns, such as the P320, Mr. Glasscock testifies that he is drawn to these types of guns, of which he has owned several,[233] because of the "repetitive fire,"[234] the "[s]emiautomatic feature of pulling the trigger and the gun goes off."[235] Relatedly, he testifies that it could be a desirable feature for a pistol to go off right after the trigger is pulled.[236] Lastly, Mr. Glasscock testifies that, at the time of purchase, the fact that the P320 he purchased did not have a manual safety did not concern him.[237] Mr. Faulkner offers similar testimony.[238] Based on SIG SAUER's experience, Thomas Taylor testifies that he does not "know that the type of action [is] necessarily as important to many customers as … how the gun feels and functions when they're going to use it in practice or … self defense or competition or whatever type use they intend."[239]

53. Because, as the published research indicates, not all buyers of the P320 will have purchased and/or used it for the same purposes or in a similar fashion, the probability of an unintended discharge will vary across the proposed class and therefore will not weigh equally into the purchase decision-making of different buyers across the proposed class. Some users, for example, may perpetually store their P320 at home, on the off-chance of a home intrusion, which is a low probability use case in which the gun is handled only on very exceptional occasions, if at all. There are virtually no opportunities for unintended discharges in this use case. Other owners of the P320 may use it recreationally, a scenario that is associated with a disproportionate number of unintentional gunshot

---

[226] Glasscock depo, 05/16/2023, p. 29
[227] Glasscock depo, 05/16/2023, p. 53
[228] Glasscock depo, 05/16/2023, p. 31
[229] Glasscock depo, 05/16/2023, p. 34
[230] Glasscock depo, 05/16/2023, p. 36
[231] Glasscock depo, 03/06/2025, pp. 13-14
[232] Glasscock depo, 03/06/2025, p. 13
[233] Glasscock depo, 03/06/2025, p. 25
[234] Glasscock depo, 03/06/2025, p. 26
[235] *Ibid.*
[236] Glasscock depo, 03/06/2025, p. 58
[237] Glasscock depo, 05/16/2023, p. 44
[238] Faulkner depo, p. 77
[239] Thomas Tayler depo, p. 223

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

injuries.[240] Yet other owners may carry the P320 on their person most or all of the time, giving rise to yet other sets of opportunities for and rates of interacting manually with the gun. All of these types of owners, as characterized in the published literature, will have different criteria for how readily their gun should be able to fire when desired to do so, which will, in turn, be reflected in the diversity of decision-making during the gun purchase process.

*Consumer preferences are varied and diverse*

54. Ultimately, whether, as Plaintiff's experts emphasize repeatedly, the P320 is nearly fully energized once the slide has been retracted and a round is in the chamber constitutes a point of concern or a desirable aspect of the P320 (and other semi-automatic pistols without manual safety) is an individuated question of consumer preference. Scientific research shows that a rather substantive proportion of gun owners store their gun(s) loaded and unlocked.[241] In other words, they display a desire for their gun to be able to fire at the ready. Although there are differences between men and women in this regard, with 43% of male gun owners and 29% of female gun owners indicating that they have a loaded, unlocked gun close at hand, even gun owners with children under the age of 18 report that there is a gun that is both loaded and easily accessible to them all of the time when they are at home. The Pew Research study found 30% of their respondents to be in that category.[242] Other characteristics that modulate whether a gun owner has a loaded, unlocked gun are veteran status, marital status, and education.[243] As the authors of one published scientific study highlighted, their data "make[] clear how subgroups of Americans defined by demographic and socioeconomic characteristics diverge in the gun habits …, which vary significantly on every dimension of social difference."[244] Geography is yet another dimension that modulates the gun safety-relevant behavior of gun owners: Research has shown that whether a household has a loaded unlocked gun or not varies from state to state, with proportions of such households ranging from 40.8% in Massachusetts to 75.7% in North Dakota,[245] with Missouri ranking above both the nationwide mean and the median (at 64.9%).[246] Some households, including or especially in Missouri, appear to value the ability to have a firearm that is ready to provide defensive capabilities at a moment's notice, to the extent that they keep one or several guns in the home loaded and unlocked, and within easy reach, even when there are children present under the age of 18. To at least some of these individuals, the absence of a manual safety or tabbed trigger, a short trigger pull and weight, and a high degree of readiness to fire are either desirable features of a weapon used very spontaneously in case of a highly imminent emergency, or they are at least not contradictory to these individuals' intentions toward the weapon in their household.

---

240 Hootman et al. (2000)
241 Wolfson et al. (2020); Parker et al. (2017)
242 Parker et al. (2017)
243 Hamilton et al. (2018)
244 Hamilton et al. (2018), p. 136
245 Hamilton et al. (2018)
246 *Ibid.*

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

**Human Factors**

55. Humans are prone to errors.[247] Those errors can be both errors of commission and errors of omission. In other words, just like a user can unintentionally pull the trigger on a loaded gun without the need for a design defect (guns are ultimately intended to shoot when the trigger is pulled – indeed, that is their very purpose, and a pistol that did not would likely be defective), he or she can forget to set a safety (if there is one present).[248] Moreover, what to one user is the absence of a safety feature, to another is an unwanted hindrance that prevents him or her from quickly firing a weapon in a moment of need potentially putting them at risk. (See the earlier discussion about the high proportion of gun owners who store a gun loaded but unlocked and within arm's reach so that it is ready to fire without impediment in a moment of crisis.) As Matt Taylor testifies, a weapon's ability to fire without delay or impediment can spell the difference between life and death in a moment of crisis;[249] and he is aware of instances in which, for example, a tabbed trigger had become such an impediment.[250] Because the SIG SAUER P320 requires the willful and purposeful retraction of the slide in order to arm the pistol initially, it is energized through an affirmative, deliberate action on part of the user, who then understands, or should understand, that the weapon will fire once the trigger is pulled; in other words, that the weapon is energized. It appears incoherent to demand a warning that a weapon a user has energized through a deliberate action is indeed fully energized and ready to fire once, but only once, the trigger is pulled.

56. In a semi-automatic weapon, the subsequent discharge of rounds should occur expeditiously and effortlessly in order for the weapon to achieve its desired mode of operation. Law enforcement officers may therefore choose to carry a round in the chamber to be prepared for any eventuality.[251] Some consumers – although SIG SAUER does not know the percentages[252] – may also carry a round in the chamber, for whatever reason – but certainly not all of them, or even a majority: A recent study of gun habits found that 14% of women and 23% of men reported carrying a loaded gun in the past 30 days,[253] showing that this scenario is far from ubiquitous. Someone who experiences an unintended discharge needs to go through a series of deliberate and volitional steps.[254] It is only once the weapon is energized that it can discharge; whether it does so intentionally or unintentionally is a mere question of the user's disposition. If the user goes through the deliberate process of energizing the P320 but no longer wants it to be in an energized state, he or she can simply drop the magazine from the handle, lock back the slide, and manually eject the unspent round in the chamber.[255] Returning the gun to an energized state then requires the user to retract the slide (once the magazine is slid back into the handle). Given the deliberateness of this action, there is conceptually no

[247] See, e.g., Norman (1981); Norman (1983); Leape (1994); Reason (1990).
[248] See, also, Declaration of Matthew Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification ("M. Taylor declaration").
[249] See Matt Taylor depo, pp. 44, 63-64.
[250] See Matt Taylor depo, pp. 64, 66.
[251] See Farkas depo, p. 148.
[252] See Matt Taylor depo, p. 232.
[253] Wolfson et al. (2018)
[254] See Farkas depo, pp. 52, 55-56, 64.
[255] See SIG SAUER P320 Operator's Manual, pp. 5, 46-49.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

difference to a single-action hammer-fired pistol, given that both require an initial deliberate and willful action on part of the user to energize the gun. Similar intentionality is required with respect to any manual safety that may be present on alternative designs, including the P320s purchased with a factory-installed manual safety. As Plaintiff's firearms expert, Mr. Gatrost writes, a manual safety "requires the user to intentionally, manually engage or disengage the safety."[256] If the user neglects to engage the manual safety, whether intentionally or owing to distraction, it cannot confer any of its intended benefits.

*Rebuttal of Plaintiff's expert, Beau A. Biller*

57. Plaintiff's expert, Beau A. Biller, discusses two constructs in his expert report that are relevant to human factors: the design safety hierarchy (also known as the safety engineering hierarchy) and the Failure Mode and Effects Analysis (or Failure Mode, Effects, and Criticality Analysis or FMECA).[257] (The latter will be discussed in more detail below in paragraphs 60 and following.) In the course of my work as a human factors professional, I frequently discuss, engage in, review for accuracy, and lecture (in graduate-level university engineering courses) on these topics. Although Mr. Biller references the safety engineering hierarchy and dedicates a page and one paragraph to discussing it, he does not actually apply the safety engineering hierarchy to the SIG SAUER P320. What he consequently does not discuss is that an application of the hierarchy only makes sense under certain circumstances. One well-recognized principle limiting the applicability of the safety engineering hierarchy is that some hazards cannot be designed out or guarded against because their preemption would undermine the functionality of the product.[258] For example, a knife cannot be made dull because its very function as a knife would be obviated.[259] (Other considerations include technical feasibility and cost.[260])

*The presence or absence of a deliberate feature desirable to some purchasers does not constitute a defect, nor can it therefore logically be addressed through a repair*

58. In the case of the P320, it is a questionable assumption that the absence of a manual safety feature on some models of the pistol constitutes a defect.[261] It is difficult to conceptualize an option as a defect that is available to consumers for their deliberation – that is, to purchase a gun without a manual safety – and that consumers can replicate at will by disengaging the manual safety (when present). In that vein, if a car buyer chooses to purchase a car without a convertible rooftop, the hardtop does not automatically render the vehicle defective. To continue in the analogy, the buyer of a convertible could elect to keep the top up permanently, making the vehicle functionally equivalent to a hardtop vehicle. By the same token, it is difficult to conceptualize the conversion of the one

[256] See Rule 26(a)(2)(B) Declaration of Benjamin D. Gatrost in Support of Plaintiff's Motion for Class Certification ("Gatrost declaration") ¶ 47.
[257] Expert report of Beau A. Biller, 11/5/2024 ("Biller report"), pp. 14-18
[258] See, e.g., Laughery & Wogalter (2010); Krauss et al. (2008).
[259] See 16 CFR, Chapter II, Subchapter B, Part 1115.
[260] See Laughery & Wogalter (2010).
[261] As Derek Watkins writes, "the presence of an external manual thumb safety is not a 'defect' but rather a feature of the P320 that can be added or removed based on consumer preferences/philosophy of use." (Wakings report, p. 33).

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

product variant into the other product variant as a repair: The retrofitting of a non-convertible vehicle with a retractable top hardly constitutes a repair. The presence or absence of a particular design element does not decide between the presence or absence of a defect; it presents choices to consumers who can freely deliberate between alternatives, some of whom will choose the one option and others the alternative option. The Plaintiff's situation is somewhat unique in this regard, in that the Plaintiff purchased a "used" gun, with a specific set of features, from a friend and coworker[262] – which limited his options to those represented in the particular exemplar he purchased. (His having purchased the gun used also meant that he did not encounter the tag with which every new P320 is outfitted that directs buyers to the safety information provided in the owner's manual.[263]) The Plaintiff could have declined to purchase the gun, given that he knew at the time of purchase that it did not have a manual safety;[264] and, indeed, the seller of the gun, Mr. Faulkner, discussed with him that his wife no longer wanted the weapon in the house owing to the fact that it did not have a manual safety.[265] If the Plaintiff had purchased the gun new (as many members of the putative class presumably have done), he would have had a large range of options, as discussed earlier, including P320 models with a manual safety.

59. The definition Mr. Biller attributes to the Consumer Product Safety Commission (CPSC) is not to be found in any of the agency's guidance documents or regulations; it appears to be a legal definition of "design defect" ("unreasonably dangerous for its intended use or foreseeable misuse"). (Moreover, and significantly, it is my understanding that the Plaintiff has not brought a design defect claim here; rather, the Plaintiff has brought a single claim under Missouri's consumer protection statute, the MMPA,[266] as discussed above.) The CPSC is explicit about the fact that it does not consider a product to be defective simply because it poses the risk of harm to consumers.[267] The above analysis of the incidence rate of alleged unintended discharges demonstrates that the P320 without a manual safety does not pose an unreasonable risk of injury to consumers. At the same time, the literature on consumer behavior vis-à-vis firearms shows that there is a desire, for at least some consumers, to be able to use a gun without impediment (such as disengaging a manual safety) in the case of an emergency. As Matt Taylor testifies, "There are potential downsides in a life or death situation of a manual safety … the time to actually … disengage [the safety] may add to the time required to fire a shot, if needed."[268] Whether to choose a P320 with or without manual safety is patently a question of consumer preference, making the P320 without a manual safety not automatically defective, as Plaintiff would argue. Indeed, from the perspective of some P320 buyers, such as law enforcement agencies,[269] a manual safety may be an undesirable feature, which logically precludes it from being considered a defect. As Matt

262 Glasscock depo, 05/16/2023, p. 40
263 See Matt Taylor depo, pp. 175, 215-216.
264 Glasscock depo, 05/16/2023, pp. 42-43
265 Faulkner depo, p. 39; Glasscock depo, 05/16/2023, p. 42
266 See Complaint ¶¶ 76-81.
267 See Congressional Research Service report R45174; 16 CFR, Chapter II, Subchapter B, Part 1115.
268 Matt Taylor depo, p. 44
269 See also Derek Watkins' discussion of the Immigration and Customs Enforcement's (ICE's) requirement that prospective pistols not be equipped with manual safeties (Watkins report).

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

Farkas testifies, for example, no law enforcement department has ever asked for a manual safety for the P320.[270] In fact, as Matt Taylor testifies, "[t]here are law enforcement agencies that do not want manual safeties…"[271] In his Declaration, Mr. Farkas explains that law enforcement agencies "will not permit the use of a manual safety feature because they believe that it presents a safety issue if the officer does not remember to disengage the manual safety in an emergency situation."[272]

60. The above analysis of incidence rate is also relevant to Mr. Biller's decontextualized discussion of the FMECA conducted by SIG SAUER.[273] FMECAs are conducted in the absence of empirical data to support a risk analysis. They are therefore a sort of "armchair" exercise. As such, they can be overinclusive and underinclusive at the same time: Whatever hazards are identified are the outgrowth of human imagination, and they are thus also limited by our ability to imagine hazards. Therefore, I might expect unintended discharges, as a theoretical scenario, to appear, simply as a matter of course, in the FMECA for any gun, whether handgun or rifle, whether hammer- or striker-fired, whether single, double, or double-single action, whether outfitted with a manual safety or not. FMECAs can be fanciful in their originality and creativity in divining potential modes of injury; or they can be uninspired in ordaining the ways in which a user may misuse a product and injure him- or herself. The foregoing description is not a critique of FMECAs per se – they are a useful tool, in the absence of empirical data, for predicting some possible adverse outcomes during the design phase of product development,[277] allowing a manufacturer to begin to attempt to address these hypothetical outcomes before the product is released. Whenever empirical data are available, however, FMECAs become irrelevant or obsolete because theoretical speculations can be replaced with actual data.

61. 

[270] Farkas depo, p. 142
[271] Matt Taylor depo, p. 190
[272] Farkas declaration ¶ 6
[273] Cf. Biller report, pp. 17-18
[274] Declaration of Ed Murphy in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification ("Murphy declaration")
[275] Murphy declaration ¶ 8
[276] *Ibid.*
[277] See MIL-STD-1629A, p. iii ("from concept through development").
[278] See Matt Taylor depo, pp. 18, 163.
[279] I understand that the M18 is the compact version of the M17 and identical to it in all other aspects.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER



62.

63.

[280] See Matt Taylor depo, pp. 172-173, 234.
[281] Plaintiff's Suggestions, Exhibit 13
[282] See MIL-STD-1629A, p. 3: "Severity considers the worst potential consequence of a failure;" see also MIL-STD-1629A, p. 9: "Evaluate each failure mode in terms of the worst potential consequences which may result and assign a severity classification category" and "Severity classifications are assigned to provide a qualitative measure of the worst potential consequences resulting from design error or item failure."
[283] Frattaroli et al. (2002), who report that "[u]nintentional firearm deaths are a relatively small portion of all gun deaths (approximately 3%)" and that many of these are attributable to unauthorized, high-risk users such as children and youths.
[284] MIL-STD-1629A, p. 102-2

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER



64. Lastly, Mr. Biller discusses the Army Field Manual, FM 3-23.35, which is superseded by TC 3-23.35 and applies to Army pistols, not civilian weapons. What Mr. Biller characterizes as a risk classification matrix, akin to the risk matrix of the FMECA,[286] is, in fact, a weapons status flowchart describing a sequence of actions in arming a weapon[287] and the associated safety level of each step in that process. As a pistol proceeds from no ammunition, with its slide in the locked open or forward position, and no round in the chamber ("green" status) to having a round in the chamber and the slide positioned forward, with the weapon ready to fire ("black" status), the very same firearm goes from functionally inoperative to armed and ready to shoot. Every weapon, including the commercially available P320 without the optional manual safety, can be characterized in that sequence of stages. As the research on Americans' gun habits that was discussed earlier shows, a majority of households, including those with children under 18, store their gun in at least the "red" state. It is moreover disingenuous of Mr. Biller to state that the P320 cannot be de-cocked, as recommended by FM 3-23.35. As discussed previously, even once the slide has been retracted and the pistol energized (a deliberate, affirmative act on part of the operator), the live round in the chamber can always be removed from the chamber of the P320 using a fairly simple sequence of steps described in the owner's manual (see above). Given the descriptions provided of the different weapons statuses, the P320 without safety manual can certainly achieve even a "green" status (no ammunition, slide in the locked open or forward position, no round in the chamber), contrary to Mr. Biller's assertion.

65. In his bulleted opinions, Mr. Biller is critical of SIG SAUER for not pointing consumers to the military manual FM 3-23.35 for further training, and thereby allegedly failing to implement the last risk-mitigation step identified in the FMECA.[288] Whereas SIG SAUER's logic is entirely coherent, Mr. Biller ignores the context in which the FMECA was performed: As discussed in detail in earlier

[285] See Plaintiff's Suggestions, Exhibit 13.
[286] Cf. Biller report, p. 17: within the same paragraph discussing SIG SAUER's FMECA, "FM 3-23.35 has *its own matrix* for 'Weapons Safety Status.'" (emphasis added).
[287] See TC 3-23.35, p. 1-4: "Each color represents a specific series of actions applied to a weapon."
[288] See Biller report, p. 21, ¶¶ 13-15.
[289] See Matt Taylor depo, pp. 18, 163.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

parts of this report, warnings about the absence of an external safety in some models of the P320 are not warranted based upon an analysis of the incident record for the P320, as well as based upon the fact that the absence of an external safety as an option available to consumers is a feature of the P320, rather than a defect.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

**List of Materials Considered**

- [Materials produced to me are listed in Appendix C to this report]

- 16 CFR Part 1115
- 21 CFR 202.1
- Ali, M., & Blades, M. (2014). Do very young children understand persuasive intent in advertisements? In M. Blades, C. Oates, F. Blumberg, & B. Gunter (Eds.), Advertising to children: New directions, new media (pp. New York: Palgrave MacMillan.
- Ayres, T. J., Gross, M. M., Horst, D. P., Wood, C. T., Beyer, R. R., Acomb, D. B., & Bjelajac, V. M. (1990). *Do subjective ratings predict warning effectiveness?* Paper presented at the 1990 Annual Meeting of the Human Factors Society.
- Ayres, T. J., Gross, M. M., Wood, C. T., Horst, D., Beyer, R. R., & Robinson, J. N. (1994). What is a warning and when will it work? In K. R. Laughery, Sr., M. S. Wogalter & S. L. Young (Eds.), *Human Factors Perspectives on Warnings* (pp. 1-5). Santa Monica, CA: Human Factors and Ergonomics Society.
- Ayres, T. J., & Wood, C. T. (1995). The warning label development process. In *Proceedings of the Silicon Valley Ergonomics Conference & Exposition* (pp. 187-190).
- Bettman, J.R., Johnson, E.J., & Payne, J.W. (1991). Consumer decision making. *Handbook of consumer behavior*, 50-84.
- Calfee, J. E., & Ringold, D. J. (1994). The 70% majority: Enduring consumer beliefs about advertising. *Journal of Public Policy & Marketing*, *13*, 228-238.
- Chen, J. Y., Gilson, R. D., & Mouloua, M. (1997). Perceived risk dilution with multiple warnings. In *Proceedings of the Human Factors and Ergonomics Society 41st Annual Meeting* (pp. 831-835).
- Dingus, T. A., Hathaway, J. A., & Hunn, B. P. (1991). A most critical warning variable: Two demonstrations of the powerful effects of cost on warning compliance. In *Proceedings of the Human Factors Society 35th Annual Meeting* (pp. 1034-1038).
- Dorris, A. L., & Purswell, J. L. (1977). Warnings and human behavior: Implications for the design of product warnings. *Journal of Products Liability*, *1*, 255-265.
- Federal Register, Vol. 71, No. 15
- Frantz, J. P., & Miller, J. M. (1993). Communicating a safety-critical limitation of an infant-carrying product: The effect of product design and warning salience. *International Journal of Industrial Ergonomics*, *11*, 1-12.
- Frantz, J. P, Rhoades, T. P., Young, S. L., & Schiller, J. A. (1999). Potential problems with overusing warnings. In *Proceedings of the Human Factors and Ergonomics Society 43rd Annual Meeting* (pp. 916-920).
- Frantz, J. P., Young, S. L., Rhoades, T. P., & Wisniewski, E. C. (2005). Predicted versus actual response to warning signs and labels: Examining the role of ANSI Z535 features. *Proceedings of the Human Factors and Ergonomics Society 49th Annual Meeting* (pp. 1785-1789).
- Frattaroli, S., Webster, D. W., & Teret, S. P. (2002). Unintentional gun injuries, firearm design, and prevention: What we know, what we need to know, and what can be done. *Journal of Urban Health: Bulletin of the New York Academy of Medicine*, *79*, 49-59.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

- Gardial, S. F., Clemons, D. S., Woodruff, R. B., Schumann, W. D., & Burns, M. J. (1994). Comparing consumers' recall of prepurchase and postpurchase product evaluation experiences. *Journal of Consumer Research*, *20*, 548-560.
- Goldhaber, G. M., & deTurck, M. A. (1988). Effectiveness of warning signs: "Familiarity effects." *Forensic Reports*, *1*, 281-301.
- Halpern-Felsher, B. L., Millstein, S. G., Ellen, J. M., Adler, N. E., Tschann, J. M., & Biehl, M. (2001). The role of behavioral experience in judging risks. *Health Psychology*, *20*, 120-126.
- Hamilton, D., Lemeshow, S., Saleska, J. L., Brewer, B., & Strobino, K. (2018). Who owns guns and how do they keep them? The influence of household characteristics on firearms ownership and storage practices in the United States. *Preventive Medicine*, *116*, 134-142.
- Hepburn, L., Miller, M., Azrael, D., & Hemenway, D. (2006). The US gun stock: Results from the 2004 national firearms survey. *Injury Prevention*, *13*, 15-19.
- Hootman, J. M., Annest, J. L., Mercy, J. A., Ryan, G. W., & Hargarten, S. W. (2000). National estimates of non-fatal firearm related injuries other than gunshot wounds. *Injury Prevention*, *6*, 268-274.
- Hyman, I. E., Boss, S. M., Wise, B. M., McKenzie, K. E., & Caggiano, J. M. (2010). Did you see the unicycling clown? Inattentional blindness while walking and talking on a cell phone. *Applied Cognitive Psychology*, *24*, 597-607.
- Karnes, E. W., Leonard, S. D., & Rachwal, G. (1986). Effects of benign experiences on the perception of risk. In *Proceedings of the Human Factors Society 30th Annual Meeting* (pp. 121-125).
- Krauss, D., Arndt, S. R., Lakhiani, S., & Khan, F. (2008). Additional considerations when applying the "safety engineering hierarchy" in industrial work settings. In *Proceedings of the 13th Annual International Conference on Industrial Engineering Theory, Applications and Practice* (pp. 633-638).
- Laughery, K. R, & Wogalter, M. S. (2010). The safety hierarchy and its role in safety decisions. In W. Karwowski & G. Salvendy (Eds.), *Advances in human factors, ergonomics and safety in manufacturing and service industries* (pp. 1010-1016). Boca Raton, FL: CRC Press.
- Leape, L. L. (1994). Error in medicine. *Journal of the American Medical Association*, *272*, 1851-1857.
- Lehto, M. R., & Foley, J. P. (1991). Risk-taking, warning labels, training, and regulation: Are they associated with the use of helmets by all-terrain vehicle riders? *Journal of Safety Research*, *22*, 191-200.
- Leonard, S. D. (2001). Relation of Owner's Manuals to Safety. In *Proceedings of the First International Driving Symposium on Human Factors in Driver Assessment, Training and Vehicle Design* (pp. 125-130).
- Leonard, S. D., & Hill, G. W. (1989). Risk perception is affected by experience. In *Proceedings of the Human Factors Society 33rd Annual Meeting* (pp. 1029-1033).
- Lima, M. L. (2004). On the influence of risk perception on mental health: living near an incinerator. *Journal of Environmental Psychology*, *24*, 71-84.
- McCarthy, R. L., Ayres, T. J., & Wood, C. T. (1995). Risk and effectiveness criteria for using on-product warnings. *Ergonomics*, *38*, 2164-2175.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

- McCarthy, R. L., Ayres, T. J., Wood, C. T., & Robinson, J. N. (1994). *Risk-based warning design*. Paper presented to the ABA National Institute, *Product Warnings, Instructions and User Information*, Washington, DC, January 20-21, 1994.
- McCarthy, R. L., Robinson, J. N., Finnegan, J. P., & Taylor, R. K. (1982). Warnings on consumer products: Objective criteria for their use. In *Proceedings of the Human Factors Society 26th Annual Meeting* (pp. 98-102).
- Mehlenbacher, B., Wogalter, M. S., & Laughery, K. R. (2002). On the reading of product owner's manuals: Perceptions and product complexity. In *Proceedings of the Human Factors and Ergonomics Society 46th Annual Meeting* (pp. 730-734).
- MIL-STD-1629A
- Mourali M., Laroche, M., & Pons, F. (2005). Antecedents of consumer relative preference for interpersonal information sources in pre-purchase search. *Journal of Consumer Behaviour*, *4*, 307-381.
- Norman, D. A. (1981). Categorization of action slips. *Psychological Review*, *88*, 1-15.
- Norman, D. A. (1983). Design rules based on analyses of human error. *Communications of the ACM*, *26*, 254-258.
- NYPD Annual Firearms Discharge Report 2010
- NYPD Annual Firearms Discharge Report 2011
- NYPD Annual Firearms Discharge Report 2012
- NYPD Annual Firearms Discharge Report 2013
- NYPD Annual Firearms Discharge Report 2014
- O'Neill, J. (2018). Functional behavior assessment of the unintentional discharge of firearms in law enforcement. *Journal of Organizational Behavior Management*, *38*, 275-287.
- O'Neill, J., Hartman, M. E., O'Neill, D. A., & Lewinski, W. J. (2018a). The ABCs of unintended discharges. *The Police Chief*, *85*, 14-15.
- O'Neill, J., Hartman, M. E., O'Neill, D. A., & Lewinski, W. J. (2018b). Further analysis of the unintentional discharge of firearms in law enforcement. *Applied Ergonomics*, *68*, 267-272.
- O'Neill, J., O'Neill, D. A., & Lewinski, W. J. (2017). Toward a taxonomy of the unintentional discharge of firearms in law enforcement. *Applied Ergonomics*, *59*, 283-292.
- Otsubo, S. M. (1988). A behavioral study of warning labels for consumer products: Perceived danger and use of pictographs. In *Proceedings of the Human Factors Society 32nd Annual Meeting* (pp. 536-540).
- Parker, K., Horowitz, J., Igielnik, R., Oliphant, B., & Brown, A. (2017). *America's complex relationship with guns*. Pew Research Center.
- Reason, J. (1990). *Human error*. Cambridge University Press.
- Rensink, R. A., O'Regan, J. K., & Clark, J. J. (1997). To see or not to see: The need for attention to perceive changes in scenes. *Psychological Science*, *8*, 368-373.
- Rettig, M. (1991). Nobody reads documentation. *Communications of the ACM*, *34*, 19-24.
- Siegel, M. B., & Boine, C. C. (2020). The meaning of guns to gun owners in the U.S.: The 2019 National Lawful Use of Guns survey. *American Journal of Preventive Medicine*, *59*, 678-685.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

- Simons, D. J., & Chabris, C. F. (1999). Gorillas in our midst: Sustained inattentional blindness for dynamic events. *Perception*, *28*, 1059-1074.
- Singer, J. P., Balliro, G. M., & Lerner, N. D. (2003). *Manufacturer's Guide to Developing Consumer Product Instructions*. Washington, DC: U.S. Consumer Product Safety Commission.
- Stewart, D. W., & Martin, I. M. (1994). Intended and unintended consequences of warning messages: A review and synthesis of empirical research. *Journal of Public Policy & Marketing*, *13*, 1-19.
- Strawbridge, J. A. (1986). The influence of position, highlighting, and imbedding on warning effectiveness. In *Proceedings of the Human Factors Society 30th Annual Meeting* (pp. 716-720).
- Streff, F. M., & Wagenaar, A. C. (1989). Are there really shortcuts? Estimating seat belt use with self-report measures. *Accident Analysis & Prevention*, *21*, 509-516.
- Taylor, K. A., & Burns, M. J. (1999). Changes in pre-and post-purchase evaluative criteria: Exploring the impact on consumer (dis) satisfaction. *Journal of Consumer Satisfaction, Dissatisfaction and Complaining Behavior*, *12*, 90-99.
- Vredenburgh, A. G., & Helmick-Rich, J. (2006). Extrinsic nonwarning factors. In M. S. Wogalter (Ed.), *Handbook of warnings* (pp. 373–382). Mahwah, NJ: Lawrence Erlbaum Associates Publishers.
- Wilkes, M. S., Bell, R. A., & Kravitz, R. L. (2000). Direct-to-consumer prescription drug advertising: trends, impact, and implications. *Health Affairs (Millwood) 19*, 110-128.
- Wolfson, J. A., Azrael, D., & Miller, M. (2020). Gun ownership among US women. *Injury Prevention*, *26*, 49-54.
- Zeitlin (1994). Failure to follow safety instructions: Faulty communication or risky decisions? *Human Factors*, *36*, 172-181.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

# Appendix A

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

**Robert Rauschenberger, PhD**
Vice President Director, Human Factors

## Key Expertise

- User Experience
- Usability
- Human Factors
- Product Design
- Medical Devices
- Product Liability
- Failure to Warn
- Class Actions
- Prop 65

## Education

Post Doctoral Scholar, Psychology, University of Arizona, 2001 - 2003

PhD, Experimental Psychology, The Johns Hopkins University, 2001

BA, Liberal Arts, emphasis in Psychology and Anthropology, Sarah Lawrence College, 1996

## Project Geographical Experience

U.S., Germany

## Languages

English, German

## Contact

48 Wall Street, 17th Floor,
New York, NY 10005 |
+1 929-696-0197 (O) |
+1 213-304-6598 (M) |
robert.rauschenberger@jsheld.com

## Summary of Experience

Dr. Rauschenberger is currently the Vice President, Director of Human Factors at J.S. Held. He has over 25 years of experience conducting research on topics of visual attention and distraction, the organization of perceptual information, product design, user experience, risk communication effectiveness, and consumer decision-making. He leverages this experience in legal cases across industries, including product liability/failure to warn cases, class actions (both at the certification and at the merits stages), Proposition 65, and web design cases, for which he has testified in deposition and at trial, in both federal and state court. Dr. Rauschenberger has also designed and tested products across various industries and will continue to do so in J.S. Held's state-of-the-art scientific user research labs (URL), which are populated with highly degreed experts in their respective fields. J.S. Held's URL provides product safety and user experience (UX) research along the entire product lifecycle based on 50 years of human factors and failure analysis.

Over the past decade-plus, Dr. Rauschenberger has cultivated specific expertise in the evaluation of mixed reality (MR) products. His professional background also disposes him toward the evaluation of healthcare products and services. Given his work in both the reactive (failure analysis, litigation support) and proactive (user experience research) realms, Dr. Rauschenberger's user research is informed by insights gleaned from alleged product failures on the reactive side of his practice, and his expert witness testimony is given with the authority of someone who is actively engaged in the evaluation and development of products and services.

## Speaking Engagements

Dr. Rauschenberger has been invited to give talks at, among other institutions, Harvard, Yale, Notre Dame, University of British Columbia, St. Andrews, Royal Holloway, and Microsoft Research Lab. He teaches a class annually at Arizona State University and at Drexel University.

## Expert/Testifying Experience

Dr. Rauschenberger has testified in deposition and at trial in a variety of cases over the past decade-plus, including medical device product liability, consumer product failure to warn, Proposition 65, and class action lawsuits, both at the class certification and at the merits phase.

## Professional Affiliations/Memberships/Licenses/Training

Psychonomic Society, Fellow
Vision Sciences Society, Member
NSERC, Canada, Committee Member
National Science Foundation, Reviewer
Research Foundation Flanders (FWO), Belgium, Reviewer
Attention, Perception & Psychophysics, Consulting Editor and Reviewer
Human Performance in Healthcare, HFES, Program Chair
Conference for Object Perception and Memory (OPAM), Organizer
European Conference on Visual Perception, Scientific Committee Member

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

## Role at J.S. Held

Dr. Rauschenberger is Vice President Director of Human Factors and oversees J.S. Held's state-of-the-art scientific user research labs (URL) in Phoenix, AZ and New York, NY. J.S. Held's URL provides product safety and user experience (UX) research along the entire product lifecycle based on 50 years of human factors and failure analysis. Dr. Rauschenberger performs user research for industry-leading clients and serves as a scientific expert in product liability, Proposition 65, and class action litigation.

## Work Experience

J.S. Held, LLC
Vice President Director Human Factors
2024 - Present

Exponent, Inc.
Principal, Human Factors
Head of Centers of Scientific User Research (CSUR)
2009 - 2023

Siemens Corporate Research, Inc.
Principal Scientist, User Experience
2005 - 2009

Harvard University
Associate, Psychology
2004 - 2005

MIT
Visiting Scholar, Brain and Cognitive Sciences
2004 - 2005

University of Arizona
Research Social Scientist, Psychology
2003 - 2004

## Select Project Experience

Designed healthcare and consumer products now deployed in the marketplace.

Conducted national and international user studies, focus groups, workflow analyses, and contextual inquiries across a large range of product domains, from healthcare to consumer to industrial to automotive to online.

Assisted companies with development and evaluation of safety communication (product warnings, user manuals, marketing disclosures) for consumer, healthcare, and online products.

Assisted companies with 510(k) submissions to the FDA for clearance for marketing of medical devices by conducting human factors studies.

Testified as human factors expert in product liability, class action, and Proposition 65 cases.

## Speaking Engagements

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER


Rauschenberger, R., Fleming, D., Sobel, K., & Hyman, E. *A science-based approach for health and safety evaluations of virtual reality products*. Workshop given at the 2020 ICPHSO Annual Meeting and Training Symposium, Orlando, FL, February 2020.

Rauschenberger, R., & Hildebrand, E. *A product liability perspective on medical device development*. Paper presented at the Human Factors and Ergonomics Society Healthcare Symposium, Baltimore, MD, April 2015.

Heckman, G., Rauschenberger, R., Kim, R., Young, D., & Lange, R. *A comparative evaluation of rearview camera display locations: Collision avoidance outcomes and use patterns*. Paper presented at the SAE Government/Industry meeting, Washington, DC, January 2012.

Rauschenberger, R. *Human factors in product design and liability: The role of attention*. Paper presented at The West Coast Product Safety & Liability Conference: Presentations for Manufacturers by Leading Experts & Attorneys, Los Angeles, CA, March 2010.

Rauschenberger, R., & Yantis S. *Attentional capture through levels of representation*. Poster presented at the Annual Meeting of the Association for Research in Vision and Ophthalmology, Fort Lauderdale, FL, May 1998.

Rauschenberger, R., & Yantis, S. *Search asymmetries revisited: A new theory of visual attention*. Poster presented at the Annual Meeting of the Psychonomic Society, Los Angeles, CA, November 1999.

Rauschenberger, R., & Yantis, S. *What can search asymmetries really tell us?* Paper presented at the Annual EPA Vision and Attention Meeting, Baltimore, MD, March 2000.

Rauschenberger, R., & Yantis, S. *Completing the picture: Representations of amodally completed objects in visual search*. Poster presented at the Annual Meeting of the Association for Research in Vision and Ophthalmology, Fort Lauderdale, FL, May 2000.

Rauschenberger, R., & Yantis, S. *What counts as a new object in the new-object hypothesis of attentional capture?* Poster presented at the Meeting of the Vision Sciences Society, Sarasota, FL, May 2001.

Rauschenberger, R., Peterson, M.A., Mosca, F., & Bruno, N. *A modified search task investigates an alternative to the two-stage model of amodal completion*. Poster presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2002.

Schulz, M.F., Rauschenberger, R., Peterson, M.A. *Amodal completion in passively viewed displays: A priming study*. Poster presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2002.

Liu, T., Rauschenberger, R., Slotnick, S.D., & Yantis, S. *Neural signatures of amodal completion*. Poster presented at the Annual Meeting of the Cognitive Neuroscience Society, New York, NY, March 2003.

Peterson, M.A., & Rauschenberger, R. *Context effects on border assignment in the target stimulus in visual search*. Poster presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2003.

Rauschenberger, R., Liu, T., Slotnick, S.D., & Yantis, S. *Cortical representation of pictorial occlusions in early visual areas and LOC*. Poster presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2003.

Skow-Grant, E., Rauschenberger, R., & Peterson, M.A. *Attention, not inhibition of return, tracks objects*. Paper presented at the 11th Annual Workshop on Object Perception, Attention, and Memory, Vancouver, Canada, November 2003.

Rauschenberger, R., & Peterson, M.A. *When unambiguous stimuli become ambiguous: Spatiotemporal context effects with nominally unambiguous stimuli*. Paper presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2004.

Rauschenberger, R., & Chu, H. *The effects of familiarity on encoding efficiency in visual search*. Poster presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2005.

Carlson, T.A., Rauschenberger, R., & Verstraten, F.A.J. *Cortical adaptation of unconscious perceptual representations*. Paper presented at the Annual Meeting of the European Conference on Visual Perception, A Coruña, Spain, August 2005.

Rauschenberger, R., & Lin, J.W. *Workflow analysis for patients' visits in VAMC audiology departments*. Paper presented at the Annual Meeting of the Association of VA Audiologists, Denver, CO, April 2007.

Chakraborty, I., Zheng, X.S., Lin, J., & Rauschenberger, R. *Computational eye movement model based on adaptive saliency map*. Paper presented at the Annual Fall Vision Meeting, Berkeley, CA, September 2007.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER


## Invited Presentations

Rauschenberger, R. *Taking a "Q" from human factors: Visual search in HMI design*. Keynote address for the HFES Regional Conference, California State University Long Beach, Long Beach, CA, February 2011.

Rauschenberger, R. *Taking a "Q" from human factors: Visual search in HMI design*. Cognitive Science and Engineering Department, Arizona State University College of Technology & Innovation, January 2011.

*Cognitive engineering for airport security screening*. Simon Fraser University, Vancouver, BC, 2009.

*When what you design is not what you get*. Microsoft Research Lab, Redmond, WA, 2009.

*An idiosyncratic perspective on visual search and perception*. University of British Columbia, Vancouver, Canada, 2008.

*An idiosyncratic perspective on visual search and perception*. Notre Dame University, South Bend, IN, 2008.

*When what you design is not what you get*. Universität Bielefeld, Bielefeld, Germany, 2006.

*When what you design is not what you get*. Deutsche Luft- und Raumfahrtgesellschaft, Braunschweig, Germany, 2006.

*When what you design is not what you get*. School of Interactive Arts and Technology, Simon Fraser University, Vancouver, Canada, 2006.

*Dynamic interactions in visual search displays: When less is more*. Yale University, New Haven, CT, 2005.

*Dynamic representations of the visual world*. University of Arizona, Tucson, AZ, 2004.

*Dynamic representations of the visual world*. Royal Holloway University, London, UK, 2004.

*Dynamic representations of the visual world*. University of Delaware, Newark, DE, 2004.

*Dynamic representations of the visual world*. University of St. Andrews, St. Andrews, Scotland, 2004.

*Dynamic interactions in visual search displays*. Michigan State University, East Lansing, MI, 2004.

*When more is less: Visual search difficulty and exposure time*. Siemens Corporate Research, Princeton, NJ, 2004.

*An idiosyncratic perspective on visual search and perception*. Vision Sciences Laboratory, Harvard University, Cambridge, MA, 2004.

*Attentional capture by auto- and allo-cues*. Visual Attention Lab., Harvard Medical School, Cambridge, MA, 2004.

*Dynamic representations of the visual world*. University of North Carolina, Chapel Hill, NC, 2003.

*Masking unveils visual representations in the brain*. University of Arizona, Tucson, AZ, 2001.

*Masking unveils visual representations in the brain*. Sarah Lawrence College, Bronxville, NY, 2000.

## Selected Publications

Lewis, R.C., Rauschenberger, R., Kalmes, R. (2021). Hand-to-mouth and other hand-to-face touching behavior in a quasi-naturalistic study under controlled conditions. *Journal of Toxicology and Environmental Health, Part A: Current Issues*, *84*, 49-55.

Rauschenberger, R., Barakat, B. (2020). Health and safety of VR use by children in an educational use case. *Proceedings of the 2020 IEEE Conference on Virtual Reality and 3D User Interfaces*, Atlanta, GA. (Nominated for Best Paper IEEE VR 2020.)

Lester, B.D., Larson, R., Dosch, I., Fowler, G., & Rauschenberger, R. (2020). Perception of terrain slope in real and virtual environments. *Proceedings of the 11th International Conference on Applied Human Factors and Ergonomics*, San Diego, CA.

Lester, B.D., Hashish, R., Kim, R., Moorman, H., Hildebrand, E., Schwark, J., Rauschenberger, R., & Young, D. (2016). Mobile device usage influences gaze patterns to obstacles during locomotion. *Proceedings of the Industrial & Systems Engineering Research Conference*, Anaheim, CA.

Barakat, B., Crump, C., Cades, D., Rauschenberger, R., Schwark J, Hildebrand E, Young D. (2015) Eye tracking evaluation of driver visual behavior with a forward collision warning and mitigation system. *Proceedings of the Human Factors and Ergonomics Society 59th Annual Meeting*, Los Angeles, CA.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER


Rauschenberger, R., Sala, J.B., & Wood, C.T. (2015) Product warnings and the involuntary capture of attention. *Proceedings of the Human Factors and Ergonomics Society 59th Annual Meeting*, Los Angeles, CA.

Schwark, J., Fowler, G., Larson, R., & Rauschenberger, R. (2015) An investigation of operator performance in All-Terrain Vehicle (ATV) handling and control. *Procedia Manufacturing*, *20*, 1567-1574.

Crump, C., Cades, D., Rauschenberger, R., Hildebrand, E. et al. (2015). Driver reactions in a vehicle with collision warning and mitigation technology. SAE Technical Paper 2015-01-1411. doi:10.4271/2015-01-1411.

Crump, C., Cades, D., Rauschenberger, R., Hildebrand, E.A., & Young, D.E. (2014). Dynamic on-road method for evaluation of Advanced Driver Assistance System (ADAS). *Proceedings of the 3rd Annual World Conference of the Society for Industrial and Systems Engineering*, San Antonio, TX (pp. 77-81). ISBN: 97819384960-2-8.

Rauschenberger, R., Wood, C.T., & Sala, J.B. (2013). Human factors and the design of medical devices. In J.B. Reiss (Ed.), *Bringing your medical device to market* (pp. 215-226). Washington, DC: Food and Drug Law Institute.

Kuzel, M.J., Cohen, H., Cohen, J., & Rauschenberger, R. (2013). Evaluation of mobile eye tracking for forensic analysis of pedestrian falls. *Proceedings of the Human Factors and Ergonomics Society 57th Annual Meeting*, San Diego, CA.

Heckman, G.M., Kim, R.S., Lin, S., Rauschenberger, R., Young, D.E., & Lange R. (2012). Drivers' visual behavior during backing tasks: Factors affecting the use of rearview camera displays. *Proceedings of the Human Factors and Ergonomics Society 56th Annual Meeting*, Boston, MA.

Kim, R., Rauschenberger, R., Heckman, G., Young, D., & Lange, R. (2012). Efficacy and usage patterns for three types of rearview camera displays during backing up. *Proceedings of the Society of Automobile Engineers World Congress*, Detroit, MI.

Zheng, X.S., Kiekebosch, J., & Rauschenberger, R. (2011). Attention-aware human-machine interface to support video surveillance task. *Proceedings of the Human Factors and Ergonomics Society 55th Annual Meeting*, Las Vegas, NV.

Sala, J.B., Nichols, E.A., Muhammad, R., Lakhiani, S.D., Rauschenberger, R., & Wood, C.T. (2010). Government, warnings, and safety information: A comparison of inter-agency regulations and guidance. In W. Karwowski & G. Salvendi (Eds.), *Advances in Human Factors, Ergonomics, and Safety in Manufacturing and Service Industries* (pp. 1047-1056). Boca Raton, FL: CRC Press.

Rauschenberger, R. (2010). Reentrant processing in attentional guidance — Time to abandon old dichotomies. Invited editorial. *Acta Psychologica*, *135*, 109-111.

Rauschenberger, R., Lin, J.J.W, Zheng, X.S., & Lafleur, C. (2009). Subset search for icons of different spatial frequencies. *Proceedings, of the Human Factors and Ergonomics Society 53rd Annual Meeting*, San Antonio, TX.

Zheng, X.S., Chakraborty, I., Lin, J.J.W., Rauschenberger, R. (2009). Correlating low-level image statistics with users' rapid aesthetic and affective judgments of web pages. *Long Paper presented at the 2009 CHI conference*, Boston, MA. (Nominated for Best Paper CHI 2009.)

Carlson, T.A., Rauschenberger, R., & Verstraten, F.A.J. (2007). No representation without awareness in the Lateral Occipital complex. *Psychological Science*, *18*, 298-302.

Zheng, X.S., Sapundshiev, I., & Rauschenberger, R. (2007). WikiTable: A new tool for collaborative authoring and data management. *HCI*, *15*, 501-508.

Zheng, X.S., Chakraborty, I., Lin, J.J.W., & Rauschenberger, R. (2008). Developing metrics to predict users' perceptions of interface design. *Proceedings of the Human Factors and Ergonomics Society 52nd Annual Meeting*, New York, NY.

Rauschenberger, R., & Yantis, S. (2006). Perceptual encoding efficiency in visual search. *Journal of Experimental Psychology: General*, *135*, 116-131.

Rauschenberger, R., Liu, T., Slotnick, S.D., & Yantis, S. (2006). Temporally unfolding neural representation of pictorial occlusion. *Psychological Science*, *17*, 358-364.

Rauschenberger, R., & Chu, H. (2006). The effects of familiarity on encoding efficiency in visual search. *Perception & Psychophysics*, *68*, 770-775.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER


Rauschenberger, R., Mosca, F., Peterson, M.A., & Bruno, N. (2004). Amodal completion in visual search: Preemption or context effects? *Psychological Science*, *15*, 351-355.

Rauschenberger, R. (2003). When something old becomes something new: Spatiotemporal object continuity and attentional capture. *Journal of Experimental Psychology: Human Perception and Performance*, *29*, 600-615.

Rauschenberger, R. (2003). Attentional capture by auto- and allo-cues. *Psychonomic Bulletin & Review*, *10*, 814-842.

Rauschenberger, R., & Yantis, S. (2001). Masking unveils pre-amodal completion representation in visual search. *Nature*, *410*, 369-372.

Rauschenberger, R., & Yantis, S. (2001). Attentional capture by globally-defined objects. *Perception & Psychophysics*, *63*, 1250-1261.

Enns, J.T., Austen, E.L., DiLollo, V., Rauschenberger, R., & Yantis, S. (2001). New objects dominate luminance transients in setting attentional priority. *Journal of Experimental Psychology: Human Perception and Performance*, *27*, 1287-1302.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

# Appendix B

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

**Previous Four Years of Deposition and Trial Testimony for Robert Rauschenberger, Ph.D.**

Last updated: February 20, 2025

| Depo Date | Trial Date | Case Name | Case Client | Court | Case # |
|---|---|---|---|---|---|
| 4/24/2024 | -- | Prieto v. JJJ Trucking | The Law Firm for Truck Safety | Circuit Miami-Dade, FL | 2022-002251-CA-01 |
| 10/21/2024 | | Center for Inquiry, Inc. v. Boiron, Inc. | SECIL Law PLLC | Superior Court of DC | 2022 CA 1610 B |
| 12/12/2025, 1/13/2025 | | Caraballo v. Home Depot U.S.A., Inc. | Parsky & Galloway, LLC | District Court of CT | 3:21-cv-252 (VAB) |
| 1/10/2025 | | Candelaria v. Conopco, Inc. | Lowenstein Sandler LLP | Eastern District of NY | 1:21-cv-06760 |

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

# Appendix C

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

**List of Materials**

- Complaint and Jury demand
- Complaint and Jury demand (Exhibit 0001, copy of the above document)
- Rauschenberger Report
- Rebuttal Rauschenberger Report
- Deposition of Joshua Glasscock 05/16/23 (+ exhibits)
- Deposition of Joshua Glasscock 03/06/25 (+ exhibits)
- Deposition of James Thomas Faulkner 03/15/24 (+ exhibits)
- Deposition of James Thomas Faulkner 05/28/24 Vol II (+ exhibits)
- Deposition of James Lano 09/11/2024 (+ exhibits)
- Deposition of Christopher Meyer 09/11/2024 (+ exhibits)
- Deposition of Matt Farkas 09/23/2024 (+ exhibits)
- Deposition of Matt Taylor 09/10/24 (+ exhibits)
- Deposition of James Lano 09/11/2024 edited
- Deposition of Christopher Meyer 09/11/2024 edited
- Defendant's motion for summary judgement
- Defendant's suggestions in support of MSJ
- Plaintiff's Objections and answers to Defendant's interrogatories (Exhibit 2)
- Plaintiff's response to Defendant's first set of requests for admission (Exhibit 4)
- Plaintiff's response in opposition to MSJ
- Plaintiff's suggestions ISO motion for class certification
- Sig Sauer's reply suggestion in support of MSJ
- Todd Werts declaration of opposition to MSJ
- Colleen M Gulliver declaration of support for Sig Sauer's reply in support of MSJ
- James Lano declaration of support for Sig Sauer's reply in support of MSJ
- B. Keith Gibson declaration of support for Sig Sauer's reply in support of MSJ
- Declaration of Thomas L Taylor in support of MSJ (Exhibit 6)
- Expert Declaration of Benjamin Gatrost 11/05/2024
- Gatrost supplemental declaration – declaration of Plaintiff's expert Benjamin Gatrost to explain our requested clarifications regarding the documents he relied upon
- Declaration of Ed Murphy in support of Sig Sauer Inc's opposition to Plaintiff's motion for class certification
- Declaration of Matt Farkas in support of Sig Sauer Inc's opposition to Plaintiff's motion for class certification
- Declaration of Chris Meyer in support of Sig Sauer Inc's opposition to Plaintiff's motion for class certification
- Declaration of Matt Taylor-fully executed
- Declaration of Tom Taylor ISO Class Certification Opposition (+ exhibits)
- Declaration of Phil Strader in support of Sig Sauer, Inc.'s opposition to Plaintiff's motion for class certification
- Sig Sauer's Mar. 28, 2024 Responses and Objections to 30(b)(6) Notice
- 2023.01.23 Ps Obj & Answers to SIG's RFP's Set 1
- 2023.01.23 P's Obj & Answers to SIG's Rogs Set 1 with verification
- 2024-01-05 P's Obj & Answer to SIG's RFAs Set 1
- 2024-01-05 P's Obj & Answers to SIG's RFPs Set 2
- 2024-01-05 P's Obj & Answers to SIG's Rogs Set 2
- 23-11-21 [doc 70] Order Denying Motion for Judgment on the Pleadings.pdf
- 23-11-17 [doc 69] Defendant's Reply Suggestions in Support of its Motion for Judgment on the Pleadings.pdf

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

- 23-11-08 [doc 67] Plaintiff's Response in Opposition to Sig Sauer, Inc.'s Motion for Judgment on the Pleadings.pdf
- 23-10-25 [doc 66] Def Sig Sauer, Inc.'s Suggestions in Support of its Motion for Judgment on the Pleadings.pdf
- 23-10-25 [doc 65] Defendant Sig Sauer Inc.'s Motion for Judgment on the Pleadings.pdf
- 22-08-26 [doc 32] Sig Sauer's Answer to Plaintiff's Complaint.pdf
- 22-08-12 [doc 30] Order Denying Sig Sauer's Motion to Dismiss.pdf
- 22-08-12 [doc 29] Sig Sauer's Reply in Support of Motion to Dismiss.pdf
- 22-07-29 [doc 27] Plaintiff's Opposition to Defendant's Motion to Dismiss.pdf
- 22-07-15 [doc 25] Sig Sauer's Suggestions in Support of its Motion to Dismiss.pdf
- 22-07-15 [doc 24] Defendant's Motion to Dismiss.pdf
- Sig's responses to Plaintiff First RFPs (11/23/2022)
- Sig's responses to Plaintiff's First Rogs (11/23/2022)
- Sig's discovery audit (Excel spreadsheet from our co-counsel outlining what was produced in Nov. 2022)
- Screenshot of James Thomas Faulkner text message exchange (Exhibit 0002-0008)
- James Thomas Faulkner firearms transaction record (Exhibit 0009)
- James Thomas Faulkner phone records, Apr 16th-May 15th, 2023 (Exhibit 0010)
- Excerpt of Joshua Glasscock deposition (Exhibit 1)
- James Thomas Faulkner deposition excerpt pg 39-50 (Exhibit 3)
- Email exchange between Todd C Werts and Joshua Glasscock (Exhibit 5)
- Screenshot of text message exchange (Exhibit 7)
- Screenshot of text message exchange (Exhibit 8)
- Excerpts from P320 X-Series Operators Manual (Exhibit 9)
- SIG- P320 MARKETING materials
- P320 X-series operator's manual
- James Faulkner text message exchange
- P320 MO Sales Orders Detail
- Contingency fee Attorney Engagement agreement
- James Faulkner text chain dated 20.04.08-23.03.13
- Glasscock Joshua 000001
- James Faulkner text chain and snapshots of P320 + materials dated 20.03.29-23.08.19
- 3_15cv855_ Flynn et al v. FCA Us LLC et al docket sheet
- Waldman Durable goods theory_JEP2003.pdf
- VNM Theory of Games & Economic Behavior.pdf
- SIG-GLASSCOCK 00001772.XLSX
- SIG-GLASSCOCK00002470 - 26. SIG-ORTIZ 001337 [MSRP].xlsx
- Mike V, Do Guns Lose Their Value - Gun Depreciation and Appreciation Analysis.pdf
- Harmer, Gun Depreciation Everything You Should Know.pdf
- George Casella and Roger L. Berger, Statistical Inference, 2nd ed. (Pacific Grove, CA Wadsworth Group, 2002), 89-90.pdf
- Browning, Edgar K. and Jacqueline M., Microeconomic Theory and Implications.pdf
- Aswath Damodaran, Strategic Risk Taking A Framework for Risk Management (New York FT Press, 2008).pdf
- 173113_Matthew_Taylor_091024_[30(b)(6)] _Full.pdf
- 22-04-18 Complaint - Glasscock v. Sig Sauer, Inc. (FINAL)

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

- TOP 03-2-504A Safety Evaluation of hand and shoulder weapons
- Shipment chart (xlsx)
- Email from Tom Taylor to Jordan Hunter dated 17.08.09
- Email from Col ben to David Faubion dated 17.02.28
- SKU chart with pricing (xlsx)
- Email from Gabe Bailey to Ahmad, Mahmoud D dated 17.08.10
- Email from Gabe Bailey to Ahmad, Mahmoud D dated 17.08.10
- Dept of Army Pistol handbook
- FMECA spreadsheet (xlsx)
- FMECA analysis (Ed Murphy)
- Sig Sauers Supplemental Objections and Responses to Plaintiffs First Set of Interrogatories dated September 5 2024 (002)
- SIG SAUER P322 .22 Caliber Pistol - from Sig Sauer Website
- Sig patent for double notched sear
- Performance purchase description
- Email from Robby Johnson to Matthew Taylor dated 14.07.01
- SAAMI-Z299.5-2023-Abusive-Mishandling-Approved-9-25-2023
- SAAMI Standards - SAAMI
- P320-XFULL CALIFORNIA COMPLIANT - From Sig Sauer Website
- P320 FULL-SIZE - From Sig Sauer Website
- MP9 SHIELD EZ MANUAL THUMB SAFETY _ Smith & Wesson
- Military Gun standard.pdf
- MIL-STD-1472 Human Engineering.pdf
- MIL-STD-882D Standard Practice for Safety System-Hazard Analysis.pdf
- Lang v. Sig - Openings.pdf
- Lang v Sig - Sean Toner.pdf
- Lang v Sig - James Tretin.pdf
- Lang v Sig - Derek Watkins.pdf
- Lang v Sig - Closings.pdf
- Lang v Sig - Bill Vigilante.pdf
- Initial Design Request.pdf
- Glossary from Sig Sauer Website.pdf
- Glock safety patent explaining lack of safety compromises safety.pdf
- fm_3-23.35_combat_training_with_pistols_m9_and_m11.pdf
- f_4590_5330._5_-_february_2020_0.pdf
- Ex 1-11 - Mark Farkas.pdf
- ASTM F589-23 Standard Cosumer Safety Specification for Non-Powder Guns.pdf
- ASTM F589-16 Standard Cosumer Safety Specification for Non-Powder Guns.pdf
- ASTM Article - Deaths Due to Accidental Discharge of a Dropped Handgun.pdf
- ASTM Article - Deaths Due to Accidental Discharge of a Dropped Handgun.pdf
- Biller Report Final
- 2024-09-03 Depo Topic Grid.xlsx
- 2022-brass-ir-comp-group-report-order.xlsx
- 1997-04-18 DOD Withdrawal.pdf
- 1994 ASTM Article - Deaths Due to Firearms Injuries in Children.pdf
- 1986-04-16 Renewal.pdf
- 1970-07-06 Winter Trigger Military Specification.pdf

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

- 1911-XFULL - From Sig Sauer Website.pdf

Intermediate and Exhibit Files

- ShipData.xlsx
- PrcDiff.xlsx
- DocsRel.docx

Documents relied on by Gatrost

- Stakeholder Sig Sauer P320 Handgun Notice.pdf
- SIG-GLASSCOCK00007628 - NIJ Standards.pdf
- SIG-GLASSCOCK00007620 - NIJ Auto-Pistol-Scheme.pdf
- SIG-GLASSCOCK00006543 - FBI PAST Report kjb.docx.pdf
- SIG-GLASSCOCK00006493 - 16-112 W320C-9 DHS ICE Durability Test Request.docx.pdf
- SIG-GLASSCOCK00006493 - 16-112 W320C-9 DHS ICE Durability Test Request.docx (1).pdf
- SIG-GLASSCOCK00006486 - 16-112 Test Report P320 DHS ICE.docx.pdf
- SIG-GLASSCOCK00006464 - 14P001.pdf
- P320Design000001-000056.pdf
- Matthew Taylor_[30(b)(6)] _Exh_3.pdf
- LinkedIn Story.pdf
- Lang v. Sig - Openings.pdf
- Lang v Sig - Sean Toner.pdf
- Lang v Sig - James Tretin.pdf
- Lang v Sig - Derek Watkins.pdf
- Lang v Sig - Closings.pdf
- Lang v Sig - Bill Vigilante.pdf
- fm3-23-35.pdf
- b-402339.3.pdf
- 2003_35_4_400_Wilson.pdf
- 262_81_21_f_P99_ENGLISH.pdf

Documents relied on by Carla Peak

- Peak CV.pdf
- MRI Spring 2024-MP June 2024 MO Handgun Owners - INTERNET USAGE.pdf
- MRI Spring 2024-MP June 2024 MO Handgun Owners - DEMO.pdf

Documents relied on by Biller

- Watkins Report.pdf
- Vigilante Report.pdf
- Tuter v Freud America Inc.pdf
- TOP 03-2-504A Safety Evaluation of hand and shoulder weapons.pdf
- tc3-23-35.pdf
- SIG-GLASSCOCK00007700 - RE_ Read this.msg.pdf
- SIG-GLASSCOCK00007602 - Fw_ Review of Sig Sauer P320 RX with Romeo 1 Reflex Red Dot Sight.msg.pdf
- SIG-GLASSCOCK00001134 - RE_ MHS_P320 white paper (UNCLASSIFIED__FOUO). msg.pdf
- Sig Sauers Supplemental Objections and Responses to Plaintiffs First Set of Interrogatories dated September 5 2024 (002).pdf
- SIG SAUER P322 .22 Caliber Pistol - from Sig Sauer Website.pdf
- Sig patent for double notched sear.pdf

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

- Performance purchase description
- Email from Robby Johnson to Matthew Taylor dated 14.07.01
- SAAMI-Z299.5-2023-Abusive-Mishandling-Approved-9-25-2023.pdf
- SAAMI Standards - SAAMI.pdf
- P320-XFULL CALIFORNIA COMPLIANT - From Sig Sauer Website.pdf
- P320 FULL-SIZE - From Sig Sauer Website.pdf
- MP9 SHIELD EZ MANUAL THUMB SAFETY _ Smith & Wesson.pdf
- Military Gun standard.pdf
- MIL-STD-1472 Human Engineering.pdf
- MIL-STD-882D Standard Practice for Safety System-Hazard Analysis.pdf
- Kent Report.pdf
- Mr. Watkins Report
- Initial Design Request.pdf
- Initial Design Powerpoint.pdf
- Glossary from Sig Sauer Website.pdf
- Glock safety patent explaining lack of safety compromises safety.pdf
- fm_3-23.35_combat_training_with_pistols_m9_and_m11.pdf
- f_4590_5330._5_-_february_2020_0.pdf
- ASTM F589-23 Standard Cosumer Safety Specification for Non-Powder Guns.pdf
- ASTM F589-16 Standard Cosumer Safety Specification for Non-Powder Guns.pdf
- ASTM Article - Deaths Due to Accidental Discharge of a Dropped Handgun.pdf
- 2022-brass-ir-comp-group-report-order.xlsx
- 1997-04-18 DOD Withdrawal.pdf
- 1994 ASTM Article - Deaths Due to Firearms Injuries in Children.pdf
- 1986-04-16 Renewal.pdf
- 1970-07-06 Winter Trigger Military Specification.pdf
- 1911-XFULL - From Sig Sauer Website.pdf
- SIG P320 Manuals (15) received 11/14/24

SIG-Complaints (2018-2022) production/Videos received

- St. Claire Prison discharge.avi
- SEPTA000083.AVI
- Rose Casino St. Rose Lousiana December 5 2021.mp4
- Roscommon seatbelt recreation video.MOV
- Roscommon AD (with audio).mp4
- Pasco County Cafeteria AD video 2 - Cross.avi
- Pasco County Cafeteria AD video 1 - Cross.avi
- Milwaukee PD - Aaron Roth.avi
- HPD Off Reyes AD - Angle 2.mp4
- HPD Off Reyes AD - Angle 1.mov
- Honesdale AD.mp4
- Confidential_Axon_Body_3_Video_2022-09-10_2146_X60346433.mp4
- Ashley Catatao AD.mp4
- 1_3_2023 11_06_34 AM (UTC-05_00).mkv

(av files) received

- 2023.01.10 George Villemaire-George Villemaire 603-315-9805.mp3
- 2022.11.05 Daniel Niemietz-RMA - 9095496 11.7.2022.mp3
- 2022.10.00 Mclay, John-McLay-RMA#9112188.mp3

- 2022.08.31 Tim Jantz - Moffat County (CO) PD.MP4
- 2022.06.20 Doug Brown-DougBrown620.mp3
- 2022.06.20 Doug Brown - IMG_6710.JPG
- 2022.06.20 Doug Brown - IMG_6709.JPG
- 2022.06.20 Doug Brown - GOPR0132.MP4
- 2022.06.20 Doug Brown - Call.mp3
- 2022.04.17 Michael Devine (M17)-audio.mp3
- 2022.04.01 Honesdale (PA) Off Thatcher-Honesdale AD.mp4
- 2022.04 Marvin Reyes (Houston PD)-IMG-3994.MOV
- 2022.04 Marvin Reyes (Houston PD)-8989502-GOPR0106.MP4
- 2022.04 Marvin Reyes (Houston PD)-8989502-GOPR0101.MP4
- 2022.04 Marvin Reyes (Houston PD)-8989502-eng inspection.MP4
- 2022.01.28 Christopher Fahlbush-RMA - 8985382.mp3
- 2022.01.28 Christopher Fahlbush-audio.mp3
- 2022.01.28 Christopher Fahlbush-8985382-GOPR0096.MP4
- 2022.01.28 Christopher Fahlbush-8985382-GOPR0095.MP4
- 2022.01.01 Steve Mentusky-267-457-9730 MENTUSKY.mp3
- 2022.00 John Watson-RMA - 9129876 01.20.23.mp3
- 2021.06.09 John Sinner-Sinner, John 6.25.2021.mp3
- 2021.06.09 John Sinner-Audio_Recording.wav
- 2021.06.09 John Sinner-8864886-test fire.MP4
- 2021.06.09 John Sinner-8864886-bench inspection.MP4
- 2021.05.15 DC Metro PD-Metro PD.mp4
- 2021.02.23 Nevada DPS-2021.04.19 NV DPS Inspection Video-NDPS.mp4
- 2020.07.20 Andy Hayes (KY)-SIG Videos re Hayes testing-IMG_1965.mov
- 2020.07.20 Andy Hayes (KY)-SIG Videos re Hayes testing-IMG_1962.mov
- 2020.07.20 Andy Hayes (KY)-SIG Videos re Hayes testing-IMG_1938.mov
- SIG-OAI 002477 - 2020.07.20 Andy Hayes (KY)-SIG Videos re Hayes testing-IMG_1937.mov
- 2020.06.06 William Campbell (TX)-1529068.webm
- 2015.00.00 Jeff Kelly-RMA 9114662 Jeff Kelly.mp3
- Incident reports (45)

Additional Videos and Images received

- Roscommon Recreation with Seatbelt.MOV
- (Roscommon video) (full with audio).mp4
- Pasco County Surveillance Video.avi
- (Roscommon Video).lnk
- (Pasco County Surveillance Video).lnk
- (Hendel Video 2).3gp
- (Hendel Video 1).3gp
- (Kneski Incident Video).MOV
- (Gardette Insp. Vid. 10).AVI
- (Gardette Insp. Vid. 9).AVI
- (Gardette Insp. Vid. 8).AVI
- (Gardette Insp. Vid. 7).AVI
- (Gardette Insp. Vid. 6).AVI
- (Gardette Insp. Vid. 5).AVI

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

- (Gardette Insp. Vid. 4).AVI
- (Gardette Insp. Vid. 3).AVI
- (Gardette Insp. Vid. 2).AVI
- SIG-OAI 01886 (Gardette Insp. Vid. 1).AVI
- ~4.JPG
- ~3.JPG
- ~2.JPG
- ~1.JPG
- ~1.JPG duplicate
- (Vadnais - Thomele - GOPR0078).MP4
- (Vadnais - Thomele - GOPR0077).MP4
- (Vadnais - Thomele - GOPR0076).MP4
- (R1_VID_CYCLE Vadnais).mp4
- SIG-OA~4.PNG
- SIG-OA~4.PDF
- SIG-OA~4.MOV
- SIG-OA~3.PNG
- SIG-OA~3.PDF
- SIG-OA~3.MOV
- SIG-OA~2.PNG
- SIG-OA~2.PDF
- SIG-OA~2.MOV
- SIG-OA~1.PNG
- SIG-OA~1.PDF
- SIG-OA~1.MOV
- SIF250~1.MOV
- SIF102~1.MP4
- SIEF53~1.MOV
- SIEF8A~1.PNG
- SIED98~1.PNG
- SIE24F~1.MP4
- SIDFBB~1.PDF
- SIDFAB~1.MP4
- SIDCFE~1.MOV
- SID1FC~1.PDF
- SIC96B~1.PDF
- SIB737~1.MOV
- SI7004~1.MOV
- SI1945~1.MOV
- SI764A~1.PNG
- SI741C~1.MOV
- SI8EF6~1.PNG
- SI8D0A~1.MOV
- SI7C77~1.MOV
- SI6B5D~1.MOV
- SI2E60~1.MOV
- SI2C7A~1.MOV

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

- SI2B62~1.PNG
- SI2A1D~1.MOV

Non-Videos incidents materials

- (Other Incidents Addl).pdf
- (Other Incidents).pdf

TEXT-TEXT001 materials

- SIG-GLASSCOCK00001132_R.txt- SIG-GLASSCOCK00008156_R.txt

NATIVES-NATIVE001 materials

- SIG-GLASSCOCK00002468_R.xlsx- SIG-GLASSCOCK00008147_R.xlsx
- Video SIG-GLASSCOCK00008128_R.avi
- Video SIG-GLASSCOCK00008129_R.mov
- Video SIG-GLASSCOCK00008130_R.MOV

DATA received

- SIG-GLASSCOCK Prod_003_Modified.dat
- SIG-GLASSCOCK Prod_003_Modified.opt

Additional IMAGES-IMG001 received

- IMG 00001132- 00008161 (JPG and TIF)

Additional TEXT-TEXT001 received

- TXT 00008162-00008621
- TXT 00008625-00008914

Additional NATIVES-NATIVES001 received

- SIG-GLASSCOCK00008539
- SIG-GLASSCOCK00008443
- SIG-GLASSCOCK00008802
- SIG-GLASSCOCK00008914

Additional IMAGES-IMG001 received

- IMG 00008162- 00008914(JPG and TIF)

Additional data received

- Production_009_Glasscock.opt
- Production_009_Glasscock_NEW.dat
- Production_009_Glasscock.dat
- Production_009_Glasscock.opt

Misc docs-received

- Stipulated Protective Order
- James Faulkner Firearms Transaction Record and Verizon phone records (04/28/2024) (Plaintiff's friend who sold him his P320)
- Initial email that Plaintiff received from class counsel
- Clearer copy of requested email; photo of Glasscock's holster; and additional responsive text messages
- Text messages and emails based on search results for "P320" and "Sig Sauer"
- Production_001.dat
- Production_001.opt
- IMG 00000001 – 00001131(JPG & TIF)

Additional Case documents-received

- GoldsteinPooleSafko_ Classical Mechanics.pdf
- MIL-STD-882E_Department of Defense Document-DLAREL0000000309.PDF
- Safety of Machinery Article-DLAREL0000002404.PDF
- taylor-2005-classical-mechanics.pdf

Glasscock v. Sig Sauer - Expert Robert Rauschenberger Docs (1)

- 320 PostUp – Copy
- 320 PreUp – Copy
- [Pre-upgrade Component Drawings].pdf
- [Post-upgrade Component Drawings].pdf
- [Pre-upgrade supplemental drawings].pdf
- [Post-upgrade supplemental drawings].pdf

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER