# EXHIBIT 26
# Filed Under Seal

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

SOUTHERN DIVISION

JOSHUA GLASSCOCK, individually and on behalf of all others similarly situated,

        Plaintiff,

v.

SIG SAUER, INC.,

        Defendant

Case No: 22-CV-03095-MDH

## REBUTTAL EXPERT REPORT OF JONATHAN T. TOMLIN

### March 30, 2025

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

# Table of Contents

I. INTRODUCTION .................................................................................................. 1

   A. Assignment ................................................................................................. 1

   B. Qualifications ............................................................................................. 1

   C. Summary of Opinions ................................................................................ 3

II. BACKGROUND ................................................................................................... 4

   A. Parties and Products at Issue ...................................................................... 4

   B. Allegations ................................................................................................. 5

   C. Expert Report of Edward M. Stockton ...................................................... 7

III. ECONOMIC FRAMEWORK FOR EVALUATING DAMAGES ....................... 9

   A. General Framework .................................................................................... 9

   B. Application to this Case ............................................................................. 9

IV. MR. STOCKTON IS UNABLE TO IDENTIFY DATA NEEDED TO DETERMINE ECONOMIC INJURY AND DAMAGES ................................................................. 10

V. ECONOMIC EVALUATION OF MR. STOCKTON'S "REPAIR COST MODEL" ...... 12

   A. The "RCM" Proposed by Mr. Stockton Does Not Have Economic Support ................ 12

   B. The "RCM" Proposed by Mr. Stockton Does Not Align With Plaintiff's Allegations . 13

   C. Individualized Factors Would Determine the Impact on Prices and Damages .............. 15

      1. Demand ............................................................................................... 16

      2. Supply ................................................................................................. 19

      3. Prices .................................................................................................. 19

VI. ECONOMIC EVALUATION OF DAMAGES BASED ON AN INCLUSION OF A MANUAL SAFETY ................................................................................................ 23

VII. MR. STOCKTON'S PROPOSED ALLOCATION METHOD LACKS ECONOMIC SUPPORT ............................................................................................................... 27

VIII. SUMMARY OF CONCLUSIONS ..................................................................... 32

# I.   INTRODUCTION

## A.  Assignment

1) The Plaintiff in this case, Joshua Glasscock, purchased a used Sig Sauer P320 firearm from his friend.  In his Complaint, he alleges, *inter alia*, that he "would not have purchased the P320, or would have paid substantially less for it, had the defective nature of the P320 … been disclosed to him and/or publicly confirmed by Sig Sauer prior to the time of purchase."[1]  I have been asked to assume that the putative class period at issue in this case stops at the end of the filing of the Complaint and is between September 1, 2017 and April 18, 2022 (the "Putative Class Period").

2) Edward M. Stockton, a Vice President at a company called the Fontana Group, Inc., was retained on behalf of the Plaintiff in this case and submitted a report in which he states he proposes a method for measuring "overpayment harm."[2]  I have been retained by Sig Sauer, Inc. ("Sig Sauer") and asked to perform an economic assessment of Mr. Stockton's report.

3) In conducting my analysis, I and members of my staff, working under my supervision and at my direction, reviewed documents and data produced in this case (including Mr. Stockton's report and supporting files), reports submitted by Plaintiff's and Defendant's technical experts, deposition transcripts, and publicly available information and economic literature that we have gathered.  I also interviewed Jon Hemming, Operations Manager at Sig Sauer.[3]  A list of materials I considered to date is attached as Exhibit 1.

## B.  Qualifications

4) I am an economist and Senior Managing Director in the Los Angeles office of Ankura Consulting.  Ankura Consulting is an international consulting services firm with over

---

[1] Complaint filed April 18, 2022 ("Complaint") at paragraph 8.  In his deposition, the Plaintiff testified that he would not have paid substantially less for his P320 and instead would not have purchased it.  Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 at page 129.
[2] Expert Report of Edward M. Stockton dated November 5, 2024 at paragraph 9.
[3] Interview with Jon Hemming dated January 22, 2025.

1

twenty-five offices across the United States, Canada, Australia, Hong Kong, Singapore, the United Kingdom, Germany, and Dubai.

5) I hold a B.A. in economics from the University of Pennsylvania, an M.A. in economics from the University of California, Los Angeles, and a Ph.D. in economics from UCLA. My specialization for over thirty years as an economist has been in the application of economics to legal issues. I have assessed economic damages in numerous cases involving the appropriateness of class certification.

6) I have published over twenty articles on law and economics. My research has been published in books, peer-reviewed economic journals, and law reviews. Many of my publications focus on the appropriate calculation of economic damages. Several of my publications focus on the topic of damages involving class actions. My research has been accepted in such peer-reviewed journals as the *Review of Law and Economics*, the *Journal of Forensic Economics*, the *B.E. Journal of Economic Analysis and Policy*, and in the *George Mason Law Review*. I have served as an economic commentator for the online edition of *Forbes* and for *theStreet.com*.

7) My past and present professional affiliations include the American Economic Association, the American Finance Association, the American Law and Economics Association, and the National Association of Business Economists. I have served as an Economics Instructor for the National Association of Certified Valuation Analysts, where I taught principles of economic damages analysis. In addition, I have testified as an economic expert witness on behalf of both plaintiffs and defendants for cases in state and federal courts.

8) My curriculum vitae is attached as Exhibit 2. Ankura Consulting is being compensated for my work on this matter at my standard hourly rate of $790.

2

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

### C. Summary of Opinions

9) Based on my review of Mr. Stockton's report and work files, the documents and data that I and members of my staff have gathered and reviewed, and the economic analysis I performed, I have the following opinions regarding Mr. Stockton's report:

a) Mr. Stockton does not identify any data in this case for determining the actual prices paid by putative class members, the identity of the original owners of P320s (particularly, when there has been more than one owner), or the number of P320s sold in Missouri during the Putative Class Period. This information is necessary to appropriately determine economic injury and damages in this case.

b) The "repair cost model" or "RCM" proposed by Mr. Stockton does not have economic support:

   i) Mr. Stockton's proposed repair cost model amounts to simply asserting that damages should be measured according to a calculation performed by Plaintiff's expert, Mr. Gatrost. But Mr. Stockton's assertion does not provide any substantive economic information that supplements Mr. Gatrost's opinion.

c) Whether a particular putative class member sustained economic injury in this case (and, if so, the amount of damages) depends on the channel in which they purchased their handgun (including whether new or used), the price of their handgun, and the information available to them at their time of purchase. The "RCM" does not measure damages with "reasonable certainty" as it fails to incorporate *any* of these factors. Mr. Stockton asserts that each putative class member should receive the exact same damages (and presumption of economic injury) regardless of any of these factors.

d) In his proposed calculation of damages based on the difference in average manufacturer suggested retail prices ("MSRPs") of P320 handguns with and without a manual safety, Mr. Stockton incorrectly averages MSRPs across models with different features and, perhaps unknowingly, inappropriately includes MSRPs for refurbished guns in his calculations. Correcting for the mistaken inclusion of refurbished guns reverses Mr. Stockton's results.

3

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

e) Many P320 handguns currently possessed in Missouri were almost certainly owned by more than one owner (this includes the Plaintiff in this case). If there was any "overpayment" for P320s as alleged by the Plaintiff in his Complaint, basic economics indicates that these "overpayment" damages can, and likely would, be distributed between the original owner and any subsequent owners. Mr. Stockton instead advocates allocating all damages to current owners and none to original owners who sold their firearm. This cannot be correct.

## II.  BACKGROUND

### A.  Parties and Products at Issue

10) The Plaintiff in this case, Joshua Glasscock, purchased a used Sig Sauer P320 firearm from his friend.[4] The Defendant, Sig Sauer, Inc. "is a leading provider and manufacturer of firearms, electro-optics, ammunition, airguns, suppressors, remote controlled weapons stations, and training."[5] Sig Sauer is headquartered in Newington, New Hampshire and has over 3,200 employees across twelve locations in three states.[6]

11) The P320 is one of many firearms (specifically, a handgun) sold under the Sig Sauer brand.[7] During the Putative Class Period, numerous different versions of the P320 were available with different options (such as different sizes and barrels) including, towards the end of the Putative Class Period, the ability for a customer to build a custom version.[8] Sig Sauer sells primarily to distributors and retailers who, in turn, sell new Sig Sauer firearms to consumers, although Sig Sauer made a small number of sales of customized versions and through customer service interactions directly to consumers beginning in late 2021.[9]

---

[4] Plaintiff's Objections and Answers to Defendant's Interrogatories dated January 23, 2023, Interrogatory number 5 (page 3).
[5] Sig Sauer, "About us," at https://www.linkedin.com/company/sigsauer.
[6] Sig Sauer, "About us," at https://www.linkedin.com/company/sigsauer.
[7] Sig Sauer, "Firearms," at https://www.sigsauer.com/firearms.html.
[8] SIG-GLASSCOCK00008914; Deposition of Thomas Taylor dated September 12, 2024 at page 26; Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at pages 2-3.
[9] Deposition of Thomas Taylor dated September 12, 2024 at page 26; Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at pages 2-3.

4

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

12) Consumers can purchase new P320 firearms through multiple channels including big box retailers, firearms dealers, online retailers, gun shows, and industry events.[10] Consumers can also purchase used Sig Sauer firearms (including the P320) through retailers, used gun websites, or through private transactions.[11] The Plaintiff in this case, Mr. Glasscock, purchased a used P320 in a private transaction, from James Faulkner, a friend and coworker, on March 30, 2020 at a price of approximately $400.[12] Mr. Faulkner testified that he was unable to obtain a record of his original purchase but believed it was likely made in cash at a price of approximately $700.[13]

## B. Allegations

13) In his Complaint, the Plaintiff alleges that the "civilian version of the P320 lacks any external safety features: no trigger toggle and no manual safety."[14] The Plaintiff defines a trigger toggle as "a small tab in the face of the trigger that has to be fully depressed for the trigger to move rearward and fire the pistol."[15] The Plaintiff alleges that the "absence of these external safety features causes and/or contributes to the P320 being more susceptible than its counterparts to inadvertent discharges, i.e., discharges where the there [sic] is no trigger pull."[16]

14) The Plaintiff further alleges the following in his Complaint: "Sig Sauer omits, conceals, and/or fails to disclose several material facts about the P320 firearm: a. It has a heightened risk of inadvertent discharges due to the absence of external safety features …, b. It requires a heightened degree of care than comparable firearms due to its lack of external safety features; and c. It lacks safety features available on other comparable firearms in the marketplace."[17] The Plaintiff also alleges that Sig Sauer "omits that the

---

[10] Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at pages 2-3, 15.
[11] Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at pages 2-3, 15.
[12] Mr. Faulkner testified that "I believe he paid in cash." Deposition of James Thomas Faulkner dated March 15, 2024 at pages 49-50; Glasscock Exhibit 2 to the Deposition of Joshua Glasscock dated May 16, 2023; Plaintiff's Objections and Answers to Defendant's Interrogatories dated January 23, 2023, Interrogatory number 5 (page 3).
[13] Deposition of James Thomas Faulkner, Volume II, dated May 28, 2024 at pages 118-119.
[14] Complaint at paragraph 25.
[15] Complaint at paragraph 17.
[16] Complaint at paragraph 26.
[17] Complaint at paragraph 61.

Case 6:22-cv-00095-MFU Document 138-12 Filed 08/06/25 Page 8 of 46
CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

military version of the firearm (the M17 and M18) contains a manual safety that is not on the consumer version of the pistol."[18]  He states that "[h]ad Sig Sauer disclosed the true quality and defective nature of the P320 firearm, Plaintiff and Class members would not have purchased them or would have paid substantially less for them."[19]

15) In his Motion for Class Certification, the Plaintiff states that "The Sig Sauer P320 is defective."[20]  He states that the "defect has three components …": 1) "the P320 is effectively fully energized and ready to fire the instant that a round is chambered," 2) "the P320 has a minimal trigger pull because it is short and lightweight,"  and 3) "the P320 lacks any external safety features."[21]  The Plaintiff seeks to certify a class defined as "All persons who purchased a Sig Sauer model P320 pistol without an external thumb safety primarily for personal, family or household purposes in the state of Missouri from September 1, 2017 through the present."[22]

16) Sig Sauer states that the Plaintiff's Motion for Class Certification relies on "new factual allegations and theories not pled in his Complaint."[23]  Sig Sauer states that the Plaintiff's Motion for Class Certification "for the first time" asserts that there are "three components" to an "inadvertent discharge defect" and that the Motion for Class Certification "alters the information Sig Sauer purportedly failed to disclose to consumers."[24]

17) It is my understanding that in the Plaintiff's Motion for Class Certification, the Plaintiff modified the allegations as to what Sig Sauer is alleged to have failed to disclose to

---

[18] Complaint at paragraph 62.
[19] Complaint at paragraph 89.
[20] Plaintiff's Motion for Class Certification and Suggestions in Support dated November 5, 2024 ("Motion for Class Certification") at paragraph 24.
[21] Motion for Class Certification at paragraph 24.  In his most recent deposition, the Plaintiff also referred to these three "components."  Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 at page 37.
[22] He states that "[e]xcluded from the class are (1) individuals who have filed an individual action against Sig Sauer related to the P320, or (2) individuals who no longer own a P320 pistol without an external thumb safety."  Motion for Class Certification at page 31 and footnote 8.  While Plaintiff seeks a class period that extends through the present, I am informed that the Putative Class Period must be limited to the date of the filing of the Complaint.  I offer no legal opinion on this issue or any other issues in this case.
[23] Defendant Sig Sauer, Inc's Suggestions in Support of its Motion to Amend the Case Schedule and Stay or Extend Further Class Certification briefing dated November 18, 2024 at page 13.
[24] Defendant Sig Sauer, Inc's Suggestions in Support of its Motion to Amend the Case Schedule and Stay or Extend Further Class Certification briefing dated November 18, 2024 at page 13.

Case 6:22-cv-03095-MDH   Document 188-12   Filed 08/08/25   Page 9 of 46
CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

consumers. In the Plaintiff's Motion for Class Certification, his allegations regarding omissions by Sig Sauer include:

a) "omitting information concerning the design of the P320"[25] including that Sig Sauer "does not inform customers that the P320 has sufficient energy to discharge a bullet any time a round is chambered"[26] and that "the P320 has a minimal trigger pull because it is short and lightweight."[27]

b) "Sig Sauer does not tell consumers about the P320's defect. Nor does Sig Sauer warn consumers that the P320 is extraordinarily dangerous compared to similar pistols."[28]

c) "just by looking at the P320, holding the P320, racking the P320's slide, or even firing the P320, a reasonable consumer could not determine what the action type of the P320 is."[29]

## C. Expert Report of Edward M. Stockton

18) Mr. Stockton states that he assumed the following: "Defendant knowingly sold Sig Sauer produced P320 model handguns that are sufficiently energized to discharge ammunition with a short, light trigger-pull and without any external safety measures."[30] He states that he was retained by counsel for the Plaintiff "to assess, under the assumption that Plaintiff is substantially correct in their factual and legal allegations, whether Class Members have suffered economic damages and, if so, to determine whether a feasible method exists, or feasible methods exist, to quantify any damages suffered on a Class-wide basis and to describe the applicable methods."[31]

19) Mr. Stockton states that he proposes to "estimate the amount by which Class Members overpaid for their Class Firearms by way of a benefit of the bargain-based overpayment model.[32] He opines that "the overpayment amount at the time of acquisition is estimable

---

[25] Motion for Class Certification at paragraph 66.
[26] Motion for Class Certification at paragraph 26.
[27] Motion for Class Certification at paragraph 24.
[28] Motion for Class Certification at page 8.
[29] Motion for Class Certification at paragraph 32.
[30] Stockton Report at paragraph 7.
[31] Stockton Report at paragraph 2.
[32] Stockton Report at paragraph 11.

7

CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

by determining the additional cost that would have been necessary to remedy the Defect fully at the time of original sale."[33] He refers to this as the "RCM."[34]

20) Mr. Stockton states that he plans to rely on the expert report of Benjamin Gatrost "to establish the components of the competent repair."[35] Mr. Gatrost opines that "to repair the Defect, the P320 can be retrofitted with a manual thumb safety."[36] Mr. Gatrost further opines that "it will cost consumers between $209.98 and $229.98, plus any applicable sales taxes and/or shipping, to retrofit their P320s to have a manual safety."[37] Mr. Stockton apparently intends to endorse these amounts as the appropriate measure of damages for each putative class member. Mr. Stockton proposes using Defendant records on "all P320 handguns shipped into the state of Missouri for retail sale to consumers" to calculate total classwide damages.[38]

21) Mr. Stockton opines that it is "also possible to measure damages as the price differential between P320 handguns with and without an external safety option."[39] He purports to calculate these amounts by year from 2016 through 2020 (despite the Putative Class Period instead spanning the years 2017 to 2022) based on MSRP data for several different P320 models.[40]

22) With regard to the issue of multiple owners of a single P320 firearm over time, Mr. Stockton opines that "economic harm in this matter is most suitably evaluated as a single cost of repair measured for the current owners."[41] He proposes that when there are multiple owners of the same firearm over time, all damages should be allocated to the current owner and no damages to the original owner.

---

[33] Stockton Report paragraph 11.
[34] Stockton Report at paragraph 30.
[35] Stockton Report at paragraph 42.
[36] Rule 26(a)(2)(B) Declaration of Benjamin D. Gatrost in Support of Plaintiff's Motion for Class Certification, dated November 5, 2024 ("Gatrost Declaration") at paragraph 90.
[37] Gatrost Declaration at paragraph 96.
[38] Stockton Report at paragraph 36.
[39] Stockton Report at paragraph 10.
[40] Stockton Report at Tab 3.
[41] Stockton Report at paragraph 40.

8

CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

## III.  ECONOMIC FRAMEWORK FOR EVALUATING DAMAGES

### A.  General Framework

23) A proper calculation of economic damages requires a description of what economists call a "but-for" scenario.[42]  The but-for scenario describes the economic environment that would have prevailed for the plaintiff "but-for" the alleged wrongful conduct at issue.[43]  The economic outcome obtained by the plaintiff in this "but-for" environment is compared with the actual economic outcome obtained by the plaintiff in order to determine whether or not the plaintiff sustained economic injury.[44]

24) In the context of a class action lawsuit, economic experts often assess whether putative class members who may have sustained economic injury can be identified (sometimes amongst a very large population of potential candidates).  They also commonly assess whether economic injury and economic damages can be assessed on a classwide basis or, instead, if the determination of economic injury, economic damages, or both, if any, requires an individual inquiry and analysis based on class member specific facts.[45]

25) Below, I evaluate Mr. Stockton's report and proposed damages analyses using the standard economic "but-for" framework.  And, I perform this in the context of evaluating both alleged economic injury and damages for individual plaintiffs and for a putative class.

### B.  Application to this Case

26) In order to perform a proper analysis of economic injury and damages it is necessary to start with the allegations and form a "but-for" scenario based on those allegations.  Economic injury and damages should also be assessed with regard to the applicable law(s) governing damages calculations.

---

[42] Economists typically evaluate the financial position of a plaintiff "but-for" the allegedly wrongful act or acts of a defendant in order to calculate damages.  See, e.g., Mark Allen, Robert Hall, and Victoria Lazear, "Reference Guide on Estimation of Economic Damages," Reference Manual on Scientific Evidence, Federal Judicial Center, Third Edition, 2011 (hereafter "Reference Manual on Scientific Evidence") at page 432.
[43] Reference Manual on Scientific Evidence at page 432.
[44] Reference Manual on Scientific Evidence at page 432.
[45] See, Roman Weil, Daniel G. Lentz, and Elizabeth A. Evans, Litigation Services Handbook, Sixth Edition, 2017 (hereafter "Litigation Services Handbook"); Chapter 14, "Expert Analysis of Class Certification Issues, at 14.4.

9

27) In this case, the Plaintiff uses different language to describe his allegations in his Complaint than he does in his Motion for Class Certification. I offer no legal opinion as to which Plaintiff claims are applicable or what legal standard should be applied. In my assessment of Mr. Stockton's report, I consider these alternative claims involving an alleged three-part defect including: i) a short and lightweight trigger pull; ii) being "fully energized" when a round is chambered; and iii) a lack of external safety features.[46]

28) With regard to the appropriate legal standard for assessing damages, I am informed that under the Missouri Merchandising Practices Act ("MMPA"), economic injury and damages are to be calculated as "the difference between the value of the product as represented and the actual value of the product as received."[47] I am also informed by Counsel that damages must be calculated with "reasonable certainty."[48]

## IV. MR. STOCKTON IS UNABLE TO IDENTIFY DATA NEEDED TO DETERMINE ECONOMIC INJURY AND DAMAGES

29) Mr. Stockton proposes using Defendant's records on "all P320 handguns shipped into the state of Missouri for retail sale to consumers" to calculate total classwide damages.[49] There are two critical deficiencies in this proposal.

30) First, this data primarily represent shipments to wholesalers and retailers (and not consumers).[50] It does not identify purchases by consumers in Missouri (i.e., it doesn't

---

[46] Motion for Class Certification at paragraph 24.

[47] *See George v. Omega Flex, Inc.*, U.S. Dist. LEXIS 123354, at *7 (W.D. Mo. July 24, 2018) (Harpool, J.) ("Missouri courts apply the 'benefit of the bargain' rule when determining if a plaintiff has suffered an ascertainable loss under the MMPA … The 'benefit of the bargain' rule awards a defrauded party the difference between the value of the product as represented and the actual value of the product as received.") (citation omitted).

[48] *See Abbott v. Golden Grain Co.*, 677 F. Supp. 3d 940, 945 (E.D. Mo. 2023) ("A person seeking to recover damages shall establish … [i]ndividual damages with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty."); *Diesel v. Mariani Packing Co., Inc.*, 2024 WL 4263944, at *9 (E.D. Mo. Sept. 23, 2024) ("Plaintiff fails to demonstrate '[i]ndividual damages with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty.' Mo. Rev. Stat. § 407.025.1(2). Plaintiff simply alleges that she believed that the Product would contain more yogurt covered raisins based on appearance alone. But this fails to provide objective evidence to permit the loss to be calculated with a reasonable degree of certainty. Moreover, Plaintiff got exactly what she bargained for, seven ounces of yogurt covered raisins as she readily admits.").

[49] Stockton Report at paragraph 36.

[50] Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at page 3. Mr. Taylor refers to data on sales to distributors and retailers in Missouri reflected in GLASSCOCK00008914. Mr. Stockton cites to SIG-GLASSCOCK 00001772 as the source of his shipment data.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

identify purchases by putative class members).  With the exception of a small number of customized guns, Sig Sauer generally does not sell directly to consumers and primarily sells P320s through distributors and dealers.[51]  I understand that distributors and retailers receiving shipments from Sig Sauer are not required to sell in Missouri.[52]  Moreover, this data does not reflect sales in the secondhand market.[53]  This data, therefore, does not confirm that these shipments ultimately resulted in a sale to a consumer in the state of Missouri during the Putative Class Period.[54]

31) For example, the seller to the Plaintiff, Mr. Faulkner, testified that he purchased the P320 at a store called Academy in Springfield, Missouri on August 7, 2018.[55]  I searched the serial number of the gun Mr. Faulkner sold to the Plaintiff in the shipment data Mr. Stockton proposes using and it does not appear (and, therefore, would not be included in Mr. Stockton's proposed calculation of damages).[56]  Because the shipment data represents sales primarily to retailers and distributors, it cannot identify consumer purchases in Missouri, including any purchases made in the secondhand market.  In short, the data proposed by Mr. Stockton would likely inaccurately identify purchases as occurring in Missouri (when they did not) and inaccurately omit purchases that did occur in Missouri.

---

Stockton Report at footnote 20.  I understand this file was re-stamped with Bates number SIG-GLASSCOCK00008802.  I understand that GLASSCOCK00008914 is an updated file reflecting shipments of P320 handguns to the state of Missouri compared to GLASSCOCK00008802.  Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at page 3 and footnote 2.

[51] Deposition of Thomas Taylor dated September 12, 2024 at pages 25-26; Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at pages 2-3.

[52] Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at page 3.

[53] Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at pages 2-4.

[54] Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at page 3.

[55] Deposition of James Thomas Faulkner, Volume II, dated May 28, 2024 at pages 111-114 and Exhibit 9 to Deposition of James Thomas Faulkner, Volume II, dated May 28, 2024.

[56] Complaint at paragraph 6 (identifying that the serial number for Mr. Glasscock's P320 is "58A146892"); SIG-GLASSCOCK00008802.  Mr. Stockton cites to SIG-GLASSCOCK 00001772 as the source of his shipment data.  Stockton Report at footnote 20.  I understand this file was re-stamped with Bates number SIG-GLASSCOCK00008802.  I additionally searched for the serial number to Mr. Glasscock's P320 in SIG-GLASSCOCK00008914, which I understand is an updated file reflecting shipments of P320 handguns to the state of Missouri.  Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at page 3 and footnote 2.  See also Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at pages 3-4.

11

32) Second, the shipment data Mr. Stockton relies upon does not show prices paid by consumers.[57]  MSRP data also does not reflect actual prices paid by any putative class members.[58]  Mr. Stockton does not identify any data capable of identifying prices paid by consumers for purchases in Missouri and I am not aware of any such data.  Even with regard to only the named Plaintiff's gun, the original buyer of that gun, Mr. Faulkner, was unable to obtain a receipt showing his purchase price.[59]

## V.  ECONOMIC EVALUATION OF MR. STOCKTON'S "REPAIR COST MODEL"

### A.  The "RCM" Proposed by Mr. Stockton Does Not Have Economic Support

33) Mr. Stockton proposes what he calls a "repair cost model" or "RCM."[60]  He states that this is "based on determining the amount of money necessary to realign the transactions for Class Firearms to the typical conditions for the new handgun market."[61]  He opines that the "cost of repair provides a method to quantify economic harm under this model" and that he will rely on the report of Mr. Gatrost "to establish the components of the competent repair."[62]  Mr. Gatrost opines on a repair in which putative class members "retrofit their P320s to have a manual safety."[63]  Thus, presumably, Mr. Stockon proposes calculating damages based on "retrofitting" P320s that do not have a manual safety to have a manual safety.

34) As a threshold matter, the "RCM" described by Mr. Stockton does not have an economic foundation.  It amounts to simply asserting, without economic basis, that damages should be equated to the costs of "retrofitting" P320s with a manual safety as calculated by Mr. Gatrost.  But, this assertion does not add anything of economic substance to the calculation proposed by Mr. Gatrost.  There is no economic underpinning for this

---

[57] SIG-GLASSCOCK00008802.  See also GLASSCOCK00008914.
[58] Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at page 15.
[59] Deposition of James Thomas Faulkner, Volume II, dated May 28, 2024 at 113-114.
[60] Stockton report at paragraph 30.
[61] Stockton report at paragraph 30.
[62] Stockton report at paragraphs 30 and 42.
[63] Rule 26(a)(2)(B) Declaration of Benjamin D. Gatrost in Support of Plaintiff's Motion for Class Certification, dated November 5, 2024 at paragraph 96.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

assertion or connection with an economic measure of damages that calculates those damages with reasonable certainty based on the allegations in this case.

35) Mr. Stockton provides economic literature citations which he claims support an "RCM" method, but they provide no such support. The citations fall into the following categories: i) entire textbooks (with no specific page numbers or even chapter numbers referenced);[64] ii) one article on durable goods, which does not relate to a "repair cost model,"[65] and iii) one article on the use of a binomial distribution (which is a statistical concept).[66] Although this information occupies many pages of Mr. Stockton's expert report, none of it provides an economic foundation for a conclusion that a "repair cost model" can accurately quantify damages in this case.

**B. The "RCM" Proposed by Mr. Stockton Does Not Align With Plaintiff's Allegations**

36) The "RCM" Mr. Stockton proposes based on the cost of retrofitting a P320 with a manual safety appears to be inconsistent with the testimony of the Plaintiff in this case. Mr. Stockton opines that "For a repair to align with the parameters of the RCM, that repair should have the following qualities. First, it should remedy the Defect such that, if applied, it restores the Class Firearms to the firearms bargained for."[67] However, the Plaintiff in this case testified that adding a manual safety to his firearm would *not* remedy the alleged defect.[68]

37) The cost of repair advocated by Mr. Stockton also does not align with what I am informed is Missouri law on damages based on "the difference between the value of the product as represented and the actual value of the product as received." Economists treat "value" as synonymous with the price. Thus, for each putative class member, the value "as represented" is equal to the price that putative class member paid (as a matter of economics). The value "as received" is equal to the price that would have prevailed had some disclosure of additional information regarding an alleged "defect" been made

---

[64] Stockton Report at footnotes 7, 9-11, 14.
[65] Stockton Report at footnotes 8, 13.
[66] Stockton Report at footnote 15.
[67] Stockton report at paragraph 38.
[68] Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 at pages 109-111.

13

CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

available to buyers and sellers.  There is no economic reason to presume that the price a putative class member paid for their firearm minus the price they would have paid given such a disclosure (which I understand is the appropriate measure under the law) should be equal to the cost of retrofitting a P320 with a manual safety.  In short:

### *Value of Product as Represented – Value as Received $\neq$ Cost of Retrofitting with a Manual Safety*

38) The "value of the product as represented" depends on the price paid by the consumer.  Yet, Mr. Stockton's proposed damages measure (presumably between $209.98 and $229.98 for every P320) is completely invariant to the price paid by a putative class member.  He seems to propose that each putative class member should receive this identical amount regardless of whether they paid $200 for their firearm (i.e., less than the cost of retrofitting), $1,400, or anywhere in between.

39) With regard to the second term in the appropriate measure of damages, the "value as received," several factors must be incorporated: i) the information that should have been disclosed to consumers in the but-for scenario (based on the allegations), ii) the impact of this information on consumer demand, if any, iii) the impact of this information on the supply response of sellers, if any, and iv) the impact of any change in demand or supply on market prices, if any, paid by the consumer.  Moreover, in this class action context, these factors must be evaluated for potential differences across putative class members.  Mr. Stockton's proposed damages measure does not consider *any* of these factors.  I evaluate each of these factors below.

40) With regard to the information that should have been disclosed (based on the allegations), as noted above in his Complaint, the Plaintiff alleges that "Sig Sauer omits, conceals, and/or fails to disclose" that the P320 "lacks safety features available on other comparable firearms."[69]  He defines external safety features as a "trigger toggle" and a

---

[69] Complaint at paragraph 61.

Case CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER of 46

"manual safety."[70]  In his Motion for Class Certification, the Plaintiff alleges that in addition to a lack of external safety features, the P320 is defective because it "is effectively fully energized and ready to fire the instant that a round is chambered" and "has a minimal trigger pull because it is short and lightweight."[71]  In his deposition, the Plaintiff testified that he "would have liked to have been told" three things: "that the gun was fully energized, that it had a light trigger pull, and it did not have an external safety."[72]  He also testified: "I was deceived whenever I purchased the gun, that I thought that the P320 that I had was the same one that the military had."[73]

41) It is unclear what specific disclosures the Plaintiff alleges Sig Sauer should have made to consumers – e.g., the "action type," the existence of a manual safety and/or a trigger toggle, the "trigger pull," that it is "effectively fully energized and ready to fire," or some combination of these disclosures (and/or other disclosures).  Thus, I consider alternative possible disclosures below.  Regarding the allegation that Sig Sauer "omits that the military version of the firearm (the M17 and M18) contains a manual safety that is not on the consumer version of the pistol," Mr. Stockton does not propose any damages analysis that directly relates to this claim.[74]

### C. Individualized Factors Would Determine the Impact on Prices and Damages

42) Basic economics dictates that whether or not the price of a P320 would have been less if additional and/or different information had been disclosed to consumers depends on the impact of the disclosure on consumer demand, if any.  In this case, the Plaintiff testified that he was aware that the P320 did not have a trigger toggle or a manual safety (and the

---

[70] Complaint at paragraph 21.  Sig Sauer's expert Mr. Derek Watkins opines that "Pistols employing pull-based trigger bar fire controls, such as the SIG Sauer P320 pistol platform, can pass industry standard drop and impact abuse testing by inertially balancing their trigger and trigger bar system and therefore, do not require a tabbed trigger to prevent drop fires."  Expert Report of Derek Watkins dated March 31, 2025 at page 6.
[71] Motion for Class Certification at paragraph 24.
[72] Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 at page 52.
[73] Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 at pages 113-114.
[74] Complaint at paragraph 62.

15

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

seller to the Plaintiff was also aware that the firearm did not have a manual safety; and had fired his P320 and therefore would have experienced the trigger pull on the P320).[75]

43) Thus, a disclosure in the "but-for" scenario that the P320 did not have an external safety or trigger toggle presumably would not have changed the information already available to the Plaintiff and the seller to the Plaintiff; would not have been expected to impact their demand or supply in negotiating the price; and would not have been expected to impact the price. And, therefore, there would be no damages to the named Plaintiff based on an allegation of wrongful conduct limited to an alleged failure to disclose the lack of a manual safety and a trigger toggle.

44) Alternatively, I assume a counterfactual "but-for" scenario in which Sig Sauer had disclosed information not only that the P320 lacked external safety features but also the information from the Motion for Class Certification that the P320 is "effectively fully energized" and "has a minimal trigger pull."[76] Mr. Stockton describes his assumption regarding these allegations, stating: "Sig Sauer produced P320 model handguns that are sufficiently energized to discharge ammunition with a short, light trigger-pull."[77]

### 1. Demand

45) Whether or not additional information that the P320 is "effectively fully energized" and "has a minimal trigger pull" (or any other disclosure) would have impacted the demand of a consumer would depend on the information already available to that consumer. Multiple sources of information are available to potential buyers of handguns and whether, and to what extent, any buyer consulted these resources would likely differ across putative class members.

46) The National Rifle Association ("NRA"), for example, recommends that consumers choosing a model of handgun to purchase should "take advantage of all the information

---

[75] Deposition of Joshua Glasscock dated May 16, 2023 at pages 42-43. Plaintiff's Objections and Answers to Defendant's Interrogatories dated January 23, 2023, Interrogatory number 5 (page 3). Deposition of James Thomas Faulkner dated March 15, 2024 at pages 31, 35.

[76] The economic framework below also extends to other possible disclosures that could have been made such as the "action type."

[77] Stockton Report at paragraph 7.

Case 2:23-cv-01108-MJP Document 158-1 Filed 03/08/25 Page 19 of 46
CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

resources at [their] disposal, including gun store employees, NRA Certified Instructors, manufacturers' catalogs and websites, videos, books and periodicals."[78]

47) With regard to the Sig Sauer website and advertising at certain points during the Putative Class Period, it disclosed, for example, the trigger pull weight of P320 models (including the Plaintiff's model);[79] that the P320 had a "smooth, crisp trigger pull"[80] (the Plaintiff testified that he interpreted that a "crisp" trigger meant a "quick" trigger[81]); and that the military version of the P320 available for commercial customers (M17 and M18) came standard with the external manual thumb safety feature.[82]

48) The NRA recommends that a consumer test-fire a model they are considering and explains that gun stores "frequently" allow for such tests.[83] The NRA states that a test-fire of a gun will allow the consumer to evaluate "how they operate, feel, handle and shoot."[84] Some (and perhaps many or most) putative class members almost certainly had an opportunity to "feel" the trigger pull of a P320 through such a test-fire before purchasing[85] and, therefore, presumably had some ability determine if it had a "short, light trigger pull" as described by Mr. Stockton before purchasing. Moreover, certain of Sig Sauer's advertising in the Putative Class Period stated that the P320 had a "Smooth,

---

[78] National Rifle Association, "First-Time Handgun Buyers Guide," NRA Family, at https://www.nrafamily.org/content/first-time-handgun-buyers-guide/.
[79] Ex. 8 to Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 (SIG-MARKETING000213 at -14).
[80] Tom Taylor Declaration at paragraph 32.
[81] Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 at page 51; Ex. 6 to Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 (SIG-MARKETING-000051 at -51). Tom Taylor Declaration at paragraph 32 ("The statement "crisp" is synonymous with the term "short" and conveys that the P320 has a short trigger pull.").
[82] Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 at pages 114-121; Exs. 14-15 to Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 (SIG-GLASSCOCK00006703 at -03; SIG-MARKETING-000107 at -09); Tom Taylor Declaration at paragraphs 50-53.
[83] National Rifle Association, "First-Time Handgun Buyers Guide," NRA Family, at https://www.nrafamily.org/content/first-time-handgun-buyers-guide/.
[84] National Rifle Association, "First-Time Handgun Buyers Guide," NRA Family, at https://www.nrafamily.org/content/first-time-handgun-buyers-guide/.
[85] As an example, The Range St. Louis West, located in Ballwin, Missouri, identifies that it provides rental firearms for use on its range including two Sig Sauer P320 models. The Range St. Louis West, "Range Fees," at https://therangestl.com/shooting-range/range-fees/. As another example, Cherokee Firearms in Springfield, Missouri identifies that it provides rental firearms, in part so that customers can "Try It Before You Buy It," and includes a Sig Sauer P320 among its available rentals. Cherokee Firearms, "Welcome to Cherokee Firearms Indoor Shooting Range," at https://cherokeefirearms.com/indoor-shooting-range.

CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

Crisp Trigger Pull" and that the P320 was "available with manual safety." [86]  However, I am not aware of any evidence submitted in this case which would allow a determination as to which members of the putative class experienced the trigger pull or saw which advertising prior to purchase.

49) Because of all of the different potential sources of information (including whether or not the purchaser of a P320 decided to do a test-fire of the gun or saw certain advertisements), the information obtained by consumers regarding the P320 prior to their purchase undoubtedly differed across consumers.  Therefore, whether additional information would have changed their demand (and, therefore, potentially the price they would have paid) differed across consumers as well.

50) In addition to differences in information consumers may have possessed regarding the P320, consumer preferences regarding a "short, light trigger pull" and "energized" nature may differ as well – and, therefore, so would the potential impact on the price they would have paid, even assuming they did receive a disclosure regarding the trigger pull that provided them with information they did not already have.  This includes the possibility that some consumers may not consider the trigger pull in their purchase decisions.[87]  This also applies to the possibility that a consumer may not have considered information related to how "energized" a gun was in their purchase decision.[88]

51) Some gun review websites tout the benefits of a lighter trigger pull for "quick shooting and accuracy."[89]  On the other hand, some gun buyers may find the trigger pull of a P320 a less desirable feature.  Whether an individual putative class member considered the

---

[86] Tom Taylor Declaration at paragraph 32; Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 at pages 120-121 and Exhibit 15 to Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 (SIG-MARKETING-000107 at -09).

[87] The Plaintiff testified that he did not research the triggers of the guns he bought.  Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 at page 39.

[88] The Plaintiff testified that he did not recall inquiring about how much energy a firearm had possessed for his purchases.  Deposition of Joshua Glasscock, Volume II, dated March 6, 2025 at page 57.

[89] Abraham, Dan, "Why Your Trigger Pull Matters," The Armory Life, April 18, 2024, at https://www.thearmorylife.com/why-your-trigger-pull-matters/; Tarr, James, "SIG Sauer P320 9mm Striker-Fired Pistol: Review," Guns & Ammo Handguns, at https://www.handgunsmag.com/editorial/sig-p320-review/137787 ("I really like the trigger pull of the SIG Sauer P320 when compared to other striker-fired guns …").  Sig Sauer's expert Mr. Derek Watkins describes that "studies exist which… [show] that the use of a standard/lighter trigger pull did not increase unintentional discharges while measurably reducing the shot placement hazard."  Expert Report of Derek Watkins dated March 31, 2025 at page 42.

18

CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

trigger pull on the P320 as a benefit or less than desirable, however, would be an individual inquiry.

### 2.    Supply

52) Whether a disclosure impacted the "supply" side of a sale for any individual P320 would also depend on the information available to the seller.  And, that can differ across sellers. Sellers in Missouri can include retailers (including big-box retailers, used sellers and online retailers), or even Sig Sauer through its limited sales via Sig Sauer's customized builds.[90]

53) The Plaintiff, for example, purchased his P320 from his friend and coworker, James Faulkner.[91]  Mr. Faulkner informed Mr. Glasscock that he was selling his P320 because his wife expressed concerns about the firearm not having an external safety, and Mr. Glasscock testified that he understood the firearm did not have any external safeties when he purchased it.[92]  Moreover, Mr. Faulkner had fired the P320 prior to selling it to Mr. Glasscock - and therefore would have experienced the trigger pull on the P320.[93]

### 3.    Prices

54) The impact on prices (and, therefore, economic injury and damages), if any, of additional information to consumers in the "but-for" scenario in which Sig Sauer had provided additional information about the P320 would not only depend on how that information impacted demand and supply factors but how this ultimately impacted price (if it did). And this would depend on the type of P320, the sales distribution channel, and what, if any, negotiations occurred over price.

55) The "P320" is a category of Sig Sauer branded handgun.  But, within the P320 category there are numerous models which differ along such dimensions as grips, slides, barrels,

---

[90] Deposition of Thomas Taylor dated September 12, 2024 at page 26; Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at pages 2-3.
[91] Plaintiff's Objections and Answers to Defendant's Interrogatories dated January 23, 2023, Interrogatory number 5 (page 3). Deposition of James Thomas Faulkner dated March 15, 2024 at pages 22-23, 36-37.
[92] Deposition of James Thomas Faulkner dated March 15, 2024 at pages 36-39; Deposition of Joshua Glasscock dated May 16, 2023 at pages 42-43.
[93] Deposition of James Thomas Faulkner dated March 15, 2024 at page 31.

19

guides and springs, color, magazines, optics, and whether they have a manual safety.[94] Differences in product characteristics can potentially lead to different demand and supply factors across models of the P320 and, accordingly, differences in prices.[95]

56) Moreover, many firearms are purchased used and such transactions occur at retail stores, online stores, and through sales by individual gun owners.[96] I performed a brief internet search of available P320s currently listed for sale in Missouri. This search showed numerous stores offering used P320s as well as classified ads listing used P320s for sale.[97] In addition, transactions for P320s may occur privately between individuals and not through a retail store or a classified ad (just as it did for the Plaintiff).

57) In order to investigate P320 prices, I obtained data on P320 prices from the Blue Book of Gun Values. The Blue Book of Gun Values is published by Blue Book Publications Inc., which describes itself as having the "biggest database of guns & gun values."[98] Data from the Blue Book of Gun Values has been used both in peer-reviewed academic research and referenced in the popular press.[99]

---

[94] Sig Sauer, "Custom Works P320 Studio," at https://www.sigsauer.com/customworks/p320. See also SIG-GLASSCOCK00008914; Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at paragraph 61; Declaration of Phil Strader in Support of Sig Sauer Inc.'s Opposition to Plaintiff's Motion for Class Certification at paragraph 4.

[95] See, e.g., Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at page 15; Declaration of Phil Strader in Support of Sig Sauer Inc.'s Opposition to Plaintiff's Motion for Class Certification at paragraph 5.

[96] Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at pages 2-3, 15.

[97] See, e.g., Bass Pro Shops, "Sig Sauer ~ P320 X5 ~ 9mm," at https://www.basspro.com/shop/en/101617042 (listing a used P320 available at Bass Pro Shops in Independence, Missouri); Armslist Firearms Marketplace at https://www.armslist.com/classifieds/missouri/guns (searching "Sig Sauer P320" and filtering to "Private Party" yields multiple P320 models available for sale in Missouri); Gun Grove, "Used Sig Sauer P320 Sub Compact 9MM," June 22, 2024, at https://gungrove.com/used-sig-sauer-p320-sub-compact-9mm/; Guns Missouri Classifieds, "Sig Sauer P320 X-Compact 9mm," at https://gunsmissouri.com/classifieds/firearms/ad/sig-sauer-p320-x-compact-9mm-4815 (listing a P320 with "about 200 rounds through it").

[98] Blue Book of Gun Values, at https://bluebookofgunvalues.com/.

[99] See, e.g., Robinson, Sonia L. et al., "Purchaser, firearm, and retailer characteristics associated with crime gun recovery: a longitudinal analysis of firearms sold in California from 1996 to 2021," Injury Epidemiology, 2024, p. 5. See also Armona, Luis and Adam M. Rosenberg, "Second-Best Amendment: Market Power and Tax Design in the Firearms Industry," December 13, 2024, p. 7; Roth, Alex and Betsy McKay, "Fear and Greed Have Sales of Guns and Ammo Shooting Up," The Wall Street Journal, April 16, 2009, at https://web.archive.org/web/20150307062539/https://www.wsj.com/articles/SB123984046627223159.

Case 0:22-cv-03095-LMP-DTS Document 180-1 Filed 03/08/25 Page 23 of 46
CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

58) Data on P320 prices shows not only a substantial difference in prices across P320 models but within a model depending upon the condition of the gun.[100]  For example a "P320 Max" is listed as having a value of $1,485 in 100% condition whereas a "P320 Nitron Compact" in 60% condition is listed as having a value of $195 (which is less than the cost to retrofit this firearm with a manual safety as calculated by Mr. Gatrost).[101]  In Figure 1 below I show the range of prices within and across models as shown in the Blue Book of Gun Values.

**Figure 1: Range of Gun Resale Values by P320 Model**
**Blue Book of Gun Values[102]**



[100] Prices provided by Blue Book of Gun Values "are based on national average retail prices paid" for firearms.  See Blue Book of Gun Values, "How to Use This Book," at https://bluebookofgunvalues.com/pdfs/gun/HowToUse.pdf. Blue Book of Gun Values reports prices based on the condition of the gun measured using the "Photo Percentage Grading System," which identifies the "percentage of original factory finish(es) remaining on the gun."  See Blue Book of Gun Values, "Grading Criteria," at https://bluebookofgunvalues.com/pdfs/gun/GradingCriteria.pdf.
[101] See Tomlin xlsx workpapers.
[102] High end listed as in 100% condition and low end listed as in 60% condition.  See Tomlin xlsx workpapers.  I include all models of the Sig Sauer P320 listed on Blue Book of Gun Values that lists an SKU that also appears in

Case 0:22-cv-03095-JMB-DTS  Document 189-1  Filed 03/08/25  Page 24 of 46
CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

59) The price for a used P320 depends on the negotiation, if any, occurring between the buyer and the seller. And the economics of bargaining indicates that the price resulting from a negotiation would depend on the preferences of the particular buyer and seller, the information they possess, and their relative bargaining strength.[103] This means that any price change in the "but-for" scenario due to additional information provided to consumers of used P320s (and, therefore, the existence and amount of any damages due to alleged wrongful conduct regarding a lack of disclosure) would differ across putative class members.[104]

60) Mr. Stockton appears to advocate a single damages figure for each P320 handgun, regardless of the presence of large price differences between different P320 handguns depending on model and condition. His use of a single proposed damages number based on the cost of retrofitting each with a manual safety not only leads to very different proposed overpayment percentages for each putative class member (depending on the price they paid) but damages that can be a very large percentage of the purchase price of the gun. His proposed damages figure can also potentially exceed the price the putative class member paid for the gun (i.e., they would receive more in damages for their purchase than they actually paid for their purchase). In Figure 2 below, I show the implied overpayment percentages using the average retrofit cost calculated by Mr. Gatrost for several selected P320 models and conditions.

---

SIG-GLASSCOCK00008914 which I understand corresponds to commercial sales of P320s from Sig Sauer to customers in Missouri during the putative class period.

[103] See, e.g., Anderson, Simon P., and Régis Renault, "Firm pricing with consumer search," In Handbook of Game Theory and Industrial Organization, Volume II, Edward Elgar Publishing, 2018, pp. 177-224.

[104] With regard to the price of the P320 purchased by the Plaintiff, Mr. Faulkner (who sold the gun to the Plaintiff), testified that "he's a friend of mine, so I wasn't going to charge him full price for it." Deposition of James Thomas Faulkner dated March 15, 2024 at page 50.

22

CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

**Figure 2: Overpayment %'s Implied by Mr. Gatrost's 'Retrofit' Costs[105]**



*Note: The alleged overpayment as a percentage of price is calculated using the midpoint of the range of alleged overpayments calculated by Mr. Gatrost ($219.98) divided by the high price (100% condition) or low price (60% condition) of a P320 model according to Blue Book of Gun Values.*

## VI. ECONOMIC EVALUATION OF DAMAGES BASED ON AN INCLUSION OF A MANUAL SAFETY

61) As explained above, Mr. Stockton proposes a "repair cost model." Based on the declaration of Mr. Gatrost (whom Mr. Stockton states he will rely upon),[106] Mr. Stockton apparently advocates the cost of adding a manual safety to existing P320 models that do not have a manual safety both (1) to establish economic injury for the entire putative class and (2) as the appropriate measure of damages. Mr. Stockton opines that it is "also possible to measure damages as the price differential between P320 handguns with and without an external safety option."[107]

---

[105] See Tomlin xlsx workpapers.
[106] Stockton Report at paragraph 42 ("I expect to rely on the report of Benjamin D. Gatrost, technical expert for the Plaintiff, to establish the components of the competent repair.").
[107] Stockton Report at paragraph 10.

Case CONFIDENTIAL—PRODUCED PURSUANT TO PROTECTIVE ORDER

62) The Plaintiff testified that he was aware that the P320 he purchased did not have a manual safety.[108]  And, based on his Complaint, the Plaintiff apparently does not allege a breach of contract or other wrongful conduct related to an express agreement or promise that his P320 would contain a manual safety.  Thus, there is a disconnect between Mr. Stockton's proposed measure of damages, the allegations in the Complaint, and the Plaintiff's own purchase experience and testimony.  Nevertheless, since Mr. Stockton proposes calculating damages based on a hypothetical "but-for" scenario in which putative class members received a manual safety, I will consider this scenario below.

63) If Mr. Stockton and/or the Plaintiff is arguing that he should have been informed that the P320 he purchased was not equipped with a manual safety and that he was damaged because he "overpaid" as a result of this lack of this disclosure, then there would be no economic damages under this theory as it relates to the Plaintiff.  Both the Plaintiff and the seller were aware that the gun did not contain a manual safety so there is no economic expectation that the Plaintiff "overpaid" because of a lack of information regarding a manual safety.[109]  Put differently, had Sig Sauer made some disclosure that the P320 did not have a manual safety, the expected price would have been no different than that actually paid by the Plaintiff (and, therefore, there would be no "overpayment").

64) Mr. Stockton and/or the Plaintiff may instead be arguing that damages should be measured as equal to the difference in value (if any) of a P320 with and without a manual safety (and not based on the difference in value with and without a disclosure that the P320 did not have a manual safety).   If this is the case, the price difference (and, therefore, the existence and amount, if any, of damages) would require evaluating the particular features of the firearm (and their prices) and the sales channel (new or used).  There are multiple differences across putative class members required for this investigation.

65) With regard to the value of a new P320 with a manual safety compared to the value of a new P320 without a manual safety (as noted, the Plaintiff did not purchase a new P320),

---

[108] Deposition of Joshua Glasscock dated May 16, 2023 at pages 42-43.
[109] Deposition of James Thomas Faulkner dated March 15, 2024 at pages 36-40; Deposition of Joshua Glasscock dated May 16, 2023 at pages 42-43.

Case CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER Page 27 of 46

Mr. Stockton opines that average MSRPs for P320 handguns without a manual safety are below those with a manual safety. He proposes using this difference to establish and measure damages.

66) I have evaluated Mr. Stockton's calculations based on MSRPs.[110] One critical distinction Mr. Stockton missed in his calculation is the existence of numerous factory refurbished P320 MSRPs in his data. I'm informed that those are designated by "UD" in the item number and are refurbished (i.e., used) sales of P320s.[111] As shown in his data, not surprisingly, these guns have lower MSRPs than new P320s. Mr. Stockton's data lists each used P320 as having a lower manufacturer suggested retail price (often substantially lower) than any new P320 model in his data. Mr. Stockton lists none of them as having a manual safety.

67) The inclusion of these used/refurbished P320s in Mr. Stockton's data drives his result that average MSRPs of P320s with a manual safety are higher than those without a manual safety. In Figure 3 below, I correct Mr. Stockton's calculation and remove items with a "UD" in their item number in order to exclusively compare new P320s with or without a manual safety. This correction *reverses* Mr. Stockton's results.

68) As shown, in four out of five years the average manufacturer suggested retail price of those firearms with a manual safety in his data is below that of those without a manual safety. This eliminates estimated damages in each of those years under Mr. Stockton's own proposed method. The average MSRP for firearms with a manual safety only exceeds the average MSRP for firearms without a manual safety in 2016, which is outside of the Putative Class Period.

---

[110] Stockton Report at Tab 3.
[111] Interview with Jon Hemming dated January 22, 2025. See, also, as an example, Guns.com, "Sig Sauer P320 Carry *Factory Refurbished," at https://www.guns.com/firearms/p/sig-sauer-p320-carry-factory-refurbished?i=45914.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

**Figure 3: Corrected Version of Mr. Stockton's Exhibit After Removing Used Firearms[112]**
Sig Sauer P320 Average MSRP
With and Without Manual Safety Option
2016 - 2020

*As calculated by Mr. Stockton:*

| Manual Safety? | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Yes | $679.00 | $679.00 | $704.43 | $733.07 | $687.64 |
| No | $675.63 | $646.61 | $668.22 | $707.49 | $641.18 |
| Difference | $3.37 | $32.39 | $36.21 | $25.57 | $46.46 |

*After removing used firearms:*

| Manual Safety? | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Yes | $679.00 | $679.00 | $704.43 | $733.07 | $687.64 |
| No | $675.63 | $704.60 | $752.02 | $804.65 | $741.99 |
| Difference | $3.37 | ($25.60) | ($47.59) | ($71.59) | ($54.35) |

69) More generally, Mr. Stockton's proposed methodology is inappropriate because Mr. Stockton calculates average prices across all models of P320s regardless of the features of those models. As explained above, there are numerous different models of P320s which vary substantially in price based on their different features. One model of P320 without a manual safety can have an MSRP that is more than double that of a different P320, also without a manual safety. Thus, product differences substantially drive prices, regardless of whether or not a particular model is equipped with a manual safety.

70) By averaging the prices across all P320s (regardless of features), Mr. Stockton is effectively comparing "apples and oranges." Thomas Taylor, former Chief Marketing Officer and Executive Vice President of Commercial Sales at Sig Sauer described that "Sig Sauer does not consider a manual safety as a feature that increases the price of a P320 model," and that "[i]nstead, the variations in MSRPs between Sig Sauer P320 models are caused by the various other features among these models, including the round size, muzzle length, coloring and graphics, sights, attachments, holster, and other features."[113]

---

[112] See "PrcDiff.xlsx" in the backup to the Stockton Report; Tomlin xlsx workpapers.
[113] Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at page 15.

26

71) Phil Strader, Vice President-Consumer Affairs for Sig Sauer also described that "Sig Sauer does not... consider the presence of a manual safety as impacting the MSRP of any firearm model, including the P320."[114] Mr. Strader also described that "At various times throughout the Putative Class Period, Sig Sauer offered for sale to commercial customers at least four pairs of P320 models that had were [sic] identical except for the safety feature," and that these pairs of P320s illustrate that "Sig Sauer set equivalent MSRP's for P320 models that were identical except for the manual safety feature."[115]

72) In addition, Mr. Stockton has not provided evidence that putative class members prefer retrofitting their P320 with a manual safety as opposed to continuing to own and operate it without a manual safety. According to Thomas Taylor, former Chief Marketing Officer at Sig Sauer, "there is significantly less consumer demand and fewer sales for models with a manual safety."[116] Economists typically determine the preferences of consumers by the choices they make (their "revealed preferences"). The economic concept of "revealed preference" means that the choices individuals make demonstrate their preferences and that the choices they make are preferred to those they could have made, but did not.[117] In this case, putative class members (like the Plaintiff) who have not retrofitted their P320 with a manual safety (or investigated the possibility of doing so) have revealed that they prefer owning the gun without a manual safety over retrofitting their gun (and the cost of retrofitting).

## VII. MR. STOCKTON'S PROPOSED ALLOCATION METHOD LACKS ECONOMIC SUPPORT

73) The Plaintiff seeks to certify a class of: "All persons who purchased a Sig Sauer model P320 pistol without an external thumb safety primarily for personal, family or household purposes in the state of Missouri ..." that excludes "individuals who no longer own a

---

[114] Declaration of Phil Strader in Support of Sig Sauer Inc.'s Opposition to Plaintiff's Motion for Class Certification at paragraph 6.
[115] Declaration of Phil Strader in Support of Sig Sauer Inc.'s Opposition to Plaintiff's Motion for Class Certification at paragraphs 7-8 and Figure 1.
[116] Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at paragraph 64.
[117] See, e.g., Varian, Hal R., "Intermediate Microeconomics," W.W. Norton & Company, 8th Edition, 2010 at pages 119-120.

Case 4:22-cv-00095-SRB Document 152-11 Filed 05/08/25 Page 30 of 46
CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

P320 pistol without an external thumb safety."[118]  Used Sig Sauer P320 pistols are widely available for sale and purchase in Missouri.  This means that the putative class of "all persons who purchased a Sig Sauer model P320 pistol" almost certainly includes individuals who purchased their Sig Sauer P320 new and retained ownership of it and individuals, like the Plaintiff, who purchased a Sig Sauer P320 used.  It is also quite plausible that a single Sig Sauer P320 changed ownership several times during the Putative Class Period so that an individual purchased a P320 used and then, in turn, sold to another purchaser (leading to three or more owners of the same P320).

74) Thus, economic damages, if any, would be distributed across multiple owners of the same P320 pistol – including across individuals excluded from the proposed class.  Mr. Stockton proposes simply allocating all damages to the current owners of P320s and ignoring the likelihood that any alleged damages, if there were any, could have been incurred by prior owners.  There is no economic basis for such an allocation.

75) Determining whether any particular buyer sustained economic injury, and if so, the amount requires determining whether or not they purchased the firearm new or used and the circumstances of their purchase, including the price they paid.  As a matter of economics, at least two factors must be evaluated to determine economic injury and the allocation of damages, if any, between multiple owners of the same P320 over time: i) how prices of the P320 depreciated over time through age and use, and ii) the information available to the new buyer and the used buyer.

76) With regard to how prices of a P320 depreciated over time, handguns (as Mr. Stockton recognizes) are a "durable good" which is a product that lasts over time (and is not immediately consumed).[119]  As is the case for many durable goods, there is an active secondhand (i.e., used) market for handguns, including P320s.  Economic research establishes that "the consumption value of a durable good *diminishes* as it ages due to physical deterioration and consumers' preference for the new."[120]  This implies that

---

[118] Motion for Class Certification at page 31 and footnote 8.
[119] Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, Fourth Edition, 2005 at page 498.
[120] Porter, Robert H., and Peter Sattler, "Patterns of trade in the market for used durables: Theory and evidence," (1999) (emphasis added).

28

prices of P320 handguns depreciate over time and, therefore, any "overpayment" occurring at the point of the initial payment when new would tend to be reduced over time.

77) In short, assuming there was any "overpayment" at the time of the initial purchase, other things equal, it is likely that not all of that "overpayment" would be reflected in the sale of the P320 in the secondhand market. For example, if the original owner "overpaid" by, say, $100 they might end up selling to a used buyer who "overpays" that original owner by $50. In this scenario, the total damages (i.e., "overpayment") would be equal to $100 but $50 would be sustained by the original owner (who overpaid $100 originally but offset that overpayment by $50 by selling to the used buyer who overpays them) and $50 to the used buyer.

78) As a demonstration of the importance of the depreciation of prices over time, consider another hypothetical example. Suppose an original owner paid $1,000 but due to alleged wrongful conduct would have paid $800 had some additional disclosure been made. Under this hypothetical scenario, the actual price is $1,000, the "but-for" price is $800, and "overpayment" damages are $200. Suppose the price of this gun depreciates 50% over time and the original owner sells the gun. The owner therefore sells the gun at $500 (which is 50% of the original price) and the "but-for" sales price of the gun would have been $400 (which is 50% of $800).

79) What are the damages in this scenario? The original owner sustains damages equal to 50% of the original "overpayment." They actually paid (on net) $500 (the $1000 they originally paid minus the $500 they sold for) but they would have paid (on net) $400 (which is the $800 they would have paid absent alleged wrongful conduct minus the $400 they would have received selling it used). The used owner sustains damages equal to the other 50% of the "overpayment" (they paid $500 but would have only paid $400 in the absence of the alleged wrongful conduct).

80) This simple illustrative example demonstrates why there is no economic basis to assume (as Mr. Stockton has done) that all overpayment damages should be allocated to current owners (and none to original owners who sold their firearm). In this simple hypothetical,

Case 0:22-cv-03095-LMP-DTS Document 107-29 Filed 03/03/25 Page 32 of 46
CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

the current owner receives a windfall under Mr. Stockton's proposed methodology – they would receive $200 in damages when they sustained only $100 in damages. This windfall would come at the expense of the first owner – they sustained $100 in damages but receive nothing. Although this is only a hypothetical, the example applies more broadly. Mr. Stockton's methodology is capable of overcompensating new owners and providing them with a windfall (including the possibility of providing them with damages when they sustained no economic damages).

81) Mr. Stockton rationalizes his assumption by stating "the only material depreciation suffered is the immediate difference as the handgun moves from the new retail market to the secondhand market, with little decrease in value thereafter."[121] But depreciation from the new retail market to the secondhand market is exactly what necessitates considering both the original owner and subsequent owners (and not assuming that all overpayment is incurred by used buyers).

82) But depreciation is not the only economic factor dictating that it is incorrect to assume that all damages should be vested only in current owners (and nothing to original owners). The second factor that needs to be considered is the information obtained by the buyer and the seller for P320s owned by more than one consumer. Even assuming that an original owner "overpaid" based on wrongful conduct, there is no economic basis to assume that the information obtained by the buyer and seller in a second (or later) transaction was the same as that in the first transaction. Because of this, it is plausible that none of this overpayment was passed on to used purchasers and a used purchaser did not sustain any economic injury and, thus, did not sustain any damages (and all damages were sustained by the original purchaser).

83) Information regarding any alleged "defect" may have been different at the time of the original purchase of a P320 than it was at the time of its sale on the secondhand market

---

[121] Stockton Report at paragraph 41. Moreover, the authority Mr. Stockton cites to support his opinion states that gun values do continue to change over time after their initial sale. The article by Jim Harmer cited by Mr. Stockton states that "new factory-produced firearms depreciate about 15% when they are purchased" and that they *continue to depreciate* at a rate of around 1% annually for the next fifteen years. See Harmer, Jim, "Gun Depreciation: Everything You Should Know (With Data)," Backfire, June 28, 2024, at https://backfire.tv/gun-depreciation/ (emphasis added).

(which could have been many years after the original purchase). The second (or later) buyer and seller could have reviewed different information and marketing materials and had different preferences with regard to particular characteristics of the P320 (such as the trigger pull). The information available would also have developed over time with regard to new purchases. Numerous additional sources of information regarding the P320 have become available since 2017 (the beginning of the Putative Class Period). This includes claims related to the safety of the P320s (including the Complaint in this case) and allegations and adjudications or investigations related to reported inadvertent discharges.[122]

84) As a simple illustration, assume only two buyers of the same P320 – buyer 1 and buyer 2. Assume that buyer 1, as with Plaintiff's allegations, claims to have been unaware of an alleged safety issue with the P320 that was not disclosed by Sig Sauer and, as a result, this impacted the demand for the P320, the price of the P320, and the consumer was damaged by an "overpayment" as a result (and sustains economic injury and damages under this scenario). Suppose buyer 1 (through usage or public sources) becomes aware of the alleged safety issue and, as a result, sells it at a lower price than he otherwise would have to buyer 2. Thus, buyer 1 sustains economic damages – under this scenario, he paid a higher price for the gun new than he otherwise would have and he sold his gun at a lower price than he otherwise would have. But, buyer 2 (buying at a discount) sustains reduced economic damages or, if the discount was equal to the overpayment (which could happen, e.g., if buyer 1 informed buyer 2 of an alleged safety issue), no economic injury or damages at all. Yet, Mr. Stockton's proposed allocation would produce exactly the opposite result – all of the damages would go to buyer 2 and no damages would go to buyer 1. There is no economic basis for this result.

85) Mr. Stockton's proposed allocation is also invariant to the time an individual owned a P320. Mr. Stockton and Plaintiff allege that owners of P320s took on added risk of owning P320 firearms because of an alleged defect.[123] Yet, Mr. Stockton proposes

---

[122] See, e.g., Declaration of Matthew L. Dameron dated November 5, 2024 at pages 6-7. Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification at paragraphs 67-75.
[123] See, e.g., Complaint at paragraph 61.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

allocating all damages to current owners while ignoring any damages that might have accrued to earlier owners who sold their firearm, regardless of how long any owner retained ownership and therefore took on any such risk.

86) For example, an owner buying in 2017, owning the firearm for 7 years and selling one week ago to another buyer would be excluded from the Plaintiff's proposed putative class, while the buyer purchasing the firearm one week ago would receive all of the damages according to Mr. Stockton. If the owners of P320s were harmed through taking on risk, as Plaintiff and Mr. Stockton argue,[124] then such an allocation would not appropriately allocate any harm from this risk.

## VIII. SUMMARY OF CONCLUSIONS

87) Based on my review of Mr. Stockton's report and the information I have reviewed in this case, I have the following opinions: i) Mr. Stockton does not identify data necessary to correctly evaluate economic injury and damages in this case.; ii) Mr. Stockton's proposed "RCM" is disconnected from the allegations in this case (and Plaintiff's testimony) and is not capable of measuring economic injury or damages, iii) Mr. Stockton incorrectly analyzed MSRP data and combined models with different characteristics. Correcting his calculation reverses his results and leads to no damages under his own proposed method using MSRPs; and iv) Mr. Stockton's proposal for allocating all damages to current owners and none to prior owners lacks economic support and is incorrect as a matter of economics.

Jon Tomlin

Jonathan T. Tomlin, Ph.D.

---

[124] See, e.g., Stockton Report at paragraph 13 ("Class Members, in addition to acquiring firearms that were less valuable at the time of acquisition because of the Defect, unwittingly assumed risk associated with the Defect.").

32

Case 0:22-cv-03095-LMP-DTS Document 180-4 Filed 03/08/25 Page 35 of 46
CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

# Exhibit 1

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

**Confidential**
**Exhibit 1**
**Documents Considered**

## Legal Documents

Complaint filed April 18, 2022

Declaration of B. Keith Gibson in Support of Sig Sauer, Inc.'s Reply in Support of Its Motion for Summary Judgment on Article III Standing and Causation under the Missouri Merchandising Practices Act dated August 9, 2024

Declaration of Colleen M. Gulliver in Support of Sig Sauer, Inc.'s Reply in Support of Its Motion For Summary Judgment on Article III Standing and Causation under the Missouri Merchandising Practices Act dated August 9, 2024

Declaration of James Lano in Support of Sig Sauer, Inc.'s Reply in Support of Its Motion for Summary Judgement on Article III Standing and Causation under the Missouri Merchandising Practices Act dated August 9, 2024

Declaration of Todd Werts in Support Plaintiff's Response in Opposition dated July 12, 2024

Defendant Sig Sauer Inc.'s Motion for Summary Judgment on Article III Standing and Causation Under the Missouri Merchandising Practices Act dated May 31, 2024

Defendant Sig Sauer, Inc.'s Reply Suggestions in Support of Its Motion for Summary Judgment on Article III Standing and Causation under the Missouri Merchandising Practices Act dated August 9, 2024

Defendant Sig Sauer, Inc.'s Reply Suggestions in Support of its Motion to Amend the Case Schedule and Stay or Extend Further Class Certification Briefing dated December 10, 2024

Defendant Sig Sauer, Inc.'s Suggestions in Support of its Motion for Summary Judgment on Article III Standing and Causation Under the Missouri Merchandising Practices Act dated May 31, 2024

Defendant Sig Sauer, Inc's Suggestions in Support of its Motion to Amend the Case Schedule and Stay or Extend Further Class Certification Briefing dated November 18, 2024

Plaintiff's Motion for Class Certification and Suggestions in Support and Exhibits dated November 5, 2024

Plaintiff's Objections and Answers to Defendant's Interrogatories dated January 23, 2023

Plaintiff's Response in Opposition under Rule 56(D) to Sig Sauer, Inc.'s Motion for Summary Judgment [Doc. 97] dated July 12, 2024

Plaintiff's Suggestions in Opposition to Defendant's Motion to Amend the Case Schedule and Stay dated November 26, 2024

Plaintiff's Expert Disclosures for Class Certification under Fed. R. Civ. P. 26 dated November 5, 2024

Plaintiff's Objection and Responses to Defendant's Second Set of Requests for the Production of Documents dated January 5, 2025

Plaintiff's Objections and Answers to Defendant's Second Set of Interrogatories dated January 5, 2025

Plaintiff's Objections and Responses to Defendant's Requests for Production dated January 23, 2023

Plaintiff's Responses to Defendant's First Set of Requests for Admission dated January 5, 2024

## Expert Reports, Declarations, Exhibits, and Backup Documents

Declaration of Christopher Meyer in Support of Sig Sauer, Inc's Opposition to Plaintiff's Motion for Class Certification dated February 4, 2025

Declaration of Ed Murphy in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification dated February 10, 2025

Declaration of Matt Farkas in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification dated February 4, 2025

Declaration of Matthew L. Dameron dated November 5, 2024

Declaration of Matthew Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification dated March 17, 2025

Declaration of Phil Strader in Support of Sig Sauer Inc.'s Opposition to Plaintiff's Motion for Class Certification dated March 25, 2025

Declaration of Sean Toner in Support of Sig Sauer, Inc's Opposition to Plaintiff's Motion for Class Certification dated February 27, 2025

Declaration of Thomas Taylor in Support of Sig Sauer, Inc.'s Opposition to Plaintiff's Motion for Class Certification dated February 17, 2025

Expert Report of Beau A. Biller, M.Eng., P.E., ACTAR dated November 5, 2024

Expert Report of Derek Watkins dated March 31, 2025

Expert Report of Edward M. Stockton dated November 5, 2024

Expert Report of Robert Rauschenberger, Ph.D. dated March 27, 2025

Rule 26(a)(2)(B) Declaration of Benjamin D. Gatrost in Support of Plaintiff's Motion for Class Certification, dated November 5, 2024

## Depositions and Exhibits

Deposition of Christopher Meyer dated September 11, 2024

Deposition of James Lano dated September 11, 2024

Deposition of James Thomas Faulkner dated March 15, 2024

Deposition of James Thomas Faulkner, Volume II, dated May 28, 2024

Deposition of Joshua Glasscock dated May 16, 2023

Deposition of Joshua Glasscock, Volume II, dated March 6, 2025

Deposition of Matt Farkas dated September 23, 2024

Deposition of Matthew Taylor dated September 10, 2024

Deposition of Thomas Taylor dated September 12, 2024

## Bates Stamped Documents

Glasscock, Joshua 000001-24

Glasscock, Joshua 000041-104

SIG-GLASSCOCK00001132-8914

**Bates Stamped Documents (Continued)**

SIG-MARKETING-000001-256
SIG-P320-MANUALS 000001-1533

**Court Rulings**

Abbott v. Golden Grain Co., 677 F. Supp. 3d 940, 945 (E.D. Mo. 2023)
Diesel v. Mariani Packing Co., Inc., 2024 WL 4263944 (E.D. Mo. Sept. 23, 2024)
George v. Omega Flex, Inc., U.S. Dist. LEXIS 123354 (W.D. Mo. July 24, 2018)

**Academic Papers and Textbooks**

Anderson, Simon P., and Régis Renault, "Firm pricing with consumer search," In Handbook of Game Theory and Industrial Organization, Volume II, Edward Elgar Publishing, 2018
Armona, Luis and Adam M. Rosenberg, "Second-Best Amendment: Market Power and Tax Design in the Firearms Industry," December 13, 2024
Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, Fourth Edition, 2005
Mark Allen, Robert Hall, and Victoria Lazear, "Reference Guide on Estimation of Economic Damages," Reference Manual on Scientific Evidence, Federal Judicial Center, Third Edition, 2011
Moshary, Sarah, Bradley Shapiro, and Sara Drango, "Preferences for Firearms and Their Implications for Regulation," National Bureau of Economic Research Working Paper 30934, 2023
Porter, Robert H., and Peter Sattler, "Patterns of trade in the market for used durables: Theory and evidence," (1999)
Robinson, Sonia L. et al., "Purchaser, firearm, and retailer characteristics associated with crime gun recovery: a longitudinal analysis of firearms sold in California from 1996 to 2021," Injury Epidemiology, 2024
Roman Weil, Daniel G. Lentz, and Elizabeth A. Evans, Litigation Services Handbook, Sixth Edition, 2017
Varian, Hal R., "Intermediate Microeconomics," W.W. Norton & Company, 8th Edition, 2010

**Internet Sources**

Abraham, Dan, "Why Your Trigger Pull Matters," The Armory Life, April 18, 2024, at https://www.thearmorylife.com/why-your-trigger-pull-matters/
Armslist Firearms Marketplace at https://www.armslist.com/classifieds/missouri/guns
Bass Pro Shops, "Sig Sauer ~ P320 X5 ~ 9mm," at https://www.basspro.com/shop/en/101617042
Blue Book of Gun Values, "Grading Criteria," at https://bluebookofgunvalues.com/pdfs/gun/GradingCriteria.pdf
Blue Book of Gun Values, "How to Use This Book," at https://bluebookofgunvalues.com/pdfs/gun/HowToUse.pdf
Blue Book of Gun Values, at https://bluebookofgunvalues.com/
Blue Book of Gun Values, at https://bluebookofgunvalues.com/dashboard
Cherokee Firearms, "Welcome to Cherokee Firearms Indoor Shooting Range," at https://cherokeefirearms.com/indoor-shooting-range
DK Firearms , "SIG Sauer CPO P320 Full Size 9mm Night Sights," at https://dkfirearms.com/product/sig-sauer-cpo-p320-full-size-9mm-night-sights/
Gun Grove, "Used Sig Sauer P320 Sub Compact 9MM," June 22, 2024, at https://gungrove.com/used-sig-sauer-p320-sub-compact-9mm/
Guns Missouri Classifieds, "Sig Sauer P320 X-Compact 9mm," at https://gunsmissouri.com/classifieds/firearms/ad/sig-sauer-p320-x-compact-9mm-4815
Guns.com, "Sig Sauer P320 Carry *Factory Refurbished," at https://www.guns.com/firearms/p/sig-sauer-p320-carry-factory-refurbished?i=45914
Harmer, Jim, "Gun Depreciation: Everything You Should Know (With Data)," Backfire, June 28, 2024, at https://backfire.tv/gun-depreciation/
National Rifle Association, "First-Time Handgun Buyers Guide," NRA Family, at https://www.nrafamily.org/content/first-time-handgun-buyers-guide/
Roth, Alex and Betsy McKay, "Fear and Greed Have Sales of Guns and Ammo Shooting Up," The Wall Street Journal, April 16, 2009, at https://web.archive.org/web/20150307062539/https://www.wsj.com/articles/SB123984046627223159
Sig Sauer, "About us," at https://www.linkedin.com/company/sigsauer
Sig Sauer, "Custom Works P320 Studio," at https://www.sigsauer.com/customworks/p320
Sig Sauer, "Firearms," at https://www.sigsauer.com/firearms.html
Tarr, James, "SIG Sauer P320 9mm Striker-Fired Pistol: Review," Guns & Ammo Handguns, at https://www.handgunsmag.com/editorial/sig-p320-review/137787
The Range St. Louis West, "Range Fees," at https://therangestl.com/shooting-range/range-fees/

**Other Sources**

Interview with Jon Hemming dated January 22, 2025
MSRP Data from Sig Sauer
PROD009 - bates cross refernce sheet (Glasscock).xlsx

CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

# Exhibit 2

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER



## JONATHAN T. TOMLIN, Ph.D.
Senior Managing Director

## Economist; Expert Witness

555 S. Flower Street, Suite #4220
Los Angeles, CA 90071

+1.213.670.3200 Main
+1.213.670.3221 Direct

jon.tomlin@ankura.com

Jon Tomlin, Senior Managing Director, has performed economic and statistical analysis of complex damages issues for over twenty-five years. Dr. Tomlin has evaluated economic damages in cases involving class certification, false advertising, antitrust, breach of contract, fraud, and intellectual property. He has also published numerous articles on the application of economic principles to legal issues and has testified as an expert witness for cases in state and federal court.

**EDUCATION**

Ph.D., Economics, University of California, Los Angeles, 1994

M.A., Economics, University of California, Los Angeles, 1991

B.A., Economics, University of Pennsylvania, College of Arts and Sciences, Philadelphia, PA, 1989

**HONORS AND AWARDS**

Who's Who Legal: Competition Economists

**AFFILIATIONS**

American Economic Association

National Association of Business Economists

Licensing Executives Society

American Finance Association

National Association of Certified Valuation Analysts, Economics Instructor

B.E. Journal of Economic Analysis & Policy, Referee

Journal of Forensic Economics, Referee

Fields of Concentration

- Industrial Organization

- Antitrust Economics

- Applied Microeconomics

Experience includes:

- Ankura Consulting
  *2018-present*

- Navigant Consulting
  *2010-2018*

- LECG, LLC
  *Principal, 2003-2010*
  *Senior Managing Economist, 1998-2002*

- Capital Economics
  *Economist, 1998*
  Provided economic analysis for projects involving law and economics.

- Economic Analysis Corporation
  *Senior Economist, 1996-1997*
  Provided economic and statistical analysis for projects involving questions in the areas of industrial organization, antitrust, intellectual property, and corporate finance.

- Micronomics, Inc.
  *Economist, 1994-1996*
  Provided economic and statistical analysis for litigation consulting and regulatory issues.

- University of California, Los Angeles, Department of Economics
  *Teaching Assistant, 1993-1994*
  Taught Intermediate Microeconomics to undergraduates.

  *Research Assistant, 1992-1993*
  Provided research support for economics faculty.

**Books**

- "Hicks-Marshall Conditions and Defining Antitrust Markets for Intermediate Goods," with Georgi Giozov, James Langenfeld, and David Weiskopf, Research in Law and Economics, Chapter 3, Volume 27 (2015).

- "Manufacturing Input Markets," with James Langenfeld, William Nye, and Louis Silvia, Market Definition in Antitrust: Theory and Case Studies, American Bar Association, 2012, Chapter II.

**Peer-Reviewed Research**

- "The Impact of Smoking Bans on the Hospitality Industry: New Evidence from Stock Market Returns," The B.E. Journal of Economic Analysis & Policy: Vol. 9: Iss. 1 (Contributions), Article 13 (2009).

- "Expert Testimony, Daubert, and the Determination of Damages," with David Cooper, Review of Law & Economics: Vol. 4: Iss.1, Article 11 (2008).

- "Junk Forecasts in the Courtroom?: Assessing the 'S' Curve Approach to Calculating Damages," with C. Paul Wazzan, Journal of Forensic Economics, Volume XIX, Number 3, Fall 2006.

- "Distinguishing the Legal from the Illegal in Antitrust Damages Calculations: Lessons from Netscape v. Microsoft," Journal of Forensic Economics, 17 (2), 2004.

- "How Mergers Affect Competitors," Ph.D. dissertation, University of California, Los Angeles, 1994.

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

## Law Reviews

- "The Accuracy and Manipulability of Lost Profits Damages Calculations: Should the Trier of Fact be 'Reasonably Certain'?," with David Merrell, Transactions: The Tennessee Journal of Business Law, Volume 7, Number 2, 2006.

- "Federalism and the Indirect Purchaser Mess," with Dale J. Giali, George Mason Law Review, Volume 11, Number 1, Fall 2002.

## Magazines, Newsletters, and On-Line Publications

- "The Epic Antitrust Cases and Challenges of Injunctive Relief," with Kelly Nordby, Law360, March 14, 2024

- "Auto Defect Damages Should Factor in Supply Conditions," Law360, October 3, 2023.

- "College Refund Class Actions Face Damages Hurdles," with Hassan Faghani, Law360, July 27, 2020.

- "Durational Disconnect Between Cartel Pleas and Class Certs.," Law360, August 9, 2019.

- "Product Labeling Class Actions – Identifying the 'Con' in Conjoint Surveys," with Robert Zeithammer, Bloomberg Law, November 1, 2018.

- "One Size Doesn't Fit All in Product Labeling Class Actions," Law360, June 15, 2018.

- "Two 'Pass-Through' Hurdles for Indirect Purchaser Plaintiffs," Law360, February 14, 2018.

- "Reliability of 'Price Premium' Calculations in Class Actions," Law360, October 10, 2017.

- "Early Lessons from the DOJ Auto Parts Investigation," with Chris Ring, Law360, July 14, 2017.

- "Class Certification and Economic 'Argle Bargle'," Law360, December 16, 2015.

- "Why Didn't Raids Stop Price-Fixing in the Auto Industry?," Law360, July 21, 2015.

- "Calculating 'Pass-Through' Rates in Price-Fixing Cases – What's in the Economist's Toolbox?," The Meeting Place, Newsletter of the ABA Section of Antitrust Law Joint Conduct Committee, Winter 2014.

- "The Demise of the 25% Rule," with Mohan Rao, Intellectual Asset Management, Issue 47, May/June 2011.

- "Comcast-NBC and the Regulatory Road to Nowhere," TheStreet.com, May 5, 2010.

- "Civil Conspiracy Claims and the Economics of Collusion," with Daniel Ingberman and Christopher Loos, American Bar Association Mass Torts Litigation Committee Newsletter, Summer 2009.

Case 3:16-cv-03085-L-BN Document 189-12 Filed 03/08/25 Page 42 of 46
CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

- "The Economic Impact of Smoking Bans," Forbes.com, June 4, 2009

- "Examining Expert Witness Testimony and Judicial Gatekeeping: Insights from Game Theory," with David Cooper, Mealey's Daubert Report, Volume 13, Issue #1, January 2009.

- "Mars v. Coin Acceptors and the 'Hypothetical Negotiation' Approach to Reasonable Royalty Calculations," IP Remedies, American Bar Association, Intellectual Property Litigation Committee, July 2008.

- "Unprofessional Economic Testimony: Why It is a Problem and How Technical Advisors Can Help," with David Cooper, American Bar Association Section of Antitrust Law Economics Committee Newsletter, Volume 7, Number 2, Fall 2007.

- "Recognizing Damages Manipulation: Tips for Putting Barbed Wire on the Daubert Gate," The Committee on Commercial & Business Litigation Newsletter, American Bar Association, Vol. 8, No. 3, Spring 2007.

- "Infringed Tech: Antitrust Responses in Such Suits Ride on Market Power," Legal Times, April 2000.

- "Big Price Fixing Cases: Will Indirect Purchasers Be Able to Recover Damages?," Perspectives, January 2000.

- "Current Methods of Evaluating Vertical Mergers and the Obsolescence of the 1984 Merger Guidelines," Private Antitrust Litigation News, American Bar Association, Spring 1999.

**Presentations**

- "Price Premium Damages in Class Actions," Strafford Publications webinar, June 2023.

- "Classwide Damage Models in Misleading and False Advertising Consumer Class Actions," Strafford Publications webinar, August 2022.

- "Damages and Restitution Claims in Covid-19 Related Class Actions," California Lawyers Association webinar, April 2021.

- "Classwide Damage Models in Misleading and False Advertising Consumer Class Actions," Strafford Publications webinar, May 2020.

- "Antitrust Economics: Fundamental Concepts Practitioners Need to Know," California Lawyers Association webinar, January 28, 2020.

- "Viewpoints on UCL Trends and Developments," California Lawyers Association Annual Meeting, October 2019.

- "Classwide Damage Models in Misleading and False Advertising Consumer Class Actions," Strafford Publications webinar, May 2019

- "Damages Models in Food Labeling Class Actions," ABA Section of Litigation, Consumer Litigation Committee, February 2019.

- "The Georgia-Pacific Factors:  Are They Useful?," Utah IP Summit, February 2016.

- "Econometrics or Just a Con?: Uses and Abuses of Data and Statistics in Competition Cases," Los Angeles County Bar Antitrust Section, May 2015.

- "Clayworth v. Pfizer, Inc. Rejected the Pass-on Defense, or Did It?," Los Angeles County Bar Antitrust Section, March 2011.

- "The Comcast/NBC Merger: Frightening Media Consolidation or Good for Consumers?," Los Angeles County Bar Association Antitrust Section, May 2010.

- "Setting the Bounds of Section 2 Liability: Understanding linkLine and its Potential Implications," Los Angeles County Bar Association Antitrust Section, November 2008.

- "Economics at the Intersection of Antitrust and Intellectual Property," Los Angeles County Bar Association Antitrust Section, September 2002.

- "How Federal and State Laws Can Fail to Work Together: The Economics of Indirect Purchaser Laws," George Mason Law Review Antitrust Symposium, May 2002.

**Expert Reports and Testimony**

- Allison Klein, et al. v. Dr. Ing. h.c.F. Porsche, AG, et al. United States District Court, Central District of California. Expert Report. 2025.

- Casey E. Hall Landers, et al. v. New York University.  United States District Court, Southern District of New York.  Expert Report, Deposition Testimony.  2024

- Hamid Bolooki, et al. v. Honda Motor Company Limited and American Honda Motor Company Inc. United States District Court, Central District of California.  Expert Report, Deposition Testimony.  2024.

- Buffalo Seafood House, LLC et al. v. Republic Services, Inc., et al., United States District Court, District of South Carolina.  Expert Reports, Deposition Testimony.  2024, 2025.

- Pacific Surf Designs, Inc. v. Whitewater West Industries, LTD, et al., United States District Court, Southern District of California.  Expert Report, Deposition Testimony, Trial Testimony.  2023.

- Sunshine Children's Learning Center, et al. v. Waste Connections of Florida, Inc., United States District Court, Southern District of Florida.  Expert Report, Deposition Testimony.  2022.

- Vivian Arevalo, et. al. v. USAA Casualty Insurance Company, et al., In the District Court of Bexar County Texas. Expert Report, Deposition Testimony.  2022.

- Jonathan Michel, et al. v. Yale University, United States District Court, District of Connecticut. Expert Report, Deposition Testimony.  2022.

Case 3:21-cv-03825-LB   Document 189-17   Filed 03/06/25   Page 44 of 46

CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER

- Youngsuk Kim, et al. v. Benihana, Inc., United States District Court, Central District of California. Expert Report, Deposition Testimony. 2021.

- Kress Stores of Puerto Rico, et al. v. Wal-Mart of Puerto Rico, Inc., et al., United States District Court, District of Puerto Rico. Expert Declaration. 2021.

- Milind Desai, individually and on behalf of all others similarly situated v. Geico Casualty Company, United States District Court, Northern District of Ohio, Eastern Division. Expert Report, Deposition Testimony. 2021.

- Michael Lavigne, et al. v. Herbalife LTD, et al., United States District Court, Central District of California. Expert Report, Rebuttal Report, Deposition Testimony. 2021.

- Will Kaupelis and Frank Ortega, individually and behalf of all others similarly situated v. Harbor Freight Tools, USA, Inc., United States District Court, Central District of California. Expert Declaration, Deposition Testimony. 2020.

- Vivian Deveroux, on behalf of herself and others similarly situated v. Apple, Inc., Superior Court of the State of California, County of Santa Clara. Deposition Testimony. 2019.

- Megan Schmitt et al. v. Younique, LLC, United States District Court, Central District of California. Expert Report. 2018.

- Claudine Macaspac, on behalf of herself, all others similarly situated, and the general public v. Henkel Corporation, United States District Court, Southern District of California. Expert Report. 2018.

- Paramount Petroleum Corporation v. International Surfacing Systems, VSS International, Inc., and Manhole Adjusting, Inc., Superior Court for the State of California, County of Sacramento. Deposition Testimony. 2016.

- California Crane School, Inc. et al. v. National Commission for the Certification of Crane Operators, et al., Superior Court for the State of California, County of Tuolumne. Expert Declaration, Deposition Testimony. 2015.

- Apumac, LLC; Apple in Bulk, Inc. v. Flint Hills International, LLC, et al., United States District Court, Central District of California. Expert Report. 2015.

- Waterfield Technologies, Inc. v. BofI Federal Bank, United States District Court, Southern District of California. Expert Declaration. 2015.

- Puppies 'N Love, d/b/a of CPI, Inc.; Frank Mineo; and Vicki Mineo v. City of Phoenix, United States District Court, District of Arizona. Expert Report, Deposition Testimony. 2014.

CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER

- Cynthia E. Spann, Individually and on Behalf of Others Similarly Situated v. J.C. Penney Corporation, Inc., United States District Court, Central District of California. Expert Declaration, Deposition Testimony. 2013.

- Eastman Kodak Company v. Altek Corporation, United States District Court, Southern District of New York. Expert Declaration. 2013.

- Maria Torres, Gabriel Rojas, and Ian Kerner, individually and on behalf of all others similarly situated v. J.C. Penney Corporation, Inc., United States District Court, Northern District of California. Expert Declaration. 2013.

- Source Health Analytics, Inc. et al. v. SDI Health, LLC, et al., Court of Common Pleas, Philadelphia County. Expert Report. 2012.

- Promega Corporation et al. v. Life Technologies Corporation, Applied Biosystems, LLC, and Invitrogen IP Holdings, Inc., United States District Court, Western District of Wisconsin. Expert Report, Deposition Testimony. 2011.

- Ammari Electronics, Mehdi Ammari, Framer's Workshop, on behalf of themselves and all other similarly situated v. Pacific Bell Directory, et al., Superior Court, State of California. Expert Report, Deposition Testimony. 2008.

- Guild, Inc. v. J.C. Penney Corporation, Inc., United States District Court, Central District of California, Southern Division. Expert Report, Deposition Testimony, Trial Testimony. 2004.

- Asphalt Busters, Inc. v. Chemical Lime Company, United States District Court, District of Arizona. Expert Report. 2003.

- National Guardian Life Insurance Company v. Crestar Securities Corp., United States District Court, Western District of Wisconsin. Expert Report. 1998.

- Summit Family Restaurants Inc., HTB Restaurants Inc., and CKE Restaurants Inc. v. Hometown Buffet Inc., and Buffets Inc., U.S. District Court, District of Utah, Central Division. Expert Report, Trial Testimony. 1996.

Case 2:24-cv-06635-MRP-DFM Document 189-27 Filed 03/03/25 Page 48 of 46
CONFIDENTIAL-PRODUCED PURSUANT TO PROTECTIVE ORDER