# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

|  |  |
|---|---|
| JOSHUA GLASSCOCK, individually and on behalf of all others similarly situated, | : : : : |
| Plaintiff, | : Case No.: 6:22-cv-3095-MDH |
| v. | : : |
| SIG SAUER, INC., | : **ORAL ARGUMENT REQUESTED** : |
| Defendant. | : : : |

## DEFENDANT SIG SAUER, INC.'S SUGGESTIONS IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

i

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS............................................................................................ 2

    **A.**    **Sig Sauer and its Market-Leading P320.** ............................................... **2**

        1.    The Design and Development of the P320. ..................................... 2

        2.    The P320 is a Modular Pistol That Has Passed All Safety Testing. ............ 3

        3.    The P320's Trigger Pull, Energized Nature, and Safety Features. .............. 4

        4.    Sig Sauer's Voluntary Upgrade Program, Which Preceded the Putative Class Period, Related to Drop Safety, Not Inadvertent Discharges.............. 5

        5.    The U.S. Army Selects the P320 Platform as the Modular Handgun System. ........................................................................................ 6

        6.    Risk of Inadvertent Discharges Is Present with All Firearms. ..................... 7

        7.    Consumers Consider Many Individualized Factors When Deciding Which Firearm to Purchase.......................................................... 8

        8.    Most Consumers Did Not Want a Manual Safety, Which Was Available. .9

            i.    Customers Preferred No Manual Safety. ............................... 9

            ii.  Sig Sauer Always Offered a Manual Safety Model........................... 11

    **B.**    **Sig Sauer Marketed the P320 with Varied Advertising in Varied Channels.** ............................................................................................ **11**

        1.    Any Consumer Exposed to Sig Sauer's Website Could Have Seen Different Content. ......................................................................... 11

        2.    No Evidence Has Been Offered to Show Which Consumers Saw What Advertising at What Time. ........................................... 12

        3.    Sig Sauer Disclosed That Consumers Could Purchase a P320 with a Manual Safety, that the P320 Had a Crisp Trigger and that the M17 was the Model P320 That Was Comparable to the Military Version. .............. 13

        4.    The Owner's Manual Is Not Advertising, The Content Varied Throughout the Class Period, And Is Not Viewed by Many Consumers. .14

    **C.**    **Plaintiff Has Not Identified the Putative Class or Their Purchases** ................ **15**

        1.    Most P320 Sales Were Through Retail or Secondary Sales and Sig Sauer Has No Records of Those Sales. .............................. 15

        2.    The Sales Chart Cannot Identify the Putative Class. ................................ 16

        3.    Mr. Stockton's Proposed Damages Model Does Not Account for These Deficiencies. ......................................................................... 17

    **D.**    **The Named Plaintiff, Mr. Glasscock, Exemplifies Why a Class Cannot Be Certified Here.** ............................................................................... **18**

        1.    Plaintiff Is a Law Enforcement Officer That Grew Up with Firearms and Bought Firearms Before Without a Manual Safety. .................................. 18

        2.    Plaintiff Sued Sig Sauer After His Attorneys Told Him His P320 Was Defective. ..................................................................................... 18

        3.    Plaintiff Purchased the P320 "Used" from a Friend and Knew It Did Not Have a Manual Safety. ............................................................ 19

4.     Plaintiff Repeatedly Testified That He Was Not Exposed to Sig Sauer Advertising Prior to Purchase and Never Mentioned That He Wanted to Be Informed About the Pistol's Trigger Pull or Highly Energized Nature.....21

5.     Plaintiff Would Not Have Purchased His P320 For Less and Does Not Believe   Adding a Manual Safety Repairs His P320. ..............................22

6.     Plaintiff Has Not Performed His Duties as a Class Representative...........23

E.     **Public Knowledge of Discharge Incidents Varied Significantly and Sig Sauer Was Not Aware of the Claimed Defect Until Plaintiff Filed His Motion.** ....................................................................................................**23**

1.     Very Few P320 Discharge Incidents Were Reported to Sig Sauer...........23

2.     The Press and Litigation About the P320 Did Not Inform Sig Sauer of the Plaintiff's Claimed 3-Part Defect...............................................24

3.     The FMECA Analysis Does Not Indicate that Sig Sauer Believed the P320 Was Defective in 2017.............................................................26

**LEGAL STANDARD** ............................................................................................**26**

**ARGUMENT** .........................................................................................................**27**

**I.     PLAINTIFF LACKS ARTICLE III STANDING** .....................................**27**

A.     **Plaintiff Does Not Have an Injury-in-Fact.** ...........................................**27**

1.     Plaintiff Does Not Have a Manifest Defect. .................................27

2.     Plaintiff Knew He Was Purchasing a P320 Without a Manual Safety......27

3.     Plaintiff Received the Benefit of His Bargain. .............................28

B.     **Plaintiff's Purported Injury Is Not Fairly Traceable to Sig Sauer.** ....**28**

C.     **Plaintiff Cannot Pursue Injunctive Relief or a Class After April 2022.** .........**29**

**II.     PLAINTIFF IS ATYPICAL AND INADEQUATE**.......................................**30**

A.     **Plaintiff Is Subject to a Multitude of Unique Defenses.** ......................**30**

B.     **Plaintiff Has Not Suffered the Same Injury as the Putative Class.**.......**32**

C.     **Plaintiff Fails to Demonstrate He Is Adequate for Additional Reasons.** ........**32**

**III.     THE PROPOSED CLASS CANNOT BE CERTIFIED UNDER RULE 23(b)(3)**.....**34**

A.     **Standing Is an Individualized Issue.** .......................................................**35**

B.     **Individual Issues Predominate Nearly Every MMPA Element**.............**35**

1.     Deceptive Omission Is an Individualized Issue. ...........................35

2.     Sig Sauer's Knowledge Is an Individualized Issue........................36

3.     Materiality Presents Individual Issues. ........................................38

4.     Causation Presents Individual Issues. ..........................................39

5.     Ascertainable Loss Presents Individual Issues. ............................41

6.     The MMPA's Usage Requirement Requires Individual Proof. ................42

C.     **Plaintiff Fails to Present a Viable Damages Model**................................**42**

**IV.     THE PROPOSED CLASS IS NOT ASCERTAINABLE NOR SUPERIOR.** ...........**43**

**V.     THE PROPOSED CLASS CANNOT BE CERTIFIED UNDER RULE 23(c)(4).** ....**44**

**CONCLUSION** .....................................................................................................**44**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Golden Grain Co.*,
677 F. Supp. 3d 940 (E.D. Mo. 2023)...........................................................................1, 35, 37, 42

*Agred Found. v. U.S. Army Corps. of Eng'rs*,
3 F.4th 1069 (8th Cir. 2021) ...............................................................................................28

*Anderson v. Ford Motor Co.*,
2020 WL 1853321 (W.D. Mo. Feb. 14, 2020) .....................................................................38

*Avritt v. Reliastar Life Ins. Co.*,
615 F.3d 1023 (8th Cir. 2010) .............................................................................................35

*Bennett v. Nucor Corp.*,
656 F.3d 802 (8th Cir. 2011) ...............................................................................................26

*Bernbeck v. Gale*,
829 F.3d 643 (8th Cir. 2016) ...............................................................................................27

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
2011 WL 6740338 (W.D. Mo. Dec. 22, 2011) ............................................................ *passim*

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ...............................................................................................41

*Bodner v. Oreck Direct, LLC*,
2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) .....................................................................32

*Boren v. Henkel*,
2024 WL 2768669 (E.D. Mo. May 30, 2024) ......................................................................35

*Bradley v. Hertz Corp.*,
2019 WL 3975177 (S.D. Ill. Aug. 22, 2019) .......................................................................40

*Brown v. Medtronic, Inc.*,
628 F.3d 451 (8th Cir. 2010) ...............................................................................................28

*State ex rel Coca-Cola Co. v. Nixon*,
249 S.W.3d 855 (Mo. 2008) (en banc) ....................................................................35, 40, 42

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..........................................................................................................26, 42

*Diesel v. Mariani Packing Co.*,
2024 WL 1674520 (E.D. Mo. Apr. 18, 2024).........................................................39, 41, 42

*Diesel v. Mariani Packing Co.*,
2024 WL 4263944 (E.D. Mo. Sept. 23, 2024).......................................................42

*Dumas v. Albers Med., Inc.*,
2005 WL 2172030 (W.D. Mo. Sept. 7, 2005) ......................................................43

*Ebert v. Gen. Mills, Inc.*,
823 F.3d 472 (8th Cir. 2016) ................................................................................34

*Elfaridi v. Mercedes-Benz USA, LLC*,
2018 WL 4071155 (E.D. Mo. Aug. 27, 2018).....................................................31

*In re Emerson Elec. Co. Wet/Dry Vac Mktg. & Sales Litig.*,
2022 WL 670131 (E.D. Mo. Mar. 7, 2022) ..................................................35, 42

*Faltermeier v. FCA US LLC*,
899 F.3d 617 (8th Cir. 2018) ...............................................................................39

*Ford Motor Co. v. Sheldon*,
113 S.W.3d 839 (Tex. Ct. App. 2003) .................................................................36

*In re Ford Motor Co. Vehicle Paint Litig.*,
182 F.R.D. 214 (E.D. La. 1998)...........................................................................36

*Frankenberry v. Sig Sauer*,
No. 19-cv-2990 (D.S.C. Feb. 4, 2022), ECF No. 79............................................25

*Garrard v. Rust-Oleum Corp.*,
575 F. Supp. 3d 995 (N.D. Ill. 2021) ..................................................................31

*In re GenesisIntermedia, Inc. Sec. Litig.*,
232 F.R.D. 321 (D. Minn. 2005)..........................................................................30

*George v. Omega Flex, Inc.*,
2020 WL 4718386 (W.D. Mo. Aug. 13, 2020) (Harpool, J.) ...............................40

*Guerrero v. Henkel Corp.*,
2024 WL 2769745 (E.D. Mo. May 30, 2024) .....................................................35

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)...............................................................................................1

*Halvorson v. Auto-Owners Ins. Co.*,
718 F.3d 773 (8th Cir. 2013) ...............................................................................35

*In re Hardieplank Fiber Cement Siding Litig.*,
  2018 WL 262826 (D. Minn. Jan. 2, 2018) ............................................................ 30

*Hays v. Nissan North America, Inc.*,
  2021 WL 912262 (W.D. Mo. Mar. 8, 2021) ......................................................... 37

*Henke v. Arco Midcon, LLC*,
  2014 WL 982777 (E.D. Mo. Mar. 12, 2014) ............................................... 30, 34, 44

*Hennessey v. Gap, Inc.*,
  86 F.4th 823 (8th Cir. 2023) ................................................................................ 31

*Huskey v. Birch Telecom of Mo., Inc.*,
  2018 WL 4679738 (E.D. Mo. Sept. 28, 2018) ..................................................... 30

*Indigo LR LLC v. Advanced Ins. Brokerage of Am. Inc.*,
  717 F.3d 630 (8th Cir. 2013) ............................................................................... 27

*J.P. v. BCBSM, Inc.*,
  2021 WL 131234 (D. Minn. Jan. 14, 2021) ......................................................... 30

*Johannessohn v. Polaris Indus., Inc.*,
  9 F.4th 981 (8th Cir. 2021) ............................................................... 27, 34, 44

*Kassover v. Comput. Depot, Inc.*,
  691 F. Supp. 1205 (D. Minn. 1987), *aff'd*, 902 F.2d 1571 (8th Cir. 1990) ............ 33

*Keister v. Allstate Fire & Cas. Ins. Co.*,
  663 F. Supp. 3d 1030 (W.D. Mo. 2023) .............................................................. 32

*Klosterman v. Vacation Mgmt. Sols., LLC*,
  682 S.W.3d 781 (Mo. App. E.D. 2023) ............................................................... 36

*Luiken v. Domino's Pizza, LLC*,
  705 F.3d 370 (8th Cir. 2013) ............................................................................... 38

*Lupo v. Shelter Mutual Ins. Co.*,
  70 S.W.3d 16 (Mo. App. E.D. 2002) ................................................................... 43

*May v. Makita*,
  2023 WL 417487 (E.D. Mo. Jan. 26, 2023) ........................................................ 29

*McCall v. Monro Muffler Brake*,
  2013 WL 1282306 (E.D. Mo. Mar. 27, 2013) ..................................................... 40

*McKeage v. TMBC, LLC*,
  847 F.3d 992 (8th Cir. 2017) ............................................................................... 43

*Meagley v. City of Little Rock*,
    639 F.3d 384 (8th Cir. 2011) ............................................... 29

*In re Milk Prods. Antitr. Litig.*,
    195 F.3d 430 (8th Cir. 1999) ............................................... 30

*Nafar v. Hollywood Tanning Sys.*,
    339 F. App'x 216 (3d Cir. 2009) .......................................... 34

*In re NHL Players' Concussion Inj. Litig.*,
    327 F.R.D. 245 (D. Minn. 2018) ........................................... 44

*In re Pre-Filled Propane Tank Antitr. Litig.*,
    2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) ........................ 26

*Price v. United Servs. Auto. Ass'n*,
    2012 WL 2847821 (W.D. Ark. Mar. 16, 2012), *R. & R. adopted*, 2012 WL
    2847916 (W.D. Ark. July 11, 2012) ...................................... 32

*Pruitt v. Pers. Staffing Grp.*,
    2020 WL 3050330 (N.D. Ill. June 8, 2020) ......................... 33

*Rattray v. Woodbury Cnty., Iowa*,
    614 F.3d 831 (8th Cir. 2010) ............................................... 30

*Riddell v. Gen. Motors LLC*,
    2024 WL 2077559 (E.D. Mo. May 9, 2024) ......................... 31

*Sandusky Wellness Ctr. v. Medtox Sci., Inc.*,
    821 F.3d 992 (8th Cir. 2016) ............................................... 43

*Sanneman v. Chrysler Corp.*,
    191 F.R.D. 441 (E.D. Pa. 2000) ........................................... 36

*Sgouros v. TransUnion Corp.*,
    2023 WL 6690474 (N.D. Ill. Oct. 12, 2023) .................... 29, 33

*In re Smitty's/Cam2 Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    2022 WL 710192 (W.D. Mo. Mar. 9, 2022) ........................ 29

*In re St. Jude Medical, Inc.*,
    522 F.3d 836 (8th Cir. 2008) ............................................... 39

*St. Louis Heart Center, Inc. v. Vein Centers for Excellence, Inc.*,
    2017 WL 2861878 (E.D. Mo. July 5, 2017) ........................ 43

*Stanford v. Samsung Elecs. Am., Inc.*,
    2024 WL 4556518 (W.D. Mo. Aug. 20, 2024) ...................... 2

*Stotz v. Mophie Inc.*,
    2017 WL 11571083 (C.D. Cal. Dec. 14, 2017) ............................................................28

*Strutton v. Blake*,
    2005 WL 8176850 (E.D. Mo. Sept. 29, 2005) .........................................................32

*Tate v. Weyerhaeuser Co.*,
    723 F.2d 598 (8th Cir. 1983) ..................................................................................30

*TBK Partners v. Chomeau*,
    104 F.R.D. 127 (E.D. Mo. 1985) ...........................................................................33

*Thornburg v. Ford Motor Co.*,
    2022 WL 4348475 (W.D. Mo. Sept. 19, 2022) .......................................................34

*Townsend v. Monster Beverage Corp.*,
    303 F. Supp. 3d 1010 (C.D. Cal. 2018) .................................................................38

*In re Tropicana Orange Juice Market. & Sales Practices Litig.*,
    2019 WL 2521958 (D.N.J. June 18, 2019) .............................................................38

*Tuft v. McDonnell Douglas Corp.*,
    581 F.2d 1304 (8th Cir. 1978) ...............................................................................27

*Vervaecke v. Chiles, Heider & Co.*,
    578 F.2d 713 (8th Cir. 1978) ..................................................................................30

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..........................................................................................26, 31

*Wallace v. ConAgra Foods, Inc.*,
    747 F.3d 1025 (8th Cir. 2014) ...............................................................................27

*White v. Just Born, Inc.*,
    2018 WL 3748405 (W.D. Mo. Aug. 7, 2018) ................................................. *passim*

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011) ..................................................................................42

## Other Authorities

Fed. R. Civ. P 23 ....................................................................................................... *passim*

Fed. R. Evid. 702 ................................................................................................................42

**TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---|---|
| **Exhibit 1** | Declaration of Colleen M. Gulliver dated March 31, 2025 |
| **Exhibit 2** | Declaration of Thomas Taylor dated February 17, 2025 (and Exhibits A – O attached) |
| **Exhibit 3** | Declaration of Matthew Taylor dated March 17, 2025 |
| **Exhibit 4** | 30(b)(6) Deposition of Matthew Taylor (September 10, 2024) |
| **Exhibit 5** | Declaration of Sean Toner dated February 27, 2025 (and Exhibit 1 attached) |
| **Exhibit 6** | 30(b)(6) Deposition of Matthew Farkas (September 23, 2024) |
| **Exhibit 7** | Report of Derek Watkins dated March 31, 2025 |
| **Exhibit 8** | SIG-MARKETING-000213 (Sig Sauer Brochure for P320 Full-Size Model) |
| **Exhibit 9** | Declaration of Phil Strader dated March 25, 2025 |
| **Exhibit 10** | SIG-MARKETING-000102 (Sig Sauer 2017 Firearms Products Catalog) |
| **Exhibit 11** | Deposition of Plaintiff Joshua Glasscock (May 16, 2023) ("Glasscock Vol. I") |
| **Exhibit 12** | Cont. Deposition of Plaintiff Joshua Glasscock (March 6, 2025) ("Glasscock Vol. II") |
| **Exhibit 13** | Report of Robert Rauschenberger, Ph. D, dated March 27, 2025 |
| **Exhibit 14** | SIG-GLASSCOCK00007700 (Tom Taylor email dated August 9, 2017) |
| **Exhibit 15** | Deposition of James Faulkner (March 15, 2024) ("Faulkner Vol. I") |
| **Exhibit 16** | Declaration of Ed Murphy dated February 10, 2025 |
| **Exhibit 17** | Declaration of Christoper Meyer dated February 4, 2025 (and Exhibit 1 attached) |
| **Exhibit 18** | Declaration of Matthew Farkas dated February 4, 2025 |
| **Exhibit 19** | IMG_3203 (Text messages dated March 29, 2020 from James Faulkner to Plaintiff) |
| **Exhibit 20** | Glasscock, Joshua 000016 (Text messages dated March 29, 2020 from Plaintiff to James Faulkner) |
| **Exhibit 21** | Glasscock's Interrogatory Responses, Set 1 (January 23, 2023) |
| **Exhibit 22** | Exhibit 14 to Glasscock Vol. II (Sig Sauer Press Release, M17) (SIG-GLASSCOCK00006703) |
| **Exhibit 23** | Exhibit 15 to Glasscock Vol. II (Sig Sauer 2018 Firearm Products Catalog) (SIG-MARKETING0000107) |
| **Exhibit 24** | SIG-MARKETING-000096 (Sig Sauer Advertisement Disclosing Manual Safety) |
| **Exhibit 25** | Exhibit 6 to Glasscock Vol. II (P320 Ad) (SIG-MARKETING-000051) |
| **Exhibit 26** | Report of Jonathan Tomlin, Ph.D., dated March 30, 2025 |
| **Exhibit 27** | Exhibit 11 to Glasscock Vol. II (Email from Plaintiff to Todd Werts dated March 9, 2022) (Glasscock, Joshua 000027) |
| **Exhibit 28** | Cont. Deposition of James Faulkner (May 28, 2024) ("Faulkner Vol. II") |
| **Exhibit 29** | Exhibit 9 to Faulkner Vol. II (Firearm Transaction Record) |
| **Exhibit 30** | 30(b)(6) Deposition of Christopher Meyer (September 11, 2024) |
| **Exhibit 31** | 30(b)(6) Deposition of Thomas Taylor (September 12, 2024) |
| **Exhibit 32** | Exhibit 9 to Glasscock Vol. II (Owner's Manual) (Glasscock, Joshua 000041-89) |

## PRELIMINARY STATEMENT

Plaintiff Joshua Glasscock's ("Plaintiff") Motion for Class Certification ("Motion" or "Mot.") comes nowhere close to demonstrating Rule 23's requirements by a preponderance of the evidence. "[P]laintiffs … must actually *prove*—not simply plead—… each requirement of Rule 23[.]" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Plaintiff has not done so here. Plaintiff is but an afterthought in his own Motion, which addresses his typicality and adequacy in five sentences of a 46-page brief and virtually without any evidentiary support. This decision may have been strategic – an attempt to minimize the unique circumstances of Plaintiff: who purchased his P320 used from his friend at his home for a discount, who knew his P320 lacked a manual safety, and who cannot show he was exposed to Sig Sauer advertising prior to purchase. Plaintiff is both atypical and inadequate because he lacks standing, is plagued by a multitude of unique defenses, does not have the same injury as the class, has abdicated his responsibility as a class representative and suffers from credibility issues.

Plaintiff also cannot meet Rule 23(b)(3)'s requirement as he failed to offer common evidence for Article III standing, numerous elements of his MMPA claim, and ascertainability and superiority. Post-amendment,[1] the MMPA requires Plaintiff to show he: (1) "purchased merchandise"; (2) "for personal, family or household purposes"; and (3) "suffered an ascertainable loss of money" (4) "as a result of an act declared unlawful []"; (5) "acted as a reasonable consumer would in light of all circumstances"; (6) "the [unlawful act] would cause a reasonable person to enter into the transaction"; and (7) he suffered "[i]ndividual damages with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty." *Abbott*, 677 F. Supp. 3d at 945-46. Moreover, "a claim for omission," such is the case here,

---

[1] In *Abbott v. Golden Grain Co.*, the court discussed the "stringent" and "substantial amendments to the MMPA" that "call into question the applicability of [pre-amendment] cases." 677 F. Supp. 3d 940, 946-47 (E.D. Mo. 2023).

requires Plaintiff to show that Sig Sauer "failed to disclose [8] material facts that were [9] 'known to [it]." *Stanford v. Samsung Elecs. Am., Inc.*, 2024 WL 4556518, at *6 (W.D. Mo. Aug. 20, 2024).

Plaintiff's Motion fails to provide classwide evidence for virtually any element, including deception, materiality, knowledge, causality, ascertainable loss (individual or a viable classwide model), and the usage element. Resolution requires numerous individualized inquiries destroying predominance as customers did not have to interact with Sig Sauer to purchase a P320, Sig Sauer advertising varied and disclosed much of Plaintiff's sought information, and Plaintiff does not provide evidence to identify the class, when they purchased (and thus what Sig Sauer knew about the defect beforehand) from where, or how much they paid. Thus, the Motion should be denied.

## STATEMENT OF FACTS

### A. Sig Sauer and its Market-Leading P320.

#### 1. The Design and Development of the P320.

Sig Sauer is a "leading provider … of firearms for civilian, military, and law enforcement." Ex. 2, T. Taylor Decl. ¶ 4, Feb. 17, 2025.[2] One firearm Sig Sauer manufactures is the P320, a polymer "striker-fired pistol." *Id.* ¶¶ 5, 63; Ex. 3, M. Taylor Decl. ¶ 5, March 17, 2025.

Sig Sauer's design engineering team oversaw the "design and the development of the P320." Ex. 3, M. Taylor Decl. ¶ 13. Sig Sauer's product management team "define[s] what products Sig Sauer should develop …, what feature sets the products should have, and, in some cases, what requirements the products should meet so that they will appeal to [a] particular customer base," which can include "which P320 models are made available with a manual safety feature." *Id.* ¶¶ 14-15; Ex. 4, M. Taylor, 71:4-8, 141:20-142:2. This can also include the "trigger pull weight," as certain customers have their own "requirements for the trigger pull weight

---

[2] Sig Sauer's exhibits, deposition testimony, and declarations in opposition to Plaintiff's Class Certification Motion are listed in Exhibit 1, the Declaration of Colleen M. Gulliver, and referenced herein as "Ex."

characteristics." Ex. 3, M. Taylor Decl. ¶ 16. Sig Sauer's marketing team is a "separate vertical"

responsible for marketing and advertising the products developed. Ex. 5, Toner Decl. ¶ 11, Feb.

27, 2025; Ex. 4, M. Taylor, 71:9-11. "[I]t is the design engineering team and the product

management team ... that decide what the trigger pull weight should be ... including [for] the P320."

Ex. 3, M. Taylor Decl. ¶ 17. The marketing team does not. Ex. 5, Toner Decl. ¶ 11.

While Sig Sauer utilized the "grip module[s]" of the P250 pistol when designing the P320,

it did not utilize the P250 Fire Control Unit ("FCU") that Plaintiff claims was faulty (Mot. ¶ 19).

Ex. 3, M. Taylor Decl. ¶¶ 18-19. The P250's FCU was "entirely different" from the P320's, *id.*

¶ 19, and Plaintiff claims the P320's alleged defect lies in its FCU, not its grip module. Mot. ¶ 34.

### 2. The P320 is a Modular Pistol That Has Passed All Safety Testing.

Sig Sauer wanted to "[d]evelop a striker fired pistol [that required] no tool disassembly and

without pulling the trigger to disassemble the pistol." *See* Pl.'s Ex. 6, P320Design00001; *see also*

Ex. 4, M. Taylor, 132:22-133:12; Ex. 6, Farkas 37:5-8. Sig Sauer did so because other firearms

like Glocks "required users to have to depress the trigger to remove the slide," which resulted in

inadvertent discharges after users "forgot to empty the chamber before pulling the trigger to

disassemble the pistol." Ex. 2, T. Taylor Decl. ¶ 35.[3] The P320 "has passed standard industry abuse

tests, which includes drop testing." Ex. 3, M. Taylor Decl. ¶ 9; *see also* Ex. 7, Report of Derek

Watkins dated March 31, 2025 ("Watkins") at 66 (Plaintiff's P320 "met and/or exceeded all the

performance standards ... as did all other P320s."). Plaintiff "cite[s] no standard by which [the

P320] has been proven to be defective." *Id.*; *see also id.* at 4-7.

One of the key features of the P320 is its "modular nature," "which allows users to

personalize their P320s." Ex. 2, T. Taylor Decl. ¶ 44. P320 users can change the "calibers, sizes,

---

[3] Sig Sauer's "Safety Without Compromise" and "Safest Takedown" statements address this improvement. Ex. 2, T. Taylor Decl. ¶¶ 36, 39-40.

and fit" of their P320 "quickly and easily," *id.* ¶ 32, and add other accessories like sights, silencers, and flashlight attachments. *See, e.g.*, Ex. 8, SIG-MARKETING-000213 at SIG-MARKETING-000214; Pl.'s Ex. 12. Between September 1, 2017 - April 18, 2022 (the "Putative Class Period"), Sig Sauer offered "approximately 90 P320 models." Ex. 9, Strader Decl. ¶ 4, March 25, 2025; *see* Ex. 10, SIG-MARKETING-000102.

### 3. The P320's Trigger Pull, Energized Nature, and Safety Features.

Plaintiff originally testified that his P320 was defective because "it's capable of going off ***without the trigger being pulled***." Ex. 11, Glasscock Vol. I, 73:3-8 (emphasis added). Plaintiff now claims that the P320 is defective because "(1) the P320 is effectively fully energized and ready to fire the instant that a round is chambered; (2) the P320 has a minimal trigger pull because it is short and lightweight; and (3) the P320 lacks any external safety features" (the "3-Part Defect"). Mot. ¶ 24; Ex. 12, Glasscock Vol. II, 37:2-6.

Plaintiff's current 3-Part Defect theory simply repackages the P320's advertised features (some or all of which are shared by competitor models) as a defect. Trigger pull weight and distance measure how easy it is to pull the trigger. Ex. 7, Watkins at 63. The P320's "trigger pull weight … is within industry performance standards" and "comparable to" its "competitors (which [are] between 4 & 7 pounds)." *Id.* at 4-5. The "energized" nature of the firearm refers to the P320's ability to fire once the user pulls back the slide, a round is chambered, and the trigger is fully depressed. *See id.* at 35 ("single action modes [] are approximately 100% cocked (i.e., fully energized)"); *see also* Ex. 13, Report of Robert Rauschenberger dated March 27, 2025 ("Rauschenberger") ¶ 55 ("[T]he [] P320 requires the willful and purposeful retraction of the slide ... [and thus] is energized through an affirmative, deliberate action on part of the user, who then

understands, or should understand, that the weapon will fire once the trigger is pulled.").[4] "The fully energized nature" of the P320 "is equivalent to its Glock, Smith & Wesson, Walther, H&K, Canik, Kahr Arms and SCCY competitors." Ex. 7, Watkins at 5. And the manual safety, is an "optional" feature that prevents an intentionally energized P320 from firing (even when the trigger is depressed), ***provided that the user chooses to engage it***. *Id.* at 15-16.

### 4. Sig Sauer's Voluntary Upgrade Program, Which Preceded the Putative Class Period, Related to Drop Safety, Not Inadvertent Discharges.

"[I]t is preferable to design out a hazard ... than to just guard against it." Ex. 7, Watkins at 31. "With drop safety in mind, Sig Sauer designed the P320 such that the mass of trigger and trigger bar tend to balance each other[,]" meaning that "the inertial effects of the trigger bar counteracts the inertial effects of the trigger." Ex. 3, M. Taylor Decl. ¶ 8. These effects "act together as an inherent passive trigger system safety eliminating the need for [a tabbed trigger]." Ex. 7, Watkins at 31.[5]

Around February 2017, before the Putative Class Period, Sig Sauer became aware that it was possible for the P320 to discharge if dropped at a 30-degree angle. *See* Ex. 14, SIG-GLASSCOCK00007700 at SIG-GLASSCOCK00007702. This is not an angle tested by industry testing standards, *see id.*, all of which the P320 has always passed. Ex. 3, M. Taylor Decl. ¶ 9. Consequently, Sig Sauer began offering a Voluntary Upgrade Program ("VUP") to further enhance drop safety by "add[ing] additional drop safety features." *See* Ex. 3, M. Taylor Decl. ¶ 8; Ex. 4, M. Taylor, 165:20-22; 167:24-168:2. All P320 pistols manufactured after August 8, 2017 included

---

[4] The energized state is not permanent, however: the user "can simply drop the magazine from the handle, lock back the slide, and manually eject the unspent round in the chamber." Ex. 13, Rauschenberger, ¶ 56.

[5] Tabbed triggers are required in pistols that do not have the P320's balanced trigger design, such as Glocks. Ex. 7, Watkins, 22-24. A "Glock is … prone to discharge when dropped unless" it has a tabbed trigger. *Id.* at 25.

the VUP features, including Plaintiff's P320 (which he purchased on March 30, 2020 (*see* Ex. 15, Faulkner Vol. I, 49:23-25)). *See* Declaration of James Lano, ECF No. 105-2 ¶¶ 7-8.

### 5. The U.S. Army Selects the P320 Platform as the Modular Handgun System.

The U.S. Army awarded Sig Sauer the Modular Handgun System ("MHS") contract in January 2017 ("MHS Contract"). Ex. 2, T. Taylor Decl. ¶ 47; T. Taylor Decl. Ex. E (Sig Sauer's press release displayed "a picture of the [coyote-tan colored] military version of the [P320, *i.e.*, the] XM17 featuring a manual safety"). The U.S. Army selected Sig Sauer's XM17 and XM18[6]— the military variants of the P320 (the "MHS Contract Pistols"). Ex. 2, T. Taylor Decl. ¶ 41; Ex. 4, M. Taylor, 18:15-24. The "MHS Contract required the MHS Contract Pistols to be equipped with an external manual safety among other things." Ex. 16, Murphy Decl., ¶ 7 n.1, Feb. 10, 2025 (citing Pl.'s Ex. 15 at § 3.4.4.(d)); Ex. 4, M. Taylor, 234:20-21.

As there is often "significant civilian interest" in a military firearm, *see* Ex. 2, T. Taylor Decl. Ex. I; *see, e.g.*, Ex. 12, Glasscock Vol. II, 13:6-19, Sig Sauer later developed "commercial variant[s]" of the MHS Contract Pistols. Ex. 2, T. Taylor Decl. ¶¶ 50-51. On July 18, 2018, Sig Sauer announced that it would be offering the "commercial variant of the U.S. Army's [X]M17 … called the P320-M17," which "features a coyote-tan PVD coated stainless steel slide with the same optic cut as specified by the MHS [C]ontract, and ... comes standard with a manual safety." Ex. 2, T. Taylor Decl. Ex. H at SIG-GLASSCOCK00006703; *see also* Ex. 12, Glasscock Vol. II, 114:15-119:4. Sig Sauer made clear in advertising that the P320-M17 was "[b]ased on the M17 firearm selected by the U.S. ARMY." *See* Pl.'s Ex. 12 at SIG-GLASSCOCK00001742.

The P320-M17s came standard with a manual safety but later versions of the P320-M17 became available without it. Ex. 2, T. Taylor Decl. Ex. H at SIG-GLASSCOCK00006703. On

---

[6] The M18 is the "compact version of the M17" and identical in all other respects. Ex. 2, T. Taylor Decl. Ex. I at 1.

December 3, 2019, Sig Sauer made available the commercial variant to the XM18, the P320-M18. *See* Ex. 2, T. Taylor Decl. Ex. I at 1; T. Taylor Decl. ¶ 51. Sig Sauer's press release once again announced the "M18 is ... configured nearly identically to the military's model. It features ... a … coyote-tan grip module, and an ambidextrous manual safety." Ex. 2, T. Taylor Decl. Ex. I at 1.

### 6. Risk of Inadvertent Discharges Is Present with All Firearms.

"[T]he possibility of accidentally pulling the trigger when the firearm is in a discharge ready condition ... is inherent in the product itself." Ex. 7, Watkins at 21. "Keeping the firearm unloaded ... is the most basic and effective manual safety." *Id.* at 18. There are also several types of passive safeties for firearms (requiring no "additional deliberate" act by the user) and manual safeties (which require a user to "consciously engage[]" it). *Id.* at 17-18. The P320's drop-safe, balanced trigger mechanism is an example of a passive safety and the P320's optional ambidextrous thumb safety is an example of an additional manual safety. *Id.* at 17, 18.

While a manual safety can "augment safe handling," the presence of this feature "cannot entirely eliminate the risk of an inadvertent discharge." Ex. 3, M. Taylor Decl. ¶ 10; Ex. 4, M. Taylor, 48:8-12, 236:11-14; *see also* Ex. 7, Watkins at 41 ("[A] manual safety does not eliminate the chance of an inadvertent discharge."); Ex. 3, M. Taylor Decl. ¶ 10 ("[U]nless the user takes the affirmative step to engage the manual safety, it cannot prevent an [inadvertent] discharge ...."); *see also* Ex. 13, Rauschenberger, ¶ 55 ("[J]ust like a user can unintentionally pull the trigger ... he or she can forget to set a safety[.]"); *id.* ¶ 56 ("as ... Mr. Gatrost writes, a manual safety 'requires the user to intentionally, manually engage [it]'.").

Real world evidence has repeatedly confirmed that manual safeties do not prevent inadvertent discharges. For example, the Los Angeles Sherriff's Department reported an "increase in [inadvertent] discharges" after it switched from "a hammer fired, double action/single action [] pistol with a manual thumb safety to a striker fired pistol equipped with a passive trigger safety

and no manual thumb safety," Ex. 7, Watkins at 40-41, but concluded the increase in discharges was caused by a "lack of training" rather than a "lack of a manual thumb safety." *Id.* at 41. Dr. Rauschenberger analyzed the New York Police Department's "annual report[s] of firearm discharges" and opined that "the range of makes and models of guns [including guns with thumb safeties[7]] that experience [inadvertent] discharges is quite wide; and it also implicates user error as a frequent culprit[.]" Ex. 13, Rauschenberger, ¶ 23.[8]

### 7. Consumers Consider Many Individualized Factors When Deciding Which Firearm to Purchase.

Consumers of firearms have a "large number of makes and models from which to make a final selection," and each "has different sets of features that trade off against one another." *Id.* at ¶ 46. The reasons why a consumer may choose a particular firearm are "diverse" and "individualized," and will impact "which features are important and which ones are not." *Id.* ¶ 51. Consumers may consider "[w]hether the firearm is semi-automatic or not, whether [it] has a manual safety or not," and the firearm's purpose, and will place a different level of importance on "how readily their gun should be able to fire." *Id.* ¶¶ 51, 53.

The P320 is no different. The P320 comes in "three different calibers, which will be important to some consumers." *Id.* ¶ 46. The P320 also allows customers to choose different grip fits and sizes. *See* Ex. 10 [SIG-MARKETING-000102-104]. Plaintiff, for example, testified that he "decide[d] to move from a Glock 23 to a P320" because "the P320 was a 9-millimeter" and the Glock's ammunition was "more expensive." Ex. 11, Glasscock Vol. I, 34:9-17. More generally, Plaintiff explained that the features he looks for when purchasing a pistol are "reliability," "other reputable sources that have ... endorsed the weapon," and "its performance." Ex. 12, Glasscock

---

[7] Pistols from Glock, Smith and Wesson, and Sig Sauer were evaluated in the NYPD study, *see* Ex. 13, Rauschenberger, ¶ 23, all come standard without a manual thumb safety. *See* Ex. 7, Watkins, 33-35.
[8] "[D]espite Glock's... tabbed trigger ... accidental discharge[s] were still experienced." Ex. 7, Watkins, 44.

Vol. II, 13:6-19, 14:5-6. Plaintiff was drawn to the P320 because it was "good enough for [the military]." Ex. 11, Glasscock Vol. I, 53:4-7. Plaintiff's seller, James Faulkner ("Mr. Faulkner"), in contrast, decided to purchase after he "saw the firearm was highlighted in a gun magazine," he read the "specifications," and "had it in [his] hands." Ex. 15, Faulkner Vol. I, 27:4-18.

### 8. Most Consumers Did Not Want a Manual Safety, Which Was Available.

#### i. Customers Preferred No Manual Safety.

The P320 was designed for sales across customer bases, including commercial (consumers), law enforcement, and military, each of whom want different features. Ex. 4, M. Taylor, 225:6-15. "Not all customers want a manual safety[.]" Ex. 17, Meyer Decl. ¶ 4, Feb. 4, 2025; Ex. 4, M. Taylor, 44:21-24; *id.* at 234:21-25. Certain customers do not want a manual safety because "[t]here are potential downsides in a life or death situation" such as the "time" it takes to "disengage" the safety. *See* Ex. 4, M. Taylor, 43:15-44:9. Similarly, many law enforcement "believe that [the manual safety] presents a safety issue if the officer does not remember to disengage [it]." Ex. 18, Farkas Decl. ¶ 6, Feb. 2, 2025. For example, the Department of Immigration and Customs Enforcement ("ICE") "has the philosophical view" that "manual thumb safeties [are] a potential safety hazard" because they "require[] the user to perform the additional act ... when deploying the pistol, which the operator could forget to do during periods of high stress." Ex. 7, Watkins at 14-15; *see also* Ex. 13, Rauschenberger, ¶ 55. Mr. Farkas confirmed that "[n]o law enforcement agency that I am aware of has selected a model P320 with a manual safety." Ex. 18, Farkas Decl., ¶ 7; Ex. 6, Farkas 141:20-142:13. Plaintiff's employer has the same philosophy, as Plaintiff carries his "Glock 19" (which does not have a manual safety) "loaded" as his employer "want[s] [him]" to do. Ex. 12, Glasscock Vol. II, 10:11-19, 11:5-17, 134:4-9.

For other consumers, "the absence of a manual safety or tabbed trigger, a short trigger pull and weight, and a high degree of readiness to fire are either desirable features ... or they are at least

9

not contradictory to these individuals' intentions toward the weapon." Ex. 13, Rauschenberger, ¶ 54. Some households, especially in Missouri, also "appear to value the ability to have a firearm that is ready to provide defensive capabilities at a moment's notice." *Id.* Characteristics that "modulate whether a gun owner has a loaded, unlocked gun are veteran status, marital status,[] education," and "geography." *Id.*; *see also* Ex. 17, Meyer Decl. ¶ 5 ("Whether a particular customer wants a manual safety ... depends on the particular preferences of the customer."). And, for some consumers, "the perception of a heightened sense of risk (whether factually true or not) may have increased the desirability" of the P320. Ex. 13, Rauschenberger, ¶ 48.

Moreover, "the significance of a manual safety as a feature of a firearm can change over time depending upon the context of [a consumer's] personal needs or constraints." *Id.* ¶ 48. For example, some customers who originally purchased a P320 with a safety "have decided they no longer want [it]." Ex. 17, Meyer Decl. ¶ 6; Ex. 13, Rauschenberger, ¶ 48 ("[C]onsumers indicate widely diverging criteria before ... and after they have purchased it."). Both Plaintiff and Mr. Faulkner wanted to purchase the P320 despite knowing it did not have a manual safety. Mr. Faulkner explained that when he bought the P320, he knew it "did not come with external safety features." Ex. 15, Faulkner Vol. I 26:22-27:18. Plaintiff similarly admitted that he knew that the P320 "didn't have any external safeties." *See* Ex. 11, Glasscock Vol. I at 40:18-25, 42:11-43:14.[9] Ultimately, though, Mr. Faulkner's preferences changed based on his family's interests: he "told [Plaintiff] that [Mr. Faulkner's] wife wanted ... him to sell the Sig Sauer P320 because it did not have an external safety." Ex. 21, Pl.'s Resp. to Def.'s First Interrogs. No. 5.

---

[9] Mr. Faulkner sent pictures of the P320 without external safety features to Plaintiff before the sale. *See* Exs. 19-20.

## ii. Sig Sauer Always Offered a Manual Safety Model.

In recognition of different customer preferences, Sig Sauer offered an "optional" manual safety throughout the Putative Class Period (and to date). Ex. 4, M. Taylor, 130:12-19; Ex. 2, T. Taylor Decl. ¶ 62; *see also* Pl.'s Ex. 4, Biller Report, at 20 ("[a] manual thumb safety for the commercially available P320 is optional"). "Sig Sauer offered for sale ... at least four pairs of P320 models that ... were identical except for the safety feature." Ex. 9, Strader Decl. ¶ 7. "[C]ustomers vastly preferred purchasing … without a manual safety feature." Ex. 2, T. Taylor Decl. ¶¶ 63-64.

Moreover, "[t]here are multiple pistols that are analogous to the P320" including the Smith & Wesson M&P, Canik TP9 Elite, Walther P99 AS, and FN Reflex pistols that are "fully energized" with "passive trigger system safeties" and no "manual thumb safeties." Ex. 7, Watkins at 34-35; *see also* Ex. 4, M. Taylor, 144:1-18 ("Certainly there are other striker fired pistols of similar nature to the 320 that don't have manual safeties.").

## B. Sig Sauer Marketed the P320 with Varied Advertising in Varied Channels.

### 1. Any Consumer Exposed to Sig Sauer's Website Could Have Seen Different Content.

Sig Sauer uses its website (https://www.sigsauer.com, the "Website") to "market to various [customer] segments." Ex. 2, T. Taylor Decl. ¶ 26. Sig Sauer "cannot identify specific visitors to its Website." *Id.* From the homepage, users can navigate to the landing page for the P320 by clicking on "Products" and then "Firearms" and selecting the P320 (the "P320 Landing Page"). *Id.* ¶ 27. "[B]etween January 2017 and November 2020, users visiting [that page] could also navigate to a separate webpage introducing the P320" (the "Meet the P320 Page"). *Id.* ¶ 28.

"Both … the P320 Landing Page and the Meet the P320 Page, … changed significantly throughout the Putative Class Period." *Id.* ¶¶ 26, 29. "[T]here is considerable diversity in the

information a consumer would have encountered[.]" Ex. 13, Rauschenberger, 22. Everyone "would have been exposed to different information." *Id.* ¶ 34.

### 2. No Evidence Has Been Offered to Show Which Consumers Saw What Advertising at What Time.

"Sig Sauer tailors particular advertisements and marketing campaigns" and uses "different advertisements depending on the advertising channel." Ex. 2, T. Taylor Decl. ¶¶ 21-22. For the commercial market, Sig Sauer uses a "variety of digital and print sources." *Id.* ¶ 18. These include its "Website, a variety of different social media platforms, influencers, digital advertisements on third-party websites and television advertisements" and "print materials such as posters sent to Sig Sauer's authorized retailers, brochures, product catalogs [for the military, law enforcement, and consumers] that are issued on a yearly basis to distributors and retailers and placed on Sig Sauer's Website, advertisements in magazines such as Recoil Magazine and Guns & Ammo Magazine; trade shows; and other in-person advertising methods." *Id.* ¶¶ 19-20, 23.

Sig Sauer will often publicize a particular advertisement "for a limited time period only as part of a specific marketing campaign ... or feature." *Id.* ¶ 24. Many of Plaintiff's cited advertisements were only displayed during narrow time periods to focused audiences, and many prior to the start of the Putative Class Period such that they are "not representative of the experience of the proposed class at large." Ex. 13, Rauschenberger, ¶ 34.

- Plaintiff's Exhibit 1 "is an advertisement [for] an in-person presentation for the SHOT Show® held in January 2017 in Las Vegas, Nevada." Ex. 2, T. Taylor Decl. ¶ 31 (citing Pl.'s Ex. 1).
- Plaintiff's Exhibit 22 "is a screenshot of the Meet the P320 Page" on the Website and was used "only for the limited period of no more than November 2016 through January 2019." *Id.* ¶ 33 (citing Pl.'s Ex. 22).
- Plaintiff's Exhibit 25 "is a digital advertisement that was displayed [in] March 2021 as part of a limited campaign in various third-party publications." Ex. 2, T. Taylor Decl. ¶ 43 (citing Pl.'s Ex. 25).
- Plaintiff's Exhibit 26 is an advertisement "published in the July/August 2016 print edition of Recoil Magazine." *Id.* ¶ 44 (citing Pl.'s Ex. 26).

- Plaintiff's Exhibit 27 is "a print poster that was created in June 2018 and distributed [to] commercial dealers." *Id.* ¶ 45 (citing Pl.'s Ex. 27).

"[A] consumer who purchased through" many popular channels may "never be exposed to any Sig Sauer advertising or statements prior to their purchase," *id.* at ¶ 8. Even if they were, "Sig Sauer would not have a record of what they might have seen and when." *Id.* This is because consumers, like Plaintiff, can purchase the P320 without interacting with Sig Sauer. For example, Plaintiff did not recall seeing any of the Motion's advertisements. *See* Ex. 12, Glasscock Vol. II, 28:22-29:15 (Pl.'s Ex. 1); 30:14-23 (Pl.'s Ex. 22); 31:13-32:5 (Pl.'s Ex. 25); 34:15-23 (Pl.'s Ex. 26); 35:16-36:1 (Pl.'s Ex. 27). Nor did Plaintiff recognize other Sig Sauer advertisements or articles. *Id.* 43:24-44:8 (Ex. 8, SIG-MARKETING-000213); 114:24-115:6 (Ex. 22, Press Release); 119:16-120:4 (Ex. 23 [Ex. 15 to Glasscock Vol. II]). Plaintiff was only able to articulate that he had seen "pictures of SIGs" and "pictures of military-dressed people with the P320," *see id.* at 29:18-19, 32:11-13, but not that Sig Sauer published those pictures. *See id.*

### 3. Sig Sauer Disclosed That Consumers Could Purchase a P320 with a Manual Safety, that the P320 Had a Crisp Trigger and that the M17 was the Model P320 That Was Comparable to the Military Version.

For those consumers who did review Sig Sauer's marketing and advertising, they would have seen that Sig Sauer had disclosed certain characteristics Plaintiff claims were part of the 3-Part Defect. *See* Mot. 33. Sig Sauer informed consumers that certain P320 models were "available with [a] manual safety." *See, e.g.*, Ex. 2, T. Taylor Decl. ¶¶ 32, 62-65; Pl.'s Ex. 12 at SIG-GLASSCOCK 00001736, 39, 42, 52, 56, 62; Ex. 24, SIG-MARKETING-000096.

Sig Sauer also informed consumers about the P320's "light" and "short" trigger pull. For example, a Sig Sauer brochure for the P320 Full-Size (Plaintiff's P320 model) described his model as having a trigger pull weight of "6.5 lbs." Ex. 8, SIG-MARKETING000213-214; Ex. 2, T. Taylor Decl. ¶ 32; *see also* Ex. 12, Glasscock Vol. II, 44:3-45:6. Other advertisements stated that the P320

has a "smooth, crisp trigger pull." Ex. 2, T. Taylor Decl. ¶ 32; Ex. 12, Glasscock Vol. II, 51:2-19; Ex. 25 [Ex. 6 to Glasscock Vol. II]; Pl.'s Ex. 26. Plaintiff admitted that he understood a "crisp trigger" pull to mean "quick," like a "crisp bite" of an "apple." Ex. 12, Glasscock Vol. II, 51:11-19; *see also* Ex. 2, T. Taylor Decl. ¶ 32. As to the "energized" nature of the P320, Plaintiff conceded he has never seen "a manufacturer advertise that ... the firearm at issue is fully energized." *See* Ex. 12, Glasscock Vol. II, 57:1-8; *see also* Ex. 7, Watkins, 5 ("[P]istol manufacturers do not directly advertise the 'energized' nature of their pistol's striker system.").

Finally, as to Plaintiff's personal belief that Sig Sauer concealed how "the gun that [he] purchased was [not] the same one that the military had," Ex. 12, Glasscock Vol. II, 118:20-21, Plaintiff admitted that Sig Sauer disclosed that the M17 and M18 were the military versions and available with safeties. *See id.* at 120:19-121:5; *see also* Ex. 22 at 1; Ex. 23 at SIG-MARKETING-000109. Sig Sauer "repeatedly publicly advertised that the P320-M17/P30-M18 … were the commercial versions of the MHS Contract Pistols," which "come with a manual safety" and the "advertisements also displayed pictures … [with them] equipped with a manual safety." Ex. 2, T. Taylor Decl. ¶ 52; *see also* Ex. 2, T. Taylor Decl. Exs. H, I, J at SIG-GLASSCOCK00008812. And the difference in color was obvious as the M17 was "coyote-tan" and the Plaintiff's Full Size P320 was black. *Compare, e.g.*, Ex. 2, T. Taylor Decl. Exs. J at SIG-GLASSCOCK00008812, *with* Ex. 8, SIG-MARKETING213.

### 4. The Owner's Manual Is Not Advertising, The Content Varied Throughout the Class Period, And Is Not Viewed by Many Consumers.

Customers receive a copy of the P320 Owner's Manual (the "Owner's Manual") when purchasing a P320. Ex. 2, T. Taylor Decl. ¶ 55. The Owner's Manual is "not read by customers prior to purchase" and is not considered "a form of advertising." *Id.* ¶¶ 54-55. As Dr. Rauschenberger noted, "[a]n owner's manual is not … marketing material; nor do all individuals

(let alone the majority of them) read the owner's manual … prior to purchas[e]." Ex. 13, Rauschenberger, ¶ 31. "[P]ublished scientific research shows that the level of reading of an owner's manual is low even post-purchase, and especially low for safety-related information." *Id.* Neither Plaintiff nor Mr. Faulkner "read" the Owner's Manual before or after purchase. Ex. 11, Glasscock Vol. I, 49:16-22, 50:22-51:4; Ex. 15, Faulkner Vol. I, 35:20-22. Plaintiff also did not read the owner's manual for his Taurus or Glock 23, Ex. 12, Glasscock Vol. II, 15:15-19, 126:12-18, and he only looked at "the picture portion" and "labeling" of his Glock 19 operator's manual during an employer training class. *See id.* at 126:19-127:4.[10]

## C. Plaintiff Has Not Identified the Putative Class or Their Purchases.

### 1. Most P320 Sales Were Through Retail or Secondary Sales and Sig Sauer Has No Records of Those Sales.

A consumer who wanted to purchase a P320 "could make the purchase in Missouri in many different ways" but could not buy a pistol "directly from Sig Sauer" until October 2021—seven months before the end of the five-year Putative Class Period—when Sig Sauer began to accept orders as part of its Custom Works program. Ex. 2, T. Taylor Decl. ¶¶ 6, 9. Combined with a very small number of sales through customer service communications, Sig Sauer only has records of sixteen individuals using Missouri addresses to purchase a P320. *Id.* ¶ 9 n.1.[11]

Consumers primarily purchased new P320s from "(a) a big box retailer, such as Academy Sports + Outdoors or Bass Pro Shops; (b) a federally-licensed (FFL) firearms dealer; (c) a gun

---

[10] Moreover, Sig Sauer released many versions of the Owner's Manual. Ex. 3, M. Taylor Decl. ¶¶ 11-12. Plaintiff's expert Mr. Gatrost referenced an early version of the Owner's Manual that stated "[t]he P320 pistol is a double-action only (DAO) design," Pl.'s Ex. 5, Gatrost Decl. ¶ 40, which was the "original version of the P320 Owner's Manual" that was "***not available*** … during the Putative Class Period." Ex. 3, M. Taylor Decl. ¶ 11 (emphasis added). Plaintiff's Owner's Manual "did not include the statement" and instead stated that '[t]he P320 is a striker-fired design.'" *Id.* ¶ 12.

[11] While Plaintiff's expert, Ms. Carla A. Peak, opines without evidence that Sig Sauer "possesses names and [contact information] for a portion of the class" (Pl.'s Ex. 28, Peak Decl., at ¶ 13), it is only 16 individuals. Ex. 2, T. Taylor Decl. ¶¶ 9, 9 n.1. This represents approximately 0.0006 percent of the transactions on the Sales Chart (SIG-GLASSCOCK00008914) relied upon by Plaintiff. Pl.'s Ex. 11, Stockton Report ("Stockton") ¶ 36 n.20.

show; (d) an online retailer;" or (e) by "attending outdoor industry fund raising events hosted by organizations such as[] the National Rifle Association." *Id.* ¶ 6. Consumers could also purchase used P320s through "used gun websites like the Palmetto State Armory, Guns.com, or Gunsbroker.com, used gun retail stores" or from friends and family. *Id.* ¶ 7. If a consumer purchased a P320 in those ways, Sig Sauer does "not have a record of the sale." *Id.* ¶ 8.

Sig Sauer "does not set retail prices" for the P320 for any sale that was not a direct sale. *Id.* ¶¶ 57-58. Instead, they are set by the seller. *Id.* Sig Sauer does, however, set a Manufacturer Suggested Retail Price ("MSRP") "for each … P320 model[], which "has no binding effect," and "[a] retailer's point of sale price can, and often does, vary from the MSRP." *Id.* ¶ 59. Sig Sauer does not know what the end price was for any indirect sales transaction. *Id.* ¶¶ 57-58; *see also* Ex. 26, Report of Jon Tomlin dated March 30, 2025 ("Tomlin") ¶ 32 ("Mr. Stockton does not identify any data capable of identifying prices paid by consumers.").

When setting the MSRP, "Sig Sauer will consider competitor pricing for comparable models and a model's suite [of] components—for example, the caliber, slide cuts/features, grips, finish and graphics, sights, and attachments (like optics, etc.)," Ex. 9, Strader Decl. ¶ 5, but does not "consider the presence of a manual safety as impacting the MSRP of any firearm model, including the P320." *Id.* ¶ 6. "Sig Sauer *set equivalent MSRP's for P320 models that were identical* except for the manual safety feature." Ex. 9, Strader Decl. ¶¶ 7, 8 (emphasis added).

## 2. The Sales Chart Cannot Identify the Putative Class.

Plaintiff claims that Sig Sauer "maintains internal records of the number of P320s sold to Missouri consumers," and has "sold over 19,000 P320s," Mot. ¶¶ 60-61, 32. This is incorrect. "Sig Sauer can only generate a list of sales to wholesale commercial distributors and commercial retailers within the State of Missouri during the Putative Class Period," which Sig Sauer produced as SIG- GLASSCOCK00008914 (the "Sales Chart"). *See* Ex. 2, T. Taylor Decl. ¶ 10. The Sales

Chart, however, does not identify consumer names or the retail price any P320 was sold for indirect sales. SIG-GLASSCOCK00008914. In addition, the Sales Chart does not indicate the purpose of any P320 sale, so it cannot be used to determine whether any individual may have purchased their P320 "to use at their job or for their business." Ex. 2, T. Taylor Decl. ¶ 15.

Moreover, for several reasons, the Sales Chart does not identify actual sales of any P320 to a consumer in Missouri during the Putative Class Period. First, the identified P320s could have been sent "to another location in another state for ultimate sale." *Id.* ¶ 11. In addition, the dates represent the "date the P320 was transferred to the wholesaler or retailer," and the "ultimate sale … could have occurred any time after that, including after the end of the Putative Class Period." *Id.* ¶ 13. Moreover, "even if a consumer purchased" an identified P320, "that consumer could have later sold the pistol." *Id.* ¶ 14. "Secondary sales information cannot and is not reflected in the Sales Chart[.]" *Id.* Therefore, contrary to Plaintiff's contention, Mot. ¶¶ 60-61, the Sales Chart is certainly not a conclusive list of P320s. And Plaintiff's P320's "serial number does not appear on the Sales Chart," Ex. 2, T. Taylor Decl. ¶ 12, so it is either underinclusive or Plaintiff would not even be a member of his own class. *See* Ex. 26, Tomlin, ¶ 31 ("[T]he data proposed by Mr. Stockton would likely inaccurately identify purchases as occurring in Missouri (when they did not) and inaccurately omit purchases that did"). Otherwise, Plaintiff's expert Ms. Peak proposes to use social media to target individuals who may be part of the class. Peak Decl. ¶¶23-27.

### 3. Mr. Stockton's Proposed Damages Model Does Not Account for These Deficiencies.

Plaintiff's damages expert "proposes a method by which to measure overpayment harm." Mot. ¶ 73 (citing Stockton, ¶ 16). Mr. Stockton opines that he is utilizing "a benefit of the bargain framework ... [that considers] the cost of the execution of a competent repair" (Stockton, ¶¶ 9, 14) or "the price differential between P320 handguns with and without an external safety option"

("MSRP Analysis"). *Id.* ¶ 10. But "Mr. Stockton does not identify any data … for determining the actual prices paid by putative class members, the identity of the original owners of P320s (particularly, when there has been more than one owner), or the number of P320s sold in Missouri during the Putative Class Period," which is "necessary to appropriately determine economic injury and damages." Ex. 26, Tomlin, ¶ 9(a). Further, correcting the errors in Mr. Stockton's MSRP Analysis "reverses [his] results" and indicates no price differential exists. *Id.* ¶¶66-72. Finally, Mr. Stockton has proposed no damages analysis that "directly relates" to the Plaintiff's assertion that Sig Sauer failed to disclose to him he was not purchasing the Military version of the P320. *Id.* ¶ 41.

### D. The Named Plaintiff, Mr. Glasscock, Exemplifies Why a Class Cannot Be Certified Here.

#### 1. Plaintiff Is a Law Enforcement Officer That Grew Up with Firearms and Bought Firearms Before Without a Manual Safety.

Plaintiff is a law enforcement officer who "grew up with firearms." Ex. 11, Glasscock Vol. I, 11:15-19, 17:1-17. Prior to purchasing the P320, Plaintiff purchased the Glock 23 and the Taurus TCP 380, neither of which have a manual safety. *Id.* at 15:7-11, 25:13-20, 35:1-3; 36:13-19. Plaintiff also currently carries a Glock 19 that "was issued to [him] by the sheriff's office," which does not have a manual safety. Ex. 12, Glasscock Vol. II, 10:9-15; 11:5-17. Plaintiff carries his Glock 19 "loaded" because his "employer want[s]" him to do so. *Id.* at 134:4-9.

#### 2. Plaintiff Sued Sig Sauer After His Attorneys Told Him His P320 Was Defective.

Prior to filing his Complaint, Plaintiff had no "issues with the pistol" including "functionally, mechanically, or ... otherwise." *See* Ex. 21, Pl.'s Resp. to Def.'s First Interrogs. No. 6; *see also* Ex. 11, Glasscock Vol. I, 64:22-65:1. Plaintiff has "not had an [inadvertent] discharge." Ex. 12, Glasscock Vol. II, 88:21-23. Plaintiff "didn't seek" his counsel. *Id.* 90:8-91:6. Instead, he started to believe his P320 was "dangerous" because his "attorneys told [him]." *id.* 60:21-61:1; *see also id.* at 56:22-25 ("Q. Am I correct in understanding that [Plaintiff's knowledge of the 3-Part

Defect] is something you obtained from your attorneys? A. Yes, that's how I've gained my knowledge."). Plaintiff also stopped using his P320 only after his attorneys informed him that he "may have a claim ... regardless of whether [he] ... experienced an [inadvertent] discharge." Ex. 11, Glasscock Vol. I, 65:2-6; Ex. 12, Glasscock Vol. II, 88:11-18; Ex. 27, Glasscock E-mail.

On April 18, 2022, Plaintiff filed his Complaint asserting a claim under the MMPA alleging that the P320 had a "heightened" and "higher" risk, is "more susceptible," and had an "increased likelihood" of inadvertently discharging. Compl. ¶¶ 26-27, 29, 61(a), 85(a). Plaintiff alleged only that Sig Sauer "omitted and concealed" that "[t]he P320 has a heightened risk of inadvertent discharges due to the absence of external safety features." *Id.* ¶ 85(a). Plaintiff also alleged that "the Operator's Manual never discloses to consumers that the P320 (1) lacks any external safety feature ... and (2) ... has a higher risk of inadvertent discharges due to the absence of an external safety feature." *Id.* ¶ 29. Plaintiff did not allege any interaction he had with Sig Sauer in connection with his purchase. *See generally id.* Plaintiff alleged that had he "known of these omissions, he would not have purchased the P320 firearm, or he would have paid substantially less for it." *See id.* ¶ 64.

### 3. Plaintiff Purchased the P320 "Used" from a Friend and Knew It Did Not Have a Manual Safety.

Sig Sauer learned through discovery, however, that on March 30, 2020, Plaintiff purchased the P320 "used" from Mr. Faulkner "a friend that he worked with." *See* Ex. 21, Pl.'s Resp. to Def.'s First Interrogs. No. 6; Ex. 15, Faulkner Vol. I, 49:23-25; Ex. 11, Glasscock Vol. I, 40:18-25. Plaintiff purchased the P320 in Mr. Faulkner's "driveway" at his "house." *See* Ex. 15, Faulkner Vol. I, 43:13-19, 46:13-22. Plaintiff conceded that his Complaint omitted these details about his purchase. Ex. 12, Glasscock Vol. II, 121:7-122:13.

Plaintiff told Mr. Faulkner that "he was in the market for another handgun" and Mr. Faulkner informed him that he was selling his P320. Ex. 15, Faulkner Vol. I, 40:8-16. After Mr. Faulkner "didn't have anything bad to say" about it, he purchased it. *Id.* at 40:4-16. Mr. Faulkner sent Plaintiff pictures of the P320 without external safety features before the sale, *see* Ex. 19, IMG_3203; Ex. 20 (Glasscock, Joshua 000016), and told him that he was selling it because it did not come with a manual safety. Ex. 21, Pl.'s Resp. to Def.'s First Interrogs. No. 5. Plaintiff described the P320 as "purty" and told Mr. Faulkner "I'll give it a touch tonight." Ex. 19, IMG_3203.

Contrary to the Complaint, while Plaintiff received the Owner's Manual at purchase, he admitted that he did not "read the owner's manual" before purchase and, in fact, has never "read" it. *See* Ex. 11, Glasscock Vol. I, 49:16-22, 50:22-51:4. Plaintiff has never read the "safety warnings" and when asked whether he would have "read" a disclosure made by Sig Sauer Plaintiff merely responded "[m]aybe." *See* Ex. 12, Glasscock Vol. II, 70:9-15; 70:19-71:9.

Plaintiff also does not have documentation for the price that either he or Mr. Faulkner paid for the P320. Mr. Faulkner believes he initially purchased the P320 for "around $700" "in cash." *See* Ex. 15, Faulkner Vol. I, 26:18-21; Ex. 28, Faulkner Vol. II, 116:11-14; 118:22-119:4. Mr. Faulkner attempted to obtain a record of his purchase from Academy Sports + Outdoors in Springfield, Missouri ("Academy"), Ex. 15, Faulkner Vol. I, 26:13-17, but was unable to obtain the "actual receipt" and the only record they could provide did not contain pricing information. *See* Ex. 28, Faulkner Vol. II, 114:2-12; Ex. 29, Firearm Transaction Record at 1. When Mr. Faulkner sold his P320 to Plaintiff, Mr. Faulkner gave him a discount because the firearm was used and he was a friend. *See* Ex. 15, Faulkner Vol. I, 50:4-15. Similarly, because Plaintiff paid "in cash," *id*. at 50:16-18, there is no documentation but estimates it was only "around $400." *See*

*id.* at 50:4-15; *see also* Ex. 21, Pl.'s Resp. to Def.'s First Interrogs. No. 5. Finally, as noted, even though Mr. Faulkner purchased the P320 in Missouri during the Putative Class Period, that serial number is not listed on the Sales Chart. Ex. 2, T. Taylor Decl. ¶ 12.

### 4. Plaintiff Repeatedly Testified That He Was Not Exposed to Sig Sauer Advertising Prior to Purchase and Never Mentioned That He Wanted to Be Informed About the Pistol's Trigger Pull or Highly Energized Nature.

In addition to not alleging in his Complaint that he was exposed to any advertising from Sig Sauer prior to his purchase, *see* Compl. ¶ 31, Plaintiff averred in his interrogatory responses that "[p]rior to completing the purchase," he reviewed only "the website for Palmetto State Armory" (an online gun seller), "talked to acquaintances who were former military personnel who said Sig Sauers were good pistols and that the military switched to them," and "read[] an article on the military's use of Sig Sauer pistols" that was not published by Sig Sauer. *See* Ex. 21, Pl.'s Resp. to Def.'s First Interrogs. No. 5. In Plaintiff's initial May 16, 2023, deposition, when asked whether he "recall[ed] any of the websites [he] looked at that indicated the P320 was a good pistol," he stated "I don't recall any specific websites" and conceded he "[couldn't] recall any of my specific websites or research," Ex. 11, Glasscock Vol. I, 55:3-5, 57:11-12. He further conceded that he did not "recall any information [he] saw on SIG Sauer's website that factored into [his] decision to purchase the P320," *id.* at 57:11-21, or "any of the websites that [he] looked at that led [him] to believe the P320 [he] was purchasing was the same as the military version" but he couldn't "imagine why [he] wouldn't have" gone to the Sig Sauer Website. *Id.* at 75:7-10; 57:1-7.

Similarly, despite alleging in 2022 only that he wanted to be informed that the P320 had "a higher risk of an inadvertent discharges due to the absence of an external safety feature," *see* Compl. ¶¶ 29, 71, 85, Plaintiff first testified in 2023 that he wanted to know his P320 "was capable of going off without the trigger being pulled. And that my weapon is something different than what I thought I was getting." Ex. 11, Glasscock Vol. I, 73:6-8. And then when asked at his March 7,

2025 continued deposition "what information ... [he] want[ed] Sig Sauer to have told [him] before [he] purchased [his] P320?" (Ex. 12, Glasscock Vol. II, 36:14-16), Plaintiff responded:

> I wish they would have told me that it has a light trigger pull, that when there's a round in the chamber it is fully energized, and that it does not have an external safety. That would have been nice to know.

*Id.* at 37:2-6; *see also id.* at 52:21-23 ("I would have liked to have been told all three of those things in one setting as an advertisement."). Plaintiff also conceded that his Complaint does not "mention" that Sig Sauer "hadn't told" him about the P320's "short and light trigger pull" or that it was "highly energized." *Id.* at 129:14-130:17. Plaintiff also confirmed that he had never inquired about the trigger pull "weight" or "length" or how energized a pistol was prior to any firearm purchase. *Id.* at 39:15-24, 41:9-12, 43:12-16, 47:3-10, 57:9-20; *see also id.* at 71:19-72:19 (Plaintiff did not recall researching the "action type" of his P320 and did not understand what a "striker-fired" pistol was).

Plaintiff also claimed that he was "deceived whenever [he] purchased the gun" because he "thought that the P320 that [he] had was the same one that the military had." Ex. 12, Glasscock Vol. II, 113:22-114:1. Yet, Plaintiff did not ask Mr. Faulkner "whether the P320 pistol that he was purchasing ... was the same." Ex. 15, Faulkner Vol. I, 42:5-10.

### 5. Plaintiff Would Not Have Purchased His P320 For Less and Does Not Believe Adding a Manual Safety Repairs His P320.

Despite also alleging in his Complaint that he "would have paid substantially less" for his P320 (Compl. ¶¶ 8, 64), Plaintiff testified to the opposite: when asked "[i]f you had been told those things [about the P320] prior to purchase, would you have been willing to purchase it but just for a lower price?" he responded, "No." Ex. 12, Glasscock Vol. II, 106:13-16; *id.* at 128:23-129:7. Moreover, despite arguing in his Motion that the class suffered an ascertainable loss as to the "cost to repair the P320's alleged Defect" (Mot. 41-42; Stockton, ¶ 10, Tab 3), Plaintiff does not want

that remedy. When asked "If someone were to take your P320, add a manual safety to it, ... would that remedy the defect in your mind?", Plaintiff testified: "No, because there's two other factors to it that together make it dangerous. It's ... ready to fire, it has a short trigger pull, and it has no manual safety." Ex. 12, Glasscock Vol. II, 109:23-110:4.

### 6. Plaintiff Has Not Performed His Duties as a Class Representative.

Plaintiff had a limited understanding of his duties as a putative class representative. *Id.* at 79:22-24. He could only identify that his "responsibilities" were "doing depositions," "[t]alking to my attorneys" and being "honest[]." *Id.* at 79:25-81:19. When questioned about how involved he was in the prosecution of the case, he repeatedly stated that he let his counsel handle the "attorney things." *Id.* at 75:8-76:3 ("Q. Do you know whether SIG Sauer filed a motion for summary judgment in this case? A. I don't know specifically. I've let my attorneys handle the attorney things."); *see also id.* at 78:17-79:1. Plaintiff also did not identify monitoring class counsel as a duty or responsibility he had. *See generally id.* at 79:22-81:19.

### E. Public Knowledge of Discharge Incidents Varied Significantly and Sig Sauer Was Not Aware of the Claimed Defect Until Plaintiff Filed His Motion.

### 1. Very Few P320 Discharge Incidents Were Reported to Sig Sauer.

Plaintiff's Motion cites Sig Sauer inadvertent discharge incident reports[12] and 32 lawsuits identified by Plaintiff's counsel. *See* Mot. ¶¶ 49-50; Pl.'s Ex. 23, Dameron Decl. These incidents were reported sporadically during the Putative Class Period and do not demonstrate Sig Sauer's knowledge of a defect. Ex. 13, Rauschenberger, ¶ 14 ("Because adverse events accumulate over time, [Sig Sauer's] knowledge of any alleged defect in ... the P320, will naturally differ across time ... [and] it will specifically have varied across the Putative Class Period."). For example, only 8

---

[12] Plaintiff claims that Sig Sauer "collected four binders' worth of incident reports" and "has not produced [them]." Mot., ¶ 49, ¶ 49 n.6. Not so. Christopher Meyer explained that "an electronic version of the binders I was referencing ... was produced." Ex. 17, Meyer Decl. ¶¶ 2, 9; *see also* Ex. 30, Meyer, 20:2-20.

incidents were reported in the first year. Ex. 17, Meyer Decl. ¶ 12. Similarly, by March 30, 2020 (when Plaintiff purchased his P320), there were only 25 incidents reported. Ex. 17, Meyer Decl. ¶ 11, Ex. 1. Moreover, less than 41% of inadvertent discharges were incidents involving commercial consumers. *See* Ex. 13, Rauschenberger, ¶ 18.

Relatedly, the alleged "cause" of these incidents changed. "Prior to mid-April 2022, the theory ... espoused ... [was] allegations that users' P320s were discharging without a trigger pull," Ex. 17, Meyer Decl. ¶ 15—which is far different from Plaintiff's 3-Part Defect asserted for the first time in the Motion. *See supra* Facts § A.3. Moreover, many incidents were determined to be caused by human error (*see* Ex. 13, Rauschenberger, ¶¶ 18, 23, 25, 55). In any event, very few P320 inadvertent discharges occurred during the Putative Class Period considering the significant number of P320s on the market. As Dr. Rauschenberger opined, it is "***nearly three times more likely that someone would get struck by lightning than experience an [inadvertent] [P320] discharge***." *Id.* ¶ 24 (emphasis added);[13] *see also* Ex. 17, Meyer Decl. Ex. 1; Ex. 2, T. Taylor Decl. ¶¶ 65-66. "[O]nly 0.003% of [P320] users have experienced an inadvertent discharge." Ex. 13, Rauschenberger, ¶ 24 (estimating "incidence rate of 0.00004% in a single year").[14]

## 2. The Press and Litigation About the P320 Did Not Inform Sig Sauer of the Plaintiff's Claimed 3-Part Defect.

Plaintiff also cited third-party news articles that referenced P320 inadvertent discharges. *See, e.g.*, Mot. ¶¶ 47-48, 51, 53-55. Any awareness from the media and lawsuits by consumers was individualized: while "some consumers may have been alerted to the alleged propensity for unintentional discharges by the media attention," those "who did not pay attention to the news

---

[13] While Plaintiff claims that Sig Sauer "received over 200" incidents, *see* Mot. ¶ 50, Mr. Meyer's calculation counted up through September 2024, which was four years after Plaintiff purchased his P320 and after the Complaint was filed.

[14] Moreover, "[o]nly one [inadvertent] discharge [was] reported to Sig Sauer as occurring in Missouri during the Putative Class Period." *Id.*; Ex. 17, Meyer Decl. ¶ 13. For Missouri, "[t]he resulting incidence rate (0.005%) is comparable in magnitude to the one calculated for nationwide occurrences." Ex. 13, Rauschenberger, ¶ 24.

articles, would not have been." Ex. 13, Rauschenberger, ¶ 39.

As with the incident reports, the vast majority of these occurred after the filing of the Complaint. *See* Mot. ¶ 50 (2023); ¶ 53 (multiple articles that post-date the class period); ¶ 54 (October 2024); ¶ 55 (November 2024). For those incidents publicized within the Putative Class Period, many were conclusively determined to be from user error. *See* Ex. 2, T. Taylor Decl. ¶ 67. For example, Plaintiff's Motion cites to an August 2021 ABC News story (more than a year after Plaintiff purchased his P320). *See* Mot. ¶ 47, p.22; Pl.'s Ex. 18. This incident involved "Brittney Hilton, a detective with the Bridge City Police Department." Ex. 2, T. Taylor Decl. ¶ 68. But her lawsuit against Sig Sauer was dismissed because "the court found Ms. Hilton was 'carrying the loaded pistol in her purse ... when it discharged.'" *Id.* ¶ 71 (quoting T. Taylor Decl. Ex. L). "The court held that 'proof of an [inadvertent] discharge is not proof of a defect.'"[15] *Id.*

Similarly, during the Putative Class Period, none of the 32 lawsuits cited by Plaintiff (Mot. ¶ 58; *see* Pl.'s Ex. 23, Dameron Decl.) determined that the P320 was defective for lacking an external safety. And in February 2022, a court granted summary judgment to Sig Sauer after holding "Plaintiffs have failed to demonstrate that the Pistol was defective." Order Granting Mot. Summ. J. at 12, *Frankenberry v. Sig Sauer*, No. 19-cv-2990 (D.S.C. Feb. 4, 2022), ECF No. 79.[16]

---

[15] Plaintiff seeks to paint Sig Sauer as a denier and biased against the media. *See* Mot. ¶ 52. This is incorrect. Sig Sauer experienced first-hand examples of selective reporting. Sig Sauer observed that ABC News "edited [its] expert's comments out" where he said "I do not have an explanation for why the updated version should have these complaints from trained individuals. If it's not legal momentum, then it would have to be some other mechanism of failure." Ex. 2, T. Taylor Decl. ¶ 69 (emphasis removed). After it ran the first time, it was run again on Nightline with the expert's commentary edited to remove the entire sentence concerning "legal momentum." *Id.* ¶ 70.

Likewise, Plaintiff's Ex. 16 references a Canadian Special Operations Forces Command (CANSOFCOM) incident where an ABC News affiliate wrongfully reported the incident as calling into question the P320's safety, when CANSOFCOM admitted it was caused by an improper holster. *See* Ex. 31, T. Taylor, 114:19-115:19.

[16] Plaintiff identifies law enforcement agencies that have stopped using the P320 (Mot. ¶ 53), but numerous agencies used the P320 throughout the Putative Class Period, including at least nineteen in Missouri. Ex. 18, Farkas Decl. ¶ 5.

### 3. The FMECA Analysis Does Not Indicate that Sig Sauer Believed the P320 Was Defective in 2017.

Failure Modes and Effects Criticality Assessment ("FMECA") is a type of analysis "conducted in the absence of empirical data" and "[w]henever empirical data are available" these analyses "become irrelevant or obsolete." Ex. 13, Rauschenberger, ¶ 60. "[A]ll products have risks associated with their design and it can be easy to demonize a product via an FMECA evaluation when the competing products are not equally evaluated." Ex. 7, Watkins, 71. "[Inadvertent] discharges, as a theoretical scenario, [would] appear, simply as a matter of course, in the FMECA for *any gun*." Ex. 13, Rauschenberger, ¶ 60 (emphasis added).

Plaintiff has asserted that the FMECA performed by Sig Sauer in early 2017 identified the P320 as "having a 'high' risk," and that "Sig Sauer admits that every P320 unit is likely to suffer an unintended discharge during the life of each pistol." Mot. ¶¶ 42-43. That is incorrect. Ex. 16, Murphy Decl. ¶¶ 4-5. Plaintiff cites the section of the FMECA that is "generic to any firearm" and not the P320 specifically. *Id.* ¶¶ 7-9. "Any pistol can experience an accidental or unintended discharge regardless of the trigger pull or whether it is fitted with a manual safety feature." *Id.* ¶ 8. The FMECA actually concluded that the probability of an inadvertent discharge was "[s]o unlikely, it can be assumed occurrence may not be experienced in the life of an item." *Id.* ¶ 11.

## LEGAL STANDARD

Certification is appropriate only where, after a "rigorous analysis," the Court determines Rule 23 is satisfied. *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350-51 (2011). Courts may "'probe behind the pleadings ....' [which] will frequently entail 'overlap with the merits of the [] underlying claim.'" *Comcast Corp. v. Behrend,* 569 U.S. 27, 33-34 (2013); *Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011). "[D]istrict courts must rigorously scrutinize the evidence … and must find, by a preponderance of the evidence, that Rule 23's requirements are met[.]" *In re*

*Pre-Filled Propane Tank Antitr. Litig.*, 2021 WL 5632089, at *5 (W.D. Mo. Nov. 9, 2021).

## ARGUMENT

## I. PLAINTIFF LACKS ARTICLE III STANDING

Standing is "a threshold issue that [the Court is] obligated to scrutinize" at any stage. *Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016). Plaintiffs must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required." *Indigo LR LLC v. Advanced Ins. Brokerage of Am. Inc.*, 717 F.3d 630, 633 (8th Cir. 2013). Plaintiff is "obviously not a proper class representative" to represent a class where, as here, he lacks standing and has suffered no injury, *Tuft v. McDonnell Douglas Corp.*, 581 F.2d 1304, 1308 (8th Cir. 1978), necessitating denial of the Motion.

### A. Plaintiff Does Not Have an Injury-in-Fact.

#### 1. Plaintiff Does Not Have a Manifest Defect.

"[P]laintiffs claiming economic injury do not have Article III standing … unless they show a manifest defect." *Johannessohn v. Polaris Indus., Inc.*, 9 F.4th 981, 988 (8th Cir. 2021). "[I]t is not enough" to show "that a product line contains a defect or that a product is at risk for manifesting this defect" the plaintiff must demonstrate "that *their* product *actually exhibited* the … defect." *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014). Here, Plaintiff concedes that his P320 has never inadvertently discharged and he has otherwise had no "issues with the pistol." *Supra* Facts § D.2. Plaintiff also cannot experience an inadvertent discharge in the future because he has stopped using it. *Id.* Thus, his defect has not manifested.

#### 2. Plaintiff Knew He Was Purchasing a P320 Without a Manual Safety.

Plaintiff also does not have an injury in fact because he knew what he getting—a P320 without a manual safety. A plaintiff who knew about an alleged defect "before purchas[e] … ha[s] no injury" and "cannot claim any injury caused by Defendants' conduct." *In re Bisphenol-A (BPA)*

27

*Polycarbonate Plastic Prods. Liab. Litig.*, 2011 WL 6740338, at *1-2 (W.D. Mo. Dec. 22, 2011) (denying certification); *see also White v. Just Born, Inc.*, 2018 WL 3748405, at *5-7 (W.D. Mo. Aug. 7, 2018) (same; "[w]ithout establishing that they were unaware of the amount of slack-fill ...class members will not be able to show injury."). The same result is compelled here. Plaintiff knew he purchased a P320 without a manual safety. *Supra* Facts §§ D.1-3.

### 3. Plaintiff Received the Benefit of His Bargain.

Plaintiff does not have an injury in fact because he conceded that he bargained for a P320 without a manual safety and that is what he received. *Id.* In his Complaint, Plaintiff asserted he was injured because he "would not have purchased [the P320] or would have paid substantially less for [it]," had the information been disclosed to him. Compl. ¶ 89. Plaintiff testified that he would ***not*** have been "willing to purchase" the P320 "for a lower price." Ex. 12, Glasscock Vol. II, 106:13-16. In any event, Plaintiff did not offer evidence that he paid a higher price for his P320 (he did not –Plaintiff purchased the P320 used at a discount).[17] *See supra* Facts § D.3.

## B. Plaintiff's Purported Injury Is Not Fairly Traceable to Sig Sauer.

Plaintiff also does not have standing because any purported injury-in-fact is not fairly traceable. "There must be causation – a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Agred Found. v. U.S. Army Corps. of Eng'rs,* 3 F.4th 1069, 1073 (8th Cir. 2021) . "[T]raceability … requires the plaintiff to show a sufficiently direct causal connection[.] That connection cannot be overly attenuated." *Id.* An "out-of-pocket loss" alone does not satisfy the standing requirement "without reference to its cause." *Brown v. Medtronic, Inc.*, 628 F.3d 451, 457-58 (8th Cir. 2010) (affirming lack of traceability). Where a

---

[17] "[C]laims may not be typical … because he purchased his ... product secondhand and did not pay … retail price for it[.]" *See Stotz v. Mophie Inc.*, 2017 WL 11571083, at *14 n.18 (C.D. Cal. Dec. 14, 2017) (tentative). Plaintiff purchased used and "it is plausible" that "a used purchaser" "did not sustain any damages." *See* Ex. 26, Tomlin, ¶ 67.

plaintiff cannot demonstrate that he "saw the labels and relied on them in making his purchasing decision," his injury does not "stem[] from Defendant's false, misleading, or deceptive labeling practices." *In re Smitty's/Cam2 Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 710192, at *8 (W.D. Mo. Mar. 9, 2022); *see also Sgouros v. TransUnion Corp.*, 2023 WL 6690474, at *5 (N.D. Ill. Oct. 12, 2023) (plaintiffs "never read any website [or other advertising] content" and "could not have been misled by a website [they] did not read").

Such is the case here. Plaintiff has offered no evidence that he was exposed to, let alone relied upon, a statement by Sig Sauer prior to purchase. He did not. Plaintiff admitted he bought his P320 from his friend, never "read the owner's manual," and relied on only non-Sig Sauer sources of information. *See supra* Facts §§ B.4, D.3-4. A direct causal connection between Plaintiff and Sig Sauer does not exist. Even if Sig Sauer had made the disclosure Plaintiff seeks, it would not have prevented him from purchasing his P320. Thus, his claimed injury is not fairly traceable.

### C. Plaintiff Cannot Pursue Injunctive Relief or a Class After April 2022.

Plaintiff cannot seek injunctive relief or represent class members who purchased their P320 after April 18, 2022. Even if Plaintiff had standing for monetary relief (which he does not), this "does not mean that he has standing for injunctive relief." *May v. Makita*, 2023 WL 417487, at *3 (E.D. Mo. Jan. 26, 2023). A plaintiff must "face[] a real and immediate threat … [of] a similar injury in the future." *Id.*; *Meagley v. City of Little Rock*, 639 F.3d 384, 391 (8th Cir. 2011) (affirming lack of standing). Plaintiff does not have standing for injunctive relief because he "can no longer claim to be misled by defendant's omission … because he now knows of the product defects … and can elect not to buy the product." *May*, 2023 WL 417487, at *3 ("plaintiff's knowledge … precludes his reliance"). Plaintiff does not offer any evidence to support his request for injunctive relief. Compl. at 18. Regardless, he cannot be misled again. *Supra* § A.3. Thus, he cannot seek injunctive relief, including representing anyone who purchased after April 18, 2022.

## II. **PLAINTIFF IS ATYPICAL AND INADEQUATE.**

Typicality assesses "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected." *In re Milk Prods. Antitr. Litig.*, 195 F.3d 430, 436 (8th Cir. 1999). Typicality is not met through "general conclusory allegations." *Huskey v. Birch Telecom of Mo., Inc.*, 2018 WL 4679738, at *3 (E.D. Mo. Sept. 28, 2018). A plaintiff must "submit sufficient evidence." *Henke v. Arco Midcon, LLC*, 2014 WL 982777, at *9, *22 (E.D. Mo. Mar. 12, 2014) (denying certification). Relatedly, adequacy requires a plaintiff "to prove" he "will adequately represent the class." *Rattray v. Woodbury Cnty., Iowa*, 614 F.3d 831, 835 (8th Cir. 2010). Adequacy is "of critical importance" and requires "careful attention." *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 719-20 (8th Cir. 1978) (plaintiff "inadequate"); *see also Milk Prods.*, 195 F.3d at 436 (adequacy must be "evaluate[d] carefully).

Here, Plaintiff does not meet his burden through a conclusory five-sentence discussion (*see* Mot. 34; Dameron Decl. ¶ 30). Plaintiff is not typical or adequate as he: (a) is subject to unique defenses, (b) has not suffered the same injury as the class, and (c) is inadequate for other reasons.

### A. **Plaintiff Is Subject to a Multitude of Unique Defenses.**

"A proposed class representative is not adequate or typical if it is subject to a unique defense that threatens to play a major role." *Milk Prods.*, 195 F.3d at 437. Courts routinely deny class certification because "the presence of even an arguable defense peculiar to the proposed representative may destroy typicality." *See, e.g.*, *In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 329-30 (D. Minn. 2005) (denying certification); *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 609 (8th Cir. 1983) (affirming denial); *J.P. v. BCBSM, Inc.*, 2021 WL 131234, at *9 (D. Minn. Jan. 14, 2021) ("unique defense … threaten[ed] to entail significant attention and resources"). For example, in *In re Hardieplank Fiber Cement Siding Litig.*, the "named [p]laintiffs claims [were] not typical … because they were exposed to different representations and, often, were not exposed

… at all." 2018 WL 262826, at *13 (D. Minn. Jan. 2, 2018).

Here, Plaintiff is subject to unique defenses, including a lack of standing and a failure to establish nearly every MMPA element. Since Plaintiff has not demonstrated traceability for standing, he also does not have causation for his MMPA claim.[18] He also cannot show Sig Sauer's knowledge of the 3-Part Defect ***prior*** to his purchase. In *Riddell v. Gen. Motors LLC*, the Court decertified the class because the plaintiff was "no longer … suitable" because the plaintiff had not shown the manufacturer "knew about the continued oil consumption defect" until October 2012 but he "purchased his truck in September 2012." 2024 WL 2077559, at *9 (E.D. Mo. May 9, 2024). Where knowledge "post-date[s] [the plaintiffs'] purchases," its absence is "fatal." *Garrard v. Rust-Oleum Corp.*, 575 F. Supp. 3d 995, 1002 (N.D. Ill. 2021); *see also Elfaridi v. Mercedes-Benz USA, LLC*, 2018 WL 4071155, at *5 (E.D. Mo. Aug. 27, 2018) ("12 complaints … prior to the purchase … are not significant when compared to the … number of class vehicles"). Here, the FMECA did not put Sig Sauer on notice of a defect (*supra* Facts § E.3), and only 25 inadvertent discharge incidents occurred before Plaintiff purchased, despite millions of P320's sold. *Id.* § E.1.

Moreover, Plaintiff is also subject to the unique defense that he has no ascertainable loss. "Missouri courts … apply the … 'benefit of the bargain' rule to determine whether an MMPA plaintiff has suffered an ascertainable loss," which is "the difference between the value of the product as represented and the actual value of the product as received." *Hennessey v. Gap, Inc.*, 86 F.4th 823, 827 (8th Cir. 2023). Plaintiff has disclaimed his price premium theory of damages (*supra* Facts § D.5), testifying only that he was injured because he "would not have purchased" his P320 had he known. *Id.* But, ascertainable loss is "distinct" from "the existence of a deceptive practice" and Plaintiff "must also prove an ascertainable loss." *Id.* at 830. He fails to do so here.

---

[18] These unique defenses have ***already*** played a major role and entailed significant attention and resources. *See Glasscock*, ECF Nos. 66-67, 69-70, 97, 101, 105-06, 130, 133-34.

### B. Plaintiff Has Not Suffered the Same Injury as the Putative Class.

A "class representative must … suffer the same injury' as the class." *Wal-Mart*, 564 U.S. at 348-49. "Without uniform injuries, plaintiffs cannot suffer the same injury[.]" *Strutton v. Blake*, 2005 WL 8176850, at *1 (E.D. Mo. Sept. 29, 2005). To have the same injury, a class representative must have "common objectives and legal and factual positions." *Keister v. Allstate Fire & Cas. Ins. Co.*, 663 F. Supp. 3d 1030, 1041 (W.D. Mo. 2023). Here, Plaintiff's bare assertion that "he suffered the same injury" is plainly insufficient. *See* Mot. 34. Plaintiff asserts that he was injured because he was not told about the 3-Part Defect and that he was not buying the military version. *Id.* at 33. Plaintiff, however, has not offered ***any*** evidence that his idiosyncratic beliefs are held by ***any*** other putative class member. In fact, Plaintiff has conceded Sig Sauer publicly disclosed that the M17 and M18 were the P320 military models, which "c[a]me with a manual safety" and that P320 had a "crisp" trigger pull, so other class members may have been aware of some (or all) of the sought information. *See supra* Facts § B.3. Moreover, Plaintiff himself disclaimed both the price premium injury and the repair remedy sought. *See supra* Facts § D.5.

### C. Plaintiff Fails to Demonstrate He Is Adequate for Additional Reasons.

Plaintiff is not adequate for three other reasons. First, Plaintiff has not performed his duties properly nor meaningfully participated in the case. Plaintiffs must be "the driving force behind [the] action." *Bodner v. Oreck Direct, LLC*, 2007 WL 1223777, at *2-3 (N.D. Cal. Apr. 25, 2007) ("plaintiff's counsel constructed ... lawsuit before it had a plaintiff"). Instead, Plaintiff here is "simply lending [his name] to a suit controlled entirely by the class attorney." *Price v. United Servs. Auto. Ass'n*, 2012 WL 2847821, at *8 (W.D. Ark. Mar. 16, 2012) (denying certification), *R. & R. adopted*, 2012 WL 2847916 (W.D. Ark. July 11, 2012). In *Keister*, plaintiff was inadequate because the plaintiff's "understanding of how they were harmed came only from their attorney," plaintiff simply "read whatever [he] was presented," and testified that the responsibility of

protecting the class is the "lawyer's job." 663 F. Supp. 3d at 1037-40.

The same result is warranted here. Plaintiff has "come to understand" his case through counsel who proposed the suit to him, told him his P320 was "dangerous," and informed him of the purported 3-Part Defect. *Supra* Facts § D.2. As such, it is not surprising that Plaintiff did not know why his Complaint failed to allege anything about the P320's "light trigger pull" or "highly energized" nature or why he alleged the Owner's Manual "never warns consumer[s] that the P320 lacks external safety features," when Plaintiff had never read it. Ex. 12, Glasscock Vol. II, 127:5-130:17; 123:7-124:8. Post-filing, Plaintiff continues to defer entirely to counsel, letting his "attorneys do attorney things," "deal" with the action, and reading only what his "attorneys [give] him." *Id.* 75:23-76:3, 11-13; 78:23-25. When asked if he could identify other happenings in the case besides his deposition, Plaintiff responded, "that's what I have attorneys for." *Id.* at 75:8-10.[19]

Second, Plaintiff is inadequate because his credibility can be called into question. "The credibility of a plaintiff may be considered … in determining the plaintiff's adequacy[.]" *TBK Partners v. Chomeau*, 104 F.R.D. 127, 132 (E.D. Mo. 1985); *Sgouros*, 2023 WL 6690474, at *5 (Plaintiff lacked credibility; he alleged that website "advertising ... misled him" but he "never read" it); *Kassover v. Comput. Depot, Inc.*, 691 F. Supp. 1205, 1213-14 (D. Minn. 1987) (Plaintiff "admitted … he possesses 'no facts' to support essential allegations in his complaint," and he "has … rel[ied] entirely upon his attorney's direction."), *aff'd*, 902 F.2d 1571 (8th Cir. 1990).

Here, Plaintiff's credibility can be called into question as critical allegations were untrue. Plaintiff claimed that Sig Sauer "concealed its knowledge" that the P320 does not have a manual safety from "Plaintiff," Compl. ¶ 84, yet Plaintiff knew that his P320 did not have a manual safety. *See supra* Facts §§ D.3-5. Plaintiff also alleged he received the Owner's Manual at purchase, but

---

[19] Plaintiffs must also perform their "responsibility of monitoring class counsel." *Pruitt v. Pers. Staffing Grp.*, 2020 WL 3050330, at *9 (N.D. Ill. June 8, 2020). Yet, Plaintiff did not identify that as his duty. *Supra* Facts §D.6.

he did not allege that he "never read any [of its] content." *Id.* § D.3. And despite alleging a price premium injury, Plaintiff testified he would not have paid "a lower price." *Id.* § D.5. Moreover, as the case has proceeded (and his counsel's strategy), so has Plaintiff's testimony. He first claimed that the P320 was defective because it fired without a "trigger pull," and now it is the 3-Part Defect. *Id.* § A.3. Similarly, he provided vastly different answers regarding what Sig Sauer should have told him, *id.* § D.4, most recently, that the 3-Part Defect be advertised "in one setting." *Id.*

Finally, "courts have repeatedly held that … splitting out personal injury … claims … destroy[s] adequacy." *See, e.g.*, *Thornburg v. Ford Motor Co.*, 2022 WL 4348475, at *7 (W.D. Mo. Sept. 19, 2022) (quoting *Henke*, 2014 WL 982777, at *11). Unlike the class defined in the Complaint, which excluded "any individuals who have suffered personal injury" (Compl. ¶ 68), the Motion class does not (*see* Mot. 31 n.8). While Plaintiff never had an inadvertent discharge, other class members could assert personal injury claims. By "leaving the class open to those who suffered personal injury but not pursuing" those claims, there is "a compelling reason to deny class certification." *Nafar v. Hollywood Tanning Sys.*, 339 F. App'x 216, 224 (3d Cir. 2009).[20]

### III. THE PROPOSED CLASS CANNOT BE CERTIFIED UNDER RULE 23(B)(3).

"Rule 23(b)(3)'s predominance requirement requires courts to ask 'whether the common, … issues … are more prevalent or important than the … individual issues.'" *Johannessohn*, 9 F.4th at 984-85 (affirming denial of certification). "An individual question is one where members … will need to present evidence that varies[.]" *Id.* "[P]redominance … is not satisfied if 'individual questions ... overwhelm the [common] questions.'" *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478-79, 480 (8th Cir. 2016) (reversing certification). Such is the case here, where standing and nearly every MMPA element present significant individual issues, and Plaintiff fails to present a viable

---

[20] Carving out individuals who experienced personal injury would require an individualized inquiry. *See supra* §I.A.1.

classwide damages model.

**A. Standing Is an Individualized Issue.**

"[A] class cannot be certified if it contains members who lack standing." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010); *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 779-80 (8th Cir. 2013) (Certification is "improper" because "[s]ome of the members likely have standing, and some … do not."). Here, the same Article III standing issues that foreclose Plaintiff's standing, *see supra* § I, likely apply to others because they: (a) have not manifested a defect since there was only one inadvertent discharge in Missouri during the Putative Class Period (*supra* Facts § E.1 n.14); (b) likely knew they were purchasing without a manual safety, that the P320 had a "crisp" trigger, or was not the military version; for example, anyone who "fired" the pistol before purchase (*id.* § B.3; Ex. 26, Tomlin, ¶ 53); (c) likely were not exposed to any Sig Sauer advertising prior to purchase (*id.* §§ B.1-2); and (d) may have known about the allegations and purchased anyway (*id.* Facts §§ E.1-2). Therefore, the class cannot be certified.

**B. Individual Issues Predominate Nearly Every MMPA Element.**

MMPA claims often do not survive Rule 23(b)(3)'s "rigorous analysis." *See, e.g.*, *In re BPA*, 2011 WL 6740338, at *5, *10; *State ex rel Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 864 (Mo. 2008) (en banc). Here, individual issues predominate for: (1) deception; (2) knowledge; (3) materiality; (4) causation, (5) ascertainable loss; and (6) purchase type, preventing certification.

**1. Deceptive Omission Is an Individualized Issue.**

The Amendment made clear that an MMPA claim requires a plaintiff "***to show*** a likelihood that the method, act, or practice alleged to be unlawful would mislead a reasonable consumer." *Abbott*, 677 F. Supp. 3d at 946 (emphasis added) (dismissing claim); *Guerrero v. Henkel Corp.*, 2024 WL 2769745, at *4 (E.D. Mo. May 30, 2024) (same). As explained in *Boren v. Henkel*, "when there is '***no evidence*** … that would amount to fraud or deception," MMPA claims fail. 2024 WL

2768669, at *4 (E.D. Mo. May 30, 2024) (cleaned up); *see also In re Emerson Elec. Co. Wet/Dry Vac Mktg. & Sales Litig.*, 2022 WL 670131, at *3 (E.D. Mo. Mar. 7, 2022) ("Plaintiffs have not presented class-wide proof of misleadingness."). That is the case here.

Plaintiff has presented no evidence that there is a common belief of his combined deception. Plaintiff states only in passing (and without evidentiary support) that "whether a reasonable consumer would be deceived … is subject to class-wide resolution." Mot. 39. Plaintiff has identified two omissions: (1) the 3-Part Defect; and (2) that "the gun that [he] purchased was the same one that the military had." *Supra* Facts § D.4. Yet, Plaintiff has offered no evidence the putative class shares his subjective belief about either, let alone all of them together. Quite the contrary, Plaintiff conceded that some customers likely saw advertising that disclosed: (a) that the manual safety was "optional"; that the M17 and M18s were the military models; and (c) that the P320 had a "crisp" trigger. *Id.* § B.3. Those who saw these advertisements were not deceived. *See Klosterman v. Vacation Mgmt. Sols., LLC*, 682 S.W.3d 781, 786 (Mo. App. E.D. 2023) ("no evidence of any 'deception'" where the "omitted" information was disclosed). Thus, disparate views likely exist within the class of what, if anything, was withheld by Sig Sauer. In summary, Plaintiff has not put forth any (let alone common) evidence to establish deception here.

## 2. Sig Sauer's Knowledge Is an Individualized Issue.

Plaintiff has not met his burden to demonstrate through common evidence that Sig Sauer had knowledge of the 3-Part Defect. Courts have refused to certify classes where, like here, the defendant's knowledge varied over time and would require an individualized determination as to which class members (if any) the company could be liable. *See In re Ford Motor Co. Vehicle Paint Litig.,* 182 F.R.D. 214, 220, 222 (E.D. La. 1998) ("Ford's state of knowledge was not uniform[.]"); *Ford Motor Co. v. Sheldon,* 113 S.W.3d 839, 849, 851 (Tex. Ct. App. 2003) (same); *Sanneman v. Chrysler Corp.,* 191 F.R.D. 441, 453, 457 (E.D. Pa. 2000) (same). In *BPA*, plaintiffs alleged the

defendant omitted disclosures of potential contaminants. 2011 WL 6740338, at *1. There, "[c]lass-wide evidence [could not] be used to show what [d]efendants knew … because their knowledge and the available information … changed during the class period." *Id.* at *5. The Court rejected the attempt to use evidence of later knowledge to prove prior knowledge because "[p]roof that [d]efendants failed to disclose information that came into existence in 2006 … does not prove—nor could it prove—[d]efendants' liability before then." *Id.* at *5, *10.

So too here. Plaintiff has not offered common evidence that Sig Sauer had knowledge of the 3-Part Defect when ***each*** putative class member ***purchased*** for over five years. When Plaintiff purchased approximately 3 years into the Putative Class Period, there were only 25 incidents, yet there were 67 incidents by the final year. Ex. 41, Meyer Decl. ¶12. At the start of the Putative Class Period, Plaintiff pointed to only the FMECA (Mot. 16-18), which Plaintiff misinterpreted—it showed that ***all*** pistols are at risk of inadvertent discharges and that the P320, specifically, had a ***decreased*** risk due to its safety features. *Supra* § E.3. And, Plaintiff's use of allegations and incidents at the end of (or even after) the Putative Class Period cannot show Sig Sauer's prior knowledge. *See* Mot. ¶¶ 47-50, 53-55. Regardless, many of those incidents were determined to be from user error. *Supra* § E.2.[21] Moreover, claims about the defect have evolved as prior to mid-April 2022 users claimed "P320s were discharging without a trigger pull" (Ex. 17, Meyer Decl. ¶ 15), but the first time Sig Sauer heard about this alleged 3-Part Defect was in Plaintiff's Motion.

Plaintiff mistakenly relies on *Hays v. Nissan North America, Inc.* (*see* Mot. 38), to argue that knowledge does not create an individualized issue because "differences … can be accommodated by class subdivisions." 2021 WL 912262, at *7 (W.D. Mo. Mar. 8, 2021). *Hays* is a pre-Amendment case that did not apply the new "stringent" requirements. *Abbott*, 677 F. Supp.

---

[21] Although Plaintiff cites the June 2024 *Lang* verdict (Mot. ¶59), it cannot demonstrate prior knowledge seven years earlier or even when Plaintiff purchased his P320 four years earlier.

3d at 946-47. The Court also noted that, unlike here, affirmative "misrepresentations" not subject to a knowledge requirement were at issue. *Hays*, 2021 WL 912262, at *6-7. Regardless, such "varied circumstances" diminish predominance. *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 374 (8th Cir. 2013). Thus, Plaintiff has not offered (nor could he offer) common "proof of [Sig Sauer's] nondisclosures." *BPA*, 2011 WL 6740338, at *5.

### 3. Materiality Presents Individual Issues.

 "A material fact ... includes 'any fact which a reasonable consumer would likely consider to be important in making a purchasing decision.'" *Id.* at *6. "Even if this is an objective inquiry, that does not mean it can be proven with class-wide evidence." *Id.* Courts routinely deny certification where, like here, plaintiffs do not offer common proof. In *Townsend v. Monster Beverage Corp.*, plaintiffs did not submit admissible expert testimony that for a "common answer" to materiality. 303 F. Supp. 3d 1010, 1045-48 (C.D. Cal. 2018). And in *In re Tropicana Orange Juice Market. & Sales Practices Litig.*, the plaintiff challenged the statement "pasteurized orange juice" but the plaintiff's experts did "not opine on whether reasonable consumers would have considered the 'pasteurized' label at all or what meaning, if any, ... would have attached to it." 2019 WL 2521958, at *12 (D.N.J. June 18, 2019). Without "evidence ... regarding reasonable customers' understanding" and whether [it] was likely to deceive," predominance failed. *Id.* at *13.

Similarly, in *BPA*, the materiality inquiry could not "be determined in a vacuum, especially when the undisclosed fact is [of] scientific debate or controversy." 2011 WL 6740338, at *7. The plaintiffs argued they could "use class-wide evidence ... by showing Defendants' nondisclosure of information from the very start of the class period." *Id.* at *5. The Court disagreed as the information evolved "over the years." *Id.* at *6. And in *Anderson v. Ford Motor Co.*, the plaintiffs alleged the defendant failed to disclose the propensity for their car's sunroof to shatter. 2020 WL 1853321, at *2 (W.D. Mo. Feb. 14, 2020). The court held the "risk of glass breaking [a]s a potential

38

safety concern does not automatically lead to the conclusion that [it] is material," and "a reasonable consumer would not consider the risk of … shattering to be material … if the chance … were miniscule." *Id.* at *3. As it was not "extremely high in the abstract" or "significantly higher than comparable vehicles," it was immaterial. *Id.* ("all brakes may fail… but … need not be disclosed … because the rate at which brakes fail is exceedingly low.").

Materiality is an individual issue here. Plaintiff presents no evidence that Sig Sauer's alleged omissions were material to other putative class members. *See* Mot. 33 (baldly asserting it is a "common" issue). While Plaintiff asserts four distinct disclosures should have been made (*id.*), class members would have received and valued information differently. *Supra* Facts § A.8.i. Plaintiff has not even shown he found the 3-Part Defect material because he knew his P320 did not have a safety and he has never "inquir[ed]," "ask[ed]," or "research[ed]" the purportedly material facts that he now asserts were omitted before purchasing "*a[ny]* ...pistol[]." *Id.* § D.4.[22] And the incident reports suggest that "only 0.003% of [P320] users [] experienced an inadvertent discharge." *Supra* Facts § E.1. Thus, materiality is not capable of common proof.

### 4. Causation Presents Individual Issues.

Where, like here, the "resolution of [] potential liability … will be dominated by individual issues of causation," the "need for such plaintiff-by-plaintiff determinations means that common issues will not predominate[.]" *In re St. Jude Medical, Inc.*, 522 F.3d 836, 840 (8th Cir. 2008). While Plaintiff argues that causation may be assessed "without any individualized proof of reliance" (Mot. 39), while "actual reliance … is not required," "evidence of some factual connection between the misrepresentation and the purchase *is required*." *Faltermeier v. FCA US*

---

[22] That no one has "seen a manufacturer advertise" whether a firearm "is fully energized" underscores the immateriality of this "defect." *See* Ex. 12, Glasscock Vol. II, 57:1-8; Ex. 7, Watkins, at 5 ¶ 14.

*LLC*, 899 F.3d 617, 622 (8th Cir. 2018) (emphasis added) (affirming dismissal).[23] Thus, courts repeatedly dismiss MMPA claims where causation is lacking. *See, e.g. George v. Omega Flex, Inc.*, 2020 WL 4718386, at *7, *8 (W.D. Mo. Aug. 13, 2020) (Harpool, J.) ("Plaintiffs simply cannot establish a connection with any alleged misrepresentation and their purchase" because "Plaintiffs who did not care about an allegedly misleading marketing practice, or who knew … and purchased … anyway, are not injured by the practice."); *Bradley v. Hertz Corp.*, 2019 WL 3975177, at *6 (S.D. Ill. Aug. 22, 2019) (plaintiff "never viewed" the source of the "alleged omissions"); *McCall v. Monro Muffler Brake*, 2013 WL 1282306, at *5 (E.D. Mo. Mar. 27, 2013) ("[N]either plaintiff read the disclosures nor was misle[d]."). In *White*, the court rejected the argument that the "'reasonable consumer standard' eliminates any individualized inquiry," because it "does not apply to" causation. 2018 WL 3748405, at *4.

Here, Plaintiff has not offered common evidence of causation—he ignores the requirement entirely. *See* Mot. 39. Yet, nothing Sig Sauer would have disclosed would have impacted his purchase decision because he bought his P320 from a friend. *See supra* Facts § D.3. Most P320 purchasers did not purchase directly from Sig Sauer and advertising was not uniform. *Id.* § C.1. Regardless, Sig Sauer ***did*** advertise most of the information Plaintiff claims was omitted and news articles publicized the risk of inadvertent discharge. *Id.* § B.3. Thus, an individualized inquiry is necessary to determine causation. *Id.* § III.B.1.[24]

---

[23] Plaintiff contends *Diesel v. Mariani Packing Co.*, 2024 WL 1674520 (E.D. Mo. Apr. 18, 2024) supports certification here "without any individualized proof of reliance." Mot. at 39. Even so, the Eighth Circuit "require[s]" a connection between plaintiff's purchase and defendant's misrepresentation. *FCA*, 899 F.3d at 622. In any event, there, no evidence was presented that the named plaintiff did not have causation, *Diesel*, 2024 WL 1674520, at *7-9, unlike here.

[24] Plaintiff points to the Owner's Manual as a common location where the 3-Part Defect could have been disclosed (Compl. ¶¶ 28-30). Not so. The Owner's Manual is not "advertising," and purchasers (including Plaintiff and Mr. Faulkner)— have never read it. In any event, it disclosed (a) P320 was available with a manual safety, (b) it was fully energized after a round was chambered, and (c) the trigger pull weight of the model. Ex. 32 at 3, 17, 25, 74.

### 5. Ascertainable Loss Presents Individual Issues.

Courts deny class certification where the "proposed class 'could include [people] who were not injured.'" *Nixon*, 249 S.W.3d at 862, 864 ("[U]ninjured class members [are] those who did not care if the Diet Coke they purchased contained saccharin."). For example, in *White*, the plaintiff alleged that "he was misled to believe that he was 'purchasing more Product than was actually received.'" 2018 WL 3748405, at *1. The court denied class certification: "whether any MMPA violation injured each class member will require individualized inquiry" because if he "knew how much slack-fill was in a [] box before he purchased it, he suffered no injury." *Id.* at *4. Likewise, in *BPA*, the court denied class certification because "[i]ndividuals who knew about BPA's existence and the surrounding controversy before purchas[e] … have no injury." 2011 WL 6740338, at *6.

Individual issues also arise where consumers paid different prices. In *Blades v. Monsanto Co.*, the court affirmed the "district court's holding that appellants cannot prove classwide injury." 400 F.3d 562, 572 (8th Cir. 2005). The court noted that the "wide variation in list prices … would require the purchasers of some [products] to prove injury through evidence that would vary … and thus would not be shared in common with the rest of the proposed classes." *Id.* at 572.

Here, the class members' ascertainable loss is not subject to common proof for five reasons:

- First, whether putative class members purchased their P320s despite knowing or not caring about the alleged defect is individualized. Plaintiff and Mr. Faulkner knew their P320 had no manual safety and many liked the P320 without it. Facts § A.8.i.
- Second, whether a defect manifested is not subject to common proof; the Court would need to investigate whether each user suffered an inadvertent discharge. *Id.* §§ I.A, III.A.
- Third, Plaintiff has not offered common evidence of a price premium injury. "Sig Sauer set equivalent MSRP's for P320 models that were identical except for the manual safety feature" and correcting Mr. Stockton's analysis shows no premium price existed. *Id.* § C.3.
- Fourth, used P320 purchasers (like Plaintiff) may not have been injured at all because any "overpayment" would not have been "reflected" in the sale in the "secondhand market." Ex. 26, Tomlin ¶ 77, § VII.
- Finally, as Plaintiff has not put forward any consumer sales records, he does not offer common proof of the price paid by the class. Sig Sauer does not set retail P320 prices, which often vary. *See supra* Facts § C.2. Without pricing information, individual analysis

will be necessary to establish ascertainable loss. *Id.*

He has not shown common proof. This again distinguishes *Diesel* (Mot. 39-40), where plaintiff alleged the defendant underfilled raisin bags and "caused an ascertainable loss because the value of the raisins received by all purchasers was less than the value of the raisins as represented." 2024 WL 1674520, at *7. This objectively clear injury—the difference in the "net weight" of the product—was common. *Id.* at *9.[25] Here, however, Plaintiff has offered no common evidence of an objective disparity between what ***all*** consumers bargained for and what they received. *See supra* Facts §§ A.3, A.8. Quite the contrary, what features consumers wanted their P320 to have was "based on [their] subjective preference[s]." *Nixon*, 249 S.W.3d at 863.

### 6. The MMPA's Usage Requirement Requires Individual Proof.

The MMPA requires that each putative class member establish that they purchased their P320 "primarily for personal, family or household purposes." *Abbott*, 677 F. Supp. 3d at 945; *see also White*, 2018 WL 3748405, at *3 ("most—if not all—class members … purchased … from a third party retailer" and "there [was] no master list … to provide common proof"). Here, similarly, purchasers will need to individually attest, such that individualized issues predominate.

### C. Plaintiff Fails to Present a Viable Damages Model.

Plaintiff's Motion entirely ignores *Comcast*, which requires him to "establish" damages are "capable of measurement on a classwide basis." 569 U.S. at 34. A plaintiff's damages model must be ""consistent with its liability case.'" *Emerson*, 2022 WL 670131, at *3. Moreover, at the class certification stage, the Eighth Circuit requires the Court to "conduct[] a focused" Rule 702 "analysis which scrutinize[s] the reliability of the expert testimony." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011); *see also Emerson*, 2022 WL 670131, at *3

---

[25] Shortly after, the *Diesel* Court granted summary judgment because the plaintiff "received what she bargained for and cannot demonstrate ascertainable loss." 2024 WL 4263944, at *5, *10 (E.D. Mo. Sept. 23, 2024).

(denying class certification after striking an expert witness). Here, Plaintiff's damages model does not. Mr. Stockton's faulty analysis demonstrates that no price differential existed for a manual safety (Ex. 26, Tomlin, § VI) and Plaintiff's experts will be subject to Rule 702 challenges, which will mandate denial of class certification. *Emerson*, 2022 WL 670131, at *3. Further, Plaintiff's proposed "repair" methodology does not comport with his theory of liability because: (a) Plaintiff testified it does not repair the 3-Part Defect as the "two other factors … make it dangerous" (*supra* Facts § D.5) and (b) it does not eliminate the risk of an inadvertent discharge (*id.* § A.6). Thus, the proposed "repair" does not "restore the damaged [product] to good, sound condition" under Plaintiff's theory. *See Lupo v. Shelter Mutual Ins. Co.*, 70 S.W.3d 16, 22 (Mo. App. E.D. 2002).

## IV. THE PROPOSED CLASS IS NOT ASCERTAINABLE NOR SUPERIOR.

The Eighth Circuit "enforces through 'a rigorous analysis" the "ascertainability" requirement. *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017). "[I]t 'is elementary that … the class … must be … clearly ascertainable." *White*, 2018 WL 3748405, at *3, n.1 (quoting *Sandusky Wellness Ctr. v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016)). In *In re BPA*, the plaintiffs sought to certify Missouri purchasers of baby bottles and "present[ed] nothing that proves … retailers ha[d] the records to identify" them. 2011 WL 6740338, at *1, *8. The court rejected the proposal that a class member could "com[e] forward" and "identify[] himself" because it "does not prove a person is in the class." *Id.* at *8. And, in *Dumas v. Albers Med., Inc.*, (Mot. 44), the plaintiff sought to certify purchasers of "Lipitor that was sold or distributed by Albers." 2005 WL 2172030, at *6 (W.D. Mo. Sept. 7, 2005). Ascertainability was lacking because "[i]dentifying the members … d[id] not involve merely the burdensome task of looking this hrough files or databases …; no such records exist." *Id.* Likewise, in *St. Louis Heart Center, Inc. v. Vein Centers for Excellence, Inc.*, ascertainability was lacking because class members could only prove they were class members "through individual testimony." 2017 WL 2861878, at *4 (E.D. Mo. July 5, 2017).

The same result is compelled here. The class is not ascertainable as Plaintiff has not offered a way to identify class members, such as retail sales records. As Mr. Faulkner's experience illustrated, sales records may no longer exist and would not identify secondary sales. *See supra* Facts § C.3. Plaintiff's class notice expert proposed social media notice (*id.* § C.2), but that would necessitate individual testimony to ***confirm*** class membership, which prevents certification here.

Similarly, Plaintiff has not established superiority where he "simply seek[s] to consolidate ...claims with too many variables." *Johannessohn*, 9 F.4th at 986. In *BPA*, superiority was not met because the court had "major manageability concern[s]," including "how to determine who is in the class." 2011 WL 6740338, at *7-8. So too here. The same concerns about individual issues arise here because there are "too many variables" to be manageable. *Supra* Facts §§ C.1-3.

## V.  THE PROPOSED CLASS CANNOT BE CERTIFIED UNDER RULE 23(C)(4).

Issue certification "cannot be used to evade the predominance and cohesiveness requirements." *In re NHL Players' Concussion Inj. Litig.*, 327 F.R.D. 245, 266-67 (D. Minn. 2018); *Henke*, 2014 WL 982777, at *22 (court "cannot manufacture predominance"). Plaintiff's 23(c)(4) argument (Mot. 45) repackages their predominance argument, which fails.

## CONCLUSION

For the foregoing reasons, this Court should deny the Motion.

Dated: March 31, 2025

Respectfully submitted,

*/s/ Cara Rose*
Cara Rose, Mo. Bar # 58992
**Franke, Shultz & Mullen, P.C.**
1919 E. Battlefield, Suite B
Springfield, Missouri 65804
417-863-0040
crose@fsmlawfirm.com

Robert L. Joyce (admitted *pro hac vice*)
B. Keith Gibson (admitted *pro hac vice*)
**Littleton Joyce Ughetta & Kelly LLP**
4 Manhattanville Road, Suite 202
Purchase, New York 10577
914-417-3400
robert.joyce@littletonjoyce.com
keith.gibson@littletonjoyce.com

Colleen Carey Gulliver (admitted *pro hac vice*)
Jason E. Kornmehl (admitted *pro hac vice*)
Connor D. Rowinski (admitted *pro hac vice*)
**DLA Piper LLP**
1251 Avenue of the Americas
New York, New York 10020
212-335-4500
colleen.gulliver@us.dlapiper.com
jason.kornmehl@us.dlapiper.com
connor.rowinski@us.dlapiper.com

*Counsel for Defendant Sig Sauer, Inc.*